UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
UNITED STATES OF AMERICA,                              :
                                                                              :
                        -against-                                   :
                                                                              :        MEMORANDUM & ORDER
ELGIN BRACK,                                                    :
                                                                              :        18-CR-684 (ENV)
                                                  Defendant.   :
                                                                              :
------------------------------------------------------------ x

VITALIANO, D.J.

On October 3, 2019, defendant Elgin Bráck filed an omnibus motion seeking wide-ranging pre-trial relief in connection with a nine-count indictment accusing him of the armed robbery of four convenience stores in Queens, Dkt. 85, which, on December 31, 2019, the Court granted in part, denied in part, and reserved decision on that portion of the motion seeking to suppress certain evidence recovered at the time of Brack's arrest. *See* Mem. & Order, Dkt. 122. Two weeks earlier, on December 18, 2019, the Court conducted a hearing on the suppression issues that had been carved out of the omnibus motion. Having considered the briefing of the parties, Dkts. 85, 103, 111, 119, 120, Brack's suppression motion is denied for the reasons stated below.

Prefatory Note

The indictment charges that, in the early morning hours of November 26, 2018, the Bracks targeted four convenience stores in Queens. Crim. Compl., Dkt. 1, at 1–7. In their crime spree, the indictment charges, the Bracks attempted to rob the first store, proceeded to rob the other three, and, during the attempted robbery, the store's clerk was shot in the head and hand.[1]

---

[1] Although Scott Brack has referred to Elgin Brack as his nephew, Elgin Brack claimed at the hearing that he is in fact Scott Brack's cousin. *See* Stein Affirm., Dkt. 85, at 2; Tr. 105. The

*Id.* Both Bracks were arrested in the Bronx in the evening of November 26, 2018. *Id.* at 9. Scott Brack has since pleaded guilty.

In this last portion of his omnibus motion, Elgin Brack seeks to suppress evidence recovered from his bag, found in the car in which he was riding at the time of his arrest. Stein Affirm. at 6. The physical evidence found in his bag includes his identification, a firearm, and clothing matching that worn by one of the perpetrators of the robberies.[2] *Id.* Brack argues that this evidence is the fruit of an illegal search and seizure because: (1) the seizure of the car, (2) his arrest and (3) the search of the car were unconstitutional. Def.'s Mem., Dkt. 85, at 16–24. The Court ordered and held and suppression hearing on December 18, 2019.

At the suppression hearing, the government called two witnesses: NYPD Detective Wesley Ryan and NYPD Lieutenant Kevin Smith, now retired from the force. The two officers credibly testified as to the events leading up to the seizure of the car in which the Bracks were riding, their subsequent arrest and the search conducted incident to it. Elgin Brack also testified at the hearing. The facts presented here reflect the Court's findings upon the preponderance of the credible evidence received on the suppression motion. The findings, of course, are solely for purposes of this motion.

Factual Findings

Hours after the early morning robberies of November 26, 2018 charged in the indictment, Detective Ryan, an investigator with 19 years of experience with NYPD, was assigned the case. Tr. 9. At 11:25 a.m., Detective Ryan's supervisor sent him surveillance images of a vehicle near

---

difference in ages suggests that "uncle" may be a familial appellation.

[2] The record is unclear as to whether Brack's cellphone was in his bag or on the seat of the car when it was discovered by law enforcement, *compare* Gov't Opp'n, Dkt. 103, at 15 *with* Stein Affirm. at 6, but that detail is inconsequential for the purposes of this motion.

2

two of the robbery locations. Tr. 9–12. Due to his experience building and repairing Toyotas—he attended a Toyota technical training school for college credit in 1993—and his background as a Toyota owner and car enthusiast, he was able to identify the vehicle as a Toyota Solara built between 1999 and 2003. Tr. 12–14. Although the image was in black and white, based on the contrast, he was able to identify it to be silver, grey or tan in color. Tr. 17–19.

Having approximated the make, model and color of the vehicle pictured in the surveillance material, Detective Ryan used a software program called Domain Awareness System (DAS) Lite to search through New York City's license plate reader (LPR) records. Tr. 14–15. LPRs are located at fixed and mobile positions throughout New York City, and when vehicles pass by, they take a picture of the vehicle's license plate number and record the time and location. Tr. 15. The DAS Lite program allows investigators to search LPR records for hits that meet certain criteria. Here, Detective Ryan searched for any hits including the key word "Solara" and limited it to the Borough of Queens around the time of the robberies. Tr. 15.

The search returned 18 hits. Gov't Ex. 1. Detective Ryan then further narrowed these results by focusing on vehicles that appeared more than once and matched the color he suspected the vehicle to be. Tr. at 19. He zeroed in on a 2002 Toyota Solara bearing a license plate ending in 8724 because it hit three times, which is more than any of the other vehicles; plus, it was grey in color. Tr. 20–21.

Using this data, Detective Ryan made a map depicting the time and place of the hits in relation to the time and place of the robberies. Gov't Ex. 16. One hit, recorded at 3:42 a.m., placed the car near the location of the first incident, a Duane Reade on 60-02 Roosevelt Avenue, only six minutes after it had occurred. *Id.* Although Detective Ryan could not provide a specific address for the location of the LPR hit, it is clear from the map that the hit was less than a mile

away from the Duane Reade. The other two hits, one at 4:31 a.m. and one at 4:32 a.m., placed the car heading east bound on Grand Central Parkway a little over ten minutes after the third incident had occurred at a Rite Aid located on 33-01 30th Ave. *Id.* Again, it is clear from the map that the hits are only a couple miles away from the Rite Aid. These hits also show the car heading in the direction of the location of the fourth incident, which occurred at 5:45 a.m. at a Rite Aid located on 115-10 Merrick Blvd. Tr. 22–24. After concluding his research, Detective Ryan flagged the suspect vehicle for his supervisor, who emailed this information to several other officers, including Lieutenant Smith. Tr. 24; Gov't. Ex. 10A.

Lieutenant Smith, who had been with NYPD for 25 years, was a commanding officer of the Sparta Task Force, a joint unit composed of NYPD and federal law enforcement officers. Among its duties, the Task Force investigates violent robberies of the type charged here. Tr. 43. Lieutenant Smith started his investigation in this case early on that morning before the fourth robbery had occurred. Tr. 44–45. Critical to the early stages of his investigation, he reviewed numerous surveillance videos and images from the robbery scenes. Tr. 45. The surveillance videos showed the perpetrator to be a young, African-American male wearing a green-and-black hooded sweatshirt, black gloves with white stripes, black pants with zippers on the pant legs and a pair of white sneakers. Gov't Exs. 5–6. Because of the hooded sweatshirt, though, that perpetrator's hair and part of his face are obscured in the videos. In one video, the perpetrator is seen walking across the street holding a cash register tray and then entering the passenger side of a silver-grey Toyota Solara with a yellow license plate. The vehicle had an air freshener hanging on the rearview mirror, which was visible in the video of the car.[3] Gov't Ex. 12A. The license

---

[3] Although Lieutenant Smith testified that the air freshener was reddish in color, Tr. 70, it is difficult to discern its color from the video aside from the fact that it is a light hue. On his cross-

plate number is not discernable from the video. Lieutenant Smith also testified that he viewed another surveillance video in the batch showing the same perpetrator inside a store where he displays a firearm and takes a cash register tray from the clerk. Tr. 51.

At 11:51 a.m., Lieutenant Smith's supervisor emailed him a summary of the suspect vehicle identified by Detective Ryan. Gov't Ex. 10. Lieutenant Smith's unit put out alerts on the car so that he would be notified if it was spotted. Tr. 55–56. After a call to 311, New York City's non-emergency help line, placed the car near Hughes Avenue, and a subsequent LPR hit placed the car coming into New York City over the George Washington Bridge, Lieutenant Smith sent a surveillance team to Hughes Avenue to see if it would show up. Tr. 56–57. The surveillance team found the vehicle there unoccupied around 8:00 p.m. Tr. 57.

By the time Lieutenant Smith arrived at the reported location of the car, it was dark, though there was lighting from street lights. Tr. 60, 76. Lieutenant Smith recognized the car as the same vehicle featured in the surveillance videos. Tr. 57. He was also informed by his surveillance team that the car had the same air freshener hanging from the rearview mirror as the car shown in the surveillance video. Tr. 58. Lieutenant Smith's unit remained in position until they saw three adults enter the car. Tr. 59.

As soon as the individuals began to pull away, Lieutenant Smith's unit blocked off the street, surrounded it, and removed the two front seat adults from the car at gunpoint. They were immediately placed in handcuffs. Tr. 59–61. Shortly thereafter, Brack was removed from the rear seat and, as soon as he was removed, Lieutenant Smith, as he testified, recognized him from the surveillance videos. Tr. 60. He did testify, though, that Brack was now wearing different

---

examination, Brack admitted that there was an air freshener in the vehicle in which he was seated and was seized at the time of his arrest and testified that it looked pink. Tr. 115.

5

clothes and had shoulder-length hair not seen in the video.[4] Tr. 60, 66. At that point, the only other individual in the car was a very young girl who had been seated next to Brack. Tr. 61. The arresting unit then transported everyone and the car back to an ATF office. Tr. 61–62.

Brack also testified to the circumstances of his arrest. He acknowledged that he was in the backseat of the 2002 Toyota Solara, and that officers surrounded the car and made the driver and passenger get out. Tr. 105–06. He admitted that he had a bag in the backseat. Tr. 117. But somewhat at odds with Lieutenant Smith's testimony, Brack testified that he was not immediately removed from the vehicle. Instead, he said that officers had identified him as a female and had let him stay in the vehicle for ten to fifteen minutes. Tr. 120–21. According to Brack, after this waiting period, officers allowed him to walk out of the vehicle on his own accord and did not search or handcuff him until they were about to leave. Tr. 120–21. He testified further that Lieutenant Smith was not present during his arrest. Tr. 110. Importantly, to the extent Brack's testimony diverges from Lieutenant Smith's testimony, the Court finds the difference, for the most part, immaterial, and any factual divergence that might be material, the Court finds Brack's testimony not credible.

Facts reciting to what happened in the immediate aftermath of Brack's arrest appear uncontested in the record. Specifically, once everyone had been transported back to the ATF office, ATF agents interviewed Scott Brack and "Person A," the individual who had been driving the car at the time of the arrest. Person A explained that he was not the owner of the car, but he had borrowed it with permission from his brother and was generally the only person to drive it for the past few months. Person A Tr. 5:7–27. Person A gave agents both oral and written

---

[4] Lieutenant Smith, to no one's surprise, also identified Brack in the courtroom in the course of the hearing. Tr. 61.

consent to search the car. Person A Tr. 28:1–44. ATF agents proceeded to search the car, including the contents of Brack's bag. Gov't Opp'n, Dkt. 103, Ex. F.

Brack also testified as to some of the events occurring after his arrest. After he had been handcuffed and placed in a vehicle for transport, he said he stuffed a bag of marijuana that had been on his person in the backseat.[5] Tr. 112. He was taken to the ATF office, where officers conducted a search of his person and recovered a wallet. Tr. 112.

Legal Standard

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "To safeguard Fourth Amendment rights, the Supreme Court created an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial . . . [including] both physical evidence and indirect products of unlawful searches . . . ." *United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015) (internal citation and quotation marks omitted). "[I]t is a cardinal principle" that warrantless searches "'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions,'" such as the inventory search exception. *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967)); *see also Colorado v. Bertine*, 479 U.S. 367, 371, 107 S. Ct.

---

[5] An odd litigation dance broke out after Brack admitted on the stand that he had possessed a bag of marijuana which he stuffed in the backseat of the vehicle transporting him to lock up. First, Brack asked if it was a crime and asserted his Fifth Amendment right against self-incrimination. Tr. 122–24. Of course, because Brack had already testified to these facts, his assertion of that right cannot erase what he had already said. *See Mitchell v. United States*, 526 U.S. 314, 321, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999). Notwithstanding, at the close of the hearing, the government moved to strike the entirety of Brack's testimony because he invoked his privilege against self-incrimination, but it did not explain the particular basis for its motion, Tr. 133, and has not pressed this point in its post-oral argument brief. Accordingly, its motion is denied and Brack's admission stands.

738, 93 L. Ed. 2d 739 (1987) ("[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment."). On a motion to suppress, once the defendant "establishes a basis for his motion, the burden rests upon the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004). Even in the event of a Fourth Amendment violation, however, suppression is not automatic; it is "our last resort, not our first impulse." *Bershchansky*, 788 F.3d at 112 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006)).

## Discussion

I. <u>Seizure of the Car</u>

Contrary to Brack's protestations, Def.'s Mem. at 16–18, as the government correctly argues, the car was properly seized under the plain view doctrine. Gov't Opp'n at 19. Law enforcement may seize evidence found in plain view without a warrant if three conditions are met: (1) "if police are lawfully in a position from which they view an object"; (2) "if its incriminating character is immediately apparent" and (3) "if the officers have a lawful right of access to the object." *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d. Cir. 1999) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993)).

The seizure here satisfies all three conditions. The first and third conditions are easily met. As Lieutenant Smith testified at the hearing, officers identified the car parked in plain view on a public street, Hughes Avenue in the Bronx, and seized it right as it started to pull away. Tr. 57–59. It is uncontroversial that officers have a lawful right to observe and access vehicles situated on a public street. *See United States v. Hill*, No. 3:05-CR-67 (MRK), 2005 WL 3113206, at *13 (D. Conn. Nov. 18, 2005) (warrantless seizure of truck proper under the plain view doctrine when truck was parked on a public street).

8

The second condition is also met. At the hearing, Detective Ryan explained how he used surveillance images and LPR records to home in on a grey 2002 Toyota Solara with a license plate ending in 8724. He also created a map showing that the LPR hits placed the car near the first and third incidents just minutes after they had occurred. And Lieutenant Smith had viewed surveillance video of the perpetrator getting into a silver-grey car consistent with the description of the car identified by Detective Ryan. When Lieutenant Smith arrived on the scene, he recognized the car as the same one he had viewed in the surveillance videos, and he was informed by officers in his unit that it had the same air freshener hanging from the rearview mirror. Tr. 57–58.

Under the totality of these circumstances, the incriminating character of the Toyota Solara was immediately apparent. The appearance of the car parked on Hughes Avenue was entirely consistent with the appearance of the car shown by surveillance videos to have been involved in the robberies. And further, its license plate number matched the license plate of a vehicle that had been in the vicinity of the robberies just minutes after they had occurred. This provided more than enough for a "common sense, practical" judgment that there was "a fair probability" this was the car from the surveillance videos. *Illinois v. Gates*, 462 U.S. 213, 214, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *see also Hill*, 2005 WL 3113206, at *13 (officers had "more than probable cause to believe that the truck was an instrumentality of a crime, as well as evidence of a crime" because "eyewitnesses . . . told police that [defendant] had used the truck to flee the scene of the shooting.").[6]

Brack's arguments on this point are meritless. He first argues that, because the

---

[6] The government also argues that the car was properly seized under the automobile exception. Gov't Opp'n at 19–20. Because the Court has found ample support under the plain view doctrine, it need not analyze this component of the government's argument.

9

surveillance videos show "a generic looking, commonplace car" and because "the license plate does not appear," there is no way to connect the surveillance video to the LPR information. Def.'s Mem. at 17. This simply ignores the detailed testimony of Detective Ryan describing how he made that very connection. Brack also takes issue with Detective Ryan's method, pointing out that the hit report included other tan, grey or silver vehicles that appear more than once. Tr. 30–31. But Detective Ryan did not stop with the raw data from the hit report. He also made a map showing that the hits on the 2002 Toyota Solara were entirely consistent with a car that had been present at the first and third incidents and was traveling to be on time for the fourth.

Finally, Brack makes much about the color of the air freshener shown in the surveillance video, arguing that it is impossible to tell whether it is red as claimed by Lieutenant Smith. Tr. 70–71. This argument misses the bigger picture. It is indeed difficult to tell from the surveillance video whether the air freshener is red. But there is no dispute that both the car in the surveillance video and the car on Hughes Avenue *had* an air freshener, and more broadly, there is no dispute that the car in the surveillance video and the car seized had the same general appearance in terms of model and color. These facts, coupled with the license plate reader analyses performed by Detective Ryan, made the incriminating character of the car immediately apparent to officers in Lieutenant Smith's surveillance unit and gave them authority to seize the car under the plain view doctrine. Accordingly, Brack's motion to suppress on this ground is denied.

II.  Brack's Arrest

Brack also challenges his arrest, claiming that law enforcement did not have probable cause to arrest him until "further investigation took place." Def.'s Post-Oral Arg. Mem., Dkt. 119, at 4–5. He primarily attacks Lieutenant Smith's assertion that he arrested Brack after

10

recognizing his face from the surveillance videos and still photographs of the incidents that he said he had closely scrutinized, characterizing this testimony as an after-the-fact justification for an unlawful arrest. *Id.* at 10. Brack points out that the perpetrator's hair and part of his face are covered in the surveillance videos, which, he contends makes identification on that basis unreliable. Beyond that, Brack presses that, at the time of his arrest, he was wearing clothing different from that depicted in any of the videos and had his shoulder-length hair uncovered. *Id.* at 6–7. Brack also notes the absence of Lieutenant Smith's version of events from the criminal complaint and Lieutenant Smith's admission that he did not memorialize his account in writing. *Id.* at 8–9. Finally, he contends that the fact that all three adults were detained "suggest[s] that the agents did not know who, if any, of the occupants of the car may have been responsible for the robberies and attempted robbery." *Id.* at 10. All of these arguments fall flat.

"Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge of reasonable trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)). While a mere suspicion of criminal activity is not enough, probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).

The testimony of Lieutenant Smith, by far more than a preponderance, establishes facts that plainly supported probable cause for Brack's arrest. As an initial matter, Brack was riding in a car that Lieutenant Smith and his unit had determined was used in a series of violent robberies earlier that day. But more critically, the Court finds credible Lieutenant Smith's testimony that

11

he closely scrutinized the surveillance videos of the perpetrator and recognized Brack's face when he was pulled from the car. In view of these facts, Brack's arguments to the contrary, even if they might create some doubt as to his guilt, cannot dispel the "probability or substantial chance of [his] criminal activity" that justified his arrest.[7]

But even if the arrest were unlawful, it would not matter for the purposes of Brack's suppression motion. As the government points out in its post-oral argument papers, there is no but-for causation between Brack's arrest and the discovery of the evidence he seeks to suppress. Gov't Post-Oral Arg. Mem., Dkt. 120, at 4. Brack moves to suppress only the evidence recovered from the car, not the evidence recovered from his person at the ATF office. Def.'s Notice of Mot., Dkt. 85, at 1. Simply put, the evidence recovered from the car is not a fruit from his arrest. Even if Brack had not been arrested, law enforcement would have seized and searched the car, including his bag. Therefore, the legality of his arrest is irrelevant for the purposes of the instant motion. *See United States v. Pabon*, 871 F.3d 164, 179 (2d Cir. 2017) ("The Supreme Court has long held 'but-for' causation to be an irreducible baseline requirement before a court may even begin to consider whether the remedy of suppression is justified on the specific facts of a case."); *see also United States v. Ocampo*, 492 F. Supp. 1211, 1233 n.13 (E.D.N.Y. 1980), *aff'd in rel. part*, 650 F.2d 421 (2d Cir. 1981) (finding that unlawful arrest of defendant did not compel suppression of bags in vehicle because the stop and search of the vehicle was proper). As a result, this branch of Brack's motion is also denied.

---

[7] The Court also finds unpersuasive Brack's argument at the suppression hearing that the search and recovery of his wallet at the ATF office after his arrest shows that law enforcement did not believe him to be the perpetrator. Tr. 129–31. Simply because law enforcement did not strip Brack of all his possessions at the time of the arrest does not mean they did not pat him for weapons as a precaution for officer safety. And because the Court credits Lieutenant Smith's testimony, it finds Brack's claim that police "didn't touch me at all" incredible. Tr. 111.

III.   Search of the Car

Finally, Brack challenges the warrantless search of the car and his bag inside of it. At the threshold, the government contends that Brack does not have standing to contest the search of the car because he has "not establish[ed] that he had any possessory interest in the vehicle searched . . . ." Gov't Opp'n at 22. This argument is easily dispensed with. Brack testified and submitted an affidavit claiming ownership of the bag at issue in this motion. *See* Tr. 117; Def.'s Mem., Ex. D ("Next to me on the seat and/or floor or [sic] was my backpack . . . ."). Accordingly, Brack has standing to challenge the search because he has a privacy interest in his bag. *See United States v. Perea*, 986 F.2d 633, 640–41 (2d Cir. 1993).

Moving to the heart of the dispute then, the government justifies the warrantless search of the car and its contents under two theories. First, it argues that Person A consented to the search. Second, it argues that the evidence would have inevitably been discovered by an inventory search. The Court finds both bases for search advanced by the government to be valid.

*A.   Consent*

To justify a search based on consent, "the Government must show by a preponderance of the evidence that the party consenting to the search had the requisite authority to consent to the full scope of the search conducted." *United States v. Sparks*, 287 Fed. App'x 918, 920 (2d. Cir. 2008). The requisite authority can be actual or apparent. *Id.* A claim of apparent authority will lie "if, at the time the consent was given, the officer receiving the consent had facts available to him that would 'warrant a man of reasonable caution in the belief that [Person A] had authority over' the bag." *Id.* (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990)).

Brack argues didactically that the bag was his, that it was for him alone to consent to its search and that "[i]t is axiomatic that another person does not have the authority to consent to a

13

search of [his] property." Def's Post-Oral Arg. Mem. at 13. But, in advancing his argument, Brack gives no consideration to whether Person A had apparent authority. Here, the government has submitted evidence showing that Person A did in fact have apparent authority. In a post-arrest interview, Person A explained that he had borrowed the car from his brother last year and was generally the only one who drove it "until the other day I leant it out." Person A Tr. 5:7–27. Later in the interview, after asking whether he would get the car back, Person A said twice, "You can search whatever you want." Person A Tr. 28:20–26. Significantly, confirming oral consent to search, Person A also signed a consent form for the search, which states that Person A "hereby authorize[s] agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives to conduct a complete search of" the car. Gov't Opp'n, Ex. D.

In these circumstances, officers had more than sufficient reason to believe that Person A had authority to consent to a search of the items in his car. This case is similar to *Sparks*, in which defendant, a passenger in a car, moved to suppress evidence found in his bag after the driver gave officers consent to search it. 287 Fed. App'x at 919–20. Advancing an argument virtually identical to Brack's argument here, Sparks unsuccessfully sought to suppress the fruits of the search to which the driver had consented, but the Second Circuit affirmed the district court's finding of apparent authority. The Circuit held that "it was reasonable for the arresting officer to believe that Martin, who was driving and produced rental papers for the car, had such authority." *Id.* The court noted that this reasonableness "could have been dispelled" if someone indicated that the bag belonged to defendant. *Id.* But no one gave such an indication, "nor did the evidence suggesting that [defendant] owned a separate suitcase on the back seat serve to indicate that he also owned the bag." *Id.* Although Person A told agents that Brack "always walks around with a bag," there is no testimony or record evidence suggesting that ATF agents

14

had any reason to know which of the bags in the car, if any, belonged to Brack when they decided to search it. The agents therefore had the requisite consent to search Brack's bag.

B.   *Inventory Search*

In any event, even if the agents did not have the requisite consent, the Court also finds that the evidence from Brack's bag would inevitably have been discovered by an inventory search of the car. Under the inevitable discovery doctrine, "evidence that was illegally obtained will not be suppressed 'if the government can prove that the evidence would have been obtained inevitably' even if there had been no statutory or constitutional violation." *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002) (quoting *United States v. Roberts*, 852 F.2d 671, 675–76 (2d Cir. 1988)). To invoke this doctrine, the government must prove that three requirements are met: (1) "the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified"; (2) "when the police in the police agency in question conducted inventory searches, they did so pursuant to 'established' or 'standardized' procedures"; and (3) "those inventory procedures would have 'inevitably' led to the 'discovery' of the challenged evidence." *Id.* (internal citations omitted).

The government demonstrated abundantly that all three requirements are met. First, as discussed at length above, officers properly seized the car and brought it to an ATF office. Second, the government has produced ATF's written vehicle inventory procedures, Gov't Opp'n at 23 n.5, Ex. E, and Lieutenant Smith testified that Sparta inventories cars as part of its regular practice. Tr. 61. Third, ATF's vehicle inventory procedures would have inevitably led to discovery of the backpack and its contents because the policy directs agents to search the entire vehicle, including "all compartments," and "[a]ll containers whether or not locked or otherwise sealed . . . ." Gov't Opp'n, Ex. E.

Brack interposes in his post-oral argument brief that "there is no evidence" to support the

15

finding that discovery would have been inevitable because Lieutenant Smith did not "establish that he knew what the policies of ATF and NYPD were, which policy was followed, and what was actually done as the inventory process of the car[.]" Def.'s Post-Oral Arg. Mem. at 12. To support his argument, he cites *United States v. Gorski*, in which the Second Circuit held that the statement "[a]n inventory was done later at my office" was, without more, insufficient to justify a finding that an inventory search would have inevitably led to discovery. 852 F.2d 692, 696 (2d Cir. 1988).

Even though Lieutenant Smith's testimony on the inventory search was indeed brief, the facts here are distinguishable from *Gorski* in an important respect. Importantly, Lieutenant Smith did not testify simply that an inventory search had been completed in this case; rather, he testified that his unit does inventory searches "as a matter of its regular practice." Tr. 62. This was precisely what was missing in *Gorski*. 852 F.2d at 696 (remanding "for an evidentiary hearing on the factual issue of whether an inventory search of the bag was a routine procedure incident to booking and detention of a suspect at the FBI office in question."). Furthermore, Brack ignores, as he must, that also received in evidence in the government's proffer was ATF's written policy setting forth its standardized procedure for the conduct of an inventory search. This showing is sufficient to establish that inventory searches are routine at the ATF office where the search of Person A's car was conducted.

On a final note, Brack challenges the search, if deemed as an inventory search, as improper in this particular instance because ATF agents "did not prepare contemporaneous invoices for the contents of the car which detail[] the facts of each vouchered item." Def.'s Mem. at 24. The government, while maintaining that the search was a proper inventory search, does not dispute that there are no contemporaneous invoices. Gov't Opp'n at 23 n.5. To Brack's

16

point, the policy submitted by the government does direct agents to "prepare an inventory as soon as possible using an ATF F 3400.23," and that may not have been done here.[8] Gov't Opp'n, Ex. E. In any event, because the Court has found that the evidence uncovered in the initial search would have inevitably been discovered by a valid inventory search, it need not decide the significance of any potential deviation from ATF's written policy in this instance. *See Mendez*, 315 F.3d at 139 ("We doubt that the police officers were conducting a valid inventory search themselves, but we do not reach this question. Like the district court, we conclude that the evidence would inevitably have been discovered in a valid inventory search."). Accordingly, because ATF agents had consent to search Brack's bag and because the contents of the bag would inevitably have been discovered by a valid inventory search, Brack's motion to suppress fails on this ground as well.

IV.   Cross-Examination of Lieutenant Smith

In advance of the suppression hearing, the government produced to defendant certain materials relating to the service performance of Lieutenant Smith and Detective Ryan pursuant to its obligations under *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). Gov't Ltr., Dkt. 107, at 1. It moved, however, to preclude Brack's counsel from cross-examining the witnesses about these materials. *Id.* In his reply, Brack opposed the government's motion as to one matter, seeking to cross-examine Lieutenant Smith about a substantiated Civilian Complaint Review Board ("CCRB") investigation from 1996. Def.'s

---

[8] The government has submitted a "Report of Investigation" that lists the recovered items and states that an inventory search was conducted, but the report is not on an "ATF F 3400.23" and was prepared on December 27, 2018, over a month after the seizure. Gov't Opp'n, Ex. F. Further, purely for the sake of completeness, though there may have been deviation from the standard ATF record-keeping procedures, there is no suggestion in the record that anything substantive reflected in those records was inaccurate.

17

Reply at 2. Brack argued that Lieutenant Smith should be subject to cross-examination on this matter because the CCRB found that he threatened a civilian by claiming he would not turn in a traffic accident report, and then lied to investigators when asked why the report was missing. *Id.* The Court, however, granted the government's motion to preclude cross-examination. Tr. 7. This writing is in further explanation of the Court's determination.

In *United States v. Cedeño*, the Second Circuit articulated seven factors to determine whether cross-examination about a prior incident in which a court has found a witness's testimony not credible should be permitted: (1) "whether the prior judicial finding addressed the witness's veracity in that specific case or generally"; (2) "whether the two sets of testimony involved similar subject matter"; (3) "whether the lie was under oath in a judicial proceeding or was made in a less formal context"; (4) "whether the lie was about a matter that was significant"; (5) "how much time had elapsed since the lie was told and whether there had been any intervening credibility determination regarding the witness"; (6) "the apparent motive for the lie and whether a similar motive existed in the current proceeding"; and (7) "whether the witness offered an explanation for the lie and, if so, whether the explanation was plausible." 644 F.3d 79, 82–83 (2d Cir. 2011).[9]

Application of the *Cedeño* framework supported the Court's determination because it counseled against permitting Brack to cross-examine Lieutenant Smith regarding the more than 23-year-old CCRB finding. The first and second factors weighed against permitting cross-examination because CCRB investigators did not find Lieutenant Smith to be "not credible generally," and the subject-matter of the 1996 incident had nothing to do with the subject matter

---

[9] Although the CCRB is not a court, other courts have used the *Cedeño* factors to decide whether cross-examination on CCRB findings should be permitted. *See United States v. Barret*, No. 10-CR-809 (S-4) (KAM), 2012 WL 194992, at *3 (E.D.N.Y. Jan. 23, 2012).

of the hearing.

The third factor was neutral. While Lieutenant Smith's statements to investigators were not made under oath and were made in a context less formal than judicial proceedings, as noted earlier, *see* note 9, *supra*, courts have found that CCRB investigations are "conducted under the auspices of an official process" and therefore impose a duty to respond truthfully. The fourth factor did weigh in favor of permitting cross-examination because Lieutenant Smith's statements involved a civilian complaint and therefore related to a matter "involving the public's trust of law enforcement officials." *See United States v. Barret*, No. 10-CR-809 (S-4) (KAM), 2012 WL 194992, at *3 (E.D.N.Y. Jan. 23, 2012).

But, that closed out Brack's side of the ledger. The fifth and sixth factors both weighed against permitting the latitude on cross-examination Brack sought, and the seventh was inapplicable. Most significantly, in recapitulation, over 20 years have passed since the CCRB incident, so its probative value has been virtually extinguished. *See, e.g., United States v. Calderon-Urbina*, 756 F. Supp. 2d 566, 568 (S.D.N.Y. 2010) ("[B]ecause the Petit Larceny Arrest occurred twenty-one years ago, the Court f[ound] that it is too remote in time to be probative in this case."). Further, Lieutenant Smith's motive to lie in an investigation to protect his personal interests was far afield from his motive to lie at a hearing about someone else's arrest. Finally, there was no indication as to whether Lieutenant Smith offered any explanation for the statements the CCRB found untruthful. On balance then, Brack's counsel, the Court determined, was not entitled to cross-examine Lieutenant Smith about this matter. Permission to do so was denied at the suppression hearing, as it will be at trial.

## Conclusion

For the foregoing reasons, Brack's motion to suppress physical evidence recovered from the vehicle he was in on November 26, 2018 is denied.

19

So Ordered.

Dated:  Brooklyn, New York
        January 28, 2019                                    s/ Eric N. Vitaliano
                                                      _____
                                                            ERIC N. VITALIANO
                                                         United States District Judge

20