```
1    EASTERN DISTRICT OF NEW YORK
     ------------------------------x
2    UNITED STATES OF AMERICA          18 CR 684(ENV)

3            versus                    United States Courthouse
                                       Brooklyn, New York
4    ELGIN BRACK and SCOTT BRACK,      April 26, 2019
              Defendants.              10:00 AM
5    ------------------------------x

6

7        TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
              BEFORE THE HONORABLE ERIC VITALIANO
8                 UNITED STATES DISTRICT JUDGE

9                        APPEARANCES

10
     For the Government:       UNITED STATES ATTORNEY'S OFFICE
11                             Eastern District of New York
                               271 Cadman Plaza East
12                             Brooklyn, New York 11201
                               BY:  PHILIP SELDEN, ESQ.
13                             Assistant United States Attorney

14   For Elgin Brack:          JOEL STEIN, ESQ.
                               30 Wall Street, 8th Floor
15                             New York, New York 10005

16   For Scott Brack:          STEVE ZISSOU & ASSOCIATES
                               42-40 Bell Blvd, Suite 302
17                             Bayside, New York 11361
                               BY:  STEVEN ZISSOU, ESQ.
18

19

20

21

22   Court Reporter:           LISA SCHMID, CCR, RMR
                               Phone:  718-613-2644
23                             Fax:    718-613-2379
                               Email:  LisaSchmidCCR.RMR@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

2

1          THE CLERK:  The first case on the calendar is USA

2     versus Elgin Brack and Scott Brack, Case Number 18 CR 684, on

3     for a status conference.

4          Would the attorneys please note their appearance,

5     beginning with Government counsel?

6          MR. SELDEN:  Good morning, Your Honor.  On behalf of

7     the United States, Assistant United States Attorney Phil

8     Selden.  Good morning.

9          THE COURT:  Good morning, Mr. Selden.

10          MR. STEIN:  Good morning, Your Honor.  Joel Stein

11     for Elgin Brack.

12          THE COURT:  Good morning, Mr. Stein.

13          MR. ZISSOU:  Steve Zissou respectfully appears for

14     Scott Brack.  Good morning, Your Honor, Judge Vitaliano.

15          THE COURT:  Good morning, Mr. Zissou, as well, and

16     both Bracks.

17          THE CLERK:  Counsel for both sides are present,

18     including the defendants.

19          THE COURT:  Okay, Mr. Selden.  Please catch us up.

20          MR. SELDEN:  Absolutely.  Thank you, Your Honor.

21          Your Honor, to date, the Government has provided

22     eight discovery productions to defendants Elgin Brack and

23     Scott Brack.  Included in those discovery productions are

24     videos, ROIs, as well as advanced 3500 and/or *Jencks* material.

25          In addition, the Government has offered a reverse

1    proffer to Mr. Elgin Brack, which he has declined, as well as

2    a request for both counsel to alert the Government as to

3    whether or not their clients are interested in possibly

4    resolving the matter short of trial.

5            As we stand here today, the Government anticipates

6    providing an additional discovery production today, including

7    all search warrants unsealed in this case as of yesterday,

8    jail calls and cell site analysis.

9            Thank you, Your Honor.

10           THE COURT:  Thank you, Mr. Selden.

11           MR. ZISSOU:  You're first, Joel.

12           MR. STEIN:  Judge, there was one outstanding

13    discovery -- well, actually, it was two outstanding discovery

14    requests we made.  One is -- I assume from Mr. Selden's

15    statements to the Court that the results of a DNA comparison

16    are not yet in from the Office of the Medical Examiners.

17           THE COURT:  Is Mr. Stein's assumption correct?

18           MR. SELDEN:  That is correct.  And as previously

19    been provided to Mr. Stein on multiple occasions, as soon as

20    those results are available, including Government counsel's

21    attempt this morning to call OCME to find out about those

22    results, we will email those results to both counsel.

23           MR. STEIN:  Judge, the other outstanding discovery

24    matter which arose in the last day or two -- although I think

25    Mr. Zissou may carry the ball on this -- is at some point down

1    the road, we anticipate filing motions, various motions, one

2    of which would be a motion to suppress based on a car stop

3    by -- I don't know if they're both federal officers and New

4    York City officers, but we made a request yesterday for, among

5    other surveillance, dash cams, and body cameras.

6            And the Government's response, which to me -- to

7    us -- avoided the point, is that the Government has given us

8    all of the information that is within their custody,

9    possession and control, which parrots the language in Rule 16,

10   but the point is whether or not there were cameras which would

11   be relevant certainly to a motion to suppress that we

12   anticipate making, based on a car stop.  So, we need to know

13   whether or not there were cameras.

14           MR. ZISSOU:  And we're happy to subpoena them

15   ourselves, Judge, but the somewhat of a nonresponse answer,

16   they have turned over everything in their control, that begs

17   the question whether or not they exist.

18           We can litigate whether or not the Government is

19   responsible for obtaining them because in our view, this is a

20   joint federal and state investigation, but be that as it may,

21   if they exist, let us know.  We'll issue subpoenas or ask the

22   Court to so order them and we can move along.  It's not

23   particularly complicated.

24           I have some other issues, but if Your Honor wants to

25   let Mr. Selden respond to that --

1            THE COURT:  Yes.  And I'll preview the response:  As

2    far as I'm concerned, if there are -- to the extent that any

3    law enforcement agency has been involved in connection with

4    the prosecution of the case, then any and all evidentiary

5    materials in their possession, responsibility of the United

6    States's Attorney's Office to find out if they exist, and if

7    they exist, to provide discovery as required under Rule 16,

8    *Giglio* or some other discovery device.

9            You know, having just concluded a trial where

10   evidence trickled in -- and that's a polite way of referencing

11   it -- I would encourage the assistant if he doesn't know

12   already to find out and get a statement that the camera

13   surveillance, videotapes or whatever you want to call them,

14   either they exist or they do not exist.  And I know the

15   problem of getting a definitive answer from the agency, and

16   particularly, NYPD, but that's what you're directed to do, Mr.

17   Selden, unless you already know.

18           MR. SELDEN:  Your Honor, I thank you so much.

19           With regards to the defense counsel's inquiry,

20   unfortunately, the way in which the inquiry was characterized

21   was not just about the traffic stop.  It was as to all

22   surveillance cameras.  And so as the Court is well aware, we

23   want to make sure that we're possibly answering accurately.

24           This request was made yesterday.  To date, we have

25   eight discovery productions made to the defense.  So if they'd

1  like to go through the prior productions and concerns about

2  Rule 16, we'd be happy to do that.

3          But for that one particular inquiry, it's our

4  understanding that there were not dash cameras during the

5  traffic stop.  It's also our understanding that body camera

6  footage was not utilized during the traffic stop.

7          THE COURT:  So the record is clear, you've made the

8  inquiry and you've gotten a flat response --

9          MR. SELDEN:  Yes.

10          THE COURT:  -- from the NYPD that it doesn't exist?

11          MR. SELDEN:  And Your Honor, with regards to the

12  actual followup, the reason why Government counsel is making

13  this representation now -- and will follow up in writing -- is

14  because given the tone and the correspondence recently from

15  defense counsel, we are going to be moving forward in writing

16  with answers to their questions, since we have verification

17  from officers, both agents involved.

18          And so as it relates to surveillance footage,

19  though, which is a separate inquiry and a separate request,

20  body camera footage can be opined one way or the other:  Just

21  for that traffic stop or for each one of the four robberies

22  that the defendants are alleged to have been involved in.

23          As the Court is well aware, this was a case that

24  involved a shooting, a shooting where a victim was shot,

25  losing his thumb and -- the head.  Following that shooting,

1   there were three subsequent robberies.  And so in any one of

2   those instances, officers turned on their body cameras.

3   That's something that the Government wants to determine

4   absolutely as soon as possible.

5            There is no body camera footage.  We didn't want to

6   immediately rush back and say, yes, there is or no, there is

7   not.  We made that request immediately upon the request from

8   Mr. Stein as of yesterday.  I spoke with one of the case

9   detectives on the phone, and we're going to get back to them

10  in writing.

11           THE COURT:  Well, that is good, and I just want to

12  underscore that if there are multiple detectives involved in

13  this matter, there should be multiple inquiries.

14           MR. SELDEN:  Yes.  Absolutely, Your Honor.

15           MR. STEIN:  ATF, as well as detectives.

16           THE COURT:  I don't know if they have --

17           MR. STEIN:  Neither do I.  That's why we asked.

18           THE COURT:  I don't think they do, but if they do,

19  obviously of them, as well.

20           MR. ZISSOU:  Judge, I beg your indulgence.  The last

21  time I sent an email, I'm fairly certain I wrote it and sent

22  it.  The communications were in writing.  All he's got to do

23  is respond, "I don't know.  I'll check for you," so we don't

24  go through this process.

25           THE COURT:  I thought the comment that Mr. Selden --

1    I understood the comment to be made is it's not something that

2    you didn't do.  It's something that he may not have done.  He

3    may not have put it all in writing.  He said he may have

4    communicated to counsel, but he now has indicated that his

5    communications will all be in writing.  Whether that writing

6    is the form of paper and pen or whether that's the form of

7    electronic communication by email, it will be in writing.

8          MR. ZISSOU:  I will follow the Judge's suggestion in

9    that matter.

10         THE COURT:  This way, in other words, we will have a

11   record of it.

12         MR. ZISSOU:  That's quite all right.

13         THE COURT:  Okay?

14         MR. ZISSOU:  Judge, so the other -- there's one

15   other thing if I could just --

16         THE COURT:  Yes?

17         MR. ZISSOU:  -- two other things, actually.

18         But Mister -- we have been concerned also about

19   search warrants and affidavits in support of search warrants.

20   I heard -- and we -- I think we've made that request before,

21   at least Mr. Stein has.

22         I heard Mr. Selden to say or I heard the attorney

23   for the Government to say that he is disclosing search warrant

24   affidavits that have been unsealed, and so I would simply ask

25   the Court to inquire of the Government whether or not there

```
 1   are still sealed search warrants which he has not made a

 2   request to unseal, because we absolutely need those unless

 3   there's some protective order.

 4             THE COURT:  Okay.  I got the point.  I think Mr.

 5   Selden gets the point, as well.

 6             If not, you can interpret your statement as being

 7   that all that exists now have been unsealed or there's a

 8   certain portion of them have been unsealed, but which is it?

 9   All of them have been unsealed?

10             MR. SELDEN:  All of the search warrants have been

11   unsealed.

12             MR. ZISSOU:  Very well.  Thank you.

13             And Judge, the last thing that I have is something

14   that appears to be an ongoing problem at the Metropolitan

15   Detention Center.

16             There is, as the attorney for the Government has

17   pointed out, a voluminous amount of material, and it's not

18   just voluminous, but because of the various proprietary

19   software that is required to run some of these videos are

20   different for each of the cameras that were used, if you will,

21   it takes a long time to go through.  You've sort of got to

22   download it.  You've got to copy.  You've got to put it on a

23   different medium.  You've got to download some of the software

24   from the internet.  It converts them.  It takes a while to go

25   through.
```

```
 1            But as I understand it, neither Scott Brack nor

 2   Elgin Brack has gotten a single minute of library time in the

 3   five months that they have been in jail, and that's despite

 4   the fact that the attorney for the Government, quite

 5   graciously, sent all the discovery material in separate

 6   packages to each defendant.  They simply have not gotten any

 7   library time, and it's a problem that is just simply not going

 8   to go away.  Why the Government hasn't been able to ensure

 9   that not only they receive it but they get to view it is a

10   mystery to me.

11            I've made some suggestions.  Since then, Mr. Stein

12   and I have made some suggestions.  One of them is, let us get

13   a computer.  I've done this in a different case in front of

14   Senior Judge Johnson.  Send it to the Government from the

15   market, from -- directly from the producer.  They load it with

16   all the discovery material and whatever software it needs.

17   They send it directly to the MDC.  The clients have it

18   available to them so they can view, as opposed to what was

19   going on.

20            MR. STEIN:  In their unit.

21            MR. ZISSOU:  In their unit.

22            MR. STEIN:  Can I just -- part of the problem,

23   Judge, is that the hard drives that the Government previously

24   provided are in the law library and from what I understand,

25   they go to law library once a week.  The fact that they have
```

1    separations complicates when they can go to the law library.

2              In addition, as I've told Mr. Selden probably more

3    than several times, I think there are at least three different

4    passwords that he's provided me to give to my client to open

5    the discovery when he is able to get into the law library.

6    None of them have been able to work.

7              I'm accepting what my client has told me.  I don't

8    go to the law library with him, but the passwords have not

9    worked, so he hasn't been able to access the discovery or has

10   had difficult doing it.  I mean, I have shared some of it with

11   him when I go there and Mr. Frisch, before me, I'm sure did so

12   also, but it's a problem on an ongoing basis.

13             THE COURT:  You concur with Mr. Zissou's proposed --

14   some of the computer suggestions?

15             MR. STEIN:  Yes.

16             THE COURT:  Mr. Selden, why doesn't that work?

17             MR. SELDEN:  Your Honor, with regards to this case,

18   so that the record is clear, the Government has put Mr. Zissou

19   on emails with Nicole McFarland at MDC Brooklyn.  We have

20   suggested that Mr. Zissou reach out to Nicole McFarland, who

21   is the senior staff attorney responsible over there for

22   coordinating discovery.

23             Mr. Zissou has declined.  He does not wish to reach

24   out to Nicole McFarland, but instead, has asked the

25   Government -- which we have already done -- to reach out to

```
 1    her.  We're concerned that --

 2              THE COURT:  Do you -- I need a simple yes or no.

 3    What they have told me about the inability of the Bracks to

 4    get to the library, is that true or not?

 5              MR. SELDEN:  Your Honor, my understanding from

 6    counsel is that that is the case.  I've not heard that from

 7    Ms. McFarland or anyone else at MDC Brooklyn.

 8              THE COURT:  So here's the question.  Mr. Zissou has

 9    offered a solution.  Do I have to order it or is the MDC

10    willing to accommodate it?

11              MR. SELDEN:  Your Honor, I can't speak to the MDC's

12    position.

13              THE COURT:  Submit an order.

14              MR. ZISSOU:  Very well, Judge.

15              MR. SELDEN:  If I may, Your Honor, just address the

16    concern that the Government has with regards to, for example,

17    a computer going back to the actual cell block.

18              There are sensitive matters in this case.  There is

19    included in those matters medical records that have been

20    turned over to the defense.  There's a protective order in

21    place in this case.  There's video of multiple individuals

22    either being robbed or a shooting of an individual.  These

23    videos haven't been blacked out.

24              And in part, the reason why the Government sought to

25    have --
```

```
 1              THE COURT:  Could they see those if they went to the
 2   library?
 3              MR. SELDEN:  Your Honor, it's my understanding that
 4   when a defendant goes to the library that they're being
 5   supervised, and that they have access to a computer, but that
 6   other potential inmates don't have access to that computer
 7   while they're looking through their discovery.  That's the
 8   point.
 9              If we could figure out a situation where, for
10   example, as Mr. Zissou suggested, getting a computer and
11   having them be supervised -- the Government's absolutely not
12   opposed to that.
13              THE COURT:  Why did it work when Judge Johnson
14   directed it?
15              MR. SELDEN:  Your Honor, I would inquire through the
16   Court whether or not that was a national security matter that
17   Mr. Zissou is making reference to.
18              MR. ZISSOU:  It was a classified case and he had
19   access to the computer, all of the nonclassified discovery
20   material that was contained on the computer, and he had it
21   with him at all times.
22              Indeed, I have the computer back now because the
23   stipulation was when the case was over, he'd have to return
24   the computer to me and I would dispose of the material in the
25   ordinary course.
```

```
 1              I won't even send that computer.  We'll get a brand
 2    new one, straight from the manufacturer, so there's no concern
 3    that there is anything hidden in it.  They're do all the
 4    loading.  They'll do all the shipping.  It couldn't be cleaner
 5    than that.  It's the simplest way to handle it.
 6              THE COURT:  If there are things that need to be
 7    redacted, you and counsel can work on that, as well.
 8              MR. STEIN:  Judge -- Judge, I have a question.
 9              MR. SELDEN:  Your Honor, with regard to responding
10    to Mr. Zissou, the only concern that the Government would have
11    is that we'd ask Mr. Zissou to reach out to Ms. McFarland to
12    confirm that that is, in fact, something that given the
13    nonclassified nature of this case, that MDC Brooklyn would be
14    willing to do.
15              Unfortunately, just MDC Brooklyn does not work for,
16    you know, in response to every email the Government counsel
17    sends and we're just asking for --
18              THE COURT:  Would they respond to an order to show
19    cause to the warden?
20              MR. SELDEN:  Your Honor, I think that's an excellent
21    idea, if the first step of Mr. Zissou not reaching out
22    doesn't --
23              THE COURT:  I'm tired of waiting, Mr. Selden.
24              MR. SELDEN:  Yes, Your Honor.
25              THE COURT:  Okay?
```

```
 1              MR. SELDEN:  Absolutely, Your Honor.

 2              THE COURT:  Either it's going to be accomplished or

 3    I'm going to order it.

 4              MR. SELDEN:  Yes, Your Honor.

 5              THE COURT:  You tell me what -- since it's you and

 6    the Department of Justice which runs the Bureau of Prisons,

 7    ask them how they want me to handle it.

 8              MR. SELDEN:  Yes, Your Honor.

 9              THE COURT:  Okay?

10              MR. SELDEN:  I will absolutely do that, Your Honor.

11              MR. STEIN:  Judge, just one concern about this.  If

12    Mr. Selden's concern is about the medical records, I have

13    consulted with my client.  The medical records don't have to

14    be included in the computer that's sent to the prison.  So, if

15    that's only issue as to that, I don't think that's --

16              THE COURT:  I think with respect to -- you can do

17    the same thing with any other sensitive document.

18              MR. ZISSOU:  Of course.

19              THE COURT:  It's not that surprising.  I know that

20    in other cases, we have used MP3s, so people can listen to

21    documents.

22              MR. STEIN:  Judge, I'm sorry.  I don't know if we're

23    finished with this.

24              THE COURT:  I don't know.  You tell me.

25              MR. STEIN:  Well, I meant this subject.  There is
```

1    another subject.

2              THE COURT:  Yes, please.

3              MR. STEIN:  Okay, Judge.  So this was rather

4    disturbing.  I'm sure Mr. Selden will not be surprised about

5    my using that term, since he doesn't like my tone, but on

6    April 17th, we submitted a request for a joint defendants'

7    meeting.

8              I have submitted or participated in submitting

9    requests for co-defendants' meetings on dozens of occasions.

10   Some of them are with supposedly violent groups, MS-13,

11   organized crime, Crips, Bloods, you name it.

12             So I submitted on April 17th.  I attached to it the

13   first page of the indictment which includes the caption.  That

14   is traditionally what the MDC requires, so they can see that

15   they're co-defendants.  So I submitted a cover letter with the

16   first page of the indictment showing the caption.  On -- this

17   co-defendant's meeting was requested to take place on

18   April 24th.

19             On April 23rd, myself and Mr. Zissou get a message

20   from -- I assume she's in the legal department of the MDC.  I

21   wasn't familiar with her name, but I think that's probably

22   true -- saying our request for the co-defendants' meeting was

23   denied.  I've been on the CJA panel in this district for over

24   40 years.  That has never happened to me.

25             So what happened -- what it turns out happened is,

1    that Mr. Selden, I don't know who initiated the contact,

2    whether it was the legal department or Mr. Selden initiated

3    the contact, he requested -- I assume that's the way he put

4    it -- he requested that the request for the co-defendants'

5    meeting be denied.  So this was rather disturbing, especially

6    since it occurred the day before the meeting.  I carved out a

7    good part of the day for the meeting, as I'm sure Mr. Zissou

8    did.

9            So we had a -- some testy exchanges with Mr. Selden

10   about this, which were quite unsatisfying, and at one point,

11   we contacted your courtroom deputy to set up a phone

12   conference because their meeting was scheduled to take place

13   that day.

14           Among the things that Mr. Selden sent to us as an

15   explanation for this -- and I, to tell you, Judge, that I

16   think his intervening at all in this was entirely improper,

17   and I mean that word intentionally, and in my experience, over

18   40 years, unprecedented.

19           He said, among other things, that he needs more

20   information other than what was in the caption of the

21   indictment, showing that they were defendants.  I don't know

22   what he's talking about and I think it's, frankly, none of his

23   business.

24           Secondly, he then included as a reason a message

25   that I had sent to him about my client's behavior in response

1   to Mr. Selden's repeated requests about setting a trial date,

2   and I told him about my client's conduct.  I personally was

3   not concerned for my safety for any reason about that, and I

4   said it in another context.  So he included that as an

5   explanation for his requesting them to deny the co-defendants'

6   meeting.

7          So after all this back and forth, we started to

8   request the Court to intervene.  Turned out it wasn't

9   necessary, because I got a call from Mr. Selden, I assumed

10  this representative or some representative from the legal

11  department was on the other line also, asking me if I had any

12  concerns for my safety, and I said absolutely none whatsoever.

13         So, after I had to assure the Government that I

14  wasn't concerned about myself, then I get a message or a call

15  that we could now thankfully have our co-defendants' meeting.

16         When I got to the MDC yesterday, I got there a

17  little before Mr. Zissou.  They brought my client down.  They

18  brought Mr. Zissou's client down.  They didn't want us to sit

19  together without Mr. Zissou being there, which I had no

20  problem with.

21         Then a lieutenant comes down.  I learned that the

22  lieutenant came to speak to me.  He spoke to me several times

23  at Mr. Selden's request, because I asked him where this came

24  from and he told me.  It came from the Assistant United States

25  Attorney.

1          The lieutenant wanted to know that if I was okay, do

2   I have any concerns, he was going to watch what was going on.

3   When I've had other complaints at the MDC about various things

4   and asked for a lieutenant to come down, they never come down.

5   Never.

6          This was really very disturbing, and I don't

7   apologize for my tone at all and to emails or to the Court

8   now.  This was really distressing.

9          MR. SELDEN:  Thank you, Your Honor.

10          Your Honor, with regards to Mr. Stein's tone, we'll

11   step to that point in a moment.

12          THE COURT:  I don't even want to hear it.

13          MR. SELDEN:  Your Honor --

14          THE COURT:  I don't want to hear about tone.

15          MR. SELDEN:  And Your Honor, I think that the

16   substance is far more important because while the Government

17   --

18          THE COURT:  Address it.

19          MR. SELDEN:  Absolutely, Your Honor.

20          Your Honor, on the 17th, as Mr. Stein says, he

21   notified MDC Brooklyn.  Government counsel only learned of

22   this notification and this request on Tuesday, April 23rd, at

23   8:12 in the morning.  We learned of this not from Mr. Stein or

24   Mr. Zissou but from MDC Brooklyn, asking what our position

25   was.

```
 1              We stated that our position, consistent with our

 2    prior separation request, was opposed to two co-defendants

 3    meeting.  We had safety concerns.  Specifically, as outlined

 4    in the complaint that the defendant, Scott Brack, had made

 5    certain statements inculpating defendant, Elgin Brack, who had

 6    safety concerns consistent with that separation agreement

 7    about the two co-defendants coming together.

 8              Following that interaction, we asked -- not in

 9    opposition -- but for more information -- were both lawyers

10    going to be present during this meeting?  Were there actual

11    notifications to MDC?

12              As outlined in the conversation with Ms. Cruz at

13    MDC, we had concerned.  Why?  In part because Elgin Brack has

14    previously been in violation of MDC rules for fighting.  He's

15    refused to come to count.  And given the allegations in this

16    case, we had those concerns.

17              I have never spoken with a lieutenant from MDC

18    Brooklyn.  I have printed up all email correspondence with Mr.

19    Zissou, as well as with Mr. Stein.  The conversations were to

20    assure that safety was paramount here.  It was not to try to

21    stop their meeting.  That's the reason why we asked what was

22    going on.

23              Once we had heard not from Mr. Stein but also from

24    Mr. Zissou on a call with a representative from MDC Brooklyn,

25    they didn't have any safety concerns, we did not have an
```

1    opposition.  That being said, it's up to MDC Brooklyn if the

2    meeting goes forward, and those steps.

3           THE COURT:  I think we have now established why we

4    don't admit hearsay into evidence.

5           MR. SELDEN:  Absolutely.

6           MR. STEIN:  Judge, if we had the old civil

7    procedure, I would enter a *demurrer* and say, so what?  I don't

8    think Mr. Selden gets the point.

9           This meeting was none of his business.  All of the

10   co-defendant meetings I've had, by definition, the

11   co-defendants had separation orders and some of them were

12   accused of far more violent conduct than this.  The point is

13   that this is none of their business.

14          MR. SELDEN:  Which we don't want to know what the

15   meeting is about, Your Honor, not the substance, more the

16   safety, which is why I've printed out -- if the Court wants

17   and I don't believe you do.

18          THE COURT:  I don't want and Mr. Stein doesn't want.

19          What I'm hearing Mr. Selden say, obviously, there's

20   a disconnect between what you say the timing is and what his

21   perception was, and what his inquiry was, vis-a-vis safety

22   concerns -- not opposing -- and that was what the inquiry

23   was -- the only inquiry that was made.

24          So, the point being, and I believe from his

25   representations in court now, he understands and apparently

1  understood that he has no other interest in whether or not you

2  and Mr. Zissou are able to meet in a joint defense meeting

3  with your respective clients together.  Doesn't have -- that's

4  not -- that was never the issue as far as he's concerned.

5  What MDC says its concern was is why we don't admit hearsay.

6          So I think everybody understands.  Don't care about

7  tone.  Don't care about past history.  The fact of the matter

8  is that you and Mr. Zissou should be able to have joint

9  defense meetings when -- try to arrange it.

10          And I know the schedule of counsel.  They always

11  tell clients of counsel, you don't really want a lawyer who

12  doesn't have any other clients.  You want lawyers who are

13  occupied on other matters.  It is hard to schedule them and

14  when something runs afoul of that schedule, it really affects

15  not only the clients in that particular case, but it affects

16  all the other cases that the lawyers are involved in.

17          So it's clear on the record now that neither lawyer

18  has a concern about their personal safety at a joint meeting

19  between -- in and among themselves and their respective

20  clients, and that they should be permitted in the ordinary

21  course, just the way they have been throughout Mr. Stein's

22  history, which apparently antedates the CPLR.

23          Any other things on the defense side?

24          MR. ZISSOU:  No, Your Honor.  Thank you for your

25  courtesy.

1          THE COURT:  And it looks like we're looking forward

2    to a motion schedule of some sort, but it doesn't seem that

3    until more information is made available to defense counsel,

4    as it unfolds, that you have the opportunity to look at the

5    search warrant application to see if there's a motion that

6    would be directed at seizure, we would, again, productively

7    schedule one at this time or am I wrong?

8          MR. ZISSOU:  We agree, Your Honor.

9          MR. STEIN:  Judge, just let me say, there's nothing

10   really to respond to, but just in terms of motions, one of the

11   motions that I anticipate making is a *Bruton* motion because

12   there was a statement which arguably has some implications.

13   So I ask probably more than once because I always repeat

14   myself, I asked Mr. Selden --

15         THE COURT:  I had the occasion to understand that.

16         MR. STEIN:  Yes.  I asked him if he could tell me --

17   he didn't have to, obviously.  He has the right to wait 'til I

18   actually file a motion, but it would simplify things if he was

19   able the tell me what he anticipates the Government's

20   response would be, since the substance of the motion is pretty

21   obvious.

22         There's a statement that has implications.  Are you

23   going to redact?  Are you not going to not use it?  Are you

24   going to leave it -- agree to separation?

25         THE COURT:  You know what?  I'm going to --

1   Mr. Stein, I'm going to force you two guys to talk to each

2   other later.

3          MR. STEIN:  Well, we do.

4          THE COURT:  And I'm sure Mr. Selden will understand

5   the point of your inquiry and he'll say, everybody including

6   the Court's time, if there's some resolution on that basis, so

7   that at least you know what if any motion you need to make on

8   that, on the issue of *Bruton*.

9          MR. STEIN:  Okay.  All we need is a date now, Judge.

10         MR. SELDEN:  And Your Honor --

11         THE COURT:  I think we should come back to status in

12  relatively short term.

13         If you -- so I think maybe the question, Mr. Selden,

14  is when do you think counsel will have enough time based on

15  what you're producing to look at it, to come back for the

16  purposes of scheduling a -- providing for a motion schedule?

17         MR. SELDEN:  Your Honor, my recommendation would be

18  30 days.

19         THE COURT:  Thirty days?

20         MR. SELDEN:  And the reason in part is because the

21  actual search warrant affidavits are built primarily off the

22  same set of facts and circumstances.

23         I did just want to alert Mr. Stein to the prior

24  position that the Government has taken.  We just would ask him

25  to file a motion, so we can know what he's saying in the

```
 1    motion before taking a position.  We are trying to sanitize

 2    the Bruton statement and potentially plan to utilize it.

 3              THE COURT:  I think that's what he --

 4              MR. SELDEN:  Yeah.

 5              THE COURT:  -- he wants to know.

 6              MR. STEIN:  Exactly.

 7              THE COURT:  If you plan to use it and you're trying

 8    to sanitize it.

 9              MR. SELDEN:  I was also going to follow up with the

10    Court.  I do plan to follow up with Nicole McFarland today,

11    Your Honor.  I plan to send a letter, assuming that she is in

12    today. I plan to send a letter today.

13              THE COURT:  And let the Court know by the end of

14    next week, and if there is no resolution on getting that

15    computer in and the redactions that both counsel indicated

16    they're willing to make, then counsel, I believe file an order

17    to show -- motion to show cause.

18              MR. ZISSOU:  Will do, Your Honor.

19              MR. SELDEN:  My hope is that we have a letter with

20    hopefully a position from MDC today --

21              THE COURT:  That's fine.

22              MR. SELDEN:  -- on Your Honor's desk.

23              THE COURT:  And that would be spectacular.

24              MR. SELDEN:  Absolutely.

25              THE COURT:  And I am giving you a few extra days --
```

```
 1              MR. SELDEN:  Of course, Your Honor.

 2              THE COURT:  -- because it is Friday.

 3              MR. SELDEN:  Of course.

 4              THE COURT:  But I want counsel for defense to know

 5   that they have leave to file that motion if, in fact, these

 6   efforts on your behalf don't appear -- and I'll look forward.

 7   I don't think I've met the new warden of MDC.  He'll be able

 8   to come sit here in the well and talk to me personally.

 9              MR. STEIN:  You should go to Judge Brodie's

10   courtroom.  He's a defendant in a civil action.

11              THE COURT:  Is he on trial now?

12              MR. STEIN:  No.

13              THE COURT:  No?  Okay.

14              MR. STEIN:  I think there's something called

15   discovery.  It's a civil case having to do with a blackout in

16   the jail.

17              THE COURT:  Oh, yes.  Jail conditions.  Yes, indeed.

18              Well, I'd rather see him in my own courtroom and

19   meet him there.  I'll let Judge Brodie take care of matters

20   over there.

21              MR. ZISSOU:  Is the 31st okay with the Court, May

22   31st?

23              THE COURT:  That is a Friday?

24              MR. ZISSOU:  It is, yes.

25              THE CLERK:  10:00 a. m., Judge?
```

```
 1                    THE COURT:  Ask the master of the work schedule.

 2                    THE CLERK:  He got the date from me.  The 31st, at

 3    10:00 a.m.

 4                    THE COURT:  The 31st, 10:00 a. m.  Okay?

 5                    MR. ZISSOU:  Judge, we have no objection to the

 6    entry of an order of excludable delay until such time, given

 7    the applications that have been made today.

 8                    THE COURT:  All right.  We have.

 9                    And the same for you, Mr. Stein?

10                    MR. STEIN:  I'm sorry?

11                    THE COURT:  No objection to the waiver?

12                    MR. STEIN:  Correct.

13                    THE COURT:  All right.  Based on the information

14    that we have provided, the discovery wheels are turning.  It

15    is clear that we now have applications, pending motions

16    relating to the ability of the defendants to see some of the

17    discovery that's already been produced and basically, we're

18    aware of that motion that will be -- likely to be made.  In

19    fact, we are adjourning this status conference to 30 days, so

20    we can be in a position to actually schedule those motions.

21                    So on that basis, without objection of any party, to

22    otherwise meet the ends of justice, we will go over to May

23    31st at 10:00 a.m. in further status.  We are going to exclude

24    the time in the interim.

25                    So, we'll see everybody on the 31st, unless an order
```

```
 1    to show cause brings us back.
 2              MR. ZISSOU:  Thank you for your courtesy this
 3    morning, Your Honor.
 4              MR. SELDEN:  Thank you, Your Honor.  May we be
 5    excused?
 6              THE COURT:  (No response.)
 7              MR. SELDEN:  Thank you, Your Honor.  May we be
 8    excused?
 9              THE COURT:  (Nods head affirmatively.)
10              MR. SELDEN:  Thank you so much, Your Honor.
11              THE COURT:  You're welcome, Mr. Selden.
12              MR. SELDEN:  Thank you.
13              (Proceedings concluded.)
14
15
16
17
18
19
20
21
22
23
24
25
```