1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      :    18-CR-684(ENV)

        Plaintiff,      :
                            United States Courthouse
   -against-      :    Brooklyn, New York

ELGIN BRACK,      :
                            March 3, 2020
        Defendant.      :    10:00 o'clock a.m.

- - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ERIC N. VITALIANO
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:


For the Government:          RICHARD P. DONOGHUE
                             United States Attorney
                             BY: PHILIP A. SELDEN
                                 JONATHAN SIEGEL
                                 JONATHAN LAX
                             Assistant United States Attorneys
                             271 Cadman Plaza East
                             Brooklyn, New York


For the Defendant:           JOEL M. STEIN, ESQ.

                             GARY FARRELL, ESQ.


Court Reporter:              Charleane M. Heading
                             225 Cadman Plaza East
                             Brooklyn, New York
                             (718) 613-2643

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

1           (In open court; outside the presence of the jury.)

2           THE CLERK:  The Honorable Eric Vitaliano presiding.

3           The case on the calendar is USA versus Elgin Brack,

4    case number 18-CR-684, on for a jury trial.

5           Will the attorneys please note their appearances

6    beginning with government counsel.

7           MR. SELDEN:  Good morning, Your Honor.  On behalf of

8    the United States, Assistant United States Attorney Phil

9    Selden.  Your Honor, I'm joined at counsel table by Assistant

10   United States Attorney Jonathan Siegel, Assistant United

11   States Attorney Jonathan Lax, Paralegal Specialist Elicia

12   Bates and Detective Steven Saint-Hilaire.  Good morning.

13          THE COURT:  Good morning to all.

14          MR. STEIN:  Good morning, Your Honor.  Joel Stein

15   for Elgin Brack.

16          MR. FARRELL:  Good morning, Your Honor.  Gary

17   Farrell also for Elgin Brack.

18          Your Honor, I will say yesterday, the jury was able

19   to meet and Judge Orenstein introduced them to our

20   paralegal/law student intern John Bennett who had to be in

21   school this morning but he will be joining us and will be

22   present for most of the trial with the Court's permission.

23   Thank you.

24          THE COURT:  Good morning in absentia.

25          THE CLERK:  Counsel for both sides are present

3

1    including defendant.

2            THE COURT:  Okay.  Good morning, all.  Good morning,

3    Mr. Brack, as well.

4            THE DEFENDANT:  Good morning.

5            THE COURT:  Do we have housekeeping?

6            MR. STEIN:  Judge, one scheduling thing although it

7    might be moot.  I don't know if we're still going to be here

8    on March 19th.  I told your courtroom deputy.  I have a

9    conference across the hall with Judge Garaufis with 17

10   defendants.  I'd like to be able to attend.  It's at 11:30.

11   Hopefully it won't be a problem.

12           THE COURT:  We'll work around it.  Originally,

13   William thought it was the 17th and I said --

14           MR. STEIN:  With deference to Mr. Farrell.

15           THE COURT:  -- if it was O'Stein and Farrell, I

16   could understand.

17           MR. STEIN:  Deference to Mr. Farrell.

18           THE COURT:  Then we definitely would honor that.

19           MR. STEIN:  I would never schedule something for the

20   17th.

21           THE COURT:  So if it becomes a problem, Mr. Stein,

22   we will work around it.

23           MR. STEIN:  Thank you.

24           THE COURT:  Any other housekeeping?

25           MR. SELDEN:  Briefly on behalf of the government,

4

1   Your Honor, just to update the Court, it's the government's

2   understanding that Mr. Stein and Mr. Farrell do not plan to

3   conduct any cross-examination based upon the proposed Giglio

4   disclosures made by the government.  We wanted to alert the

5   Court and the courtroom clerk about that matter.

6           THE COURT:  Was that the subject of the preclusion

7   motion?

8           MR. SELDEN:  Yes, Your Honor.

9           THE COURT:  Okay.  That takes care of that.

10          Any other housekeeping?

11          MR. SELDEN:  Your Honor, just one last housekeeping

12   matter.  The government understands from Mr. Brack that with

13   the exception potentially of the defendant, there will be no

14   other defense witnesses and we wanted to just put that on the

15   record for scheduling purposes for the Court's knowledge.

16          MR. FARRELL:  That's what we expect, Your Honor, at

17   this point and we'll certainly alert the government if our

18   intention changes.

19          THE COURT:  Every day is a new day, Mr. Farrell.

20   I've learned not to plan too far ahead.  It saves on the

21   erasers.

22          MR. SELDEN:  One last matter, Your Honor.

23          THE COURT:  Sure.  Go ahead.

24          MR. SELDEN:  Mr. Brack has entered into a forfeiture

25   stipulation and we wanted to alert the Court to that matter

5

1    and we'll provide that to the Court.  That signed stipulation

2    that the Court will be considering is a stipulation as it

3    relates to forfeiture.

4           Your Honor, at this time, if you would like, I can

5    tender that stipulation up to your courtroom deputy.

6           THE COURT:  Sure, please.

7           MR. SELDEN:  Thank you very much, Your Honor.

8           THE COURT:  Otherwise, later on, things get hazy.

9           MR. SELDEN:  Of course, Your Honor.  Thank you very

10   much, Your Honor.  Nothing else on behalf of the government.

11   Thank you.

12          MR. SIEGEL:  Actually, Your Honor, there is one

13   substantive issue we want to raise but I don't know if you

14   want to deal with that forfeiture stipulation first.

15          THE COURT:  Well, we will do the forfeiture

16   stipulation in chambers.  So, Mr. Siegel?

17          MR. SIEGEL:  One of the exhibits that the defense

18   has asked the government to bring to court or one of the items

19   the defense has asked us to bring to court is 9 millimeter

20   ammunition that was found in the car that the defendant and

21   Scott Brack were arrested in.  I think it's everyone's

22   understanding that ammunition belonged to the driver of the

23   car who we've been referring to as "Person A" but at trial, it

24   will come out his name is Edward Vasquez.

25          It's the government's position that any evidence of

6

1    that 9 millimeter ammunition is irrelevant.  The gun in this

2    case was a .357 revolver and 9 millimeter ammunition wouldn't

3    even fit in that gun.  So it has no relevance to these charged

4    crimes.

5            To the extent there's any argument that Edward

6    Vasquez was the kind of person who had ammunition and,

7    therefore, was more likely to commit these crimes, that's the

8    same kind of propensity argument that the defense was trying

9    to make about Scott Brack that Your Honor has already

10   precluded and should also be precluded here.

11           There's a larger issue that goes to this ammunition

12   and potentially other evidence in the case which is arguments

13   about should the ATF or the NYPD have done more investigation

14   into Edward Vasquez since they found this ammunition or other

15   factors.  The issue with that argument is it's highly

16   prejudicial to the government because the reason the ATF and

17   the NYPD didn't do more investigation into Edgar Vasquez is

18   that Scott Brack confessed the night he was arrested.  He

19   said, "I was the driver, my nephew Elgin was the person who

20   went into the store," and every ATF officer who saw the

21   surveillance video and saw Elgin Brack recognized him from

22   that video as you heard Lieutenant Smith testify on his own

23   behalf.

24           So if there's any argument that the ATF should have

25   investigated Mr. Vasquez more as a suspect in this robbery,

1   the government's hands are going to be tied because we can't

2   explain why they didn't do that investigation without bringing

3   in, frankly, testimony that would violate the Sixth Amendment.

4   So given that we can't actually respond with the reasons why

5   they didn't do that investigation, it's prejudicial and,

6   frankly, not probative to get into any accusations of why

7   didn't you do this more investigation or shouldn't you have

8   done more investigation into Edward Vasquez.

9           THE COURT:  Mr. Stein or Mr. Farrell?

10          MR. STEIN:  Judge, well, you know, I think bringing

11  this up now is going to open up a bit of a Pandora's box.  I

12  don't know if you want to deal with it now.

13          THE COURT:  Well, it depends if Mr. Vasquez is going

14  to be the first witness.

15          MR. STEIN:  He's not, Judge.

16          THE COURT:  Then we can wait.

17          MR. STEIN:  That's part of the problem.

18          THE COURT:  Then we can wait.

19          MR. STEIN:  Okay.

20          THE COURT:  We can pick it up one day after we've

21  finished for the day as far as the jury is concerned and this

22  way, we won't lose jury time.

23          MR. SIEGEL:  And Your Honor, that's obviously fine

24  with the government.  As Mr. Stein alluded to, we're not going

25  to be calling Mr. Vasquez.  If this evidence comes in at all,

8

1    I expect it would probably be brought out through an ATF

2    witness who isn't testifying today, but I just want to make

3    sure that's not something that's going to be in the opening or

4    tried to be crossed with any of the witnesses today.  As long

5    as that's not going to happen today, obviously, we can resolve

6    it later.

7             MR. STEIN:  That's fine, Judge.

8             THE COURT:  Okay.  That alerts us.  We can always

9    have, if it's a different witness, we can always have a

10   sidebar if we don't get to resolve it in advance.

11            Anything else?

12            MR. SELDEN:  Not on behalf of the government.  Thank

13   you, Your Honor.

14            MR. STEIN:  No, Judge.

15            THE COURT:  Today is the traditional morning of

16   remorse and lament, so Juror Number Seven has anxiety

17   issues at the robust age of 20.  It gives her migraines.  My

18   inclination is, and I don't know, I wasn't obviously there

19   yesterday so I don't know if any of that came up during voir

20   dire.  I just assume that she had an opportunity at some point

21   during voir dire to bring that to the attention of

22   Judge Orenstein.

23            MR. FARRELL:  I would agree with you, Your Honor.

24   Judge Orenstein gave everyone a full and fair opportunity and

25   many, many jurors took advantage of sharing their feelings,

9

1    and Ms. Marks, Juror Seven, did not in any way indicate that

2    she was anxious or anything.

3              THE COURT:  So my inclination is to -- well, she

4    indicates that she can provide medical proof, et cetera.  My

5    inclination is to tell her to sit and see what happens and

6    we'll cross a problem bridge should one actually develop.

7              MR. SELDEN:  Your Honor, the government is in

8    agreement with the Court on that matter.  We also do want to

9    alert the Court that she did put on the record yesterday that

10   migraines can happen to her, but we are in agreement with the

11   Court, see how things flesh out.

12             THE COURT:  It can happen.  There are plenty of

13   people who have anxiety and migraines and good old fashioned

14   headaches and you try to work through them.

15             William has provisionally told Juror Seven that her

16   request is under consideration and that the Court would take

17   it up with the parties and that we would go from there.  So

18   now William knows where the "there" is and he will advise her

19   that we will go from there.

20             Now, on openings, which whom's are doing them?

21             MR. FARRELL:  I'm doing the defense, Your Honor.

22             THE COURT:  Mr. Farrell, yes.

23             MR. SELDEN:  Your Honor, I'll be conducting the

24   opening on behalf of the government.

25             THE COURT:  Mr. Selden.  You're too far away from me

1  to see so I'm trying to recognize your voice.  It works most

2  of the time, not all of the time.

3          All right.  William, I guess apparently we are ready

4  so let us begin.

5          (Jury enters.)

6          THE COURT:  Counsel will stipulate that the jury is

7  present and properly seated.

8          MR. STEIN:  Yes, Judge.

9          MR. SELDEN:  Yes, Your Honor.

10          THE COURT:  The clerk will swear the jury.

11          (Jury sworn by the clerk.)

12          THE CLERK:  Thank you.

13          THE COURT:  Be seated, please.

14          Ladies and gentlemen of the jury, I am Judge Eric

15  Vitaliano.  I am privileged to preside over this case and to

16  welcome you to our court and to thank you for your service.

17  Your cooperation, the fact that you are all here is extremely

18  important to all of us.

19          What I always tell jurors, whether it's a criminal

20  case like this one or a civil case, don't underappreciate how

21  important you are.  Other than putting on a uniform and

22  defending your country in a time of war, there is no greater

23  act of patriotism or citizenship to do exactly what you are

24  doing.  There are many, many countries around the world that

25  we would recognize to be free and democratic and they don't do

1  it this way.  They don't protect their rule of law the way we

2  protect our rule of law.  And what is it that we do?  We rely

3  on everyday citizens to put down their own work, their own

4  lives, and come to a court and sit as jurors and make this

5  their most important business.

6          Hundreds of thousands of Americans over the 200 plus

7  years of our existence have fought and died for the rule of

8  law and when they have returned home, they hand that rule of

9  law over not just to judges and lawyers, but most importantly

10  protected in our constitution, they hand it over to you,

11  everyday citizens.  So what you do and how you do it and your

12  commitment to do it is not only helping to resolve a

13  particular case, you're keeping faith with those who have

14  fought and died for the rule of law and the American way of

15  providing civil and criminal justice.

16          So we certainly, all of us, appreciate your

17  commitment, your sacrifice and we look forward to making your

18  stay with us as efficient as we can and as painless and we can

19  but, again, we all thank you.

20          Now, I have prepared some preliminary instructions

21  to help orient you to the case and I am going to ask my deputy

22  clerk of court and law clerk Anthony LaMonaco to read them to

23  you.

24          Mr. LaMonaco.

25          THE LAW CLERK:  Members of the jury, we are about to

1  begin the trial of this criminal case about which you heard a

2  little bit during the process of jury selection.  Before the

3  trial begins, however, there is certain information the Court

4  will now give you which will help you to understand what will

5  be presented before you and how you should conduct yourselves

6  during the trial.

7          To begin with, you are here to administer justice in

8  this case according to the law and the evidence with complete

9  fairness and impartiality and without bias, prejudice or

10  sympathy for or against the government or the defendant.

11          This is important to the defendant who is charged

12  with a crime and has the constitutional right to receive a

13  fair trial.  The case is also important to the government

14  since the enforcement of the criminal laws is important.

15          There are three basic rules about a criminal case

16  that you must keep in mind.

17          First, the defendant is presumed innocent unless and

18  until proven guilty at the conclusion of the case.  The

19  indictment against the defendant brought by the government is

20  only an accusation, nothing more.  It is not proof of guilt or

21  anything else.  The defendant therefore starts out with a

22  clean slate.

23          Second, the burden of proof is on the government

24  throughout the case.  The defendant has no burden to prove his

25  innocence or to present any evidence or to testify.  Since the

1  defendant has the right to remain silent, the law prohibits

2  you from arriving at your verdict by considering the defendant

3  may not have testified.

4          Third, the government must prove a defendant's guilt

5  beyond a reasonable doubt.  I will give you further

6  instructions on this point later, but bear in mind that in

7  this respect, a criminal case is different from a civil case.

8          The case is based on an indictment.  I will not read

9  the full indictment to you, but similar to what

10 Magistrate Judge Orenstein said to you during the jury

11 selection, I will summarize it to you.  I will explain each

12 count in greater detail at the close of the case in my final

13 instructions to you.

14          Keep in mind, however, that the indictment is a

15 document in which the criminal action is commenced and is

16 merely an accusation, a charge.  It is not evidence of the

17 defendant's guilt.

18          The indictment contains nine counts.

19          Count One charges that on or about November 26,

20 20148, Elgin Brack, together with others, did knowingly and

21 intentionally conspire to obstruct, delay and affect commerce

22 by robbery of United States currency from one or more

23 employees of one or more convenient stores in Queens,

24 New York.

25          Count Two charges that on or about November 26,

Jury Instructions by Order of the Court          14

1   2018, Elgin Brack, together with others, did knowingly and

2   intentionally attempt to obstruct, delay and affect commerce

3   by the robbery of United States currency from one or more

4   employees of a Duane Reade store located at 60-02 Roosevelt

5   Avenue in Queens, New York.

6           Count Three charges that on or about November 26,

7   2018, Elgin Brack, together with others, did knowingly and

8   intentionally possess, brandish and discharge one or more

9   firearms during and in relation to the crime charged in

10  Count Two.

11          Counts Four, Five -- sorry.  Counts Four, Six and

12  Eight charge that on or about November 26, 2018, Elgin Brack,

13  together with others, did knowingly and intentionally

14  obstruct, delay and affect commerce by the robbery of United

15  States currency from one or more employees at the following

16  locations:  A 7-Eleven store located at 50-92 Northern

17  Boulevard in Queens, New York; a Rite Aid store located at

18  33-01 30th Avenue in Queens, New York; and a Rite Aid store

19  located at 115-10 Merrick Boulevard in Queens, New York.

20          Counts Five, Seven and Nine charge that on or about

21  November 26, 2018, Elgin Brack, together with others, did

22  knowingly and intentionally possess and brandish one or more

23  firearms during and in relation to the crimes charged in

24  Counts Four, Six and Eight.

25          Since the defendant has pleaded not guilty, the

1  government has the burden of proving each of the essential

2  elements of each charge of the indictment beyond a reasonable

3  doubt.  The purpose of the trial is to determine whether the

4  government meets this burden.

5          I will repeat:  The defendant does not have to prove

6  his innocence.  On the contrary, the defendant is presumed to

7  be innocent of the accusations against him contained in the

8  indictment.

9          The trial will proceed in the following order.

10          First, the parties have the opportunity to make

11  opening statements.  The government will make such a

12  statement.  Then the defendant, though he is not obliged to do

13  so, may make an opening statement or may defer it until the

14  end of the government's case.  What is said in these

15  statements is not evidence but simply an introduction to the

16  evidence that the parties intend to produce.

17          Next, the government will introduce evidence in

18  support of the charges.

19          Then the defendant may present evidence but is not

20  required to do so.  The burden is always on the government to

21  prove every element of each offense charged beyond a

22  reasonable doubt.  The law never imposes on the defendant in a

23  criminal case the burden of calling any witnesses or

24  introducing any evidence.

25          After all the evidence has been presented, each

1  party has the opportunity to present an argument in support of

2  their case.  What is said in these arguments is not evidence.

3  They simply present to you the contentions of the parties as

4  to what the evidence has shown and what inferences may be

5  drawn from the evidence.  The government has the right to open

6  and close the argument.

7          Lastly, the Court will instruct you on applicable

8  law and you will then retire to consider your verdict.  Your

9  verdict must be unanimous.

10          You have a tremendously important task as jurors.

11  It is to determine the facts.  Our constitution gives the

12  defendant a right to have you, who are members of the

13  community, find those facts.  You, and not the Court, are the

14  sole and exclusive judges of the facts, and nothing I say or

15  do should be taken by I you as any indication of my opinion as

16  to the facts.  As to the facts, neither I nor anyone else may

17  invade your area of responsibility.

18          I will preside impartially and will not express any

19  opinion concerning the facts.  Any opinions of mine on the

20  facts would, in any event, be entirely irrelevant because the

21  facts are for you to decide.  On the other hand, and with

22  equal emphasis, I instruct you that, in accordance with the

23  oath you took as jurors, you are required to accept the rules

24  of law that I give you whether you agree with them or not.

25  You are not to ask anyone else about the law.  You should not

1  consider or accept any advice about the law from anyone else

2  but me.

3          The evidence from which you will find the facts will

4  consist of the testimony of witnesses as well as documents or

5  other things being received on the record as exhibits in

6  evidence.  Evidence also includes any facts that the lawyers

7  agree to or stipulate to or that the Court may instruct you to

8  find.

9          There are two kinds of evidence:  Direct and

10 circumstantial.  Direct evidence is direct proof of a fact

11 such as testimony of an eye witness.  Circumstantial evidence

12 is proof of facts from which you may infer or conclude that

13 other facts exist.  I will give you further instructions on

14 these as well as other matters at the end of the case, but

15 keep in mind that you may consider both kinds of evidence.

16         Ultimately, when it comes to the testimony of

17 witnesses, it will be up to you to decide which witnesses to

18 believe, which witnesses not to believe, and how much of any

19 witness' testimony to accept or reject.  I will give you some

20 guidelines for determining the credibility of witnesses at the

21 end of the case.

22         Certain things you may hear or see are not evidence

23 and must not be considered by you.  I will list them for you

24 now.

25         Statements, arguments and questions by lawyers are

Jury Instructions by Order of the Court          18

1  not evidence.

2        Objections to questions are not evidence.  Lawyers

3  have an obligation to their clients to make objections when

4  they believe evidence being offered is improper under the

5  rules of evidence.  You should not be influenced by the

6  objections or by the Court's rulings on them.  These rulings

7  deal with questions of law and not fact.  Objections and

8  rulings have nothing to do with your role as jurors.  They are

9  for the Court to decide.  If the objection is sustained,

10  ignore the question.  If it is overruled, treat the answer

11  like any other.  If you are instructed that some item of

12  evidence is received for a limited purpose only, you must

13  follow that instruction.

14        Testimony that the Court has excluded or told you to

15  disregard is not evidence and must not be considered.

16        Anything you may have seen or heard outside of the

17  courtroom is not evidence and must be disregarded.  You are to

18  decide the case solely on the evidence presented here in the

19  courtroom.

20        There are several rules which should govern your

21  conduct during any recess, that is, when you are not in the

22  courtroom.  You will not be required to remain together while

23  court is in recess, but you are required to follow these

24  instructions about recesses.

25        Do not discuss the case among yourselves or with

1   anyone else.  This includes discussing the case in person, in

2   writing, by phone or electronic means, by text messaging,

3   e-mail, Facebook, Twitter, Instagram, Snapchat, blogging or

4   any other chat room, website or other feature.  You should

5   keep an open mind, reaching your conclusion only during your

6   final deliberations after all the evidence is in and you have

7   heard the attorneys' summations and the Court's instructions

8   on the law, and then only after an exchange of views with the

9   other members of the jury.

10          Do not try to do any research or make any

11  investigation on your own about the case, any individuals or

12  entities involved in the case, or any media platforms,

13  technology or online forums you might hear about throughout

14  the case.  Do not read, listen to or watch any accounts of

15  this case should it be covered by any media.  The case is to

16  be decided only by the evidence you see and hear in the

17  courtroom during trial.

18          Since this case involves occurrences alleged to have

19  happened at particular locations, you may be tempted to visit

20  the locations yourself.  Please do not do so.  Because of the

21  time that elapses before a case comes to trial, substantial

22  changes may have occurred at the locations in question since

23  the events relevant to this case.  Also, in making a visit

24  without the benefit of explanation, you might get mistaken

25  impressions.  Therefore, even if you happen to live near any

Jury Instructions by Order of the Court          20

1   of the locations, please avoid going to them or past them

2   until the case is over.

3          Do not permit any other person to discuss the case

4   in your presence, and if anyone does so even though you tell

5   him or her not to, report that fact to me.  You should not,

6   however, discuss with your fellow jurors either that fact or

7   any other fact that you feel necessary to bring to my

8   attention.

9          Though it is a normal human reaction to talk with

10  people with whom one is thrown together in contact, please do

11  not talk with any of the parties or their attorneys or any

12  witness, whether in the courtroom, in the hallways, in the

13  elevator, outside or anywhere else.  By this, I mean not only

14  do not talk about the case, but do not talk at all, even to

15  pass the time of day.

16         Under the law, only twelve jurors will deliberate on

17  this case when it is submitted for consideration.

18         We have selected additional jurors called

19  alternates.  Alternate jurors are selected to serve because a

20  regular juror may be prevented from continuing to serve by

21  some emergency such as a serious illness or death.  Although

22  this seldom happens during a trial, there are cases where we

23  do call on the services of alternates.  Alternates are

24  required to pay the same careful attention to the trial as the

25  regular jurors, so that if needed, they will be fully familiar

1  with the case.

2          The fact that there are alternate jurors does not

3  mean that any regular juror is free to excuse himself or

4  herself from the case.  As a duly chosen juror, it is your

5  obligation to be available throughout the trial.

6          The description of trial procedure, the rules

7  governing your conduct, and the legal principles governing a

8  criminal case I have just discussed with you, will, I believe,

9  make it easier for you to understand the trial as it goes on

10 and to reach a proper and just result at its conclusion.

11         Now, ladies and gentlemen, we are ready to proceed

12 with the next phase of the trial.

13         THE COURT:  Thank you, Mr. LaMonaco.

14         Now, ladies and gentlemen, if you paid attention,

15 and I know you did, to what Mr. LaMonaco read to you, the next

16 phase of the trial are the opening statements by the

17 attorneys.

18         Now, again, what is said in these opening statements

19 is not evidence.  This is an introduction to what they think

20 the evidence in their view will show.  Ultimately, of course,

21 that's the decision that you will make during the time of

22 deliberations.

23         So to begin the opening statements, I will call on

24 Assistant United States Attorney Phil Selden to make the

25 opening statement on behalf of the government.

1          MR. SELDEN:  Thank you, Your Honor.

2          On November 26, 2018, at 3:30 in the morning,

3   defendant Elgin Brack walked into a 24 hour Duane Reade.  He

4   walked up to a store clerk, pretended to make a purchase and

5   when that clerk opened the cash register tray in front of him,

6   the defendant pulled out a gun.  He demanded money.  When the

7   clerk didn't act quickly enough, he shot him in the left hand.

8   The men struggled and defendant Elgin Brack shot that store

9   clerk in the head.  As the clerk lay bleeding on the store

10  floor, defendant Elgin Brack did not stop there.  Over the

11  next two hours, the defendant went to three other 24-hour

12  convenience stores all in Queens and committed armed

13  robberies.

14          That, ladies and gentlemen, is why we are here

15  today.

16          My name is Assistant United States Attorney Phil

17  Selden.  I'm joined at counsel table by Assistant United

18  States Attorney Jonathan Siegel, Assistant United States

19  Attorney Jonathan Lax, Paralegal Specialist Elicia Bates,

20  Detective Steven Saint-Hilaire from the joint ATF-NYPD robbery

21  task force.  Together, we represent the United States.

22          We will prove this case beyond a reasonable doubt

23  and you will come to learn that over two hours, the defendant

24  went to four separate stores pretending to make legitimate

25  purchases; in some instances, a bag of Skittles, a carton of

1   eggs, a greeting card, stick of gum, even a Snickers bar.  He

2   lulled cashiers into believing that he was there for a

3   legitimate purpose and when they opened up their cash register

4   trays, he pulled out a .357 revolver and robbed them.

5        You'll come to learn that he wore the same

6   distinctive black and green hooded sweatshirt, the same

7   distinctive paints with copper zippers running down the legs

8   and the same distinctive white shoes at each one of those four

9   stores.

10        You'll also come to learn that he didn't act alone

11  because while the defendant was the gunman, there was a

12  getaway driver outside and you'll learn about that evidence

13  throughout the course of the trial.

14        For his crimes, the defendant is charged with

15  conspiring to commit those robberies with the getaway driver.

16  He's charged with attempting to rob that first Duane Reade

17  store because after he shot the store clerk, he was not

18  successful in taking any money, he's charged with discharging

19  a firearm and, finally, he's charged with the three other

20  robberies of the stores, a 7-Eleven and two separate Rite Aid

21  stores, as well as using a gun during those crimes.

22        We will prove this case beyond a reasonable doubt in

23  the following ways.

24        You'll hear from eye witnesses.  Ladies and

25  gentlemen, you will hear from the store clerks who will

1  describe how they were lulled into believing this was a

2  legitimate purpose, you'll hear the interaction that they had

3  and you will hear about the robberies that took place.

4         Beyond eyewitness testimony, you'll also see

5  surveillance video, surveillance video that captures the

6  defendant entering into those stores with that same

7  distinctive green and black hooded sweatshirt, those same

8  distinctive paints and those same white shoes, and on that

9  surveillance video, ladies and gentlemen, you'll see the

10 defendant's face because he wasn't wearing a mask.

11        Beyond eyewitness testimony, surveillance video,

12 there is more.  Ladies and gentlemen, less than 24 hours after

13 the defendant committed this armed robbery spree, he was

14 stopped in the same car with the same getaway driver.

15        When ATF and NYPD officers went and approached him

16 in the back seat of that car, seated next to him was that

17 distinctive green and black hooded sweatshirt as well as his

18 cell phone and on that cell phone, when agents reviewed it,

19 they found internet searches, internet searches that

20 correspond to the exact time that he was committing these

21 robberies, internet searches for 24-hour convenient stores and

22 for his final robbery, an internet search for a 24-hour

23 convenient store, Jamaica, New York.  Ladies and gentlemen,

24 the evidence will show that the last armed robbery committed

25 by defendant Elgin Brack was of a Rite Aid, a 24-hour

1    convenience store in Jamaica, New York.

2            But there's more.  You'll also come to learn that

3    seated next to the defendant was his backpack and in that

4    backpack were the distinctive black pants with the zippers

5    going down the legs, in that backpack was his ID and in that

6    backpack was the gun he used to shoot the store clerk with

7    Elgin Brack's DNA on it.

8            Ladies and gentlemen, when you consider all of this

9    evidence, the eyewitness testimony, surveillance video, when

10   you consider the physical and the forensic evidence, we will

11   ask you to reach the only verdict that it supports.  Hold the

12   defendant accountable.  Find him guilty.

13           Thank you.

14           THE COURT:  Thank you, Mr. Selden.

15           MR. SELDEN:  Thank you.

16           THE COURT:  We will now have the opening statement

17   on behalf of the defendant by Mr. Gary Farrell.

18           Mr. Farrell?

19           MR. FARRELL:  May it please the Court, Mr. Brack,

20   Mr. Stein, gentlemen and lady who represent the government,

21   ladies and gentlemen of the jury, good morning.

22           I've got to tell you, I'll admit it, the wind's

23   officially knocked out of my sails.  What do I mean by that?

24   I'll tell you.  I was excited to go old school defense

25   attorney.

Case 1:18-cr-00684-ENV   Document 173   Filed 03/13/20   Page 26 of 171 PageID #: 1223

1     What do I mean by that?  I was going to borrow from

2 one of two:  A classic opening by John Gotti's lawyer, he

3 would always stash an indictment on the government's desk, he

4 would pick it up, he'd rip it up, throw it in the garbage and

5 that was his thing, or I was going to borrow from my favorite

6 fictional lawyer, Vincent Gambini, played so masterfully by

7 Joe Pesci in "My Cousin Vinny," where after an opening like

8 Mr. Selden just gave laying out the evidence, Vincent Gambini

9 looked up to the jury, walked up and said, "What that guy just

10 said, it's all bull, you know what."

11     But I can't do that here, ladies and gentlemen.  I

12 listened like you did intently to Mr. Selden and I know it's

13 not all bull, what he said.  It's just not.

14     There were four crimes here captured on videotape.

15 No question about it.  The person who did the crimes was, his

16 face was partially concealed.  Mr. Selden would have you

17 believe that it's just like he was walking, but that's not the

18 case, not what it was.  It was pulled tight, the hood, so keep

19 that in mind, that's important.  But he's right with respect

20 to the fact that this was captured on videotape.  And one guy

21 was shot, seriously injured.

22     There was distinctive clothing.  He's right about

23 that.  The shooter was wearing a green jacket with a black

24 hood and these black zipper pants.  That's true.  He used a

25 big black gun.  That's true.  Money was taken from the three

1    stores, about 1,300 bucks.

2         This license plate recognition you are going to hear

3    about, I don't think Mr. Selden talked about it but I know you

4    are going to hear about it, it was responsible for identifying

5    the getaway car here and that getaway car was driven by Scott

6    Brack.  You are going to hear about that.

7         Then as Mr. Selden ended his opening, he talked

8    about what happened in the Bronx at 8:45 that evening.  That's

9    important because that's when Elgin Brack was stopped in a car

10   with Scott Brack, a guy named Edward Vasquez who was driving

11   and Edwin Vasquez's daughter.

12        And, yes, this distinctive clothing, this green

13   jacket, this black pants with zippers, all sorts of cash, over

14   $6,000 was recovered in that car.  A big black gun was

15   recovered in that car and not only a big back gun, a big black

16   gun that showed it was just fired twice and that, of course,

17   is how many shots were fired at the Duane Reade when the poor

18   guy working there got shot.  And you know what?  It even gets

19   worse because they're going to tell you the evidence is going

20   to show that on the handle of that gun was DNA, a mixture of

21   DNA, some of which belonged to Elgin Brack.  And they're going

22   to show you that a phone registered to Elgin Brack was in that

23   car and that showed, as he told you, it showed there was a

24   search for 24 hour stores the morning around the time of

25   robberies.

1          So what can we conclude from all of that, ladies and

2    gentlemen?  We conclude they're right, I guess:  Elgin Brack's

3    guilty.

4          I'm sorry, Elgin.  I really am.

5          You know what though?  Wait a second, ladies and

6    gentlemen.  Before you close the book on young Elgin Brack,

7    consider this for a moment, that, yeah, they're right, he's

8    guilty, but he's not guilty of the crimes charged in this

9    indictment.

10          You know what the evidence is going to show he's

11   guilty of?  Of being Scott Brack's cousin and that's not his

12   fault because we all know you can pick your family -- I'm

13   sorry, I messed that up old saying.  You can pick your

14   friends, ladies and gentlemen, you can pick your friends.  You

15   can't pick your family.

16          The evidence will show beyond any shadow of a doubt

17   that Scott Brack is a thousand percent guilty of these crimes

18   and the evidence is going to show that Elgin Brack is much,

19   much different than Scott Brack.

20          First of all, he's half his age.  He's only 24.  And

21   unlike Scott who the evidence will slow lived around Queens

22   for years, Elgin grew up in the south from North Carolina.  He

23   just came up here to New York City fairly recently.  And this

24   was his family, his only family, so he relied on him for a

25   plays to live.

1          Here's a significant thing that you didn't hear from

2     the government.  Elgin Brack was gainfully employed.  I don't

3     mean working off the books at a deli, not that there's

4     anything wrong with that, I did that in college.  He was

5     employed by the biggest employer in this whole city and you

6     guys know who that is:  The City of New York.

7          Elgin Brack worked for the Parks & Rec. Department

8     and you'll see official records verifying that.  Don't take my

9     word for it.  And you are going to show that this young man

10    worked so much overtime that in a 12 week pay period, his

11    gross was nearly $5,000 and that's in October 2018.  This kid

12    was, this young man was single.  No children.  That's a lot of

13    money.  That's what this, the evidence will show.

14         Elgin Brack had a bank account at Wells Fargo.  You

15    are going to see two months of records, two months of

16    statements.  He actually deposited cash into his account.

17    What self-respecting robber does that?  But you are going to

18    hear that's the evidence that you are going to see those

19    records from Wells Fargo.

20         And you are going to see that Elgin Brack, like many

21    young men do, he posted on Facebook and he posted pictures of

22    him holding money, stacks of 20s.  Now, he didn't hold a big

23    black gun in the other hand.  The evidence will show this guy

24    is not Jesse James.  He's Elgin Brack.  He was trying to

25    impress girls showing the *dinero* trail, as he called it,

1    because he made the money honestly, legitimately.

2            Then there's Scott Brack.  Fifty years old.  He's

3    hanging out with Edwin Vasquez, "Boogie" and he refers to him

4    in his phone.  And the evidence will show you that Vasquez

5    lived in a homeless shelter in Jersey City.  That's who Scott

6    Brack's man was, scheming Scott Brack, the evidence will show

7    and, hey, I'm not here to talk about the President but he's

8    pretty good with the nicknames.

9            So the evidence is going to show scheming Scott

10   Brack and Mr. Vasquez were hanging around in Vasquez's car.

11   It kind of sounds like it doesn't make sense.  What homeless

12   guys have cars?  Well, Vasquez, he wasn't driving a Porsche.

13   It was 2002 Toyota Solara that he got from his brother, but

14   you are going to hear that it was important to Scott Brack

15   that he needed that car on the night of November 25, 2018

16   because Vasquez had to go back to Jersey to sign into the

17   shelter by 11.

18           Now, fast forward to November 26, 8:45 p.m.  The

19   NYPD task force does a great job through the technology of

20   license plate reading.  They see the car.  It's on video, it's

21   pulling away from one of the robberies, and with the license

22   plate, they can trace the car.  They get a tip.  It's in the

23   Bronx.  It's double-parked somewhere.  They do a great job.

24   They get up there.

25           And what happens?  The evidence is going to show

1    they came up on this car at about 8:45 at night on Hughes

2    Avenue and they confront, hey, this is the car.  And who's in

3    the car?  Well, Vasquez is in the car.  He's driving it.

4    Scheming Scott Brack is sitting next to him in the front and

5    Elgin is sitting in the back with a four-year old girl.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Opening Statement - Farrell                    32

1    (Continuing)

2              MR. FARRELL:  And when the cops came up to the car,

3    Elgin didn't run away.  He could have.  You'll see he was

4    dressed in a sweatsuit and he had good sneakers on.  He didn't

5    run.

6              And the cops, you'll see, the evidence will show,

7    they were concerned with the guys in the front seat.  Vasquez

8    and "Scheming Scott".  They took them right out.  Elgin was

9    sitting in the car with the little girl.  He heard other cops

10   say when they asked what's up in the back?  Oh, no biggy.  Two

11   girls.

12             Now, you can see Elgin has the distinctive dreads

13   and in the dark, the cops thought he was a girl.  So they

14   didn't do anything to him.  He was there for 15 minutes

15   waiting, trying to figure out, well, what's going on.

16             And you'll see the evidence, he was just looking for

17   a ride to the bus to go to North Carolina from Vasquez.

18             Eventually, he's taken to ATF headquarters and the

19   car was searched at ATF, and that's an important part of the

20   case, ladies and gentlemen, because Vasquez remember, he's

21   homeless.  We all see homeless guys.  They've got their carts.

22   Well, his cart was his brother's car.

23             The Government would have you believe this is a

24   nice, neat package.  Oh, there's Elgin Brack's bag.  The

25   distinctive pants were in it.  The big gun was in it.

1          Well, that's what they say, ladies and gentlemen,

2    but I submit the evidence is not going to show that; that

3    nothing in life or certainly in this case or that car is so

4    nice and neat.  I submit the evidence is going to show that

5    those agents compromised the integrity of that physical

6    evidence.  There was a whole bunch of stuff in the back seat,

7    in the trunk.  There was crap spread all over.  And yeah, the

8    gun was somewhere in there, but the evidence is going to show

9    it wasn't in Elgin's bag because it wasn't his gun.

10          Now, I don't think Mr. Selden told you this, but I'm

11   telling you.  They're going to bring in an expert to say there

12   was a mixture of three types of DNA on that gun, and one of

13   them was Elgin's.  But I'll tell you this also, the expert's

14   not going to say that I can tell you definitively the DNA

15   is -- because he was holding that gun when he was holding up

16   people on the morning of November 26th.  He's going to talk

17   about the possibility of transference and you'll hear about

18   that during the trial.

19          And by the way, the shooter wore gloves in this

20   case.  You'll see that as plain as day, but no gloves were

21   recovered in his car.

22          Now, yeah, Brack's phone was recovered somewhere in

23   that mess.  And another phone was recovered in that car.  And

24   another backpack was recovered in that car.  You didn't hear

25   about that from Mr. Selden, but you're going to hear about it

1   during the trial.

2           And about that phone, yes.  They're going to be able

3   to say that someone, someone Googled 24-hour searches because

4   you know what?  You also didn't hear when they got his phone,

5   they did what good police do.  They got a search warrant to

6   extract the whole body of stuff.  Think about it, ladies and

7   gentlemen.  Think about how much of our lives are in our phone

8   these days.  You know how much came out of Brack's phone?

9   2500 pages of texts, of searches, of anything you could do

10  with your phone where we live our lives, unfortunately, now.

11          And you know what you're going to see in this case

12  coming from those 2500 pages?  One little piece from

13  November 26th, 2018, from 2 a.m. to 4 a.m., where someone is

14  searching for 24-hour stores.  I submit the evidence will show

15  it wasn't Elgin Brack, because he wasn't with his phone.  The

16  phone was with Scott Brack at that time in Vasquez's car and

17  Elgin was not there.  2500 pages.  You would think there would

18  be something that might show that the guy was a robber,

19  instead of a guy working at a park in the Bronx.

20          The bank records again will help Elgin Brack because

21  they're going to show that that morning, remember this took

22  place early in the morning.  Later in the morning Elgin took

23  20 bucks out of a bank in New Jersey, where he did take a ride

24  with Scott to give Vasquez's car back.  He pulled over and he

25  paid two extra dollars to take out 20.  This is from a guy who

1    supposedly just stole 1300 bucks from three stores.

2             And then later on, on November 26th, he took 50

3    bucks out of the Bronx.

4             Here's the best, ladies and gentlemen, though.

5    Here' something Mr. Selden didn't tell you, but I'm telling

6    you.  There was a whole bunch of cash in that car; over

7    $6,000.  You know what the Government did with 5,000 of it?

8    They gave it back to Elgin Brack, because they couldn't prove

9    it came from anywhere, other than his hard work.  They gave

10   the money back.  To the robber.  Think about that, ladies and

11   gentlemen.

12            And think about what Elgin actually did have with

13   him; two pairs of jeans s, not black pants with zippers.

14   Those weren't his and they certainly weren't in his bag.

15   You're going to see it's this little backpack.  It could not

16   have fit all this stuff.  He had flip-flops because he was

17   going to North Carolina.  He had T-shirts, jeans.

18            Ladies and gentlemen, Elgin, you should have taken

19   an Uber.  He was looking for a ride to the bus and here he

20   stands today.

21            The evidence will show that not one of the four

22   victims is going to come and sit in that chair and point to

23   our client and say that guy robbed me, even though the robber,

24   you're going to see on the video, he was as close or closer

25   than I am to any of you.  Not one of those people are going to

1    say he's the guy that robbed them.

2            And the shiny white sneakers that Mr. Selden talks

3    about.  Well, ladies and gentlemen, the evidence is going to

4    show at that Duane Reade when the perpetrator tried to steal

5    the money, the clerk, Mr. Deleon, was a hero.  He tried to be.

6    He fought with the guy pointing a gun at him instead of just

7    giving it up, and that cost him dearly.  It cost him half of

8    his thumb.  It cost him being shot in the head.

9            But what happened here, there is blood all over

10   where this happened.  All over.  You're going to see the

11   pictures.  You're going to hear about it.  Yet there's Elgin

12   Brack in his shiny white sneakers, not a drop of blood on it.

13   And you know what they did?  They gave it back.  They gave the

14   sneakers back to him.  The guy that supposedly shot the guy

15   for refusing to give over the money.  Not a scintilla of blood

16   on it.

17           And ladies and gentlemen, about the all-important

18   search of this car.  You'll decide where everything really

19   was; that they tried to document it by videotaping it on

20   somebody's cell phone.  I think you're going to see that.

21           You're going to hear the agents laughing while

22   they're doing this and it's not clear and it's not high

23   quality.  It's just not professionally done.  The integrity of

24   that physical evidence was contaminated right away, the way

25   they did the search.  And the evidence is definitely going to

1    show there's nothing funny about this case.

2            The case the Government wants you to believe is

3    based on assumptions they want you to make and when you hear

4    the charge of proof beyond a reasonable doubt at the end of

5    trial by Judge Vitaliano, you're going to agree that doesn't

6    equal proof beyond any reasonable doubt.  You're going to see

7    and it's going to start any minute, tons and tons of photos,

8    of videos, from all these locations.  You're going to wish

9    they served Red Bull when they call some of these witnesses,

10   ladies and gentlemen, I can promise you that, because all it's

11   going to show is that each of those four locations, yes, a

12   crime was committed.  An attempted robbery and a shooting

13   where Mr. Deleon was badly hurt, and he's lucky to be alive.

14   And we're of course all glad that he is.

15           But that evidence doesn't go anywhere near close to

16   showing that the guy whose face is hardly visible is the face

17   of our client, Elgin Brack.  It's just not there.  The guy

18   Elgin Brack, Mr. Dinero trail, making in one clip almost

19   $5,000 gross in a two-week period, all for $1300 that he

20   presumably had to split with Scheming Scott.

21           Ladies and gentlemen, the case won't make sense and

22   I'm going to leave you with one teaser.  You know I like the

23   movies so, I don't want to spoil it.  But you're going to see

24   at one point, one piece of evidence that's going to show that

25   Elgin Brack could not have committed these crimes and that

1    will give you all the reasonable doubt you need.

2          Thank you very much for your attention.

3          THE COURT:  Thank you, Mr. Farrell.

4          All right.  Ladies and gentlemen, after the openings

5    come the beginning of the Government's case.  We will start

6    that up.  Normally -- to give you a little preview of

7    scheduling, normally we will take, and we will -- take a

8    midmorning break and a lunch break and a midafternoon break

9    and we generally end up, depending on where the testimony

10   takes us, closing the day somewhere between 5:00 and 5:30.

11   But these are not hard and fast rules.  They are sort of

12   targets and we adjust them as circumstances warrant.

13         Mr. Selden, are you handling the first witness?

14         MR. STEIN:  Yes, Your Honor.

15         THE COURT:  Call your witness to get us started.

16         MR. STEIN:  Thank you very much, Your Honor.

17         The Government calls Police Office Ruyi Wang.  I ask

18   the Court's indulgence while we step outside.

19         (Pause in the proceedings.)

20         (Witness enters and takes stand.)

21         THE COURTROOM DEPUTY:  Raise your right hand,

22   please.

23

24         (Continued on following page.)

25

Wang - direct - Selden                                           39

1    **RUYI WANG**,

2              called as a witness having been

3              first duly sworn, was examined and testified

4              as follows:

5              THE COURTROOM DEPUTY:  Please state your first and

6    last name and spell for the record.

7              THE WITNESS:  Ruyi Wang, R-U-Y-I, W-A-N-G.

8              THE COURTROOM DEPUTY:  Thank you.  Have a seat,

9    please.

10             THE COURT:  Mr. Selden, you may inquire.

11             MR. SELDEN:  Thank you very much, Your Honor.

12   DIRECT EXAMINATION

13   BY MR. SELDEN:

14   Q    Good morning.

15   A    Good morning.

16   Q    Sir, where are you from?

17   A    Queens, New York.

18   Q    Where did you go to school?

19   A    John Jay College.

20   Q    Did you graduate from John Jay College?

21   A    Yes, I did.

22   Q    Following John Jay College, what did you do?

23   A    Served in the United States Marine Corps.

24   Q    Are you still in the United States Marine Corps?

25   A    Yes, I am.

Wang - direct - Selden                40

1   Q     Besides your service in the United States Marine Corps,
2   are you presently employed in any other way?
3   A     Yes, I am.
4   Q     How are you presently employed?
5   A     New York City Police Department.
6   Q     What is your rank in the New York City Police Department?
7   A     Police officer.
8   Q     Where do you work on behalf of the New York City Police
9   Department?
10  A     The 108 Precinct.
11  Q     Officer Wang, speak a little bit more slowly for the
12  court reporter, please.
13  A     Absolutely.
14  Q     Thank you.
15        You mentioned the 108th Precinct.  What exactly is
16  the 108th Precinct?  Where is it located?
17  A     In the confines of Queens.
18  Q     Would you give us the neighborhoods in the 108th
19  Precinct?
20  A     Yes.  Long Island City, Sunnyside and Woodside.
21  Q     Officer Wang, I want to turn your attention to
22  November 26th, 2018.
23        Where were you working in the early morning hours of
24  that day?
25  A     I was working within the confines of the 108 Precinct.

VB        OCR        CRR

1   Q    What was your particular shift that day?

2   A    I was assigned to midnight patrol from 11:15 at night to

3   7:15 in the morning.

4   Q    Turn your attention to approximately 3:30 that morning.

5        Where were you working?

6   A    I was working within the confines of the 108th Precinct

7   in Woodside.

8   Q    Did you have an opportunity to respond to any call for

9   service that particular day at that particular time?

10  A    Yes, I did.

11  Q    Where did you respond to?

12  A    I responded to 60-02 Roosevelt Avenue.

13  Q    What's located at 60-02 Roosevelt Avenue?

14  A    A Duane Reade pharmacy.

15  Q    What did you observe when you arrived at that Duane Reade

16  pharmacy?

17  A    I observed a man laying on the sidewalk covered in blood.

18  Q    Did you come to learn how he was covered in blood?

19  A    I learned later that he had sustained a gunshot wound.

20  Q    Where was that gunshot wound?

21  A    The left hand and the head.

22  Q    Did you eventually come to learn that person's name?

23  A    Yes, I did.

24  Q    How did you learn that?

25  A    I recovered his identification from his pocket.

```
                        Wang - direct - Selden                    42
```

1    Q    Do you remember that person's name?

2    A    Yes, I do.

3    Q    What was that person's name?

4    A    Mr. Alejandro Deleon.

5    Q    We'll get back to how you recovered Mr. Deleon's

6    identification in a moment, but upon arriving and seeing

7    Mr. Deleon, as you described, covered in blood, what did you

8    do next?

9    A    I interviewed immediate witnesses on scene and canvassed

10   the pharmacy.

11   Q    Who did you interview?

12   A    Employees, whoever was on scene; asked them if anything

13   happened.

14   Q    How did they appear to you physically before you

15   interviewed them?

16   A    They were excited and frantic.

17   Q    What, if anything, was relayed to you by those employees?

18   A    The employees --

19             MR. STEIN:  Objection.  Excuse me.  Objection.

20             THE COURT:  Sustained.

21             MR. SELDEN:  Your Honor, I believe there is a

22   foundational basis upon which Officer Wang can testify.  A

23   moment ago he explained the employees appeared excited and

24   shaken.

25             THE COURT:  Yes.

Wang - direct - Selden                              43

1            MR. SELDEN:  Your Honor --

2            THE COURT:  Not what they said.

3            MR. SELDEN:  Your Honor, the Government would move

4    pursuant to an excited utterance to bring in the witness's

5    statements to Officer Wang.

6            MR. STEIN:  Objection, Judge.  It sounds to me like

7    we're going to hear a narrative.

8            THE COURT:  Why don't we hear you at side-bar.

9            (Side-bar conference held on the record out of the

10   hearing of the jury.)

11

12           (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Side-Bar                                    44

1              (Side-bar.)

2              MR. SELDEN:  Your Honor, I believe the Government

3     has laid a foundation for an excited utterance.  Specifically,

4     the witness was asked how did the particular employees appear

5     and the witness testified that they appeared shaking and

6     excited.  Hence, the Government believes that an excited

7     utterance from those witnesses, not a narrative as Mr. Stein

8     has described, would be the basis upon which to allow their

9     statements to come in.

10             MR. STEIN:  Well, Judge, that avoids the whole

11    issue, which is what is this witness going to say that the

12    other employees said?  The fact, in and of itself, that they

13    were upset or frantic, excited.

14             THE COURT:  Yes, there is really no showing here of,

15    for example, how long the conduct took place before the time

16    the police officer observed it, number one.

17             And this is -- they are now responding -- they are

18    not making utterances.  They are answering questions.  That is

19    not an utterance, that is a response.

20             MR. SELDEN:  And Your Honor, beyond their physical

21    state, I would be happy to ask the witness how long it took

22    him, approximately, to arrive on scene.

23             THE COURT:  From the call?

24             MR. SELDEN:  From the call, absolutely.

25             THE COURT:  And no one knows when the call was made

1    in connection to when the shot was fired.  You are not going

2    to lay a foundation there.

3              And again, these so-called utterances are in

4    response to questions.

5              MR. SELDEN:  Your Honor, I believe the witness would

6    testify that those individuals stated that they heard, but

7    were not present for several gunshots and that they were not

8    present for the actual gunshots.  That's the basis upon which

9    the Government believes the witness will testify.  But if the

10   Court does not believe the excited utterance --

11             THE COURT:  Yes, I do not believe that creates an

12   excited utterance at all.

13             MR. SELDEN:  Of course, Your Honor.  Happy to move

14   on.

15             THE COURT:  If the point is to say that they did not

16   hear the gunshot, I do not think Mr. Stein cares about that.

17             MR. STEIN:  No, not particularly.

18             MR. SELDEN:  I think that's essentially what the

19   point is.

20             THE COURT:  Did you hear a gunshot?

21             MR. SELDEN:  That they heard a gunshot.

22             THE COURT:  They did hear a gunshot?

23             MR. SELDEN:  They did hear a gunshot.  That's it.

24             MR. STEIN:  If that's it, that's fine.

25             THE COURT:  That is not a statement.  That is what

Side-Bar                                        46

1    they heard.

2              MR. SELDEN:  Absolutely, Your Honor.

3              So Your Honor, just so that I'm clear, we'll proceed

4    by asking the witness if any of the witnesses indicated that

5    they had heard a gunshot.  We'll start off at that point, if

6    that's okay with the Court.

7              THE COURT:  Do you have a problem with that?

8              MR. STEIN:  No.

9              THE COURT:  All right.

10             (Side-bar end.)

11

12             (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Wang - direct - Selden                          47

1          (In open court.)

2          THE COURT:  Ladies and Gentlemen of the Jury, you

3    heard in the instructions that there are basically two parts

4    to every case.  One involves the facts, which is for your

5    consideration, and there are other legal issues that involve

6    the lawyers and the Court, and those issues are often taken at

7    side-bar out of your hearing, but not out of your sight.

8    Sometimes we actually have to handle them out of both your

9    hearing and your sight so we will send you back to the jury

10   room, but whatever happens over here has no effect on you and

11   should be of no concern to you.

12          Many of the huddles that we have over here are

13   designed, ultimately, to shorten and make the case more

14   efficient, which is why we have the huddles over here.  Many

15   times we might need them and we have been able to accomplish

16   that objective this morning and so if you see us having those

17   little huddles in the future, do not think we are wasting

18   time.  We are actually speeding it up.

19          So pursuant to our huddle, Mr. Selden, you may

20   proceed.

21          MR. SELDEN:  Thank you very much, Your Honor.

22   BY MR. SELDEN:

23   Q    Officer Wang, briefly, did those witnesses that you speak

24   with indicate whether or not they had heard gunshots?

25   A    Yes, they did.

Wang - direct - Selden                48

1  Q    Officer Wang, I want to turn you back to the Duane Reade

2  you just described.

3            MR. SELDEN:  And Mr. Villanueva, for identification

4  purposes only, will you please put Government Exhibit 106-A,

5  and specifically on the screen for Officer Wang.

6  Q    Officer Wang, do you remember what the Duane Reade looks

7  like that morning?

8  A    Yes, I do.

9  Q    I am now turning your attention to 106-A.

10            MR. SELDEN:  For the record, a copy of Government

11  Exhibit 106-A has been provided to the defense.

12  Q    Do you recognize what I've just shown you?

13  A    Yes, I do.

14  Q    How do you recognize it?

15  A    I recognize it as a photograph of the Duane Reade

16  pharmacy as I responded that night.

17  Q    Is it a fair and accurate depiction of the outside of

18  that Duane Reade you responded to on November 26th, 2018, at

19  approximately 3:30 in the morning?

20  A    Yes, it is.

21            MR. SELDEN:  Your Honor, at this time the Government

22  moves to admit Government's Exhibit 106-A into evidence.

23            THE COURT:  Any objection?

24            MR. STEIN:  No.

25            THE COURT:  Received without objection.

1              (Government Exhibit 106-A received in evidence.)

2              MR. SELDEN:  Thank you, Your Honor.

3              With the Court's permission, may I now publish this

4    photograph to the jury?

5              THE COURT:  You may indeed.

6              (Exhibit published.)

7              MR. SELDEN:  Thank you.  Mr. Villanueva, with your

8    assistance, we have it queued up on the Government's laptop.

9              (Exhibit published.)

10   BY MR. SELDEN:

11   Q    Officer Wang, please briefly describe -- and there is a

12   screen in front of you -- what you see to the Ladies and

13   Gentlemen of the Jury?

14   A    I see the front of the photograph, the front of the store

15   that I responded to that night.

16             MR. STEIN:  Excuse me, Judge, sorry.  It's not on

17   our screens, should it be?

18             THE COURTROOM DEPUTY:  It should be.

19             THE COURT:  We are having some technical issues.

20             (Pause in the proceedings.)

21             MR. STEIN:  Thank you.

22             THE COURTROOM DEPUTY:  It's good.

23             MR. SELDEN:  Thank you, Mr. Villanueva.

24   Q    Officer, a moment ago you had described arriving on scene

25   and seeing Mr. Deleon covered in blood.

1   A    Yes.

2   Q    Where, if at all in Government Exhibit 106-A -- and you

3   have a touch screen in front of you that you can utilize --

4   where were you able to see Mr. Deleon?

5   A    Approximately right over here.

6        MR. SELDEN:  And for the record, if you are able to

7   identify whether or not there is an item next to where you

8   just circled on Government Exhibit 106-A.

9        THE WITNESS:  Yes, a bicycle to the left.

10        MR. SELDEN:  Your Honor, for the record, the witness

11   has just provided a circle in what appears to be in the middle

12   of the sidewalk next to a bicycle.

13        THE COURT:  The record will reflect.

14   BY MR. SELDEN:

15   Q    Now, when you saw Mr. Deleon at that particular location

16   when you arrived, were you able to speak with him?

17   A    No, I was not.

18   Q    Why not?

19   A    His speech was incoherent.  He wasn't able to talk.

20   Q    Following that interaction, did you search for evidence?

21   A    I tried to.

22   Q    What, if anything, did you do?

23   A    I went to the store, really started to look around to see

24   if I find evidence of what had happened.

25   Q    I see on the outside of Government Exhibit 106-A, outside

Wang - direct - Selden                                           51

1   of the store, there appears to be yellow tape with:  Police

2   Line Do Not Cross?

3   A    Yes.

4   Q    Was that tape placed when you were there?

5   A    Yes, it was.

6   Q    A moment ago you mentioned that you had found out

7   Mr. Deleon's name.

8          Can you remind the ladies and gentlemen how you

9   determined that?

10  A    Yes.  I, on arriving to the hospital, I went to his

11  pocket, recovered his identification card.

12  Q    How did you go to the hospital?

13  A    I transported Mr. Deleon to the hospital via ambulance.

14  Q    Now, for identification purposes only --

15         MR. SELDEN:  I'm going to ask Mr. Villanueva in a

16  for a moment to pull up Government Exhibit 106-B for the

17  witness.

18  Q    Turning your attention to Government Exhibit 106-B --

19         MR. SELDEN:  For the record, a copy of Government

20  Exhibit 106-B has been provided to the defense.

21  Q    Officer Wang, do you recognize what we're showing you in

22  Government Exhibit 106-B?

23  A    Yes, I do.

24  Q    How do you recognize it?

25  A    I recognize it to be a photograph of Mr. Deleon's

1    identification card.

2    Q    Is it a fair and accurate representation of a photograph

3    or of the identification, I should say, from that evening?

4    A    Yes, it is.

5              MR. SELDEN:  Your Honor, at this time the Government

6    moves to admit 106-B into evidence.

7              THE COURT:  Any objection?

8              MR. STEIN:  No.

9              THE COURT:  Received without objection.

10             (Government Exhibit 106-B received in evidence.)

11             MR. SELDEN:  Your Honor, with the Court's permission

12   to publish 106-B to the jury?

13             THE COURT:  You have it.

14             MR. SELDEN:  Thank you.

15             (Exhibit published.)

16   BY MR. SELDEN:

17   Q    Officer Wang, what do we see in 106-B?

18   A    It's a photo of Mr. Deleon's identification card.

19   Q    Is that how Mr. Deleon looked to you that evening?

20   A    No.

21   Q    Officer Wang, when you traveled to the hospital, where

22   did you go specifically in the hospital?

23   A    Elmhurst General Hospital in the ER.

24   Q    ER, is that the emergency room?

25   A    Yes, it is.

1          MR. SELDEN:  I have no further questions for Officer

2    Wang at this time.

3          THE COURT:  Thank you, Mr. Selden.

4          MR. SELDEN:  Thank you.

5          THE COURT:  Any cross?

6          MR. FARRELL:  Just a few, Your Honor.

7          THE COURT:  Mr. Farrell.

8          MR. FARRELL:  May I ask from here, Judge?  It's just

9    a few or would you like me to use the podium.  I will use the

10   podium.

11         THE COURT:  It is easier to use the podium, then we

12   have a uniformity and you never know when all of a sudden you

13   want to show something and there you are.

14         MR. FARRELL:  Yes, you are right.

15         Mr. Villanueva, if we could just put down the --

16   thank you so much.

17   CROSS EXAMINATION

18   BY MR. FARRELL:

19   Q    Good morning, Officer Wang.

20   A    Good morning, sir.

21   Q    My name is Gary Farrell.  You and I have never met or

22   discussed the case; correct?

23   A    We have not.

24   Q    You are in a uniform command; is that correct?

25   A    That's correct.

Wang - cross - Farrell                                    54

1    Q     So you don't normally dress like you are today; right?

2    A     No, I don't.

3    Q     These are your special courtroom clothes?

4    A     Yes, it is.

5    Q     This is your day off really; right?

6    A     Yes, it is.

7    Q     Time-and-a-half?

8    A     Yes.

9    Q     Okay.  In fact, on this -- what shift were you working

10   the day of this incident?

11   A     The midnight shift.

12   Q     Were you driving a marked patrol car?

13   A     Yes.

14   Q     And did you have a partner with you?

15   A     Yes, I did.

16   Q     Who was that?

17   A     Officer Scavetta.

18   Q     And is it your testimony that you believe you were the

19   first police officers, either the first police or EMS or fire

20   department, you were the first responder in this case;

21   correct?

22   A     I believe so, yes.

23   Q     Did you ride in the ambulance with Mr. Deleon?

24   A     Yes.

25   Q     You said you made a -- you did make an attempt to look

1    for evidence inside the store; correct?

2    A    I did.

3    Q    And in so doing, did you notice the presence of blood by

4    the counter, you know, where people --

5    A    Yes.

6    Q    You actually did.

7              And how would you describe it?  I know it's almost

8    well over a year ago.  What do you -- how do you recall how

9    the blood looked?

10   A    It was a lot of blood by the register; all over the

11   floors, walls.

12   Q    Anyone from law enforcement stay at the Duane Reade to

13   make sure the scene was not tampered with when you left with

14   Mr. Deleon to the hospital?

15   A    That, I do not know.

16   Q    Did your partner go with you to the hospital with

17   Mr. Deleon?

18   A    No.

19   Q    What did he do?

20   A    He prepared reports.

21   Q    But did he stay at Duane Reade?

22   A    I don't know that.

23   Q    Do you remember any plainclothes detectives coming in

24   from -- you know, what the Crime Scene Unit is --

25   A    Yes.

Wang - cross - Farrell                          56

1   Q      -- being an experienced police officer now.

2          Do you recall any members of the Crime Scene Unit

3   coming to the store --

4   A      No.

5   Q      -- while you were there?

6          How long do you think you were there in the entirety

7   of your visit?

8   A      Of the store.

9   Q      Yes.

10  A      Approximately 15 to 30 minutes.

11  Q      And did it take that long for an ambulance to come to

12  help this guy?

13  A      No.

14  Q      When did the ambulance come?  In relation to when you

15  were there?

16  A      Shortly after I arrived on scene.

17  Q      And they attended to Mr. Deleon on the street first;

18  correct?

19  A      Yes.

20  Q      And then they loaded him into the ambulance?

21  A      Yes.

22  Q      And you went in there with him?

23  A      Yes.

24  Q      But I think you just testified, correct me if I'm wrong,

25  that took a half-hour like from the time you first got there

1    to the time the ambulance left?

2    A    Approximately.

3    Q    Were you in charge of collecting Mr. Deleon's clothes?

4    A    No.

5    Q    As you recall -- and again I know it was a long time

6    ago -- what was he wearing when you first observed him in

7    terms of what he was wearing?  Did he appear fully dressed;

8    pants, shirt?

9    A    He appeared fully-dressed.

10   Q    Okay.  Shoes too?

11   A    I don't recall.  I don't remember.

12             MR. FARRELL:  That's all.  Thank you.

13             THE COURT:  Thank you, Mr. Farrell.

14             Mr. Selden, any cross?

15             MR. SELDEN:  Brief redirect, Your Honor.

16             THE COURT:  Redirect, I mean.

17             MR. SELDEN:  Thank you, Your Honor.

18             THE COURT:  You can do that, too.

19   REDIRECT EXAMINATION

20   BY MR. SELDEN:

21   Q    Officer Wang, you recall the line of cross-examination by

22   Mr. Farrell asking about other people who were present at the

23   Duane Reade from the New York City Police Department.

24             Do you recall that line of cross-examination?

25   A    Yes, I do.

Wang - recross - Farrell                                    58

1   Q    Were you the only responding officer who was there, for

2   example, setting up the crime screen tape?

3   A    No.

4   Q    Were you the only responding officer there who was

5   standing outside of the Duane Reade at the time when you were

6   first dealing with Mr. Deleon?

7   A    No.

8   Q    Were there other, besides New York City Police Officers,

9   other higher-ranking officers on the scene in response to the

10  shooting?

11  A    Yes.

12  Q    Do you know every interaction that those particular

13  officers had as it relates to the investigation?

14  A    I do not.

15       MR. SELDEN:  Officer Wang, I have no further

16  questions for you at this time.

17       Thank you, Your Honor.

18       THE COURT:  Anything, Mr. Farrell?

19       MR. FARRELL:  Yes.  Very briefly, Judge, one

20  question.

21  RECROSS EXAMINATION

22  BY MR. FARRELL:

23  Q    Officer Wang, if I were to ask you to name -- well, I'm

24  asking you -- if you could name all of those officers, you

25  wouldn't be able to do that; right?

Proceedings                                                59

1    A    A few, but not all of them.

2    Q    All right.  Give me the few you've got.

3    A    Sergeant Egan, Officer Scavetta, Officer Morton,

4    Officer Del Rio.

5    Q    Were they all uniformed officers from your command?

6    A    Yes.

7    Q    At the risk of repetition, you didn't see any crime scene

8    detectives there while you were at the Duane Reade?

9    A    No.

10             MR. FARRELL:  Okay.  Thank you.

11             THE COURT:  Mr. Selden?

12             MR. SELDEN:  Nothing further, thank you, Your Honor.

13             THE COURT:  Officer Wang, thank you very much.  You

14   are excused.

15             THE WITNESS:  Thank you, Your Honor.

16             (Witness excused.)

17             THE COURT:  All right.  Ladies and gentlemen, that

18   sort of brings us to around the time we would normally take

19   our midmorning break.  So we will take our midmorning break.

20             You will hear instructions from me at each break and

21   the reason I repeat them is because they are important.  So it

22   is really important that we do not get to believe that this

23   routine, we can disregard them.  They are extremely important

24   and I will continue to remind you of them.

25             First is that you are to continue to keep an open

Proceedings                                              60

1   mind throughout this case, not only on the first day but

2   throughout each and every day of the trial.

3           Secondly, you are not to discuss this case amongst

4   yourselves or with anyone else you may run into in the back,

5   including staff of the Court.  You can go back to the jury

6   room.  There are a couple of other rooms there you might need

7   to help refresh.  We will take about a 10 or 15-minute break

8   and we shall resume before the lunch period.

9           Again, we thank you for your patience and

10  attentiveness and refresh, and we will see you in about 10 or

11  15 minutes.

12          THE COURTROOM DEPUTY:  All rise.

13          (In open court; outside the presence of the jury.)

14          THE COURT:  Okay.  We will see you in about 10 or

15  15.

16          ALL:  Thank you, Your Honor.

17          (Recess taken.)

18          (In open court; outside the presence of the jury.)

19          (Judge ERIC N. VITALIANO enters the courtroom.)

20          THE COURTROOM DEPUTY:  All rise.

21          Court is back in session.  Counsel for both sides

22  are present, including defendant.

23          THE COURT:  Are you ready, Mr. Selden?

24          MR. SELDEN:  Thank you, Your Honor, we are.

25          As a preview to the Court, we're going to start out

Proceedings                                  61

1   with a brief stipulation and several exhibits that have been

2   stipulated to.

3            THE COURT:  One of my favorite words.

4            MR. SELDEN:  Thank you, Your Honor.

5            With Mr. Villanueva's always help, I will ask to use

6   the lectern, specifically the overhead, to read those

7   stipulations into the record for the jury.

8            THE COURT:  We will try our best.

9            All right.  Mr. Villanueva, let's get the jury and

10  go from there.

11           We are going to try to end the morning session

12  around 12:55 or so.

13           MR. LAX:  Your Honor, after the stipulations, our

14  next witness, I think, will be maybe just under an hour, so we

15  might get to 12:45 and it might make sense to break at that

16  point.

17           THE COURT:  That somewhat helps.

18           (Jury enters.)

19           THE COURT:  Be seated please.

20           Counsel will stipulate that the jury is present and

21  properly seated.

22           MR. SELDEN:  Thank you, Your Honor.

23           MR. STEIN:  Yes, Judge.

24           THE COURT:  Thank you, counsel.

25           All stipulated that the jury is present and

Proceedings                                        62

1   Mr. Selden, let's -- I understand you have stipulations for

2   us.

3            MR. SELDEN:  We do.  Thank you, Your Honor.

4            Your Honor, at this time the Government moves to

5   read the following stipulation into evidence and with

6   Mr. Villanueva's assistance, that would be Government

7   Exhibit Stipulation No. S-11, and I will read, and then at the

8   same time publish to the Ladies and Gentlemen of the Jury the

9   stipulation and the applicable exhibits.

10           (Exhibit published.)

11           MR. SELDEN:  It is hereby stipulated and agreed by

12  and between the United States of America and the defendant,

13  Elgin Brack, through his attorneys, that:

14           Government Exhibit 133-A consists of a true and

15  accurate copy of an X-ray image of Alejandro Deleon's skull

16  taken from Elmhurst Hospital Center emergency room on

17  November 26, 2018, that includes bullet fragments located

18  inside his skull from a shooting on that same date.

19           Government Exhibit 133-B consists of a true and

20  accurate copy of Elmhurst Hospital Center records,

21  specifically, a property form for bullet fragments recovered

22  from Alejandro Deleon's skull on November 26, 2018.

23           Government Exhibits 133-A and 133-B were made at or

24  near the time of the occurrences referenced above by, or from

25  information transmitted by, a person with knowledge of the

Proceedings                                      63

1   matters described therein.  Making and maintaining such

2   records was a regular part of Elmhurst Hospital Center's

3   business and operations.

4           Government Exhibits 133-A and 133-B, as well as this

5   stipulation, marked as Government's Exhibit S-11, are

6   admissible in evidence.

7           Dated March 3rd, 2020.  Agreed and consented to by

8   the parties.

9           Your Honor, I will now move to publish Government's

10  Exhibit 133-A --

11          (Exhibits published.)

12          MR. SELDEN:  -- for the Ladies and Gentlemen of the

13  Jury.

14          THE COURT:  Those exhibits and the stipulation are

15  received in evidence without objection and you may publish

16  those exhibits to the jury.

17          MR. SELDEN:  Thank you, Your Honor.

18          (Government's Exhibits S-11, 133-A and 133-B

19  received in evidence.)

20          MR. SELDEN:  I am pointing to the top of Government

21  Exhibit 133-A.  Specifically this is referenced in the prior

22  stipulation.

23          I am now moving to publish, with the Court's

24  permission, 133-B, previously represented in a prior

25  stipulation.

Proceedings                                   64

1          THE COURT:  You may.

2          MR. SELDEN:  Thank you, Your Honor.

3          (Exhibit published.)

4          MR. SELDEN:  Now, pointing to 133-B.

5          Thank you, Your Honor.

6          MR. SIEGEL:  Your Honor, at this point I am going to

7   read a stipulation.

8          THE COURT:  Mr. Siegel.

9          MR. SIEGEL:  And Your Honor, with the Court's

10  permission, I would just like to move this screen so that I

11  can look as well while I publish to the jury.

12         THE COURT:  You can.

13         (Exhibit published.)

14         MR. SIEGEL:  Your Honor, at this time I would like

15  to read Government Exhibit S-9, which a stipulation between

16  the parties.  The stipulation reads:

17         It is hereby stipulated and agreed, by and between

18  the United States of America and the defendant, Elgin Brack,

19  through his attorneys, that:

20         The following Government Exhibits (collectively, the

21  surveillance video exhibits) are true and accurate copies of

22  excerpts of surveillance videos.  These surveillance video

23  exhibits fairly and accurately depict events that occurred on

24  November 26th, 2018, at the locations identified in the below

25  chart.

VB        OCR        CRR

Proceedings                                            65

1        Where a surveillance video exhibit includes a time

2   stamp, the below charts indicates if the time stamp, as

3   compared to the actual time of reported events, is

4   approximately accurate, fast (ahead of the actual time) or

5   slow (behind the actual time), and by approximately how much

6   time.

7        Where a surveillance video exhibit does not include

8   a time stamp, the approximate start time for the video is

9   indicated in the below chart.

10       Your Honor, on the second page is a chart that

11  continues onto the third page.  I am not going to read every

12  one of these, but I will read the exhibit numbers for them to

13  be in the record.  Those exhibits are 402-A, 402-B, 402-C,

14  402-D, 402-F, 402-G, 402-H, 402-I, and as set forth in the

15  chart, all of those 402 exhibits are from inside a Duane Reade

16  at 60-02 Roosevelt Avenue in Queens.

17       There's also Exhibits 408-A, 408-B, 408-C, 408-D,

18  408-E, and as set forth in the stipulation, all of those

19  exhibits are from inside a 7-Eleven at 50-92 Northern

20  Boulevard, Queens.

21       Exhibits 410-A, 410-B, 410-C, 410-D, which are in

22  all of those 410 exhibits are from United Fruit Brothers at

23  32-24 30th Avenue as southwest corner of 30th Avenue and

24  33rd Street in Queens.

25       411-A, 411-B, 411-C and each of those 411 exhibits

Proceedings                                    66

1    are from a Rite-Aid at 33-01 30th Avenue, Queens.

2           414-A, 414-B, and each of those exhibits are from

3    inside a Rite-Aid at 115-10 Merrick Boulevard, Queens.

4           And 415-A, 415-B, which are from a camera at the

5    southeast corner of 115th and Merrick Boulevard in Queens.

6           The surveillance video exhibits, as well as this

7    stipulation marked as Government's Exhibit S-9, are admissible

8    in evidence.

9           Dated Brooklyn, New York, February 27th, 2020, and

10   agreed and consented to by the parties.

11          THE COURT:  That stipulation and those exhibits

12   named in it are all received in evidence without objection.

13          (Government's Exhibits S-9, 402-A, 402-B, 402-C,

14   402-D, 402-F, 402-G, 402-H, 402-I, 408-A, 408-B, 408-C, 408-D,

15   408-E, 410-A, 410-B, 410-C, 410-D, 411-A, 411-B, 411-C, 414-A,

16   414-B, 415-A, 415-B received in evidence.)

17          MR. SIEGEL:  And Your Honor, at this time the

18   Government calls Detective Jerry St. Louis.

19          (Witness enters and takes stand.)

20

21          (Continued on following page.)

22

23

24

25

                   St. Louis - direct - Siegel                    67

1   (Continuing)

2              THE COURTROOM DEPUTY:  Stand right there, please.

3   Raise your right hand.

4              (Witness sworn.)

5              THE COURTROOM DEPUTY:  Please state your first and

6   last name and spell it for the record.

7              THE WITNESS:   Jerry St. Louis.  First name is

8   J-E-R-R-Y, S-T, period, L-O-U-I-S.

9              THE COURTROOM DEPUTY:  Thank you.  Please be seated.

10             THE COURT:  Mr. Siegel, you may inquire.

11             MR. SIEGEL:  Thank you, Your Honor.

12  **JERRY ST. LOUIS**,

13       called by the Government, having been duly

14       sworn, was examined and testified as follows:

15  DIRECT EXAMINATION

16  BY MR. SIEGEL:

17  Q    Sir, where do you work?

18  A    NYPD.

19  Q    Is that the New York City Police Department?

20  A    Yes.

21  Q    What is your rank with the NYPD?

22  A    I'm a detective.

23  Q    How long have you been with the NYPD?

24  A    Approximately 16 years.

25  Q    Are you a member of any specialized teams within the

1    NYPD?

2    A    Yes.

3    Q    What team that?

4    A    Crime Scene Unit.

5    Q    What is the Crime Scene Unit?

6    A    We basically respond to the scene to document, take

7    photographs, so that later on we can recreate the scene.

8    Q    And you said -- I believe you said you document and take

9    photographs?

10   A    Correct.

11   Q    Do you also collect evidence at the scene?

12   A    Yes.

13   Q    And just for abbreviation, is the Crime Scene Unit also

14   known as CSU?

15   A    Yes.

16   Q    Did you receive training to be part of CSU?

17   A    Yes.

18   Q    What training did you receive?

19   A    How to dust for fingerprints, fingerprints, swab DNA and

20   basically photograph, documents -- I'm sorry, document the

21   scenes.

22   Q    Do you receive classroom training?

23   A    Yes.

24   Q    In addition to classroom training, what other kind of

25   training do you receive?

St. Louis - direct - Siegel                    69

1    A     Basically I do footwear impression, laser trajectory, and
2    basically how to document the scene of a crime scene.
3    Q     In addition to the training in the classroom, do you also
4    receive training on the job?
5    A     Yes.
6    Q     How long do you receive training on the job for?
7    A     Six, seven months.
8    Q     In addition to the training in the classroom and training
9    on the job, is there any other training that you have
10   undergone as part of your job at CSU?
11   A     Yes.
12   Q     What training is that?
13   A     It's radioactive training and basically arson training.
14   Q     Where did you get that training?
15   A     One was in Las Vegas and one was in Atlanta.
16   Q     And when you say radioactive training, what is that?
17   A     That's basically like biohazard.  God forbid something
18   were to happen in terms of chemical reaction, how to respond
19   to that crime scene.
20   Q     How long have you been in CSU?
21   A     I have been in CSU for seven years.
22   Q     Does CSU respond to every single type of crime?
23   A     Somewhat, yes.
24   Q     Let me ask you a question.  Is there another group called
25   the Evidence Collection Team?

1    A    Yes.

2    Q    What is the distinction between the Evidence Collection

3    Team and CSU?

4    A    Crime scene responds to more fatal crimes.  If the

5    complainant is likely to die, homicides, arsons, rapes,

6    newsworthy incidents.

7              ECT responds to more like crime arsons from autos

8    and burglaries.

9    Q    And you said ECT.  Is ECT the abbreviation for the

10   Evidence Collection Team?

11   A    Correct.

12   Q    Just at a high level, what is it that CSU does when it

13   arrives at the scene?

14   A    We confer with the detective at the scene.  So we

15   basically confer with each other in terms of what evidence

16   needs to be collected and how it's basically documented at the

17   scene and also photographed at the scene in terms of the

18   evidence collected.

19   Q    When you collect evidence, do you follow any particular

20   procedures in the way you collect evidence?

21   A    Yes.

22   Q    What procedures do you follow?

23   A    We confer with the detectives and then we basically take

24   photos.  After we take photos, we place photo placards in

25   terms of evidence we're going to bring in and we collect the

St. Louis - direct - Siegel                                   71

1    evidence.

2    Q     What are photo placards?

3    A     Photo placards is basically like numbers that we place

4    down in terms of what we are going to collect.

5    Q     When you collect the evidence, do you wear gloves?

6    A     Yes.

7    Q     Why do you wear gloves?

8    A     So we don't contaminate the scene in terms of leaving our

9    skin cell behind at the location.

10   Q     In addition to gloves, is there any other clothing that

11   you wear as part of your work with CSU?

12   A     Yes.

13   Q     What clothing is that?

14   A     It's called a Tyvek suit.  It's like a spaceman suit.

15   Q     In addition to wearing gloves and the Tyvek suit, are

16   there tools that you use to collect evidence?

17   A     Yes.

18   Q     What tools do you use to collect evidence?

19   A     We use basically sanitized tweezers, basically freshly

20   packaged, so we can pick up the item.  Of course we use

21   gloves, masks, so we don't contaminate the evidence.

22   Q     After you pick up an item with gloves and the sanitized

23   tweezers, what do you do with the item?

24   A     Basically, we package the item.

25   Q     What do you package the item in?

1   A     If it's clothing, it's a brown bag.  If it's ballistics,

2   it's basically a clear plastic bag.

3   Q     Do those bags get sealed?

4   A     Yes.

5   Q     Do you put any markings on the bag to keep track of what

6   the evidence is?

7   A     Yes.

8   Q     What kind of markings do you put on the bag?

9   A     So, my first name is Jerry and my last name is St. Louis.

10  I would mark it my initials, so it would JSL-1 and so on.

11  Q     When you say so on, the first one would be JSL-1?

12  A     JSL-1 continuous, JSL-2, 3, and on.

13  Q     Let me direct your attention to November 26, 2018.  Were

14  you working that day?

15  A     Yes.

16  Q     Were you sent out to a crime scene?

17  A     Yes.

18  Q     Where was the crime scene that you were sent out?

19  A     It was at 60-02 Roosevelt Avenue.

20  Q     In what borough?

21  A     Queens.

22  Q     And what was that location?

23  A     It was a Duane Reade's location.

24  Q     What was the status of the scene when you arrived?

25  A     It was basically surrounded with crime tape, crime scene

1   tape, and also safeguarding officers, like cops, NYPD officers

2   to safeguard the scene.

3   Q     What is crime scene tape?

4   A     It basically blocks off from anybody coming in the scene

5   to contaminate the scene.

6   Q     You mentioned safeguarding officers.  What are

7   safeguarding officers?

8   A     That's NYPD officers, so they don't let anybody interfere

9   in terms of touching evidence at the scene.

10  Q     Were you there when the crime scene tape was put up?

11  A     I came after the fact.  When I came there, the crime

12  scene tape was already put up.

13  Q     From your understanding of the procedures of the NYPD,

14  once the crime scene tape goes up, are people other than

15  police officers allowed in to the scene?

16  A     No.

17  Q     So when you arrived at the scene, what was the first

18  thing you did?

19  A     I conferred with the detective at the scene.  We

20  basically conferred with one another in terms of what needs to

21  be collected.  We looked at the surveillance video on what

22  happened and from then on we decided to pick up the evidence

23  on what we saw through the video.

24  Q     As part of those conferrals and watching the surveillance

25  video, did you confirm that the scene had been safeguarded?

St. Louis - direct - Siegel                74

1  A    Yes.

2  Q    Why was it that you were watching the surveillance video?

3  A    So it can basically aid us in collecting the evidence at

4  the scene.

5  Q    Can you explain that a little bit?

6  A    If he touched an item or he dropped an item, that would

7  basically help me in terms of collecting the evidence at that

8  scene.

9  Q    As part of your work with crime scene, did you also take

10  photographs of the scene and other evidence?

11  A    Yes.

12  Q    Why is it that you take photographs?

13  A    Just to be -- so, for instance, like when we come to the

14  scene, we can basically show everybody this is how the

15  location was when we got to the scene.

16  Q    So I'd like to hand you a CD, which would be contains

17  Government Exhibit 106-A, Government Exhibit 126, Government

18  Exhibit 127, Government Exhibit 300-A, Government Exhibit

19  300-B, Government Exhibit 301-A, 301-B, 301-C, 302-A, 302-C,

20  302-D, and 302-E.

21          MR. SIEGEL:  And this CD was previously shown to

22  defense counsel.  I'd like to hand the CD to the witness with

23  the Court's permission.

24          THE COURT:  You may.

25          MR. SIEGEL:  Your Honor, may I inquire from standing

St. Louis - direct - Siegel                    75

1    by the witness just to collect the evidence when he is done

2    with it?

3            THE COURT:  If it will expedite matters, please.

4    Q    Sir, do you recognize that?

5    A    Yes.

6    Q    How do you recognize it?

7    A    It has my signature on it.

8    Q    And what is on that CD?

9    A    My photographs that I took at the crime scene.

10   Q    Are the photographs on that CD fair and accurate

11   depictions of what you saw at the crime scene that day?

12   A    Yes.

13   Q    Thank you.

14           MR. SIEGEL:  Your Honor, I move that the exhibits

15   that I previously read on the CD be admitted into evidence.

16           MR. FARRELL:  No objection.

17           THE COURT:  No objection by the defense, those

18   exhibits are admitted into evidence.

19           (Government Exhibits 106-A, 126, 127, 300-A, 300-B,

20   301-A, 301-B, 301-C, 302-A, 302-C, 302-D, and 302-E received

21   in evidence.)

22           THE COURT:  Mr. Siegel, does the CD itself have a

23   separate exhibit?

24           MR. SIEGEL:  It does not have a separate exhibit,

25   but we can put one on it if the Court would prefer.  It is

1  labeled with the exhibits on it.

2           THE COURT:  Then it's fine.

3           MR. SIEGEL:  Mr. Villanueva, if I could have the

4  laptop to show, please.

5           Everything I'm going to show for a little while is

6  on that CD, so it's now in evidence.

7  Q    So I'm showing you Government Exhibit 106-A.  What is

8  Government Exhibit 106-A?

9  A    It's in front of the location, Duane Reade, 60-02

10 Roosevelt Avenue.

11 Q    Is that the scene that you responded to?

12 A    Yes.

13 Q    And is it possible for you to see the crime scene tape

14 that you referred to?

15 A    Yes.

16 Q    Could you describe where you see that crime scene tape?

17 A    It's in front of the Duane Reade location where the

18 incident occurred.

19 Q    What color?

20 A    Yellow.

21 Q    Now, I'd like to show you Government Exhibit 126.  What

22 is Government Exhibit 126?

23 A    That's the opposite view of where -- from the other

24 photo, just basically showing the opposite view of the

25 establishment, Duane Reade.

St. Louis - direct - Siegel                          77

1    Q     Showing the area across the street?

2    A     Correct.

3    Q     Okay.  So you mentioned earlier that you viewed

4    surveillance video when you arrived; is that right?

5    A     Yes.

6    Q     I'm showing you 402-C, which is in evidence pursuant to a

7    stipulation as evidence from inside Duane Reade.  Before I

8    play it, do you recognize this opening shot?

9    A     Yes, I do.

10   Q     Is this surveillance video that you saw that day?

11   A     Yes.

12        MR. SIEGEL:  I'm going to now hit play.

13        (Video playing.) (Video paused.)

14        MR. SIEGEL:  I am going to pause at the end of the

15   video.

16   Q     Can you describe what you saw on the video when you were

17   at the scene that day?

18   A     We basically watched the perpetrator come inside the

19   Duane Reade store and holding a bag of Skittles and basically,

20   after a few seconds of talking with the victim, goes behind

21   the counter and I guess requests for money or something and --

22        MR. STEIN:  Objection.

23        MR. FARRELL:  Objection.

24        THE COURT:  Sustained.  Don't speculate.

25   A     -- basically shoots the victim and then a struggle ensues

MDL      RPR      CRR      CSR

St. Louis - direct - Siegel                    78

1    and fires another shot at the victim.

2    Q    I just want to -- I am going to hit play again to talk

3    about some of what you just said.

4            (Video playing.) (Video paused.)

5    Q    You said before that the robber had a bag of Skittles?

6    A    Correct.

7    Q    On the touch screen in front of you, could you circle

8    that bag of Skittles?  And the screen can be a little finicky.

9            MR. SIEGEL:  For the record, he has circled in the

10   lower left-hand corner a bag.

11   Q    Was that bag of Skittles still at the scene when you

12   arrived?

13   A    Yes, it was.

14           MR. SIEGEL:  I just stopped the video at 13 seconds

15   and I am going to hit play again.

16           (Video played.) (Video stopped.)

17           MR. SIEGEL:  I am hitting pause at 39 seconds.

18   Q    You said when you watched the surveillance video, you saw

19   a firearm?

20   A    Yes.

21   Q    Are you able to see the firearm in this image?

22   A    Yes.

23   Q    Can you please circle where you see the firearm.

24           MR. SIEGEL:  For the record, the witness has circled

25   a black object in the lower right-hand corner of the frame.

St. Louis - direct - Siegel                    79

1           I am hitting play again.

2           (Video played.) (Video stopped.)

3    Q    When you described the video before, you said you saw the

4    victim be shot.  What is it that you saw that led you to

5    believe that the victim had been shot?

6    A    The flash of the muzzle and also you could see like smoke

7    coming after the flash of the muzzle and you could see his

8    reaction after being hit.

9    Q    What do you mean you could see his reaction?

10   A    You could see him --

11          THE COURT:  "Him" being?

12          THE WITNESS:  The victim holding his side after

13   being shot.

14   Q    The smoke you mentioned, are you able to see that smoke

15   in this image?

16   A    Yes.

17          MR. SIEGEL:  This is at 56 seconds, by the way, for

18   the record.

19   Q    Could you circle where you see that smoke?

20          MR. SIEGEL:  For the record, he has circled a gray

21   patch at the bottom center of the image.

22          I am hitting play again.

23          (Video played.) (Video stopped.)

24          MR. SIEGEL:  I have stopped it at a minute, 10.

25   Q    You mentioned there was a struggle.  What happened after

St. Louis - direct - Siegel                    80

1    the struggle?

2    A    Apparently the perpetrator shoots the victim --

3          MR. STEIN:  Judge, objection to "apparently."

4          THE COURT:  Testify as to what you know.

5    "Apparently" suggests that you are guessing.

6          THE WITNESS:  Okay.

7          THE COURT:  We don't want guessing.

8          THE WITNESS:  All right.

9    A    Basically the perpetrator shoots the victim in the head

10   after an encounter ensues.

11   Q    And what does the robber do after that?

12   A    He flees the location.

13   Q    When you were at the scene of the location, did you see

14   any bloody footprints along the path that the robber took as

15   he fled?

16   A    No.

17   Q    What did that indicate to you about whether the robber

18   had stepped in any blood?

19          MR. FARRELL:  Objection to eliciting an opinion, he

20   is not an expert.

21          MR. SIEGEL:  Your Honor, as part of his training, he

22   watches the surveillance video to look for evidence to

23   collect.  He watched the surveillance video to see if there

24   were a bloody trail, to see if the robber would have stepped

25   in any blood.

1          THE COURT:  Try a different form.  You can get to

2    where you want to go, Mr. Siegel.

3    Q    Did you see any evidence at the scene or from the

4    surveillance video that the robber had stepped in any blood?

5    A    I saw a whole lot of blood at the location.

6    Q    We will get to that in a moment.  Did you see any

7    evidence indicating that the robber had stepped in that blood?

8    A    No.

9    Q    Based on the surveillance video, was there any particular

10   evidence you were going to look for at the scene?

11   A    Basically looking for ballistics at the scene.

12   Q    What does that mean to look for ballistics?

13   A    It's the projectile that flies -- -once you fire the shot

14   of the firearm and the bullet flies out of the muzzle part of

15   the firearm and it basically leaves pieces of evidence at the

16   scene from that fired bullet.

17   Q    Did you search for ballistics evidence?

18   A    Yes.

19   Q    What did you find?

20   A    We found one copper jacketing, one lead fragment, and

21   another lead fragment at the scene.

22   Q    Just to explain of those terms, what is copper jacketing?

23   A    Copper jacketing is the outer covering of a fired bullet

24   once it's fired.

25   Q    So let's walk through some of that.  I am showing you

1   Government Exhibit 301-A.  What is Government Exhibit 301-A?

2   A    301-A, I see photo markers three and six, photo markers

3   three and six that we placed at the scene.

4   Q    Before we get to the photo markers, what area is this?

5   A    This is besides the counter, basically where the incident

6   took place.

7   Q    So now for the photo markers you mentioned, you mentioned

8   photo markers 3 and 6.

9   A    Yes.

10  Q    What are those photo markers for as a general matter?

11  A    It's so we can take those items, that evidence into

12  custody in NYPD.

13  Q    You mentioned earlier when you mark evidence you mark it

14  JSL-1, JSL-2, et cetera?

15  A    Yes.

16  Q    Where there is a three, does that indicate where JSL-3

17  was found?

18  A    Yes.

19  Q    And the 6, does that indicate where JSL-6 was found?

20  A    Yes.

21  Q    You mentioned that there was blood at the scene.  At the

22  bottom of this picture, there is a red substance.  Is that the

23  blood you are referring to?

24  A    Yes.

25  Q    And further up on the scene, in the area that the robber

St. Louis - direct - Siegel                83

1    was running out, in this picture, were there any bloody

2    footprints from the robber?

3    A    Yes.

4    Q    I'm sorry, bloody footprints from the robber?

5            MR. STEIN:  Judge, objection to his prompting the

6    witness.

7            THE COURT:  You should lay the proper foundation.

8    Q    This is a picture you took at the scene?

9    A    Yes.

10   Q    Is that right?

11   A    Yes.

12           THE COURT:  The question is did he see any bloody

13   footprints.

14   Q    Did you see any bloody footprints from the robber on the

15   video?

16           MR. STEIN:  Judge, I object.

17           THE COURT:  First whether he saw bloody footprints.

18   Q    Did you see any bloody footprints at the scene?

19   A    Yes.

20           THE COURT:  Ask him where they were.

21   Q    Where did you see bloody footprints?

22   A    I saw bloody footprints towards the counter, the front

23   part of the counter of the establishment, the Duane Reade.

24   Q    Did you see bloody footprints anywhere else in the store?

25   A    Yes.

St. Louis - direct - Siegel                    84

1    Q    Where else did you see bloody footprints?

2    A    Behind the rear part of the Duane Reade.

3    Q    Did you also watch surveillance video from the rear part

4    of the Duane Reade?

5    A    No.

6    Q    Did you watch surveillance video to see what the victim

7    did after the encounter with the robber?

8    A    Yes.

9    Q    What did the victim do after the encounter with the

10   robber?

11   A    He ran throughout the whole store in panic, in shock.

12   Q    Did you see any bloody footprints left from that?

13   A    Yes.

14   Q    In the front area towards the exit to the door, where on

15   the previous video the robber had run out, did you see any

16   bloody footprints following that path?

17   A    No.

18   Q    I am going to show you Government Exhibit 127.  What is

19   Government Exhibit 127 showing?

20   A    Photo markers 4, 6, and 7.

21   Q    And what area of the store is this?

22   A    This is toward the side area where the incident occurred.

23   Q    And the photo marker 6 that is shown in this picture is

24   that the same as the photo marker 6 in the last photo we

25   looked at?

1   A    Yes.

2   Q    So let's start with that photo marker 4.  I am going to

3   show you Government Exhibit 300-A.  What is Government Exhibit

4   300-A?

5   A    That's the copper jacketing.

6   Q    And what did you label this piece of evidence?

7   A    It has a photo marker 4 with my blue scale with my

8   initials marked JSL-4.

9   Q    Can you circle on this picture where you see that copper

10  jacket?

11          MR. SIEGEL:  Let the record reflect that he has

12  circled a copper colored item on the right side of the

13  photograph.

14  Q    What is the purpose of the blue scale that you referred

15  to?

16  A    It's the point that the evidence is going to be taken by

17  us.

18  Q    What did you do with JSL-4?

19  A    We photographed it.  That was a close-up shot, and we

20  packaged it.

21  Q    When you packaged it, did you use any tools?

22  A    Yes.

23  Q    What tool did you use?

24  A    Sanitized tweezer.

25  Q    Did you wear gloves?

St. Louis - direct - Siegel                    86

1    A    Yes.

2    Q    And what did you package it in?

3    A    A plastic bag, a small plastic bag.

4    Q    Was that bag sealed?

5    A    It was sealed.

6    Q    When you collected that evidence, was it ultimately

7    assigned a voucher number and item number?

8    A    Yes.

9    Q    What is a voucher number?

10   A    It's a number given by NYPD basically to give it a number

11   for us so we can recall it and get it if we want to for NYPD

12   purposes.

13   Q    What is the difference between a voucher number and an

14   item number?

15   A    An item number is the item that's basically put into that

16   voucher, the number is given by NYPD so you know what item it

17   is at that particular time.

18   Q    Can multiple items be assigned the same voucher number?

19   A    Yes.

20   Q    What was the voucher number for JSL-4?

21   A    It was six -- I'm sorry, pardon, it was 4000625302.

22   Q    What was the item number on that voucher?

23   A    That was item No. 1.

24   Q    Let's go back to another placard we saw.  I am going to

25   show you Government Exhibit 127.  Could you circle where you

1  saw placard 6.

2        MR. SIEGEL:  Let the record reflect he has circled

3  the number six on the left-hand side of the image.

4  Q    I am going to show you Government Exhibit 301-C.  What is

5  Government Exhibit 301-C?

6  A    It's a piece of lead fragment embedded in blood.

7  Q    Could you circle where in this picture you see that lead

8  fragment?

9        MR. SIEGEL:  Let the record reflect he has circled

10 an object in the center of the photograph.

11       I am going to blow it up on the screen, the object

12 he circled.

13 Q    What was that object marked?

14 A    It was marked 6, but JSL-6.

15 Q    What did you do with JSL-6?

16 A    Picked up it with a sanitized, freshly packaged tweezer

17 and basically put in a plastic bag.

18 Q    Was that plastic bag sealed?

19 A    Yes.

20 Q    Was that also assigned a voucher number?

21 A    Yes.

22 Q    What voucher number was that assigned?

23 A    It was 4000625302.

24 Q    Was that the same voucher number that JSL-4 was given?

25 A    Yes.

St. Louis - direct - Siegel                    88

1   Q    What item number was JSL-6 given?

2   A    Item No. 2.

3   Q    In addition to JSL-4 and JSL-6, did you find any other

4   bullet fragments at the scene?

5   A    Yes.

6   Q    Where did you find another bullet fragment?

7   A    My partner and I found another bullet fragment behind the

8   counter where the incident took place.  It was lodged inside

9   the window sill of that establishment.

10  Q    I am going to show you Government Exhibit 302-A.  What is

11  Government Exhibit 302-A?

12  A    It's showing where the bullet made a path and basically

13  lodged in the ledge of that window behind the counter where

14  the incident took place.

15  Q    Are you able to see that bullet fragment in this picture?

16  A    Yes.

17  Q    Could you circle where you see that bullet fragment in

18  this picture?

19       MR. SIEGEL:  Let the record reflect the witness has

20  circled a small silver object under the window sill in the

21  upper left-hand side of the window sill.

22       I am going to blow up that portion that he circled.

23  Q    What did you mark this bullet fragment as?

24  A    I marked it JSL-9.

25  Q    I'd like to show you now Government Exhibit 302-B.  What

St. Louis - direct - Siegel                    89

1   is 302-B?

2   A    302-B is the piece of lead fragment, basically JSL-9.

3   Q    What did you do with JSL-9?

4   A    Like I did with JSL-4 and JSL-6, used a freshly packaged

5   tweezer and basically put in a plastic bag.

6   Q    Did you seal the plastic bag?

7   A    Yes.

8   Q    Did this also get a voucher number?

9   A    Yes.

10   Q    Did it get the same voucher number as the other two

11   items?

12   A    Yes.

13   Q    What item number did JSL-9 get?

14   A    It was item number 30.

15   Q    In addition to taking pictures to document the scene,

16   does CSU also make sketches of the crime scene?

17   A    Yes.

18   Q    Did you make a sketch of this scene?

19   A    Yes.

20   Q    What does the sketch show?

21   A    It shows the layout of the Duane Reade.

22   Q    Does it also show where you would have found evidence in

23   the Duane Reade?

24   A    Yes.

25   Q    I'm showing you Government Exhibit --

St. Louis - direct - Siegel                    90

1          MR. SIEGEL:  Mr. Villanueva, this should be just for

2    the witness.  Government Exhibit 125 just for the witness.

3    Q    Do you recognize Government Exhibit 125?

4    A    Yes.

5    Q    How do you recognize Government Exhibit 125?

6    A    It has my name, my shield number, and my run number for

7    this case.

8    Q    What is Government Exhibit 125?

9    A    It's basically -- it's a top view of the establishment,

10   Duane Reade.

11   Q    Is this the sketch that we were referring to a moment

12   ago?

13   A    Yes.

14   Q    Is this a true and accurate copy of that sketch?

15   A    Yes.

16          MR. SIEGEL:  Your Honor, I move to admit Government

17   Exhibit 125.

18          THE COURT:  Is there any objection?

19          MR. STEIN:  Just to note, I understand this is not

20   to scale.

21          THE COURT:  That is correct, Detective St. Louis,

22   it's not to scale; correct?

23          THE WITNESS:  Correct.

24          MR. SIEGEL:  It's not to scale as the exhibit itself

25   says.

1          THE COURT:  And with that, no objection?

2          MR. STEIN:  Correct.

3          THE COURT:  Received with no objection.

4          (Government's Exhibit 125 received in evidence.)

5          MR. SIEGEL:  Just for ease of viewing, I am going to

6     blow up a portion of this exhibit.

7     Q    On the sketch, could you please circle where the entrance

8     to the store is shown.

9          MR. SIEGEL:  Let the record reflect, the witness has

10    circled the word "entrance."

11    Q    Next to the entrance, there is a line of Ws.  What are

12    those Ws?

13    A    Those are windows.

14    Q    Could you indicate on this sketch where the cash

15    registers are?

16    A    Can I circle it?

17    Q    Please.

18         MR. SIEGEL:  Let the record reflect he has circled a

19    portion of a rectangle near where the numbers three and two

20    are on the sketch.

21    Q    So I have been referring to numbers on the sketch.  What

22    do those numbers represent?

23    A    Those numbers represent items that I took at the crime

24    scene.

25    Q    So is JSL-4 shown on this sketch?

St. Louis - direct - Siegel                    92

1   A    Yes.

2   Q    You don't have to circle it, but could you describe how

3   we can see where JSL-4 would be?

4   A    It's in red and it's where -- with the photographs, it

5   correlate to the photos I took where number 4 was with the

6   photos along with the sketch.

7   Q    Let me ask you a different question.  There is a number 4

8   shown on this sketch; is that right?

9   A    Yes.

10  Q    Does that indicate where JSL-4 was found?

11  A    Yes.

12  Q    Does the number 6 also indicate where JSL-6 was found?

13  A    Yes.

14  Q    Would the same be true for JSL-9?

15  A    Yes.

16  Q    In addition to the ballistics evidence that we talked

17  about today, did you find additional evidence at the scene?

18  A    Yes, I did.

19  Q    What, generally speaking, is some of the other evidence

20  that you found at the scene?

21  A    We found a short-sleeved shirt that was outside the Duane

22  Reade.  We saw a bag of Skittles, Sweet Heat Skittle, $20

23  bill, brown left-handed glove, broken eyeglasses with possible

24  blood, left lens from broken eyeglasses, a black Tazio Italy

25  black belt inside the location.

St. Louis - direct - Siegel                    93

1       We found a right and a left shoe at the location,

2   blue jeans and briefs and black socks.

3       MR. STEIN:  Excuse me, Judge.  I don't have a

4   problem with the witness doing it, but it appears that he is

5   reading from a document.  If he needs that to refresh his

6   recollection, then he should say so.

7       THE COURT:  Mr. Siegel, do you want to take him

8   through it?

9       MR. SIEGEL:  Yes.

10  Q    Detective, were you just reading what you were saying

11  from a document?

12  A    Yes.

13  Q    As you sit here today, without that document, do you

14  remember every piece of evidence that you collected?

15  A    Yes.

16  Q    Even without reading off this, would you remember --

17  A    Oh, would I -- no.  No.  I handle tons of crimes, so I

18  wouldn't have remembered that right now.

19  Q    Does seeing this document in front of you refresh your

20  recollection as to the items you did collect?

21  A    Yes.

22  Q    In fact, the items that are listed at the bottom of the

23  sketch, are those the items that you collected?

24  A    Yes.

25  Q    And the numbers that are listed next to them, are those

St. Louis - direct - Siegel                    94

1    the numbers that you marked them with?

2    A    Yes.

3    Q    On the diagram, there are red lines shaped like triangles

4    or V's.  What are those?

5    A    Those are surveillance cameras.

6    Q    For the view of the surveillance camera, is the open part

7    of the V or is the closed part of the V the direction that the

8    camera is facing?

9    A    The open part of the V is where the camera is facing.

10   Q    Are you able to identify which surveillance video the

11   video is the camera that we watched the video from earlier?

12   A    It's between --

13   Q    And you can circle it on your screen.

14            MR. SIEGEL:  Let the record reflect the witness has

15   circled a red triangle.  It is the second from the left on the

16   top of the sketch.

17   Q    Detective St. Louis, I would like to hand you Government

18   Exhibit 300.

19            MR. SIEGEL:  Your Honor, may I approach the witness?

20            THE COURT:  You may.

21   Q    So, I'm handing you again Government Exhibit 300.  Do you

22   recognize that outer packaging for Government Exhibit 300?

23   A    No.

24   Q    Could you open it up and look on the inside?

25            And do you recognize the contents of Government

1    Exhibit 300?

2    A    Yes.

3    Q    How do you recognize those contents?

4    A    It has my markings on it and the evidence that I saw at

5    the location, the.

6    Q    Can you explain what is the contents of Government

7    Exhibit 300?

8    A    It's a copper jacketing, the piece of lead fragment that

9    was on the floor, that was embedded in the blood and another

10   lead piece, a lead fragment that was on the window sill ledge

11   of the establishment.

12            (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

St. Louis - direct - Siegel                    96

1    BY MR. SIEGEL:  (Continuing)

2    Q    When you packaged those items, how did you package them?

3    A    I packaged them in this clear bag.  (Indicating.)

4         MR. SIEGEL:  So for the record, the witness is

5    holding up a medium-sized clear bag.

6    Q    Did you package each exhibit into that one bag?

7    A    Not --

8    Q    Each piece of evidence into that one bag?

9    A    No.  They have their own separate bags.

10   Q    So what marking is written on that bag?

11   A    It has "JSL 9" for my initials.

12   Q    And does that indicate that JSL 9 was inside that bag?

13   A    Yes.

14   Q    There's also, in addition to the medium bags and --

15   actually, let me take a step back.

16        So that medium bag says, "JSL 9"?

17   A    Yes.

18   Q    There are two other medium bags.  What are those bags

19   marked as?

20   A    JSL 4 and JSLk6.

21   Q    Are those the bags that you had put JSL 4 and JSLk6 in?

22   A    Yes.

23   Q    In addition to the medium bags, there are also three

24   larger bags.  What are those?

25   A    Those are given to the officer at the scene so he can

St. Louis - direct - Siegel                                97

1    basically keep those items in one, in their own separate bag

2    to give its own number.

3    Q    When you say it's own number, what are you referring to?

4    A    Invoice number.  The voucher, yes, the invoice number.

5    Q    Is that the same vouchering number we talked about

6    before?

7    A    Yes.

8    Q    The voucher number that you gave before that I don't

9    remember right now, is that number written on each of these

10   large bags?

11   A    Yes, it is.

12   Q    And when it was packaged, what was the relationship

13   between the large bag and the small bag or the medium bag,

14   excuse me?

15   A    It's to, basically send it to the, to the police lab so

16   they can do their testing.  So it's packaged in a NYPD serial

17   number.

18   Q    Was the medium bag inside the larger bag?

19   A    Yes.

20   Q    And what about the fragments themselves, are they

21   currently in bags?

22   A    Yes, they are.

23   Q    Did you put them in those bags?

24   A    No.

25   Q    Do you know where those bags came from?

St. Louis - direct - Siegel                    98

1    A    No.

2    Q    When you last saw them, were they sealed inside the

3    medium sized bags we referred to?

4    A    They were sealed inside these bags because I put them in

5    there, these bags, with my initials on them, JSL 9, JSL 6 and

6    JSL 4.

7              MR. SIEGEL:  Your Honor, at this time, I move to

8    admit Government Exhibit 300 subject to connection.

9              MR. STEIN:  No objection.

10             THE COURT:  Received without objection subject to

11   connection.

12             (So marked.)

13   Q    I'd like to collect all this and bring it to the ELMO.

14   Let's not lose anything.

15             (Pause.)

16             (Continued on next page.)

17

18

19

20

21

22

23

24

25

1      THE COURT:  Mr. Siegel, where do you think we are?

2 Are we getting to a landing point?

3      MR. SIEGEL:  I was going to go through these items

4 to just show them to the jury and then was going to stop.  We

5 can break before I do that show and tell or after.

6      THE COURT:  I think that might take more time than

7 we have so let's break.

8      MR. SIEGEL:  We can take a break now.

9      THE COURT:  That works for me.

10      All right.  Ladies and gentlemen, we are going to

11 take a break now.  Normally we would continue through and have

12 a logical break.  Unfortunately, there is a business meeting

13 of the judges at this hour so I have to break to go there.

14 Otherwise, my ordinary practice would be to continue until we

15 came to a logical conclusion.  This is not a logical

16 conclusion.  What Mr. Siegel was about to do would have been.

17      Anyway, it does bring us to the luncheon break and,

18 again, because these instructions are so important, you are

19 going to hear them repeatedly.

20      Ones that apply to little recesses that we take

21 apply here too so you are going to continue to keep an open

22 mind.  You are not going to discuss the case amongst

23 yourselves or with anyone else.  Now you're also going to be

24 outside the presence of this area of the courtroom.  You are

25 going to be outside having lunch or going to the cafeteria to

1  have lunch and there's more time than the short little breaks

2  that we take so that there are more concerns and there are

3  more very important rules that apply.

4          So you are not to use the luncheon period to conduct

5  any investigations about anything that remotely touches on

6  this case, either directly or remotely, any of the names, the

7  personalities, the issues, and that means doing it

8  electronically, I guess as we've all become accustomed to, or

9  the old fashioned way of looking it up in some print medium.

10         Also, during this luncheon break and, again, for the

11 overnight recess, you are not to use the time to read any

12 accounts of the case that appear in the media and there's a

13 big footnote here.  Back when I was young, media meant

14 newspapers, radio and TV.  Today, media means an awful lot of

15 things.  People get news in an awful lot of ways.  So you

16 never know when news will pop up on Facebook or Instagram.  So

17 should any of those things happen, you are directed to totally

18 disregard it, close them out of your eyes, mind and ears, and

19 just shut them out.  So there's to be no, not only no

20 investigation, but shutting out any media accounts that might

21 occur.

22         This was referenced in Mr. LaMonaco's instructions

23 to you and I want to repeat them.  While you are a juror on

24 this case, you are on radio silence.  You're not to

25 communicate the fact that you are a juror, that you're coming

1   to Brooklyn or that there's anything that relates to this case

2   directly or indirectly.  That's all strictly prohibited.

3   There will be no communications of any sort, electronic or

4   otherwise, about anything that goes on that relates to this

5   trial or the fact that you're even coming to the courthouse in

6   Brooklyn.

7           So that brings us to lunch which is the good news.

8   The bad news is that nobody is buying you lunch.  There is a

9   cafeteria here if you wish to avail yourself.  I don't know

10  what the weather is.  I know rain is supposedly coming at some

11  point but there are luncheon places around the courthouse.  So

12  we're going to break for that lunch.

13          I'm going to ask you to come back to the Central

14  Jury Room.  You can't come up to the courtroom or the regular

15  jury room unaccompanied.  Report back to the Central Jury Room

16  at around 2:15 and we'll start at 2:15, as close to 2:30 as we

17  can.

18          We all appreciate your patience, your cooperation,

19  your attendance and your sacrifice.  I bid you a good lunch

20  and we'll see you between 2:15 and 2:30.

21          (Jury exits.)

22          THE COURT:  All right.  Detective St. Louis, you are

23  excused.  Have a good lunch.

24          (Witness steps down.)

25          THE COURT:  Counsel, to the extent the rules apply,

1    to the extent that you want to leave anything in the courtroom

2    during the break, feel free.  William is going to lock it up.

3    To the extent that you think you might need something, then

4    take it with you so that way, you'll have access to it during

5    the luncheon period.

6              We'll see you between 2:15 and 2:30.

7              MR. SELDEN:  Thank you, Your Honor.

8              THE COURT:  Enjoy your lunch.

9              MR. SELDEN:  Thank you.

10             (Luncheon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                   AFTERNOON SESSION
2          (In open court; outside the presence of the jury.)
3          THE CLERK:  Court is back in session.
4          Counsel for both sides are present including
5   defendant.
6          THE COURT:  Counsel, welcome back all.
7          We have received a brief on behalf of Juror
8   Number Seven from some doctor of some sort indicating this
9   grave condition that she has that she's liable to panic in the
10  midst of proceedings here.  Counsel was willing to give me
11  sage counsel in the morning.  Do they have sage counsel in the
12  afternoon?
13         MR. FARRELL:  We're willing to let her go, Judge.
14  That's our sage counsel for the afternoon.
15         THE COURT:  I think it's a losing battle, gentlemen.
16  Defense agree?
17         MR. SELDEN:  Your Honor, on behalf of the
18  government, we agree.
19         THE COURT:  I heard a voice from somewhere.  The
20  government agrees?
21         MR. SELDEN:  Yes.
22         THE COURT:  Government agrees.  Defense agrees.
23  Judge agrees.  Let's bring in Juror Number Seven.
24         (Juror Number Seven enters.)
25         THE COURT:  Have a seat, Juror Number Seven.
```

CMH        OCR        RMR        CRR        FCRR

1    We received a note from your doctor.  I won't place

2  on the record the conditions but we take notice of it.  The

3  only comment I have is that you sat through what's known as

4  voir dire jury selection yesterday and you won't know how long

5  it took and the decisions that the lawyers on both sides have

6  to make are made with the understanding of who the pool is.  I

7  know, and the lawyers have confirmed for me, Judge Orenstein's

8  practice would have given you enormous opportunity, even

9  privately expressed at the sidebar, the health issues that you

10  have, but you didn't and that, frankly, jeopardizes all that

11  we do here, we hope, because no one ever knows, which is why

12  we select alternates in the first place, what might arise

13  after jury selection occurs that prevents a juror from

14  completing service.  When the problem arises before jury

15  service begins, then we've effectively lost one of our safety

16  valves and that is very regretful.

17    I am certainly not going to keep you as a member of

18  the jury in the teeth of the note diagnosis, prognosis, call

19  it what you will, that your doctor has provided, but I would

20  urge you in situations where people are making decisions on

21  the basis of the information that you provide them, if you're

22  incapable of doing something, be a little more forthright the

23  next time so that people don't make decisions based on

24  information that's not accurate.

25    MR. STEIN:  Judge, I believe actually this came up

1    during voir dire.

2          THE JUROR:  Yes.  If I could speak, I said it

3    yesterday.  He asked if anyone has vision impairments and I

4    had raised my hand and said that I get really bad migraines

5    that cause aura, numbness, tingling-ness that are caused from

6    my upper back and neck spasms.  I go to physical therapy twice

7    a week for it.  I didn't realize that it would affect me

8    because they haven't been often, but due to the stress it took

9    driving three hours this morning, I was just -- I was so tense

10   and my head was killing, the lights in here.

11          I don't want to be not fair to the defendant, the

12   government.  I just -- I said something this morning.  I know

13   I understand, obviously, it's my duty.  I want to serve my

14   rights.  I want to sit here but I just needed to express that

15   today before it got any further and I'm so sorry.

16          THE COURT:  Well, and we certainly, all of us, are

17   sympathetic to your issues.  I think migraines and the other

18   issues or conditions described in the doctor's note are more

19   concerning.  Migraines can be painful, certainly, but some of

20   the other conditions that were described there can be

21   disruptive and painful.

22          Obviously, we're concerned from the viewpoint of how

23   the case gets handled, but we're all equally, none of us,

24   would want to put you personally in a situation that

25   compromises your health and that's, to me, that's what that

1   doctor's note says and none of us here, we analogized it to

2   military service but we don't expect jurors to give blood, you

3   know, on the battlefield.

4            THE JUROR:  Thank you.

5            THE COURT:  So we regret that it ends this way but

6   we certainly, all of us, wish you to find some sort of, you go

7   with our good wishes and find, to the extent your condition

8   can be better managed, we all hope that that's ultimately

9   where this story ends, where there's some better management

10  for you so you don't face the kind of issues that you faced

11  today.

12           So we regret that and we give you good wishes and

13  you will be excused for the balance of the term.

14           THE JUROR:  Thank you.  Thank you.

15           THE COURT:  You're welcome.

16           (Juror Number Seven excused.)

17           MR. STEIN:  Judge, something also I want to alert to

18  your attention.  I don't know if you want to wait until

19  William comes back.

20           THE COURT:  No.  If it doesn't involve William doing

21  something --

22           MR. STEIN:  It might concern him indirectly because

23  I don't know what communication he has with the jurors.

24           THE COURT:  He always isolates the jurors.  So

25  what's going on between William and Juror Number Seven --

1          MR. STEIN:  Nothing between the two of them.  I'm

2     talking about the jury in general.

3          So I told the government about this during the lunch

4     break.  So they're used to be an area in the lunchroom where

5     there's a sign that says "Jurors Dining Area" or something.

6     For whatever reason, it's closed.  It's sealed off.  So there

7     were a number of jurors, not surprisingly, who were in the

8     cafeteria as I saw members of the government were and one of

9     my colleagues who knew I was here, in a somewhat loud sort of

10    jovial tone, came over to me and started asking me about the

11    case but they were general questions, not something specific.

12    I told him that there were jurors around so he had to stop.

13         So I don't know what you can do about this because

14    unless you want to sign off on my voucher to go to a nice

15    restaurant in Brooklyn Heights, I'm not sure what to do about

16    it, Judge.

17         THE COURT:  I'll have William inquire of the

18    District Executive.

19         MR. STEIN:  It was awkward and somewhat

20    uncomfortable, frankly.

21         THE COURT:  What Mr. Stein is saying, William, is

22    there used to be a section of the luncheon area that was

23    reserved for jurors and for whatever reason, that section has

24    been closed off and there was an intermingling of or --

25         I suppose there were jurors from some other cases as

1    well, Mr. Stein?

2              MR. STEIN:  I assume so.  That's certainly possible,

3    Judge.  I was only thinking about the jurors in our case.

4              THE COURT:  So the inquiry would be, and maybe the

5    District Executive can make inquiry here as to what can be

6    done to try to be more protective of jurors who are eating

7    lunch to separate them from counsel and to give counsel, as

8    Mr. Stein was noting, that counsel who jovially met him would

9    not be aware, that there were jurors present because the area

10   that used to be reserved for jurors with a sign is no longer

11   so marked.

12             THE CLERK:  Okay.

13             THE COURT:  So we'll see what we can do between now

14   and tomorrow's lunch.  It's a good point, Mr. Stein, in any

15   event.

16             THE CLERK:  I will inquire.

17             THE COURT:  That's really housekeeping.

18             MR. STEIN:  Literally.

19             THE COURT:  Literally.  In any event, we are

20   otherwise ready to go, I assume.

21             MR. SELDEN:  On behalf of the government, yes,

22   Your Honor.

23             THE COURT:  And Detective St. Louis can be back.

24             MR. SELDEN:  Would you like him to be seated,

25   Your Honor?

1        THE COURT:  Yes.  He can be seated before the jury
2   comes in.
3        (Witness resumes the stand.)
4        THE CLERK:  Just for the record, Counsel, Alternate
5   Juror Number One will take the place of Juror Number Seven.
6        (Jury enters.)
7        THE COURT:  Be seated, please.
8        Counsel will stipulate the jury is present and
9   properly seated.
10        MR. SELDEN:  On behalf of the government, yes,
11   Your Honor.
12        MR. STEIN:  Yes, Your Honor.
13        THE COURT:  Thank you, Counsel.
14        Ladies and gentlemen, welcome back.  We had a
15   greater length of time required to deal with certain
16   housekeeping matters.
17        In Mr. LaMonaco's preliminary advice to you about
18   how things would unfold, we did make reference to alternate
19   jurors and there are times because of urgent situations,
20   though extremely rare, we do have to at times replace a
21   regular juror with an alternate juror.  Unfortunately, we've
22   had that experience in this case.  We believe everything will
23   work out well to the excused juror but we were required to
24   replace Juror Number Seven with former Alternate Juror Number
25   One who is now Juror Number Seven.

1          Now, when we did break for lunch, you remember

2     Detective St. Louis was on the witness stand.  He was still

3     undergoing direct examination by Mr. Siegel and Mr. Siegel may

4     continue that examination now.

5          MR. SIEGEL:  Thank you, Your Honor.

6          Mr. Villanueva, if I can have the ELMO, please.

7     DIRECT EXAMINATION (Continued)

8     BY MR. SIEGEL:

9     Q    So Detective St. Louis, I want to go through some of the

10    items that you identified on the stand now on the projector.

11    So I wanted to just start by sorting them out as if I was

12    standing up in front of you.

13         What is in this envelope currently marked as 10?

14    Have you seen this plastic envelope before?

15    A    No.

16    Q    I'd like to take the item out.  Do you recognize this as

17    one of the items you recovered?

18    A    Yes.

19    Q    Which was this?

20    A    JSL 9.

21    Q    We also talked about the bags that were in that envelope.

22    So I'm going to start with the, what I was referring to as a

23    medium sized bag.  This signature that's running by the top at

24    the edge of the bag, do you recognize that signature?

25    A    Yes.

1  Q    What signature is that?

2  A    That's mine.

3  Q    And on the back of that medium sized bag, is that your

4  marking of "JSL 9"?

5  A    Correct.

6  Q    And when you packaged this bag, was JSL 9 inside of this

7  particular bag?

8  A    Yes.

9  Q    There is also this larger bag that says on it, "JSL 9."

10 What was inside of this larger bag?

11 A    The plastic bag that was marked JSL 9 with the piece of

12 lead fragment.

13 Q    So I'll just hold it up.  The piece of lead was in the

14 sealed bag, the sealed medium bag, and the sealed medium bag

15 was in the larger bag?

16 A    Correct.

17 Q    And we talked about this before but I want to make sure

18 that the jury can see it, the invoice number that's on this

19 yellow sticker.

20 A    Yes.

21 Q    That same invoice number that we talked about before is

22 the voucher number?

23 A    Correct.

24 Q    I'm now showing you what's in the plastic baggie marked

25 as, it has a "9" on it.  Have you seen this plastic baggie

1  before?

2  A    No.

3  Q    And that item inside the plastic baggie, is that an item

4  you collected?

5  A    Yes.

6  Q    Which item is this?

7  A    That is JSL 6, marker 6.

8  Q    When you collected JSL 6, did it look like this?

9  A    No.

10 Q    How was it different?

11 A    It was covered in blood.  Now it's not covered in blood.

12 Q    Did you clean the blood off of it?

13 A    No.

14 Q    I'll put JSL 6 back inside the plastic bag that it was

15 inside of.

16           There is also a sealed envelope containing one of

17 those medium sized bags that's also marked with a "9."  Do you

18 recognize the medium sized bag that is inside this sealed

19 envelope?

20 A    Yes.

21 Q    What do you recognize it as?

22 A    That's JSL, JSL 6, but also the identifying mark is the

23 blood residue that was on the piece of led fragment that's

24 inside that plastic bag.

25 Q    When you refer to the blood residue, do you mean that red

1   discoloration in the upper left-hand corner of this?

2   A    Correct.

3   Q    And there's also a larger plastic bag that's marked with

4   JSL 6.  Was the relationship for JSL 6 the same that we

5   discussed for JSL 9, the item in the medium bag, and this

6   medium bag in this larger bag?

7   A    Correct.

8   Q    I'm going to zoom in on the yellow sticker.  Is the

9   listed invoice number there the same as the voucher number we

10  discussed before?

11  A    Yes.

12  Q    Finally, I'm showing you what's in a small plastic baggie

13  with a faded "8" on it.  And I'm not going to take it out, but

14  do you recognize what's inside that small plastic baggie?

15  A    Yes.

16  Q    What is that?

17  A    That's the copper jacketing which was from the marker 4

18  which I marked as JSL 4.

19  Q    Was it in two pieces or one piece when you collected it?

20  A    It was in one piece.

21  Q    Do you know why it is now in two pieces?

22  A    I guess through transportation of it going to the

23  precinct of concern --

24              MR. STEIN:  Judge, I move to strike.

25              THE COURT:  Yes.  The answer is stricken.

1   Q    Instead of you guessing, do you know what --

2   A    No.  No.  I don't know.

3   Q    And I'm showing you a medium sized bag that has "JSL 4"

4   written on the back and there's also a signature by the tape.

5   Do you recognize that signature?

6   A    Yes.

7   Q    What signature is that?

8   A    That's my signature.

9   Q    And when you packaged JSL 4, was it placed inside this

10  medium sized bag?

11  A    Yes.

12  Q    And was it sealed at the time?

13  A    Yes.

14  Q    And I'm now showing you, again, a larger sized bag that

15  is marked as JSL 4.  What is this larger bag marked JSL 4?

16  A    That's where I put JSL 4, the copper jacketing into that

17  smaller bag, into that big bag.

18  Q    The similar way that you described for JSL 6 and JSL 9?

19  A    Correct.

20  Q    I just want to show the invoice number on here and just

21  read it for the record.  It's 4000625302.

22         Is that the same number that we talked about before

23  as the voucher number?

24  A    Yes.

25  Q    All right.  I'm going to set that aside as well.

1          MR. SIEGEL:  William, if we could go back to the

2   computer, please, and this is in evidence.

3   Q    So I just want to ask you a question about the video that

4   we looked at before and I'm going to start it at about

5   36 seconds.

6          You described earlier when we talked about this, you

7   described two shots, is that right?

8   A    Correct.

9   Q    And I just want to play the video.

10          (Video played.)  (Video stopped.)

11  Q    I'm stopping at 1 minute and 10 seconds.

12          So I just want to be clear, are you able to see two

13  shots on this video?

14  A    No.

15  Q    How many shots are you able to see on this video?

16  A    One.

17  Q    So the second shot, what is that you were referring to?

18  A    The second shot was when I got to the scene and I

19  basically, and I saw the lead, the piece of lead fragment on

20  that floor with the blood covered on it, so that's how I know,

21  basically, that's how he shot the second shot.

22          (Continued on next page.)

23

24

25

1    (Continuing)

2    Q    I also just want to go back for a moment to Government

3    Exhibit 125 which is the sketch we talked about before.

4         (Exhibit published.)

5    Q    And I asked you if this was a true and accurate copy of

6    the sketch, but I didn't ask, other than the fact that it's

7    not to scale, is this a fair representation of what the scene

8    looked like on the night that you were there?

9    A    Yes.

10   Q    I also asked about 4, 6 and 9, or JSL-4, 6 and 9, and I

11   just want to blow it up.

12        Could you just circle on this where 4, 6 and 9 were

13   found?

14        MR. SIEGEL:  So for the record he has circled red

15   numbers 4, 6 and 9.

16   Q    And I'd also just like to correct on this.  I think when

17   I described -- when you circled the surveillance video before

18   I described it as the second from the left and is it, in fact,

19   the second from the right that I should have said?

20   A    Yes.

21   Q    Let me look at that.

22        The surveillance video that we watched the video

23   from, could you circle that on this sketch.

24        So as I said, before I indicated that was the second

25   from the left.  I think I should have said that that is the

1   second camera from the right on the top on this sketch.

2           MR. SIEGEL:  Just a moment, Your Honor?

3           (Pause in the proceedings.)

4           MR. SIEGEL:  Your Honor, I have no further questions

5   and I would just ask permission for a moment to clean up the

6   little mess I've made by the ELMO.

7           THE COURT:  We appreciate your tidiness.

8           MR. STEIN:  Housekeeping, Judge.

9           THE COURT:  Who is handling cross?

10          MR. FARRELL:  I've got it, Judge.

11          THE COURT:  Mr. Farrell.

12  CROSS EXAMINATION

13  BY MR. FARRELL:

14  Q    Good afternoon, Detective St. Louis.

15  A    Good afternoon.

16  Q    My name is Gary Farrell.  You and I have never met or

17  discussed this case; correct?

18  A    Correct.

19  Q    Your unit, the Crime Scene Unit of the New York City

20  Police Department, how long have you been in it again?

21  A    Seven years.

22  Q    And you would agree with me, that's a city-wide unit.  In

23  other words, you cover all five boroughs; correct?

24  A    Correct.

25  Q    You are based in the Bronx, though.  Bronx, New York;

1   right?

2   A    No.  Queens.

3   Q    Queens.  Weren't you in the Bronx for a long time?

4   A    No.

5   Q    It's always been Queens?

6   A    It's Queens and Brooklyn.

7   Q    Okay.  So your unit was based in Queens back when this

8   incident happened?

9   A    Correct.

10  Q    And I believe you asked -- you answered the question

11  about the types of cases you respond to and it's not every

12  crime that happens on any particular day; right?  It's only

13  certain types of crimes; right?

14  A    Certain types of crimes; correct.

15  Q    The most serious crimes, like homicide, rape, arson,

16  shooting; would that be fair to say?

17  A    Correct.

18  Q    And your main duties and responsibilities are about

19  documenting and collecting evidence; correct?

20  A    Correct.

21  Q    And there is another unit that does this to less serious

22  crimes that I think you were asked about by Mr. Siegel, and

23  that's the NYPD's Evidence Collection Unit; correct?

24  A    Correct.

25  Q    They might respond to cases involving burglary or the

1    possession of a gun, and try to obtain evidence from -- in

2    those type of cases; correct?

3    A    Correct.

4    Q    They received similar training to you in terms of how to

5    document and recover and package evidence; correct?

6    A    Correct.

7    Q    You would agree with me that officers in the field don't

8    have that type of training, the training you have and the

9    Evidence Collection Unit officers unit has; is that fair to

10   say?

11   A    Fair to say.

12          MR. SIEGEL:  Objection, Your Honor, to that.  I

13   don't know whether he knows what other officers have training

14   on.

15          THE COURT:  Do you have an understanding of what

16   officers in NYPD have with respect to the collection of

17   evidence and documenting evidence if they are not a member

18   either of the CSU or the ECT?

19          THE WITNESS:  Yes.

20          THE COURT:  He may answer.

21   Q    Detective, you described on direct some of the tools you

22   have that are specific to people in your unit, Crime Scene

23   Unit.  You describe a suit kind of like a space suit; correct?

24   A    Correct.

25   Q    And you have certain tools that aid you in preserving

1    evidence and trying to avoid contamination; correct?

2    A    Correct.

3    Q    And those specific tools aren't carried by your typical

4    officer in the field.  You'd agree with me; correct?

5              MR. SIEGEL:  Your Honor, again, I don't know that he

6    knows.

7              THE COURT:  He just told us he knows what officers

8    generally in the field carry.  He is 16 years on the force,

9    seven years in CSU.

10   Q    I think you can answer, Detective.

11   A    Yes.

12   Q    Now, getting back to this case again.

13             Were you at the base in Queens when you got the call

14   or were you out on a job somewhere?

15   A    I was actually -- I came in early in the morning and what

16   happens is we have a satellite.  God forbid something was to

17   happen in Manhattan, they have a satellite in Brooklyn where

18   we could respond quickly, God forbid a 9-11 was to occur, so

19   we can respond to that catastrophe.

20             So I was at -- actually, I was in Brooklyn at the

21   Brooklyn satellite in the 84 Precinct.

22   Q    Okay.  And about what time did you arrive to the Duane

23   Reade that's the subject of your testimony?

24   A    6:30 in the morning.

25   Q    And did you have a partner that accompanied you to that

1    Duane Reade?

2    A     Yes.

3    Q     What was his name or her name?

4    A     Jay Eddy, J-A-Y, E-D-D-Y.

5    Q     And you say that upon entering the Duane Reade, one of

6    the first things you did was confer with one of the detectives

7    who was on the site, on the scene; is that right?

8    A     Correct.

9    Q     As you sit here today, I know it was a long time ago, do

10   you know who that detective was?

11   A     I can't recall.

12   Q     And you also said, I believe, correct me if I'm wrong,

13   one of the first things you did was watch the video, the video

14   that we've now seen a few times.  We might even see one more

15   time; is that right?

16   A     We all did, yes.

17   Q     Where inside the store did you watch that video?  Do you

18   recall?

19   A     I can't recall.

20   Q     Do you recall that it was the store manager that was

21   cooperative and brought you and the detective who was on the

22   scene trying to find out what happened into his office where

23   you could watch the case?  Does that ring a bell?

24   A     Sort of.

25   Q     And how many times did you watch it?  We've watched it

St. Louis - cross - Farrell                122

1   probably three times now in court.

2          How many times did you watch it that day before you

3   went out and began to do your job of documenting and

4   collecting evidence?

5   A    Approximately eight, nine times.

6          MR. FARRELL:  And I'm going to make it one last time

7   in court, please, with the assistance of Mr. Siegel and with

8   my colleague, Mr. Burns.

9          This will be Government's Exhibit 402-C.

10          (Video played for jury.)

11          MR. FARRELL:  Could we stop this there, Mr. Siegel.

12  Thanks.

13  BY MR. FARRELL:

14  Q    Detective, would you agree with me that the person who

15  was originally holding was what turned out to be Skittles, was

16  one of the things you collected; correct?

17  A    Yes.

18  Q    And that he held them in his right hand and that he held

19  them for a few seconds at least; right?  He was kind of

20  shaking them?

21  A    Shaking them; correct.

22  Q    And would you also agree with me that the guy pulled out

23  a gun with his right hand and pointed it at the man working

24  behind the counter.

25  A    I can't tell from -- I mean, I can't tell --

1    Q     If you want to go back.

2    A     Could we go back, please?  Thank you.

3    Q     Sure.

4            (Video played for jury.)

5    Q     Did you see that?

6    A     Yes.

7    Q     The hand he was reaching, would you agree it was his

8    right hand?

9    A     Yes.

10   Q     Okay.

11           MR. FARRELL:  Now we can play it, Mr. Siegel.  Thank

12   you.

13           (Video played for jury.)

14           MR. FARRELL:  Stop it, please.

15   Q     And you'd agree with me, and I think this has been asked

16   by Mr. Siegel, that would be the point of what we've been

17   calling the first shot; correct, Detective St. Louis?

18   A     Yes.

19   Q     Okay.  Thank you.

20           MR. FARRELL:  Continues, please, Mr. Siegel.

21           (Video played for jury.)

22           MR. FARRELL:  Stop it, please.

23   Q     At that point, Detective, do you agree that the person

24   that was shot charged or certainly went toward and, in fact,

25   touched the person that had shot him?  Would you agree with

St. Louis - cross - Farrell                    124

1   that?

2           Would you like to see it again?

3   A    I'd like to see it again, please.

4   Q    Okay.

5           (Video played for jury.)

6   Q    Having seen it again, Detective, would you agree that it

7   appeared that the person who was shot touched the person who

8   shot him with his left hand as he moved toward him?

9   A    I can't tell by that.

10  Q    Would you agree that there was -- you've described as the

11  second shot occurred off camera; correct?

12  A    Correct.

13  Q    Well, in the course of your investigation at the scene,

14  Detective, did you determine that the victim was shot in the

15  hand and, in fact, part of his thumb was shot off?  You found

16  that out when you were there; right?

17  A    Yes.

18  Q    And you also found out...

19          (Pause in the proceedings.)

20  Q    And you know it was his left hand; right?  That the

21  victim, it was his left thumb that was injured by the first

22  gunshot; correct?  In fact, he lost a part of it.

23  A    That, I can't recall.

24  Q    And well, Detective, you're agreeing that one of his

25  thumbs was shot; correct?  Right?

1  A    Yes.

2  Q    And would you agree that it was possible that blood from

3  his finger, as he moved toward the perpetrator, could have got

4  on the perpetrator's clothes?  You would agree with that;

5  right?

6           MR. SIEGEL:  Your Honor, that calls for speculation.

7           THE COURT:  Yes, also.  Sustained.

8  Q    Well, Detective, tell us what the term blood splatter

9  means.

10 A    Well, I'm not an expert because we have that in our crime

11 scene personnel.  We do have a blood spatter expert and I

12 can't state that I'm --

13 Q    Well, in your many years of responding to serious crimes

14 like murders, you've seen evidence of blood splatter before;

15 right?

16           MR. SIEGEL:  Your Honor, he just said that he --

17           THE COURT:  No, he can answer that question as a

18 difference between something about blood splatter, as opposed

19 to whether he has ever seen blood splatter that he believes

20 other people investigate.

21 Q    I think you can answer that question, Detective.  Do you

22 understand?

23 A    Would you repeat that question again, please.

24 Q    Sure.

25           In your many years of responding to scenes, some

St. Louis - cross - Farrell                126

1   very heinous homicide, you've seen evidence of blood splatter

2   yourself; right?

3   A     Yes.

4   Q     And there was a lot of blood in this Duane Reade;

5   correct?

6   A     Yes.

7   Q     And there was -- well, there was blood concentrated, in

8   fact, where you took out JL-6, one of the bullet fragments,

9   was in a, be fair to say, a pool of blood; correct?

10  A     Yes.

11  Q     And you know that just as a, without being an expert,

12  that when a person is shot, blood can project back toward the

13  shooter.  You know that; right?

14        MR. SIEGEL:  Your Honor, objection.

15        THE COURT:  Sustained.

16        MR. FARRELL:  Okay.  I'd ask with help of

17  Mr. Siegel, that Government's 301-C be shown to the witness.

18        (Exhibit published.)

19  BY MR. FARRELL:

20  Q     You remember Mr. Siegel showing you this, Detective;

21  right.

22  A     Yes.

23  Q     And that's just what I was asking you about; right?

24  That's showing where you recovered -- just so I'm sure, was it

25  a bullet fragment in this J -- that you identified as JSL-6?

St. Louis - cross - Farrell                    127

1   A    That's a piece --

2   Q    Piece of lead fragment?

3   A    Lead fragment; correct.

4   Q    And would you also agree with me that this blood that's

5   depicted in this picture is, was -- was close to the counter

6   where the incident occurred; correct?  The one we just saw in

7   the video?

8   A    Yes.

9   Q    And would you also agree with me that present in that

10  photograph is the image of a footprint in that blood?  Would

11  you agree with that?

12  A    I can't tell from that.

13  Q    Well, Detective, you wrote a lengthy report, a summary of

14  what occurred in this case; correct?

15  A    Correct.

16  Q    Have you read it recently or do you have it with you

17  today?

18  A    I have it with me today but not on me right now.

19       MR. FARRELL:  Mr. Villanueva, if I was to put this

20  on this and show it only to the witness, could I do that?

21       THE COURTROOM DEPUTY:  Yes.

22       (Pause in the proceedings.)

23  BY MR. FARRELL:

24  Q    Can you see it, Detective?

25  A    Yes.

VB      OCR      CRR

St. Louis - cross - Farrell                    128

1    Q    Do you see where I have asterisks?  To save some time, I

2    want to cut down to that.

3    A    I see it.

4         THE COURT:  Identify the exhibit for the record.

5         MR. FARRELL:  Yes, Judge.  It's under this witness's

6    3500 material.  Doesn't have a -- I believe it's JSL 3500

7    JSL-12, which is a multidocument -- which is a multidocument.

8         THE COURT:  But it is 12.

9         MR. FARRELL:  Multipage report, yes.  Thank you.

10   Q    When you've completed reading your report -- by the way,

11   this is your report that you wrote; right?

12   A    Yes.

13   Q    And you wrote it pretty soon after the events that you

14   observed when things were fresh in your head; right?

15   A    Correct.

16   Q    And you always try to be accurate when you prepare an

17   official police report; correct?

18   A    Correct.

19   Q    And that's what you tried to do in this case; right?

20   A    Yes.

21   Q    And now that your recollection is refreshed to the point

22   that you can admit to me that, in fact, that was a footprint

23   what we just saw?

24   A    Yes.

25   Q    And Detective, with respect to that particular footprint,

St. Louis - cross - Farrell                    129

1    the shoes s of the victim were part of the things you

2    recovered.  In fact, you noted them as JS-11 -- JSL-11 and

3    JSL-12; correct?

4    A    Yes.

5    Q    As you sit here today, do you recall if there was blood

6    on the bottom of either of those shoes?

7    A    I can't recall.

8              MR. FARRELL:  I'm going to show you what's in

9    evidence as GX-125.

10   Q    I think -- can you see it as your map, Detective?

11             (Exhibit published.)

12   A    Yes.

13   Q    Okay.

14   A    Could you move it up a little bit, I can't, okay.  There

15   you go.

16   Q    Okay.

17   A    Thank you.  Right there is good.

18   Q    Okay.  That's better.  Okay.

19             Now, you noted that the shoes were recovered as

20   JS-11 and JSL-11, JSL-12 as brown right Clarks shoe and a

21   brown left Clarks shoe; correct?

22   A    Correct.

23   Q    Could you show me where that it is on the map, on your

24   map?  I see two, I see seven, I see six.  I don't know that I

25   see those shoes, 11 and 12.

VB        OCR        CRR

1  A    No, I don't see it.

2  Q    By the way, did you respond to the hospital at all where

3  they took the gentleman who was shot?

4  A    No.

5  Q    Yet you -- from JSL-10 is his belt; correct?  You note

6  that?

7  A    Yes.

8  Q    11 and 12 are the shoes; right?

9  A    Yes.

10 Q    The belt you actually noted possible blood; correct?

11 A    Correct.

12 Q    The shoes you did not note possible blood; correct?

13 A    I didn't note that, no.

14 Q    Blue jeans you did note possible blood, correct, for

15 JSL-13?

16 A    Correct.

17 Q    Okay.  But JSL-14, MacroMan briefs with possible blood;

18 correct?

19 A    Correct.

20 Q    And then JSL-15 and 16 are two socks; correct?

21 A    Correct.

22 Q    So if you didn't go to the hospital, how did you get this

23 guy's clothes to make notes about it?

24 A    I can't recall.  I can't recall.

25 Q    Another officer swore in the same seat that you're in

1  that the victim went to the hospital with all his clothes on

2  just earlier today.

3         MR. SIEGEL:  Objection, Your Honor.

4         THE COURT:  Sustained.

5  Q    Is there anything you think that might refresh your

6  recollection as to how you made all these observations about

7  clothing that you don't note on your diagram?

8  A    I probably -- I probably... I have -- I'm pretty sure I

9  have it in one of my documentation, in one of my sheets where

10  I got this sneakers, not sneakers, the Clarks shoes from.  I'm

11  pretty sure I have that.

12  Q    Okay.  But as you sit here today, you can't really recall

13  where that --

14  A    I can't recall where that was, no.

15  Q    And do you recall making a conclusion that --

16         MR. FARRELL:  Go back to the footprint for a minute.

17  Q    -- that the footprint was made by the victim's shoes?

18  Did you see that this your report before when I showed you?

19  A    Yes, I did.

20  Q    Well, how did you have any basis at all to do that,

21  Detective?  Just like you're not an expert in blood splatter,

22  you're not an expert in footprint reading, are you?

23  A    No, I'm not, but there was another video that we saw from

24  a different angle that showed -- that showed them wrestling

25  and you see him, you see the perpetrator and the defendant

St. Louis - cross - Farrell                    132

1    fighting and they're slipping.

2    Q    You saw a video --

3    A    I saw, yes.

4    Q    -- you saw the perpetrator and the --

5    A    Victim.

6    Q    -- victim struggling with each other?

7    A    Correct.

8    Q    You can barely see both of them and they're standing in

9    the pool of blood.

10   A    I just recall seeing the victim in the pool of blood

11   like, slipping.

12   Q    Okay.  But as you sit here today, you're not sure and you

13   certainly didn't note on your report on or your map that those

14   shoes had any blood on them; correct?

15   A    Not that I know of.

16   Q    JSL-2 was the package of Skittles that we saw; correct?

17   A    Correct.

18   Q    And you noted -- you took them as evidence that could be

19   probative in this case; correct?

20   A    Yes.

21   Q    Why did you do that?  Why take the Skittles because we

22   all saw the guy was wearing a glove, Detective, when he was

23   holding them?

24   A    Well, according to the case detective, his supervisor, we

25   conferred with each other.  They basically said we should take

1    that just in case.  It was seen in the video that he was

2    handling that Skittles bag.

3    Q    And, in fact, Detective, didn't you note in your own

4    report that the bag of Skittles candy was sent for DNA because

5    the suspect was wearing gloves at the time committing a crime

6    and might have handled the gloves before committing the crime

7    and the suspect might have transferred DNA from handling

8    gloves in the past?  Wasn't that your own -- the way you put

9    it in your own report?

10   A    Correct.

11   Q    And the $20 bill that the person put on the counter as if

12   he was going to pay for the Skittles, that was also -- that's

13   JSL-3; right?

14   A    I can't recall.

15   Q    You want to look at your map where it says JSL-3, $20

16   bill?

17   A    Okay.  Now I see it.  It's on the cash register.

18   Q    Right.

19        You took that and you sent that for DNA testing,

20   too; right?

21   A    Correct.

22   Q    On the same theory that the DNA could have been

23   transferred to the 20, even because of the glove; right?

24   A    Correct.

25   Q    And the ballistic evidence, JSL-4, 5 and 6, that was sent

1   for testing for the appropriate unit, the ballistics unit;

2   right?

3   A    You said 4, 5 and 6?

4   Q    JSL-4 is copper jacket -- you're right.  I'm sorry.

5        JSL-4, JSL-6, JSL-9 were sent to ballistics;

6   correct?

7   A    Correct.

8   Q    By the way, JSL-flag --  I'm sorry.

9        JSL-5 brown, left-handed glove, what was significant

10  about that, that you documented it and collected it?

11  A    Well, again, as I conferred with the detective along with

12  his supervisor, they saw a glove that was on the aisle and it

13  seemed out of place.  So.

14  Q    Was anyone suggesting it was the perpetrator's glove?

15  A    No.  It just said it just seemed out of place.  So just

16  take that and send it, just in case.

17  Q    Now, JSL-7 you note broken eyeglasses with possible

18  blood.

19        Was that the victim's eyeglasses?

20  A    I can't recall.

21  Q    And JSL-8 was a lens, left lens, broken eye glass

22  (JSL-7).

23        So that was the lens to those broken glasses.

24  A    Correct.

25  Q    But you're not sure as you sit here today what their

1 significance was?

2 A    No.

3         MR. FARRELL:  Thanks, Detective.  I have nothing

4 further.

5         THE COURT:  Mr. Siegel, any redirect?

6         MR. SIEGEL:  Yes, Your Honor.  Thank you.

7 REDIRECT EXAMINATION

8 BY MR. SIEGEL:

9 Q    Detective St. Louis, I want to make sure I understand.

10 Have you received training on footprint impressions?

11 A    Yes.

12 Q    And I'm showing you what Mr. Farrell showed you before,

13 your 3500 material.

14         MR. FARRELL:  That's not in evidence.  I didn't show

15 it to the jury.

16         MR. SIEGEL:  Oh, I'm sorry.

17         MR. FARRELL:  I showed it for a limited purpose.

18         MR. SIEGEL:  I'm just showing it to the witness.

19 Q    Do you see that in front of you?

20 A    Yes.

21 Q    Now, I don't think Mr. Farrell asked you, but seeing

22 that, does seeing that refresh your recollection of whether

23 you made a comparison of the victim's shoes, the shoe print

24 and the blood?

25 A    No.

1   Q    Did you come to a conclusion about whose footprint was in

2   the blood?

3            MR. FARRELL:  Objection.  Asked and answered.

4            THE COURT:  I am going to allow it, following up on

5   the cross.

6   A    Yes, I did state victim's shoes.

7   Q    And what was the basis for that conclusion?

8   A    After watching that video, after watching that second

9   video and seeing him struggle and struggling with the

10  perpetrator and that's where basically the case investigator

11  and his supervisor, we all deemed that it might have been his

12  shoe impression.

13  Q    And so to make sure I understand.  You said on

14  cross-examination with Mr. Farrell that you watched a video?

15  A    Correct.

16  Q    And in that video did you see either the perpetrator or

17  the victim step in the blood?

18  A    I saw him struggling and slipping, so I'm assuming that

19  they were slipping on blood.

20  Q    And so what was the basis that you determined that that

21  was the victim's shoe print instead of the perpetrator's shoe

22  print?

23  A    I don't know.  I -- I guess just watching him slip and

24  slide, I guess, just seemed just two feet, my -- not my

25  supervisor, his supervisor, my case investigator and his

supervisor, basically said I guess that's the victim's --

MR. FARRELL: Objection to what they basically said. Move to strike.

THE COURT: Sustained.

A That's the victim's shoe impression --

MR. STEIN: Excuse me. He's still answering the question.

THE COURT: Stricken.

Q So putting aside what anyone said, from your investigation --

A Yes.

Q -- did you come to a conclusion about whose footprint that was in the blood?

A It could have been both. It could have been the victim or the perpetrator's.

Q You were also asked about transference of DNA?

A Correct.

Q Are you a DNA expert?

A No.

Q Do you understand how transference would work?

A Not fully. To a certain -- to a certain caliber, yes; but not fully, no.

Q And do you have an understanding of how likely or unlikely transference would be?

MR. FARRELL: Objection. He's not an expert.

1          THE COURT:  He has some limited abilities.  The

2     question is, is that among them?

3          THE WITNESS:  State that again, sir.

4     Q    Do you have an understanding about how likely or unlikely

5     transference would be in any given case?

6     A    Yes.

7          THE COURT:  Based on your training.

8          THE WITNESS:  Yes.

9          THE COURT:  So he says he has that.  Mr. Siegel may

10    inquire.  Based on his training, he has an understanding of

11    likelihood or not likelihood.

12         MR. SIEGEL:  Just one moment.

13

14         (Continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                139

1   (continuing)

2            MR. SELDEN:  No further questions, Your Honor.

3            MR. FARRELL:  I have nothing further.  Thank you,

4   Judge.

5            THE COURT:  Mr. St. Louis, you are excused.  Thank

6   you.

7            THE WITNESS:  Thank you.

8            MR. SELDEN:  Should we call for our next witness or

9   would you like to take our afternoon break?

10           THE COURT:  It sounds like the witness who may be

11  going on very short.  We had a long witness this morning.

12  This is not one of them?

13           MR. SELDEN:  I don't think so.

14           THE COURT:  Then it makes more sense to take the

15  afternoon break early than to start and taking it in the

16  middle.

17           Ladies and gentlemen, we are going to take our

18  mid-afternoon break.  Again, do not discuss the case amongst

19  yourselves or with anyone else you might run into.  Continue

20  to keep an open mind.

21           We will come back in about 10 or 15 minutes and that

22  will put us in the home stretch for today's court session.

23           Again, thank you for your attentiveness and

24  continued cooperation.  We will see you in about 10 or 15.

25           (Jury exits the courtroom.)

Proceedings                    140

1        THE COURT:  See you in 10 or 15.

2        MR. SELDEN:  Thank you.

3        (Recess taken.)

4        THE COURTROOM DEPUTY:  All rise.  Court is back in

5   session.  Counsel for both sides are present, including the

6   defendant.

7        THE COURT:  All right.  Mr. Selden, is this your

8   witness?

9        MR. SELDEN:  Your Honor, it is.  In advance of the

10  next potential Government witness, we want to flag for the

11  Court that we have a certified federal court interpreter, Ms.

12  Vivian Goa.  With the Court's permission we would like to

13  assist the witness.

14       THE COURT:  Is this one of ours or one of yours?

15       MR. SELDEN:  It is one of ours, but she has been

16  certified federally previously.  She is available here today.

17  This is the witness that we previously flagged for the Court

18  that we would request limited accommodation for.

19       THE COURT:  Before we resume with the jury, she is

20  not one of the Court's, but I think it would be appropriate to

21  have her sworn.

22       MR. SELDEN:  Absolutely, Your Honor.  We were going

23  to suggest just that.

24       THE COURT:  Why don't we do that before we proceed

25  further.

Proceedings                                    141

1          MR. SELDEN:  Absolutely.  Before bringing any

2    potential witness, with the Court's brief indulgence, we will

3    step outside and bring her in.

4          THE COURT:  Yes.

5          THE COURTROOM DEPUTY:  Please raise your right hand.

6          (Interpreter sworn.)

7          THE COURT:  Please state your first name and last

8    name for the record.

9          THE INTERPRETER:  Vivian Goa, G-O-A.

10          THE COURTROOM DEPUTY:  Thank you.

11          MR. STEIN:  Judge, there is a possibility, depending

12    on my perspective, I might want to move my chair over there,

13    okay.

14          THE COURT:  We will let you move around, Mr. Stein.

15          MR. STEIN:  Thank you.  I have been liberated.

16          THE COURT:  I will advise the jury the witness may

17    be in need, from time to time, of the assistance of an

18    interpreter and that's why the interpreter is present there.

19    Are we otherwise ready to go?

20          MR. SELDEN:  We are, on behalf of the Government.

21    Thank you, Your Honor.

22          THE COURT:  Please get our jurors.

23          (Jury enters the courtroom.)

24          THE COURT:  Mr. Selden, will you have a way of

25    flagging for us those other issues you have?

Proceedings                    142

1          MR. SELDEN:  Your Honor, I do, and I have a notepad

2     with me here.  I believe the witness has at times indicated

3     through use of a pen.  So we would just ask to leave a pen up

4     with the witness in front of him.  If I may actually leave a

5     pen once the jury is in.

6               (Jury enters the courtroom.)

7          THE COURT:  Be seated, please.  Counsel will

8     stipulate that the jury is present and properly seated.

9          MR. SELDEN:  On behalf of the Government, thank you,

10    Your Honor.

11         MR. STEIN:  Yes, Judge.

12         THE COURT:  Welcome back, ladies and gentlemen.  We

13    are ready to proceed.  Mr. Selden has indicated he has another

14    witness.

15         MR. SELDEN:  Thank you, Your Honor.  The Government

16    calls Mr. Alejandro DeLeon.

17              The Court's brief indulgence while we step outside

18    and locate Mr. DeLeon.

19         THE COURT:  Yes, please.

20         THE COURTROOM DEPUTY:  Please raise your right hand.

21              (Witness sworn.)

22         THE COURTROOM DEPUTY:  Please state your first and

23    last name for the record.

24         THE WITNESS:  Alejandro DeLeon.

25         THE COURTROOM DEPUTY:  Spell it for the record.

DeLeon - direct - Selden                              143

1            THE WITNESS:  Alejandro DeLeon.

2            THE COURTROOM DEPUTY:  Please spell it for the

3    record.

4            THE COURT:  He can't.

5            Be seated, please.  Mr. DeLeon.

6            Ladies and gentlemen, at times we have witnesses who

7    have various degrees of English proficiency and at times

8    witnesses can operate under the English language and sometimes

9    they lapse into their native language.  So we have a standby

10   interpreter who is present to assist Mr. DeLeon should the

11   need arise.

12           Mr. Selden.

13           MR. SELDEN:  Thank you, Your Honor.

14   **ALEJANDRO DeLEON,**

15       called by the Government, having been duly

16       sworn, was examined and testified as follows:

17   DIRECT EXAMINATION

18   BY MR. SELDEN:

19   Q    Good afternoon, Mr. DeLeon.

20   A    Thank you.

21   Q    Mr. DeLeon, where are you from?

22   A    Alejandro DeLeon.

23   Q    Are you from New York?

24   A    New York.

25   Q    Mr. DeLeon, when you were younger, were you raised in

1    Puerto Rico?

2    A    Yes.

3    Q    Mr. DeLeon, how old are you?

4          Mr. DeLeon, would you like to write on a notepad?

5    A    Yes, please.

6          MR. SELDEN:  Your Honor, may I approach the witness?

7          THE COURT:  You may.

8          MR. SELDEN:  Thank you, Your Honor.  For the record,

9    I have noted Government Exhibit 135 on the notepad.

10         For the record, Mr. DeLeon has indicated the number

11   50 on the notepad.

12   Q    Mr. DeLeon, are you 50 years old?

13   A    Yes.

14   Q    I am going to leave this in front of you for a moment,

15   okay.

16         Mr. DeLeon, in front of you, to your right, is a

17   computer screen.  I am going to put up Government Exhibit

18   106-A on that computer screen, okay.  Please take a look at it

19   and see if you recognize where that is.

20         MR. SELDEN:  Ms. Bates, if you could put up 106-A,

21   please.

22         And, Mr. Villanueva, this has previously been

23   admitted as Government Exhibit 106-A.

24   Q    Mr. DeLeon, do you recognize where Government Exhibit

25   106-A is?

DeLeon - direct - Selden                           145

1    A    Yes.

2    Q    Where is 106-A?

3    A    By Duane Reade.

4    Q    Did you work at that Duane Reade?

5    A    Yes.  Yes.

6    Q    What was your job at that Duane Reade?

7    A    Manager.

8    Q    How long did you work at the Duane Reade?  Of course, Mr.

9    DeLeon.

10        MR. SELDEN:  For the record, the witness has written

11   on Government Exhibit 135 the number 12.

12        THE INTERPRETER:  And he said more than 12.

13   Q    More than 12 years?

14   A    I think so.

15   Q    Mr. DeLeon, is that Duane Reade located in Queens, New

16   York?

17   A    Yes.

18   Q    When you worked at the Duane Reade, did you have any

19   employees that worked for you?

20   A    Yes.

21   Q    How many employees?

22   A    Two (in English).

23   Q    Mr. DeLeon, I am now going to show a clip from a

24   previously admitted, by stipulation, photograph.  I'm sorry, a

25   photo of a clip from a previously admitted exhibit, and that

1    is Government Exhibit 130.

2    A    It's me.

3    Q    And, Mr. DeLeon, you just said "it's me"?

4    A    Yeah.   I working that day.

5    Q    Were you working at the Duane Reade that day?

6    A    Yes.

7    Q    Can you touch on the screen and show where you are?  Can

8    you touch the screen?

9    A    Here.

10   Q    Can you circle yourself?

11   A    This.

12        MR. SELDEN:  For the record, the witness has tapped

13   on the person who appears to be himself on Government Exhibit

14   130.

15   Q    Mr. DeLeon, I want to turn your attention next to the

16   next photograph, 131.

17   A    It's me again.

18   Q    You said it's you again.  Is that you working at the

19   Duane Reade also?

20   A    Yes.

21   Q    Is there a cash register immediately behind you?

22   A    Mine.  It's mine.

23   Q    Did you work at that cash register?

24   A    Yes.  Yes.

25   Q    Was there money in that cash register when you were

1  working?

2  A    Yes.

3        MR. SELDEN:  And for the record, the witness has

4  indicated yes and is moving his hand back and forth?

5  Q    Mr. DeLeon, was there money in the other cash registers

6  that we see in Government Exhibit 131?

7        Two?

8  A    Two more.  Here and here.

9        MR. SELDEN:  For the record, Your Honor, on

10  Government Exhibit 131, Mr. DeLeon has pointed to two

11  additional cash registers.

12  Q    Mr. DeLeon, can you point to where you are in this

13  photograph, please?

14  A    I was -- I was here just a little -- they were -- oh, my

15  God.  The guys -- my guys were picking up.  My guys.  My guys.

16  Q    Were your guys with you that night or were they in

17  another part of the store?

18  A    Inside, downstairs, uh-hum.

19  Q    Were the other two employees downstairs when you were

20  standing here in Government Exhibit 131?

21  A    Yes.

22  Q    Mr. DeLeon, I want to now ask you if we could turn to the

23  next photograph.  What do we see in Government Exhibit 132?

24  A    The guy (in English).

25  Q    Mr. DeLeon, when you saw the guy, were you able to tell

DeLeon - direct - Selden                    148

1   how old he was?

2   A    I think -- I think it's this, I believe.

3          MR. SELDEN:  For the record, the witness has written

4   down the number 23.

5   Q    Mr. DeLeon, were you able to see the guy's hair?

6   A    Yes, I think.  Yes.  He has one.

7          MR. SELDEN:  For the record, the witness has pointed

8   out outside of his head.

9   A    Yes.  He was like that.

10  Q    Mr. DeLeon, can you hold up your left hand.

11         Can you put it down, please.

12         What happened, if at all, between you and the guy

13  that you remember?

14  A    He wanted the money.  He wanted the money, but I closed

15  the money.  I closed it.

16  Q    Mr. DeLeon, before this night, did you use an

17  interpreter?

18  A    No.  No.  Why?

19  Q    Thank you, Mr. DeLeon.

20         MR. SELDEN:  I don't have any further questions for

21  you.  Okay.  Thank you.

22         THE COURT:  Thank you, Mr. Selden.

23         Any cross?

24         MR. STEIN:  No questions, Your Honor.

25         THE COURT:  Thank you, from Stein.

1           Mr. DeLeon, thank you.  You are excused.

2           THE WITNESS:  Thank you.

3           THE COURT:  You're welcome.

4           MR. SELDEN:  Before the next witness is called in,

5   the Government moves to admit Government Exhibit 135 into

6   evidence.

7           THE COURT:  Any objection?

8           MR. STEIN:  I'm sorry, Judge, I missed the first

9   part.  Something about Government Exhibit 135.

10          MR. SELDEN:  I will be happy to repeat it, Mr.

11  Stein.  The Government moves to admit Government Exhibit 135

12  into evidence.

13          MR. STEIN:  The notepad, no objection.

14          THE COURT:  Received without objection.

15          (Government's Exhibit 135 received in evidence.)

16          MR. SIEGEL:  Your Honor, the Government calls Anjan

17  Saha.

18          THE COURTROOM DEPUTY:  Raise your right hand.

19          (Witness sworn.)

20          THE COURTROOM DEPUTY:  Please state your first and

21  last name.

22          THE WITNESS:  My name is Anjan Saha, A-N-J-A-N,

23  S-A-H-A.

24          THE COURT:  Speak directly into the microphone.  Mr.

25  Siegel.

1    **ANJAN SAHA**,

2         called by the Government, having been duly

3         sworn, was examined and testified as follows:

4    DIRECT EXAMINATION

5    BY MR. SIEGEL:

6    Q    Good afternoon, Mr. Saha.

7    A    Yeah.

8    Q    Mr. Saha, where are you from originally?

9    A    I'm from Louisiana.

10   Q    Were you born in Louisiana?

11   A    No.

12   Q    Where were you born?

13   A    I am from India.

14   Q    When did you come to America?

15   A    2017.

16   Q    When you came to America, did you ever live in New York?

17   A    Yeah.

18   Q    Approximately when did you live in New York?

19   A    It's 2018.

20   Q    Why did you come to New York?

21   A    For my study.

22   Q    Where is it that you were going to study?

23   A    I was planning to get admission in the lag community

24   college.  La Guardia.

25   Q    Did you work while you were in New York?

Saha - direct - Siegel                    151

1   A    Yeah.

2   Q    Where did you work?

3   A    7-Eleven.

4   Q    What did you do at 7-Eleven?

5   A    As a cashier.

6        MR. SIEGEL:  So I would like to show an exhibit just

7   to the witness.

8   Q    I am showing you what has been marked as Government

9   Exhibit 110.  It is on the screen in front of you, do you

10  recognize Government Exhibit 110?

11  A    Yes, sir.

12  Q    What do you recognize Government Exhibit 110 as?

13  A    This is the picture of 7-Eleven I used to work.

14  Q    Is this a fair and accurate depiction of the 7-Eleven

15  where you used to work?

16  A    Yes, sir.

17       MR. SIEGEL:  Your Honor, I move to admit Government

18  Exhibit 110.

19       MR. STEIN:  No objection.

20       THE COURT:  Seed without objection.

21       (Government's Exhibit 110 received in evidence.)

22       MR. SIEGEL:  May I publish it, please?

23       THE COURT:  You may.

24       (Exhibit published.)

25  Q    Mr. Saha, what hours did you work at the 7-Eleven?

1  A    9:00 to 6:00.

2  Q    Is that 9:00 p.m. to 6:00 a.m.?

3  A    Yeah.

4  Q    Were you working at the 7-Eleven in late 2018?

5  A    Yeah.

6  Q    Do you still work at the 7-Eleven?

7  A    No.

8  Q    Why don't you still work at the 7-Eleven?

9           MR. STEIN:  Objection, Judge.

10          THE COURT:  Are you going to connect it up in some

11 way?

12          MR. SIEGEL:  I am.

13          THE COURT:  I will take it subject to connection.

14 Q    Why don't you still work at 7-Eleven?

15          MR. STEIN:  Objection, Judge.

16          THE COURT:  Overruled.

17 Q    You can answer.

18 A    Me?  Once incident happened, someone robbed me when I was

19 working in the 7-Eleven, after that, I left from New York.

20 Q    What happened that night?

21 A    One guy came to my store, I was in -- I was working in

22 7-Eleven and one guy came to store and put gun in my head and

23 he robbed me.

24 Q    Let's take that piece by piece.  Before this person put a

25 gun at your head, did you see him around the store?

Saha - direct - Siegel                          153

1   A    Before the robbery, he came one time, then he went
2   outside, then he came again to the store.
3   Q    Was that all the same night of the robbery?
4   A    Yes.
5   Q    After he came back in the second time, what did this
6   person do?
7   A    He was trying to buy a box of egg.  He gave me a one
8   dollar bill but the egg was expensive, $10 more dollars.  So I
9   say this is not enough for the egg, and then he said it's
10  okay, I don't need the egg.  He was showing the hand like
11  this.
12            MR. SIEGEL:  Just for the record, when he say show
13  his hand like this, he indicated that he was shaking his hand
14  from side to side.
15  A    Yeah.  He don't want the egg.
16  Q    Then what happened?
17  A    And he got one candy.  It's like 25 cents, and then I
18  opened the cash register to give him change that time and when
19  I saw at him, I saw the gun on my head.
20  Q    Did he say anything to you when he had a gun at your
21  head?
22  A    He was trying to say something, but I don't know what.
23  Q    What did you understand he wanted?
24  A    Because he was covered by jacket and everything, so it's
25  not clear.

1    Q    Did you understand if he wanted something?

2    A    Maybe asking for --

3             MR. STEIN:  Objection.

4             Excuse me, objection, leading.

5             THE COURT:  You can't speculate to any of that.

6    Q    What did you do?

7    A    I kept whole drawer of cash register to him.

8    Q    Why did you give the cash register to him?

9    A    Because I'm scared and he put gun at my head.

10   Q    What happened after you gave him the cash register tray?

11   A    Then he left.

12   Q    Did you follow him out?

13   A    No.

14   Q    Why not?

15   A    Because I really scared.

16   Q    Did you see where he went?

17   A    No.

18   Q    What did you do after he left?

19   A    I called my coworker.  The old guy who used to work with

20   me and then I explained what happened to me and then I called

21   the cop, 911.

22   Q    The person who you saw who held that gun to your head,

23   how old did that person appear to be?

24   A    Maybe 18, 19, like that.

25   Q    Why did you think so?

1   A    Because he was young and in front of me.

2   Q    So I'd like to show you Government Exhibit 408-E, which

3   is already in evidence.

4        MR. SIEGEL:  Mr. Villanueva, if we can take it off

5   the publisher for a second.

6        THE COURTROOM DEPUTY:  Sure.

7   Q    I'm showing you 408-E and I am putting it to timestamp

8   shown as approximately 3:55:38 a.m.

9        MR. SIEGEL:  Mr. Villanueva, we can publish it now.

10       (Exhibit published.)

11  Q    I'm going to play the video and then I am going to ask

12  you some questions about it.

13       (Video playing.) (Video paused.)

14       MR. SIEGEL:  I am going to stop it at timestamp

15  3:56:45.  I am going back to timestamp 3:55:40.

16  Q    Who is the person that is shown in this video at this

17  point?

18  A    This guy.

19  Q    Who is that person?

20  A    This guy who robbed me.

21  Q    Is that the person who robbed you?

22  A    Yes, sir.

23       MR. SIEGEL:  I am hitting play.

24       (Video played.) (Video paused.)

25  Q    I am going to stop at 3:55:47 and there is a person

Saha - direct - Siegel                    156

1   wearing red.  Who is that person?

2   A    It's me.

3   Q    And I am stopping at timestamp 3:55:53.  There is a

4   person in blue.  Who is that person?

5   A    He is the old guy who used to work with me.

6            MR. SIEGEL:  I am hitting play again.

7            (Video playing.) (Video paused.)

8            MR. SIEGEL:  I am hitting pause at time 3:56 and 39

9   seconds.

10  Q    What is that in the robber's hands?

11  A    It was a gun.

12  Q    What were you thinking when you saw that gun?

13  A    I really scared, so I don't know what I was thinking.

14           MR. SIEGEL:  I am hitting play again.

15           (Video playing.) (Video paused.)

16           MR. SIEGEL:  I am hitting stop at timestamp 3:56:43.

17  Q    What is that in your hands?

18  A    The drawer of the cash register.

19           (Continued on following page.)

20

21

22

23

24

25

Saha - direct - Siegel                    157

1    BY MR. SIEGEL:   (Continuing)

2    Q    Was there money in the drawer?

3    A    Yes.

4    Q    I'd like to show you another video.  I'm showing you

5    Government Exhibit 408-A which is in evidence.

6              (Video played.)  (Video stopped.)

7    Q    So we're at the end of the video at 14 seconds.

8              Who is that person in red?

9    A    It's me.

10   Q    And I'm going to hit play on the video one more time.

11             (Video played.)  (Video stopped.)

12             MR. SIEGEL:  My apologies.

13             (Video played.)  (Video stopped.)

14   Q    I'm going to pause about 7 seconds into the video.

15             Who is the person standing in the door?

16   A    That guy who robbed me.

17   Q    Now I'd like to show you Government Exhibit 408-D which

18   is another video in evidence.

19             (Video played.)  (Video stopped.)

20   Q    I'm hitting pause about 3 seconds into the video.

21             Who is the person standing by the door?

22   A    This is who robbed me.

23   Q    Is that the person who robbed you?

24   A    Yes.

25   Q    What is that in his hands?

1  A     The drawer of the cash register.

2           (Video played.)  (Video stopped.)

3           MR. SELDEN:  Your Honor, permission to approach the

4  witness to hand him an exhibit?

5           THE COURT:  You may.

6  Q     Mr. Saha, I'm handing you a CD containing Government

7  Exhibits 116-A through 116-H and it's been marked as

8  containing 116-A to 116-H.

9           Do you recognize that CD?

10 A     Yes, sir.

11 Q     How do you recognize that CD?

12 A     Because I put my name and date on it.

13 Q     What is on that CD?

14 A     The picture of me and that guy who robbed me.

15 Q     Are the pictures on the CD fair and accurate depictions

16 of you and the person who robbed you from that night?

17 A     Yes, sir.

18          MR. SELDEN:  Your Honor, I move to admit Government

19 Exhibits 116-A to 116-H.

20          THE COURT:  Any objection?

21          MR. STEIN:  No.

22          THE COURT:  Received without objection.

23          (So marked.)

24 Q     I'm starting with Government Exhibit 116-A.  Who is the

25 person standing in the door?

Saha - direct - Siegel                    159

1    A    This guy?

2    Q    Who is that person?

3    A    Yes, who robbed me.

4    Q    And who is the person in red?

5    A    It's me.

6    Q    And now I'm showing you Government Exhibit 116-B.  Can

7    you see the person who robbed you in this picture?

8    A    Yes, sir.

9    Q    Where are they standing?

10   A    (Indicating.)

11        MR. SIEGEL:  Let the record reflect that he has

12   circled a person wearing a green and blue hoodie and black

13   pants with copper lines and white shoes.

14   Q    I'm now showing you Government Exhibit 116-C.  Do you see

15   the person who robbed you in this picture?

16   A    Yes, sir.

17   Q    Where is that person standing?

18   A    (Indicating.)

19        MR. SIEGEL:  Let the record reflect that Mr. Saha

20   again has circled a person wearing a green and blue hoodie,

21   black pants with copper lines on it and white shoes.

22   Q    I'm not going to show you all these pictures.  I just

23   want to show you one more.

24        Government Exhibit 116-G.  Do you see the person who

25   robbed you in this picture?

Saha - cross - Farrell                    160

1   A    Yes, sir.

2   Q    Could you circle that person?

3   A    (Witness complies.)

4        MR. SIEGEL:  Let the record reflect that he has

5   circled a person in a green and blue hoodie and black pants.

6        Your Honor, may I have just one moment.

7        (Pause.)

8        MR. SIEGEL:  Your Honor, the government has no

9   further questions for this witness.

10       THE COURT:  Thank you, Mr. Siegel.

11       Mr. Stein or Mr. Farrell?

12       MR. FARRELL:  Yes, I'm going to ask him two

13  questions.

14       THE COURT:  Mr. Farrell.

15  CROSS-EXAMINATION

16  BY MR. FARRELL:

17  Q    Good afternoon, Mr. Saha.

18  A    Good afternoon.

19  Q    My name is Gary Farrell.  You and I have never met or

20  discussed the case, right?

21  A    Yes.

22  Q    Did you quit the next day after this happened?

23  A    I'm sorry?

24  Q    Did you quit 7-Eleven right after this happened, the next

25  day?

1   A    Yes, sir.  Yes, sir.

2   Q    Are you working today?

3   A    No.

4   Q    I mean not as you're sitting here in court, obviously,

5   but do you have a job?

6   A    Yes, sir.

7   Q    What do you do?

8   A    A gas station.

9   Q    Another gas station?

10  A    Yes, sir.

11  Q    In Queens?

12  A    Right now, I'm not living in New York, I mean, New York.

13  Q    Oh, okay.  You're about 28 or 29 years old, right?

14  A    Yes, sir.

15  Q    So you're not going to LaGuardia anymore?

16  A    No, sir.

17  Q    You still going to school somewhere?

18  A    Yes, sir.

19  Q    The guy that robbed you, he took out the gun with his

20  right hand, right?  We watched that video about three times.

21  A    Yes, sir.

22  Q    And you gave him the drawer right away, correct, the cash

23  register drawer?  You gave him the whole drawer?

24  A    Yes.

25  Q    How much money was in the drawer, you think?

1   A    I'm not sure but maybe more than $200.

2   Q    Okay.  And including that -- by the way, you told the

3   cops it was less than 300, correct?

4   A    Yeah.

5   Q    And in that 300, was some of it change, quarters, dimes,

6   nickles?

7   A    I think so.

8   Q    Okay.  Did you keep your rolls of change in there also,

9   like rolls of quarters, rolls of dimes, rolls of nickles?

10  A    At that time?

11  Q    Yes.

12  A    I can't remember.

13  Q    Okay.  Did that store take food stamps?  Was it possible

14  there were food stamps in there too in that drawer?

15  A    No.

16  Q    That store didn't take food stamps?

17  A    I cannot remember.

18  Q    Were you ever trained by 7-Eleven how to act if somebody

19  pulled a gun at you?

20  A    Yes.

21  Q    And did they tell you always give up everything?  Right?

22  A    Everything.

23  Q    Don't fight with the guy, right?

24  A    Yeah.

25  Q    Was it pretty slow that time in the morning because it

Saha - cross - Farrell                    163

1   was, like, what time was it, about 3 in the morning?

2   A    I cannot remember the exact time but it was, it was night

3   out.

4   Q    The midnight shift, that's when you worked, right?

5   A    Yes, sir.

6   Q    And this was a Sunday after Thanksgiving weekend going

7   into the Monday, right?  Do you remember that?

8   A    I cannot remember.

9   Q    You told us on direct the guy who robbed you seemed

10  really young, right, like 18, 19, maybe like at the end of

11  high school?

12  A    Maybe.  I'm not sure.

13  Q    You couldn't see anything about his hair, could you?

14  A    No, sir.

15  Q    You mentioned an old guy and we saw him in the video,

16  right?

17  A    Yeah.

18  Q    You called him the "old guy."  What was his name, do you

19  remember?

20  A    I forgot.  I always called him "uncle."

21  Q    Okay.

22  A    Yeah.

23  Q    You weren't related though, I have a feeling, right?

24  A    All -- he's an old guy.  Everyone called him "uncle."

25  Q    The cops came pretty quickly because you called 911,

1   right?

2   A     Yes, sir.

3   Q     And the police arrived, right?

4   A     Yeah.

5   Q     And they interviewed you, right?  They asked you what

6   happened?

7   A     No, they took me to find that guy.

8   Q     But you weren't able to find the guy, right?

9   A     No.

10  Q     When you say they took you, they took you in a car and

11  you rode around in a marked police car?

12  A     Yes, sir.

13  Q     Did they interview the old guy?  Sorry to refer to him by

14  that but that's what we're calling him, the guy you called

15  "uncle."

16        Did the cops ask him anything about the robber?

17  A     Yes.

18  Q     They did?  When you called 911, you said, "I'm really

19  nervous right now," right?

20  A     I cannot remember.

21  Q     The government didn't play your 911 call for you before

22  you testified?

23  A     Sorry?

24  Q     The government, you know, these guys represent the

25  government.  Right?

1   A     Yeah.

2   Q     Did they play your 911 call so you can hear it?  Did they

3   play it for you so you can remember it?  I know it was a long

4   time ago.

5   A     No.

6   Q     Well, you were really nervous, right?  Forget what you

7   said to 911.  I'm asking you when you saw that big gun pointed

8   at you, you were really nervous, right?

9   A     Yes, sir.

10  Q     Did you recall on the 911 call, the operator was trying

11  to get a description from you and you said it was a brown gun

12  and the guy was maybe wearing jeans?

13  A     Yes.

14  Q     Do you remember that?

15  A     Yes.

16  Q     Thanks, sir.

17          MR. FARRELL:  I have nothing further.

18          THE COURT:  Thank you, Mr. Farrell.

19          Any redirect, Mr. Siegel?

20          MR. SIEGEL:  Nothing from the government,

21  Your Honor.

22          THE COURT:  Mr. Saha, you are excused.  Thank you

23  very much.

24          THE WITNESS:  Oh, can I go?

25          THE COURT:  You may.

```
                        Sidebar                      166
```

1          THE WITNESS:  Thank you.

2          THE COURT:  Have a good evening.

3          (Witness excused.)

4          THE COURT:  I'll touch base with counsel at sidebar.

5          (The following occurred at sidebar.)

6          THE COURT:  If we have another short one, I'm

7     inclined to take him.  I don't know.  I don't know what --

8          MR. SELDEN:  I think, Your Honor, we probably have a

9     longer witness rather than a short witness.

10         THE COURT:  Okay.

11         MR. SELDEN:  This might be a good time for a break

12    for the day.

13         THE COURT:  For the day?  Okay.  Just if we had

14    another one of these little baby short guys, I would take him.

15         MR. STEIN:  While we're up here, can you tell us who

16    the other witnesses are besides the ones that were in the

17    e-mail?

18         MR. SELDEN:  In light of today's defense

19    presentation, I think since we haven't concluded the trial

20    day, we're not yet ready to make that assessment on the record

21    here, but we'll be happy to e-mail you this evening.

22         Just for the record, as we did yesterday, in advance

23    of trial, we'll be happy to e-mail defense.

24         THE COURT:  That's great.  That's the way it should

25    be.

1           (In open court; sidebar ends.)

2           THE COURT:  All right.  Ladies and gentlemen, we've

3    consulted with counsel to see whether we have more productive

4    time.  You may consider this good news.  The answer was no so

5    we are going to break for the night and return tomorrow

6    morning.

7           I will go over with you the instructions once again.

8    As I say, we don't do them as a matter of routine.  We do them

9    because they are really important so that we can ensure that

10   the case is ultimately decided the way cases are to be

11   decided.  The only thing that counts is what happens inside

12   the four walls of this courtroom so we want to make sure we go

13   over the rules so you understand them clearly.

14          So, again, obviously, the case has just gotten

15   underway but it doesn't matter whether it's the second day,

16   the tenth day, the hundredth day of a trial, juries have to

17   keep an open mind until the case is given to them for

18   deliberations.  So that means you are not making any

19   determinations about anything.  You're listening, you're

20   observing, letting it all filter into your mind.

21          You are not to discuss the case amongst yourselves.

22   You are also not to discuss the case among anybody else or

23   with anybody else.  And discussing the case doesn't mean just

24   discussing what happened during trial on a given day.

25   Discussing the case means talking about the case, wondering

1    about how the Court, asking about how the Court's operating,

2    saying that I'm on a case that's like this, it's in federal

3    court.  None of that is an appropriate conversation.  There is

4    to be no mention, no discussion about anything that directly

5    or indirectly relates to this case.  Whether it's with people

6    in the courtroom, in the courthouse, on the way to the

7    courthouse, on the way from the courthouse, after you get

8    home, on the train, no discussion at any time about anything

9    that even remotely touches upon the case.

10          During the overnight period, again, the "don't

11   investigate" rule still applies and, of course, if you listen

12   carefully and I'll remind you from time to time some of the

13   things Mr. LaMonaco told you about.

14          Obviously, you're now hearing locations.  So one of

15   the things that is also prohibited even if you live in the

16   neighborhood, we're asking you not to go anywhere near the

17   locations that have been referenced at any time during the

18   course of the trial, but you're also not to do any

19   investigations, electronic or the old fashioned kind of

20   actually looking things up in a book.  Again, what counts is

21   not how you can investigate.  What counts is how well you

22   listen and take in what you hear and see in the courtroom.

23          Now, we also have a concern, again, ensuring the

24   integrity of the process that in case there's a media account

25   of what goes on in this trial, that you tune it out, whether

1    it's on radio TV or in the newspapers, but, again, a great

2    certain is that it may pop up on social media.  One can never

3    account for what appears on Facebook or on Instagram or any of

4    the other new means of media.  So should there be an account

5    of these proceedings, again, just block it out.

6              Now, I also urge jurors to the extent that the media

7    has accounts about any proceeding in a court, that you block

8    that out as well for fear that you might hear something there

9    that ultimately confuses you about what you're supposed to be

10   doing here which is why I strongly suggest that you block it

11   out.

12             And lastly, we are on radio silence so that

13   communications rule is a two-way street.  Not only are you not

14   listening to things that come to you through the media, you're

15   not putting out anything in the other direction, whether it's

16   by telephone or Instagram or Twitter or anything else.  There

17   is to be no reference whatsoever to this case, any of the

18   personalities, any of the issues or that you're even a juror,

19   that you come to Brooklyn, you come to the courthouse.  All of

20   that is strictly forbidden during the course of this trial.

21   That's the only way we can ensure there's a standard both for

22   the government and the defendant in the course of trial.

23             So with all those admonitions, it's time to take our

24   evening break.  There was a few sprinkles out there before.  I

25   don't know if it's still sprinkling so you may have to dodge a

170

1    couple of raindrops on the way home, but we will reassemble

2    tomorrow morning.  I will ask you to come to the Central Jury

3    Room.  Never come to any place other than the Central Jury

4    Room, period, not at any time, not to this floor, not to any

5    other floor.  You will go to the Central Jury Room and you

6    will be directed from there to the courtroom when it's time to

7    appear.

8              So come to the Central Jury Room at around 9:45.

9    We'll start as close as we can to 10:00 and we wish you a very

10   pleasant evening and, again, all of us appreciate your

11   patience, your cooperation and your sacrifice.

12             Have a pleasant evening.  We will see you tomorrow.

13             (Jury exits.)

14             THE COURT:  Okay.  Let's get ready for tomorrow and

15   we'll go from there.

16             MR. SELDEN:  Thank you, Your Honor.

17             (Matter adjourned to March 3, 2020 at 10:00 a.m.)

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2    WITNESSES:

 3        RUYI WANG
                                                          39
 4            DIRECT EXAMINATION BY MR. SELDEN
              CROSS EXAMINATION BY MR. FARRELL            53
 5            REDIRECT EXAMINATION BY MR. SELDEN          57
              RECROSS EXAMINATION BY MR. FARRELL          58
 6
          JERRY ST. LOUIS
 7                                                        67
              DIRECT EXAMINATION BY MR. SIEGEL
 8            CROSS EXAMINATION BY MR. FARRELL            117
              REDIRECT EXAMINATION BY MR. SIEGEL          135
 9
          ALEJANDRO DeLEON
10                                                        143
              DIRECT EXAMINATION BY MR. SELDEN
11
          ANJAN SAHA
12                                                        150
              DIRECT EXAMINATION BY MR. SIEGEL
13            CROSS-EXAMINATION BY MR. FARRELL            160

14
                           EXHIBITS:
15
              Government Exhibit 106-A                    49
16            Government Exhibit 106-B                    52
              Government's Exhibits S-11, 133-A           63
17            and 133-B
              Government's Exhibits S-9, 402-A,           66
18            402-B, 402-C, 402-D, 402-F, 402-G,
              402-H, 402-I, 408-A, 408-B, 408-C,
19            408-D, 408-E, 410-A, 410-B, 410-C,
              410-D, 411-A, 411-B, 411-C, 414-A,
20            414-B, 415-A, 415-B
              Government Exhibits 106-A, 126, 127,        75
21            300-A, 300-B, 301-A, 301-B, 301-C,
              302-A, 302-C, 302-D, and 302-E
22            Government's Exhibit 125                    91
              Government Exhibit 300                      98
23            Government's Exhibit 135                    149
              Government Exhibit 110                      151
24            Government Exhibits 116-A to 116-H          158

25
                    *      *      *      *
```