172

1                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK

2

3  - - - - - - - - - - - - - - - X

4  UNITED STATES OF AMERICA,   :   18-CR-684(ENV)

5          Plaintiff,     :

                       United States Courthouse
6      -against-       :  Brooklyn, New York

7  ELGIN BRACK,          :

                       March 4, 2020
8          Defendant.    :  10:00 o'clock a.m.

9  - - - - - - - - - - - - - - X

10

11                    TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE ERIC N. VITALIANO
12      UNITED STATES DISTRICT JUDGE, and a jury.

13  APPEARANCES:

14

15  For the Government:      RICHARD P. DONOGHUE
                      United States Attorney
16                   BY: PHILIP A. SELDEN
                        JONATHAN SIEGEL
17                      JONATHAN LAX
                      Assistant United States Attorneys
18                   271 Cadman Plaza East
                   Brooklyn, New York

19

20  For the Defendant:       JOEL M. STEIN, ESQ.

21                    GARY FARRELL, ESQ.

22  Court Reporter:          Charleane M. Heading
                   225 Cadman Plaza East
23                   Brooklyn, New York
                   (718) 613-2643

24

25  Proceedings recorded by mechanical stenography, transcript
  produced by computer-aided transcription.

1           (In open court; outside the presence of the jury.)

2           THE CLERK:  Judge Eric Vitaliano presiding.

3           The case on the calendar is USA versus Brack,

4  18-CR-684, on for jury trial.

5           Would the attorneys please note your appearances

6  starting with government counsel.

7           MR. SELDEN:  Good morning, Your Honor.  On behalf of

8  the United States, Assistant United States Attorney Phil

9  Selden.  I'm joined at counsel table by Assistant United

10  States Attorney Jonathan Siegel, Assistant United States

11  Attorney Jonathan Lax, Paralegal Specialist Elicia Bates and

12  Detective Steven Saint-Hilaire.  Good morning.

13           THE COURT:  Good morning.

14           MR. SIEGEL:  Good morning, Judge.

15           MR. STEIN:  Good morning, Judge.  Joel Stein for

16  Elgin Brack.

17           MR. FARRELL:  And Gary Farrell for Elgin Brack who

18  has joined us at counsel table.

19           THE COURT:  Good morning.

20           Mr. Brack, good morning.

21           THE CLERK:  Counsel for both sides present including

22  the defendant.

23           THE COURT:  All right.  Do we have any housekeeping?

24           MR. SELDEN:  Brief matters from the government, Your

25  Honor, just with regards to housekeeping.

1      We understand, in the pendency of yesterday's busy

2   trial day, Mr. Stein and Mr. Farrell made a request with

3   regards to identifying a particular witness that the defense

4   may want to call.  We have identified that individual for the

5   defense and provided their name, tax ID and contact

6   information.  We confirmed this morning that the phone number

7   for that person is, in fact, correct.  I notified them

8   directly that they should be expecting whether or not it's a

9   defense subpoena or a defense request for them to potentially

10  appear at trial.  They didn't express any concern about

11  availability.  We just wanted to note that on the record.

12      If Mr. Stein or Mr. Farrell have any additional

13  difficulties in locating that person and not able to contact

14  them, please immediately let the government know and, we'll of

15  course, do everything we can to make sure they're here for

16  trial.

17          THE COURT:  Thank you, Mr. Selden.

18          MR. STEIN:  Just to update everybody about this, if

19  "stipulation" is the word you like to hate the most -- I'm

20  sorry -- "stipulation" is a word that you love the most.

21          THE COURT:  Love the most.

22          MR. STEIN:  "Scheduling" is probably the opposite.

23          THE COURT:  That's true.

24          MR. STEIN:  So Mr. Selden is correct, they gave us

25  the information.  I reached out to the phone number this

1  morning.  It turns out that phone number is the phone number

2  of the lab where this person works and they confirmed her

3  availability but they said because this is a federal matter,

4  they would request a so ordered subpoena so I will prepare one

5  today and they gave me fax and e-mails so hopefully this all

6  works.

7           THE COURT:  I'm game, Mr. Stein.

8           MR. STEIN:  Okay.

9           THE COURT:  Anything else?

10           MR. STEIN:  Yes.  I don't know if the government --

11           MR. SELDEN:  I'll defer to Mr. Stein.  We have a

12  couple of matters but, of course, I'll defer to Mr. Stein.

13           MR. STEIN:  So yesterday, Mr. Siegel brought up the

14  question, we don't need to resolve it today, I doubt it's

15  going to come up today, it may be true of the case agent's

16  testimony today, the question of the four rounds of ammunition

17  that they said they would object to.

18           I don't know how you want to deal with that.  It's

19  just a reminder that this is still something we have to

20  resolve.

21           THE COURT:  Those are the 9 millimeter shells?

22           MR. STEIN:  Correct.

23           MR. SIEGEL:  Your Honor, it is the 9 millimeter, but

24  it's also the broader category that the 9 millimeters fall

25  into of questioning of, I think, specifically the case agent

1    of what investigative steps did you not take that call into

2    question why or cause a jury to ask, to wonder why the case

3    agent did not do that when we all know the reason but it's not

4    something that we would generally tell the jury.

5            MR. STEIN:  Which is why when this came up yesterday

6    and it wasn't a good time to flesh this out that I thought it

7    opened up the so-called Pandora's box just as Mr. Siegel

8    alluded to again so that's still something we have to resolve.

9            A business matter.  So I've consulted with the court

10   reporters about this.  I think you have to authorize it.  So

11   we got a transcript from yesterday but I saw that a word index

12   was not included.  I have found that in the past to be

13   extremely helpful instead of fumbling so if you would

14   authorize that, I would appreciate it.

15           THE COURT:  Sure.

16           MR. SELDEN:  I don't know if Mr. Stein has any other

17   housekeeping matters.  We don't want to interrupt him if he

18   does.

19           MR. STEIN:  Yes, I'm on a roll.

20           Judge, the last matter is just on the record, the

21   government sent us last night a list of their prospective

22   witnesses today and we sent to them a transcript of the 911

23   call that our law student/paralegal prepared.  I've reviewed

24   it.  I believe that it's accurate.  I don't know if they have

25   any objection to the use of the transcript if it's necessary

1   because it's possible during the course of that witness'

2   testimony, his 911 call may be played.

3        MR. SELDEN:  Your Honor, as the Court is well aware,

4   and I want to just make the record clear on this, on

5   February 18th, at a status conference, the government notified

6   the Court and counsel for the defendant that we planned to

7   provide trial exhibits by February 24th.  We did so.

8        On February 28th at 5:00 p.m., the defense provided

9   their defense exhibits.  Specifically regarding the 911 call

10  that Mr. Stein has outlined, that 911 call was provided to the

11  defense on January 24, 2019 in the government's second

12  production.  When we reviewed the particular supposed

13  transcript, it had a number of errors.  It actually didn't

14  have complete sentences.  It had words that the government

15  believes are not accurate and consistent with what the 911

16  call actually provides.

17       Separate and apart from that, the foundational

18  issues of admitting that 911 call through the witness, if the

19  defense is planning to potentially cross-examine this witness,

20  and have the witness be shown this transcript that Mr. Stein

21  has alluded to was created by a law student at 10:15 last

22  night with those errors in it, we think that would not be an

23  appropriate way to, A, cross-examine the witness because the

24  actual use of a transcript is not an appropriate examination

25  point without asking the witness first if they can recall what

1   they said and then seeing what the answer to that is and then

2   second, and more concerning to the government, the transcript

3   is just simply not accurate.  It omits words.  I'll give by

4   way of an example.

5           In the transcript, there's a description of, "It's a

6   black jacket with a white stripe on the hood."  The actual

7   audio says, "red stripe on the hood."  The idea that a

8   transcript would include that different of a material change

9   is concerning to the government and this is not a new 911 call

10  and so if this was something that the defense planned to

11  utilize as an exhibit, we would have asked for additional

12  notification and then an opportunity to actually have the

13  transcript be accurate.

14          MR. STEIN:  Judge, I can short-circuit this problem

15  because I didn't, we didn't intend to introduce the

16  transcript.  Frankly, it was just provided as some assistance

17  as transcripts often are, but we do intend, depending on how

18  the direct examination goes, to ask this witness questions

19  about his call which is on a 911 recording.

20          THE COURT:  Right.  Well, I mean the transcript can

21  be used for purposes of refreshing somebody's recollection

22  with.  To the extent that the government has a different

23  version, you can provide that version at the same time if you

24  have it.

25          MR. SELDEN:  I think the challenge is, Your Honor,

1    we received the transcript at 10:15 last night.

2              THE COURT:  Oh, when is the witness coming?

3              MR. SELDEN:  The witness is coming this morning and

4    this was a 911 call that had been provided to the defense as I

5    mentioned in January of 2019 and the transcript is simply not

6    accurate.  That's the challenge, that it omits certain

7    information.

8              So if the purpose is to refresh the witness with

9    what they said, I suppose the foundational question would be

10   to ask the witness, for example:  Do you recall asking or

11   stating that there was a black jacket with a red stripe on the

12   hood:  If the witness says, Yes, I recall saying that, well,

13   then, there's no need to refresh.  If the witness says, No,

14   and then the witness is followed up with, Would there be a

15   document that would refresh your recollection, showing the

16   witness a transcript that was created by a law student that

17   the witness has not adopted would not be a proper refreshment

18   or cross-examination of that witness.

19             So I suppose my point is that based on what the

20   transcript would be that would be put before that particular

21   witness with the errors, not just that red stripe, but other

22   errors completely omitting --

23             THE COURT:  Do we have the 911 call itself?

24             MR. STEIN:  Judge, that's what I thought I just

25   said.  I'm not going to -- we're going to be using the 911

1  call itself to question the witness if a particular subject

2  comes up, so I'm glad to hear more about our mistakes in the

3  transcript.  It's not the point.  The point is --

4          THE COURT:  So you are going to actually play the

5  recording?

6          MR. STEIN:  Correct.

7          MR. SELDEN:  Your Honor, one last point with regards

8  to potentially trying to play the recording for the witness.

9  The government's position is that if the door is opened

10  challenging the witness' memory with regards to statements

11  that they made that evening, that pursuant to the federal

12  rules, we would be allowed to rehabilitate that witness or

13  present a witness with statements made to a witness about what

14  that witness had said at the time, for example, a description

15  of the defendant that was made to law enforcement shortly

16  thereafter.  Specifically, having opened the door to

17  questioning the credibility of the witness, we believe that

18  that would be appropriate under the federal rules.

19          THE COURT:  As of what kind of statement?

20          MR. SELDEN:  As a means to rehabilitate a prior

21  identification statement, that being said, the prior

22  description that is attacked.  For example, on cross:  You

23  didn't say X, you said Y.  You didn't say Y, you said Z.  If

24  that witness previously made a consistent statement, that

25  consistent statement could come in as substantive evidence.

1          MR. STEIN:  Actually, I disagree with that, Judge,

2     because we're not going to be making a claim that whatever

3     other statement the witness made, that the statement we're

4     going to impeach him with is a recent fabrication.  So my

5     understanding of the rule that Mr. Selden is referring to,

6     they can rehabilitate a witness with a prior statement --

7          THE COURT:  Prior to the challenge.

8          MR. STEIN:  -- if there is a claim of a recent

9     fabrication which we are not.

10         THE COURT:  That's my understanding of the rule

11    generally also.

12         MR. SELDEN:  We look forward to seeing the defense

13    cross on this point, Your Honor.  I think given that the

14    transcript, it sounds like, will not be something that will be

15    permitted to be shown to this witness, the government's

16    position is, well, we'll wait and see, to quote the Court, but

17    we did want to flag some of our concerns with regards to -- I

18    guess, we're a little confused as to why we would receive a

19    proposed transcript if the defense was planning to use it, but

20    we'll wait and see what happens during their cross.

21         MR. STEIN:  Judge, it was a harmless courtesy.

22    Judge, that's all I meant it as.

23         THE COURT:  Courtesies are to be encouraged,

24    Mr. Stein.

25         MR. STEIN:  Yes, even in the heat of battle.

182

1          THE COURT:  Correct.

2          MR. SELDEN:  Your Honor, with regards to one other

3    housekeeping matter for the government, we had an opportunity

4    to speak to Mr. Farrell and we had provided an additional

5    Giglio update Mr. Farrell.  We wanted to just put that on the

6    record.  We'll memorialize that in an e-mail to counsel for

7    defense but I wanted to also flag that was an additional

8    Giglio matter we made with regards to a possible testifying

9    witness here today, that being Sergeant Bryan.

10          MR. FARRELL:  I acknowledge receipt of that

11   information.  Thank you.

12          THE COURT:  That is recorded on the record.  Thank

13   you.

14          MR. SELDEN:  Nothing else from the government.

15          THE COURT:  Mr. Stein?

16          MR. STEIN:  No, Judge.

17          THE COURT:  Then we're ready to go.

18          (Jury enters.)

19          THE COURT:  Be seated, please.

20          Counsel will stipulate that the jury is present and

21   properly seated.

22          MR. SELDEN:  On behalf of the government, thank you,

23   Your Honor.

24          MR. STEIN:  Yes, Judge.

25          THE COURT:  Thank you, Counsel.

183

1          Ladies and gentlemen, welcome back.  It's a

2  beautiful day in downtown Brooklyn.  We are ready to finish.

3  I hope you enjoyed a pleasant evening.  As we broke yesterday,

4  we were still on the government's case and I think Mr. Selden

5  has another witness for us.

6          MR. SELDEN:  Thank you very much, Your Honor.

7          Your Honor, the government calls Ms. Sharon Sanchez

8  to the stand.  I'd ask for the Court's brief indulgence while

9  we bring Ms. Sanchez into the courtroom.

10          THE CLERK:  Please, raise your right hand.

11          (The witness is duly sworn/affirmed by clerk.)

12          THE CLERK:  Please state your first and last name

13  and spell it for the record.

14          THE WITNESS:  Sharon Sanchez, S-H-A-R-O-N, Sanchez,

15  S-A-N-C-H-E-Z.

16          THE CLERK:  Thank you.  Have a seat, please.

17          MR. SELDEN:  Thank you very much, Your Honor.

18

19          (Continued on next page.)

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MR. SELDEN:

3    Q    Good morning.

4    A    Good morning.

5    Q    Ms. Sanchez, the acoustics in this room are difficult so

6    if you could just move up just a little bit in front of that

7    microphone, that would be so helpful.

8    A    Sure.

9    Q    Thank you so much.

10          Ms. Sanchez, please tell the ladies and gentlemen of

11   the jury a little bit about yourself.  Where are you from?

12   A    I'm from Peru.

13   Q    Without saying exactly where, where do you currently

14   live?

15   A    In Queens, East Elmhurst.

16   Q    When did you come to the United States?

17   A    I be here for three years.

18   Q    Are you currently employed?

19   A    Yes.

20   Q    Where do you work?

21   A    I work in Rite Aid pharmacy in Queens.

22   Q    Where specifically is that pharmacy in Queens?

23   A    Jackson Heights.

24   Q    How long have you worked at Rite Aid?

25   A    For three years now.

Sanchez - direct - Selden                    185

1  Q    Besides working at Rite Aid, are you also in school?

2  A    Yes, I'm in college.

3  Q    Where are you in college?

4  A    LaGuardia Community College.

5  Q    Ms. Sanchez, what are you studying at LaGuardia Community

6  College?

7  A    Business administration.

8  Q    Turning back to Rite Aid, what is your current job title

9  at Rite Aid?

10 A    An assistant manager now.

11 Q    Have you always been an assistant manager?

12 A    No.  I started as cashier, then shift supervisor and then

13 assistant manager.

14 Q    Ms. Sanchez, I want to turn you back to November 26,

15 2018.  Were you working that day?

16 A    Yes.

17 Q    Were you working at the Jackson Heights Rite Aid?

18 A    No, I was working in different store.

19 Q    Do you remember where this other store was located?

20 A    Yes.  It was in Astoria.

21 Q    Do you remember the exact address?

22 A    It is in 33rd Street, but I don't remember exactly the

23 address.

24 Q    Ms. Sanchez, why were you working at that different Rite

25 Aid at 33rd Street rather than the one at Jackson Heights?

1   A    Because my store manager told me to cover one other shift

2   supervisor that was, that worked in that store.

3   Q    What time were you working at that store on November 26,

4   2018?  What was your shift?

5   A    It was between 11 to, 11 p.m. until 7 a.m.  I work

6   overnight.

7            MR. SELDEN:  Mr. Villanueva, for identification

8   purposes, I would now like to put up on the screen

9   Government's Exhibit 108-A.

10  Q    Ms. Sanchez, can you please take a look at the screen

11  that's immediately to your right in front of you and see

12  whether or not you recognize what I've just shown you in

13  Government's Exhibit 108-A.

14  A    Okay.

15  Q    Do you recognize that?

16  A    Yes.  This is a photo of one of the entrance of the store

17  that I was covering that night.

18  Q    Is that a fair and accurate depiction of how the store

19  looked when you were working there?

20  A    Yes.

21           MR. SELDEN:  Your Honor, at this time, the

22  government moves to admit Government's Exhibit 108-A into

23  evidence.

24           THE COURT:  Any objection?

25           MR. STEIN:  No.

1          THE COURT:  Received without objection.

2          (So marked.)

3          MR. SELDEN:  Thank you so much, Your Honor.

4     Q    Ms. Sanchez, while we are on that topic, Mr. Villanueva,

5     before we publish it, just briefly, I would like to show two

6     other exhibits.  Okay?

7          Ms. Sanchez, can you please look at Government's

8     Exhibit 108-B and I'll turn to Government's Exhibit 108-C in a

9     moment.

10         Can you look at 108-B, please?

11    A    Yes.

12    Q    Do you recognize that?

13    A    Yes.

14    Q    What do you recognize it to be?

15    A    It's a store, the first -- it's one of the, it's one of

16    the entrance that I was covering that night.

17    Q    Is that a fair and accurate depiction of how the store

18    looked that you were covering that evening?

19    A    Yes.

20         MR. SELDEN:  Your Honor, the government moves to

21    admit 108-B into evidence.

22         THE COURT:  Any objection?

23         MR. STEIN:  No.

24         THE COURT:  Received without objection.

25         (So marked.)

Sanchez - direct - Selden                    188

1    Q    And then lastly, Ms. Sanchez, if you could take a look at

2    108-C, please.  Do you recognize that?

3    A    Yes.  It is, it's the other entrance of the store that

4    was working that night.

5    Q    And lastly, is that a fair and accurate depiction of the

6    store that you were working at on November 26, 2019?

7    A    Yes.

8              MR. SELDEN:  Your Honor, at this time, the

9    government moves to admit Government's Exhibit 108-C.

10             MR. STEIN:  No objection.

11             THE COURT:  Received without objection.

12             (So marked.)

13             MR. SELDEN:  Thank you, Your Honor.  Permission to

14   publish these exhibits to the jury, 108, please.

15             THE COURT:  You may.

16             MR. SELDEN:  Mr. Villanueva, if you can put it up on

17   the screen, please.  Thank you so much.

18   Q    Ms. Sanchez what do we see in Government's Exhibit 108-A?

19   A    Okay.  It's a street on one of the side of the store.

20   Q    And if you could just circle the store on your screen,

21   please.

22   A    Sure.

23   Q    Push a little harder.  Thank you so much.

24   A    Oh.  (Witness complies.)

25   Q    Was that the store you were working at on November 26,

1  2018?

2  A    Yes, that's right.

3  Q    And just briefly, if we could turn to 108-B, what do we

4  see in 108-B?

5  A    This part is, is one, is one of the entrance of the

6  store, one of the, one of the side.

7  Q    And if you could just circle on 108-B, please.

8  A    Sure.

9  Q    Thank you.

10  A    (Witness complies.)

11  Q    And Ms. Sanchez, we're going to turn to 108-C.  What do

12  we see in 108C?

13  A    This is the other entrance for, from the store.

14  Q    Ms. Sanchez, I want to turn you back to that particular

15  day and, specifically, what, if anything, do you recall

16  happening when you were working at the store at approximately

17  4:15 in the morning?

18  A    Sorry, can you repeat it?

19  Q    What do you recall happening in the store at

20  approximately 4:15 that morning?

21  A    I was, I was taking a customer, a regular customer that

22  night, and I remember there was a guy with a hoodie entered to

23  the store and he, he came to with gift cards to pay for it but

24  he didn't pay.  He just asked me the price of the card.  And

25  after, after, he said it was a little expensive, he was, like,

1   cheap, cheap, right?  So I asked, I told him that he need

2   help, I can help him, but instead of that, he took one of the

3   cards that was by the register and pay for it with $1 bill and

4   I opened the register.  After that, he showed me the gun that

5   he have and he told me to give all, all the money that I have

6   in the register.

7   Q    Ms. Sanchez?

8   A    Yes.

9   Q    Did you give all the money that you had in the register?

10  A    Yes, because I was point with a gun so I was a little

11  scared at that moment so I, I gave him all the, he asked me.

12  Q    And was there money in the register?

13  A    Yes.

14  Q    Was that the only thing you gave him?

15  A    Yes.

16  Q    The money, that is?

17  A    The till, yes, all the till.

18  Q    What is the till?  Can you explain that to the ladies and

19  gentlemen of the jury?

20  A    What is till?

21  Q    Yes.

22  A    Well, we have the register and the till is where we put

23  the money and the coins, you know.

24  Q    What happened next?

25  A    After that, he took the till and he went to the corner

1   because one customer was in there.  He left after that.  I

2   called 911.

3            MR. SELDEN:  Mr. Villanueva, if we could, for the

4   witness only, please.

5   Q    Ms. Sanchez, do you know whether or not the Rite Aid that

6   you were working at that evening had any security cameras?

7   A    Yes.

8   Q    How do you know that?

9   A    Because, because I know, I work, all the store that I

10  work for that was in that company have security cameras.  I

11  just know we have the cameras in the office too and then we

12  have the screen where we can look.

13  Q    That evening, did you actually watch the security camera?

14  A    Yes.

15  Q    Okay.  We'll get back to that in a moment.

16  A    Sure.

17  Q    Ms. Sanchez, I want you to look up on the screen and I'm

18  putting up on the screen Government's Exhibit 411-B that's

19  been previously agreed to by stipulation.

20            Ms. Sanchez, do you recognize what I've just shown

21  you in Government's Exhibit 411-B?

22  A    Yes.

23  Q    Okay.

24            MR. SELDEN:  And Mr. Villanueva, if you could

25  actually pull this up on the screen, please, 411-B.

1   Q    All right.  Ms. Sanchez, can you explain to the ladies

2   and gentlemen of the jury what we are seeing here in

3   Government's Exhibit 411-B?  What is this a view of?

4   A    Here is just the register of the store I was working that

5   night.

6   Q    Can you circle those registers, please?

7   A    Sure.  (Witness complies.)

8   Q    Is that the only register that was there that evening?

9   A    Actually, it's three registers and two self chip card.

10  It's a machine.

11  Q    If you could circle the other registers, please.

12  A    I just see two here.

13         MR. SELDEN:  Mr. Villanueva, and I apologize if I

14  wasn't clear about this, this exhibit is previously in by

15  stipulation so if we can publish it to the jury.

16         THE CLERK:  Sorry.

17         MR. SELDEN:  That's my apologies.

18  Q    So Ms. Sanchez, just to bring the jury up to speed, what

19  did you just circle in Government's Exhibit 411-B?

20  A    There --

21  Q    What are those things?

22  A    The registers.

23  Q    I'm now going to play Government's Exhibit 411-B.

24         (Video played.)  (Video stopped.)

25  Q    Ms. Sanchez, for the record, I'm stopping Government's

1   Exhibit 411-B at 18 seconds.  Do you recognize anyone in

2   Government's Exhibit 411-B?

3   A    Yes.  This is the regular customer that was paying

4   before, before the incident happened.

5   Q    Can you please circle that regular customer, Ms. Sanchez?

6   A    Sure.  (Witness complies.)

7   Q    Do you recognize anyone else in Government's

8   Exhibit 411-B?

9   A    And myself.

10  Q    Can you circle yourself, please?

11  A    Sure.  (Witness complies.)

12          MR. SELDEN:  For the record, the witness has now

13  circled an individual with a red sweatshirt as well as she

14  described herself with a blue top and khaki pants.

15  Q    Ms. Sanchez, I'm going to keep playing 411-B.

16          (Video played.)  (Video stopped.)

17  Q    Ms. Sanchez, I've now stopped 411-B at second 29.  What

18  do you see in 411-B?

19  A    I see the black guy with the hoodie that just entered

20  into store.

21  Q    Can you please circle the black guy with the hoodie that

22  you just described who entered in the store on Government's

23  Exhibit 411-B?

24  A    Sure.   (Witness complies.)

25          MR. SELDEN:  For the record, the witness has circled

Sanchez - direct - Selden                    194

1   what appears to be an African-American gentleman walking into

2   the store with a hoodie on.

3          Ms. Sanchez, we're going to keep playing

4   Government's Exhibit 411-B in a moment, but if you can orient

5   the ladies and gentlemen of the jury, what is to the right of

6   this screen?  So if that person that you just described being

7   the black guy wearing the hoodie kept walking, where would he

8   be walking in the store?

9   A    Well, he went straight to the hallway that we have by the

10  office and then he went to the greeting cards.

11  Q    And then I'm going to play Government's Exhibit 411-B for

12  you.

13         (Video played.)  (Video stopped.)

14  Q    Ms. Sanchez, what has just happened in Government

15  Exhibit 411-B at approximately 1 minute and 16 seconds?

16  A    So he gave me the greeting cards.  One of the greeting

17  card, he asked me for the price of the card so I scan the card

18  and I tell him about the price, but he decide he want a

19  cheaper one.

20         (Video played.)  (Video stopped.)

21  Q    Ms. Sanchez, what has just happened in Government's

22  Exhibit 411-B at approximately 1 minute and 47 seconds?

23  A    Okay.  So he took one of the greeting cards that was on

24  the register because he have, he, because he -- well, can I

25  restart something?

1   Q    Sure.

2   A    Okay.  He asked me for the price but I asking him he need

3   help because he want something that cost a little, it cost, it

4   cost lower than that.  So that's why when you saw me, like,

5   going down, going to, going to in front of him to help him,

6   right, but he took a gun, he said, he told me, "Now you see

7   this."  Okay.  So I charge for it and he paid me $1 bill and

8   at this moment, he show me the gun that he have.  And after

9   that, he opened the register because he asked, he told me to

10  give him all the money.

11  Q    Ms. Sanchez, if you could circle where you're describing

12  the gun that he had?

13  A    Sure.   (Witness complies.)

14       MR. SELDEN:  For the record, the witness has circled

15  in the middle of the screen immediately left to the cash

16  register.

17  Q    Ms. Sanchez, what were you thinking at this moment when

18  you had the gun there?

19  A    Well, I was nervous, I wasn't thinking.  So I was afraid

20  of, you know, that he shoot me or something so I, whatever he

21  wants, yes.

22  Q    You mentioned a moment ago that you opened up the cash

23  register tray.  I'm going to play Government's Exhibit 411-B

24  starting at 1:47.  I'll back up.

25       (Video played.)  (Video stopped.)

Sanchez - direct - Selden                              196

1   Q     What are you doing right there, Ms. Sanchez, in

2   Government's Exhibit 411-B at minute 2?

3   A     So I opened the register.  I use my fingerprint because

4   only the chief supervisor, the assistant manager and the store

5   manager can open the register.  The cashiers usually don't do

6   that.

7   Q     I'm going to continue playing 411-B.

8             (Video played.)  (Video stopped.)

9   Q     Ms. Sanchez, what have you just done there as it relates

10  to the --

11  A     So I gave him all the till but he saw the bills that we

12  keep behind the till and he asked me for that too, for those

13  bills.  They're 100's and 50.

14  Q     Did you give him those 100's and 50s?

15  A     Yes, those too because he asked me for them.

16            (Video played.)  (Video stopped.)

17  Q     Ms. Sanchez, if you could orient for the ladies and

18  gentlemen of the jury, what direction does that man walk?

19  That was the black guy you described with the hoodie, what

20  direction does he walk after you gave him the till?

21  A     He went by the corner of the entrance.

22  Q     If you could just circle where he is, please.

23  A     Sure.  (Witness complies.)

24            MR. SELDEN:  For the record, the witness has circled

25  in the upper left-hand corner what appears to be the gentleman

Sanchez - direct - Selden                    197

1    she just previously described.

2              (Video played.)  (Video stopped.)

3    Q    I'm going to stop this here at 2:35.  Ms. Sanchez, it

4    appeared there was another person who walked on the screen.

5    Did you see who that person was?

6    A    He was a regular customer too.  He went to the main

7    cooler.

8    Q    Did that customer get milk from the milk cooler?

9    A    Yes.

10   Q    What did you do?

11   A    I told him we were closing because this had just happened

12   so I was calling 911 at that time.

13   Q    I'm going to finish playing the video, please.

14             (Video played.)   (Video stopped.)

15   Q    Ms. Sanchez, I'm going to show you what's been previously

16   admitted as Government's Exhibit 411-C.  Just bear with me

17   here a moment, please.  I'm sorry.  411-A.

18             What do we see in Government's Exhibit 411-A,

19   Ms. Sanchez?

20   A    That's myself checking the cameras.

21   Q    Ms. Sanchez, is this before or after the robbery took

22   place?

23   A    Before.

24   Q    Okay.  I'm going to --

25             MR. SELDEN:  Thank you so much, Mr. Villanueva, for

Sanchez - direct - Selden                  198

1   publishing that.

2   Q    I'm just going to fast forward for you with regards to

3   this particular video.

4          (Video played.)  (Video stopped.)

5   Q    Ms. Sanchez, we're going to take a quick step back.

6          (Video played.)  (Video stopped.)

7   Q    So Ms. Sanchez, what, if anything, do we see in

8   Government's Exhibit 411-A at second 25?

9   A    I see here that black guy with the hoodie who took the

10  till.

11  Q    Okay.  And if you could just circle that person in

12  Government's Exhibit 411-A at second 25.

13  A    (Witness complies.)

14  Q    Ms. Sanchez, is this another angle in close proximity to

15  the actual cash register?  That's another angle by that?

16  A    Yes.

17          MR. SELDEN:  For the record, the witness has circled

18  what appears to be an African-American man in the middle of

19  the screen.

20  Q    Ms. Sanchez, I'm just going to play this video.  I'm just

21  going to fast forward it to 2:15, Ms. Sanchez.  All right?

22  I'm playing for the record at minute 2:15.

23          (Video played.)  (Video stopped.)

24  Q    What did we just see playing from minute 2:15 to minute

25  2:23?

1   A    He was leaving the store.

2   Q    And Ms. Sanchez, did we also see the customer who was

3   there to purchase milk?

4   A    Yes, he went to the main cooler.

5   Q    Ms. Sanchez, were you able to tell the general age of the

6   man who robbed you?

7   A    He was between his 20s.

8   Q    Ms. Sanchez, I have no further questions for you at this

9   time.

10           MR. SELDEN:  Thank you.

11           THE COURT:  Thank you, Mr. Selden.

12           Any cross?

13           MR. FARRELL:  Yes.  Thank you, Your Honor.

14           THE COURT:  Mr. Farrell.

15   CROSS-EXAMINATION

16   BY MR. FARRELL:

17   Q    Good morning, Ms. Sanchez.

18   A    Good morning.

19   Q    My name is Gary Farrell.  You and I have never met or

20   discussed the case, right?

21   A    Right.

22   Q    When the guy came up with the greeting card, he asked you

23   how much it was?

24   A    Yeah, he asked me for the price.

25   Q    Okay.  Did you tell him the price is on the back, you can

1   look for it yourself, or did you know the price by heart and

2   you just told him?

3   A    Yes, I scan it first and then I told him the price but it

4   was -- all the greeting card have the price on the back.

5   Q    And then it looked like on the video, correct me if I'm

6   wrong, that you actually touched the card, you took it?

7   A    Yes.

8   Q    And then you put it back on the counter?

9   A    Uh-huh.

10  Q    Now, isn't it true, Ms. Sanchez, that the guy that robbed

11  you that took the till, the hood was so tight that it covered

12  most of his face?

13  A    He was covered up to here until -- (Indicating) -- behind

14  the nose, yes.

15  Q    Well, you agree --

16       MR. STEIN:  I'm sorry, Judge.  Can we have an

17  indication of the record where the witness was gesturing?

18       THE WITNESS:  Over here.  (Indicating.)

19  Q    Let the record indicate it was covering from up to the

20  top of your lip?

21  A    Yes, to like here, by the nose.  (Indicating.)

22  Q    Okay.  So what could you see, from above the lip or below

23  the lip?

24  A    I could see the top part.

25  Q    So would you say that most of his face was covered?

1    Would you agree with that?

2    A    Yes.

3    Q    Ms. Sanchez, as you're testifying here in court today,

4    you have your glasses on, correct?

5    A    That's correct.

6    Q    Do you usually wear eyeglasses?

7    A    Yes.

8    Q    Did you wear them during that shift on that day back in

9    November 2016?

10   A    No, I wasn't.

11   Q    And you didn't have contacts on that shift, did you?

12   A    No.  I use my glasses only because I feel tired.  That's

13   why.

14   Q    Okay.  Now, we just watched the video.  Would you agree

15   with me that when the guy took the gun out, he did it with his

16   right hand, correct, and he pointed the gun at you with his

17   right hand?

18   A    I don't remember.

19   Q    You watched the video with us in court today, right?

20   A    Uh-huh.

21   Q    Is this the first time you ever saw the video?

22   A    No, because I provide that video to the police.

23   Q    Right.  The morning of the incident, right?

24   A    Yes.

25   Q    And have you -- before testifying here on the stand,

1  you've seen the video at the government's offices, haven't

2  you?

3  A     In the what, what?

4  Q     You spoke to these guys, the gentlemen at this table.

5  Today wasn't the first time you met Mr. Selden, right?

6  A     Yeah.

7  Q     It was, today?

8  A     Today?  No.  I met him like a couple times.

9  Q     Okay.  And in those couple of times, he showed you that

10 video, right?

11 A     That's right.

12 Q     And he asked you and explained to you how this was going

13 to work, that he was going to ask you certain questions and

14 you were going to give certain answers, right?

15 A     No.

16 Q     He just asked you what happened that particular day,

17 right, and you told him?

18 A     Yes, I told him that, what happened that night.

19 Q     Okay.  Now, the guy -- so you had some, the guy, there

20 was some exchange of conversation, albeit not that much,

21 between you and the guy, right?  You heard his voice?

22 A     Yes.

23 Q     Any accent that you were able to pick up?  Like, you have

24 kind of an accent because you're from Peru.

25 A     Yes.  No.  No.

1    Q    Any accent?

2    A    No, I didn't notice nothing.

3    Q    Now, you stated that you originally started taking the

4    bills out of the till and then you just gave him the till --

5    A    Yes.

6    Q    -- is that right?

7         Did he ask you to do that or did you just think,

8    hey, this is quicker, I wanted to get this over with.

9    A    It was my first time that I was in that situation so I

10   just, I thought that he maybe need the bills, the 20s, but he

11   told me that, no, he need the till, the complete till, the

12   entire till.  So, yes, I gave him.

13             (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

1    BY MR. FARRELL:   (Continuing.)

2    Q    And, Ms. Sanchez, how much did the till hold at that

3    point that you gave it to him?

4    A    Well, when I make the report it was about, like, 1,000.

5    Q    Ms. Sanchez, isn't it true that the police responded

6    pretty quick; let me establish that first, right, after you

7    called 911?

8    A    Yes.

9    Q    Within ten or fifteen minutes?

10    A    No, it took, like, between ten minutes, yeah.

11    Q    The police, some were wearing uniforms?

12    A    Yes.

13    Q    And some were wearing suits, blazers, the detectives?

14    A    I don't remember the suit that they have.

15    Q    You gave a few interviews though; you told them what

16    happened?

17    A    Yes, of course.

18    Q    And you tried to be as accurate as you could and you told

19    them the details of things; right?

20    A    Well, when they came I just showed them the video and

21    told them what has happened a few minutes ago.

22    Q    Okay.  And in the course of telling that, did you happen

23    to tell a gentleman named Detective Tom Carter that the drawer

24    that you handed the guy contained approximately $802.17?  Did

25    you say that?

1    A    I don't remember saying that.

2    Q    If you saw the detective's official report that

3    interviewed you that that's what you said, would that refresh

4    your memory?

5               MR. SELDEN:  Objection, Your Honor.

6               THE COURT:  She said she doesn't remember.  Don't

7    describe what you want to show her.  If you want to show

8    her --

9               MR. SELDEN:  The objection is whether or not the

10   witness has actually seen the police report before.

11              THE COURT:  That question is stricken.  The question

12   now is whether or not she is going to see something that might

13   refresh her recollection.  Whether she has seen it in the past

14   is not relevant.

15              MR. SELDEN:  Thank you, Your Honor.

16   BY MR. FARRELL:

17              MR. FARRELL:  So, Mr. Villanueva, I'm showing the

18   witness 3500-SS-11, just for the witness.

19   Q    Are you able to read it?

20   A    Yes.

21   Q    Take your time, of course.  I just asterisked the line

22   that I referred you to.  Take your time and see if it

23   refreshes your recollection of whether or not you gave that

24   specific number as to how much was in the till at the time the

25   person took it?

1              THE COURT:  Meaning now after looking at it,

2    Ms. Sanchez, do you remember whether or not you gave that

3    number to the police at that time?

4              THE WITNESS:  I don't remember that that was the

5    price.

6              THE COURT:  You don't remember?

7              THE WITNESS:  No.

8              THE COURT:  She doesn't remember.

9              MR. FARRELL:  Thank you, Your Honor.

10   BY MR. FARRELL:

11   Q    During -- after the robbery, was there a way to even know

12   how much could have been taken or were you just -- would you

13   have to just have guessed or approximated?

14   A    No.  It's showing -- the wheel out to go, they tell us

15   how much money we have in each register.

16   Q    So, there was a way for you to figure out how much was in

17   there at the time you arrived?

18   A    That's right.

19   Q    Okay.  As you sit here today, though, and I know it's

20   kind of a long time ago, do you remember if you did that; if

21   you figured it out so you could give the detectives the exact

22   number as opposed to just guessing saying a few hundred?

23   A    I don't remember.  It was, like, two or -- two or three

24   years ago.  No, two years ago.

25   Q    Do you remember -- you said something on the record about

1   hundreds and fifties?

2   A    Yes.

3   Q    So the guy definitely took some hundreds and some

4   fifties?

5   A    Yes, there was bills behind the till.

6   Q    Would you say, like, under the till; is that where you

7   kept the big bills back then?

8   A    Yes.

9   Q    Do you know how man hundreds and how many fifties were

10  there?

11  A    No.

12  Q    So you probably wouldn't know how many twenties, tens,

13  fives or ones either; right?

14  A    No.

15  Q    Was there loose change in the till?

16  A    Yes.

17  Q    Did you keep rolls of quarters, dimes, nickels --

18  A    Yes.

19  Q    And how about credit card receipts or food stamps, would

20  they be in the till also?

21  A    No.

22  Q    Would they be kept somewhere else?

23  A    Yes, in the system, but not on the register.

24  Q    Was anyone else working that shift with you or were you

25  by yourself?

Sanchez - cross - Farrell                    208

1   A    No, there was two more guys.  One guy was in the basement

2   and the new guy was facing the store.

3   Q    What do you mean by facing the store?

4   A    Fixing the store, putting the stuff in the correct place.

5   Q    Okay.  So they weren't anywhere near the cash register

6   when this happened; right?

7   A    No.

8   Q    And had you been trained by writing how to act when

9   somebody robs you with a gun?

10  A    I saw a series of videos.

11  Q    Did the videos tell you not to fight with the guy, just

12  give it to him?

13  A    That's right.

14  Q    And that's what you did; right?

15  A    Yes.

16  Q    And, Ms. Sanchez, as fate had it, you had a vacation

17  planned; you were flying to Peru; correct?

18  A    Yes.

19  Q    And do you remember the detective calling you to follow

20  up on the interview from the night before?

21  A    I remember they called me because they want some sample

22  of my saliva.

23  Q    They wanted a sample of your saliva?

24  A    Yes.

25  Q    Did you give that sample of that saliva?

1   A    Yes, of course.

2   Q    And you told them, I could never identify that guy if I

3   ever saw him again; right?

4   A    No, I never said that.

5   Q    Okay.  I'm going to ask you to take a look at SS --

6   3500-SS-2.  Again I'm going to put an asterisk to help you

7   look at that spot.  I'm going to -- while you're looking, I'm

8   going to ask a similar question:  Isn't it true that at 9

9   o'clock at night on November 27th, you got a call from a

10  Detective Bravo and you told him that you did not believe you

11  could identify the perpetrator?

12  A    I don't remember saying that.

13  Q    You don't remember saying that either?

14  A    No.

15  Q    Did you complete your shift after this incident happened

16  or were you able to go home early?

17  A    I called the store manager for the store and I met with

18  him so he could talk with me with the police and so I wait

19  until 7 a.m.  That was my shift.

20  Q    And you did talk to the police; right?

21  A    I talk with the police, yeah.

22  Q    Have you been back to that Rite Aid since?

23  A    Yes.

24  Q    To work?

25  A    To work, yeah.

1    Q    Okay, great.

2              MR. FARRELL:  Nothing further.

3              MR. SELDEN:  Brief redirect, Your Honor.

4              THE COURT:  Redirect by Mr. Selden.

5              MR. SELDEN:  Thank you very much, Your Honor.

6    REDIRECT EXAMINATION

7    BY MR. SELDEN:

8    Q    Ms. Sanchez, I would appreciate if you could look at the

9    screen in front of you for a moment.

10   A    Yes.

11   Q    Ms. Sanchez --

12             MR. FARRELL:  And, Mr. Villanueva, could you please

13   publish to the jury what we're seeing on the screen in front

14   of Ms. Sanchez?

15             (Exhibit published.)

16   BY MR. SELDEN:

17   Q    Ms. Sanchez, do you see what I'm showing you as

18   Government Exhibit 411-B.  Do you see that?

19   A    Yes.

20   Q    Do you remember the questions that were asked about what

21   hand; right hand, left hand?  Do you remember that line of

22   questioning?

23   A    Yes, I remember those questions.

24   Q    Do you see whether the person in 411-B is holding the

25   firearm with one hand or two hands?

Sanchez - redirect - Selden                211

1    A    Two hands.

2    Q    Ms. Sanchez, as this was going on, do you remember the

3    line of questioning by Mr. Farrell about the amount of money

4    that was in the cash register till that night?

5    A    Yes.

6    Q    Were you focused on $802 or $1,000 or were you focused on

7    something else?

8    A    I was focused on something else.

9    Q    What were you focused on, Ms. Sanchez?

10   A    My life; that he don't shoot the gun.

11   Q    Ms. Sanchez, you were asked a line of questions about

12   what you did after the fact, do you remember that?

13   A    Yes.

14   Q    After you --

15   A    I don't remember everything, you know, because as I say

16   it happened, like, two years ago.

17   Q    What's the one thing -- as Mr. Farrell was asking about

18   the meetings with the Government, what's the one thing we

19   asked from you?

20   A    The truth.

21   Q    Ms. Sanchez, do you remember after this happened whether

22   or not you provided a screenshot of this video to anyone?

23   A    Yes, I sent a screenshot of the guy to the other shift

24   supervisor that was working in my store, in the regular store,

25   in Jackson Heights.

1   Q    Why did you send a video of the guy who robbed you to

2   another store in Jackson Heights?

3          MR. STEIN:  I object.  This is outside the scope of

4   any cross-examination.

5          THE COURT:  It does appear to be outside the scope.

6          MR. SELDEN:  Your Honor, I believe there was a

7   question as to what Ms. Sanchez did or did not do with regards

8   to her statements to law enforcement and to others afterwards.

9   That's in response to that.

10          THE COURT:  I will allow it.

11  BY MR. SELDEN:

12  Q    Ms. Sanchez, I will ask the question again.  Why did you

13  send a video of the guy who robbed you to your colleague or

14  friend in the Jackson Heights store?

15  A    Because I was afraid that he went to the store and do the

16  same thing.

17          MR. SELDEN:  Nothing further.  Thank you, Your

18  Honor.

19          MR. FARRELL:  Mr. Selden, if you could just stay

20  there for my recross I will need some assistance with the

21  video.

22          THE COURT:  Mr. Farrell on recross.

23  RECROSS-EXAMINATION

24  MR. FARRELL:

25          MR. FARRELL:  Showing the same exhibit as Mr. Selden

1    is.

2              THE COURT:  Which one, Mr. Farrell?

3              MR. FARRELL:  411-B.  Watch this part of the video,

4    please, Ms. Sanchez.

5              (Video played.)

6              (Video paused.)

7    BY MR. FARRELL:

8    Q    Did you watch that Ms. Sanchez, closely?

9    A    Yes.

10   Q    Did you see the perpetrator pull the gun out with his

11   right hand from his right pocket?

12   A    If you can repeat again the video so I can be sure.

13             (Video played.)

14             (Video paused.)

15   BY MR. FARRELL:

16   Q    Did you see it, Ms. Sanchez?

17   A    Yes.

18   Q    Did you see the gun in his right hand taken from his

19   right front pants pocket?

20   A    Yes.

21             MR. FARRELL:  Thank you.

22             THE COURT:  Thank you Mr. Farrell.

23             I imagine you are finished, Mr. Selden.

24             MR. SELDEN:  I am, Your Honor.

25             THE COURT:  Thank you very much, Ms. Sanchez.  You

1    are excused.

2             (Witness excused.)

3             THE COURT:  Does the Government have another witness

4    for us?

5             MR. SIEGEL:  Yes, Your Honor.  The Government calls

6    Detective Julie Casale.

7             (Witness takes the stand.)

8             THE COURTROOM DEPUTY:  Raise your right hand.

9             (Witness sworn/affirmed.)

10            THE COURTROOM DEPUTY:  Have a seat.  Please state

11   and spell your name for the record.

12            THE WITNESS:  Julie Casale, C-A-S-A-L-E.

13            (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Casale - direct - Siegel                    215

1   **JULIE CASALE**,

2               called by the Government, having been

3               first duly sworn, was examined and testified

4               as follows:

5   DIRECT EXAMINATION

6   BY MR. SIEGEL:

7   Q    Good morning.

8   A    Good morning.

9   Q    Where do you work?

10  A    In the NYPD Crime Scene Unit.

11  Q    What is your rank with the NYPD?

12  A    I'm a detective.

13  Q    How long have you been with the NYPD for?

14  A    A little over 13 years.

15  Q    You mentioned that you are with the Crime Scene Unit?

16  A    Yes.

17  Q    Is that also known as CSU?

18  A    Correct.

19  Q    What is CSU?

20  A    Crime Scene Unit is a unit that responds to homicides,

21  felony assaults where a person is likely to die, sexual

22  assaults, crimes against children, certain robberies,

23  burglaries and high-profile cases.

24  Q    And what is it that CSU does when it responds?

25  A    When we respond to jobs, we recognize documents, collect,

SN      OCR      RPR

Casale - direct - Siegel                    216

1   preserve and forward evidence through analysis and storage.

2   Q     Did you receive training to be part of CSU?

3   A     Yes.

4   Q     What training do you receive?

5   A     For 18 months before we get our detective shields.  For

6   three months we were in classroom training and for the

7   remaining 15 months we work alongside with an experienced

8   investigator.

9   Q     How long have you been in CSU?

10  A     Four years and six months.

11  Q     And about how many crime scenes have you responded to?

12  A     A few hundred.

13  Q     And I know you described documenting and collecting

14  evidence, but just at a high level could you walk through what

15  CSU does when it comes to a crime scene?

16  A     We respond to a job.  We document the crime scene through

17  notes, pictures, reports, sketches and diagrams.

18  Q     Let me direct your attention to November 26, 2018.  Were

19  you working that day?

20  A     Yes.

21  Q     Were you sent out to a crime scene?

22  A     Yes.

23  Q     Where was the crime scene that you were sent to?

24  A     This the crime scene was Rite Aid located at 33-01 30th

25  Avenue in the confines of the 114 Precinct.

Casale - direct - Siegel                     217

1    Q    And what borough is that in?

2    A    It's Queens.

3    Q    What was the condition of the scene when you arrived?

4    A    The Rite Aid was closed.  It was robbed at gunpoint.

5    Q    Was there any crime scene tape?

6    A    Yes.  There was crime scene tape as well as police

7    officers safeguarding the scene.

8    Q    And what does it mean for a police officer to safeguard

9    the scene?

10   A    They make sure that nobody enters the crime scene.

11   Q    I'm going to show you Government Exhibit 108-A.  Do you

12   recognize Government Exhibit 108-A?

13   A    Yes.

14   Q    What is Government Exhibit 108-A?

15   A    This is a picture of the front of the you have Rite Aid.

16   Q    Is that the Rite Aid?

17   A    Yes.

18   Q    Is that a fair and accurate depiction of that Rite Aid?

19   A    Yes.

20        MR. SELDEN:  Your Honor I move to admit Government

21   Exhibit 108-A.

22        THE COURT:  Any objection?

23        MR. STEIN:  No.

24        THE COURT:  Received without objection.

25        (Government Exhibit 108-A received in evidence.)

Casale - direct - Siegel                    218

1          MR. SIEGEL:  And I if may publish it to the jury.

2          THE COURT:  You may.

3          (Exhibit published.)

4   BY MR. SIEGEL:

5   Q    When you arrived at the store did you watch any

6   surveillance video?

7   A    Yes.

8   Q    Why did you watch the surveillance video?

9   A    We try to watch surveillance video to determine what to

10  process to see what would be collected and sent in for

11  testing.

12  Q    I'm going to show you Government Exhibit 411-B which is

13  already in evidence.  And I'm going to start at timestamp

14  4:14:16.  Before I hit play, is this the surveillance video

15  that you watched that day?

16  A    Yes.

17         MR. SIEGEL:  Now hitting play.

18         (Video played.)

19  Q    I'm hitting pause on the video at 4:15:09.

20         (Video paused.)

21  BY MR. SIEGEL:

22  Q    Who did you understand stand these people to be?

23  A    You have the woman who is the cashier and the male who is

24  the suspect who held the cashier at gunpoint.

25  Q    And what is it that the cashier is handing to the

Casale - direct - Siegel                    219

1    suspect?

2    A    The cash register drawer.

3    Q    I would like to show you Government Exhibit 411-A.

4         MR. SIEGEL:  If we could unpublish for a moment,

5    Mr. Villanueva.

6    BY MR. SIEGEL:

7    Q    I'm going to show you starting at timestamp 4:13.21.

8         MR. SIEGEL:  We can publish this now.

9         THE COURT:  You may.

10        (Exhibit published.)

11   BY MR. SIEGEL:

12   Q    Detective Casale, is this the video that you watched that

13   day?

14   A    Yes.

15   Q    Play it.

16        (Video played.)

17        (Video paused.)

18        MR. SIEGEL:  Stopping at 4:13:26.

19   BY MR. SIEGEL:

20   Q    Who do you understand this individual to be?

21   A    The suspect.

22   Q    In addition to watching video inside the store, did you

23   also view video from outside the store?

24   A    Yes.

25   Q    Where did you watch other video?

Casale - direct - Siegel                    220

1    A    There was a fruit market diagonal from the Rite Aid that

2    we watched video from.

3    Q    What did you see in the video that you saw in that store

4    diagonally across from the Rite Aid?

5    A    You see a vehicle stopped in the middle of the street.

6    You see a man get out of the passenger side of the car.  The

7    car then proceeds to pull over to the side and you see the

8    driver get out and drop something into a dumpster, which is

9    right next the fruit market.

10   Q    You described two men getting out of a car.  From what

11   you see in the video --

12            MR. STEIN:  Excuse me, Judge, I heard her say one

13   person got out of the car not two.

14            THE COURT:  Yes, I heard one.

15   BY MR. SIEGEL:

16   Q    Did you say you saw two people get out of the car or one?

17   A    I said two.  The front passenger got out of the car, the

18   driver moves over and then you see the driver gets out and

19   drops something into the dumpster.

20   Q    From watching that video, did you understand one or both

21   of those men to have a role in this robbery?

22   A    Yes.

23   Q    And which of those men?

24            MR. STEIN:  Judge, I object.  I don't see how this

25   witness is competent to answer that.

Casale - direct - Siegel                    221

1            MR. SIEGEL:  I'm going to ask her to explain.

2            THE COURT:  I will allow it subject to connection

3    assuming it comes off the video.

4            MR. SIEGEL:  That's right.

5    BY MR. SIEGEL:

6    Q    Which of these men?

7    A    The front passenger.

8    Q    And why is it that you felt the front passenger was the

9    one that was involved in the robbery?

10   A    You see the front passenger exit the car and he's wearing

11   white sneakers, dark pants and a dark jacket heading toward

12   the Rite Aid.

13   Q    And when you say white sneakers -- did you say dark pants

14   or black pants?

15   A    Dark pants.

16   Q    And a hoodie.  Why did that seem relevant to you?

17   A    Because that's what the suspect in the Rite Aid was

18   wearing.

19   Q    You mentioned earlier that CSU makes sketches of the

20   crime scenes; is that right?

21   A    Yes.

22   Q    Did you also make a map of the area?

23   A    Yes.

24           MR. SIEGEL:  I would like to show just the witness

25   Government Exhibit 115.

Casale - direct - Siegel                          222

1   Q     Do you recognize Government Exhibit 115?

2   A     Yes.

3   Q     What is Government Exhibits 115?

4   A     This is a map or a diagram that I created from my rough

5   sketch of the crime scene location.

6   Q     Does the map fairly and accurately depict the area around

7   the crime scene as it appeared on November 26, 2018?

8   A     Yes.

9          MR. SIEGEL:  Your Honor, I move to admit Government

10  Exhibit 115.

11         THE COURT:  Any objection?

12         MR. STEIN:  No.

13         THE COURT:  Received without objection?

14         (Government Exhibit 115 received in evidence.)

15         MR. SIEGEL:  I'm going to blow up a portion of the

16  map portion.

17         (Exhibit published.)

18  BY MR. SIEGEL:

19  Q     On this map is it possible to see where the Rite Aid is?

20  A     Yes.

21  Q     Could you circle where that Rite Aid is?

22  A     (Witness complies.)

23         MR. SIEGEL:  Let the record reflect that the witness

24  has circled a square with the numbers 33-01 in it.

25  BY MR. SIEGEL:

Casale - direct - Siegel                223

1    Q    You mentioned a fruit store.  Could you circle where on

2    the map the fruit store is?

3    A    (Witness complies.)

4         MR. SIEGEL:  For the record, the witness has circled

5    a building that says 32-24 on it.

6    BY MR. SIEGEL:

7    Q    On this map could you indicate the car that you saw pull

8    up in the video, where you saw that car from the video?

9    A    Sorry.  Are you saying -- sorry?

10   Q    I'm sorry Detective Casale, when you said "sorry" what

11   were you referring to?

12   A    It was a terrible circle of the location.

13   Q    Would you like to try it again?

14   A    Yes, please.

15   Q    Okay.

16   A    (Witness complies.)

17        MR. SIEGEL:  Let the record reflect that the witness

18   has circled a portion of 33rd Street.

19   Q    Are you able to tell which way is south on this?

20   A    Yes, 33rd Street running northeast.

21   Q    So this is to the southwest of 30th Avenue?

22   A    Yes.

23   Q    In addition to making this map, did you take pictures of

24   this area?

25   A    Yes.

Casale - direct - Siegel                                    224

1          MR. SIEGEL:  I'd like to show just the witness

2   Government Exhibit 114.

3   BY MR. SIEGEL:

4   Q    Do you recognize Government Exhibit 114?

5   A    Yes.

6   Q    What is Government Exhibit 114?

7   A    This is a picture of the fruit market.

8   Q    Is this a fair and accurate depiction of that fruit

9   market from November 26, 2018?

10  A    Yes.

11         MR. SIEGEL:  Your Honor, I move to admit Government

12  Exhibit 114.

13         THE COURT:  Any objection?

14         MR. STEIN:  No.

15         THE COURT:  Received without objection.

16         (Government Exhibit 114 received in evidence.)

17         (Exhibit published.)

18  BY MR. SIEGEL:

19  Q    Just to orient us, could you tell us where it is on that

20  map that you saw the surveillance video?

21  A    The general area.  (Witness complies.)

22         MR. SIEGEL:  Let the record reflect that the witness

23  has circled a taxi cab van on the street on the left side of

24  the picture.

25  BY MR. SIEGEL:

Casale - direct - Siegel                    225

1    Q    And, just to be clear, you have circled the taxicab van.

2    Is that what you were talking about?

3    A    No.

4    Q    Was it in that area though?

5    A    Yes.

6    Q    I would now like to show you Government Exhibit 112-B?

7            MR. SIEGEL:  Please, just the witness.

8    BY MR. SIEGEL:

9    Q    Do you recognize Government Exhibit 112-B?

10   A    Yes.

11   Q    What is Government Exhibit 112-B?

12   A    This is the rear of the fruit market facing toward the

13   Rite Aid.

14   Q    Is this a fair and accurate depiction of the rear of that

15   fruit market facing towards the Rite Aid as it appeared on

16   November 26, 2018?

17   A    Yes.

18           MR. SIEGEL:  Your Honor, I move to admit Government

19   Exhibit 112-B.

20           MR. STEIN:  No objection.

21           THE COURT:  Received without objection.

22           (Government Exhibit 112-B received in evidence.)

23           (Exhibit published.)

24           MR. SIEGEL:  Just to note, it appears that the

25   screens have it.  The big screen is frozen.

Casale - direct - Siegel                           226

1    BY MR. SIEGEL:

2    Q    You mentioned you could see the Rite Aid in this picture.

3    Could you circle where you see the Rite Aid?

4    A    (Witness complies.)

5              MR. SIEGEL:  Let the record reflect that the witness

6    has circled the Rite Aid in this image.

7    BY MR. SIEGEL:

8    Q    There's a yellow awning in this picture.  Is that the

9    same yellow awning for the fruit market that we saw from the

10   other angle in Government Exhibit 114?

11   A    Yes.

12   Q    On the left side of this picture there is also what

13   appears to be a dumpster.  You mentioned a dumpster earlier.

14   Is that this dumpster that you were referring to?

15   A    No.  There's two of them.  This doesn't look like it's

16   it.  I'm sorry.

17   Q    That's okay.  You said there's two dumpsters?

18   A    Yes.

19   Q    And it appears that there's another dumpster that you're

20   referring to?

21   A    Yes.

22   Q    I would like to show you Government Exhibit 410-A which

23   is in evidence.

24              (Video played.)

25   Q    I'm pausing it at the very beginning.  Is this the video

SN        OCR        RPR

1    that you've been referring to?

2    A    Yes.

3              (Video played.)

4              (Video paused.)

5    Q    I'm pausing it 24 seconds into the video.

6              What just happened on the video?

7    A    I see the car stop is in the middle of the street and you

8    see the front passenger get out.

9    Q    Okay.  I'm going to play it again.

10             (Video played.)

11             (Video paused.)

12   Q    I'm pausing at approximately 35 seconds in.  And I'm

13   blowing up a picture.

14             What is shown in the blow up that I've shown?

15   A    I see a male wearing white sneakers, dark pants and a

16   dark, hooded jacket.

17   Q    And is this the person you referred to earlier that you

18   thought was wearing similar clothes to the suspect in the

19   robbery?

20   A    Yes.

21             (Video played.)

22             (Video paused.)

23   Q    Pausing the video at 1:05.

24             What happened?

25   A    You see the car pull on the side and the driver exit the

Casale - direct - Siegel                                    228

1    vehicle.

2    Q    I'm hitting play.

3            (Video played.)

4            (Video paused.)

5    Q    I'm pausing again at 1 minute and 13 seconds.  What just

6    happened on the video?

7    A    You see the man lift the lid to the dumpster and drop

8    something in there.

9    Q    And, just to be clear, when you say "the man," which man

10   are you referring to?

11   A    The man that just exited the vehicle on the driver's

12   side.

13   Q    From the perspective of your work as a crime scene

14   detective, what did this video lead you to do?

15   A    This led us to the dumpster which we looked and we saw an

16   item that was a cash register drawer inside.

17   Q    Did you also notice in the video when you saw the video

18   whether the driver was wearing gloves?

19   A    I was able to notice that he was not wearing gloves.

20   Q    And did that cause you to do anything?

21   A    I was able to swab where he lifted the lid to the

22   dumpster.

23   Q    Why did you Schwab where he lifted the lid of the

24   dumpster?

25   A    To possibly get DNA from the suspect.

Casale - direct - Siegel                    229

1   Q    When did you took the swab, what were the procedures that

2   you followed to do that?

3   A    We get a sterilized Q-Tip or a swab.  We put sterile

4   water on it and swab the location of where we think there's

5   DNA.  We enclose it in a plastic container that dries it.  We

6   put it in an envelope.  We tape it and submit it to the lab

7   for possible testing.

8   Q    Do you wear gloves when you do that?

9   A    Yes, always.

10  Q    And you say you submitted it to the lab for testing?

11  A    Yes.

12  Q    When it's submitted to the lab for a testing does it

13  receive a voucher number?

14  A    Yes.

15  Q    What's a voucher number?

16  A    It's a number that's assigned to items that are either

17  sent to the lab or sent to storage and it's easily -- we can

18  easily look it up by just putting in the voucher number and

19  know where the location of the item is.

20  Q    What was the voucher number for the swab that you took

21  from that dumpster handle?

22  A    The voucher number was 4000625254.

23  Q    And how is it that you are able to remember that that

24  long for?

25  A    They're all the same sequences.  So the items that I

Casale - direct - Siegel                230

1  submitted in for testing or for storage had the same 4000 and

2  625.  The other two vouchers that I had had continuous

3  numbers.

4  Q    You also mentioned that you went in the dumpster and

5  recovered an item?

6  A    Yes.

7  Q    I'm showing you Government Exhibit 112-A.

8         MR. SIEGEL:  And this is just for the witness,

9  please.

10 BY MR. SIEGEL:

11 Q    Do you recognize Government Exhibit 112-A?

12 A    Yes.

13 Q    What is Government Exhibit 112-A?

14 A    That's the dumpster from which I recovered two items

15 from.

16 Q    Is this a true and accurate depiction of the dumpster

17 that you recovered items from?

18 A    Yes.

19        MR. SIEGEL:  Your Honor, I move to admit Government

20 Exhibit 112-A.

21        MR. STEIN:  No objection.

22        THE COURT:  Received without objection.

23        (Government Exhibit 112-A received in evidence.)

24        (Exhibit published.)

25 BY MR. SIEGEL:

Casale - direct - Siegel                           231

1   Q    Earlier in your testimony, Detective, you referred to two

2   dumpsters?

3   A    This is the dumpster that we recovered.  There was

4   another dumpster nearby.

5   Q    When you search in that dumpster, do you move those

6   creates out of the way?

7   A    No, I actually use it to stand to look in the dumpster to

8   see what was in there.

9   Q    What was in the dumpster?

10  A    We recovered the cash register drawer, a headset and a

11  lot garbage inside.

12         MR. SIEGEL:  I'm just showing the witness Government

13  Exhibit 321-B.

14  Q    Do you recognize Government Exhibit 321-B?

15  A    Yes.

16  Q    What is Government Exhibit 321-B?

17  A    This is a picture of marker number 2 next to the cash

18  register drawer and the headsets.

19  Q    What is marker number 2?

20  A    It's the number which we assigned to the cash register

21  drawer that we recovered.

22  Q    Is this a fair and accurate depiction of that cash

23  register draw and that marker number two when you collected it

24  on November 26, 2018?

25  A    Yes.

Casale - direct - Siegel                    232

1          MR. SIEGEL:  Your Honor, I move to admit Government
2   Exhibit 321-B.
3          MR. STEIN:  No objection.
4          THE COURT:  Received without objection.
5          (Government Exhibit 321-B received in evidence.)
6          (Exhibit published.)
7   BY MR. SIEGEL:
8   Q    Is this the view inside the dumpster?
9   A    Yes.
10  Q    Can you indicate where inside the dumpster you saw the
11  cash register tray?
12  A    (Witness complies.)
13         MR. SIEGEL:  Let the record reflect that the witness
14  has circled a black and silver item to the right of number 2.
15         I would like to show just the witness Government
16  Exhibit 321-A.
17  Q    Do you recognize Government Exhibit 321-A?
18  A    Yes.
19  Q    What is Government Exhibit 321-A?
20  A    This is a close-up picture of the cash register draw with
21  our blue scale.
22  Q    Is this a fair and accurate depiction of that register
23  drawer from November 26, 2018?
24  A    Yes.
25         MR. SIEGEL:  Your Honor, I move to admit Government

                         Casale - direct - Siegel                    233

1    Exhibit 321-A.

2              MR. STEIN:  No objection.

3              THE COURT:  Received without objection.

4              (Government Exhibit 321-A received in evidence.)

5              (Exhibit published.)

6              MR. SIEGEL:  Your Honor, if I may approach the

7    witness.

8              THE COURT:  You may.

9              (Counsel approaches.)

10   Q    Detective, I'm handing you Government Exhibit 321.  Just

11   to start with that outside bag, do you recognize that?

12   A    Yes.

13   Q    How do you recognize it?

14   A    It's an evidence bag.

15   Q    And how do you recognize this particular evidence bag?

16   A    The evidence bag has my seal over the tape as well as

17   there's a label that indicates everything, the invoice number,

18   what the item is, where I recovered it from and who is the

19   invoicing officer.

20   Q    And what is the contents of that evidence bag?

21   A    It's the cash register drawer.

22   Q    Would you take it out to look at it?

23   A    (Witness complies.)

24   Q    Is that item substantially in the same condition as it

25   was when you collected it on November 26, 2018?

Casale - direct - Siegel                234

1   A     Yes.

2           MR. SIEGEL:  Your Honor, I move to admit Government

3   Exhibit 321.

4           MR. STEIN:  No objection.

5           THE COURT:  The document is received without

6   objection.

7           (Government Exhibit 321 received in evidence.)

8

9           (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION (Continuing)

2   BY MR. SIEGEL:

3   Q    And, Detective, for the jury's benefit, if you could

4   present that.

5              Thank you very much, Detective.

6              MR. SIEGEL:  Your Honor, at this time I have no

7   further questions for the witness.

8              THE COURT:  Thank you, Mr. Siegel.

9              Any cross?

10             MR. FARRELL:  Yes.  Thanks.

11             THE COURT:  Mr. Farrell.

12  CROSS EXAMINATION

13  BY MR. FARRELL:

14  Q    Good morning, Detective Casale.

15  A    Good morning.

16  Q    My name is Gary Farrell.

17             You and I haven't discussed this case; right?

18  A    Correct.

19  Q    Mr. Siegel asked you some of the things you do as a crime

20  scene detective.  Would you agree with me that interviewing

21  civilian victims like the cashier in this case, that's

22  typically not one of the things you do; correct?

23  A    That's correct.

24  Q    And the investigation that resulted in the arrest of

25  people on cases that you work on -- I withdraw that question.

Casale - cross - Farrell                                    236

1   You don't make arrests either, do you, Detective?

2   A    No.

3   Q    On CSI, on the show, they do.  Did you know that?

4   A    No.

5   Q    In this case.  You responded to the crime scene at what

6   time?

7   A    Approximately 9 o'clock in the morning.

8   Q    So about a little less than five hours after the crime

9   occurred; is it fair to say?

10  A    Correct.

11  Q    And the crime scene seen tape was already up when you

12  arrived?

13  A    Correct.

14  Q    You don't know who put it up, do you?

15  A    No.

16  Q    At what point after your arrival did you watch the

17  surveillance tape that we have just seen here in court?

18  A    Within a few minutes of our arrival.

19  Q    And you agree that the cashier at the -- when the

20  perpetrator went up initially with a greeting card in his

21  hand, right?

22  A    Correct.

23  Q    He was wearing gloves; right?  The perpetrator?

24  A    Yes.

25  Q    And the cashier at one point, she took the card in her

1  hand; correct?

2  A    Yes.

3  Q    And JC-4 was how you itemized that greeting card;

4  correct?

5  A    Correct.

6  Q    And I think on your paperwork, but correct me if I'm

7  wrong, you requested that it be tested, the greeting card for

8  DNA; is that right?

9  A    Correct.

10  Q    Why did you make that notation, Detective?

11  A    Watching the video inside the Rite Aid, we were able to

12  determine that he was wearing utility fabric gloves, possibly

13  used it more than once.  There could be DNA on there, which is

14  why we sent the card in for DNA.

15  Q    Even though he was wearing gloves, the gloves themselves

16  could have had his DNA on them, that could have been

17  transferred to the card?  Is that --

18  A    Yes.

19  Q    Okay.  Do you know that the cashier was asked to submit

20  her own DNA swab?

21  A    Yes.

22  Q    And that's standard procedure; right?

23  A    Yes.

24  Q    To exclude her because we know she is not the

25  perpetrator; right?

Casale - cross - Farrell                    238

A     Yes.

Q     You just answered some questions by Mr. Siegel about recovering the till, is how the cashier described it.  Is that okay to call it that?

A     Yes.  Yes.

Q     From the dumpster; correct?

A     Correct.

Q     And you, actually -- the only way to do it, I imagine, is you climbed into the dumpster?

A     I was able to lean in and grab the cash register drawer while wearing gloves.

Q     By the way, did you recover that before you recovered the card inside the Rite Aid?  Do you remember the order?

A     Yes.  I recovered the items from the outside, the dumpster, because it was about to rain.  We did that first and then we went inside and collected the card.

Q     And there was a headset also in the dumpster; correct?

A     Yes.

Q     Did you think that had any particular relevance to the case?

A     Possibly.  It was out of ordinary to see a headset thrown into a garbage dump.

Q     Did you see any change, any quarters, dimes, nickels, any type of money at all in the dumpster?

A     No.

Casale - cross - Farrell                    239

1   Q    And was the dumpster, in relation to the Rite Aid, was it

2   on the same side of the street or across?  It was tough for me

3   to tell.

4   A    It was across.

5   Q    Right.  And when you swabbed the outside of the dumpster

6   where you believe the guy who put something in it lifted the

7   dumpster; right?

8   A    Correct.

9   Q    How did you do that?  What tools, if any, did you use?

10  A    We used a Q-tip, a sterilized swab.  We apply sterilize

11  water to it.  I swabbed the handle of the dumpster.  I placed

12  it into the tube.  It has self-drying crystals inside.  We

13  then placed that into an envelope.  We tape it, seal it and

14  submit that into the lab.

15  Q    Did you see any skin cells?  They're not typically

16  visible to the naked eye; right?

17  A    No.

18  Q    As you sit here today, do you know if any skin cells were

19  recovered from the swab that you took?

20  A    No.

21  Q    Why is that?

22  A    They don't tell us about the results.

23  Q    Could you tell me the order of when it leaves you?  You

24  packaged it, you described that process for us.

25  A    Yes.

Casale - cross - Farrell                              240

1  Q     Where does it go?  Where did you last see that package

2  before you saw it today?

3  A     The 114th Precinct, when I handed it over to the

4  invoicing officer is the last tame I saw it.

5  Q     What does the invoicing officer mean?  What does that

6  person do?

7  A     The officer who takes custody of the property, they

8  typically, they will type in all the information into the

9  computer system, generates that invoice number, and then the

10 paperwork and the item are then moved from the 114th Precinct

11 and transferred over to the lab.

12 Q     And who requests what, if any, tests should be done on

13 items that you recover, like in this case?

14        It was four items that you recovered; right?

15 A     Correct.

16 Q     Let's go through them.  What were the four items of

17 physical evidence?

18 A     Item number one was the DNA swab.

19 Q     From the dumpster.

20 A     From the dumpster.  Item number two was the cash register

21 drawer that was recovered inside the dumpster.  Item number

22 three was the headset that we recovered inside the dumpster.

23 And item number four was the greeting card that we recovered

24 from the register inside the Rite Aid.

25 Q     Getting back to my question that I didn't let you answer,

Casale - cross - Farrell                    241

1   and I'm sorry, whose responsibility is it to request the

2   specific test that should be done on those items?  Who does

3   that?

4   A    We do a rough draft of what we want the items to go down

5   to the lab for.  Again, it's sent to the property clerk.

6   Again, the invoicing officer then copies that and that gets

7   submitted to the lab.

8   Q    I don't know, did you describe what a latent fingerprint

9   is on your direct, Detective.  If you didn't, please do so

10  now.

11  A    Latent fingerprint is a chance print left by a person.

12  Q    Visible to the naked eye or not?

13  A    No, it's not visible.

14  Q    Was that part of the evidence -- was that within the

15  purview of what you were possibly looking for here?

16  A    Yes.

17  Q    As you sit here today, you don't know if any were

18  recovered, do you?

19  A    I dusted the outside lid of the container of the garbage

20  and we weren't able to lift anything.

21  Q    And what does the NYPD criminalist -- if you're a

22  criminalist for the NYPD, what do you do?

23  A    They typically analyze the evidence that we bring to the

24  lab.

25  Q    That's ultimately the stuff that you recover at the

242

1    scene; right?

2    A    Correct.

3    Q    And how about the Office of the Chief Medical Examiner,

4    what do they do?

5    A    They determine what gets tested or does not.

6    Q    They make that determination?

7    A    Yes.

8    Q    Thank you, Detective Casale.

9              MR. FARRELL:  I have nothing further.

10             THE COURT:  Mr. Siegel?

11             MR. SIEGEL:  Nothing further.

12             THE COURT:  Detective Casale, you are excused.

13   Thank you very much.

14             (Witness steps down.)

15             THE COURT:  Ladies and gentlemen of the jury, that

16   brings to us our midmorning break.  It will give you a chance

17   to refresh and it will give us all a chance to refresh as well

18   as.  Again, the rules are repeated because they are important.

19   Continue to keep an open mind.  Do not discuss the case

20   amongst yourselves or with anyone else you may want to in the

21   back.  We will give you a chance to refresh.  We will give you

22   about 15 minutes.  Thank you.

23             (Jury exits the courtroom.)

24             THE COURT:  See you in about 10, 15.

25             MR. SELDEN:  Thank you, Judge.

243

1              (Recess taken.)

2              THE COURTROOM DEPUTY:  All rise.  Court is back in

3    session.

4              Counsel for both sides are present, including the

5    defendant.

6              THE COURT:  We are back.  Are we ready to go?

7              MR. SELDEN:  We are ready on behalf of the

8    Government.  Thank you, Your Honor.

9              THE COURT:  Mr. Villanueva.

10             (Jury enters the courtroom.)

11             THE COURT:  Be seated, please.

12             Counsel will stipulate that the jury is present and

13   properly seated.

14             MR. FARRELL:  Yes.

15             MR. SELDEN:  On behalf of the Government, yes.

16             THE COURT:  Ladies and gentlemen, welcome back.  I

17   hope you are refreshed.  We are ready to resume.  Hopefully

18   Mr. Selden has another witness.

19             MR. SIEGEL:  Your Honor, the Government calls Gaspar

20   Pena.

21             THE WITNESS:  Good morning.

22             Good morning, Your Honor.

23             THE COURT:  Good morning.

24             THE COURTROOM DEPUTY:  Please raise your right hand.

25             (Witness sworn.)

Pena - direct - Siegel                    244

1           THE COURTROOM DEPUTY:  Please state your first and

2    last name and spell it for the record.

3           THE WITNESS:  Gaspar, G-A-S-P-A-R. The last name

4    Pena, P-E-N-A.

5           THE COURTROOM DEPUTY:  Thank you.  Have a seat,

6    please.

7           THE WITNESS:  Good morning.

8           THE COURT:  Mr. Siegel is apparently handling this

9    witness.

10          MR. SIEGEL:  Yes, Your Honor, thank you.

11   **GASPAR PENA**,

12       called by the Government, having been duly

13       sworn, was examined and testified as follows:

14   DIRECT EXAMINATION

15   BY MR. SIEGEL:

16   Q    Hello, Mr. Pena.

17   A    Hello.  Good morning.

18   Q    Good afternoon.

19   A    Good afternoon.

20          THE COURT:  Time flies when you are having fun.

21   Q    Mr. Pena, without giving your specific address, where do

22   you live?

23   A    I live in Queens, New York.

24   Q    How long have you lived in Queens?

25   A    All my life.

1   Q     Where do you work?

2   A     I work at a Rite Aid store.

3   Q     Where is that Rite Aid?

4   A     It's located on Merrick Boulevard, Jamaica, to be

5   specific.

6   Q     How long have you worked at that Rite Aid in Jamaica,

7   Queens?

8   A     I've been there for about five and a half, almost six

9   years now.

10          MR. SIEGEL:  I'd like to show just the witness a

11  picture, which is Government Exhibit 111.

12  Q     Mr. Pena, do you see Government Exhibit 111?

13  A     I do.

14  Q     Do you recognize Government Exhibit 111?

15  A     Yes.

16  Q     What do you recognize Government Exhibit 111 as?

17  A     The store where I work at.

18  Q     Is that a fair and accurate depiction of the Rite Aid

19  where you work?

20  A     Yes, it is.

21          MR. SIEGEL:  Your Honor, I move to admit Government

22  Exhibit 111.

23          MR. STEIN:  No objection, Judge.

24          THE COURT:  Received without objection.

25          (Government's Exhibit 111 received in evidence.)

1           MR. SIEGEL:  If I can publish it.

2           THE COURT:  You may.

3           (Exhibit published.)

4           THE COURT:  The way these computers are working, Mr.

5    Siegel, we cross our fingers each time.

6           MR. SIEGEL:  So far we have been blessed.

7    Q    Mr. Pena, next to that Rite Aid store, there is a street

8    with some cars parked on it.

9    A    Yes.

10   Q    What street is that?

11   A    That would be Merrick Boulevard.

12   Q    What do you do at the Rite Aid?

13   A    I am an assistant manager at the store.

14   Q    What do you do as the assistant manager?

15   A    Well, my main duties are provide customer service, help

16   with restocking the store, maintaining a clean and

17   customer-ready environment and obviously help my workers, my

18   coworkers.

19   Q    What shift do you work at the Rite Aid?

20   A    I mostly work overnights.  Three nights I do overnight

21   and two days I work in the morning shift.

22   Q    And what are the times for the overnight shift?

23   A    I start at 9:30 at night and I go home 7:00, 8:00 in the

24   morning.

25   Q    I think you said that you have been at Rite Aid for five

Pena  -  direct  -  Siegel                    247

1    years.

2    A    Uh-hum.

3    Q    How long have you been a manager?

4    A    I've been a manager for the past four years, I'd say.

5    Q    What did you do at the Rite Aid before that?

6    A    Before I came a manager, I used to work on loss

7    prevention.

8    Q    What is loss prevention?

9    A    Loss prevention is basically deterring people from

10   shoplifting at the store.

11   Q    What do you do to deter people from shoplifting at the

12   store?

13             MR. STEIN:  Objection, the --

14   A    The main thing is to provide customer service always and

15   observing people, usually suspicious-looking people going into

16   the store.

17   Q    What did you do before you worked at Rite Aid?

18   A    Before I used to -- I used to attend classes, IT classes

19   was my major.

20   Q    Where were you attending classes?

21   A    I graduated actually from ITC College.

22   Q    Where is that?

23   A    That's in the city.  It's located -- well, it used to be

24   located in Manhattan.

25   Q    Were you doing anything else other than taking classes?

Pena -  direct - Siegel                            248

1   A    Yes.  I used to be a part-time musician.

2   Q    What did you do as a musician?

3   A    I played drums.

4   Q    Were you in a band?

5   A    Yes.

6   Q    What kind of band were you in?

7   A    It was mostly covers bands.  We used to play other

8   people's music, mostly classic rock, the Beatles, the Rolling

9   Stones, that sort of thing.

10  Q    Let me direct your attention to the early morning hours

11  of November 26, 2018.  Were you working that overnight shift?

12  A    Yes, I was.

13  Q    Why is it that you remember that particular night?

14  A    It's the day when the store was robbed.

15  Q    So let's talk about that.

16            MR. STEIN:  Objection.

17            I'm sorry.  Can we have the microphone a little

18  closer to the witness, please.

19            THE COURT:  Mr. Pena, if you could move a little

20  closer to the microphone.

21            THE WITNESS:  Is that better?

22            MR. STEIN:  Much.

23  Q    About what time did that robbery occur?

24  A    Sometime around 5:00 in the morning.

25  Q    Where were you working in the store when the robbery

1    happened?

2    A    I was actually on the floor restocking some shelves.

3    Q    Did there come a time when you went from somewhere else

4    -- from stocking shelves to somewhere else in the store?

5    A    Yes.  That's actually when I was working on the floor and

6    then I came behind the register.

7    Q    Why did you come behind the register?

8    A    Because what I thought a customer wanted to check out.

9    Q    So what happened when you went behind the register?

10   A    It's when the robbery happened.

11   Q    Can you walk us through that piece by piece?

12   A    Sure.

13   Q    So you went behind the register and then what happened?

14   A    I -- well, I asked the person if he was ready to checkout

15   and he said yes.  He had picked out a candy bar.  I believe it

16   was a Snickers bar.  He placed it on the counter.  I told him

17   what the total was for the item.  He handed me a dollar bill.

18   I said -- as I was looking down to put the money inside the

19   drawer and as I looked up, I noticed a gun being pointed at

20   me.

21   Q    What did you do when you saw a gun pointed at you?

22   A    I was mostly shocked.  That had never happened to me

23   before.

24   Q    Did the person who was pointing a gun at you say

25   anything?

Pena - direct - Siegel                    250

1    A    Yes.

2    Q    What did he say?

3    A    His words were give me the money before I fucking shoot

4    you.

5    Q    What happened after he said give me the money before I

6    fucking shoot you?

7    A    I just complied with his orders.

8    Q    What did you do?

9    A    My first -- my initial reaction was I stepped back.  I

10   remember just stepping back for him to grab the money.  He

11   said, "No, you give me the money," meaning he wanted me to

12   hand the money over to him, which I did.

13   Q    How did you hand the money over to him?

14   A    I just picked up the whole drawer and I handed it to him.

15   Q    Had you ever seen a gun before?

16   A    No.

17   Q    Had you ever been robbed before?

18   A    No.

19   Q    What happened after you gave him the cash register

20   drawer?

21   A    I dialed 911.

22   Q    What did he do after you gave him the cash register

23   drawer?

24   A    He just took it from me and walked out the store.

25   Q    So I'd like to show you Government Exhibit 414-B, which

Pena  -  direct  -  Siegel                    251

1    is already in evidence.

2              (Video playing.) (Video paused.)

3    Q    I'm stopping the video at the timestamp at the top that

4    says 5:44:32 seconds.  And I am going to go back to the

5    beginning and ask you some questions.

6              At the very beginning of this video, Government

7    Exhibit 414-B, there is a person in blue standing at the

8    bottom of the screen.  Who is that person?

9    A    That's me.

10   Q    Where are you standing?

11   A    I'm behind the register.

12             MR. SIEGEL:  I am hitting play.  I am hitting pause

13   at timestamp at the top 5:43:58 seconds.

14             (Video playing.) (Video paused.)

15   Q    A person just walked in on the frame from the right side

16   of the frame.  Who is that person?

17   A    That's the person that robbed the store.

18             MR. SIEGEL:  I am hitting play again.

19             (Video playing.) (Video paused.)

20             MR. SIEGEL:  I am stopping it at 5:44:01.  That's

21   the timestamp at the top.

22   Q    What did that person just hand you?

23   A    A Snickers bar, a candy bar.

24             (Video playing.) (Video paused.)

25             MR. SIEGEL:  I am hitting pause again at 5:44:16

1   second, the timestamp at the top.

2   Q    What is in the robber's hands?

3   A    A gun.

4        MR. SIEGEL:  I am hitting play again.

5        (Video playing.) (Video paused.)

6        MR. SIEGEL:  I am hitting stop at 5:44:27 seconds.

7   Q    What is it that you just handed to the robber?

8   A    The money and the drawer.

9   Q    Was there money in the drawer?

10  A    Yes.

11  Q    I'd like to show you Government Exhibit 117-A.

12       MR. SIEGEL:  This is just for the witness, please.

13       (Exhibit published.)

14  Q    Do you recognize Government Exhibit 117-A?

15  A    Yes.

16  Q    What is Government Exhibit 117-A?

17  A    It's me at the bottom of the image and on top is the

18  person that robbed the store.

19  Q    Is this a fair and accurate depiction of you and the

20  robber from early in the morning on November 26, 2018?

21  A    Yes.

22       MR. SIEGEL:  Your Honor, I move to admit Government

23  Exhibit 117-A.

24       MR. STEIN:  No objection.

25       THE COURT:  Received without objection.

Pena -  direct - Siegel                    253

1              (Government's Exhibit 117-A received in evidence.)

2    Q    I'd like to publish that, please.

3              (Exhibit published.)

4    Q    Could you circle the person you identified as the robber

5    in this image?

6              MR. SIEGEL:  Let the record reflect he circled a

7    person in a green and black hood in the upper right-hand

8    corner of the image.

9              Now, I'd like to show just the witness Government

10   Exhibit 117-B.

11   Q    Do you recognize Government Exhibit 117-B?

12   A    Yes.

13   Q    What is Government Exhibit 117-B?

14   A    Again, at the bottom of the image, it's me and on the top

15   is the person that robbed the store.

16   Q    Is this a fair and accurate depiction of you and the

17   robber from early in the morning of November 26, 2018?

18   A    Yes.

19             MR. SIEGEL:  Your Honor, I moved to admit Government

20   Exhibit 117-B.

21             MR. STEIN:  No objection.

22             THE COURT:  Received without objection.

23             (Government's Exhibit 117-B received in evidence.)

24   Q    You mentioned earlier that the person robbed you at

25   gunpoint; is that right?

1    A    Yes.

2    Q    Do you see the gun in this image?

3    A    Yes.

4    Q    Could you please circle the gun?

5         MR. SIEGEL:  Let the record reflect that the witness

6    has circled a dark object in the robber's hands in the center

7    of the image.

8    Q    When you saw the robber, how old did he appear?

9    A    He appeared to be a young person.

10   Q    About how old, would you estimate?

11   A    Probably between, I'd say, 18 to 25.

12   Q    What are you basing that on?

13   A    I guess the brief interaction I had with him, his voice.

14   I mean, basically the sound of his voice, it sounded like a

15   young person's voice.

16        MR. SIEGEL:  Your Honor, just one moment.

17        THE COURT:  Sure.

18   Q    Do you remember anything else about the robber's facial

19   features?

20   A    Yes.  He had facial hair.  He had a mustache.

21   Q    Did you notice any other facial hair other than a

22   mustache?

23   A    No.

24   Q    After the robber left, did you follow him outside?

25   A    No.

Pena - direct - Siegel                255

1   Q    Why not?

2   A    Because he's armed.  I wouldn't follow anybody who has a

3   gun.

4   Q    Did you see where he went?

5   A    No.

6   Q    What did you do after he left?

7   A    I dialed 911 and I tried to get to safety.  I went into

8   the office and I dialed 911 from my phone.

9           MR. SIEGEL:  Thank you very much, Mr. Pena.

10          Thank you, Your Honor.  No further questions.

11          THE COURT:  Thank you, Mr. Siegel.

12          Any cross?

13          MR. STEIN:  No questions, Judge.

14          THE COURT:  Thank you, Mr. Stein.

15          Mr. Pena, you are excused.  Thank you very much.

16          THE WITNESS:  Thank you.

17          (Witness steps down.)

18          THE COURT:  Mr. Selden, do you have another witness?

19          MR. SELDEN:  Yes, Your Honor.  May we have a brief

20   sidebar in terms of logistics and alerting the Court.

21          THE COURT:  Sounds like a plan.

22          (Sidebar held outside the hearing of the jury.)

23          (Continued on the next page.)

24

25

```
                              Sidebar                        256
```

1              (The following occurred at sidebar.)

2              THE COURT:  Shoot.

3              MR. STEIN:  Don't say that.  Strike that.

4              THE COURT:  Judge Stein said to strike it.

5              MR. SELDEN:  Your Honor, with regards to logistics,

6    we would have an exhibit that we would like to publish at this

7    point that is coming in by stipulation, as well as we have a

8    few stipulations to read to the jury.  We think now is a good

9    time with regards to reading those things in and wanting to

10   alert Mr. Stein and Mr. Farrell to the Government's plan not

11   for an actual witness but for exhibits and stipulations.

12             THE COURT:  Cool.  Are you happy?

13             MR. STEIN:  Very.  Especially when you say on the

14   record cool.

15             THE COURT:  Cool.

16             MR. FARRELL:  Will this take us to the lunch break?

17             MR. SIEGEL:  That's what I was going to raise.  It

18   is several long stipulations.  By the time we're done with the

19   stipulations, I think the next witness is going to be a longer

20   witness.  So it might make sense to take a lunch break after

21   the stipulations.

22             MR. STEIN:  Who's the next witness?

23             THE COURT:  Who's coming?

24             MR. SELDEN:  Our hope is that the next witness is

25   outside.  Hope springs eternal.  I can say that the witness

```
                        Sidebar                          257
```

1   was potentially testifying across the river.  I need to see if

2   they are available here.  And to answer Mr. Stein's question,

3   it might be Officer Fox, but we don't know yet.

4           MR. STEIN:  So long as he is not up the river.

5           THE COURT:  That's for sure.  Okay.  We will

6   continue and see what happens.

7           MR. SELDEN:  Thank you, Your Honor.

8           THE COURT:  Sounds like a plan.

9           MR. SIEGEL:  Thank you.

10          (Sidebar concluded.)

11          (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. SIEGEL:  Your Honor, at this time the Government

2  would like to publish an exhibit that was previously admitted

3  by stipulation.

4      THE COURT:  Again, ladies and gentlemen, when we had

5  the preliminary instructions to you, which Mr. LoMonaco read,

6  we have evidence, testimony, exhibits, and there are also

7  stipulations.  These are agreements by the lawyers as to

8  certain facts and certain things and it short circuits, again,

9  one of those expeditious, and we try to be as expeditious and

10  as efficient as we can.  This short circuits a much longer way

11  of getting to the same location.  We all encourage counsel to

12  agree, both sides, to agree on stipulations.  They have a

13  series of them and some of them we are about to hear now.

14      MR. SIEGEL:  I am going to play Government Exhibit

15  415-B, which was previously admitted by stipulation number S-9

16  and 415-B.  Reading from the stipulation:  There is a camera

17  at the southeast corner of 115th and Merrick Boulevard in

18  Queens with an approximately accurate timestamp.

19      I am starting the video at what's written in the

20  timestamp towards the bottom at 5:46:03.4:27 a.m.

21      (Video playing.) (Video stopped.)

22      I will now read some additional stipulations into

23  the record.  Mr. Villanueva, if I could please have the ELMO.

24      Mr. Villanueva, if we could publish this, please.

25      (Exhibit published.)

259

1          MR. SIEGEL:  So this is marked as stipulation S-1.

2          It is hereby stipulated and agreed, by and between

3    the United States of America and the defendant, Elgin Brack,

4    through his attorneys, that if an official from the New York

5    City Police Department, the NYPD, with knowledge of the NYPD

6    license plate reader (LPR) camera systems and records were

7    called to testify, this official would testify that:  One, the

8    NYPD maintains a systems of LPR cameras mounted in fixed

9    locations, including bridges and highways, and on NYPD patrol

10   vehicles.  These LPR cameras, which are regularly maintained

11   by the NYPD to ensure their proper functionality,

12   automatically photograph the license plates of passing

13   vehicles.  After an LPR camera takes a photograph, the

14   photograph and information regarding its time, date and

15   location are automatically paired and electronically

16   transmitted to a computer database that is maintained by the

17   NYPD in the ordinary course of the NYPD's operations.

18          Government Exhibits 200-A, 200-B, 201, 202, 203,

19   204, 205, 206, 207, 208, and 209 (collectively, the LPR

20   exhibits) consists of true and accurate copies of NYPD

21   records, including records of LPR camera photographs and

22   corresponding date, time and location of where these

23   photographs were taken, and vehicle registration information

24   for a gray 2002 Toyota Solara with a New York State license

25   plate HYC 8724, during the period November 26, 2018 at 2:20

1  a.m. to November 26, 2018 at 5:35 p.m., as follows:

2         Government Exhibit 200-A is from 2:20 a.m. at the

3  George Washington Bridge upper northbound.

4         Government Exhibit 200-B from 2:20 a.m. on the

5  George Washington Bridge upper northbound.

6         Government Exhibit 201 is from 2:52 a.m. on the

7  Queensboro Bridge outbound lower two.

8         Government Exhibit 202 from 3:42 a.m. at Roosevelt

9  Avenue and 60th Street in Queens, New York.

10        Government Exhibit 203 is from 4:31 a.m. on the

11 Grand Central Parkway, 82nd street overpass eastbound.

12        Government Exhibit 204 is from 4:32 a.m. on the

13 Grand Central Parkway, 27th Avenue overpass eastbound.

14        Government Exhibit 205 is from 6:13 a.m. on the

15 Bronx Whitestone Bridge Bronx bound.

16        Government Exhibit 206 is from 7:06 a.m. on the

17 Alexander Hamilton Bridge inbound.

18        Government Exhibit 207 is from 7:07 a.m. on the

19 George Washington Bridge lower southbound.

20        Government Exhibit 208 is from 5:28 p.m. on the

21 George Washington Bridge upper northbound.

22        Government Exhibit 209 is from 5:35 p.m. on the

23 Alexander Hamilton Bridge outbound.

24        (Continued on following page.)

25

261

1          MR. SIEGEL:  (Continuing)  The LPR exhibits, as well

2     as this stipulation, marked as Government Exhibit S-1 are

3     admissible in evidence.  Dated:  Brooklyn, New York,

4     February 27, 2020.  Agreed and consented to by the parties.

5          Your Honor, at this time, I just would like to

6     publish one of those as an example, if we may go back to the

7     laptop, please.

8          THE COURT:  You may.  All of these exhibits are

9     received in evidence.

10          (So marked.)

11          MR. SIEGEL:  So by way of example, Government

12     Exhibit 202 which is a two-page document, the first page

13     showing information, second page showing a map.

14          Your Honor, I will now read an additional exhibit

15     Government Exhibit S-4.  If we can please go back to the ELMO.

16          This is Government Exhibit S-4 which reads:

17          It is hereby stipulated and agreed by and between

18     the United States of America and the defendant Elgin Brack,

19     through his attorneys, that, one, the robberies or attempted

20     robberies of the following stores on or about November 26,

21     2018 had an actual or potential effect on interstate and

22     foreign commerce, or the movement of goods in interstate and

23     foreign commerce:  A, the Duane Reade located at

24     60-02 Roosevelt Avenue in Queens, New York; B, the 7-Eleven

25     located at 50-92 Northern Boulevard in Queens, New York; C,

1  the Rite Aid located at 33-01 30th Avenue in Queens, New York;

2  and, D, the Rite Aid located at 115-10 Merrick Boulevard in

3  Queens, New York.

4          This stipulation, marked as Government Exhibit S-4,

5  is admissible in evidence.  Dated:  Brooklyn, New York,

6  February 27, 2020.  Agreed and consented to, signed by the

7  parties.

8          THE COURT:  Received in evidence.

9          (Government Exhibit S-4 so marked.)

10          MR. SIEGEL:  Your Honor, if I may, I want to go back

11  to Government Exhibit 202 and just zoom in a little bit.  I've

12  been informed that it was actually a little hard to read the

13  way I'm showing it.

14          THE COURT:  Okay.

15          MR. SIEGEL:  And, Your Honor, just for the record, I

16  move Government Exhibit S-4 into evidence.

17          THE COURT:  I received it before you moved it.

18          MR. SIEGEL:  Thank you very much.

19          So I'm just going to blow up portions of Government

20  Exhibit 202 so it can be seen.  So, first, I'm just blowing up

21  the top section of the first page of the document.  Next, I'm

22  blowing up the two middle sections.  Now I'm blowing up the

23  third and final section on this page.  I'm going to the second

24  page.  I'm just blowing up the map that is shown on the second

25  page.

1          Thank you very much, Your Honor.

2          THE COURT:  Thank you, Mr. Siegel.

3          Mr. Selden, does that bring us to the end of that

4   batch of stipulations?

5          MR. SELDEN:  That does, Your Honor.

6          THE COURT:  And this would be a logical morning

7   break for the lunch break?

8          MR. SELDEN:  We think so, Your Honor.  Thank you

9   very much.

10          THE COURT:  Okay.  Then we will.

11          Ladies and gentlemen, we have reached logical point,

12   it's a little earlier than we normally would break, but

13   counsel advised me that they think, in the interest of

14   efficiency, this is the place for us to make that break.  So

15   we will adjourn for lunch.

16          Very similar to yesterday.  We're breaking for lunch

17   but no one is buying you lunch so you're on your own.  Again,

18   there is a cafeteria in the building that is available as are

19   restaurants, luncheonettes in the nearby area.  You are free

20   to visit them as well, but wherever you decide to have lunch,

21   the most important rules that I've gone over with you, recess

22   rules, continue to apply.

23          You are not to discuss the case amongst yourselves

24   or with anyone else.  You are to continue to keep an open

25   mind.  During the luncheon break, you are not free to conduct

264

1    any investigations of any kind that relate directly to the

2    case or indirectly to the case or deal with the operations of

3    the court, the case before you, the names of witnesses, the

4    names of the parties, the names of the lawyers or the issues

5    that are pending here.  None of that independent research is

6    permitted and, certainly, not jumping in your car and visiting

7    any of the locations that we have mentioned.  All of that is

8    strictly prohibited.

9           If we're going to have a rule of law and adhere to

10   the rules that ensure the rule of law, the rules that govern

11   the practice here in the courtroom, then we have to follow

12   them religiously and that means that this case will be decided

13   only by what you hear and see within the four walls of this

14   courtroom.

15          Again, to the extent that there may be any media

16   account, and I talked to you more than once about the broader

17   definition of media to include Facebook and Instagram and

18   Twitter and other things, you never know what's going to pop

19   up there about anything that we're doing here, I'm going to

20   ask you to, should that happen, totally disregard it.  Avert

21   your eyes and your ears and your mind of anything that might

22   pop up in the media.

23          In addition, when we're talking about

24   communications, we remain on radio silence.  So whether it's

25   direct conversation that we cover in our first instruction or

265

 1   whether it was on the telephone or text messaging or any other

 2   form, you are not to make any reference to the fact that

 3   you're a juror, that you're coming to the courthouse in

 4   Brooklyn, that you're somehow associated with this case.

 5   There will be no references whatsoever, direct or indirect, to

 6   your service as a juror or your involvement in this case.

 7           So with all of those admonitions that I continue to

 8   underscore for you because they do remain so important, we are

 9   going to adjourn the morning session allowing you to go out to

10   lunch.  I am going to ask you to return to the jury room

11   sometime between 2 and 2:15 and we will get started as close

12   as possible as we can and the jury room being, as always, the

13   Central Jury Room.  Again, to reiterate that other

14   instruction, you are never to come directly to the courtroom

15   or to the jury room or anyplace else in the courthouse without

16   escort or express permission.

17           So with all of those rules, we bid you a good lunch.

18   We will see you, as I said, between 2 and 2:15, closer to

19   2:15, more likely, and enjoy yourself and we will see you

20   then.

21           (Jury exits.)

22           THE COURT:  Okay.  Again, the usual rules.  If you

23   want to leave it, William will lock it up.  If you need it,

24   take it with you.

25           I assume since there was a little squishiness as to

266

1    what we were doing next, the government will ensure that we're

2    doing something this afternoon.

3            MR. SELDEN:  Your Honor, I'm certain we'll have a

4    witness.  Who that witness is, once I step outside, hopefully

5    I'll know.  Thank you, Your Honor.

6            THE COURT:  Okay.  We look forward not to wasting

7    the afternoon.

8            MR. SELDEN:  I think both of us do, Your Honor.

9    Thank you so much.

10           THE COURT:  Enjoy your lunch as stated.

11           MR. SELDEN:  Thank you.

12           (Luncheon recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25

267

1            AFTERNOON SESSION

2            (In open court; outside the presence of the jury.)

3            THE CLERK:  Court is back in session.  Counsel for

4    both sides present including defendant.

5            THE COURT:  Welcome back, all.  Do we have any

6    housekeeping?

7            MR. SELDEN:  Your Honor, just brief housekeeping.

8    Maybe it's my Jesuit education, but when there's a reference

9    to Pandora's box, I always like to at least address it before

10   we might run into some issues.

11           THE COURT:  Before we run into Pandora.

12           MR. SELDEN:  Exactly.  And I think the government

13   would probably defer to Mr. Stein if he has anything, since

14   we've addressed I think the government positions on the

15   record, if he has any additional thoughts on how we can or

16   cannot deal with some of the potential issues with regards to

17   the matter, I think Mr. Siegel will respond.

18           THE COURT:  I'm sure Mr. Siegel will respond.

19           MR. SELDEN:  Of course, Your Honor.

20           MR. STEIN:  This is about the four rounds of

21   9 millimeter?

22           MR. SELDEN:  Yes, Mr. Stein.

23           MR. STEIN:  So, Judge, in order to understand this,

24   what's happened, we need some context so that will take me a

25   little bit of time so you can understand what's happened here.

268

1          So the person who was previously referred to as

2     "Person A" is Edward Vasquez.  So Edward Vasquez was the

3     driver of the car.  As you may recall, they interviewed him,

4     it was recorded, for about a half hour.  You heard the

5     recording.  During the course of the recording, he made

6     various statements including identifying, from the

7     surveillance video, identifying the person in the surveillance

8     video as Mr. Brack.

9               THE COURT:  Elgin Brack.

10              MR. STEIN:  Correct, Elgin Brack, and you suppressed

11    that.

12              THE COURT:  I did.

13              MR. STEIN:  And excluded it as evidence.

14          During the course of the interview, the agents said

15    to him, in substance, that we know you have some history, some

16    previous arrests.  There was no discussion of that.  We have

17    asked them to produce the arrests, his arrest record.  They've

18    declined to do so because they're not calling him as a

19    witness.

20          What they're going to do is, I think, because it's

21    one of the exhibits they've marked and it's someone on the

22    witness list, is they're going to try to prove that

23    Mr. Vasquez was in a homeless shelter in, I think, Jersey City

24    with some records from the shelter that they have produced a

25    certified copy of.

269

1          So when he, when the car was stopped, they found

2    inside the car, I think it was in a wheel base which I'm not

3    sure if that's actually the trunk area or what, four rounds of

4    9 millimeter ammunition.  It's my understanding that you can't

5    fire 9 millimeter ammunition in a .357, which is the gun that

6    the government is going to contend is the weapon that was used

7    in this case.

8          So this is my word, obviously, I'm sure they

9    wouldn't agree with it, but they're attempting to sanitize the

10   record to try to eliminate Mr. Vasquez as someone that the

11   defense can point to as a perpetrator of this offense along

12   with Scott Brack and we've been arguing this in our papers for

13   months that, we were going to argue that two other people,

14   none of whom was Elgin Brack, committed the offense.

15         So we don't have the history, we don't have his

16   history.  We don't have him as a witness.  They've told us

17   they're not calling him.  We have tried to locate him.  We

18   have an investigator who has tried to serve him a subpoena.

19   The government provided his address.  He was unable to be

20   served.  I think the government at one point earlier last year

21   was trying to locate him also.

22         In addition, they obtained from Mr. Vasquez an

23   authorization to search his phone.  Some time ago, I asked the

24   government for the phone records for Mr. Vasquez.  They don't

25   have his phone records.

1          So I feel like I'm shadowboxing, frankly, because

2     the way they have structured -- again, that's my word -- this

3     part of the case.  We are being inhibited from trying to argue

4     what we've been arguing in our papers for months which is that

5     he is someone that we can point to based on these

6     circumstances as someone who committed these crimes with Scott

7     Brack.  We even have a picture of him.  They're going to mark

8     his picture as an exhibit.  I assume an agent is going to

9     identify his picture and say that's Edward Vasquez and he was

10    the driver of the car.

11               THE COURT:  At the time of the arrest.

12               MR. STEIN:  Yes, I'm sorry, at the time of the

13    arrest, yes, on the evening of November 26th.

14          So we're left with some sort of breadcrumbs to be

15    able to try and argue what -- as I said, we've been arguing

16    for months in our papers and if the Court excludes the four

17    rounds of ammunition, then we have even less breadcrumbs.  I

18    don't know what his record is but under federal law, if he has

19    a previous federal conviction, he could have been charged

20    under federal law under the felon in possession of ammunition,

21    not a gun, just ammunition itself, with a previous felony

22    record.  My legal advisor, Mr. Farrell, advised me that under

23    some provision of the New York City administrative code, it's

24    an unclassified misdemeanor to have, be in possession of

25    ammunition.

271

1    So we want to be able to ask the agent who

2 inventoried the contents, I assume it's the case agent, Tyler

3 Miceli, although I'm not sure 100 percent, we want to ask him

4 that, yes, we recovered these four rounds of ammunition

5 wherever they were in the car.

6         THE COURT:  Well, who's responding for the

7 government?

8         MR. SIEGEL:  Your Honor, I will, Mr. Siegel.

9         THE COURT:  Mr. Siegel.  Okay.

10         MR. SIEGEL:  I think the defendant's argument is

11 that they don't -- they want to argue that Mr. Vasquez was

12 involved in this.  They don't have a lot of evidence for that

13 and so they want to bring in evidence that is inadmissible to

14 do it, but that's just not the way it works.  There are rules

15 of evidence and the fact that he had bullets has no relevance

16 to whether he was involved in this robbery.  In fact, as

17 Mr. Stein recognizes --

18         THE COURT:  Well, the bullets were not in his

19 physical possession.

20         MR. SIEGEL:  They were in the car.

21         THE COURT:  In the car owned by nobody in the car.

22         MR. SIEGEL:  That's right.  But even assuming that

23 they are his bullets, there's nothing to tie them to the

24 robbery.  In fact, they wouldn't even fit in the gun that was

25 used in the robbery.  So the only purpose for this is to show

272

1  propensity that is he a person with bullets, he is a person

2  with guns and, therefore, you can infer that he was involved

3  in this robbery and that's simply not permissible.

4        MR. STEIN:  Judge, if this was flipped over and the

5  government believed that the four rounds of ammunition could

6  in some way be attributable to my client, I suspect that we

7  would have gotten a 404(b) notice that they wanted to argue

8  this as relevant because he's charged with possession of a

9  firearm, et cetera.

10        MR. SIEGEL:  Your Honor, that is completely contrary

11  to the facts and history in this case.  On his phone, there

12  are searches for tasers.  He tried to buy a gun.  We've been

13  incredibly accommodating and worked to compromise not bring in

14  this evidence because we're going to prove he did this crime,

15  not that he was involved in other crimes.  So to suggest that

16  if he had bullets on him that were conclusively not involved

17  in this crime, that we would try to bring that in, there is no

18  basis for it.

19        MR. STEIN:  Judge, I don't know where the taser gets

20  thrown into this argument.  They said from the first set of

21  motions that they're not, they have no intention of using

22  that, it's got nothing to do with anything in this case.

23        THE COURT:  Mr. Siegel is emphasizing that fact it

24  could have come in.  My recollection, with respect to certain

25  visits to a gun store, that fact might have gotten in because

273

1    of related admissible purpose that that visit might have.

2            MR. STEIN:  The gun story I don't think had anything

3    to do with the taser, Judge.

4            The only other thing I neglected to mention is I

5    believe during that half hour interview of Mr. Vasquez, he

6    acknowledged that the bullets were his.  He had found them

7    somewhere and he had stored them or just put them in his car.

8    So it's not just that they were in the car as I recall from

9    the interview, he acknowledged that they were his or at least

10   he had found them.

11           THE COURT:  Yes.  I think if Mr. Vasquez were to

12   take the stand, I think we're in a different situation.  It

13   could go to his credibility, his reasons to please the

14   government which they didn't, they didn't charge him with

15   possession of the ammunition, and that was something he wasn't

16   entitled to be in possession of being a convicted felon.

17           Mr. Vasquez is not on the stand and the question is

18   this is going down rabbit holes in a different field because

19   it doesn't deal with his credibility, he's not here, so the

20   only thing that's left is propensity that he's a likely, that

21   he's a likely criminal.

22           Now, the fact is that I assume we're going to hear

23   testimony somewhat mirroring the, maybe I'm wrong, what we

24   heard on the suppression hearing, that Mr. Vasquez was in the

25   car and was one of the guys pulled out of the car at the time

1    of the arrest and that there is, you know, Mr. Brack is in the

2    car, Mr. Scott Brack is in the car as well.

3            We will have two traditional charges that sort of

4    balance each other off.  One of them is that the jury is not

5    to speculate as to why people who are named who seem to be

6    tangentially involved are not before the jury and the other

7    one is the charge that it's not for the jury to speculate or

8    be concerned about specific law enforcement techniques.  That

9    still leaves you the freedom to argue that there were other

10   people that were involved that wasn't Mr. Elgin Brack.

11           MR. STEIN:  I understand I can argue that, Judge,

12   but I'm sure the government is going to argue that the

13   evidence to support that is weak or nonexistent partially

14   because we don't have the four bullets.

15           THE COURT:  Well, but the four bullets can go to

16   propensity.  There is no connection.  You have not

17   demonstrated to me any connection between the four bullets and

18   the crimes charged in this indictment.  They're four bullets.

19   It goes to Mr. Vasquez's criminality, not criminality related

20   to any of the charges before the Court now but, clearly, I

21   agree, if Mr. Vasquez was on the stand, we've got a different

22   ballgame.  He's not here.

23           MR. STEIN:  The silence means I'm done.

24           THE COURT:  Okay.

25           MR. SIEGEL:  I apologize.  I'm a little less silent

 1  than Mr. Stein.  Mr. Stein is raising issues of discovery that

 2  I want to be clear about.

 3          The reason why we didn't provide a report of

 4  Mr. Vasquez's phone is because there is no such report.  We

 5  don't have it.  Similarly, we don't have his phone records.

 6  Otherwise, we would have produced them.

 7          I also, I think this is just an extension perhaps --

 8          THE COURT:  Was there a warrant sought to try to --

 9          MR. SIEGEL:  There was no warrant sought.  He signed

10  a consent form.

11          THE COURT:  Consent.

12          MR. SIEGEL:  But there was no report generated.

13          MR. STEIN:  Judge, I can't resist.  It's not, I'm

14  not raising a discovery question about Vasquez's own records.

15  That's not my point.

16          THE COURT:  But I think it's important, even if you

17  didn't, there's an implication.  I think it's fair for the

18  government to place on the record why things, you say you

19  didn't receive, why they weren't given.

20          MR. STEIN:  No.  If I said I didn't receive, then I

21  misspoke.  What I meant is I asked them if they have phone

22  records for Vasquez and they said no.  That's all I'm saying.

23  I mean, if this becomes a point during the trial, then we'll

24  deal with it.

25          I'm not complaining about any lack of discovery

1    production.  As I've said a number of my times in the papers,

2    and otherwise, they've been more than forthcoming in

3    discovery.  I have no complaint about that.

4              MR. SIEGEL:  Your Honor, I think this may be just a

5    related issue and I don't know that this needs to be resolved

6    today, but there's still the larger issue of questioning the

7    case agent about investigative techniques, steps that could or

8    should have been taken and how that would the open the door to

9    Scott Brack's statements were it not the constitutional

10   statements.  So we can resolve it now, if Your Honor wants to,

11   we can resolve it tomorrow, but I think --

12             THE COURT:  How do you see that coming up?

13             MR. SIEGEL:  Well, I don't know what the defense is

14   going to do but we are going to have one of the case agents

15   testify and if there are questions -- for example, in

16   Mr. Farrell's opening, he talked about not taking Elgin

17   Brack's shoes.  I suspect part of the reason that Elgin

18   Brack's shoes were not taken is that the view from the agents

19   was that this case was pretty well wrapped up.  Scott had

20   confessed, he had identified Elgin, they had Elgin in custody,

21   they all recognized Elgin as the person from the surveillance

22   video, and that had an impact on what steps they didn't, they

23   did or didn't take.

24             If they're going to bring in why didn't you do X,

25   shouldn't you have done Y, couldn't you have done Z, the

277

1   answer to a lot of that is going to be we didn't really see

2   the point, and the reason they didn't really see the point is

3   because, as I said, that night, Scott confessed, implicated

4   Elgin and they all recognized Elgin.

5           THE COURT:  You know, that "and," that "and" is very

6   powerful and certainly if, in fact, they thought it was all

7   wrapped up, that's a great answer and it presumably allows you

8   on redirect for them to explain why they thought it was all

9   wrapped up other than, other than ask, making a reference to

10  Scott Brack's confession.  That you won't do.

11          MR. SIEGEL:  That we won't do but given that that

12  was a large factor in it, I mean, I recognize --

13          THE COURT:  That's powerful evidence against Scott

14  Brack.  It's not evidence at all against Elgin Brack unless

15  Scott Brack was to be a cooperator.  We had the Bruton motion

16  all ready to go.  In fact, it may have been filed.  I don't

17  remember.

18          MR. STEIN:  Judge, he pleaded guilty so it mooted

19  the Bruton motion.

20          THE COURT:  Right.  It could have -- had Scott Brack

21  ultimately become a cooperator, then that would have perhaps,

22  and then he would have been here for cross-examination so we

23  wouldn't have a Bruton issue either.

24          MR. STEIN:  Judge, I don't know if Mr. Siegel is

25  finished.

278

1          THE COURT:  But, you know, to the extent, to the

2    extent that the defense were to open the door to a redirect

3    that allows the agent or the police officer, whatever the case

4    may be, to explain what their thinking process was, that's

5    fine, as long as there isn't a constitutional infringement

6    which it would be if there was reference made to Scott Brack's

7    confession.

8          MR. SIEGEL:  That's fine, Your Honor.  We understand

9    that.

10          THE COURT:  That's up to the defense, how they want

11    to proceed.  And even if they, you know, even if they don't,

12    you are going to have -- as I say, there's going to be

13    testimony there was somebody else in the car pulled out of the

14    car and, Mr. Farrell, you can point to that if you want to,

15    Mr. Stein, say there are other people, other people involved

16    in this case in --

17          MR. STEIN:  Judge --

18          THE COURT:  -- sum and substance.

19          MR. STEIN:  I don't know if this is going to be

20    persistent coming up, but Mr. Siegel is making reference to an

21    instruction on alternative other investigative techniques.

22    This isn't a question of that.  This is a question of -- and I

23    know you are going to charge this.  You are going to charge

24    the jury that reasonable doubt, in substance, can be based on

25    evidence or lack of evidence.

1          THE COURT:  Correct.

2          MR. STEIN:  I cannot believe that Mr. Siegel is

3   really suggesting that we can't ask questions of agents which

4   show that there is a lack of this evidence or that evidence.

5   So if they didn't, for example, take his sneakers, send them

6   to a lab and see whether there's microscopic dots of blood on

7   that --

8          THE COURT:  I don't think he's saying you can't ask

9   that, Mr. Stein.  I think what Mr. Siegel is saying is there

10  may be a reason and there may be a lame reason the jury could

11  find itself, the reason they didn't is because we also had

12  this, this and this.

13         MR. STEIN:  I understand, Judge.

14         THE COURT:  That's the point I think Mr. Siegel is

15  making.

16         MR. STEIN:  Okay.

17         THE COURT:  That on redirect, to rehabilitate

18  whatever damage is done because you didn't send the sneakers

19  out would be this listing, this is the reason why we didn't do

20  it, you know, Lieutenant Smith spent hours examining his chin

21  before he ran into him in the Bronx, et cetera.

22         That's my understanding of what I think Mr. Siegel

23  is telling you and he just wanted to make sure that if the

24  door is open, that he's got his entourage who is ready to

25  march through it.  I just wanted to let him know that the

280

1   entourage doesn't include Scott Brack's post-arrest

2   statements.

3            MR. STEIN:  Okay.

4            THE COURT:  Do we have any other housekeeping

5   issues?  It must have been dirtier than I thought.  We have a

6   lot of housekeeping.

7            MR. SELDEN:  You never know with Pandora.

8            Nothing else from the government.  Thank you.

9            MR. FARRELL:  Judge, I have one thing.  I believe

10  one of the searching agents, Detective Nuzio is testifying,

11  and I noticed GX-315 is described here -- we're trying to pull

12  it up now and my assistant Mr. Bennett is having a little

13  trouble -- it says:  Ski mask and beanie recovered in the car.

14           I submit that's irrelevant to anything and it's

15  prejudicial.  People think that robbers use ski masks and

16  there's no evidence Mr. Brack -- I don't know if they plan to

17  introduce it, I should have asked off the record, but that's

18  my application, that if they intend to introduce 315, they

19  should not.  No relevance and prejudicial.

20           MR. SIEGEL:  That's not something that's going to

21  come in from the search of the car.  That's something that

22  came off Scott Brack's person and his hat that he can be seen

23  wearing on some of the surveillance video.

24           MR. FARRELL:  I thought it was the car.

25           MR. SIEGEL:  And we have that physical evidence.

281

1          THE COURT:  That's why those off the record
2     conversations are good, Mr. Farrell.
3          MR. FARRELL:  Absolutely.  Sorry.
4          THE COURT:  Are we otherwise ready?
5          MR. SELDEN:  On behalf of the government, we are.
6     Thank you, Your Honor.
7          MR. FARRELL:  Yes, on behalf of the defense.
8          THE COURT:  I'm dying to know, did you come up with
9     a witness, Mr. Selden?
10          MR. SELDEN:  We did.
11          THE COURT:  Is it the one you thought it was?
12          MR. SELDEN:  It's not but we alerted Mr. Stein and
13     Mr. Farrell at the break so they knew who we were calling
14     before Pandora's discussion.
15          THE COURT:  It could be Pandora's brother.
16          MR. SELDEN:  Your Honor, we are ready with the
17     witness outside.
18          THE COURT:  All right.  We're ready.  Mr. Villanueva
19     assured me he's ready with the jury.
20          (Continued on next page.)
21
22
23
24
25

Proceedings                                        282

1   (continuing.)

2          THE COURT:  Counsel, the jury was inquiring whether

3   this week we were sitting on Friday.  I have advised them that

4   we will not.  So now you won't have to.

5          MR. SELDEN:  Thank you, Your Honor.

6          (Jury enters.)

7          THE COURT:  Be seated, please.  Counsel will

8   stipulate that the jury is present and properly seated.

9          MR. SELDEN:  On behalf of the Government, thank you,

10  yes, Your Honor.

11         MR. STEIN:  Yes, Judge.

12         THE COURT:  Thank you, Counsel.

13         Ladies and gentlemen, I hope you enjoyed your lunch.

14  Welcome back to the courthouse.  As I told you on past

15  occasions, again there are two phases to the trial and one of

16  them involves legal issues.  Oftentimes the lawyers call it

17  housekeeping but we have been tidying up the courtroom for

18  some time.  We apologize for the delay but the legal issues

19  are important to be ironed out as well.  And as I say

20  sometimes we do it over here at the sidebar, but sometimes

21  it's easier to let you relax in the jury room while we haggle

22  the way we have to haggle.

23         We appreciate your patience and cooperation and

24  wanted to assure you that we all value your time and we try to

25  communicate our activities as efficient as we can so we don't

Proceedings                                        283

1    tax you any more than we need to.  So, again, thank you.

2         The Government advises that we do have another

3    witness and, Mr. Selden, it is your call.

4         MR. SELDEN:  Thank you very much.  Your Honor.  Your

5    Honor, the Government calls Keith Bryan.  The Court's brief

6    indulgence while we locate Mr. Bryan.

7         THE COURT:  Indeed.

8         MR. SELDEN:  Thank you, Your Honor.

9         (Witness takes the stand.)

10        THE COURTROOM DEPUTY:  Raise your right hand.

11        (Witness sworn/affirmed.)

12        THE COURTROOM DEPUTY:  Have a seat.  Please state

13   and spell your name for the record.

14        THE WITNESS:  Sergeant Keith Bryan, B-R-Y-A-N.

15        THE COURT:  Mr. Selden.

16        MR. SELDEN:  Thank you, Your Honor.

17        (Continued on the next page.)

18

19

20

21

22

23

24

25

1    **KEITH BRYAN**, called by the Government, having been

2              first duly sworn, was examined and testified

3              as follows:

4    DIRECT EXAMINATION

5    BY MR. SELDEN:

6    Q    Good afternoon, sir.

7    A    Good afternoon.

8    Q    Sir, where are you originally from?

9    A    Brooklyn.

10   Q    Where did you get your post-high school education?

11   A    In Brooklyn, St. Joseph's College.

12   Q    Did you graduate from St. Joseph's College?

13   A    Yes, I did.

14   Q    What did you get your degree in?

15   A    Business.

16   Q    What did you do after you finished St. Joseph's College?

17   A    Joined the New York City Police Department.

18   Q    Are you presently employed by the New York City Police

19   Department?

20   A    Yes, I am.

21   Q    How long have you been with the New York City Police

22   Department?

23   A    27 years.

24   Q    What's your current rank at the New York City Police

25   Department?

1  A    Sergeant.

2  Q    Have you always been a sergeant with the New York City

3  Police Department?

4  A    No, not at all.

5  Q    Where did you start out, without going all through 27

6  years.  Did you start out as a sergeant?

7  A    I started out as a police officer.

8  Q    Are you currently assigned to any particular units within

9  the New York City Police Department or otherwise?

10  A    Yes, I am.  I'm currently involved with the Joint Robbery

11  Task Force.

12  Q    Is that otherwise known as SPARTA?

13  A    Yes, it is.

14  Q    I want to turn to --

15         THE COURT:  Does that make you a detective sergeant?

16         THE WITNESS:  I'm a detective sergeant.

17  Q    My sincere apologize if I gave you a downgrade.

18         THE COURT:  As long the guy on the check

19  understands.

20  BY MR. SELDEN:

21  Q    Detective Sergeant, I want to draw your attention to

22  November 6, 2018.  In the evening hours at approximately 7

23  p.m., were you involved in an investigation that led you to

24  the Bronx, New York?

25  A    Yes, I was.

Bryan - direct - Selden                    286

1  Q     And specifically what block, if you can recall, were you

2  involved in investigating or where were you located?

3  A     Hughes Avenue and 179th Street in the Bronx.

4  Q     Is that in proximity to the 2000 block of Hughes Avenue?

5  A     Correct.

6  Q     Sergeant, with regards to that location, Hughes Avenue

7  and 179th Street in the Bronx, how close is that approximately

8  to the SPARTA office where you work?

9  A     About a 20, 25 minute drive.

10 Q     Where is your SPARTA office?

11 A     In the confines of the Bronx as well.

12 Q     Is it by any particular hospitals or other entities

13 there?

14 A     It's within the Montefiore Hospital complex.

15 Q     Okay.  Let's go back to the 2000 block of Hughes Avenue.

16 How did your investigation bring you there?

17 A     We were notified that we were looking for a car.

18         MR. STEIN:  Objection, Judge.

19         THE COURT:  Just without going into the details, do

20 you recall getting a report of somebody asking you to respond

21 there?

22         THE WITNESS:  Yes.

23 BY MR. SELDEN:

24 Q     What were you looking for?

25 A     A vehicle, a Toyota Solara.

1   Q    Do you remember the approximate color of that Toyota

2   Solara?

3            MR. STEIN:  Judge, this is what he was informed.  I

4   object.

5            MR. SELDEN:  I don't believe there's been any

6   testimony about what he's been informed.  I'm asking the

7   witness's recollection of what he was told.

8            THE COURT:  Why he responded there.

9            That's why you responded there.

10  BY MR. SELDEN:

11  Q    Detective Sergeant, I was asking you the approximate

12  color of the Toyota Solara that you were there for.  Do you

13  recall what it was?

14  A    A champagne silver color.

15  Q    When you arrived in the 2000 block of Hughes Avenue did

16  you see a Toyota Solara champagne silver in color?

17  A    Yes, I did.

18  Q    What else did you notice about the particular car?

19  A    The plate, which I don't recall now, there was a plate

20  associated with the car as well as an air freshener that hung

21  off the rearview mirror.

22            MR. STEIN:  Objection.  Judge, I object for the same

23  reason.  This is what he was told.

24            THE COURT:  We will hear you at sidebar.

25            (Continued on next page.)

```
                        Sidebar                     288
```

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          THE COURT:  It's not being offered for the truth.

4     It's being offered for his state of mind.  Why is he there,

5     what he looking for, that's it.

6          MR. STEIN:  The problem is what I think they're

7     doing is in effect trying to bolster their case.  He can say,

8     if I can be presumptions to suggest, he went to this location

9     in response to a report, he went there, he saw a car, he saw

10    an air freshener and saw whatever but not to bolster it all as

11    to testifying what he was told what he should be looking for.

12    I saw it and I did whatever.

13         MR. SELDEN:  Maybe Mr. Stein is hearing a different

14    narrative from this witness than the Government is.  We simply

15    asked what he was doing there and what he saw.  I think he's

16    describing what he saw.  He hasn't attributed this to any

17    other --

18         THE COURT:  Let's ask that question.  Did you

19    respond there and what did you see.

20         MR. SELDEN:  Absolutely.

21         THE COURT:  Okay.

22         MR. STEIN:  That's fine.

23         THE COURT:  We will strike the prior answer.

24         MR. SELDEN:  That sounds good.

25         (Sidebar ends.) (Continued on next page.)

1           THE COURT:  Ladies and gentlemen we have to enforce

2     the rules of evidence and you heard it in the charge and you

3     will hear it repeated again when the court instructs you on

4     the law, you have to follow it.  Even if it doesn't make sense

5     to you you have to follow it.  I am going to strike the last

6     question and answer and Mr. Selden is going to ask a question

7     and we will have Detective Sergeant Bryan respond.

8           MR. SELDEN:  Thank you, Your Honor.

9     BY MR. SELDEN:

10    Q     Detective Sergeant Bryan, when you responded to the 2000

11    block of Hughes Avenue what did you see?

12    A     I saw a champagne color Solara two-door.

13    Q     And a moment ago you were just describing you being in

14    the 2000 block of Hughes Avenue.  Specifically were you there

15    on foot, in a car?  How were you there?

16    A     I was in a vehicle.

17    Q     What were you doing there?

18    A     I was there making an observation on a vehicle that was

19    involved in a crime.

20          MR. STEIN:  Judge, move to strike the last part of

21    his answer.

22          THE COURT:  Reportedly involved in a crime.  I'm

23    just going to allow him to orient it.  Ask him what he saw,

24    can he describe the inside of the car or the license plate.

25          MR. SELDEN:  Absolutely, Your Honor.  I have a

1  follow-up question to what Detective Sergeant Bryan describes

2  a moment ago before Mr. Stein's objection.

3  Q    You said that there was an observation that you were

4  conducting?

5  A    Yes.

6  Q    Can you explain to the ladies and gentlemen of the jury,

7  what is an observation; what are you doing there in a law

8  enforcement capacity?

9            THE COURT:  What does that mean, "observation"?

10           THE WITNESS:  I'm set up in an observation point to

11  look at a particular subject which is this vehicle and report

12  what I find.

13  Q    Take us back to that evening.  Were there any

14  obstructions between where you were seated in your car and the

15  vehicle that you were looking at?

16  A    No.

17  Q    And how was the overhead lighting?  Was there any street

18  lighting on the street that night?

19  A    Yes.

20  Q    And was it still light out that night or was it dark at

21  this point?

22  A    It was dark at this point.

23  Q    Approximately how far away were you from the Toyota

24  Solara that you just described to the ladies and gentlemen of

25  the jury?

1   A    About a city block.

2   Q    What happened next?

3   A    I was out there for approximately over an hour at the

4   observation point when I observed a male black about five foot

5   eight come from the rear of me, cross from west to east

6   crossing 179, enter the silver Solara, opened the passenger

7   side and entered the back seat of the car.

8   Q    Detective Sergeant Bryan, would you recognize that

9   individual if you saw him again?

10  A    Yes.

11  Q    Would you take a look around the courtroom and see if you

12  recognize anybody from that evening.

13  A    The gentleman here with the braids.

14       MR. SELDEN:  For the record, Your Honor, Detective

15  Sergeant Bryan has identified --

16  Q    Can you identify him from an article of clothing?

17  A    I see a black jacket and he's kind of hunched down with a

18  gray shirt.

19       MR. STEIN:  We acknowledge the identification of the

20  witness.

21  BY MR. SELDEN:

22  Q    Do you remember anything about that -- the defendant as

23  he was walking across the street in terms of articles of

24  clothing or anything else that he was wearing?

25  A    Yes, I do.  He had mostly gray, dark clothing.  He either

Bryan - direct - Selden                292

1    had a head gear, meaning a hat or a hoodie, pulled over his

2    head and over his right shoulder he had a knapsack, gray in

3    color.

4    Q    What happened next after the defendant got into that

5    Solara?

6    A    Maybe a few minutes later, another male, male black, slim

7    build, a little taller, walked across in the same direction

8    from west to east crossing 179, walks over to the car and

9    enters in the passenger position.

10   Q    You said a little taller.  Could you approximate how much

11   taller he was?

12   A    He should be around six feet.

13   Q    What happened next?

14   A    At that point another vehicle, I couldn't tell you the

15   make or model, double-parked or parallel parked next to the

16   vehicle.  They seemed like they were in conversation.  I

17   relayed that over to the field team.  That vehicle eventually

18   left that location.  Moments later I observed the brake light

19   begin to flicker, meaning that someone is stepping on the

20   brake pedal.  I relayed that to the field team that this

21   vehicle is about to drive off.

22   Q    Are you talking about the car that double-parked by the

23   Toyota Solara or the Toyota Solara?

24   A    Sorry, yes, the Toyota Solara.

25   Q    Detective Sergeant Bryan, what happened after you relayed

1    to the field team that the brake light appeared to have been

2    initiated on the Solara, what happened next?

3    A    We were going to the car possibly moving on.  I'm giving

4    the direction the car is going to be moving, which was

5    southbound, and we blocked the car in for a car stop.

6    Q    Did you, in fact, stop the car?

7    A    Yes, we did.

8    Q    Were you alone when you stopped that car where or were

9    there other law enforcement agents with you?

10   A    No, there were other law enforcement agents with me.

11   Q    What happened next?

12   A    I entered from the driver's side.  I approached from the

13   driver's side and pulled the driver out of the car.

14   Q    When you approached the car, can you orient the ladies

15   and gentlemen of the jury to where the individuals in the car

16   were seated?

17   A    The gentleman that I originally observed walking, he's in

18   the rear seat on the passenger side.

19   Q    Let me stop you there.  Is that the individual that you

20   identified here in the courtroom today?

21   A    Yes, it is.

22   Q    So the defendant is in the rear passenger side seat.  Who

23   else is located in the car?

24   A    The second individual I observed walking in the same

25   direction, he is in the passenger side front seat.

1   Q    Is this the taller individual that you described, the

2   slimmer build African American man in front of him?

3   A    Correct.

4   Q    Who else is in the car?

5   A    A small child was in the rear of the driver and then I

6   pulled out the driver which was a male Hispanic, about five

7   foot ten.

8   Q    And with regards to the inside of the car and the

9   occupants inside the car, how long were those occupants inside

10  the car when the members of law enforcement arrived and

11  stopped the car?

12  A    We pulled him out immediately with the exception of the

13  girl.

14  Q    And approximately how old was the girl?  Was she under

15  the age of 18?

16  A    Yes, she was.

17  Q    Was she under the age of ten?

18  A    Yes, she was, definitely.

19          MR. SELDEN:  I'm now showing for the witness only

20  for identification purposes, Mr. Villanueva, what was

21  previously marked as Government Exhibit 304.

22  Q    Before I get to that, Detective Sergeant Bryan, did you

23  have an opportunity to look inside the car?

24  A    Yes, I did.

25  Q    Let me show you Government Exhibit 304 for identification

1  purposes only.  What do we see in Government Exhibit 304?  Do

2  you recognize what I've put up on the screen as Government

3  Exhibit 304?

4  A    Yes.

5  Q    What is that?

6  A    The rear seat of the Toyota Solara.

7  Q    Is that a fair and accurate depiction of how it looked

8  when you arrived upon sort of approaching the vehicle with the

9  other members of law enforcement?

10 A    Yes, it is.

11      MR. SELDEN:  Your Honor at this time I move to admit

12 Government Exhibit 304-F into evidence.

13      THE COURT:  304-F.

14      MR. STEIN:  Objection.  Could I voir dire on this?

15      THE COURT:  Yes.

16 VOIR DIRE EXAMINATION

17 BY MR. STEIN:

18 Q    Sergeant, do you know about when this picture was taken?

19 A    I'm not sure when exactly this picture was taken,

20 timewise, no.

21 Q    So, did you take the picture?

22 A    No, I did not.

23 Q    Were you present when the picture was taken?

24 A    No, I was not.

25 Q    Can you give us an estimate of how much longer after the

Bryan - voir dire - Stein                    296

1   car was approached by law enforcement until this picture was

2   taken?

3   A    No, I cannot.

4   Q    Did you have the car under constant observation once you

5   approached it?

6   A    Yes, I did.

7   Q    So about how many law enforcement officers were there?

8   A    I would say approximately seven.

9   Q    Okay.  And once the individuals in the car were removed

10  from the car, you said that that was done immediately;

11  correct?

12  A    Yes.

13  Q    Did you see any law enforcement officers approach the car

14  and appear to do anything inside the car?

15  A    No.

16  Q    When the car door was opened -- when the car was opened,

17  did you see this bag?

18  A    Yes.

19  Q    And what you saw of the bag inside this car is what you

20  see in this picture?

21  A    Yes.

22  Q    It's your testimony that no law enforcement officer,

23  before you saw this bag, did anything at all with respect to

24  the property that was in the car?

25  A    No, we -- our job is to yank --

1   Q    Just give me a yes or no.

2   A    Repeat it again.

3   Q    Sure.  Is it your testimony that when this picture was

4   taken, no law enforcement officer entered the car and did

5   anything physically with respect to any of the contents of

6   the --

7   A    I couldn't say that.

8   Q    So you don't know whether or not, I take it from your

9   last answer, whether or not anything was moved around in order

10  to display something more prominently?  You don't know whether

11  or not that happened?

12  A    The car was moved.

13  Q    I'm not talking about the car itself.  I'm talking about

14  what was in the car.  You don't know, do you, whether or not

15  before this picture was taken if some law enforcement officer

16  moved the contents of the car around in order for a picture to

17  be taken which would more prominently display the contents of

18  the car, do you?

19  A    I'm going by my recollection of what I seen that night

20  and when I removed the occupants of the vehicle, those bags

21  were left in the back seat.

22  Q    That's not my question.  My question is did any law

23  enforcement officer that you saw go into this car or appear to

24  do anything with respect to the contents of the car before

25  this picture was taken?

Bryan - voir dire - Stein                    298

1          MR. SELDEN:  Your Honor, I believe that question was

2  asked and answered.

3          THE COURT:  Do you recall someone doing that or you

4  don't.

5          THE WITNESS:  No, I don't.

6          THE COURT:  He doesn't.

7  BY MR. STEIN:

8  Q    And before you testified today, did you review any

9  reports concerning your testimony specifically concerning this

10  picture?

11  A    Yes.

12  Q    What did you look at?

13  A    I looked at this picture.

14  Q    Anything else?

15  A    The general -- no.

16  Q    You said there were approximately seven law enforcement

17  officers there?

18  A    Yes.

19  Q    Before testifying today, at any time since November 26,

20  2018 did you discuss with any other members who were there

21  that night anything about the contents of the car?

22          MR. SELDEN:  Objection as to relevance.  I think

23  we've moved beyond --

24          THE COURT:  Sustained.

25          MR. STEIN:  Judge, I object to the admission of this

1   picture.

2         THE COURT:  Does the picture reflect, to the best of

3   your recollection, what you saw when you opened the door and

4   took the driver out?

5         THE WITNESS:  Yes.

6         THE COURT:  Objection overruled.

7         What's the exhibit number?

8         MR. SELDEN:  It's Government Exhibit 304-F as in

9   Frank.  Permission to publish to the jury Government Exhibit

10  304 F.  I move to admit it.

11        THE COURT:  Received.

12        (Government Exhibit 304-F received in evidence.)

13        THE COURT:  You may publish it.

14        (Exhibit published.)

15  CONTINUED DIRECT EXAMINATION

16  BY MR. SELDEN:

17        MR. SELDEN:  Mr. Villanueva, can we dim the overhead

18  light just for this one?

19        THE COURTROOM DEPUTY:  Yes.

20  Q    Detective Sergeant Bryan, what do we see in Government

21  Exhibit 304-F?  In front you have a touch screen, do you

22  recognize anything in there?

23  A    Yes.

24  Q    Push a little harder, Detective Sergeant.  Thank you so

25  much.

1            MR. SELDEN:  For the record, Detective Sergeant

2    Bryan circled a multicolored gray knapsack.

3    Q    What do we see there?

4    A    This is the knapsack on the gentleman.

5    Q    Just remind the ladies and gentlemen which gentleman was

6    that?

7    A    The gentleman seated here.

8    Q    Detective Sergeant, just a few more questions in relation

9    to the line of voir dire that you had with Mr. Stein, did you

10   search for any other evidence at that scene on the street that

11   being 2000 Hughes Avenue after you pulled the individuals out

12   of the car?

13   A    I searched the individual I pulled out for safety, but I

14   did not search the car, no.

15           MR. SELDEN:  The Court's brief indulgence.

16           (Pause in proceedings.)

17           MR. SELDEN:  Your Honor, I think now is a good time

18   to pull up the lights after conferring with my colleagues.

19           Mr. Villanueva, if you wouldn't mind.

20   BY MR. SELDEN:

21   Q    Detective Sergeant, with regards to the car, taking you

22   back a moment upon what you saw, did you see an air freshener

23   in that car?

24   A    Yes, I did.

25   Q    No further questions.

1            MR. SELDEN:  Thank you, Your Honor.

2            THE COURT:  Thank you Mr. Selden.  Any cross?

3            MR. FARRELL:  Yes, Your Honor, thank you.

4    Mr. Farrell.

5    CROSS-EXAMINATION

6    BY MR. FARRELL:

7    Q    Good afternoon, Detective Sergeant Bryan.  My name is

8    Gary Farrell.  We haven't discussed this case prior?

9    A    No.

10   Q    Would you agree that as a detective sergeant, you don't

11   have to keep a memo book, correct?

12   A    Yes, you do.

13   Q    You keep one?

14   A    Yes, I do.

15   Q    Did you keep one for this date, the morning -- the

16   evening of November 26, 2018?

17   A    Yes, I did.

18   Q    Did you ever provide it to the Government?

19   A    No.

20   Q    Did they ever ask you for it?

21   A    I don't recall.

22   Q    Do you have it with you today by any chance?

23   A    No, I don't.

24   Q    Did you prepare any reports that reflect any type of

25   observations you may have made on the evening of November 26,

1    2018?

2    A    No.

3    Q    Would it be fair to say that you're testifying from

4    memory about these specific details that you just told these

5    people about; right?

6    A    Yes.

7    Q    What time did you arrive in the vicinity of 2008 Hughes

8    Avenue?

9    A    Around 1900.

10   Q    If you could use civilian time?

11   A    A little after 7 p.m.

12   Q    And would it be fair to say that you weren't alone; there

13   were several other team members with you?

14   A    Yes.

15   Q    I'm going to read some names and you let me know if they

16   were there Lieutenant Smith?

17   A    Yes.

18   Q    Finbar Fleming, detective?

19   A    Yes.

20   Q    Detective Puskas, P-U-S-K-A-S?

21   A    Yes.

22   Q    Detective Chevere, C-H-E-V-E-R-E?

23   A    Yes.

24   Q    And Detective Tessitore, T-E-S-S-I-T-O-R-E; is that

25   right?

1  A    Yes.

2  Q    And how many cars -- when I say "cars" I mean police

3  cars, were used to take those members of the team up to that

4  location?

5  A    I'm estimating about six or seven cars.

6  Q    There's only six or seven guys?

7  A    There were members of the detective bureau as well.

8  Q    All the names I said you would agree were there, but

9  there were other people there also?

10 A    Correct.

11 Q    So as far as your memory goes, would you be able to tell

12 us some of those other people?

13 A    The members of the detective bureau I cannot, no.

14 Q    Was the detective bureau working with you or --

15 A    They were with another group.

16 Q    With respect to the Toyota that you described as a

17 champagne silver Toyota, was that car already there in the

18 vicinity of 2008 Hughes Avenue or did you see it arrive?

19 A    It was already there.

20 Q    Were you ever at that location before that evening, 2008

21 Hughes Avenue?

22 A    No.

23 Q    How would you describe the street; residential,

24 commercial?

25 A    Residential, five-story buildings.

1  Q    Was this car parked legally, parked on the street in

2  front of a house, would that be fair to say?

3  A    Correct.

4  Q    It was parked legally?

5  A    I believe it was parked legally.

6  Q    On the street, not in a driveway?

7  A    On the street I believe, yeah.

8  Q    And how -- who was in your car if you can remember that?

9  A    Just me.

10  Q    Was that true for the other members of the team too, was

11  it one guy per car or some had more than one?

12  A    Some had more than one.

13  Q    If you had to estimate the distance from your car to the

14  subject car, we'll say, what's the distance, like, from you to

15  me, from you to the back wall, a football field?  What would

16  you say?

17  A    I would say from me to you.

18         MR. FARRELL:  Your Honor, do we have an estimate of

19  that distance for the record, would you say?

20         THE COURT:  You're asking me or are you asking him?

21         In the sold days we used to measure the jury box.

22         MR. FARRELL:  The jury can see how far we are from

23  each other.

24         THE COURT:  We use car lengths.

25  BY MR. FARRELL:

1    Q    At least four or five car lengths, would that be fair to

2    say?

3    A    That would be fair to say.

4    Q    And you got there at 7 p.m. and the first person entered

5    the car at about what time?

6    A    It had to be about at least an hour and a half later.

7    Q    Were you in communication with other members of the team

8    during that hour and a half?

9    A    Yes.

10   Q    How so, radio?

11   A    Point-to-point radio.

12   Q    And during that hour and a half, did you personally go up

13   to that car and look inside it?

14   A    From my own vehicle, yes.

15   Q    From me to you, you couldn't really see inside the car at

16   night; right?

17   A    When we began the observation, I wasn't stagnant.  I was

18   moving around.

19

20              (Continued on the following page.)

21

22

23

24

25

1   CROSS EXAMINATION

2   BY MR. FARRELL:  (Continuing)

3   Q    So you got out of the car and walked around?

4   A    No.  I was moving around in the car and then at some

5   point --

6                THE COURT:  You were moving the car?

7                THE WITNESS:  I was driving to get observation on

8   the car and put myself in a particular place so I could

9   observe the car constantly.

10  Q    Did you get out of the car and go up to the windows and

11  look in?

12  A    No.

13  Q    Did any member of the team do that that you were able to

14  observe?

15  A    I couldn't tell you.  I could tell you that I did it from

16  my vehicle, my windows into the vehicle's windows.

17  Q    And all you could tell was that there were no noticeable

18  humans sitting in there; right?

19  A    Correct.

20  Q    You couldn't tell anything else from the car from that

21  advantage at that time?

22  A    The license plate that came over, I verified that, and

23  the air freshener that was hanging from the rearview mirror.

24  Q    So those were the two things, there were pretty good

25  things in terms of looking at the right car, right?  You saw

1    the air freshener and the license plate number matched the

2    license plate number you'd been given; correct?

3    A    Correct.

4    Q    Would you say that you were the closest car to the

5    subject car of the other members of your team or were there

6    any of the other guys closer than you?

7    A    I believe I was the closest.

8    Q    Now, prior to going out to this location, had you been

9    involved in the investigation into the robberies that we're

10   dealing with at this trial?

11   A    Somewhat, but not on the investigative side.  We spoke

12   about it in the office.

13   Q    For example, you hadn't seen any of the videos of the

14   actual robberies from the Duane Reade or the 7-Eleven or the

15   two Rite Aids, had you, when you were at Hughes Avenue?  You

16   hadn't seen any of those; right?

17   A    I think I may have seen some stills.  I think we put some

18   wanted stills out.

19   Q    You think?  You are not sure of that; right?

20   A    I haven't seen wanted posters for this.

21   Q    There were already wanted posters up by 7 o'clock at

22   night, is that what you're saying?

23   A    I believe there were freeze frames, yes.

24   Q    So you had some basic information about the case; right?

25   A    Yes.

Bryan - cross - Farrell                    308

1   Q    You didn't have any information about a young girl being

2   involved, did you?

3   A    No.

4   Q    Now, you say at one point at about 8:45, did I say that

5   time or did you say it?

6            What time did you see my client get into the car?

7   A    I would say I was observing over an hour and a half in

8   the area.

9   Q    And where did you say -- where, according to your memory,

10  did you see my client come from to get to that car?

11  A    I'm on 179th and Hughes and he came from behind my car.

12  Q    And he was walking by himself is your testimony?

13  A    Correct.

14  Q    Did you say on direct -- I might have -- was he wearing a

15  hat?

16  A    He was wearing a headdress.  When I say a headdress, I

17  couldn't make out it was.  Scrunched over with a hoody or he

18  had a large cap on his head.  I couldn't tell.

19  Q    Just for your eyes only, I am going to show you what has

20  been previously identified as Defendant's Exhibit A for

21  identification.  I think Mr. Villanueva will be able to put

22  that up so that only you can see it.

23           You know who that is; right?

24  A    Yes, I do.

25  Q    That's Elgin Brack; right?

Bryan - cross - Farrell                    309

1    A    Correct.

2    Q    Isn't true that that's how his hair was and that's how he

3    was dressed on the night of November 26, 2018?

4    A    When I observed him, it was -- it seems as though he had

5    something over his head.

6    Q    Okay.  Other than that, what you're claiming is some sort

7    of hat or headdress, would you agree that everything else is

8    substantially the same in terms of the jacket, the sweatpants,

9    the sweat jacket with the Adidas logo and the Adidas stripes?

10   A    With his positioning, he had a backpack over his right

11   shoulder, I seen a gray figure going into the car.  So I

12   wasn't making out all of these details that you are saying.

13   Q    So you can't say that the picture that you're looking at

14   now is necessarily the same guy you saw get into back seat?

15   A    It's the same guy, but the clothing, I didn't describe

16   the clothing with you.

17   Q    So you tell me then what clothing was he wearing that you

18   recall.

19   A    I actually seen gray clothing.

20   Q    You said obviously the backpack.  When you are saying

21   that, the guy was carrying a backpack?

22   A    Correct.

23   Q    Not a suitcase; correct?

24   A    Correct.

25   Q    Like a school backpack that college people use to take

1  their books to school; right?

2  A    Right.  A bookbag.

3  Q    Thanks.  The next person that entered the Solara came how

4  much after you say Elgin Brack was already sitting by himself

5  in the back seat?

6  A    Maybe five minutes, five to six minutes.

7  Q    Was that a layover between Brack going?

8  A    Yes.

9  Q    And Brack entered through the passenger side; right?

10  A    Correct.

11  Q    Did you see if he had a key to the car at all?

12  A    I couldn't tell that.

13  Q    Were you able to see what he was doing, if anything, in

14  the back seat from your vantage point in your car?

15  A    So the Toyota Solara is a two-door.  I seen him push the

16  seat up and crawl into the back seat.

17  Q    And you really couldn't see much else then; right?

18  A    From where I was, no.

19  Q    Who was the next person to go into the car?

20  A    A second male several minutes later, a male, six-foot,

21  slimmer build, he gets into the front seat.

22  Q    Okay.  Front driver or front passenger?

23  A    Front passenger.

24  Q    As you sit here today, do you know the name of that guy

25  that you just described?

1    A    Scott Brack.

2    Q    Are you guessing or you know?

3    A    No.  Scott Brack.

4    Q    So he walked by himself into the car, is that your

5    testimony?

6    A    Correct.

7    Q    And he's in there how long before the next person comes

8    in?

9    A    Maybe a few minutes later, three minutes, I would say at

10   the most, a car double parks parallel to the car.  Then I'm

11   unable to see the driver get in.  I don't get to see the

12   driver or the young girl get in.

13   Q    You never actually saw them get in the car?

14   A    The driver and the young girl, because the car is in

15   front of me now.  There's a double parked car in front of me.

16   Q    Okay.  Is it your testimony that they got out of that

17   double parked car to get into the Solara?

18   A    I have no idea.  I couldn't tell you.  I didn't see that.

19   Q    So you know that they got in there because the car

20   started moving, is that your testimony?

21   A    Correct.

22   Q    It started moving towards you, going in the same way or

23   going way from you?

24   A    Away from me, southbound.

25   Q    Okay.  So how far did the car go before it was stopped,

1   meaning the Solara?

2   A    Maybe three or four car lengths before we boxed it in.

3   Q    And opposite from -- not towards you, opposite from where

4   you were; right?

5   A    So, I believe 178th is the next block over and they

6   might've made it over to the intersection of 178th.

7   Q    Do you know the team that was able -- who stopped them?

8   A    So we used a blocker car, which is Keith Smith, to block

9   his car, Lieutenant Keith Smith.

10  Q    So he blocked the front and you came up right behind?

11  A    Correct.

12  Q    And you got out of your car; correct?

13  A    Correct.

14  Q    Gun drawn?

15  A    Yes.

16  Q    And you approached which side, the driver or passenger?

17  A    Driver.

18  Q    And you pulled out the guy that was in there; right?

19  A    Correct.

20  Q    That turned out to be Edward Vasquez?

21  A    Yes.

22  Q    Would you describe him as a dark-skinned Hispanic?

23  A    Yes.

24  Q    By the way, as your car was coming from the back and as

25  Lieutenant Smith acted as the blocker, you didn't see Elgin

Bryan - cross - Farrell                          313

1  Brack try to bolt out of the car, out of the Solara, right,

2  and run away?

3  A    No.

4  Q    And if you were involved with pulling Edward Vasquez out

5  of the car, who was involved with pulling Scott Brack out of

6  the car?

7  A    On the other side of the car I believe was Finbarr,

8  Detective Finbarr and Detective Puskus was on the other side.

9  Q    And they were doing that at about the same time that you

10 were pulling out Vasquez?

11 A    Yes.

12 Q    It's your testimony at the same time someone was pulling

13 out Elgin Brack too?  That's what you're saying?

14 A    We were pulling everyone out of the car at the same time.

15 Q    Are you -- I'm sorry.  Are you sure there wasn't some

16 delay before Elgin was pulled out of the back that you had Mr.

17 Vasquez and you had Scott Brack, who, by the way, were both

18 obviously older than Elgin Brack; correct?

19 A    Yes.

20 Q    There was no delay, is that your testimony?

21 A    There was no delay whatsoever.

22 Q    Was everyone handcuffed and patted down when they were

23 removed from the car as you recall?

24 A    Yes.

25 Q    Do you remember what, if anything, Edward Vasquez had on

1  his person when you patted him down?

2  A    I don't recall.

3  Q    There was no -- you don't recall any weapons being

4  recovered on Elgin Brack when he was out of the car; correct?

5  A    I was frisking my guy, which is Vasquez and he had no

6  weapons.

7  Q    Who was frisking Elgin Brack again?

8  A    I can only tell you what I did.  I pulled Vasquez out of

9  the car and I patted him down.

10 Q    So as you sit here --

11 A    Other members, as we approached the car, were

12 communicating together to make sure the car was clear.

13 Q    To be 100 percent sure, you don't know what member of the

14 team put his hands and pulled Elgin Brack out of the car?

15 A    I could see the other members on other side of the car

16 and I was on the opposite side of the car.

17 Q    And who dealt with the little girl?

18 A    The little girl was left in the car.

19 Q    Okay.  Was she crying because her father was outside

20 handcuffed?

21 A    She was fairly calm.

22 Q    She was calm.

23       When Mr. Selden was asking you how old she was, I

24 think he said was she under 12, she was like 4; right?

25 A    I believe five or six.

1   Q     So how long is everyone -- and when I say everyone, I

2   mean Edward Vasquez, Scott Brack, Elgin Brack, they're

3   standing out in front of the car that they were just driving

4   and handcuffed, where do they go from there?

5   A     We called over a marked van.  And we had them transported

6   in a marked van.

7   Q     Was that van there for that purpose or did you have to

8   get the van from somewhere else?

9   A     We got the van.  I believe the local precinct supplied us

10  with a van.

11  Q     And how long did it take before they got there?

12  A     Maybe two, three minutes.

13  Q     And these three adults, Scott, Elgin Brack, and Edward

14  Vasquez, were taken into the van?

15  A     Correct.

16  Q     How about the little girl?

17  A     The little girl may have went in someone else's car.  I

18  couldn't tell you.  I don't know.

19  Q     The car, the Solara, what was done with that?

20  A     That was driven back to 1250 Waters Place.

21  Q     And who did that?  Who drove it back?

22  A     I believe Detective Finbarr.

23  Q     Finbarr is his first name?

24  A     I'm sorry.  Detective Flemming, I apologize.

25  Q     Did he go with anyone or did he have the whole car to

1   himself?

2   A    I don't know.

3   Q    As you sit here today, you're pretty sure Edward Vasquez

4   didn't go in the car with him back to the station?

5   A    No.

6   Q    He gave up the keys, right, to Flemming?

7   A    I would imagine so.

8   Q    So you didn't look in the car as it was stopped?  You

9   didn't look in the back seat really, did you?

10  A    Absolutely, yes.

11  Q    You did?

12  A    Yes.

13  Q    Did you make any notes of anything you might have seen?

14  A    Physical notes, no.

15  Q    You've met with the members of the prosecution team other

16  than just today; right?

17  A    Yes.

18  Q    How many times do you think?

19  A    Maybe three.

20  Q    And because you don't have any notes, Detective Sergeant,

21  isn't it true that much of your testimony here is based on

22  talking to other members of the team during the meetings with

23  the prosecution, with the Government; isn't that right?

24  A    Just from my memory.

25  Q    It's just from your memory.

1          And wasn't one of the meetings on February 19th, a

2    couple of weeks ago, does that sound right?  February 19th of

3    this year?

4    A    We did meet this year, yes.

5    Q    And at that time, didn't you tell the group that at the

6    time of the arrest, the car, the subject car was occupied by

7    three African-American men and a young girl?  Do you recall

8    stating that, Detective Sergeant?

9    A    I don't recall that.

10         MR. FARRELL:  Could I have a minute to consult, Your

11   Honor?

12         THE COURT:  You may.

13         MR. FARRELL:  With the Court's indulgence, one or

14   two more questions.

15         I'm going to show just the witness, please, what has

16   been marked previously as Government Exhibit 322.

17   Q    Take a look at that, Detective Sergeant.

18   A    Go ahead.

19   Q    Is that what Elgin Brack was wearing when you say you saw

20   him enter the car?

21   A    I couldn't tell you.  It was dark gray clothing.

22   Q    It was dark gray clothing.  Did it have a hood?

23   A    Right.  I remember there was a headdress.  It was either

24   a hood or a large cap.

25   Q    You're not prepared to say this is what Elgin was

1   wearing?

2   A    No.

3           MR. FARRELL:  Thank you.  Nothing further.

4           Oh, wait.

5           THE COURT:  Thank you, Mr. Farrell.

6           MR. FARRELL:  I am getting the high sign here from

7   Mr. Stein.  If I could have one more minute.

8           THE COURT:  Certainly.

9           MR. FARRELL:  Last time, Judge, I think.

10          THE COURT:  I wouldn't hold you to it.

11          MR. FARRELL:  If Mr. Villanueva could show the

12  witness what has been previously marked as Government Exhibit

13  124.

14  Q    Do you see that picture, Detective?  Is it up there?

15  A    No.

16          MR. FARRELL:  124, please, Mr. Villanueva.  I'm

17  sorry, I need the Government's help.

18          MR. SELDEN:  You don't have it up there?

19          MR. FARRELL:  No.  Government Exhibit 124, please,

20  if we could have it, please, shown to the witness.

21          MR. SELDEN:  Of course.  Your brief indulgence, Mr.

22  Farrell.

23          MR. FARRELL:  Of course.  Thank you for your help.

24          MR. SELDEN:  Your Honor, may we have a brief sidebar

25  with regards to Government Exhibit 124?

Bryan - cross - Farrell                    319

1          THE COURT:  Yes.

2          MR. SELDEN:  Thank you very much.

3          (Sidebar held outside the hearing of the jury.)

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                          320

1          (The following occurred at sidebar.)

2          MR. FARRELL:  I will have Mr. Stein argue this even

3     though it's my witness.

4          MR. SELDEN:  Far be it for me to step in Mr. Stein's

5     shoes.  If you have an argument would like to make now.  I

6     think he probably suspects the Government is going to object

7     based on the fact that this witness has said he can't recall

8     specifically what Mr. Elgin Brack was wearing and he has been

9     asked that now three times on cross-examination.

10          If the attempt through 124 is to provide a fourth

11     time, we would respectfully object.  This is a photograph,

12     Your Honor, for the record, of Scott Brack, and the reality is

13     that if it's about Elgin Brack and what he is wearing, I don't

14     think that it's irrelevant for Elgin Brack to be shown a

15     photograph of Scott Brack if that's what they are trying to

16     refresh with a picture of someone else.

17          MR. STEIN:  Judge, this witness has been a police

18     officer for 27 years.  He has made thousands and thousands of

19     observations.  He made no notes whatsoever.  What I believe

20     has happened here is this witness, if I am correct, would

21     throw his testimony into complete doubt.  I think what he has

22     done is he has mistaken, based on the clothing description,

23     Scott Brack for Elgin Brack.

24          Elgin Brack, he showed him the picture, Mr. Farrell

25     showed him the picture of what Elgin Brack was wearing, which

Sidebar                    321

1   is a running outfit with stripes down the side.  He says he

2   doesn't remember that.  The pictures of Scott Brack fit the

3   description that this witness gave of the person that he saw

4   get into the rear passenger seat.

5        THE COURT:  I will let you lay a foundation.  You

6   can ask him, since he mentioned Scott Brack, to describe what

7   Scott Brack was wearing.

8        MR. FARRELL:  Okay.

9        MR. SELDEN:  Your Honor, here's the challenge:  They

10  just actually showed him Scott Brack's sweatshirt, which is

11  contained we believe in part in Government Exhibit 124 and he

12  said he didn't recall it.  If I may, Mr. Stein.

13       MR. STEIN:  Sure.

14       MR. SELDEN:  And the reality here is that -- I

15  understand Mr. Stein made some allusion to throwing his

16  testimony in terms of this particular exhibit.

17       MR. STEIN:  I don't know what that means, throwing

18  his testimony.

19       MR. SELDEN:  We're trying to create the narrative

20  that if that sweatshirt that was shown to the witness didn't

21  refresh his recollection, the witness has been asked three

22  separate times what Elgin Brack was wearing.

23       This is simply an attempt to bring in a photograph

24  of someone else that doesn't have any relevance.  So I think

25  at this point we would object to continuing to show picture

Sidebar                                              322

1   after picture.

2          THE COURT:  I am not going to let him show picture.

3   I am going to ask him.

4          MR. STEIN:  He hasn't seen this picture.  He sees

5   this and he sees this and he recognizes Scott Brack, that

6   could change his testimony.

7          MR. SELDEN:  No. He actually identified Elgin Brack

8   based upon specifically on his long dreadlocks, which is not

9   at all apparent from this Exhibit 124.

10          MR. STEIN:  I'm talking about his observations of

11   people getting into the car.

12          THE COURT:  Okay.  I will let Mr. Farrell ask him,

13   since he gave the description of what Mr. Elgin Brack was

14   wearing, can he give us a description of what Mr. Scott Brack

15   was wearing.  If there is further inquiry after that, we will

16   come back and have another sidebar.

17          MR. SELDEN:  Absolutely.

18          MR. STEIN:  Correct.

19          (Sidebar concluded.)

20

21

22

23

24

25

Bryant - cross - Farrell                    323

1              (In open court.)

2    BY MR. FARRELL:

3    Q    Detective Sergeant, I am going to switch over to Scott

4    Brack, the guy you identified as getting into the front

5    passenger seat.  Can you tell the jury what he was wearing?

6    A    He's a little taller, slimmer.  He was wearing darker

7    clothes.  I couldn't tell you specifically the articles.

8    Q    Anything covering his head?

9    A    I don't remember either/or.

10   Q    If you saw a picture, do you think it might help refresh

11   your recollection of what he was wearing?

12   A    It might.

13         MR. FARRELL:  Then I'd asked, Judge, finally, last

14   one, to show him for that limited purpose.

15         THE COURT:  For the limited purpose of refreshing

16   his recollection as to what Scott Brack was wearing.

17         MR. FARRELL:  Thank you.

18         THE COURT:  124, is that it?

19         MR. FARRELL:  That's it, Judge.

20         THE COURT:  I will allow for the witness only to see

21   if that refreshes his recollection as to what Mr. Scott Brack

22   was wearing.

23   Q    Can you see it?

24   A    No, I can't.

25   Q    Take a look now, Detective Sergeant Bryan.

1           Having seen that photo, does it refresh your

2    recollection as to what Scott Brack was wearing?

3    A    Aside from the dark clothing, specifically, no.

4    Q    Can you say it's this dark clothing?

5    A    No, I cannot.

6    Q    Okay.  Thanks for trying.

7           MR. FARRELL:  Nothing further.

8           THE COURT:  Okay.  Thank you, Mr. Farrell.

9           Mr. Selden, any redirect?

10          MR. SELDEN:  Very briefly, Your Honor.

11   REDIRECT EXAMINATION

12   BY MR. SELDEN:

13   Q    Detective Sergeant, do you recall the line of

14   cross-examination by Mr. Farrell with regards to the amount of

15   time before you had the three men, including the defendant,

16   Elgin Brack, Scott Brack and Mr. Vasquez removed from the

17   inside of the car?  Why would you have done it as quickly as

18   you did?

19   A    Because of the danger of being shot.

20   Q    Can you expand upon that a little bit more?

21          MR. FARRELL:  Objection.

22          THE COURT:  I am going to allow it.

23   A    It's a felony car stop --

24          THE COURT:  What the police practice would be,

25   police procedure.

1   A    It's a felony car stop.  We believe the car is involved

2   in a shooting and we would act very, very quickly.

3           MR. SELDEN:  No further questions.  Thank you, Your

4   Honor.

5           THE COURT:  Mr. Farrell, any recross?

6           MR. FARRELL:  Nothing based on that, Judge.  Thank

7   you.

8           THE COURT:  Detective Sergeant Bryan, thank you very

9   much.  You are excused.

10          THE WITNESS:  Thank you.

11          (Witness is excused.)

12          THE COURT:  Ladies and gentlemen, that brings us to

13  our mid-afternoon break.  We are going to take that

14  mid-afternoon break.  It will give you a chance to go back and

15  refresh.  Again, the most important instructions are don't

16  discuss the case amongst yourselves or with anyone else.

17  Continue to keep an open mind and we will see you in about 15

18  minutes or so.

19          (Recess taken.)

20          (Jury exits the courtroom.)

21          THE COURT:  Mr. Selden, do you have another witness

22  for us?

23          MR. SELDEN:  We do.  We have one here and we will be

24  ready after the mid-afternoon break.  Thank you, Your Honor.

25          THE COURT:  I made an assumption there that I

1  probably should have asked you.

2          Anything else?

3          MR. SIEGEL:  Our next witness is going to be

4  Detective Nunzio.  He has a number of physical exhibits.  With

5  the Court's permission, I would like to set them up behind him

6  so I don't have to walk back and forth each time I want to

7  hand him something.

8          THE COURT:  You are getting tired, young man?

9          MR. SIEGEL:  I think the jury is getting tired of me

10 walking back and forth.

11         THE COURT:  You can.

12         MR. SELDEN:  Thank you, Your Honor.

13         (Brief recess.)

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; outside the presence of the jury.)

2          THE CLERK:  Court is back in session.

3          Counsel for both sides present including defendant.

4          THE COURT:  Ready to go?

5          MR. SELDEN:  Your Honor, on behalf of the

6    government, we are ready to proceed.  We wanted to alert to

7    the Court and Mr. Villanueva, we've already notified the

8    marshals that we have a firearm that's been made safe but just

9    so that Your Honor and Mr. Villanueva know that part of the

10   some of the evidence now will include a firearm.

11         THE COURT:  Thank you for the forewarning.

12         MR. SELDEN:  Of course, Your Honor.

13         THE COURT:  I see Mr. Siegel has his rummage sale

14   ready to go.  So with that, we'll find the jury and invite

15   them to the party.

16         (Jury enters.)

17         THE COURT:  Be seated, please.

18         Counsel will stipulate that the jury is present and

19   properly seated.

20         MR. STEIN:  Yes, Judge.

21         MR. SELDEN:  On behalf of the government, yes.

22   Thank you, Your Honor.

23         THE COURT:  Thank you, Counsel.

24         Ladies and gentlemen, welcome back.  We've been in

25   the courtroom a little bit but we're ready to go.

1           Mr. Siegel?

2           MR. SIEGEL:  Your Honor, the government calls

3    Detective Thomas Nuzio.

4           THE CLERK:  Raise your right hand.

5           (The witness is duly sworn/affirmed by clerk.)

6           THE CLERK:  Please state your first and last name

7    and spell it for the record.

8           THE WITNESS:  Thomas Nuzio, T-H-O-M-A-S, N-U-Z-I-O.

9           THE CLERK:  All right.  Thank you.  Please have a

10   seat.

11          THE COURT:  Mr. Siegel, you may inquire.

12          MR. SIEGEL:  Thank you, Your Honor.

13   DIRECT EXAMINATION

14   BY MR. SIEGEL:

15   Q    Sir, where do you work?

16   A    I'm in the New York City/ATF joint robbery task force.

17   Q    What is the New York City/ATF joint robbery task force?

18   A    We are a group consisting of detectives of New York City

19   Police Department and agents from the ATF and we investigate

20   various Hobbs Act robberies.

21   Q    Is that team also called SPARTA?

22   A    Yes.

23   Q    And are you on the ATF side or on the NYPD side?

24   A    NYPD.

25   Q    What is your rank with the NYPD?

Nuzio - direct - Siegel                        329

1   A    A detective.

2   Q    How long have you been with the NYPD for?

3   A    About 13 and a half years.

4   Q    Let me direct your attention to November 26, 2018.  Were

5   you working that day?

6   A    Yes.

7   Q    At the time, were you a member of Sparta?

8   A    No.

9   Q    Where did you work at the time?

10  A    I was in the Queens robbery squad.

11  Q    What happened that day?

12  A    A short time after I had gone in for my shift, one of the

13  detectives in my office received a phone call that an arrest

14  was made up in the Bronx at the ATF office and that he was

15  heading up there.

16  Q    And what did you do?

17  A    I inquired if he needed any assistance and he said yes,

18  to the come along for the ride.

19  Q    Before that, had you had any involvement in the case that

20  your colleague was working on?

21  A    No, not that I recall.

22  Q    Did you know anything about the case?

23  A    I had found out that there was a spree of robberies the

24  night before.

25  Q    What was the name of this colleague?

1  A     Detective Bravo.

2  Q     Did you go with Detective Bravo to the ATF office in the

3  Bronx?

4  A     Yes.

5  Q     And when you got there, did you help with anything?

6  A     Yes.

7  Q     What is it that you helped with?

8  A     I had -- I helped conduct a search of the vehicle.

9  Q     Where was this vehicle?

10  A     It was parked in the parking garage of the ATF office.

11  Q     Is that a secure location?

12  A     Yes.

13  Q     Was anyone else there with you during the search?

14  A     Yes.

15  Q     Who else was there?

16  A     Special Agent Gest and group supervisor Andrew Voss.

17  Q     Were there other people there as well?

18  A     Yes.

19  Q     Do you know their names?

20  A     No.

21  Q     So I am handing you a CD with Exhibits 105-A to 105-C,

22  304-C, 304-D, 305-B, 305-C, 305-D, 305-E, 307-D, 307-C, 308-B,

23  308-C, 308-D, 308-E and 308-H.

24         Detective Nuzio, do you recognize that CD?

25  A     Yes.

1   Q    How do you recognize that CD?

2   A    I had signed and dated it.

3   Q    Had you reviewed the files on the CD?

4   A    Yes.

5   Q    What are the files on that CD?

6   A    They are pictures of the search of the vehicle.

7   Q    Are there any files on there in addition to pictures?

8   A    Yes.

9   Q    What other files are there?

10  A    There are live photos.

11  Q    What is a live photo?

12  A    It's a picture that can be taken, like, on an iPhone

13  where it, I guess, extends the picture a second or two to make

14  it, like, almost like a small movie, I guess.

15  Q    Are the pictures and live photos on that CD --

16         MR. STEIN:  I'm sorry.  They're having a

17  conversation together and he's talking away from the

18  microphone so maybe he can talk into the microphone.

19         THE COURT:  Detective, talk right into the mic.  And

20  Jonathan Siegel, keep your voice up,

21         MR. SIEGEL:  And Mr. Stein, do you want him to

22  repeat his answer on what the live photo was?

23         MR. STEIN:  I'm okay.

24  Q    Are the pictures and live photos on that CD fair and

25  accurate depictions of what you saw on the search?

1   A    Yes.

2           MR. SIEGEL:  Your Honor, I move to admit the

3   exhibits that were on the CD that I read that are written on

4   the CD itself.

5           THE COURT:  Mr. Stein?

6           MR. STEIN:  No objection, Judge.

7           THE COURT:  No objection.  Received in evidence

8   without objection.

9           Again, Mr. Siegel, the CD itself does not have a

10  separate identification, right?

11          MR. SIEGEL:  The CD itself does not have a separate

12  identification.  It has Detective Nuzio's signature and a list

13  of exhibits on it.

14          (Exhibits 105-A to 105-C, 304-C, 304-D, 305-B,

15  305-C, 305-D, 305-E, 307-D, 307-C, 308-B, 308-C, 308-D, 308-E

16  and 308-H so marked.)

17  Q    So let me start out by showing you Government

18  Exhibit 105-A which is now in evidence.  What is Government

19  Exhibit 105-A?

20  A    It's a picture of the vehicle that was searched.

21  Q    I'm now showing you Government Exhibit 105-B.  What is

22  Government Exhibit 105-B?

23  A    That's a picture of the front of the vehicle.

24  Q    What is the license plate number for this vehicle?

25  A    It's New York plate HYC8724.

Nuzio - direct - Siegel                      333

1   Q    And in the windshield of this vehicle, there's something.

2   What is that?

3   A    It appears to be an air freshener.

4   Q    And Detective Nuzio, I'm now showing you Government's

5   Exhibit 105-C.  What is 105-C?

6   A    It's a picture of the rear of the vehicle.

7   Q    Is the license plate on the rear the same as the license

8   plate on the front?

9   A    Yes.

10  Q    And what kind of car is this?

11  A    It's a Toyota Solara.

12  Q    Is there a particular item that you were responsible for

13  searching from the car?

14  A    Yes.

15  Q    What item was that?

16  A    It was a backpack.

17  Q    I'm showing you Government Exhibit 304-C.  Do you

18  recognize Government Exhibit 304-C?

19  A    Yes.

20  Q    What is that?

21  A    That is the backpack that I searched.

22  Q    Where was it when you performed the search?

23  A    On the hood of the vehicle.

24  Q    When you began the search, was the backpack open or

25  closed?

1   A    It was closed.

2   Q    And did you wear gloves when you searched the backpack?

3   A    Yes.

4   Q    Why did you wear gloves?

5   A    Just to not contaminate any evidence.

6   Q    What kind of contamination were you concerned about?

7   A    Just not putting like my DNA on it.

8   Q    Did you open the backpack?

9   A    Yes.

10  Q    I'm showing you Government Exhibit 304-D.  What is

11  Government Exhibit 304-D?

12  A    That's the backpack unzipped.

13  Q    And is that how the backpack looked when you initially

14  unzipped it?

15  A    Yes.

16  Q    What was in the backpack?

17  A    Several clothing items.

18  Q    And how tightly packed was this backpack?

19  A    It was tightly packed.

20  Q    So the clothes that are shown in 304-D, did you take

21  those clothes out?

22  A    Yes.

23  Q    So I want to talk about some of the clothes that you took

24  out of the bag.

25          I'm showing you Government Exhibit 305-B.  What is

1   Government Exhibit 305-B?

2   A    It's a picture of some clothing and other items that were

3   removed from the bag.

4   Q    And I'm showing you Government Exhibit 305-E.  What is

5   Government Exhibit 305-E?

6   A    Those are other items of clothing that were removed from

7   the bag.

8   Q    Can you describe those articles?

9   A    There's a yellow shirt and multi-colored pair of

10  underwear, it looks like.

11  Q    And now I'm showing you Government Exhibit 307-B.  What

12  is Government Exhibit 307-B?

13  A    It's a pair of jeans with a belt on it.

14  Q    Where did you find those jeans?

15  A    Inside of the backpack.

16  Q    And now just putting Government Exhibit 307-B on the left

17  side of the screen and I want to put Government Exhibit 304-D

18  on the right side of the screen.

19          Is it possible to see a piece of these jeans or that

20  belt in 304-D?

21  A    Yes.

22  Q    Where do you see that?

23  A    I see them on the right-hand side here, the brown belt,

24  right in that area.  (Indicating.)

25  Q    Is that the belt that's currently in those black jeans in

1  307-B?

2  A    Yes.

3          MR. SIEGEL:  So for the record, he circled a brown

4  belt with a double set of pulls in it shown in 304-D.

5  Q    After you pulled the clothes out of the bag, did you find

6  anything else?

7  A    Yes.

8  Q    What did you find in the bag?

9  A    A firearm.

10 Q    Were there other items in there in addition to the

11 firearm?

12 A    Yes.

13 Q    I'm showing you Government Exhibit 308-B.  What is

14 Government Exhibit 308-B?

15 A    It's a picture of the backpack open.

16 Q    And the firearm you mentioned, is it possible to see that

17 in this picture?

18 A    It is.  It is tough to see it in this picture but yes,

19 you can see it.

20         MR. SIEGEL:  So, Mr. Villanueva, if you would dim

21 the lights for this one.

22 Q    Detective Nuzio, could you circle where it is that you

23 see a firearm in this picture?

24 A    (Witness complies.)

25         MR. SIEGEL:  For the record, he has circled a dark

1  spot toward the center of the picture and I'm going to try

2  blowing up that area.

3  Q    Can we get any details on that firearm?

4  A    It appears to be a piece of the, piece of the cylinder

5  and a piece of the handle.

6  Q    I'm going to now show you Government Exhibit 308-E.  What

7  is Government Exhibit 308-E?

8  A    That's a picture, closer up picture of the inside of the

9  bag.

10  Q    Are you able to see the firearm you mentioned in this

11  picture?

12  A    Yes.

13  Q    Could you circle where you see that?

14  A    (Witness complies.)

15          MR. SIEGEL:  And he has circled a brown and black

16  item in the center of the photo.

17  Q    Can you describe any details that you see of that

18  firearm?

19  A    Again, you can see a piece of the cylinder and the brown

20  handle and it looks like there's some sort of insignia on top

21  of the handle.

22          MR. SIEGEL:  Mr. Villanueva, you can turn the lights

23  back on.

24  Q    And I may have asked this but I just wanted to be clear

25  if I forgot.  Where was this firearm in relationship to all

1    those clothes?

2    A    They were underneath.

3    Q    So what do you do with this firearm after you found it in

4    the backpack?

5    A    I notified everybody surrounding me that there was a

6    firearm.  It was then deemed that we take it upstairs.  It was

7    made safe and packaged properly.

8    Q    What does it mean to make a firearm safe?

9    A    Basically to remove any ammunition so that the firearm

10   cannot be fired.

11   Q    Was there any ammunition in the firearm?

12   A    Yes.

13   Q    What was in the firearm?

14   A    There was three fired rounds and three live rounds.

15   Q    And what's the distinction between a fired round and a

16   live round?

17   A    A fired round would be, I guess, a shell casing, would be

18   compared to a shell casing.  It's only the cartridge that's

19   left.  A live round has got the bullets still attached to the

20   cartridge.

21   Q    And you said you packaged the firearm?

22   A    Yes.

23   Q    How did you package it?

24   A    It was placed into a paper bag.

25   Q    Why did you put it into a paper bag?

Nuzio - direct - Siegel                                        339

1   A     From my training in the Police Department, I was always

2   told to put DNA evidence in a paper bag.

3   Q     And what do you do with the three live cartridges and the

4   three fired rounds?

5   A     They were also placed inside the bag.

6   Q     Did you ever touch either the firearm or any of those

7   cartridges or shell casings without wearing gloves?

8   A     No.

9   Q     After you packaged those items in a paper bag, what did

10  you do with them?

11  A     They were brought down to the lab and I vouchered them.

12  Q     And when you vouchered them at the lab, how did you

13  package them at the lab?

14  A     The firearm was secured in a white box with a zip tie so

15  that it can't be moved and the rounds were placed separately

16  in plastic bags.

17  Q     How many plastic bags?

18  A     There was two.

19  Q     And how do you divide the rounds?

20  A     There was fired and live rounds.

21  Q     And did you seal those plastic bags?

22  A     Yes.

23  Q     And where did those plastic bags go?

24  A     They went inside the box with the firearm and then

25  sealed.

1    Q    Did you put any markings on that box?

2    A    Yes.

3    Q    What markings did you put on them?

4    A    I signed the seal.

5    Q    I want to go back to the pictures for a moment.

6         In 308-E --

7              MR. SIEGEL:  And I'm sorry, Mr. Villanueva, if you

8    could dim the lights again.

9    Q    -- to the left of what you identified as the firearm,

10   there is a brown rectangular object.  What is that?

11   A    That's a wallet.

12   Q    Are there any markings on that wallet?

13   A    There's writing in the lower corner of it.

14   Q    I'm showing you Government Exhibit 308-B again.  Are you

15   able to see that wallet in this picture?

16   A    Yes.

17   Q    Could you circle where you see that wallet?

18   A    (Witness complies.)

19             MR. SIEGEL:  Let the record reflect he has circled a

20   brown rectangle in the backpack.

21             Mr. Villanueva, you can turn the lights back on.

22   Thank you.

23   Q    I'm going to walk over to hand you Government

24   Exhibit 317.  I'm going to show it to defense counsel too.

25             Just to start with the packaging, do you recognize

1   the packaging that Government Exhibit 317 is in?

2   A    No.

3   Q    What about the contents, do you recognize the contents?

4   A    Yes.

5   Q    What do you recognize that as?

6   A    This is the brown wallet that was in the backpack.

7   Q    And how do you recognize it?

8   A    It has the same writing on the bottom corner.

9   Q    Could you open up the wallet to look at the contents?

10  A    (Witness complies.)

11  Q    Do you recognize the contents at all?

12  A    Yes.

13  Q    Does the wallet appear to be in substantially the same

14  condition as it was when you found it in the backpack?

15  A    To my knowledge, yes.

16  Q    Does it appear to be that way to you?

17  A    Yes.

18          MR. SIEGEL:  Your Honor, I move to admit Government

19  Exhibit 317.

20          MR. STEIN:  We'd like to voir dire, please.

21          THE COURT:  Certainly, Mr. Stein.

22          MR. STEIN:  I'm going to approach the witness.  I

23  want to see the package again.

24          THE COURT:  Surely.

25          (Pause.)

1   VOIR DIRE EXAMINATION

2   BY MR. STEIN:

3   Q    Okay.  Detective Nuzio, you said there was something you

4   did not recognize.  What was that?

5   A    I'm sorry?

6   Q    When Mr. Siegel was asking you some questions about that

7   item, you said there was something you didn't recognize.  What

8   was that?

9   A    The package, the bag.

10  Q    The plastic bag that I was just looking at?

11  A    Yes, sir.

12  Q    Okay.  And what is that bag just in general, what is it?

13  A    It appears to be a property evidence bag.

14  Q    That's used by the New York City Police Department?

15  A    No, sir.

16  Q    Used by ATF?  You don't know?

17  A    I do know now.

18  Q    Okay.  And what do you understand it to be?

19  A    It's a property envelope.

20  Q    From what law enforcement agency?

21  A    From the ATF.

22  Q    Okay.  And you are not with the ATF, correct?

23  A    I am now.

24          THE COURT:  Are you employed by the ATF or the NYPD?

25          THE WITNESS:  I'm employed by the NYPD.

1   Q    I'm sorry.  Back on November 26, 2018, you were not?

2   A    Correct.

3   Q    Okay.  So there's a number of entries on the outside of

4   that envelope, correct?

5   A    There's writing on it.

6   Q    Is any of that yours?

7   A    No.

8   Q    And just from your experience as a police officer and a

9   detective, would you agree that those, the writing on the

10  outside of the envelope, that those are entries or writings

11  that were made so that a record of the custody of the contents

12  of that plastic bag can be created?

13  A    You're asking if that's what I understand --

14  Q    Correct.

15  A    -- them to be?

16  Q    Yes.

17  A    Yes.

18  Q    And none of that is yours, correct?

19  A    No.

20  Q    So when you have testified that you saw the wallet, a

21  wallet inside the backpack, did you physically remove that

22  backpack, that wallet from the backpack?

23  A    Yes.

24  Q    And what did you do with it when you removed it?

25  A    It was given to Special Agent Miceli.

Nuzio - voir dire - Stein                                    344

1    Q    Okay.  And you don't know what he did with it after that,

2    correct?

3    A    No, sir.

4    Q    And did you make any markings yourself on the wallet

5    itself -- excuse me.

6         Did you make any markings on the wallet itself, a

7    sticker or anything like that, to identify it by yourself?

8    A    No, sir.

9    Q    And before today, have you seen that item other than

10   November 26th, 2018?

11   A    Yes.

12   Q    And did you see that in the offices of the prosecutors?

13   A    Yes.

14   Q    And that was recently?

15   A    Yes.

16         (Continued on next page.)

17

18

19

20

21

22

23

24

25

Sidebar                                                        345

1          MR. STEIN:  Judge, unless and until we have

2    Agent Miceli's testimony, I assume he'll be testifying, I

3    object to the admission of this.

4          MR. SIEGEL:  Your Honor, to the extent it's an

5    objection to the packaging with the entries on it, we're happy

6    to admit it without the packaging, but in terms of the wallet

7    itself, he says he recognizes the wallet, he recognizes it to

8    be in substantially the same condition as when he found it, so

9    that lays the foundation for him to admit the wallet.

10         MR. STEIN:  Judge, it's all one to me.  It's one

11   exhibit, the envelope.  The purpose of the envelope is to

12   create a record of it and you cannot in my view distinguish

13   the envelope and the contents of the envelope in terms of its

14   admissibility at this time.

15         THE COURT:  Let me hear you at sidebar.  I want to

16   see where we're going otherwise.

17         (The following occurred at sidebar.)

18         MR. SIEGEL:  So, Your Honor, he testified that --

19         THE COURT:  I don't want to make an unnecessary

20   ruling.  Anybody's signatures on there, are they actually

21   coming in here?

22         MR. SIEGEL:  Detective Miceli is going to come in.

23         THE COURT:  So subject to connection.

24         MR. SIEGEL:  So the wallet can come in and the bag

25   subject to connection.  Detective Miceli will be here shortly.

                              Sidebar                           346

1            MR. STEIN:  My objection is -- okay.  Fair enough,

2    Judge, subject to connection.

3            THE COURT:  Yes, subject to connection.

4            MR. SIEGEL:  Special Agent Miceli.

5            THE COURT:  Yes, he can complete the chain of

6    custody.

7            (Sidebar conference ends.)

8            (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Ladies and gentlemen, I will admit the

2    wallet subject to connection.

3          That's one of those legal expressions that we hear.

4    Basically what that means is there's another piece that's

5    necessary to complete the technical offer of the evidence to

6    the court.  You can't have everything here at the same time so

7    sometimes for purposes of an orderly presentation of evidence,

8    the Court will take something subject to connection.  If the

9    connection isn't ultimately made, then the testimony and the

10   exhibit get stricken but for now, it's received subject to

11   connection.

12          That's 317?

13          MR. SIEGEL:  Yes, Your Honor.

14          THE COURT:  Exhibit 317, subject to connection.

15          (Government Exhibit 317 so marked.)

16          MR. SIEGEL:  I'm going to come and get the wallet.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

Nunzio - direct - Siegel                           348

1    (continuing.)

2             MR. SIEGEL:  Mr. Villanueva, on could I please have

3    the ELMO?  I'm showing Government Exhibit 317.

4             (Exhibit published.)

5    DIRECT EXAMINATION  (Continued)

6    BY MR. SIEGEL:

7    Q    Could you circle where on this you saw the writing that

8    you referred to?

9    A    (Witness complies.)

10            MR. SIEGEL:  Let the record reflect he has circled

11   bold or yellow colored writing on the lower right-hand corner

12   of the wallet.

13   BY MR. SIEGEL:

14   Q    I'm going to open this wallet up.  Is there any

15   identification in this wallet?

16   A    Yes.

17   Q    What identification is there?

18   A    It looks like an identification card, Elgin Brack.

19   Q    I'm going to take it out for a moment.  Is there a

20   picture with the identification card?

21   A    Yes.

22            MR. SIEGEL:  I'm zooming in the ELMO to the picture

23   of Mr. Brack on the identification card.

24   Q    I would like to now go through some of the physical

25   evidence.  Behind you or next to you is a bag labeled

1    Government Exhibit 304.  Could you pick that up and examine

2    it?  That should be on the far left.  Starting with the

3    packaging, do you recognize that packaging?

4    A    Yes.

5    Q    How do you recognize the packaging?

6    A    It has my signature on the seal.

7    Q    What is that packaging?

8    A    It is a voucher.

9    Q    What is the bag itself?

10   A    I'm sorry.

11   Q    Is that an evidence bag?

12   A    Yes, it is.

13   Q    What's inside the evidence bag?

14   A    It's a backpack.

15   Q    Do you recognize that backpack?

16   A    Yes.

17   Q    How do you recognize the backpack?

18   A    This is the backpack that I vouchered.

19   Q    Is that the backpack that we talked about you searching?

20   A    Yes.

21   Q    Does it appear to be in substantially the same condition

22   as it was when you searched it?

23   A    Yes.

24        MR. SIEGEL:  Your Honor, I move to admit Government

25   Exhibit 304.

1          MR. STEIN:  No objection.

2          THE COURT:  Received.

3          (Government Exhibit 304 received in evidence.)

4    BY MR. SIEGEL:

5    Q    Sergeant Nunzio, could you hold that backpack up so the

6    ladies and gentlemen of the jury can see it?

7    A    (Witness complies.)

8    Q    Set that aside and turn to Government Exhibit 305.

9    Starting with the packaging, do you recognize that packaging?

10   A    No.

11   Q    Do you recognize the contents?

12   A    Yes.

13   Q    What is the contents?

14   A    Two pairs of jeans that I recall.  There's a yellow

15   T-shirt that I recall and there are two sandals that I don't

16   remember.

17   Q    So putting aside the sandals for a moment, the yellow

18   shirt and those two pairs of jeans where, do you recall them

19   from?

20   A    From inside the backpack.

21   Q    Do they appear to be in the same condition substantially

22   as they were when you found them inside the backpack?

23   A    Yes.

24   Q    Your Honor, I move to admit Government Exhibit 304

25   subject to connection?

1           THE COURT:  I think this is 305.

2           MR. STEIN:  No objection.

3           THE COURT:  Received, subject to connection.

4           (Government Exhibit 305 received in evidence.)

5  BY MR. SIEGEL:

6  Q    Could you hold those jeans up one at a time for the jury?

7  A    (Witness complies.)

8  Q    Would you please hold up the yellow T-shirt?

9  A    (Witness complies.)

10 Q    Set Government Exhibit 305 aside and look at 307, so

11 skipping over one.  Starting with the packaging, do you

12 recognize Government Exhibit 307?

13 A    Yes.

14 Q    How do you recognize that packaging?

15 A    It has my signature on the seal.

16 Q    And what is inside of that?

17 A    It's a pair of black jeans with a brown belt.

18 Q    Do you recognize those black jeans with the brown belt?

19 A    Yes.

20 Q    Where do you recognize them from?

21 A    From the backpack.

22 Q    Did you find those jeans inside the backpack?

23 A    Yes.

24 Q    Are they essentially in the same condition as when you

25 found them in the backpack?

Nunzio - direct - Siegel                    352

1    A    Yes.

2          MR. SIEGEL:  Your Honor, I move to admit Government

3    Exhibit 307.

4          THE COURT:  Mr. Stein?

5          MR. STEIN:  No objection.

6          THE COURT:  Received.

7          (Government Exhibit 307 received in evidence.)

8    BY MR. SIEGEL:

9    Q    Would you show everyone those jeans one more time?

10   A    (Witness complies.)

11   Q    I'm going to walk up and show you Government Exhibit 308

12   which is a large plastic package in four parts.

13          (Counsel approaches.)

14          MR. SIEGEL:  Your Honor, I would like to inquire

15   with the witness standing near him.

16          THE COURT:  Speak up.

17   BY MR. SIEGEL:

18   Q    So I am starting -- as I said, this plastic package has

19   four parts.

20          THE COURT:  Are these independent compartments?

21          MR. SIEGEL:  They are independently sealed

22   compartments in a sealed package.

23   BY MR. SIEGEL:

24   Q    In the top sealed compartment what do you see?

25   A    A voucher.

Nunzio - direct - Siegel                                    353

1    Q    Do you recognize it?

2    A    Yes.

3    Q    How do you recognize it?

4    A    It has my name on it.

5    Q    What is it a voucher for?

6    A    A firearm and ammunition.

7    Q    Is that the voucher for the firearm that you took to the

8    police lab that night?

9    A    Yes.

10   Q    I'm showing you the second sealed package.  Do you

11   recognize that?

12   A    Yes.

13   Q    What do you recognize it as?

14   A    That's the firearm that I vouchered that night.

15   Q    Does it appear to be in substantially the same condition

16   as it was when you found it?

17   A    Yes, minus the red lock on it.

18   Q    What is the red lock that you're describing?

19   A    It's going through the barrel so that it can't be fired.

20            THE COURT:  You add the red lock -- does someone add

21   the red lock?

22            MR. SIEGEL:  The red lock was added to bring it into

23   the courtroom.

24   BY MR. SIEGEL:

25   Q    Moving on to the third sealed package, do you recognize

                         SN      OCR      RPR

1   the items in that third sealed package?

2   A    I recognize the envelopes.

3   Q    And what do you recognize the envelopes as?

4   A    Those are the envelopes that the ammunition was placed

5   in.

6   Q    Remind us what ammunition you're referring to.

7   A    The three live rounds and the three fired casings.

8   Q    In this package there's also two pieces of metal, what

9   are those?

10  A    It appears to be there's a live round.  It looks to be a

11  bullet and a casing.

12  Q    Are those consistent with the live rounds that you

13  packaged?

14        MR. STEIN:  Judge, I'm sorry.  I don't know if this

15  witness is qualified to say that.

16        THE COURT:  The question is -- the first question is

17  did he put them in there.

18        MR. STEIN:  I'm not objecting to that.

19        THE COURT:  Well --

20        MR. STEIN:  I'm objecting to the last question.

21        THE COURT:  I sustained your objection to the last

22  question until I get an answer to the first question.

23  BY MR. SIEGEL:

24  Q    Well, did you put any of these items in this plastic

25  packaging?

1    A    No.

2         THE COURT:  Did you voucher all of the items that

3    are in the plastic?

4         THE WITNESS:  Yes.

5         THE COURT:  Including this last compartment?

6         THE WITNESS:  The last compartment is --

7         MR. SIEGEL:  The last compartment we were just

8    speaking about.

9    A    I apologize --

10         MR. SIEGEL:  Your Honor, if I can try and clarify

11    the question.

12         MR. STEIN:  Judge, there was an objection to the

13    question.  I thought you sustained it.

14         THE COURT:  I did.  Then I asked a question.

15         MR. SIEGEL:  Because there's multiple items in this,

16    I want to break it down piece by piece.

17    BY MR. SIEGEL:

18    Q    You said there's plastic bags in there?

19    A    Yes.

20    Q    Do you recognize those plastic bags?

21    A    Yes.

22    Q    And just one more time, what are those plastic bags?

23    A    Those are where the ammunition was put in.

24    Q    And is there anything in there other than the plastic

25    bags?

Nunzio - direct - Siegel                          356

1    A    Yes.

2    Q    What else is in there?

3    A    There is a live round, a bullet and a casing.

4    Q    Are you able to determine if those are the cartridges

5    that you vouchered?

6    A    No.

7    Q    Are they of the same type of the cartridges that you

8    vouchered?

9    A    I would have to look at the back of them.

10   Q    Are you able to?

11   A    Yes, I can pull them out.  The live round said Federal 38

12   Special, which I believe is on the voucher, yes, and the

13   casing says a Winchester 357, which is also on the voucher.

14   Q    And I want to move onto the last compartment.  What is in

15   this last compartment?

16   A    That's the piece of the box that the firearm was

17   vouchered in.

18   Q    Is it the entire box?

19   A    No.

20   Q    Other than the fact that this is just a piece of that

21   box, is it in essentially the same condition as it was when

22   you packaged the firearm?

23   A    Yes.

24        MR. SIEGEL:  Your Honor, I move to admit Government

25   Exhibit 308 subject to connection.

Nunzio - direct - Siegel                     357

1           MR. STEIN:  Subject to connection.

2           THE COURT:  Received, subject to connection.

3           (Government Exhibit 308 received in evidence.)

4   BY MR. SIEGEL:

5   Q    I'm going to show some of these items on the ELMO.  I'm

6   starting with the voucher.  What did you voucher?

7   A    I vouchered a firearm.  Item one is a revolver.  The make

8   Dan Wesson Arms .357 caliber, black.  The serial number is

9   325808.  Item number two are two fired bullets.  Make was

10  federal caliber .38.  Item number three is one fired bullet.

11  Make is Winchester caliber .357.  Item number four are two

12  cartridges, Federal caliber .38.  Item five is one cartridge

13  of Winchester caliber .357.

14  Q    Now, since you wrote this voucher, have you had the

15  opportunity to review it for any discrepancies?

16  A    Yes.

17  Q    Are there any discrepancies on this voucher?

18  A    Yes.

19  Q    Could you explain what those are?

20  A    Items number two and three I had written, fired bullet.

21  What I meant to write was a fired cartridge.

22  Q    What is the distinction between a fired bullet and a

23  fired cartridge?

24  A    The fired bullet is the piece of the front of the

25  cartridge that exits the barrel of the gun and is fired.  The

                    SN       OCR       RPR

Nunzio - direct - Siegel                    358

1    cartridge is what remains, the shell casing.

2    Q    I'm showing the third compartment.  On the right side of

3    this plastic packaging, there is a copper item, a copper tube.

4    What is that?

5    A    On the top?

6    Q    That's right.

7    A    That's a cartridge, a fired cartridge.

8    Q    So when you say you -- strike that.

9            The items that you vouchered, were they like this

10   that is shown here?

11   A    Yes.

12   Q    I'm moving on to the second compartment.  What is this

13   item?

14   A    It's a firearm that was vouchered.

15   Q    Is there a serial number on this item?

16   A    Yes.

17   Q    Where would the serial number be?

18   A    I would have to look at it a little closer.

19   Q    I will turn it over and are you able to read the serial

20   number on this firearm?

21   A    325808.

22   Q    Is that the same is what you had on your voucher?

23   A    Yes.

24   Q    Where did you find this firearm?

25   A    It was inside of the backpack.

Nunzio - direct - Siegel                        359

1   Q    I'm going to move on to the next packaging.  What were

2   the items that you recognized in this packaging?

3   A    The plastic bags.

4   Q    And what were those plastic bags?

5   A    Where the ammunition was vouchered.

6   Q    And why are there two of them?

7   A    One was for the fired casing and one was for live rounds.

8   Q    And, finally, I'm showing this piece of cardboard.  Is

9   that your handwriting on it?

10  A    Yes.

11  Q    What did you label inside this box?

12  A    One .357 Dan Wesson revolver, three fired rounds, three

13  live rounds.

14  Q    The error that you made at the beginning that we talked

15  about as labeling the fired round as bullets, why did you make

16  that mistake?

17           MR. STEIN:  Judge, objection.

18           THE COURT:  I want to sustain it.  If you want to

19  ask why it was mistake.

20           MR. SIEGEL:  He already testified why it was a

21  mistake.

22           THE COURT:  Then we need nothing further on that

23  point.

24           MR. SIEGEL:  That's fine, Your Honor.

25  BY MR. SIEGEL:

1   Q     So what did you do with the items once you found them

2   inside the backpack?

3   A     I made the firearm safe.  I placed the items into a paper

4   bag and brought them down to the lab to get them vouchered.

5   Q     What about the clothing that you found?

6   A     Some of the clothing was brought down to the lab to be

7   vouchered as well.  Other clothing and items inside the bag

8   were given to Special Agent Miceli.

9   Q     Did you give any items to Agent Miceli that didn't come

10  out of the backpack?

11  A     I don't believe so.

12  Q     Did you search anything other than that one backpack?

13  A     No.

14  Q     I'd like you to look at Government Exhibit 306 which is

15  behind you.  Do you recognize the packaging that Government

16  Exhibit 306 is in?

17  A     Yes.

18  Q     How do you recognize it?

19  A     It has my signature on the seal.

20  Q     What is the contents of 306?

21  A     There's a multicolored hooded sweatshirt or jacket.

22  Q     And where do you recognize it from?

23  A     This was given to me by Special Agent Miceli.

24  Q     Does it appear to be in substantially the same condition

25  as it was when it was given to you by Special Agent Miceli?

1   A    Yes.

2           MR. SIEGEL:  Your Honor, I move to admit Government

3   Exhibit 306 subject to connection.

4           MR. STEIN:  Subject to connection, yes.

5           THE COURT:  Received in evidence subject to

6   connection.

7           (Government Exhibit 306 received in evidence.)

8   BY MR. SIEGEL:

9   Q    Detective Nunzio, would you hold that up for the jury to

10  see?

11  A    (Witness complies.)

12          MR. SIEGEL:  One moment Your Honor.

13          THE COURT:  Sure.

14          (Pause in proceedings.)

15          MR. SIEGEL:  Thank you, Your Honor.  No further

16  questions.

17          THE COURT:  Thank you Mr. Siegel.

18          Any cross?

19          MR. STEIN:  I'm sorry, Judge, what did you say?  I

20  didn't hear what you said, Judge.

21          THE COURT:  Is there any cross-examination?

22          MR. STEIN:  Could we approach, please

23          (Sidebar held outside of the hearing of the jury.)

24          (Continued on next page.)

25

```
                        Sidebar                        362

1              (The following sidebar took place outside the

2     hearing of the jury.)

3              MR. STEIN:  Judge, it's ten after 5.  I'm not going

4     to be short with him.

5              THE COURT:  You're going to be long?

6              MR. STEIN:  I would rather defer my

7     cross-examination to tomorrow.

8              THE COURT:  Okay.

9              MR. STEIN:  Okay, meaning what?

10             THE COURT:  Okay, if you insist.

11             MR. STEIN:  I mean, do you want me to --

12             THE COURT:  If you're not going to finish don't

13    start.

14             MR. STEIN:  Half hour, an hour.  I'm bad at time

15    estimates honestly.

16             THE COURT:  Let Mr. Farrell do it then.

17             MR. STEIN:  He's relentless.  I'm methodical.

18             THE COURT:  I will vouch for that.  If you start and

19    stop and then repeat to get us back to where you were, it's a

20    waste of time.  You will make me go home early.

21             MR. STEIN:  I never made you do anything, Judge,

22    except off the record.

23             (Sidebar ends.)

24             (Continued on next page.)

25
```

Proceedings                                363

1      THE COURT:  Ladies and gentlemen, we had a chance to
2  confer with counsel.  We had to make a decision as to whether
3  we would -- I'm bad at stopping and we had to decide whether
4  we would press on with Detective Nunzio's testimony.
5          One of the things we have observed over the course
6  of time is if we can't complete someone's testimony, what
7  happens is we begin it and then you start over the next day
8  and everybody backs up and we redo half of what we did at the
9  close.  So we end up doing it twice which only makes things
10  longer.  The net result is that you are going to be the
11  beneficiary because we will conclude our afternoon session and
12  ultimately I think it will reduce the amount of time overall
13  that you spend in the courtroom so it's not necessarily a bad
14  thing.
15
16          (Continued on the following page.)
17
18
19
20
21
22
23
24
25

SN        OCR        RPR

Proceedings                          364

1       THE COURT:  (Continuing) But what's important now as

2   we conclude the session is to go over the reminders again

3   because they are so important so that we ensure that we have a

4   fair trial.  Fair means fair to both the Government and the

5   defendant and that is what we rely on you all of you to do for

6   us to ensure that we are going to have that fair trail.

7           As we break for the evening recess, you are to

8   continue to keep an open mind.  You are not to discuss the

9   case amongst yourselves or with anyone else.  And discuss

10  means even a mention about it, much less any of the details

11  about the case or about the subject area generally, not even

12  general discussions about any of the issues, the rulings, the

13  arguments, or the kinds of arguments that have been made

14  during the course of today.  You are totally forbidden to

15  engage in those discussions.  You are not to talks amongst

16  yourselves or with anyone else about that.

17          During the overnight hours, you are not to conduct

18  any research.  Again, the case will be decided on what you see

19  and hear in the four walls of this courtroom.  No research of

20  any kind, electronic or otherwise.  No visiting any of the

21  locations that have been mentioned during the trial.  If you

22  live near them, continue on to your route and avoid them, if

23  you can.

24          To the extent there may be any media accounts of

25  this trial, including that broader definition of media again,

Proceedings                                           365

1    continue tuning out, closing your ears and eyes to them.

2    Again, I encourage you to close your ears and eyes to media

3    accounts of any legal proceedings for fear that you may hear

4    something there that may confuse you about what your

5    responsibilities are here.

6             Again, we remain on radio silence.  That

7    non-communication rule is broader than just face-to-face

8    contact.  Contact means any form of communication, telephone,

9    texts, Twitter, Instagram, Facebook, any of those things as

10   well.

11            And if you have a great desire to tell people, some

12   folks telling everything they are doing every minute of the

13   day so that they can follow, no discussion that you are a

14   juror, or you're coming to the courthouse in Brooklyn or

15   anything that even remotely touches on this trial.

16            Otherwise have a very pleasant evening and we will

17   see you tomorrow.

18            I think William has communicated to you that

19   although it is not always an inflexible rule, the general rule

20   is that we do not sit for trial on Fridays.  It gives us a

21   chance to handle lots of other cases that we have pending

22   before the court.  So that rule will be followed.  So for your

23   planning purposes, we will not be sitting and you will have a

24   free day to go back to work or do whatever it is that you wish

25   to do.

Proceedings                            366

1        Again, we wish you a very pleasant evening.  We

2   express our gratitude for your attendance and attentiveness.

3   We will see you tomorrow.  Report to the central jury room at

4   around 9:45 and we will try to get started close to that time

5   as we can.

6             Again, thank you, and we will see you tomorrow.

7             (Jury exits the courtroom.)

8             THE COURT:  Detective Nunzio, you are excused.  We

9   will see you tomorrow.

10            MR. STEIN:  Judge, can we have a direction to the

11  witness not to discuss his testimony with anybody?

12            THE COURT:  Don't discuss your testimony with

13  anyone.  You are on cross-examination coming tomorrow.

14            THE WITNESS:  Good.

15            MR. STEIN:  He said good.

16            MR. SELDEN:  For the record, the Government did

17  advise the witness of that potential, that they were not to

18  speak with anyone during the pendency of the matter.

19            THE COURT:  Do we have any evening housekeeping

20  before we conclude?

21            MR. STEIN:  No.

22            MR. SELDEN:  Not on behalf of the Government.  Thank

23  you, Your Honor.

24            THE COURT:  Do we know how many witnesses we have

25  tomorrow?

Proceedings                                    367

1          MR. SELDEN:  Your Honor, I think we will have a full

2    day of witnesses tomorrow.  I think we will go throughout the

3    day.  If that changes, we will of course alert the Court first

4    thing in the morning.  I think we will spend the full day.

5          THE COURT:  You are more sure about your witnesses

6    being here today?

7          MR. SELDEN:  I think we are more sure.

8          MR. STEIN:  You will let us know who's on the list

9    for tomorrow?

10         MR. SELDEN:  As we have throughout each day, we will

11   e-mail defense counsel and let them know which witnesses we

12   plan on calling.

13         THE COURT:  That makes things work more smoothly.

14   Okay.  We appreciate that.

15         Everyone have a pleasant evening.  We will see you

16   tomorrow.

17         (Matter adjourned to March 5, 2020 at 10:00 a.m.)

18

19                            ooo0ooo

20

21

22

23

24

25

368

1                    I N D E X

2

3    WITNESSES:

4

5        SHARON SANCHEZ

6            DIRECT EXAMINATION BY MR. SELDEN        184

7            CROSS-EXAMINATION BY MR. FARRELL        199

8            REDIRECT EXAMINATION BY MR. SELDEN      210

9            RECROSS-EXAMINATION BY MR. FARRELL      212

10       JULIE CASALE

11           DIRECT EXAMINATION BY MR. SIEGEL        215

12           CROSS EXAMINATION BY MR. FARRELL        235

13       GASPAR PENA

14           DIRECT EXAMINATION BY MR. SIEGEL        244

15       KEITH BRYAN

16           DIRECT EXAMINATION BY MR. SELDEN        284

17           CROSS-EXAMINATION BY MR. FARRELL        301

18           REDIRECT EXAMINATION BY MR. SELDEN      324

19       THOMAS NUZIO

20           DIRECT EXAMINATION BY MR. SIEGEL        328

21           VOIR DIRE EXAMINATION BY MR. STEIN      342

22           DIRECT EXAMINATION BY MR. SIEGEL (Cont'd)   348

23

24

25

CMH     OCR     RMR     CRR     FCRR

369

1                        I N D E X (Continued)

2

3                            EXHIBITS:

4

5          Government Exhibit 108-A                    186
           Government Exhibit 108-B                    187
           Government Exhibit 108-C                    188
6          Government Exhibit 108-A                    217
           Government Exhibit 115                      222
7          Government Exhibit 114                      224
           Government Exhibit 112-B                    225
8          Government Exhibit 112-A                    230
           Government Exhibit 321-B                    232
9          Government Exhibit 321-A                    233
           Government Exhibit 321                      234
10         Government Exhibit 111                      245
           Government Exhibit 117-A                    253
11         Government Exhibit 117-B                    253
           Government Exhibits 200-A, 200-B, 201,      259
12         202, 203, 204, 205, 206, 207, 208, and
           209
13         Government Exhibit S-4                      262
           Government Exhibit 304-F                    299
14         Government Exhibits 105-A to 105-C,         332
           304-C, 304-D, 305-B, 305-C, 305-D,
15         305-E, 307-D, 307-C, 308-B, 308-C,
           308-D, 308-E and 308-H
16         Government Exhibit 317                      347
           Government Exhibit 304                      350
17         Government Exhibit 305                      351
           Government Exhibit 307                      352
18         Government Exhibit 308                      357
           Government Exhibit 306                      361
19

20

21

22                    *       *       *       *

23

24

25

CMH      OCR      RMR      CRR      FCRR