370

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - - - - X

4    UNITED STATES OF AMERICA,    :   18-CR-684(ENV)

5             Plaintiff,          :
                                       United States Courthouse
6        -against-                :   Brooklyn, New York

7    ELGIN BRACK,                 :
                                       March 5, 2020
8             Defendant.          :   10:00 o'clock a.m.

9    - - - - - - - - - - - - - - - X

10

11                  TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE ERIC N. VITALIANO
12           UNITED STATES DISTRICT JUDGE, and a jury.

13   APPEARANCES:

14

15   For the Government:          RICHARD P. DONOGHUE
                                  United States Attorney
16                                BY: PHILIP A. SELDEN
                                      JONATHAN SIEGEL
17                                    JONATHAN LAX
                                  Assistant United States Attorneys
18                                271 Cadman Plaza East
                                  Brooklyn, New York
19

20   For the Defendant:          JOEL M. STEIN, ESQ.

21                                GARY FARRELL, ESQ.

22   Court Reporter:             Charleane M. Heading
                                 225 Cadman Plaza East
23                               Brooklyn, New York
                                 (718) 613-2643
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.

                CMH      OCR      RMR      CRR      FCRR

1          (In open court; defendant and jury not present.)

2          THE CLERK:  The Honorable Eric Vitaliano presiding.

3          The case on the calendar is USA v. Elgin Brack, case

4  number 18-CR-684, on for a jury trial.

5          Will the attorneys please note their appearance

6  beginning with government counsel.

7          MR. SELDEN:  Good morning, Your Honor.  On behalf of

8  the United States, Assistant United States Attorney Phil

9  Selden.  I'm joined at counsel table by Assistant United

10  States Attorneys Jonathan Siegel and Jonathan Lax.  We're also

11  joined at counsel table by Paralegal Specialist Elicia Bates

12  and Detective Steven Saint-Hilaire.  Good morning.

13          THE COURT:  Good morning, all.

14          MR. SIEGEL:  Good morning.

15          MR. LAX:  Good morning.

16          THE COURT:  Joel Stein for Mr. Brack who I believe

17  is about to join us.

18          MR. FARRELL:  And Gary Farrell for defendant and

19  John Bennett, our law school intern.

20          THE COURT:  Good morning, all, as well.

21          (Defendant enters.)

22          THE CLERK:  Counsel for both sides are present

23  including the defendant.

24          THE COURT:  Good morning, Mr. Brack.

25          THE DEFENDANT:  Good morning.

372

1          THE COURT:  All right.  Do we have any housekeeping?

2          MR. SELDEN:  Briefly, on behalf of the government,

3     Your Honor.  With regards to brief housekeeping regarding 3500

4     material, specifically Detective Nuzio who is testifying now,

5     a copy of his memo book was provided to Mr. Farrell and

6     Mr. Stein this morning.  It's approximately two pages and it

7     was provided to counsel for Mr. Brack.

8          In addition, the defense has indicated that they

9     plan to call a criminalist by the name of Daphne Mavris and

10    the government has endeavored to get any underlying notes that

11    she has and we forwarded on for her a receipt, that I believe

12    the defense plans to ask Ms. Mavris about, to the defense.  We

13    will provide a redacted copy of all her notes to the defense

14    today.  They plan to call her, it sounds like, in their case

15    in chief.

16         The last housekeeping matter for the government is

17    it's our understanding that the defense intends to play a

18    portion of defendant Elgin Brack's post-arrest statement and

19    to do so by way of cross-examination of a potential government

20    witness.  The government would respectfully oppose playing the

21    defendant's post-arrest statement in any form.  It's our

22    understanding that the defense potentially plans to play this

23    in the hopes of showing the defendant using his hand or

24    potentially making a gesture with his left hand rather than

25    his right hand.

373

1        The context by which the defendant is making a

2   post-arrest statement surely would confuse the members of the

3   jury.  If Mr. Brack wishes to testify and talk about which

4   hand he is, that's one matter, but to see the defendant seated

5   in a room with other law enforcement agents making statements

6   certainly would be confusing and misleading to the jury if

7   presented through a cross-examination question.

8        So, respectfully, we would oppose the playing of

9   that during cross.

10       MR. FARRELL:  Your Honor, respectfully, what the

11   defense intends to do, we can't anticipate that

12   Special Agent Miceli will remember from November of 2018 that

13   when Mr. Brack invoked his right to remain silent, he wrote

14   with his left hand.  The agent gave him a pen in his right

15   hand.  His left hand was handcuffed and he passed the pen from

16   his right hand to his left hand and signed his name

17   left-handed.

18       That's all we want the jury to see.  You know that

19   we made it an issue in the case.  How strong an issue, that's

20   up to the jury to decide, but it's clear beyond peradventure

21   that the robber here used his right hand in each of the four

22   robberies.  And Elgin Brack, if he does testify, will, of

23   course, testify that he's been left-handed his whole life but

24   we don't have to necessarily commit to him testifying when

25   there's clear evidence, clear video evidence.

374

1          We're not asking them to -- we don't want audio.  We

2     just want them to see that he's signing with his left hand.

3     That's it.  That's demonstrative evidence that is relevant

4     evidence in the case that the jury should see.

5          MR. SELDEN:  Your Honor, in weighing the 403

6     balancing test, while the defense argues that it's relevant,

7     it certainly would confuse a jury to see Elgin Brack seated I

8     believe it's in front of approximately four other law

9     enforcement agents being asked questions.  It would cause them

10    to wonder did he make a statement, did he not make a

11    statement, were others potentially arrested along with Elgin

12    Brack subject to the same statements and it certainly would

13    confuse them.

14         So we don't see how it's demonstrative evidence

15    outweighing the potential prejudice and real confusion to the

16    members of the jury.

17         THE COURT:  I agree with the government but,

18    Mr. Farrell, what I would let you do is you can certainly ask

19    the witness if he recalls whether Mr. Brack signed anything

20    and if he recalls which hand he used to sign it and if he says

21    he doesn't recall, I would let you show the witness the video

22    and you can ask him whether that refreshes his recollection as

23    to whether or not the document signed in his or her presence

24    by Defendant Brack was signed with his left or right hand.

25         MR. FARRELL:  Understood, Your Honor.

1          MR. SELDEN:  Just for clarity, Your Honor, we just

2     want to make sure that the question that counsel plans to ask

3     the witness is not set within the context of a post-arrest

4     statement.

5          THE COURT:  Yes, I'm going to show you something,

6     show you an exhibit, and ask him if it refreshes his or her

7     recollection.  If the answer is yes, then the witness will

8     answer and if they say no, so be it.

9          Any other housekeeping?

10         MR. STEIN:  Not from us, Judge.

11         MR. FARRELL:  Just one thing, yes, yes.

12         MR. SELDEN:  Your Honor, can we just briefly confer

13    with defense counsel as to whether they're planning to elicit

14    this cross-examination through the witness who is currently on

15    the stand or a subsequent witness.

16         MR. FARRELL:  Miceli.

17         MR. SELDEN:  Okay.

18         MR. FARRELL:  This guy wasn't present for that.

19         MR. SELDEN:  The reason, in part, why we're asking

20    about that is the government would like to be able to confer

21    amongst ourselves for a brief moment just to talk about one

22    additional follow-up with that.  So if we can have a brief

23    moment, Your Honor.

24         THE COURT:  Certainly.

25         (Pause.)

1        MR. SELDEN:  Thank you, Your Honor, for the brief

2   moment.  Nothing further on behalf of the government for

3   housekeeping matters.  Thank you.

4        THE COURT:  Thank you, Mr. Selden.

5        Anything further, Mr. Farrell or Mr. Stein?

6        MR. FARRELL:  Yes, Judge, and I hope this will be

7   brief.  I just want to -- I need to make a point on behalf of

8   Mr. Brack, Your Honor.

9        He's made -- his conduct throughout the trial has

10  been exemplary and we want to keep it that way.  He's a bright

11  young man, he's found things that we've missed, but he's never

12  been through a trial before.  He was so upset yesterday when

13  Sergeant Bryan testified about what he was wearing and his

14  position is that the government knew that he was not wearing a

15  gray hooded sweatshirt, that it was really Scott Brack who was

16  wearing that and that they should have corrected the witness.

17  The witness should have, once confronted with the pictures,

18  should have at least admitted what was clear and obvious, that

19  he made a mistake, and Mr. Brack's contention is that's just

20  fundamentally wrong and it should have been corrected.

21       I did explain to him that sometimes that's the

22  nature of a trial, Mr. Brack, that there are conflicting

23  testimony and we argue our point to the jury, but I felt in

24  the interest of keeping things harmonious at the table, Judge,

25  I just wanted to raise that.  It's not a privilege issue.

377

1        I am crystal -- I am convinced beyond any doubt that

2   he is right on this issue regarding what he was wearing or not

3   wearing that day, and it just upset him to the point where I

4   don't want the potential to upset the table or for him to talk

5   while the jury is here.  He's been a gentleman now.  He's been

6   raising his hand.  If I can talk to him for a moment and then,

7   hopefully, we'll be done with the application.

8        (Pause.)

9        MR. FARRELL:  And I would only briefly add, Judge,

10  it wasn't just the clothing.  It was the fact that he was put

11  in a van with two other people which he says is completely not

12  true and other issues of his testimony and that's the end of

13  it.  Thanks for hearing us on that.

14       THE COURT:  All right.  I'm sure you told Mr. Brack

15  that witnesses, he'll hear it in the final instructions.

16  You've heard those instructions many times over.

17       Mr. Brack, this is your first time in trial and you

18  have not heard them.  We point out those kinds of issues for

19  the jury in a general way.  These are matters for the jury

20  ultimately to resolve, as to whether or not a witness'

21  testimony is believable or not believable.  And oftentimes we

22  get conflicting evidence.  That's not an unusual result which

23  is why we have juries in the first place.  The jury,

24  ultimately, not the judge, not the lawyers, but, ultimately,

25  the jury has to make that finding.

378

1          MR. FARRELL:  Judge, thank you very much for that

2     explanation.

3          If Mr. Brack could briefly, briefly address the

4     Court on that issue, then we're definitely done.

5          THE COURT:  It won't be Mr. Brack's first address.

6          MR. FARRELL:  Right.

7          THE COURT:  Go ahead, Mr. Brack.

8          THE DEFENDANT:  All right.

9          THE COURT:  Again, you know the admonition.

10    Anything you say can be used against you so it is all taken

11    down.

12         THE DEFENDANT:  I understand what you said, Judge,

13    but I want to make my statement so it would be on the record.

14    All right.

15         My issue is that the prosecutor, I know and the

16    Judge knows, like, if you look at the contents that we have

17    that we cannot show the jury, that the officer is lying on the

18    stand.  You know I didn't have a gray, I didn't have gray

19    clothes on.  Okay.  It was a mistake.  We show you, give you a

20    chance to correct the mistake and you still lie.  Two, you

21    said you drove past the car, there was nobody in the car.  The

22    driver said it himself, which the prosecutor knows, that he

23    was in the car with his daughter first.

24         So my thing is the prosecutor letting his witness

25    lie on the stand to the jury.  That's not a fair trial.

379

1  That's unacceptable.  That's my only argument.  Thank you for

2  hearing me out.

3      THE COURT:  Well, thank you, Mr. Brack, and as all

4  of your other past comments, they're a matter of record.

5      THE DEFENDANT:  Thank you.

6      THE COURT:  You're welcome.

7      MR. SELDEN:  Your Honor, may we just briefly

8  respond?

9      THE COURT:  If you care to.

10     MR. SELDEN:  Just very briefly, Your Honor, the

11  government stands on both the trial record as well as the

12  testimony that's been elicited in this matter here today as

13  well as this past week.

14     Nothing further from the government.

15     THE COURT:  Very good, Mr. Selden.

16     MR. SELDEN:  Thank you, Your Honor.

17     THE COURT:  So I guess we are ready for the jury at

18  this point?

19     MR. SELDEN:  On behalf of the government, we are.

20  Thank you, Your Honor.

21     THE COURT:  Okay.

22     MR. SIEGEL:  And Your Honor, just to make clear, the

23  physical items that were laid out for Detective Nuzio

24  yesterday, we've laid them out again.

25     Should we have the witness on the stand before the

380

1   jury?

2           THE COURT:  You might as well.  It will save a

3   little bit of time.

4           (Witness THOMAS NUZIO resumes the stand.)

5           THE WITNESS:  Good morning, Your Honor.

6           THE COURT:  Good morning, Detective.

7           Mr. Stein, are you conducting the cross?

8           MR. STEIN:  Yes, Judge.

9           (Jury enters.)

10          THE COURT:  Be seated, please.

11          Counsel will stipulate that the jury is present and

12  properly seated.

13          MR. SELDEN:  On behalf of the government, yes,

14  Your Honor.  Thank you.

15          THE COURT:  Defense?

16          MR. STEIN:  Yes, Judge.

17          THE COURT:  Thank you, Counsel.

18          Ladies and gentlemen, welcome back.  It's a cool

19  crisp day in Brooklyn.  We did some more legal housekeeping in

20  your absence and we are ready to go.

21          As you will recall, we broke last night at the close

22  of direct examination.  Detective Nuzio is back on the stand.

23          I remind Mr. Nuzio that he continues under oath and

24  we are ready now for the cross-examination which I believe is

25  going to be conducted by Mr. Stein.  Mr. Stein.

1          MR. STEIN:  Thank you, Judge.

2     CROSS-EXAMINATION

3     BY MR. STEIN:

4     Q     Good morning, Detective.

5     A     Good morning, sir.

6     Q     So before we saw each other yesterday afternoon, we have

7     never seen each other or talked to each other?

8     A     No.

9     Q     How long have you been with the Police Department?

10    A     About 13 and a half years.

11    Q     And before your present assignment which I think is with

12    the joint task force, yes?

13    A     Yes.

14    Q     Before that, what was your previous assignments?

15    A     I was in the academy.  Then I went to the 6th Precinct

16    and from there, I went to the Queens Transit Robbery Squad and

17    then moved up to the Queens Robbery Squad and now I'm

18    currently assigned to the Joint Robbery Task Force.

19    Q     Now, just approximately, how many times have you

20    testified previously altogether in state court, federal court?

21    A     More than ten.

22    Q     Now, you know, don't you, from your previous experience

23    in testifying that everything that you write in connection

24    with a particular investigation can potentially become

25    evidence in a case, correct?

1    A    Yes.

2    Q    And that would be particularly so when it comes to

3    documenting evidence that's related to an investigation,

4    correct?

5    A    Yes.

6    Q    And would it be also true that in documenting the

7    evidence, that it's extremely important for you to be as

8    careful as possible?

9    A    Yes.

10   Q    And do you think that in this particular case, you were

11   as careful as possible?

12   A    Yes.

13   Q    So on the early morning hours of November 26, 2018, you

14   were in the Bronx, correct?

15   A    Yes.

16   Q    I'm sorry.  You were in -- initially when you got a call?

17   A    I was in Queens.

18   Q    And you got a call from, just do you know who you got a

19   call from?

20   A    No.

21   Q    Somebody that was involved in the investigation of this

22   case?

23   A    Yes.

24   Q    And did you talk for just a couple of seconds or what?

25   A    No, sir.

1    Q    Were you briefed on what the investigation was about?

2    A    Just minimal details.

3    Q    Okay.  And before that phone call, you had nothing to do

4    with this case, correct?

5    A    I did not receive a phone call.

6    Q    Okay.  You made a phone call?

7    A    No, sir.

8    Q    You were contacted in some way which led you to go to the

9    Bronx?

10   A    A detective in my office was contacted and I had asked if

11   he needed assistance.

12   Q    Okay.  And that was Detective --

13   A    Detective Bravo.

14   Q    And as a result of that, you went to the Bronx, correct?

15   A    Yes.

16   Q    And just roughly, about how long did it take you to get

17   to the Bronx?

18   A    Half hour maybe.

19   Q    And I assume at that hour, there probably wasn't that

20   much traffic?

21   A    I don't particularly recall.

22   Q    And did you go with Detective Monroe?

23   A    I don't know who that is.

24   Q    I'm sorry.  The detective who asked you about needing

25   assistance.  Detective Bravo.  I'm sorry, I misspoke.

1    A    Yes.

2    Q    So the two of you went together?

3    A    Yes, I believe my supervisor went as well.

4    Q    And who was that?

5    A    Lieutenant Manfredi.

6    Q    And while you were in the car for approximately a half

7    hour, did you receive any additional information about the

8    case?

9    A    Not that I recall.

10   Q    So it was just in the car going to the ATF office, it was

11   just idle chatter?

12   A    I don't particularly remember.

13   Q    Okay.  So there came a time that you got to the Bronx,

14   correct?

15   A    Yes.

16   Q    The ATF office, which was located where approximately?

17   A    It's located at 1250 Waters Place.

18   Q    And where's the first place you went to when you got to

19   that location?

20   A    We went to the parking garage.

21   Q    Okay.  And is that where you saw the Toyota Solara that

22   you testified about yesterday?

23   A    It's in the same location, yes.

24   Q    So you approached the car, correct?  You approached the

25   Toyota Solara in the garage?

1    A    As a first time being there?

2    Q    Yes.

3    A    No, I don't recall that, sir.

4    Q    Well, you saw the car, correct?

5    A    It's possible.

6    Q    Well, you took photographs of it and you testified about

7    that yesterday, correct?

8    A    No, sir, I did not take photographs.

9    Q    So did there come a time when you saw a Toyota Solara in

10   the garage?

11   A    Yes.

12   Q    And about how long after you arrived did you see that

13   car?

14   A    I don't, I don't recall.

15   Q    Did you confer with anybody before you approached the

16   car?

17   A    Yes.

18   Q    And who did you confer with?

19   A    Several members of the office.

20   Q    Who were already there?

21   A    Yes.

22   Q    So approximately how many law enforcement officers were

23   there in the vicinity of the Toyota Solara when you arrived, a

24   dozen?

25   A    I don't believe so.

1    Q    Ten?

2    A    I would say it was less than ten.

3    Q    But certainly a number of them, correct?

4    A    Yes.

5    Q    And when you saw the Toyota Solara, were there a number

6    of items of, physical items of evidence that were already

7    displayed on the car?

8    A    I don't recall where everything was when I had arrived.

9    Q    Okay.  So what did you bring with you to prepare yourself

10   for what you were about to do?

11   A    I didn't bring anything.

12   Q    You testified yesterday that you had gloves, correct?

13   A    Yes.

14   Q    So did you bring some gloves with you?

15   A    I took them from the office, yes.

16   Q    From the office in Queens?

17   A    No, sir, in the ATF office.

18   Q    Okay.  So did you use one pair of gloves during the

19   entire procedure that you engaged in?

20   A    Yes, sir.

21   Q    So let's focus on the backpack that you testified about

22   yesterday.  When you first saw the backpack, where was it?

23   A    From what I remember, it was on the hood of the vehicle.

24   Q    All right.  So you didn't put it there, correct?

25   A    No, sir.

Nuzio - cross - Stein                                    387

1    Q    Do you know whoever put it there, whether that person was

2    wearing gloves?

3    A    I do not, sir.

4    Q    So when you saw the backpack, what, if anything, did you

5    do with respect to the backpack?

6    A    I'm not sure what you mean.

7    Q    Well, did you open it?

8    A    Once I was -- once photographs were taken of the piece of

9    evidence, then it was, I was able to open it, yes.

10   Q    So you opened it?

11   A    Yes, sir.

12   Q    And were you wearing gloves?

13   A    Yes, sir.

14   Q    So about how long did it take you to examine the

15   backpack?

16   A    A few minutes.

17   Q    Did you physically come into contact with anything else

18   of an evidentiary value other than the backpack?

19   A    No, sir.

20   Q    So you didn't handle any pants?

21   A    Nothing that was not in the backpack, sir.

22   Q    Okay.  So you testified yesterday there were some pairs

23   of pants which you showed to the jury yesterday.  I believe

24   they're government exhibits.  Did you handle the pants?

25   A    Yes, sir.

Nuzio - cross - Stein                              388

1   Q     And all three pairs of pants?

2   A     Yes, sir.

3   Q     Okay.  And when you handled the pairs of pants, were you

4   wearing gloves?

5   A     Yes, sir.

6   Q     After each pair of pants, did you put on a different pair

7   of gloves?

8   A     No, sir.

9   Q     And there came a time also where you found, where you

10  testified that you found a firearm at the bottom of the

11  backpack, correct?

12  A     Yes, sir.

13  Q     So when you found the firearm at the bottom of the

14  backpack, did you have the same pair of gloves on?

15  A     Yes, sir.

16  Q     So you took out initially three pairs of pants, correct?

17  A     Yes, sir.

18  Q     And you had on a pair of gloves?

19  A     Yes, sir.

20  Q     And as to each pair of pants, you had on the same pair of

21  gloves, correct?

22  A     Yes.

23  Q     And you had on the same pair of gloves when you actually

24  retrieved the firearm from the bottom of the backpack,

25  correct?

1    A    Yes.

2    Q    Tell us how verbally first you actually picked up the

3    firearm?

4    A    I don't particularly remember specifically how it was

5    removed from the bag.

6    Q    So is there some practice since a firearm obviously is

7    inherently dangerous, is there some particular practice that

8    you would have for picking up an item that nature?

9    A    It would be not to have your finger on or near the

10   trigger.

11   Q    So we have the handle or grip of the gun, correct?

12   A    Yes.

13   Q    We have the barrel, correct?

14   A    Yes.

15   Q    And at the end of the barrel is the muzzle?

16   A    Yes.

17   Q    There's also a trigger, correct?

18   A    Yes.

19   Q    Also a guard around the trigger, the trigger guard?

20   A    Yes.

21   Q    And there's also a hammer that you could pull back if

22   someone is intending to discharge the firearm, correct?

23   A    Yes.

24   Q    So do you recall as you sit here now what part of the gun

25   did you touch in order to remove it from the firearm, from the

1  backpack?

2  A    Most likely, I picked it up from the handle.

3  Q    I'm not asking you most likely.  I'm asking what you

4  actually remember as you sit here today?

5  A    I don't remember where on the firearm I picked it up, no.

6  Q    And, again, the same pair of gloves, correct?

7  A    Yes.

8  Q    Now, I assume from the written materials we have here,

9  you didn't document any of this stuff by taking notes about

10  what procedures you used, correct?  You were doing it from

11  your memory?

12  A    Which procedures, sir?

13  Q    About opening up the bag, examining the contents of the

14  bag, the pairs of pants and whatever else was in there.

15  A    No, sir.

16  Q    From your memory?

17  A    Yes, sir.

18  Q    Now, as a result of the investigation you performed, you

19  prepared some reports, correct?

20  A    I prepared vouchers.

21  Q    And did you also prepare -- well, what are vouchers?

22  A    Vouchers are when a piece of property is taken into

23  evidence, not necessarily evidence, but into the custody of

24  the police department, it's then written down on a piece of

25  paper and placed into a bag that has a specific number to it.

1   Q    Okay.  And that number is unique as to that item?

2   There's nothing else in the Police Department that would have

3   that number, correct?

4   A    Not to my knowledge, no.

5   Q    Meaning that's not correct or the number is unique?

6   A    The number is unique to that bag, yes.

7   Q    So in addition to the vouchers which, as I understand

8   what you just said, it documents something being taken into

9   police custody, whether or not it eventually becomes evidence,

10  correct?

11  A    Yes.

12  Q    And do you recall whether or not you prepared any other

13  documents, official Police Department documents, other than

14  the invoices on the vouchers?

15  A    I do not recall.

16  Q    Well, you know what a request for laboratory examination

17  is?

18  A    Yes, sir.

19  Q    Did you prepare any other, any requests for laboratory

20  examination in connection with what you retrieved?

21  A    Yes.

22  Q    And do you know how many you prepared?

23  A    Not off the top of my head, sir.

24  Q    So tell us, in general, what is a request for laboratory

25  examination?

1  A    When certain items are taken into, as an invoice or

2  placed as an invoice, certain items require a request for lab

3  document.

4  Q    Okay.  And the lab examination could be fingerprints?

5  A    They could be a number of, a number of things.

6  Q    DNA?

7  A    I'm not sure who tested the DNA.

8  Q    I'm just asking your general experience.  When you

9  complete a request for laboratory analysis or examination, it

10 could be for fingerprints, correct?

11 A    Yes, I believe so.

12 Q    It could be for blood?

13 A    Yes.

14 Q    It could be for DNA?

15 A    Yes.

16 Q    It could be for any foreign substance in this whole

17 world, correct?

18 A    Yes.

19 Q    Hair?

20 A    I'm not sure.

21 Q    So did you prepare a request for laboratory analysis or

22 laboratory examination with respect to the items that you've

23 testified about?

24 A    If it required that documentation.

25 Q    Okay.  And as you sit here now, do you remember what

1    request for laboratory analysis you made?

2    A    It would be for the firearm.  Off the top of my head, I

3    would have to, I would have to look at it, sir.

4              MR. STEIN:  Judge, can I approach the witness?

5              THE COURT:  You may.

6              MR. SIEGEL:  Your Honor, I'd also like to approach

7    to see what he's showing.

8              MR. STEIN:  I was going to put it on the record but

9    he's certainly welcome to come up here.  I'm showing the

10   witness what's been marked for identification as 3500-TN-2.

11   Q    Can you take a look at that, just read it to yourself.

12   Just disregard the stuff on the other side, please.

13             (Pause.)

14   Q    Okay.  So does that help you remember what laboratory

15   analysis you requested?

16   A    Yes, sir.

17   Q    And this is in connection with what item of physical

18   evidence?

19   A    It looks like items 1 through 5.

20   Q    One through 5 on the voucher?

21   A    Yes, sir.

22   Q    And what are items 1 through 5?

23   A    Item 1 was the firearm and items 2 through 5 were

24   ammunition.

25   Q    Ballistics evidence?

1  A    Yes.

2  Q    Okay.  So what analysis did you request to be performed

3  on those items?

4  A    Operability, DNA evidence and latent prints, I believe.

5  Q    Anything else?

6  A    I would have to look at it again.  I apologize.

7  Q    Okay.

8           MR. STEIN:  You can point to the area.

9  Q    I'm just going to point.

10          (Pause.)

11 A    It looks like just the three that I had mentioned.

12 Q    Nothing else?

13 A    It doesn't appear so, no.

14 Q    Okay.  Now, in addition to the contents of the backpack

15 including the firearm, did you request any analysis of any

16 kind of the other contents of the backpack including the three

17 pairs of pants that you testified about?

18 A    I'm sorry.  I don't understand the question.

19 Q    Okay.  Besides the firearm that you just testified about

20 and you testified yesterday was in the backpack, did you

21 request any analysis of the other items that you said you

22 found in the backpack, the three pairs of pants?

23          THE COURT:  Directing your attention to the three

24 pairs of pants, did you request analysis of those items.

25 A    I don't recall.  I would have to look at the voucher,

1   sir.

2           MR. STEIN:  Can I approach again, this time is with

3   3500-TN-5?

4           THE COURT:  You may.

5   Q    Could you take a look at that.

6           (Pause.)

7   A    Okay.

8   Q    So does that refresh your recollection as to whether or

9   not you made a request for analysis of any other items of

10  physical evidence that were in the backpack besides the

11  firearm?

12  A    Yes, sir.

13  Q    And what do you recall?

14  A    There was a pair of pants with a belt and a

15  sweatshirt/jacket.

16  Q    Okay.  And what do you recall what kind of analysis you

17  requested for those items?

18  A    DNA and -- I forget the second one.  I apologize.

19  Q    Again, 3500-TN-5.

20          (Pause.)

21  A    So it says fiber analysis comparison to a known sample

22  and then DNA analysis and hair analysis for both items.

23  Q    Okay.  And this was your request, correct?

24  A    Yes, sir.

25  Q    Your signature is at the end of this document, correct?

Nuzio - cross - Stein                                                    396

1    A    Yes, sir.

2    Q    Now, you testified about a particular backpack and the

3    contents of the backpack.  While you were at the location

4    where this car was, did you see another backpack?

5    A    I don't remember.

6    Q    If you saw pictures, would that help you remember?

7    A    It's possible.

8    Q    And do you recall examining the contents of any other

9    backpack?

10   A    I don't recall.

11              (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS EXAMINATION

2    BY MR. STEIN:  (Continuing)

3             MR. FARRELL:  Can you take that paper off the

4    screen, please.  Thank you.

5             MR. STEIN:  I'm sorry.

6    Q    Detective Nuzio --

7             MR. STEIN:  Mr. Villanueva, can we turn on the ELMO

8    for everybody?

9             MR. SIEGEL:  Can you identify the document for the

10   record.

11            MR. STEIN:  It is -- I'm not sure which of your

12   exhibit numbers it is, frankly, but it is a picture of the

13   backpack.

14            MR. SIEGEL:  Your Honor, we have a marked copy of

15   the exhibit, which we are going to pull up.

16            MR. STEIN:  That would be helpful.

17            THE COURT:  Sometimes the old fashion way works.

18            MR. STEIN:  I believe it is 304.

19            THE COURT:  Your reference to the backpack, this is

20   a reference to the backpack that we just been discussing;

21   correct?

22   Q    So I'm showing you what's already in evidence as

23   Government Exhibit 304-C.  Is that the backpack that you have

24   been testifying about?

25   A    Yes, sir.

1   Q    Okay.  As you sit here now, you don't recall any other

2   backpack?

3   A    I don't recall, no.

4          MR. STEIN:  Can I approach the witness, Judge?

5          THE COURT:  You may.

6   Q    Could you take a look at that photograph and see if it

7   helps you --

8          MR. SIEGEL:  Mr. Stein, could you just identify what

9   it is you are showing him?

10         MR. STEIN:  Sure.

11  Q    So does that help you remember whether or not there was

12  another backpack?

13  A    It appears there was.

14  Q    Okay.  So --

15         THE COURT:  The question is do you remember it?

16         THE WITNESS:  No, sir, I do not.

17         MR. SIEGEL:  Your Honor, can we get that marked with

18  some identification for the record of what it was that he was

19  shown, a defense exhibit.

20         MR. STEIN:  We will put an exhibit number on it,

21  Judge.

22         THE COURT:  Have you pre-marked it, Mr. Stein?

23         MR. STEIN:  I did not.

24         MR. SIEGEL:  I can check if we have that particular

25  picture.

Nuzio - cross - Stein                          399

1            THE COURT:  If you don't know for sure, it is just

2     as easy to put a defense exhibit.

3            Have you pre-marked that, Mr. Stein?

4            MR. STEIN:  No, I have not.

5            THE COURT:  Should we mark it as A?

6            MR. STEIN:  It seems we have an A.  I think we are

7     up to G or H.

8            THE COURT:  Mr. Bennett, what letter are we up to?

9            MR. BENNETT:  H.

10            THE COURT:  Defendant's Exhibit H for

11     identification.

12     Q    So while we are working that out, I'd like to show you

13     another photograph.

14            Detective, I'd like to show you a photograph which

15     has been I believe received in evidence as Government Exhibit

16     304-F, as in Frank, although that's not the actual exhibit.

17            MR. SIEGEL:  Can we show him the marked copy that we

18     have?

19            MR. STEIN:  Sure.

20            MR. SIEGEL:  304-F.

21     Q    Would you take a look at what is marked received in

22     evidence as Government Exhibit 304-F?

23            So, there is a picture of a backpack that you

24     identified and testified about; correct?

25            MR. SIEGEL:  Objection.

Nuzio - cross - Stein                    400

1          MR. STEIN:  It's a foundation question.

2          MR. SIEGEL:  I'm sorry, I withdraw my question.

3   Q    You can see a backpack in that particular picture that

4   you testified about and it's the backpack that's on the

5   screen?

6   A    Yes, it looks the same.

7   Q    Take a look at that photograph.  Does that he help you

8   remember that there was another backpack in the car?

9   A    No, sir.

10  Q    It does not.  Okay.  Thank you.

11          So, Detective, I assume, because you don't have any

12  recollection of this backpack, you don't have any recollection

13  of examining the contents of a second backpack; correct?

14  A    No, sir.

15  Q    Other than the contents of the backpack, the firearm, the

16  three pairs of pants, and some miscellaneous things that were

17  at the bottom of the backpack, some loose change, some U.S.

18  currency, did you examine anything else?

19          THE COURT:  In the backpack?

20          MR. STEIN:  Anything else at all?

21          THE COURT:  From the vehicle?

22          MR. STEIN:  Correct.

23  A    I don't recall, sir.

24  Q    So, based on your present recollection, you were in

25  Queens.  You traveled a half hour; correct?  You went to the

1  Bronx and your sole purpose, as far as you can remember, was

2  to document the backpack that is depicted in 304-C?  That was

3  your job, you did nothing more, nothing less, as far as you

4  can remember; correct?

5  A    As far as I remember, yes.

6  Q    Okay.  As you sit here now, do you have any recollection

7  whatsoever as to what was in the car?

8  A    No, sir.

9  Q    Now, did you examine yourself -- you testified about the

10  black blue jeans as opposed to the two pairs of blue jeans.

11  Did you examine the pockets of the black blue jeans?

12  A    I don't recall.

13  Q    So you have no recollection of retrieving any pieces of

14  paper from any of the pockets in the black jeans; correct?

15  A    Not to my recollection.

16  Q    Now, in addition to the still photographs that you have

17  testified and some of which I have shown you today, you

18  testified also yesterday that there were other kinds of

19  photographic-type of documentation; correct?

20  A    Yes.

21  Q    What was the term you used to refer to them?

22  A    The live photo.

23  Q    Tell us generally what's a live photo.

24  A    It's a photo that can be taken like on an iPhone where a

25  still image is extended for roughly a second or two.

Nuzio - cross - Stein                                402

1  Q    Did you take any of those?

2  A    No, sir.

3  Q    Some other law enforcement agent did?

4  A    Yes, sir.

5  Q    And do you recall that process being done while you were

6  there?

7  A    Slightly.

8  Q    Okay.  Well, do you recall during that process when these

9  visual images were being taken that some of your colleagues

10  were laughing?

11 A    I only remember them from hearing it on the photos.

12 Q    These -- I forget the term again, the visual photos?

13 A    The live photos.

14 Q    Okay.  So there either yourself or your colleagues, while

15  this process, this important process was being engaged in, you

16  or some of your colleagues were laughing; correct?

17 A    Yes.

18 Q    Cursing?

19 A    I don't recall that.

20 Q    But did that happen on a number of occasions during these

21  types of photographs?

22 A    In this particular event?

23 Q    Yes.

24 A    I believe so, yes.

25 Q    And were you one of the ones who was laughing?

Nuzio - cross - Stein                                    403

1    A    I don't recall that.

2    Q    Well, you testified earlier at the beginning of my

3    questioning, you said it was very important to be as focused

4    as possible on what you were doing; correct?

5    A    Yes, sir.

6    Q    Yet you or some of your colleagues were laughing during

7    this process; correct?

8    A    Correct.

9              MR. STEIN:  Judge, this is going to be awkward

10   because our computer is not compatible with the Government's

11   system, so I would like to be able to acknowledge -- it

12   defeats us all eventually --

13             THE COURT:  It defeats me always.

14             MR. STEIN:  No comment.  So I would like to approach

15   the witness just for him to identify this.

16             THE COURT:  Okay, Mr. Stein.

17             MR. SIEGEL:  Your Honor, can we have a brief sidebar

18   on this?

19             THE COURT:  Sure.

20             (Sidebar held outside the hearing of the jury.)

21             (Continued on the next page.)

22

23

24

25

```
                        Sidebar                    404
```

1          (The following occurred at sidebar.)

2          MR. SIEGEL:  The issue is he wants to play some of

3     these clips where audio playing in the background.  They are

4     not in evidence.

5          I just asked Mr. Stein if he had a way of playing it

6     just for the witness, even if he plays it close enough to the

7     witness, the jury is close enough to the witness that the jury

8     is going to hear it.

9          THE COURT:  What is it?

10         MR. STEIN:  It's about 10 or 12 of these video

11    clips.  They are each a second or two long as opposed to

12    photographs.  Like I said, it will last for a second or two

13    and you can hear audio in the background.

14         Mr. Siegel is correct, that these are not in

15    evidence, but I don't want -- the witness already acknowledged

16    there was laughing during the course of this process, but I

17    want to be able to move this into evidence so the jury can

18    hear the background audio.

19         THE COURT:  No.  The photos can go in without sound.

20    He has already testified to what was going on.

21         MR. STEIN:  Correct, Judge, but, you know, it is one

22    thing for words to come out of a witness' mouth; it's another

23    thing for the jury to experience themselves.

24         THE COURT:  No, no, no.  None.

25         MR. STEIN:  That was definitive.

```
                          Sidebar                        405

1          THE COURT:  That takes care of that problem, doesn't

2    it?

3          MR. STEIN:  Okay.

4          (Sidebar concluded.)

5          (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  Q    Detective Nuzio, you testified about some of the

2  background audio to these video clips; correct?

3  A    Yes.

4  Q    Do you remember specifically anything that was being said

5  by any of your colleagues during the course of this process?

6  A    No, sir.

7            MR. SIEGEL:  Your Honor, I have an objection to

8  that.

9            THE COURT:  I will overrule it now.  He doesn't

10  recall.

11  Q    Well, do you recall one of your colleagues saying, during

12  the course of this video clip, do me a favor, throw that in

13  there?

14  A    No, sir.

15  Q    Okay.

16            MR. STEIN:  This becomes a little more awkward

17  because I want to be able to play this so just the witness can

18  hear this.  Obviously the jury should not hear this at this

19  point.

20            MR. SIEGEL:  Your Honor, if he wants to talk about

21  it, we should do it at sidebar.

22            (Sidebar held outside the hearing of the jury.)

23            (Continued on the next page.)

24

25

Sidebar                                        407

1              (The following occurred at sidebar.)

2              MR. SIEGEL:  Your Honor, even though the witness

3    answered that -- testified that he didn't remember, Mr. Stein

4    shouldn't be allowed to testify during his questions about the

5    audio that Your Honor already said he can't play.  So I would

6    ask that the last question where he said did you hear --  I

7    forgot exactly what he said -- should be stricken.

8              THE COURT:  What is the point?  What are you trying

9    to do?

10             MR. STEIN:  The point is --

11             THE COURT:  Do you have a good faith basis to think

12   they corrupted the photo?  Is that your point?

13             MR. STEIN:  Not the photo itself, but items, the

14   physical evidence, yes.  We are going to be challenging that

15   throughout the course of the Government's case, and I am going

16   to be summing up, I wouldn't use the word corrupted.  I would

17   say that --

18             THE COURT:  What do you mean?  They have added --

19   I'm not following.

20             MR. STEIN:  Okay.  I'm not sure who the officer was

21   who was saying this, but during the course of this process

22   with the video clips, one officer or agent can be heard saying

23   words to the effect throw this in there.

24             THE COURT:  What does that mean?  Why are you

25   offering that?  What's the point of it?

```
                        Sidebar                      408
```

1          MR. STEIN:  I'm offering to show that --

2          THE COURT:  What is the "throw this in there"?

3   What's the connection?

4          MR. STEIN:  There is no way to tell what specific

5   item that was being referred to by whoever was saying this,

6   but the point of it is we want to be able to show to the jury

7   that they should not trust --

8          THE COURT:  You don't even know where the throw it

9   is, do you?

10         MR. STEIN:  Excuse me?

11         THE COURT:  You have no good faith basis to know

12  that it has anything to do with anything that was recorded.

13         MR. STEIN:  I do, Judge, because the video clip in

14  which these words were being said was in the process of the

15  documenting of the physical evidence.

16         THE COURT:  It's in the background, right?

17         MR. STEIN:  Well, I don't know if the witness is

18  saying it or whether or not one of his colleagues.  There is

19  no way to know that.

20         MR. SIEGEL:  He says he doesn't remember it being

21  said.

22         MR. FARRELL:  Mr. Bennett has headphones.  He can

23  listen to it so the jury doesn't hear it.

24         MR. STEIN:  Can we do that, Judge?  We will put on

25  the headset and see if that refreshes his recollection.

```
                           Sidebar                        409
```

1            MR. SIEGEL:  I think the bigger issue is, if

2    somebody is in the background, and even if his memory is

3    refreshed, and he says, yeah, somebody said throw that in

4    there, he was standing there, so if they want to ask did

5    someone ask you to put something in the bag, they can ask

6    that.  Did someone say the words put that in there is

7    irrelevant and misleading.

8            THE COURT:  It is misleading.  I am asking what the

9    good faith connection is.  Then may be talking about a

10   hamburger for all you know in the background.

11           MR. STEIN:  Literally, they could be talking about

12   anything, but the point is in the context of what was going

13   on.

14           THE COURT:  It's not admissible and it's confusing

15   and it's prejudicial, and under 403, it is excludable.  There

16   is no basis for this.  We are going to strike the last

17   question and answer as well.

18           (Sidebar concluded.)

19           (Continued on the following page.)

20

21

22

23

24

25

Nuzio - cross - Stein                           410

1           (In open court.)

2           THE COURT:  The motion to strike the last question

3   and answer is granted.  The jury will disregard it.

4           (In open court.)

5   Q    Did you photograph any of the other contents of the car?

6   A    No, sir.

7           THE COURT:  Did you photograph anything at the

8   scene?

9           THE WITNESS:  Not that I recall, no.

10  Q    Detective, the pair of pants that you have testified

11  about, are you the officer who vouchered the pants?

12          MR. SIEGEL:  Your Honor, there are a couple of pairs

13  of pant.  If he could identify.

14  Q    I'm sorry, the black pants.

15  A    I'm sorry, can you repeat the question?

16  Q    Sure.  Are you the officer who vouchered the black pair

17  of pants?

18  A    Yes.

19  Q    And you also testified about a sweatshirt; correct?

20  A    Yes.

21  Q    Did you voucher that?

22  A    Yes.

23  Q    Did you retrieve that item, the shirt from the car?

24  A    The sweatshirt?

25  Q    Yes.

1    A    No, sir.

2    Q    Do you know who did?

3              MR. SIEGEL:  Objection, Your Honor.

4              THE COURT:  He can ask if he knows who removed the

5    shirt.

6    A    I do not know who removed it.

7              MR. STEIN:  I approach the witness with 3500-TN-3.

8    Q    I am going to point to a particular place on the

9    document, where my finger is.  Does that help you remember who

10   retrieved that?

11   A    Yes, sir.

12   Q    Who retrieved it?

13   A    Special Agent Miceli.

14             MR. STEIN:  I have no further questions.

15             THE COURT:  Thank you, Mr. Stein.

16             Mr. Siegel, do you have any redirect?

17             MR. SIEGEL:  Your Honor, could we have just one

18   moment?

19             THE COURT:  Sure.

20             MR. SIEGEL:  Thank you, Your Honor.

21   REDIRECT EXAMINATION

22   BY MR. SIEGEL:

23   Q    Detective Nuzio, there were a lot of questions about

24   things that you touched during the search or before the

25   search.  I just want to go back to that.  Did you search

Nuzio - redirect - Siegel                    412

1  anything other than this one backpack that you were talking

2  about?

3  A    Not that I recall.

4  Q    And the defendant, Elgin Brack, did you interact with him

5  that night?

6  A    No, sir.

7  Q    Did you touch him?

8  A    No, sir.

9        MR. SIEGEL:  Thank you.

10        MR. STEIN:  No further questions, Judge.

11        THE COURT:  Thank you, Mr. Stein.

12        Detective Nuzio, you are excused.  Thank you very

13  much.

14        THE WITNESS:  Thank you.

15        (Prospective juror excused.)

16        THE COURT:  Does the Government have another

17  witness?

18        MR. SIEGEL:  Your Honor, the Government calls

19  Special Agent Miceli.

20        Your Honor, I am going to grab some physical

21  evidence from the back.

22        THE COURTROOM DEPUTY:  Please raise your right hand.

23        (Witness sworn.)

24        THE COURTROOM DEPUTY:  Please state your first and

25  last name.

                    Miceli - direct - Siegel                413

1              THE WITNESS:  It's Tyler Miceli.  T-Y-L-E-R.

2    M-I-C-E-L-I.

3              THE COURTROOM DEPUTY:  Thank you have a seat.

4              THE WITNESS:  Thank you.  Good morning.

5              THE COURT:  Good morning.

6              You may inquire when you are ready, Mr. Siegel.

7              MR. SIEGEL:  Apologies, Your Honor.

8              THE COURT:  No problem.

9    **TYLER MICELI**,

10        called by the Government, having been duly

11        sworn, was examined and testified as follows:

12   DIRECT EXAMINATION

13   BY MR. SIEGEL:

14   Q    Good morning, Agent Miceli.

15   A    Good morning.

16   Q    Where do you work?

17   A    For the Bureau of Alcohol, Tobacco, Firearms and

18   Explosives, also known as ATF.

19   Q    What is your job with the ATF?

20   A    Special agent.

21   Q    How long have you been a special agent with the ATF?

22   A    About five years.

23   Q    Back in November of 2018, were you on a particular team

24   within the ATF in New York City?

25   A    Yes.

1   Q     What team was that?

2   A     I was a joint robbery task force.

3   Q     What is the joint robbery task force?

4   A     It's a group of ATF's agents and NYPD detectives.

5   Q     What does the joint robbery task force do?

6   A     Primarily we investigate Hobbs Act robberies or

7   commercial robberies.

8   Q     Is the joint robbery task force also known as SPARTA?

9   A     Yes.

10  Q     Let me direct your attention back to the morning of

11  November 26, 2018.  Were you assigned to work on a case that

12  day?

13  A     Yes.

14  Q     What was the case?

15  A     It was a pattern robbery and shooting.

16  Q     What is a pattern robbery?

17  A     A pattern robbery is a spree of robberies, more than one,

18  typically believed to be committed by the same suspect or

19  suspects.

20  Q     Where had this pattern robbery occurred?

21  A     Queens.

22  Q     When had it occurred?

23  A     In the early morning hours of November 26th.

24  Q     What did you do that day as a part of your investigation?

25  A     Once we got assigned to the case, we met up with the

Miceli - direct - Siegel                     415

1   other NYPD commands.  I just started gathering all of the

2   intelligence we could.

3   Q    What kind of intelligence were you gathering?

4   A    Video surveillance, reviewing police complaints from each

5   of the locations.

6   Q    Did you review surveillance video?

7   A    Yes.

8   Q    Did you also track LPR data?

9   A    Yes.

10  Q    What is LPR?

11  A    LPR data stands for license plate reader data.  It pings

12  license plate that is put into the system as it crosses

13  throughout certain points in the city.

14  Q    And did there come a time when people were arrested in

15  the case?

16  A    Yes.

17  Q    About when was that?

18  A    That was about 8:30, 8:45 that evening.

19  Q    When you say that evening, about how many hours was this

20  after the robbery spree?

21  A    About 15 hours after.

22  Q    Were you at the arrest?

23  A    No.

24  Q    Where were you?

25  A    I was at the ATF office.

Miceli - direct - Siegel                    416

1   Q    Did there come a time when the people who were arrested

2   were brought back to your office?

3   A    Yes.

4   Q    How many people were brought back?

5   A    Four.

6   Q    What were the genders of those people?

7   A    Three males and one young girl.

8   Q    Who were the men?

9   A    It was Elgin Brack, Scott Brack, and Edward Vasquez.

10  Q    Who was the little girl?

11  A    It was Edward Vasquez's daughter.

12  Q    Was the little girl arrested?

13  A    No.

14  Q    Why was the little girl brought back?

15  A    Because just wanted to keep her with her father and her

16  father was not under arrest at the time.

17  Q    Did you meet each of the men that night?

18  A    Yes.

19  Q    About how far away from them were you when you saw them?

20  A    Face-to-face, within feet.

21  Q    How long did you spend with each of them?

22  A    Hours.

23  Q    I would like to show you Government Exhibit 101.

24       MR. SIEGEL:  This will be for just the witness.

25  Q    While that is loading, let me ask you another question.

1    A    Sure.

2    Q    You said one of the men that was arrested that night was

3    Elgin Brack?

4    A    Yes.

5    Q    Would you recognize Elgin Brack if you saw him again

6    today?

7    A    Yes.

8    Q    Would you look around the courtroom and tell us if you

9    see Elgin Brack?

10   A    I do.

11   Q    Would you please identify him by an article of clothing

12   he is wearing?

13   A    He is wearing the black blazer.

14        MR. FARRELL:  Acknowledge the ID, Judge.

15        THE COURT:  The identification is acknowledged by

16   the defense.

17   Q    At the time of his arrest, how old was Elgin Brack?

18   A    About 23.

19   Q    So, now, I am getting ready to show you Government

20   Exhibit 101.  Do you recognize Government Exhibit 101?

21   A    I do.

22   Q    What is Government Exhibit 101?

23   A    That is a photograph of Elgin Brack.

24   Q    Is that a fair and accurate depiction of how he looked

25   the night of his arrest?

Miceli - direct - Siegel          418

1   A    Yes.

2        MR. SIEGEL:  Your Honor, I move to admit Government

3   Exhibit 101.

4        THE COURT:  Any objection?

5        MR. STEIN:  No.

6        THE COURT:  Received without objection.

7        (Government's Exhibit 101 received in evidence.)

8        MR. SIEGEL:  I will publish that for the jury.

9        (Exhibit published.)

10       MR. SIEGEL:  And now just for the witness again.

11  Q    Now, I would like to show just the witness Government

12  Exhibit 122.  Do you recognize Government Exhibit 122?

13  A    Yes.

14  Q    What is Government Exhibit 122?

15  A    That is a photograph of Elgin Brack the night that he was

16  arrested.

17  Q    Is that a fair and accurate depiction of how he looked

18  the night he was arrested?

19  A    Yes.

20       MR. SIEGEL:  Your Honor, I move to admit Government

21  Exhibit 122.

22       THE COURT:  Any objection?

23       MR. STEIN:  No.

24       THE COURT:  Received without objection.

25       (Government's Exhibit 122 received in evidence.)

1          MR. SIEGEL:  All right.  Now, I would like to show

2    just the witness Government Exhibit 123.

3    Q    What is Government Exhibit 123?

4    A    That is a photograph of Elgin Brack's shoes the night he

5    was arrested.

6    Q    Is it a fair and accurate depiction of his shoes the

7    night he was arrested?

8    A    Yes.

9          MR. SIEGEL:  I move to admit Government Exhibit 123.

10          THE COURT:  Any objection?

11          MR. STEIN:  No.

12          THE COURT:  Received without objection.

13          (Government's Exhibit 123 received in evidence.)

14   Q    Why did you take a close-up picture of Elgin Brack's

15   shoes?

16          MR. STEIN:  Objection.

17          THE COURT:  Is that an objection?

18          MR. STEIN:  Yes, Judge.

19          THE COURT:  Sustained.

20   Q    I'd like to show just the witness Government Exhibit 102.

21   Do you recognize Government Exhibit 102?

22   A    Yes.

23   Q    What is Government Exhibit 102?

24   A    That is a photograph of Scott Brack.

25   Q    Is that a fair and accurate depiction of how Scott Brack

1    looked on the night of the arrest?

2    A    Yes.

3         MR. SIEGEL:  Your Honor, I move to admit Government

4    Exhibit 102.

5         THE COURT:  Any objection?

6         MR. STEIN:  No.

7         THE COURT:  Received without objection.

8         (Government's Exhibit 102 received in evidence.)

9    Q    At the time of the arrest, how old was Scott Brack?

10   A    About 50.

11        MR. SIEGEL:  All right.  Now, I would like to show

12   just the witness Government Exhibit 124.

13   Q    Do you recognize Government Exhibit 124?

14   A    I do.

15   Q    What is Government Exhibit 124?

16   A    That is a still of Scott Brack the night of his arrest.

17   Q    Is that a fair and accurate depiction of Scott Brack on

18   the night of the arrest?

19   A    Yes.

20        MR. SIEGEL:  Your Honor, I move to admit Government

21   Exhibit 124.

22        THE COURT:  Any objection?

23        MR. STEIN:  No.

24        THE COURT:  Received without objection.

25        (Government's Exhibit 124 received in evidence.)

1    Q    Now, I'd like to show again just the witness Government

2    Exhibit 103.  What is Government Exhibit 103?

3    A    That is a photo of Edward Vasquez.

4    Q    Is that a fair and accurate depiction of how Edward

5    Vasquez looked the night of the arrest?

6    A    Yes.

7              THE COURT:  Any objection?

8              MR. STEIN:  No.

9              THE COURT:  Receive without objection.

10             (Government's Exhibit 103 received in evidence.)

11   Q    I want to be clear, was this photograph taken the night

12   of the arrest?

13   A    No.

14   Q    The night of the arrest, did his hair look the same way

15   that it looks in this photo?

16   A    It was a little shorter.

17   Q    Based on the time that you spent with Edward Vasquez,

18   what race did you perceive him to be?

19   A    Hispanic.

20   Q    How old was Edward Vasquez the night of his arrest?

21   A    About 45.

22   Q    During the course of preparing for trial, did you have an

23   opportunity to review your paperwork in connection with this

24   case?

25   A    Yes.

Miceli - direct - Siegel                          422

1   Q     Did you notice any mistakes in your paperwork?

2   A     I did.

3   Q     What particular paperwork are you thinking of?

4   A     The complaint.

5             MR. STEIN:  Judge, I object to this line of

6   questioning.

7             MR. SIEGEL:  Your Honor, if we can have a brief

8   sidebar.

9             THE COURT:  Sure.

10            (Sidebar held outside the hearing of the jury.)

11            (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                    423

 1            (The following occurred at sidebar.)

 2            MR. SIEGEL:  Your Honor, as Mr. Stein raised before,

 3   in the Complaint, Agent Miceli inaccurately referred to the

 4   people in the car as three African-American men.  I suspect

 5   that is going to be the subject of cross examination and I am

 6   going to pull the sting on it.

 7            THE COURT:  Okay.  If that happens, then you can

 8   take care of it on --

 9            MR. STEIN:  The subject is certainly relevant, but

10   to bring it out at this point during the direct examination.

11            THE COURT:  He had admitted that he made errors.

12   Just move on, and then you can come back later on as need be

13   on recross, on redirect.

14            MR. FARRELL:  Are we taking a morning break soon?

15            THE COURT:  Gentlemen, where do you think we should

16   be coasting in?

17            MR. STEIN:  This is just the beginning of his

18   testimony.

19            MR. SIEGEL:  This is just the beginning.

20            THE COURT:  Is this a logical point?

21            MR. SIEGEL:  There are one or two more pictures we

22   are going to show.

23            THE COURT:  Then put the pictures up and then we

24   will take a break.

25            (Sidebar concluded.) (Continued on the next page.)
```

Miceli - direct - Siegel                    424

1   Q    Agent Miceli, you mentioned earlier that you were looking
2   at LPR records?
3   A    Yes.
4   Q    Was there a particular car that you were looking at LPR
5   records for?
6   A    Yes.
7   Q    What car was that?
8   A    It was a two-door Toyota Solara, silver.
9   Q    Was that car brought to the ATF's offices?
10  A    Yes.
11  Q    Did you review records to determine who the owner of the
12  car was?
13  A    Yes.
14  Q    Who was the owner of the car?
15  A    Jimmy Vasquez.
16  Q    Who is Jimmy Vasquez?
17  A    He's the brother of Edward Vasquez.
18  Q    And sometime later, did you have the chance to speak to
19  Jimmy Vasquez?
20  A    Yes.
21  Q    So let me show you --
22            MR. SIEGEL:  I'm sorry, just the witness, Government
23  Exhibit 129.
24  Q    Do you recognize Government Exhibit 129?
25  A    Yes.

                    Miceli - direct - Siegel                425

1    Q     What is Government Exhibit 129?

2    A     A photo of Jimmy Vasquez.

3    Q     Is that a fair and accurate depiction of Jimmy Vasquez?

4    A     Yes.

5              MR. SIEGEL:  Your Honor, I move to admit Government

6    Exhibit 129.

7              THE COURT:  Any objection?

8              MR. STEIN:  No.

9              THE COURT:  Received without objection.

10             (Government's Exhibit 129 received in evidence.)

11             MR. SIEGEL:  Your Honor, at this point, I think it

12   would be a logical time for the morning break.

13             THE COURT:  Okay.  Thank you, Mr. Siegel.

14             Ladies and gentlemen, sometimes we confer as to

15   where we think a logical break in the action is and counsel

16   advised that this is it.  So we will take our midmorning break

17   at this time, again.  Do not discuss the case amongst

18   yourselves or with anyone else you may run into in the back.

19   It will give you a chance to refresh.  And please keep an open

20   mind.  We will see you in about 10, 15 minutes.

21             (Jury exits the courtroom.)

22             THE COURT:  Agent Miceli, you can step down.

23             We will see you in about 10 or 15.

24             THE WITNESS:  Thank you.

25             (Recess taken.)

1    (Continuing.)

2              (In open court - jury not present.)

3              THE COURTROOM DEPUTY:  All rise.  Court is back in

4    session.

5              (Judge Vitaliano entered the courtroom.)

6                 (Defendant entered courtroom.)

7              THE COURTROOM DEPUTY:  Counsel for both sides,

8    including defendant, are present.

9              THE COURT:  Ready to presume?

10             MR. SELDEN:  Your Honor, on behalf of the

11   Government, we have a brief housekeeping matter.

12             Since it is Mr. Siegel's witness, he is going to

13   address The Court.

14             MR. SIEGEL:  Your Honor, this is just a follow-up on

15   the post-arrest statement.

16             Just to avoid any further issue on it, we have

17   offered to the defense to stipulate that the defendant did

18   sign the document on November 26th, 2018 with his left hand.

19   The defense said they are considering it.  Hopefully, we will

20   get that resolved before the cross-examination, but to the

21   extent there isn't a stipulation on it, we would just like to

22   reiterate and make sure that it's clear that any questions

23   they ask shouldn't in any way imply or mention that this was

24   part of an interview.  Just -- they can ask did he sign a

25   document, what hand did he use; but any of the context

1    shouldn't come in and shouldn't be in any questions.

2              THE COURT:  That was the Court's ruling.

3              MR. STEIN:  Judge, we've resolved this.  We are not

4    going to stipulate and Mr. Farrell informed The Court

5    yesterday or today what the whole purpose of this is.

6              We are not going to ask any questions about any

7    interview.  It is strictly if he doesn't -- if the witness

8    doesn't recall to show him the video, ask him if that

9    refreshes his recollection as to what hand Mr. Brack used when

10   he wrote something.  I'm not going to ask questions about an

11   interview or what the something was or anything like that.

12             THE COURT:  Sounds to me like the stipulation

13   accomplishes the same objective, but if that is the way you

14   want to do it.

15             MR. STEIN:  Yes, we prefer that, Judge.

16             THE COURT:  Okay.

17             Anything?

18             MR. SELDEN:  Your Honor, on behalf of the

19   Government, nothing else.

20             THE COURT:  The witness can resume.

21             MR. LAX:  We are bringing him back in, Your Honor.

22             THE COURT:  Yes.

23             (Witness resumes the stand.)

24             (Jury enters.)

25             THE COURT:  Be seated, please.  Counsel will

Miceli - direct - Siegel                    428

1    stipulate that the jury is present and properly seated.

2            MR. SELDEN:  On behalf of the Government, yes, Your

3    Honor.  Thank you.

4            MR. STEIN:  Yes, Judge.

5            THE COURT:  Thank you, counsel.

6            Ladies and gentlemen, welcome back.  We are ready to

7    resume.  If you will recall that Special Agent Miceli was on

8    the stand and we are still on Mr. Siegel's direct examination.

9            MR. SIEGEL:  Thank you, Your Honor.

10   DIRECT EXAMINATION CONTINUING

11   BY MR. SIEGEL:

12   Q    I think when we left off we were talking about Jimmy

13   Vasquez, the owner of the car?

14   A    Yes.

15   Q    The night of the arrests, did you search the car?

16   A    Yes.

17   Q    Before that search took place, had you come into any

18   contact with Elgin Brack?

19   A    No.

20   Q    Had you touched Elgin Brack?

21   A    No.

22   Q    Where did your search occur?

23   A    In the garage of the ATF office.

24   Q    And prior to searching the -- prior to searching the car,

25   can you describe its condition?

Miceli - direct - Siegel                    429

1   A    It was closed and it was a little messy.

2          MR. STEIN:  I'm sorry, closed and what?

3          THE WITNESS:  A little messy.  I'm sorry.

4   BY MR. SIEGEL:

5   Q    Were you able to tell if anyone else had searched the car

6   before you searched it?

7   A    No.

8   Q    When you -- when you conducted your search, would you

9   have worn gloves?

10  A    I don't recall in that instance, but likely yes.

11  Q    And why is that?

12         MR. STEIN:  Judge, move to strike his answer.

13  "Likely."

14         THE COURT:  Yes, the "likely" part.  He said he

15  doesn't recall.  You can ask him if he had a pattern and

16  practice.

17  BY MR. SIEGEL:

18  Q    Agent Miceli, do you have a pattern or practice of

19  wearing gloves during searches?

20  A    Yes.

21  Q    And why do you have that pattern or practice?

22  A    We were trained to do so.  Beyond that, I've been an EMT

23  for 16 years, so touching anything without gloves on doesn't

24  sit well.

25  Q    What area of the car did you search?

```
                    Miceli - direct - Siegel              430
```

1    A    The rear seat, passenger side.

2    Q    And what did you see when you searched the rear seat,

3    passenger side of the car?

4    A    I saw a piece of what appeared to be a green hooded

5    jacket.

6    Q    Where was that jacket?

7    A    In the backseat passenger side.

8    Q    Did you take a picture of what you saw?

9    A    I did.

10         MR. SIEGEL:  I am showing just the witness

11   Government Exhibit 304B.

12   Q    Do you recognize Government Exhibit 304B?

13   A    Yes.

14   Q    What is Government Exhibit 304B?

15   A    A photo I took of the back seat.

16   Q    Is this a true and fair and accurate depiction of what

17   you saw in the back seat?

18   A    Yes.

19         MR. SIEGEL:  Your Honor, I move to admit Government

20   Exhibit 304B.

21         THE COURT:  Any objection?

22         MR. STEIN:  No.

23         THE COURT:  Received without objection.

24         (Government's Exhibit 304B received in evidence.)

25         (Exhibit published.)

Miceli - direct - Siegel                    431

1    BY MR. SIEGEL:

2    Q    Did you move anything in the car before you took this

3    picture?

4    A    No.

5    Q    Let's start walking through the items in this photograph.

6              There is an item in the right, upper right-hand

7    corner.  What is that?

8    A    That is a multi-colored backpack.

9    Q    You also mentioned that you saw a jacket.

10             Are you able to see the jacket in this photograph?

11   A    Yes.

12   Q    Where do you see that jacket?

13   A    Under the black plastic bag.

14   Q    Can you circle where you see that jacket?

15   A    Sure.  (So marked.)

16             MR. SIEGEL:  Let the record reflect he has circled a

17   green triangle sticking out next to that black plastic bag.  I

18   am just going to blow up that portion.

19   Q    As part of your search, did you move the black plastic

20   bag?

21   A    Yes.

22   Q    Did you take a photo of what you saw after you moved the

23   black plastic bag?

24   A    Yes.

25             MR. SIEGEL:  I am going to show just the witness,

1    please, Government Exhibit 306A.

2    BY MR. SIEGEL:

3    Q    What is Government Exhibit 306A?

4    A    That is the jacket that was under the black plastic bag

5    and the cell phone.

6    Q    Is it a fair and accurate depiction of what you saw when

7    you moved the black plastic bag?

8    A    Yes.

9         MR. SIEGEL:  Your Honor, I move to admit Government

10   Exhibit 306A.

11        THE COURT:  Any objection?

12        MR. STEIN:  No.

13        THE COURT:  Received without objection.

14        (Government's Exhibit 306A received in evidence.)

15        (Exhibit published.)

16   BY MR. SIEGEL:

17   Q    Did you take this photograph?

18   A    I did.

19   Q    And other than moving the black plastic bag, had you

20   moved anything else in the car before taking this photograph?

21   A    No.

22   Q    And what is shown in this picture?

23   A    You see the jacket, a cell phone, and a piece of the

24   multi-colored backpack.

25   Q    Did you take anything out of the car?

Miceli - direct - Siegel                    433

1    A    Yes.

2    Q    What did you take out of the car?

3    A    I took the jacket and the cell phone.

4    Q    What about the backpack?

5    A    No.

6    Q    Where did you leave the backpack?

7    A    Right where it was.

8    Q    And why did you take that jacket and cell phone?

9    A    I took the jacket because it matched --

10             MR. STEIN:  Objection.

11             THE COURT:  I am going to sustain the objection.

12   BY MR. SIEGEL:

13   Q    So, after you did that initial search of the car where

14   you found that jacket and the cell phone, was the car searched

15   further?

16   A    Yes.

17   Q    By whom?

18   A    By Detective Nuzio, Special Agent Guest, and other

19   members of the my team at ATF.

20   Q    And did you meet with the people from the search after

21   the search?

22   A    Yes.

23   Q    Who did you meet with?

24   A    Detective Nuzio and Special Agent Guest.

25   Q    And did they show you items when you met with them?

Miceli - direct - Siegel                    434

1    A    They did.

2    Q    So I'd like to show you Government Exhibit 304C, which is

3    in evidence.

4            (Exhibit published.)

5    BY MR. SIEGEL:

6    Q    Do you recognize Government Exhibit 304C or the item

7    depicted in Government Exhibit 304C?

8    A    Yes.

9    Q    And what is that?

10   A    That is the backpack that was in the back seat.

11   Q    And did you see that backpack again that night?

12   A    Yes.

13   Q    When did you see it again?

14   A    Detective Nuzio had brought it up to me.

15   Q    All right.

16            MR. SIEGEL:  And now I'd like to show just the

17   witness, please, Government Exhibit 305A.

18   Q    Do you recognize Government Exhibit 305A?

19   A    Yes.

20   Q    What is Government Exhibit 305A?

21   A    A yellow T-shirt that says Nautica across it, two pairs

22   blue jeans, and flip-flops; a photograph of those items.

23   Q    Where did you get those items?

24   A    From Detective Nuzio.

25   Q    Is that a fair and accurate depiction of the clothing you

Miceli - direct - Siegel                435

1   received from Detective Nuzio that night?

2   A    Yes.

3           MR. SIEGEL:  Your Honor, I move to admit Government

4   Exhibit 305A.

5           THE COURT:  Any objection?

6           MR. STEIN:  No.

7           THE COURT:  Received without objection.

8           (Government's Exhibit 305A received in evidence.)

9           (Exhibit published.)

10  BY MR. SIEGEL:

11  Q    And I want to be clear, did Detective Nuzio give you all

12  of these clothes, including those flip-flops?

13  A    Yes.

14  Q    So, now I'd like to show you Government's Exhibit 307B,

15  which is in evidence.

16          (Exhibit published.)

17  Q    Do you recognize the item depicted in Government

18  Exhibit 307B?

19  A    I do.

20  Q    What is that?

21  A    A pair of black pants with golden zippers.

22  Q    And did you see those pants that night?

23  A    I did.

24  Q    When did you see those pants?

25  A    Detective Nuzio brought those to me, as well.

1          MR. SIEGEL:  Your Honor, if I may approach?

2          THE COURT:  You may.

3    BY MR. SIEGEL:

4    Q    I'd like to hand you Government Exhibit 317, which is in

5    evidence, subject to connection.

6    A    Thank you.

7    Q    And if you could start just with the packaging.

8          Do you recognize that packaging?

9    A    Yes.

10   Q    What is that packaging?

11   A    This is one of our evidence bags.

12   Q    And is there a label on it?

13   A    Yes.

14   Q    Do you recognize the label?

15   A    I do recognize it.  My signature is on it.

16   Q    And what is the contents of that packaging?

17   A    A brown wallet.

18   Q    Could you take it out and look at it?

19          Do you recognize that brown wallet?

20   A    I do.

21   Q    And how do you recognize it?

22   A    This was a wallet given to me that night by Detective

23   Nuzio.

24   Q    Does it appear to be in substantially the same condition

25   as it was when you received it from Detective Nuzio?

Miceli - direct - Siegel                    437

1    A     Yes.

2          MR. SIEGEL:  Your Honor, I move to admit Government

3    Exhibit 317.

4          THE COURT:  Any objection?

5          MR. STEIN:  No.

6          THE COURT:  Received in evidence without objection.

7          (Government's Exhibit 317 received in evidence.)

8          (Exhibit published.)

9          THE COURT:  Meaning no longer subject to connection.

10         MR. SIEGEL:  No longer subject to connection.

11         THE COURT:  It has been connected, in other words,

12   under the Rules of Evidence, ladies and gentlemen.

13         MR. SIEGEL:  Mr. Villanueva, I would like to have

14   the ELMO for one moment.  I am just opening up the wallet.

15         (Exhibit published.)

16   BY MR. SIEGEL:

17   Q    That ID card in the wallet, was that ID card in it the

18   night that you received it from Detective Nuzio?

19   A     Yes.

20         MR. SIEGEL:  All right, and if I could, I would like

21   to, please, just show just the witness Government

22   Exhibit 317A.

23   Q    Do you recognize exhibit -- Government Exhibit 317A?

24   A     Yes.

25   Q    What do you recognize that as?

Miceli - direct - Siegel                    438

1   A    It is a photograph of that same wallet.

2   Q    Is it a fair and accurate depiction of the wallet as it

3   looked the night of November 26th, 2018?

4   A    Yes.

5           MR. SIEGEL:  Your Honor, I move to admit Government

6   Exhibit 317A.

7           THE COURT:  Any objection?

8           MR. STEIN:  No.

9           THE COURT:  Received without objection.

10          (Government's Exhibit 317A received in evidence.)

11          (Exhibit published.)

12  BY MR. SIEGEL:

13  Q    In addition to the clothing and the wallet and the

14  backpack that we've discussed, did Detective Nuzio bring

15  anything else up to you?

16  A    Yes.

17  Q    What else did he bring?

18  A    A firearm.

19  Q    And what happened to all of those items after you and

20  Detective Nuzio examined them?

21  A    Some items were retained by ATF, others went to the NYPD

22  lab.

23  Q    Did you give anything to Detective Nuzio for him to

24  voucher with the NYPD?

25  A    Yes.

Miceli - direct - Siegel                    439

1   Q    What did you give to Detective Nuzio?

2   A    That green hooded jacket.

3   Q    Is that the one you pulled from the back seat of the car?

4   A    Yes.

5   Q    So now I'd like you to review some of the physical items

6   in this case.

7          MR. SIEGEL:  Your Honor, if you'll excuse me for

8   just one moment, there is just one other item I would like to

9   grab out of the closet.

10         THE COURT:  Yes.

11         (Pause.)

12  BY MR. SIEGEL:

13  Q    I am going to hand you what's been marked as Government

14  Exhibit 315.

15         MR. SIEGEL:  Actually, I am going to bring up to the

16  witness, 315, 316 and 311.

17         THE COURT:  These are all currently for

18  identification, Mr. Siegel?

19         MR. SIEGEL:  Yes, Your Honor.

20  Q    So let's start with Government Exhibit 315.

21         Starting with the packaging, do you recognize

22  Government Exhibit 315?

23         MR. STEIN:  Judge, I'm sorry.  Could we have a

24  sidebar, please?

25         (Sidebar held outside the hearing of the jury.)

```
                          Sidebar                          440
```

1              (The following sidebar took place outside the

2    hearing of the jury.)

3              MR. STEIN:  So, Government Exhibit 315, which I

4    think is what Mr. Siegel is referring to is --

5              THE COURT:  Currently, yes.

6              MR. STEIN:  -- is a ski mask and a beanie, okay.  I

7    don't know -- understand what possible connection there is to

8    the ski mask because there is no connection to anything that

9    I'm aware of.

10             The beanie, I think at some point Scott Brack is

11   seen wearing it.  I think he was wearing it when he was being

12   interviewed after he was arrested.  But the ski mask, I don't

13   see any connection whatsoever.

14             MR. SIEGEL:  Your Honor, these are items that,

15   actually, Mr. Farrell raised an objection to yesterday as one

16   of the housekeeping we talked about.  These are both items

17   that were taken off of Scott Brack's person at the time of the

18   arrest.

19             MR. STEIN:  So.

20             THE COURT:  Yes.

21             MR. FARRELL:  This agent wasn't present for that

22   though, Your Honor.  The basis would be hearsay, unless they

23   are going to call in the officer who actually recovered these

24   items.  He was just given them by someone.

25             MR. SIEGEL:  He's seen the video.

```
                         Sidebar                      441
```

1              MR. STEIN:  The video.

2              THE COURT:  I am not getting where this is going.

3              MR. STEIN:  I don't think the video shows anything

4     about a ski mask.

5              THE COURT:  Of whom?

6              MR. SIEGEL:  Well, so, Your Honor, then if the issue

7     is just with the ski mask, then we can just bring in the

8     beanie, which Scott Brack is seen in the surveillance footage

9     wearing.

10             And by surveillance footage, I mean footage from one

11    of the robberies.  Scott Brack is captured outside one of the

12    stores in that blue beanie, and it was recovered from on top

13    of his head after the arrest.

14             THE COURT:  So which piece again?

15             MR. SIEGEL:  Just the beanie and not the ski mask.

16             MR. STEIN:  Fine.

17             MR. FARRELL:  Yes, that works.

18             THE COURT:  Let's put the beanie in then.

19             MR. SIEGEL:  Well --

20             THE COURT:  Do you have more?

21             MR. SIEGEL:  When I ask the witness what is the

22    item, he is going to describe what he sees.  So should I just

23    lead him on this?

24             MR. FARRELL:  Yes, yes, definitely.  Thank you.

25             THE COURT:  Yes, on the beanie. (Sidebar concluded.)

Miceli - direct - Siegel                    442

1              (In open court - jury present.)

2              MR. SIEGEL:  Thank you, Special Agent.

3    EXAMINATION CONTINUING

4    BY MR. SIEGEL:

5    Q    So Government Exhibit 315, just starting with the

6    packaging, do you recognize that packaging?

7    A    Yes.

8    Q    And is there a label on the packaging?

9    A    Yes.

10   Q    Who prepared that label?

11   A    I did, and it has my signature on it.

12   Q    And inside that packaging, is there a blue beanie or a

13   blue knit cap?

14   A    Yes.

15   Q    Where did that knit cap come from?

16   A    This was taken off of Scott Brack at the time of his

17   arrest.

18   Q    Is the knit cap in substantially the same condition it

19   was when it was taken from Scott Brack?

20   A    Yes.

21              MR. SIEGEL:  Your Honor, I move to admit Government

22   Exhibit 315 under the terms we just discussed.

23              THE COURT:  Any objection?

24              MR. STEIN:  No.

25              THE COURT:  The beanie just described is received in

Miceli - direct - Siegel                    443

1  evidence as Government's Exhibit 315 without objection.

2           (Government's Exhibit 315 received in evidence.)

3  BY MR. SIEGEL:

4  Q    And, Special Agent Miceli, could you just hold up that

5  beanie for the jury to see?

6  A    Sure.  (Witness complies.)

7  Q    And while you are doing that, I am going to show you

8  Government Exhibit 124.

9           MR. SIEGEL:  This is in evidence.

10          (Exhibit published.)

11 Q    Is that blue beanie the same blue beanie that's on Scott

12 Brack's head in this photograph?

13 A    Yes.

14 Q    Okay, you can set that down.

15          I would now like you to look at Government

16 Exhibit 316.  Starting with the packaging, do you recognize

17 Government Exhibit 316?

18 A    I do.

19 Q    What is that packaging?

20 A    This is one of our evidence bags with our label and my

21 signature on it.

22 Q    And what is the contents of Government Exhibit 316?

23 A    It is a wallet, purple earphones, a toothbrush, and a

24 cigar wrapper.

25 Q    And where did those items come from?

Miceli - direct - Siegel                    444

1    A     These came off of Elgin Brack when he was arrested.

2    Q     And can you take them out and examine them?

3              MR. FARRELL:  I'm objecting, Judge.

4              What's the basis that he can say that, unless he was

5    present for it?

6    BY MR. SIEGEL:

7    Q     Were you present when those items were taken from Elgin

8    Brack?

9    A     I was in the room when these items were taken off him.

10             MR. FARRELL:  Thank you.

11   Q     Looking at those items, do they appear to be in

12   substantially the same condition as they were when you took

13   them from Elgin Brack or when they were taken from Elgin

14   Brack?

15   A     Yes.

16   Q     Is there a driver's license in that wallet?

17   A     Give me one moment.  There is an identification card.

18   Q     So, I am going to come take that from you and show it on

19   the ELMO.

20             Your Honor, I think there was -- I may have

21   forgotten.

22             THE COURT:  You didn't move it.

23             MR. SIEGEL:  I move this item into evidence, which

24   is Government's Exhibit 316.

25             THE COURT:  That's 16?

1          MR. SIEGEL:  316.

2          THE COURT:  Any objection?

3          MR. STEIN:  316, no.

4          THE COURT:  Received in evidence without objection.

5          (Government's Exhibit 316 received in evidence.)

6          (Exhibit published.)

7    BY MR. SIEGEL:

8    Q    Is this the identification card you were just referring

9    to?

10   A    Yes.

11   Q    What state is this issued by?

12   A    North Carolina.

13   Q    I'd also like you to look at Government Exhibit 311,

14   which is in front of you.

15          Starting with the packaging, do you recognize

16   Government Exhibit 311?

17   A    Yes, this is one of our evidence bags with our label and

18   my signature on it.

19   Q    And what is the contents of Government Exhibit 311?

20   A    It is a cell phone.

21   Q    And is this a particular cell phone?

22   A    Yes, this is the cell phone that I recovered from the

23   back seat of the vehicle.

24   Q    Does the cell phone appear to be in substantially the

25   same condition as it was when you took it out of the back seat

                    Miceli - direct - Siegel                    446

1    of the car?

2    A    Yes.

3            MR. SIEGEL:  Your Honor, I move to admit Government

4    Exhibit 311.

5            THE COURT:  Any objection?

6            MR. STEIN:  No.

7            THE COURT:  Received without objection.

8            (Government's Exhibit 311 received in evidence.)

9    BY MR. SIEGEL:

10   Q    What I'd like you to do now, please, behind you there is

11   Government Exhibit 304, which is in evidence.

12   A    (Witness complies.)

13   Q    And you can take that out of the packaging.

14   A    Okay.

15           MR. STEIN:  Which?

16           MR. SIEGEL:  304.

17   Q    Do you recognize Government Exhibit 304?

18   A    I do.

19   Q    What is that?

20   A    This is the backpack that was in the back seat of the

21   vehicle.

22   Q    Is that also the backpack that Detective Nuzio brought up

23   and showed you?

24   A    Yes.

25   Q    Can you just show that backpack to the jury?

Miceli - direct - Siegel                          447

1   A    (Witness complies.)

2   Q    Thank you, Special Agent.

3        I would now like you to look at Government

4   Exhibit 305, which is in evidence subject to connection.

5        And starting with the packaging that --

6   A    Sure.

7   Q    -- such as it still is, do you recognize that?

8   A    I do.

9   Q    How do you recognize it?

10  A    This is one of our evidence bags with our label and my

11  signature on it.

12  Q    And what are the contents of Government Exhibit 305?

13  A    It is a yellow Nautica T-shirt, two blue jeans, and a

14  pair of flip-flops.

15  Q    And did you receive those items that night?

16  A    Yes.

17  Q    Where did you receive them from?

18  A    From Detective Nuzio.

19  Q    Is that all the items in that bag?

20  A    Yes.

21  Q    Do they appear to be in substantially the same condition

22  as they were when you received them from Detective Nuzio?

23  A    Yes.

24       MR. SIEGEL:  Your Honor, I move to admit Government

25  Exhibit 305, no longer subject to connection.

Miceli - direct - Siegel                          448

1          THE COURT:  Mr. Stein.

2          MR. STEIN:  No objection.

3          THE COURT:  Received in evidence, no longer subject

4    to connection, without objection.

5          (Government's Exhibit 305 received in evidence.)

6          MR. SIEGEL:  Your Honor, if I may, at this time I'd

7    like to read a stipulation into evidence.

8          THE COURT:  Surely.

9          MR. SIEGEL:  This is Government Exhibit S-8:

10         It is hereby stipulated and agreed, by and between

11   the United States of America and the defendant Elgin Brack,

12   through his attorneys that:

13         Government Exhibit 421 is a true and accurate copy

14   of an excerpt of surveillance video.  Government Exhibit 421

15   fairly and accurately depicts the defendant, Elgin Brack, at a

16   store located in Greensboro, North Carolina on November 21st,

17   2018.

18         Government Exhibit 421, as well as this stipulation,

19   marked as Government Exhibit S-8, are admissible in evidence.

20         Dated Brooklyn, New York, February 27th, 2020 and

21   signed by the parties.

22         THE COURT:  Both are received in evidence without

23   objection.

24         (Government's Exhibits 421 and S-8 were received in

25   evidence.)

Miceli - direct - Siegel                          449

1    BY MR. SIEGEL:

2    Q    So I am now going to play that video of the defendant

3    from November 21st, but before I do, about how many days

4    before the robberies was November 21st?

5    A    About five days prior.

6         MR. SIEGEL:  Mr. Villanueva, can we dim the lights

7    one moment?

8         (Video played.)  (Video stopped.)

9         MR. SIEGEL:  Thank you.  Mr. Villanueva, you can

10   turn the lights back on.

11   BY MR. SIEGEL:

12   Q    So I am going to just play through that video one more

13   time.

14        THE COURTROOM DEPUTY:  Do you want the lights down?

15        MR. SIEGEL:  No, thank you.

16        THE COURTROOM DEPUTY:  Okay.

17        (Video played.)

18        MR. SIEGEL:  And I am stopping the video at

19   approximately 11 seconds into the video.  There is no time

20   stamp on the video, itself.

21        (Video stopped.)

22   BY MR. SIEGEL:

23   Q    Special Agent Miceli, could you hold up that backpack,

24   Government Exhibit 304?

25   A    (Witness complies.)

```
                    Miceli - direct - Siegel              450
```

1  Q    Thank you, Special Agent Miceli.

2           (Video played.)  (Video stopped.)

3           MR. SIEGEL:  I am playing the video again.

4           (Video played.)

5           MR. SIEGEL:  I am stopping it at 29 seconds and

6  blowing up a portion of the video showing the defendant.

7           (Video stopped.)

8  BY MR. SIEGEL:

9  Q    Special Agent Miceli, could you please hold up that

10 yellow T-shirt from Government Exhibit 305?

11 A    (Witness complies.)

12 Q    Can you hold up the flip-flops from Government

13 Exhibit 305?

14 A    (Witness complies.)

15 Q    Okay, thank you, Special Agent Miceli.

16          So behind you is Government Exhibit 307.

17 Government's Exhibit 307 is in evidence.

18          So looking at the contents of 307, do you recognize

19 those?

20 A    I do.

21 Q    What are those?

22 A    These are the black pants given to me by Detective Nuzio.

23 Q    Would you please hold those up for the jury?

24 A    (Witness complies.)

25 Q    Thank you, Special Agent Miceli.

Miceli - direct - Siegel                    451

1          And now, could you please take Government

2    Exhibit 306?

3          MR. SIEGEL:  Government Exhibit 306 is in evidence

4    subject to connection.

5    Q    Do you recognize the contents of Government Exhibit 306?

6    A    Yes.

7    Q    What is that?

8    A    This is the jacket that I recovered from the back seat of

9    the vehicle.

10   Q    And what did you do with that jacket after you recovered

11   it?

12   A    I took it up to the ATF office.  I later gave it to

13   Detective Nuzio.

14   Q    Does it appear --

15         MR. STEIN:  I didn't hear the last part, gave it to?

16         THE WITNESS:  And then gave it to Detective Nuzio.

17   BY MR. SIEGEL:

18   Q    Does that jacket appear to be in substantially the same

19   condition as it was when you recovered it from the back seat

20   of the car?

21   A    Yes.

22         MR. SIEGEL:  Your Honor, I move to admit Government

23   Exhibit 306, no longer subject to connection.

24         THE COURT:  Any objection?

25         MR. STEIN:  No.

Miceli - direct - Siegel                    452

1          THE COURT:  Received without objection, no longer

2    subject to connection.

3          (Government's Exhibit 306 received in evidence.)

4    BY MR. SIEGEL:

5    Q    Would you please hold up that jacket for the jury?

6    A    (Witness complies.)

7    Q    Thank you.

8          The day after the arrests on November 27th, did you

9    do a video canvas in the area of 2008 Hughes Avenue?

10   A    Yes.

11   Q    What is a video canvas?

12   A    You go into an area, you look for surveillance cameras.

13   If you see some that you think might have captured what you're

14   looking for, you try to pull excerpts or video off of the

15   surveillance system.

16   Q    As part of that video canvas, did you review surveillance

17   video at 20-31 Hughes Avenue?

18   A    Yes.

19   Q    And where is 20-31 Hughes Avenue in relationship to the

20   2000 block of Hughes Avenue?

21   A    It's the same street.

22   Q    And after reviewing the surveillance video at 20-31

23   Hughes Avenue, did you download a portion of it?

24   A    Yes.

25   Q    How did you download it?

Miceli - direct - Siegel                    453

1    A    Took a flash drive, plugged it into the system, selected

2    the portion of the video I wanted and put it on the flash

3    drive.

4    Q    Did the video to be downloaded have time stamps on it?

5    A    Yes.

6    Q    What, if anything, did you do to confirm whether the time

7    stamp was accurate?

8    A    So, I looked at the video as it was in realtime in front

9    of me and then looked at a reliable source.  I used my iPhone.

10   Everybody has an iPhone.  I confirmed the time on my iPhone to

11   that on the live video.

12   Q    Did you also check that the date was accurate?

13   A    Yes.

14   Q    And what did you do determine?

15   A    It was an accurate time and date.

16   Q    So I'm showing you a CD with Government Exhibits 417A and

17   Government Exhibits 417B on it.

18            Do you recognize that CD?

19   A    Yes.

20   Q    How do you recognize that CD?

21   A    I was able to review it, and I put my initials and the

22   date of my review.

23   Q    And what is on that CD?

24   A    This is an excerpt of that video surveillance from that

25   address.

Miceli - voir dire - Stein                    454

Q      How many excerpts are on the CD?

A      Two.

Q      Are the excerpts on that CD true and accurate copies of
excerpts from the surveillance that you downloaded on November
27th, 2018?

A      Yes.

            MR. SIEGEL:  Your Honor, I move to admit Government
Exhibits 417A and 417B.

            MR. STEIN:  Judge, we'd like a voir dire on this.

            THE COURT:  By you or Mr. Farrell?

            MR. FARRELL:  Mr. Stein is going to handle this.

            THE COURT:  Proceed, whoever.

VOIR DIRE EXAMINATION

BY MR. STEIN:

Q      So, Mr. Miceli, what was the building that this video was
taken from?

A      I believe it was a residence.

Q      And what's the date that you went there and obtained
this?

A      The 27th.

Q      Of November of 2018?

A      Yes, sir.

Q      And did you confer with anybody from the building in the
process of obtaining this video?

A      I believe the occupants.  I don't recall who exactly.

1   Q    By "occupants," you mean somebody who lived in the

2   building?

3   A    Yes.

4   Q    Did you confer with the superintendent of the building?

5   A    I don't remember.

6   Q    Did you confer with the managing agent of the building?

7   A    I don't remember.

8   Q    Okay.

9         So, as you sit here today, can you tell us whether

10  or not you had an occasion to attempt to verify whether the

11  video surveillance from that building was in working order?

12  A    I'm sorry, I don't understand the question.

13  Q    Sure.

14        Did you have the occasion on November 27th to

15  attempt to verify whether or not the equipment that was making

16  this recording was in proper working order?

17        Did you speak -- in other words, did you speak to

18  the managing agent?  Did you speak to the super of the

19  building?

20  A    I don't remember.

21  Q    Okay.  So, as you sit here now, you have no information

22  to tell us about whether or not you attempted to verify

23  whether this machine was working properly, correct?

24  A    Yeah, not beyond what I was able to recall.

25  Q    And tell us, what is the procedure you used to download

Miceli - voir dire - Stein                          456

1    this?

2    A    We took a flash drive.  We inserted the flash drive into

3    the DVR component, and then we -- all systems are different,

4    so I don't recall how this particular one was, but you can

5    select the video you want and then put it on the flash drive.

6    Q    So if I could just summarize it, you just copied an

7    excerpt from the video at this building, correct?

8    A    Correct.

9    Q    And as you sit here now, you have no information as to

10   whether or not the machine that was making this recording was

11   functioning properly, correct?

12   A    Correct, not beyond what I was able to pull off the disk.

13           MR. STEIN:  Judge, we object to this.

14           THE COURT:  Anyone want to be heard?

15           MR. SIEGEL:  Your Honor, could we have a brief

16   sidebar?

17           THE COURT:  Sure.

18           (Sidebar held outside the hearing of the jury.)

19

20           (Continued on the following page.)

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

```
                        Sidebar                      457
```

1           (The following occurred at sidebar.)

2           MR. SIEGEL:  Your Honor, as he testified on direct,

3    he went there, he looked at the system, he confirmed the time

4    stamping date on the system and then pulled videos from that

5    system and this is the video he pulled from that system.

6           THE COURT:  I assume, it's not entirely clear, but I

7    assume you are proffering that it was aimed at something

8    that's relevant to the case?

9           MR. SIEGEL:  Oh, yes, yes.

10          THE COURT:  I assume.

11          MR. SIEGEL:  Your Honor.  This is going to be

12   footage from November 25th.

13          THE COURT:  Right, it's across the street.

14          MR. SIEGEL:  This is the street where he was

15   arrested.  It's from November 25th, 12 hours before the

16   robbery.  It shows the defendant walking down the street with

17   the hood down and all the clothes from the robbery.

18          THE COURT:  Yes.

19          MR. STEIN:  Judge, that's all very interesting but

20   it has nothing to do with our objection.  The objection is

21   whether or not this is something that's reliable and

22   trustworthy because we don't know anything about the machine.

23          THE COURT:  It's reliable and trustworthy enough to

24   get in.  You can argue as to the weight.

25          MR. STEIN:  Thank you.

Miceli - direct - Siegel                    458

1              (In open court; sidebar ends.)

2              MR. SIEGEL:  Your Honor, I move Government's

3    Exhibit 417-A and 417-B into evidence.

4              THE COURT:  Received over objection.

5              (So marked.)

6              MR. SIEGEL:  Mr. Villanueva, can you please dim the

7    lights, please, and I'm going to play Government Exhibit 417.

8              (Video played.)  (Video stopped.)

9    DIRECT EXAMINATION (Continued)

10   BY MR. SIEGEL:

11   Q    I'm stopping it right at the beginning.  The time stamp

12   at the top says 3:07:02.

13             Agent Miceli, can you remind us what was the date

14   you collected this video?

15   A    The 27th of November, 2018.

16   Q    And what's the date stamp on the video of Government

17   Exhibit 417-A?

18   A    It's 11 or November 25, 2018.

19   Q    And what time?

20   A    3:07 and .2 seconds -- I'm sorry -- 2 seconds.

21   Q    Is that a.m. or p.m.?

22   A    That's p.m.

23   Q    And just to orient us in terms of the robberies, about

24   how long is this before or after the robberies?

25   A    About 12 hours before.

                    Miceli - direct - Siegel              459

1    Q    I'm now hitting play.

2          (Video played.)  (Video stopped.)

3    Q    I'm rewinding the video back to timestamp 3:07:24.  I'm

4    going to hit play again.

5          (Video played.)  (Video stopped.)

6    Q    I'm pausing it at timestamp 3:07:30.

7          Special Agent Miceli, can you hold up Government

8    Exhibit 306, please.

9    A    (Witness complies.)

10   Q    Thank you, Special Agent Miceli.

11         And can you please hold up Government Exhibit 307?

12   A    (Witness complies.)

13   Q    Thank you, Special Agent Miceli.

14         I'm going to play Government Exhibit 417-B.

15         (Video played.)  (Video stopped.)

16   Q    I'm hitting pause at the beginning of the video.

17         What is the time stamp at the beginning of the

18   video?

19   A    11/25/2018, 3:07 and 24 seconds.

20   Q    Is that a.m. or p.m.?

21   A    p.m.

22   Q    Is that approximately the same time as Government

23   Exhibit 417-A?

24   A    Yes.

25   Q    What's the difference between these two videos?

Miceli - direct - Siegel                    460

1    A    They're different angles.

2    Q    I'm hitting play again.

3         (Video played.)  (Video stopped.)

4    Q    I'm stopping the video at 3:07:41 on the timestamp.  I'm

5    just rewinding it to the beginning to capture a brief frame.

6         (Video played.)  (Video stopped.)

7    Q    I'm stopping the video at timestamp 3:07 -- I apologize.

8    I couldn't tell if that was 28 or 20.

9         (Video played.)  (Video stopped.)

10   Q    It's timestamp 3:07:28.  I'm blowing up the portion of an

11   image of a person standing on the right side.

12        Could you please hold up Government Exhibit 304?

13   A    (Witness complies.)

14   Q    Can you hold up 306, please, particularly the back of

15   306?

16   A    I'm sorry?

17   Q    If you can show the back of 306.

18   A    (Witness complies.)

19   Q    All right.  Thank you, Special Agent Miceli.

20        MR. SIEGEL:  No further questions.  Thank you.

21        THE COURT:  Thank you, Mr. Siegel.

22        (Continued on next page.)

23

24

25

461

1          THE COURT:  All right.  That brings us almost

2     exactly to the lunch hour so it's a capricious time to take

3     lunch and, ladies and gentlemen, that we will do.

4          The most important rules continue to apply.  Do not

5     discuss this case amongst yourselves or with anyone else.

6     Continue to keep an open mind.  The cafeteria remains open for

7     your use as well as other luncheonettes in the area.  Do not

8     use the recess period, the lunch, as an opportunity to do any

9     research of any kind relating to this case.  You remain on

10    radio silence.  No communication, social media or otherwise,

11    to anyone about being a juror or coming to the courthouse or

12    anything that touches upon this case and, you know, no

13    communication rule and the media rule includes that broad

14    definition of "media" and to the extent that there are any

15    inclusions in that form of media relating to this case, you're

16    to totally disregard it.

17         So with those continued admonitions, we will break

18    for the lunch period.  I ask you to come back to the jury room

19    at around 2:15 or so and we'll get started as close to that

20    time as possible.  And, again, jury room meaning the Central

21    Jury Room where you will be eventually guided up here when we

22    are ready to resume for the afternoon session.

23         Enjoy your lunch.

24         (Jury exits.)

25         THE COURT:  All right.  We'll take the usual lunch

462

1  break.  The usual rules apply to the extent if you want to

2  leave something, William will lock up the courtroom.  To the

3  extent you might need it during the lunch period, please take

4  it with you, and we'll see you around 2:15.

5          MR. SELDEN:  Thank you, Your Honor.

6          THE COURT:  You're welcome.

7          MR. STEIN:  Judge, before we break?

8          THE COURT:  Okay.

9          MR. SELDEN:  If it's a housekeeping matter, the

10  witness is still in the room.

11          (Witness steps down.)

12          MR. STEIN:  Judge, Mr. Brack has requested to

13  address the Court again.

14          THE COURT:  Mr. Brack?  Again, you understand, I'll

15  remind you every time you speak to me, that anything you say

16  can be used against you.

17          THE DEFENDANT:  I know.  I know.  I know all that.

18  I want to save you some breath.

19          THE COURT:  I have to remind you anyway.

20          THE DEFENDANT:  All right.  My thought is the court

21  right now and the theatrics they're doing right now, I don't

22  agree with it but I want to be on record with my complaint.

23          THE COURT:  Hold it.

24          THE DEFENDANT:  Can I finish?

25          THE COURT:  No, Mr. Brack.  I run the place.  Okay?

463

1    There are rules.

2            THE DEFENDANT:  Everybody has a boss.

3            THE COURT:  There are rules and we're going to

4    follow the rules of evidence.

5            THE DEFENDANT:  Can I finish my statement?

6            THE COURT:  You can take exception but that's

7    besides the point.

8            THE DEFENDANT:  That's not my objection.  My

9    objection is you let an officer lie yesterday knowing he lied

10   and Officer Miceli just confirmed that he lied about my

11   outfit, other detectives that prove as far as transportation

12   and all this other stuff.

13           Now, you let him show this evidence and then break

14   so that's left in the jury's minds?  Come on.  Like, like,

15   this is, like, a theater.  This is not fair.  We all know

16   what's going on.  I would like a fair trial.  Like, that

17   wasn't a certified video but you let it in.  Like, come on.

18   You picking and choosing.  This is supposed to be fair.

19           THE COURT:  Your objection is noted.

20           THE DEFENDANT:  Yeah.  And everybody has a boss.

21   You're not the President.

22           THE COURT:  Thankfully.

23           THE DEFENDANT:  Stupid shit keep going.  And Joel,

24   make note that I still haven't got the discovery.  What the

25   fuck?  Like, come on, man.

464

1          (Defendant exits.)

2          THE COURT:  Any further need of the Court before

3    lunch or can we break?

4          MR. SELDEN:  Not on behalf of the government.  Thank

5    you, Your Honor.

6          (Luncheon recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

465

1                       AFTERNOON SESSION

2            (In open court; outside the presence of the jury.)

3            THE CLERK:  Court is back in session.

4            Counsel for both sides are present including

5    defendant.

6            THE COURT:  Are we ready to go?

7            MR. SELDEN:  On behalf of the government,

8    Your Honor, I believe we are ready to proceed.  Thank you.

9            THE COURT:  Mr. Stein, are you handling the cross?

10           MR. STEIN:  Yes, sir.

11           THE COURT:  Are you ready then?

12           MR. STEIN:  I'm consulting with Mr. Bennett.

13           THE COURT:  Do you want to bring the witness in?

14           MR. STEIN:  Hold on one second.

15           (Pause.)

16           MR. STEIN:  Okay, Judge.

17           THE COURT:  Then we're ready for the jury.

18   Mr. Villanueva.

19           MR. SIEGEL:  The witness is coming in now, Judge.

20           (Witness TYLER MICELI resumes the stand.)

21           (Jury enters.)

22           THE COURT:  Counsel will stipulate that the jury is

23   present and properly seated.

24           MR. SELDEN:  On behalf of the government, yes,

25   Your Honor.  Thank you, Your Honor.

Miceli - cross - Stein                    466

1              MR. STEIN:  Yes, Judge.

2              THE COURT:  Thank you, Counsel.

3              Ladies and gentlemen, welcome back.  I hope you had

4    an enjoyable lunch.  We are ready to resume for the afternoon

5    session.

6              Special Agent Miceli has resumed the stand.  We've

7    concluded the direct examination and I believe Mr. Stein has

8    cross-examination for us now.

9    CROSS-EXAMINATION

10   BY MR. STEIN:

11   Q     Good afternoon.

12   A     Good afternoon.

13   Q     So we actually have met before, haven't we?

14   A     Yes, sir.

15   Q     About last July?

16   A     Yes.

17   Q     Other than walking about the courthouse?

18   A     Correct.

19   Q     So you told us this morning that you were an ATF agent

20   for about five years, correct?

21   A     Yes.

22   Q     And what did you do before you were an ATF agent?

23   A     I worked in corrections in New Jersey.

24   Q     And how long did you work there?

25   A     From college, so about ten years.

Miceli - cross - Stein                                    467

1    Q    And before that?

2    A    College.

3    Q    So were you not an EMT?

4    A    Yes.  I was also an EMT from the age of 15 to now or 16

5    to now.

6    Q    So you're still an EMT?

7    A    Yes, sir.

8    Q    So how long have you been an EMT?

9    A    About 16 years.

10   Q    So that's where the area -- I assume, it's the area where

11   you reside perhaps?

12   A    It was where I used to live and now out in this area, in

13   New York.

14   Q    Okay.  And then during that period of time, you were with

15   the Department of Corrections?

16   A    No.  I was at a private facility in New Jersey as well as

17   Morris County.

18   Q    And you just told us again you've been at ATF for five

19   years?

20   A    About, yes.

21   Q    So I can't help but ask how old are you?

22   A    Thirty-three.

23   Q    So you're the case agent, correct?

24   A    Correct.

25   Q    What is a case agent?

1   A    My responsibility is to navigate the investigation.

2   Q    You're in charge; other than the prosecutors, you're in

3   charge of the investigation, they're in charge of the

4   presentation in court, correct?

5   A    Yes, sir.

6   Q    So, I mean, you're the boss of the law enforcement

7   agents, correct?

8   A    Yes, you could say that.

9   Q    And you're responsible for the evidence in the case?

10  A    Yes.

11  Q    And including maintaining the integrity of the evidence

12  so it doesn't, it's not tampered with or affected in some way?

13  A    Yes.

14  Q    And just generally speaking, what do you do to maintain

15  the integrity of evidence?

16  A    I would put it in our evidence bags, we seal it and we

17  sign it and then it's locked away in one of our vaults.

18  Q    Now, do you know what 3500 material is?

19  A    Yes.

20  Q    What is 3500 material?  The jury has probably heard some

21  references to it.

22          MR. SIEGEL:  Objection.

23          THE COURT:  I'm going to allow it.

24  A    To my knowledge, it's material that is my case product

25  that is available to the defense.

Miceli - cross - Stein                          469

1   Q    And there is something like forty 3500, actually more

2   than forty 3500 exhibits for you, correct?

3   A    I don't know the number.

4   Q    Now, I know we're in an age where everybody e-mails and

5   not many people write things down, but you attended a number

6   of meetings with the prosecutors?

7   A    Yes.

8   Q    So since November 26, 2018, how many times have you met

9   with the prosecutors?

10  A    I couldn't tell you the number.  A lot.

11  Q    A hundred?

12  A    Maybe.  I really don't know.

13  Q    Okay.  And on a number of those occasions when you met

14  with the prosecutors, were there witnesses present where the

15  prosecutors and perhaps you were interviewing witnesses?

16  A    Yes.

17  Q    And can you tell us how many times during a hundred or so

18  meetings, we'll just use that figure as a working number,

19  about how many times during that, about how many occasions

20  during those hundred or so meetings did you actually write

21  something down in good old fashioned handwriting?

22  A    Very few.

23  Q    And you know, don't you, that everything that gets

24  written down that relates to a witness is subject to being

25  turned over to defense counsel, correct?

1   A    Yes.

2   Q    So if very few, if any, exhibits were handwritten down,

3   was that done intentionally to maintain a kind of 3500

4   exhibit?

5   A    Not necessarily so.

6   Q    So there was no conscious attempt by you or the

7   prosecutors to avoid handwritten notes, correct?

8   A    Correct.

9   Q    So I'd like to show the witness two 3500 exhibits that

10  are identical except their number, 3500-TM-28 and 3500 -- let

11  me start over -- 3500-TM-28 and 3500-KB-1.  Could you take a

12  look at these?

13  A    Sure.

14          (Pause.)

15  Q    And are those your handwriting?

16  A    Yes, sir.

17  Q    And without reading from it, can you tell us what this

18  is?

19  A    Those were notes that I had taken being at one of those

20  meetings with witnesses.

21  Q    And, specifically, was it Detective Sergeant Keith Bryan?

22  A    Yes, that's one or both, yes.

23  Q    So these are identical exhibits, correct?

24  A    Yes.

25  Q    Except for the exhibit number?

1   A    Can I see it one more time?

2   Q    Sure.

3   A    Thank you.

4        (Pause.)

5   A    Yes, those are identical.

6   Q    So yesterday, Detective Sergeant Bryan testified --

7        MR. SIEGEL:  Objection, Your Honor.

8        MR. STEIN:  It's just a foundation for my question.

9        MR. SIEGEL:  He can ask the question but he doesn't

10  need to get, to tell this witness what anybody has testified

11  to.

12       THE COURT:  Ask the question, Mr. Stein.

13       MR. STEIN:  I was.  I was trying to use a foundation

14  so that it had some context.

15       THE COURT:  I don't want you to repeat testimony

16  from another witness.

17       MR. STEIN:  Okay.

18  Q    Do you know how many times Detective Sergeant Bryan met

19  with the prosecutors?

20  A    I believe twice, I think.

21  Q    So not three?

22  A    I don't know.

23  Q    Okay.  And you were there when he, when he met with the

24  prosecutors?

25  A    At least once, I was.

Miceli - cross - Stein                          472

1    Q    Okay.  So would it be fair to say that the two exhibits I

2    just showed you which are identical to each other except for

3    the exhibit number are the only notes that you ever took at a

4    meeting with Detective Sergeant Bryan, correct?

5    A    Yes, correct.

6    Q    And did Detective Sergeant Bryan state during this

7    meeting that the occupants of the car were three Afro-American

8    males?

9    A    I believe so.

10   Q    Not a male Hispanic and two Afro-American men, correct?

11   A    I believe so.

12   Q    And do you remember preparing a complaint in connection

13   with this case?

14   A    Yes, sir.

15   Q    And in connection -- what is a complaint?

16   A    A complaint is an initial charging document.

17   Q    Okay.  And it's sworn to under oath?

18   A    Yes.

19   Q    And you were the one who signed that document?

20   A    Yes, sir.

21   Q    And you swore before a federal judge that the contents of

22   the affidavit were correct?

23   A    Yes.

24   Q    Okay.  And when you prepared this complaint and swore to

25   it, did you state in your complaint that there were three

1    Afro-American men in the car?

2    A    Yes, I did.

3    Q    Now, during the government's direct examination of you,

4    you were not asked a single question about money, correct?

5    A    Correct.

6    Q    And did you have a meeting with the prosecutors at which

7    there was a decision made in which you were not going to be

8    asked any questions about money?

9    A    I don't recall that.

10   Q    Well --

11        MR. SELDEN:  Mr. Stein, we can see your notes.

12        MR. STEIN:  No one would be able to read them.

13        MR. SIEGEL:  I'm sorry.  Because it's on the ELMO.

14        Would you repeat the last question?

15        MR. STEIN:  Can we have it read back, please.

16        (Record read.)

17   Q    So you do agree that during the time that Mr. Siegel was

18   questioning you, not one single question was asked to you

19   about money, United States currency?

20   A    Yes, I agree with that.

21   Q    And as a matter of fact, when Mr. Brack was arrested,

22   when the three individuals were taken into custody, I'll say,

23   or detained, $6,000 or more was seized by either you

24   personally or some law enforcement agent working with you,

25   correct?

Miceli - cross - Stein                                        474

1   A     That's right.

2   Q     And did you do anything to document the 6,000 or so

3   dollars that were seized?

4   A     Yes.

5   Q     And what did you do to document the $6,000?

6   A     I believe I included it in one of my reports.

7   Q     So I'd like to show you this.  What is that?

8   A     This is an evidence label.

9   Q     Okay.  And what's it an evidence label for?

10  A     The currency.

11  Q     $6,000 or so, correct?

12  A     Yes.

13  Q     Now, is this the only documentation that you as a case

14  agent prepared in connection with $6,000 that was seized on

15  November 26th?

16  A     No, it also would have been included in one of my

17  reports.

18  Q     I'm talking about something that actually records as a

19  voucher would with the Police Department that something was

20  seized.

21  A     Yes, sir.

22  Q     So that is the only document, one piece of paper,

23  correct?

24  A     Yes.

25  Q     Okay.  And did you at some point photograph the money?

1   A    No, I don't believe so.

2   Q    Did you or somebody working with you record the serial

3   numbers of the, of the currency that was seized?

4   A    No, sir.

5   Q    As you sit here now, do you remember the denominations of

6   the bills?

7   A    I would have to refresh my memory.

8   Q    With what?

9   A    With seeing the bills so, no, I do not remember.  I don't

10  recollect.

11  Q    Well, as you sit here now, do you recall whether there

12  were any 100s or 50s in there?

13  A    I don't remember.

14  Q    Now, did there come a time that you're aware of that the

15  government agrees to return, of that 6,000 or so dollars, that

16  the government agreed to return $5,000 to Elgin Brack?

17  A    Yes.

18  Q    And as matter of fact, there was an occasion where you

19  met a representative of Mr. Brack and you gave to that

20  individual on behalf of Mr. Brack $5,000?

21  A    About that, yes.

22  Q    $5,004, correct?

23  A    Yes, sir.

24  Q    I'd like to show you what's been marked for

25  identification as Defendant's Exhibit E.  What is that?

Miceli - cross - Stein                    476

1   A     That is a release of property.

2   Q     And is this the $5,004 that you released with the

3   prosecutor's consent to a representative from Mr. Brack?

4   A     Yes, yes, sir.

5           MR. STEIN:  I offer this into evidence, Judge.

6           THE COURT:  Any objection?

7           MR. SIEGEL:  No objection.

8           THE COURT:  Received without objection.

9           (Defendant's Exhibit E so marked.)

10          MR. STEIN:  Mr. Villanueva, can we show this to the

11  jury?  Can we put it on the screen there also.  I'm not sure

12  if the jurors can see it.  Excuse me.

13          THE CLERK:  It's warming up.

14          MR. STEIN:  Okay.  It's there.  Okay.

15  Q     So from the 6,000 or so dollars that was seized on

16  November 26th, you were personally responsible for returning

17  $5,004 to a representative of Mr. Brack with the prosecutor's

18  consent, correct?

19  A     Correct.

20  Q     And of the $5,004 that was returned, did you do anything

21  to record the denominations of those bills?

22  A     Not outside of creating a new evidence label for them.

23  Q     So the answer to my question is you did not?

24  A     I created a new evidence label and submitted the new

25  amount in evidence.

1  Q    But you don't know as you sit here now the denominations

2  of those bills?

3  A    No, sir.

4  Q    You don't know whether those bills included any 100s or

5  50s?

6  A    No.

7  Q    And of the remaining money that was not returned to

8  Mr. Brack, you don't know as you sit here now whether there

9  were any 50s or 100s in that amount?

10  A    Correct.

11  Q    And where is that money now?

12  A    It is at our ATF vault, I believe.

13  Q    So, obviously, Mr. Siegel did not ask you any questions

14  about the balance of the money, correct?

15  A    Correct.

16  Q    Now, when Mr. Brack and Scott Brack were arrested and

17  Edward Vasquez was detained, where were you?

18  A    During different parts of the night, I would have been in

19  different places.  Can you be more specific, if you don't

20  mind?

21  Q    Well, at 8:45 in the evening when I believe they were

22  arrested, where were you?

23  A    I was at the ATF office.

24  Q    And how far is that away from the location on Hughes

25  Avenue where they were arrested?

1    A    I don't know the exact distance but it's within the

2    Bronx.

3    Q    It's a big place.

4    A    It is a big place.

5    Q    So you don't know where you were?

6    A    I was at the ATF office in the Bronx.

7    Q    How long were you there for altogether continuously

8    including 8:45 p.m.?

9    A    I'm sorry.  Can you rephrase the question?

10   Q    Sure.

11        Using 8:45 as a focal point, how long were you in a

12   office, how many hours before 8:45 and how many hours after

13   8:45?

14   A    I don't recall before, a few hours.  Afterward, we were

15   there until we left for court the next morning.

16   Q    Okay.  So there came a time where Elgin Brack, Scott

17   Brack and Edward Vasquez were brought to your office, correct?

18   A    Correct.

19   Q    Do you know about what time that was?

20   A    Soon after 8:45.

21   Q    Okay.  So what were you doing during that time before

22   they were brought to the office?

23   A    Just preparing for the arrest, processing them and still

24   gathering intelligence as we were going on through the day.

25   Q    So you were not out in the field, so to speak, on Hughes

1    Avenue observing and supervising what was taken place,

2    correct?

3    A    Correct.

4    Q    And do you know whether or not as the case agent any

5    attempt was made -- everybody's got a cell phone.  They all

6    have video functions on them.

7            Do you know as you sit here now whether any of those

8    ten or so agents videotaped the entire sequence of events?

9    A    I don't believe so.

10   Q    Now, Edward Vasquez, he was the driver.  You weren't

11   there at the arrest but you understand that he was in the

12   driver's seat, correct?

13   A    Correct.

14   Q    And he was released at some point that evening or the

15   next morning?

16   A    Yes.

17   Q    And since that time, have you had any contact with him?

18   A    No.

19   Q    Have you attempted to look for him?

20   A    Yes.

21   Q    About how many times?

22   A    Half a dozen.

23   Q    And you went to an address in New Jersey that you were

24   provided with?

25   A    Yes.

Miceli - cross - Stein                    480

1    Q    And did you stay there for some time or did you just

2    knock on the door and leave?

3    A    We stayed there for some time and tried to knock on the

4    door.

5    Q    Okay.  And one of the purposes of your attempting to

6    locate Mr. Vasquez was to serve him with a subpoena?

7    A    That's correct.

8    Q    And specifically, a subpoena for a DNA sample, correct?

9    A    Well, subpoena to show up and speak with the prosecutors

10   at court.

11   Q    Okay.  So did you ever obtain a DNA sample from Edward

12   Vasquez?

13   A    No, sir.

14   Q    And he never came to court?

15   A    No.

16   Q    He never was served a subpoena?

17   A    No.

18   Q    You couldn't find him?

19   A    Correct.

20   Q    Now, in the car, on the dashboard of the car, there was a

21   GPS device, correct?

22   A    Correct.

23   Q    And as a matter of fact, you helped, with the

24   prosecutors, obtain a search warrant to go through the

25   addresses that were input, if that's the right term, into the

1  GPS device?

2  A    Yes.

3  Q    A dozen, 15 places or more?

4  A    I don't remember how many.

5  Q    Did you ever go to any of them to find out what those

6  locations were?

7  A    No.

8  Q    Not one of them?

9  A    No.

10  Q    And this, of course, the GPS, was in the Toyota Solara

11  which was the subject of your investigation?

12  A    Yes.

13  Q    So although you obtained this information, would it be

14  fair to say you did nothing with it?

15  A    We analyzed it and we didn't go to any of the addresses.

16  Q    Now, when you were meeting with Edward Vasquez, did he

17  agree or consent to a search of his phone?

18  A    He, he showed us snapshots of his phone.

19  Q    Okay.  My question is did he sign an official ATF

20  document which he consented to a search of his phone?

21  A    I believe so.

22         (Continued on next page.)

23

24

25

1    CROSS EXAMINATION

2    BY MR. STEIN:   (Continuing).

3    Q    So did you take that consent and use it to go to the

4    provider of his telephone services to get a record of all of

5    his calls, especially the ones around November 26, 2018?

6    A    No.

7    Q    So the only records that you have from his phone are some

8    screen shots; correct?

9    A    That's correct.

10   Q    Nothing else?

11   A    Yes.

12   Q    So we don't know who he was calling and who he was in

13   contact with and what, if anything, he was saying, if, for

14   example, it was a text message?

15   A    That's correct.

16   Q    Now, Scott Brack was arrested?

17   A    Yes.

18   Q    And when you encountered him at the office after he had

19   been arrested, what was he wearing?

20   A    He was wearing a jacket, when I got him, I believe his

21   hat and jacket may have been removed.  Truly, I don't

22   remember, when I walked into the room.

23   Q    Okay.  And the jacket looked like some kind of leather

24   jacket?

25   A    I believe so.

Miceli - cross - Stein                              483

1   Q    And underneath the jacket, what was he wearing?

2   A    A gray hoodie.

3   Q    So a gray sweatshirt with a hood; correct?

4   A    Yes.

5   Q    Gray?

6   A    I believe so.

7   Q    As a matter of fact, you seized from him those articles

8   of clothing; correct?

9   A    Correct.

10  Q    Now, there came a time that Elgin Brack was brought to

11  your office after he had been arrested; correct?

12  A    Yes.

13  Q    And I think you identified a photograph of him in which

14  he was wearing, for lack of a better way of phrasing it, a

15  running outfit?

16  A    Yes, you could call it.

17  Q    He had on white sneakers; correct?

18  A    Yes.

19  Q    No hat?

20  A    Correct.

21  Q    And you're aware that a subject of your investigation,

22  during the course of the commission of the offenses that you

23  were investigating, was wearing white sneakers; correct?

24  A    Correct.

25  Q    And you're also aware that at the scene of one of the

1    crimes, an attempted robbery, Mr. Alejandro DeLeon was shot

2    and badly wounded; correct?

3    A    That's true.

4    Q    And you are aware also that as a result of his injuries

5    at the scene there was a lot of blood?

6    A    Yes.

7    Q    You had seen the pictures; correct?

8    A    Yes, sir.

9    Q    And you've probably seen the photographs from the crime

10   scene detective, Detective St. Louis, as well as his reports;

11   correct?

12   A    I don't remember who had taken the photos, but I have

13   seen them.

14   Q    And you would agree that there was certainly a lot of

15   blood?

16   A    Yes.

17   Q    Including in the immediate vicinity of the cash register

18   where Mr. DeLeon was shot; correct?

19   A    Yes.

20   Q    As a matter of fact, when he was first shot, his thumb

21   was literally shot off of his hand?

22   A    You can make that inference.

23   Q    And then there was a second time immediately afterward

24   where he was shot in the head; correct?

25   A    I believe so.

1   Q    Just as an observer, not even as a law enforcement

2   officer, you could see that there was an extreme amount of

3   blood?

4   A    Yes, sir.

5   Q    Have you seen the video of the shooting?

6   A    Part of it.

7   Q    You would agree that during the course of that shooting

8   that there appeared to be a struggle, a physical struggle

9   between the shooter and Mr. DeLeon; correct?

10  A    Yes, you can see a struggle start.

11  Q    So when Elgin Brack was brought to your office on the

12  evening of November 26, what did you do, if anything, with the

13  shoes, the white sneakers?

14  A    We kept it with him on his feet.

15  Q    So they were not vouchered as evidence?

16  A    No.

17  Q    And they were not sent to a police laboratory to analyze

18  in any way what, if anything, was on the sneakers; correct?

19  A    Correct.

20  Q    And in addition to the sneakers -- excuse me.  Aside from

21  the sneakers, you have seen a number of video surveillances

22  from the various premises?

23  A    Yes.

24  Q    And you saw that the subject who was committing the

25  robbery was wearing some kind of gloves?

1   A    Yes.

2   Q    As far as you know, during your search of the car, were

3   there any pair of gloves that were recovered?

4   A    No, sir.

5   Q    Now, you testified on direct examination that when you

6   first saw a coat it was underneath a black plastic bag;

7   correct, which had some writing on it?

8   A    Yes.

9   Q    You have identified a photograph of that?

10  A    Correct.

11  Q    Then when Mr. Siegel showed you the photograph, there was

12  a very small part of the jacket that was sticking out from

13  underneath the black plastic bag?

14  A    Yes.

15  Q    As a matter of fact, he asked you to circle it so that we

16  could see what you were testifying about, that there was a

17  small part of the jacket sticking out from underneath the

18  black plastic bag?

19  A    Correct.

20  Q    Now, did you, as part of your duties as the case officer

21  working with the prosecutors, obtain a number of search

22  warrants for electronic devices?

23  A    Yes.

24  Q    Such as the GPS that I asked you about?

25  A    Yes.

1   Q     Cell phones that were seized?

2   A     Yes.

3   Q     I think altogether there were three cell phones seized?

4   A     Yes.

5   Q     And in order to obtain a search warrant, you have to get

6   the approval of a federal judge; correct?

7   A     Correct.

8   Q     In order to do that, you have to prepare an affidavit in

9   which you swear to the truth of the contents before a federal

10  judge, not necessarily Judge Vitaliano, but just like Judge

11  Vitaliano?

12  A     Yes.

13  Q     And before you actually started testifying here today,

14  you took an oath to tell the truth?

15  A     Correct.

16  Q     So when you prepared these affidavits for the search

17  warrants -- well, why don't I step back.

18          What is a search warrant, first of all, just in

19  general terms?

20  A     A search warrant is a warrant approved by a judge to

21  allow you to search a premises or a device.

22  Q     And in this case, it was the three electronic devices

23  that were seized from the car; right?

24  A     Yes.

25  Q     And what you and the prosecutors were hoping to achieve

1   is to get authorization from a federal judge to search through

2   the contents of these three electronic devices; right?

3   A    Yes.

4   Q    You were successful in doing that; correct?

5   A    We were.

6   Q    You were the person who signed the affidavit in support

7   of the search warrants; correct?

8   A    Yes.

9   Q    And did you include in your affidavit as part of a sworn

10  statement information about where the black pants were with

11  the zippers?

12  A    I don't remember.

13  Q    Well, as you sit here now, can you tell us whether or not

14  the information that you swore to before a federal judge on a

15  number of occasions, because there were different search

16  warrants, was incorrect as far as where the pants were found

17  in the car?

18  A    I don't remember.  If you have something to refresh with.

19  Q    I'm showing you search warrant 18M-1188.

20       MR. SIEGEL:  Mr. Stein, if there is a 3500 number

21  that it is marked with for identification.

22       MR. STEIN:  3500-TM-24.

23       I'm sorry, I didn't know whether you were going to

24  pull that out or not.

25       MR. SIEGEL:  I just wanted to know what I was

1   looking at.

2   Q    I am going to show you page 10 of the search warrant

3   affidavit.  I am going to direct your attention to the balance

4   of paragraph 25.  It is on page 10.

5            MR. STEIN:  May I approach the witness, Your Honor?

6   Q    Take a look where my thumb is.

7            Okay.  So is that a correct sworn statement as to

8   where, according to what you wrote and swore to, as to where

9   the black jeans were?

10           MR. SIEGEL:  Your Honor, objection.

11           THE COURT:  We will hear you at the sidebar.

12           (Sidebar held outside the hearing of the jury.)

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

```
                         Sidebar                    490

 1              (The following occurred at sidebar.)

 2         MR. SIEGEL:  Your Honor.

 3         THE COURT:  What's on the screen now anyway?

 4         MR. SIEGEL:  There is nothing on the screen.

 5         MR. STEIN:  There is nothing on the screen.

 6         THE COURT:  What is the witness looking at?

 7         MR. SIEGEL:  I think he was showing in a hard copy,

 8    but it was a copy of the search warrant affidavit.

 9         THE COURT:  Right.  And what paragraph?

10         MR. SIEGEL:  Paragraph 25.

11         THE COURT:  And it says?

12         MR. SIEGEL:  Do you want do read it?

13         MR. STEIN:  I will read it into the record.

14         THE COURT:  Yes.

15         MR. STEIN:  "Also found beneath Elgin Brack was a

16    black LG cellular telephone, parenthesis, device two.  In

17    addition, in the same car were found dark colored pants with

18    multiple horizontal copper zippers and multiple holes in the

19    front of the pants legs.  There is some additional language,

20    but I am not going to read that.

21         MR. SIEGEL:  The basis of my objection is I don't

22    have a problem asking did you say X?  Is that correct?  But to

23    say does this document that isn't in evidence say X isn't

24    proper.  That document is not in evidence.  If he wants to

25    refresh his recollection about what he said, he can do that,
```

Sidebar                                      491

1    but to put a document that is not in evidence and ask a

2    witness to basically read it without putting it into evidence

3    is improper.

4              THE COURT:  Do you want him to read the statement?

5              MR. SIEGEL:  Well, the second part of my objection

6    is that the search warrants affidavit, like a complaint,

7    includes hearsay.  So part of his knowledge about what is in

8    there or not is what other people told him.

9              THE COURT:  Okay.  So your point is it is an

10   incorrect statement?

11             MR. STEIN:  Correct.  Judge, let me put it in

12   context.  This witness testified on direct examination that

13   the photograph, that the jacket was underneath the plastic

14   bag, which I submit is inconsistent with what's in here.

15             MR. SIEGEL:  Your Honor, like I said, I don't have a

16   problem with asking him did you say --

17             MR. LAX:  He said pants.

18             MR. STEIN:  What did I say?

19             MR. SELDEN:  You said jacket.

20             MR. STEIN:  I'm sorry, Judge, I meant the pants

21   obviously.  I misspoke, I'm sorry.

22             THE COURT:  I assumed that.

23             MR. SIEGEL:  As a general matter, a couple of times

24   Mr. Stein has been describing things that aren't in evidence,

25   so if he wants to impeach him, he can say did you say this.

```
                          Sidebar                        492
```

1          MR. STEIN:  Let me backtrack and start over again.

2     There was testimony from Detective Nuzio that the black pants

3     were recovered from the knapsack that has been attributed to

4     Elgin Brack.  So this statement is inconsistent with what --

5          THE COURT:  I'm not sure I recall that.

6          MR. STEIN:  He did.  You don't recall what?

7          THE COURT:  Where the black pants were.

8          MR. SIEGEL:  Detective Nuzio testified that they

9     were inside the backpack.

10          THE COURT:  Didn't he say that the belt was visible?

11          MR. SIEGEL:  He said he could see the belt which was

12     inside and it was attached to the pants and that the pants

13     were not in the backpack.

14          MR. STEIN:  After he opened up the backpack.  So my

15     point is what he wrote here is inconsistent with what Nuzio

16     testified yesterday.

17          THE COURT:  That doesn't impeach him.

18          MR. STEIN:  It impeaches Nuzio.

19          MR. SIEGEL:  You can't impeach Nuzio with Agent

20     Miceli's prior past statement.

21          THE COURT:  You can argue that.  You are agreeing --

22          MR. STEIN:  From what happened now, there is nothing

23     to argue.

24          THE COURT:  You are agreeing that what he says here

25     is accurate, because you are going to use that later on in

```
                           Sidebar                      493
```

1    your argument to impeach Nuzio.

2              MR. STEIN:  Correct.

3              MR. FARRELL:  Right.

4              THE COURT:  So you are laying the foundation for

5    your argument.

6              MR. STEIN:  Correct.

7              THE COURT:  But you basically are going to end up

8    embracing the truth of this, but you are not impeaching him.

9              MR. STEIN:  Excuse me, Judge.  Can I have a moment?

10             (Pause.)

11             MR. STEIN:  Okay.  So, let me make my position

12   clear.  So the purpose of eliciting this testimony about where

13   this witness says the black pants were impeaches Nuzio's

14   testimony.  Nuzio said they were in the backpack.

15             THE COURT:  But that is for argument.  Mr. Siegel's

16   point is did you say -- you didn't ask him, number one, where

17   were they.

18             MR. SIEGEL:  The problem with that is that gets into

19   hearsay.  All he knows is what Nuzio told him.

20             THE COURT:  So the answer is -- well, then you can

21   ask, he made a statement, what's the basis of your statement.

22             MR. STEIN:  Judge, if Nuzio had relayed to this

23   witness where the black jeans were, presumably an accurate

24   statement would have been put in this affidavit.

25             THE COURT:  So you can ask him where he got that

Sidebar                                    494

1   statement.

2            MR. STEIN:  Okay.

3            THE COURT:  Where he got that.  The Complaint says

4   this.  In your complaint, you said blah, blah, blah, where did

5   you get that?  Did you see it?  What's the basis of your

6   information?

7            MR. STEIN:  That's fine, Judge.

8            (Sidebar concluded.)

9            (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court.)

2    Q    Agent Miceli, in this search warrant affidavit, you made

3    a statement as to where it was your understanding that the

4    black jeans with the zippers were found; correct?

5    A    Yes.

6    Q    And who told you that?

7    A    Detective Nuzio.

8    Q    And did Detective Nuzio tell you -- excuse me.  Did you

9    state in this affidavit that the black jeans were found in a

10   backpack?

11   A    As written there, it says in the vehicle.

12   Q    And of course you were not present when Detective Nuzio

13   recovered the black jeans from wherever he recovered them

14   from; correct?

15   A    Correct.

16   Q    You were in the office?

17   A    Correct.

18   Q    Now, you have testified that the coat, the jacket was

19   underneath a black plastic bag; correct?

20   A    Correct.

21   Q    And did you testify in the grand jury in connection with

22   this matter?

23   A    Yes.

24   Q    And that was on or around December 21st, 2018?

25   A    I believe so.

1   Q    Okay.  And at that time, were you asked questions about

2   where the jacket was recovered from?

3   A    I believe so.

4   Q    And you have testified here, just to put it in context,

5   that the jacket was found underneath the black plastic bag

6   that we saw pictures of; correct?

7   A    Correct.

8   Q    When you testified in the grand jury, you were under

9   oath; correct?

10  A    Yes.

11  Q    Did you testify under oath that the jacket was found --

12  that Mr. Brack was sitting on top of jacket?

13  A    I don't recall.  Could I see it if you have it.  Thank

14  you.

15          MR. STEIN:  3500-TM-26.

16          I am approaching the witness, Your Honor.

17          THE COURT:  Certainly.

18  Q    These are two pages from your grand jury testimony, which

19  was given under oath.  I highlighted it.

20  A    Thank you.

21          Thank you.

22  Q    So reading that, does that help you remember?

23  A    Yes.

24  Q    And what do you remember?

25  A    I remember swearing to that document that Elgin was

1   sitting on top of the jacket.

2   Q    And that's not correct, is it?

3   A    So, as was explained to me --

4   Q    Excuse me.  I'm just asking you a yes-or-no question.

5   That was not correct, was it?

6   A    That was correct.

7   Q    What you testified to in the grand jury was correct?

8   A    Yes.

9   Q    Did you not testify here this morning that when you saw

10  the jacket that there was a black plastic bag on top of the

11  jacket?

12  A    Yes.  I did swear to that.

13  Q    So it's your testimony, nevertheless, that Elgin Brack

14  was, according to what you were told, was sitting on the

15  plastic bag on top of the jacket?

16  A    I mean, may I explain it?

17  Q    No.  I just want you to answer my question.

18  A    Can you rephrase it one more time.

19       MR. STEIN:  Can we have it read back, please.

20       THE WITNESS:  Thank you.

21       (Record read.)

22       MR. SIEGEL:  Your Honor, objection.

23       That calls for hearsay.

24       THE COURT:  No, I am going to allow it in this

25  context.

1   A    I was told he was sitting on top of the jacket.

2   Q    And nevertheless, you have testified today, identifying a

3   photograph that there was a plastic bag which looked full of

4   something, had contents, was on top of the jacket; correct?

5   A    Yes.

6   Q    Now, did you take charge of the pants from Detective

7   Nuzio?

8   A    The black pants?

9   Q    Yes.

10  A    Yes.

11  Q    Did you take charge of the coat as well?

12  A    I'm sorry, I took charge -- I took the coat from the car

13  itself.  Detective Nuzio showed me the pants, ultimately

14  everything was vouchered by the PD, those two items.

15  Q    What was done with the jacket and the pants?

16  A    They were vouchered by the PD.

17  Q    As the case agent, you do not know what happened to them

18  after they were vouchered?

19  A    I believe they were retained by NYPD until we took them

20  back.

21  Q    Okay.  So sitting here as the case agent in charge of the

22  investigation of this case, you do not know whether or not

23  those items of evidence were sent to a police laboratory to be

24  examined after they were vouchered?

25  A    I do know they were.

1  Q    Okay.  So they were vouchered, they were sent to a police

2  lab, and they were examined by a scientific expert; correct?

3  A    I can't say.  I don't know whether they were examined or

4  not when I got to the lab.  I know they were vouchered to the

5  lab.

6  Q    And that was the purpose of vouchering them for the lab,

7  to have them examined; correct?

8  A    If need be, yes.

9  Q    Now, you prepared an inventory of the contents of the

10  car; correct?

11  A    Yes.

12  Q    And the inventory of the contents of the car were meant

13  to document what was recovered from the car; correct?

14  A    As evidence, yes.

15  Q    And you recorded your inventory of the contents of car in

16  an official ATF report; correct?

17  A    Correct.

18  Q    And you included everything that was recovered from the

19  car; correct?

20  A    Everything I kept as evidence.

21  Q    Okay.  Well, in your inventory, did you include, quote,

22  The following was recovered from the vehicle, unquote?

23  A    I believe so, yes.

24  Q    Those are your words?

25  A    I don't know if they're exact verbatim, but I believe so.

1   Q    You believe so?

2   A    Yes.

3   Q    In the inventory that you prepared in this official

4   document, did you include the coat?

5   A    No.

6   Q    Even though this inventory purports to list the following

7   was recovered from the vehicle and there is a list of items;

8   correct?

9   A    That's correct.

10  Q    And you agree that you did not include the coat in this

11  inventory?

12  A    Yes, I included it another report, because that was -- I

13  had --

14  Q    My question is this inventory purports to be an inventory

15  of what was recovered from the car; correct?

16  A    Yes.

17  Q    It says, "The following was recovered from the vehicle,"

18  and you agree that the coat was not included; correct?

19  A    In that list, yes.

20  Q    Now, when Mr. Brack was brought into your office, he was

21  wearing what we talked about before, a running outfit;

22  correct?

23  A    Yes.

24  Q    With the white sneakers; correct?

25  A    Correct.

1   Q    And did you or other agents in your presence conduct a

2   search of his person?

3   A    Yes.

4   Q    And did you recover from him a black wallet?

5   A    Yes.

6   Q    And did you recover from within that wallet a number of

7   documents?

8   A    I believe so, whatever the contents of the wallet were.

9   Q    And did those documents include a number of paycheck

10  stubs from the New York City Parks Department?

11  A    I remember seeing them.  I don't remember what was in

12  that particular wallet.

13  Q    And you don't remember where they were?

14  A    If they were in that particular wallet, I don't remember.

15  Q    And was there also approximately $97 in U.S. currency in

16  there and some loose change?

17  A    I believe that came from the backpack.  I don't remember

18  if it was in the wallet itself.

19  Q    But there was $97 that was recovered which you agree was

20  his personal money; correct?

21  A    I don't remember the exact amount but there was an amount

22  in the 90s.

23  Q    Well, you had prepared a document in which you said that

24  money could be returned to his attorney; correct?

25  A    Correct.

1   Q    Because you had no reason to believe that that money was

2   connected to whatever you were investigating; correct?

3   A    At the time.

4   Q    The same as the $5,004 that you returned to him; correct?

5   A    Correct.

6            MR. STEIN:  Now, I'd like to approach the witness.

7            THE COURT:  You may.

8            MR. STEIN:  To show him what has been marked for

9   identification as Defendant's Exhibit B.

10  Q    Just take a look at this, please.

11  A    Sure.

12  Q    Do you recognize these?

13  A    I do.

14  Q    And what are they, first of all?

15  A    They are a MetroCard, I believe New York City pay stubs,

16  and cards, an assortment of cards and ID.

17  Q    Okay.  It also includes a number of pay stubs from the

18  New York City Parks Department payable to Elgin Brack;

19  correct?

20  A    Yes.

21  Q    It looks like at least a half dozen or so; correct?

22  A    About that, yes.

23  Q    And would it be fair to say that through your

24  investigation you learned that at around the time that these

25  offenses occurred he was employed by the New York City Parks

1   Department; correct?

2   A    I did learn that he was employed by the New York City

3   Parks Department.  I don't remember the status as to what

4   time.

5   Q    Had you seen his employment records from the New York

6   City Parks Department?

7   A    Yes.

8           MR. STEIN:  Judge, at this time I would offer

9   Defendant's Exhibit B.

10          THE COURT:  Any objection?

11          MR. SIEGEL:  No objection.

12          THE COURT:  Received without objection.

13          (Defendant's Exhibit B received in evidence.)

14          MR. STEIN:  I am going to put it up on the ELMO.

15          THE COURT:  You may.

16          (Exhibit published.)

17          (Continued on next page.)

18

19

20

21

22

23

24

25

1    (Continuing.)

2         MR. STEIN:  I'd like to approach the witness with

3    what's been marked as Defendant's C.

4    EXAMINATION CONTINUING

5    BY MR. STEIN:

6    Q    Could you take a look at this?

7    A    Sure.

8         (Pause.)

9    Q    What is that?

10   A    That looks like a pay stub.

11   Q    For Elgin Brack for the New York City Parks Department?

12   A    Yes.

13   Q    And do you know where this was found?

14   A    I don't remember.

15        MR. STEIN:  At this time, Your Honor, I'd offer

16   Defendant's C into evidence.

17        THE COURT:  Any objection?

18        MR. SIEGEL:  No objection, Your Honor.

19        THE COURT:  Received without objection.

20        (Defense Exhibit C was received in evidence.)

21        (Exhibit published.)

22        MR. STEIN:  Could I just note for the record that

23   this is -- covers the pay period from October 7th, 2018 to

24   October 20th, 2018.  Pay date is November 2nd, and the amount

25   paid was about $1300.

1    BY MR. STEIN:

2    Q    Would you agree?

3    A    (No response.)

4    Q    Regular pay, plus overtime, in the lower left-hand

5    corner?

6    A    Yes.

7            MR. STEIN:  Can I approach the witness again?

8            THE COURT:  You may.

9            MR. STEIN:  Defendant's D for identification.

10           THE WITNESS:  Thank you.

11   BY MR. STEIN:

12   Q    What is that?

13   A    It looks like a Wells Fargo receipt.

14   Q    And was this recovered from Mr. Brack when he was

15   arrested?

16   A    Yes, I believe so.

17           MR. STEIN:  At this time, Your Honor, I would offer

18   Defendant's D into evidence.

19           THE COURT:  Any objection?

20           MR. SIEGEL:  No objection.

21           (Defense Exhibit D was received in evidence.)

22           (Exhibit published.)

23   BY MR. STEIN:

24   Q    So, for an account ending in 9156 at Wells Fargo Bank --

25           THE COURT:  Received without objection.

Miceli - cross - Stein                    506

1           MR. STEIN:  Excuse me?  I'm sorry, Judge, I didn't

2    mean to interrupt you.

3           THE COURT:  I said, received without objection.

4           MR. STEIN:  I understand, that's why I am reading

5    from it.

6           THE COURT:  I know.  I didn't say that.  I just

7    wanted to make sure it was in the record before you read it.

8           MR. STEIN:  Thank you, Judge.

9    BY MR. STEIN:

10   Q    So for an account ending in 9156 at Wells Fargo Bank on

11   October 31st, 2018, the accountholder had a balance of

12   $6,410.39.

13          MR. STEIN:  May I approach the witness again, Judge.

14          THE COURT:  You may.

15   Q    Could you take a look at what's been marked for

16   identification as Defendant's H?

17   A    Thank you.

18   Q    Do you recognize that?

19   A    Not particularly, no.

20          THE COURT:  Mr. Stein, was that the document we saw

21   earlier today?

22          MR. STEIN:  Yes, Judge.

23          THE COURT:  I want to make sure we don't have two

24   H's by accident.

25          MR. STEIN:  No, I believe it came up in the context

1   of Detective Nuzio's cross-examination.

2          THE COURT:  Okay.

3   BY MR. STEIN:

4   Q    So you don't recall this?

5   A    No, sir.

6   Q    Government's Exhibit 304F.

7          MR. STEIN:  Perhaps, you could put that up.  I

8   believe this is in evidence.

9          (Exhibit published.)

10  BY MR. STEIN:

11  Q    Could you take a look at what's been received in evidence

12  as Government's 304F?  Do you see that?

13  A    Yes.

14  Q    And do you see what appears to be two backpacks?

15  A    Is that the lower -- the bag on the lower left, that's a

16  backpack, the same one?

17  Q    Correct.

18  A    Yes, that and the multi-colored backpack.

19  Q    So does that help you remember that the item that's

20  pictured in Defendant's Exhibit H --

21          MR. SIEGEL:  Your Honor, objection.

22          MR. STEIN:  He said he didn't remember this.

23          THE COURT:  He's asking to refresh his recollection.

24  You want to reask him?

25          MR. STEIN:  I do.

1          THE COURT:  Then re-present him H and ask him again.

2          MR. STEIN:  Okay.

3   BY MR. STEIN:

4   Q    Having looked at Government Exhibit 304F, and now take a

5   look, again, at Defendant's H, does that help you remember

6   whether or not -- what this is?

7   A    I mean it looks like that backpack, but I don't remember

8   seeing this backpack.

9   Q    Okay, it looks like it.

10         And as the case agent in charge of the investigation

11  in this case, was this backpack, that is shown in 304F and

12  looks like the backpack --

13         MR. SIEGEL:  Your Honor, objection.  He's holding up

14  an objection that is not in evidence.

15         THE COURT:  Yes.

16         MR. STEIN:  Okay.

17         THE COURT:  Just keep everything that is in evidence

18  in evidence, and everything else --

19  BY MR. STEIN:

20  Q    So having looked at Government Exhibit 304F, and having

21  looked at -- which is in evidence, and looking at Defendant's

22  H, you agree that the item that's depicted in Defendant's

23  H looks like the bag that's depicted in 304F?

24         MR. SIEGEL:  Your Honor, objection.

25         MR. STEIN:  He just testified to that.

1          THE COURT:  Yes, I am going to allow him to

2    straighten that out.  If that is what his recollection is, if

3    that what his understanding is, then I will let him testify to

4    that.

5    A    Those -- those two photos do look similar.

6    Q    And as the case agent in charge of the investigation, do

7    you have any recollection at all as to what, if anything, was

8    recovered from the other bag?

9    A    From the blue bag?

10   Q    Yes.

11   A    No, sir.

12   Q    Now, you were -- had a chance to observe Elgin Brack

13   after he was arrested on the evening of November 26th, 2018 --

14   A    Yes.

15   Q    -- correct?

16          And did there come a time during the course of when

17   he was in your presence that you asked him to sign a document?

18   A    Yes.

19   Q    And as you sit here now, do you remember with which hand

20   he signed a document?

21   A    His left hand.

22   Q    Now, you testified also earlier today about a video that

23   was taken on November 25th, 2018 in the afternoon on Hughes

24   Avenue, correct?

25   A    Yes.

1  Q    And you testified about your observations of persons who

2  appeared in that video, correct?

3  A    Correct.

4  Q    Did Scott Brack appear in that video?

5  A    I believe so, yes.

6  Q    And did Edward Vasquez, along with his young daughter,

7  appear in that video as well?

8  A    I believe so, yes.

9  Q    So would -- would -- the sequence of people passing from

10  right to left would have been Elgin Brack, then at some short

11  distance behind him was Scott Brack, correct; and then behind

12  Scott Brack was Edward Vasquez with his daughter, correct?

13  A    Yes.

14  Q    Now, as part of the search warrants that you obtained

15  from federal judges, that search warrant allowed you, through

16  an expert technician, to extract information from cell phones,

17  correct?

18  A    Correct.

19  Q    And did you have a chance to see the phone extraction

20  from the phone that was attributed to Elgin Brack?

21  A    Yes.

22  Q    And as you sit here now, do you remember approximately

23  how many pages?

24  A    No.

25  Q    Would $2500 help you remember --

1          THE COURT:  I don't think you want to phrase it that

2   way.

3          MR. STEIN:  25 -- what did I say?

4          THE COURT:  Whether 2500 would help him remember,

5   dollars.

6          MR. STEIN:  I'm afraid -- it was not a bribe, Judge.

7          THE COURT:  It sounded like one.

8   BY MR. STEIN:

9   Q    Would 2500 pages refresh your recollection as to the

10  approximate amount of pages of information that was extracted

11  from the phone that was attributed to Elgin Brack?

12  A    It could very well have been 2500 pages.

13  Q    It was a lot?

14  A    It was a lot.

15  Q    Any way you cut it, correct?

16  A    Yes.

17         MR. STEIN:  Can I have a moment to consult with

18  Mr. Farrell?

19         THE COURT:  Certainly.

20         (Pause.)

21  BY MR. STEIN:

22  Q    When you took custody of the black pants with the

23  zippers, did you search through the pockets of it?

24  A    No, sir.

25  Q    So you have no idea what, if anything, was in the pockets

1   of the black zipper pants, correct?

2   A    Correct.

3           MR. STEIN:  Can I approach the witness with what has

4   been marked as Defendant's Exhibit I?

5           THE COURT:  You may.

6           MR. STEIN:  May I approach witness, Judge?

7           THE COURT:  Yes, you may.

8   BY MR. STEIN:

9   Q    I would like to show you what's been marked for

10  identification as Defendant's I.

11  A    Thank you.

12  Q    As the case agent in charge of the entire investigation

13  of this case, do you recall ever seeing this?

14  A    No, sir.

15          MR. STEIN:  I have no further questions, Judge.

16          THE COURT:  Thank you, Mr. Stein.

17          Mr. Siegel, any redirect?

18          MR. SIEGEL:  I do, Your Honor, but I think it would

19  be helpful to have a brief sidebar before I begin.

20          THE COURT:  Sure.

21          (Sidebar held outside the hearing of the jury.)

22

23

24          (Continued on the following page.)

25

```
                         Sidebar                        513
```

1              (The following sidebar took place outside the

2      hearing of the jury.)

3              MR. SIEGEL:  Your Honor, this is in relation to the

4      issue we talked about yesterday about opening the door to his

5      identification of Elgin Brack.

6              Given that there was questions about letting Edward

7      Vasquez go and about not taking the shoes, I think it's fair

8      for us to ask the witness:  Why did you let Edward Vasquez go?

9      Did you believe Edward Vasquez was the shooter?  Did you think

10     there was a possibility he was the shooter?  Did you see

11     someone that you did think was the shooter?

12             THE COURT:  Well, I think what I indicated to you

13     yesterday, anything other than a Crawford violation.

14             MR. SIEGEL:  I agree.  I just wanted to make sure

15     that we were all on the same page before I got up there and

16     started doing it.

17             THE COURT:  Yes.

18             MR. STEIN:  Judge --

19             THE COURT:  Go ahead, Mr. Stein.

20             MR. STEIN:  Judge, now we're back to the Pandora's

21     box again.

22             So, if the Court is going to permit this on

23     redirect, I should be permitted on recross examination to ask

24     him about the four rounds of ammunition.

25             THE COURT:  No; that doesn't logically follow at

```
                        Sidebar                    514
```

1  all.

2           MR. SELDEN:  At all.

3           THE COURT:  Four rounds of ammunition in a car owned

4  by Jimmy Vasquez.  It only goes to the impeachment.

5           MR. STEIN:  Okay.  There isn't evidence in the

6  record at this trial about this, but when you say that the car

7  was owned by Jimmy Vasquez, during the interview of Mr. Edward

8  Vasquez he told the agents that he had borrowed the car, I

9  think it was, approximately for six months.  So, it wasn't

10  just like a temporary thing.

11           THE COURT:  I will hear you again.  I still see it

12  as something impeaching the credibility of a witness who is

13  not testifying, but I will listen.

14           Would you like to respond to Mr. Stein's argument

15  about the bullets?

16           MR. SIEGEL:  The arguments that we made yesterday.

17  It's the only connection --

18           THE COURT:  No, his point is now after redirect,

19  does that open the door to him?

20           MR. SIEGEL:  I don't see how it does.  The fact that

21  he recognized Elgin Brack does not say anything about bullets

22  in the car.

23           MR. STEIN:  Judge, but -- I'm sorry.

24           MR. SIEGEL:  And, Your Honor, it might be different

25  if the bullets could fit in the gun, but they can't.  So

1    there's no reason to believe that these bullets have anything

2    to do with this robbery.

3              MR. STEIN:  Judge, but the point is if they're going

4    to be permitted on redirect to be asking questions about

5    investigating or not investigating Edward Vasquez, so four

6    rounds of ammunition found in the car is not a reason for them

7    to investigate Mr. Vasquez further?

8              I mean he told --

9              THE COURT:  No, no, no, not investigate Mr. Vasquez

10   further, investigate Mr. Vasquez in connection with the crimes

11   charged here.  The crimes charged here, not that they could

12   have arrested him for a felon-in-possession of a gun.  That's

13   what relates to impeachment of his credibility.

14             MR. STEIN:  Could I have a moment, Judge, to confer

15   with Mr. Farrell?

16             (Pause.)

17             MR. SIEGEL:  Your Honor, just so that the jury

18   doesn't have to sit here while we work this out, it might make

19   sense to take the afternoon break since we are about that time

20   anyway.

21             THE COURT:  Okay, I was going to take the break

22   before you redirected, but we can expand it a little bit.

23             MR. LAX:  I imagine they would be happier back

24   there.

25             MR. STEIN:  You don't think they're having a good

Proceedings                                              516

1    time sitting there?

2              (Sidebar concluded.)

3              (In open court - jury present.)

4              THE COURT:  Ladies and gentlemen, we are at about

5    the afternoon break at any rate.  So, counsel wisely counseled

6    that it probably makes more sense for us to continue and

7    finish our legal issues while we go into the break.  We expand

8    the break a little, we give you 20 to 25 minutes of a break,

9    rather than for you to sit here.

10             So we will give you the earlier expanded break

11   starting now.  And whether it is a small or short break, same

12   rules:  Do not discuss the case amongst yourselves or with

13   anybody else and continue to keep an open mind.

14             (Jury exits.)

15             (In open court - jury not present.)

16             (Witness steps down.)

17             THE COURT:  All right, I think we should go back to

18   sidebar.  We still have the witness here, number one.

19   Number two, there is usually a rush to the little rooms and

20   not enough little rooms, so you often get congregation of

21   jurors in the hallway trying to use the rest facility in the

22   hallway.  So it is much easier to hear what we are saying if

23   we are too loud out there in the hallway as opposed to in the

24   jury room.

25             So we can come back to sidebar if there is anything

1   further to be said.

2            (The following discussion held at sidebar with

3   counsel and The Court.)

4            THE COURT:  You and Mr. Farrell were conferring, I

5   don't know if that brings us to something new?

6            MR. STEIN:  No, Judge, but I do think -- I don't

7   think this will be objectionable, but I do think if they are

8   going to be permitted to ask questions about Ed Vasquez

9   investigating or not investigating him, there are certainly

10  some other questions besides the four rounds of ammunition

11  that I think would be fair game on recross.

12           THE COURT:  About what?

13           MR. STEIN:  Excuse me?

14           THE COURT:  About why they didn't investigate

15  Vasquez --

16           MR. STEIN:  No.

17           THE COURT:  -- in connection with this crime?

18           MR. STEIN:  No.  What happened was when he was taken

19  out of the car, he was handcuffed.  When he was taken to

20  the -- to the -- to an office, he was given Miranda warnings.

21  He was asked about whether or not he could leave and they

22  avoided asking -- saying he could -- I'm sorry, he was asked

23  if he was under arrest and they didn't answer him.  There was

24  an exchange about whether he could leave or not.

25           I think that's all fair game if this is going to be

Sidebar                          518

1   allowed, if this is going to be permitted on redirect.

2        MR. SIEGEL:  Your Honor, I don't see any possible

3   relevance of that to anything, and it is also highly

4   prejudicial because it brings in the fact that there was a

5   post arrest interview, while keeping us from obtaining that he

6   identified the defendant during that interview.

7        THE COURT:  I will think more about the bullets, but

8   what conduct they did with Mr. Vasquez, the issue is whether

9   or not, which is the purpose of the redirect, is to repair the

10  implication that there was a failure to pursue certain

11  techniques that should have pointed the investigators towards

12  other people other than Elgin Brack; namely, Mr. Vasquez.

13       And the point of the redirect is to point out what

14  it was that they had, they believed that they had at the time,

15  other than something that would violate the Sixth Amendment,

16  i.e., Mr. -- that they also had -- I mean the reality is they

17  also had Mr. Brack, Scott Brack's post arrest statement.

18       MR. STEIN:  Which you precluded them from eliciting.

19       THE COURT:  I am precluding them from using, so that

20  they are not get everything that they have, but they are going

21  to get enough to be fair to rebut your -- and to the extent

22  that I would let you ask, if you wanted to ask about the

23  bullets I will think about it.  And the answer to that

24  question is going to be it doesn't fit, it didn't fit the gun.

25  So it wasn't a concern for this case.

Sidebar                                    519

1          But I will think about it, whether you want to go

2     and ask that question on that point, but either on re-redirect

3     or somehow it comes out directly from the witness in response

4     to your question, but you have a tight reign on your

5     witnesses, so you would ask me to strike it anyway, which I

6     would, since it would be a yes or no question.  It would be

7     nonresponsive.

8          MR. SIEGEL:  Just on the 403 issue, even if the

9     Agent Miceli could respond it didn't fit in this gun, that

10    just shows how non-probative it is and it raises all the

11    prejudicial issues of showing Edward Vasquez's potential

12    propensity to use firearms.

13         THE COURT:  As I say, I will think about it.  But,

14    again, the point is that Vasquez is not -- it is really,

15    pardon the pun, ammunition that would be used to establish

16    Mr. Vasquez's lack of credibility had he testified for you.

17         MR. SIEGEL:  Right.

18         THE COURT:  Not for him.  They would use it to show

19    that there was a deal or the Government looked the other way

20    to get Vasquez's testimony because he could have been charged

21    as a felon and he wasn't.

22         MR. STEIN:  So we won't have more back and forth

23    about this, so if the redirect that Mr. Siegel proposes is

24    allowed about Mr. Vasquez, I understand the potential issues

25    about our interview, but I can certainly ask about the fact

Sidebar                                    520

1    that he was handcuffed.  In my view he was detained.  He was

2    not free to leave.  He was asked whether he could leave and

3    they did not say it was -- in so many words that he could

4    leave.  He was asked under arrest -- if he was under arrest

5    and, as I recall the interview, they didn't answer him.

6              MR. SIEGEL:  Your Honor, again, there's no possible

7    relevance of that to whether or not Elgin Brack committed

8    these crimes.

9              MR. STEIN:  Well, the question is whether somebody

10   else may have committed them.

11             MR. SIEGEL:  And the fact that he was handcuffed or

12   not has no relevance to whether or not he committed the

13   crimes.

14             You can ask Agent Miceli:  Did you think that Edward

15   Vasquez committed the crime?

16             I am going to ask him that and his answer is going

17   to be:  No, because I recognized Elgin Brack's face

18   immediately.

19             THE COURT:  Yes.  I don't necessarily think you are

20   going down a productive hole, Mr. Stein.

21             MR. STEIN:  Okay, understood, Judge.

22             THE COURT:  Okay.

23             I will think about the bullets some more and let you

24   know when we come back.

25             MR. LAX:  Thank you, Judge.

```
                         Sidebar                        521

 1          MR. SELDEN:  Thank you, Your Honor.

 2          MR. SIEGEL:  Thank you.

 3          (Sidebar concluded.)

 4          (Recess taken.)

 5

 6          (Judge Vitaliano exited the courtroom.)

 7          (Continued on the following page.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

522

1           (In open court; outside the presence of the jury.)

2           THE CLERK:  Court is back in session.

3           Counsel for both sides are present including the

4     defendant.

5           THE COURT:  All right.  Counsel, I have had a chance

6     to think about and confer with my own law clerks and think it

7     out loud and what strikes me about all of this is the argument

8     itself, particularly, putting the seatbelt and the harness

9     around the fact that because of the Sixth Amendment issue,

10    that a very significant piece is left out of the puzzle, what

11    occurs to me as a result of all of that, it just sort of

12    underscores why under 403, that all of it is out.  The

13    cross-examination is out and the redirect examination is out

14    to respond to the -- I mean the redirect and the recross

15    examination would be out to respond to Mr. Stein's cross of

16    the witness which suggests there were things that the

17    government didn't pursue in its investigation.

18           Essentially, what the witness would then be asked to

19    do on redirect is, in my view, when I thought it out more, is

20    basically to provide a mini summation of what the government's

21    argument is, what evidence that the government believed was so

22    overwhelming, that it didn't need to do any of the things that

23    Mr. Stein's cross suggested that they could have but didn't

24    do.  All of those things were really immaterial because, from

25    the government's perspective, they didn't need to do it.

523

1          So that all strikes me that that argument should be

2    reserved for what the word suggests, argument at the end of

3    the case.  And, ultimately, it's really in harmony with the

4    instruction that we give about not pursuing every lead and not

5    pursuing every technique, that the reasons why, which is

6    really what the government is getting at in its proposed

7    redirect, the reasons why the government didn't do something

8    in pursuit of the investigation is not any of the jury's

9    business.  The jury's business is to decide whether or not, on

10   the basis of the evidence that is before the jury, that beyond

11   a reasonable doubt, Mr. Brack is guilty of the crimes charged.

12          So on that re-reflection, we're not going to go down

13   the rabbit holes at all, we're not going to, I don't know if

14   Mr. Siegel has any other redirect of the witness, but to try

15   to establish the reasons why the investigatory theme didn't

16   take other steps will not be permitted and is precluded.

17          So if you have other redirect, Mr. Siegel, feel free

18   to do that.  Otherwise, we'll go to another witness.

19          MR. SIEGEL:  Your Honor, two questions.  First, I

20   just want to understand, is the Court striking parts of the

21   cross-examination?

22          THE COURT:  No, I am not.  I'm letting the parts

23   that suggest what they didn't do, what the agents didn't do

24   because it completes what they did do.  These are things that

25   they didn't do.

524

1          The argument as to why they didn't do it is not

2     going to be presented by the witness.  That's argument that

3     you can make in conjunction or Mr. Selden can make in

4     conjunction with the closing argument as to why the evidence

5     that you did gather and did produce to the jury establishes

6     beyond a reasonable doubt why Mr. Brack is guilty.  Why you

7     didn't pursue a different technique, just as the government

8     usually seeks to make the argument and to insist upon the

9     charge, it's not the jury's business.

10          It's not unusual for a defendant to point out the

11    things that, you know, the evidence that's not there or the

12    evidence, you know, there's no -- in this case, you might pick

13    one of the more prominent touchstones, that there was no

14    examination of Mr. Brack's shoes.  Okay?  Now, whether that's

15    because -- we know one of the leading reasons why that

16    happened is because of what can't come in under any

17    circumstances which is Scott Brack's statement.  The jury is

18    not going to hear that.

19          So, 403 gives us an opportunity to avoid going down

20    rabbit holes that only expand, confuse and ultimately

21    prejudice, and in this case, prejudice to some extent both

22    sides.  The fact that prejudice hits both sides doesn't make

23    it a good idea.  It makes it a bad idea.

24          MR. SIEGEL:  And then, Your Honor, what I just ask

25    is if I can have a moment to confer with my colleagues so I

525

1    can discuss with my colleagues any further direct.

2             THE COURT:  Do you want five minutes of quiet time?

3             MR. SIEGEL:  That would be great, yes.

4             THE COURT:  Okay.  We'll be in the back.

5             (Court is in recess.)

6             (In open court; outside the presence of they jury.)

7             THE CLERK:  Court is back in session.  Counsel for

8    both sides present including defendant.

9             THE COURT:  Are you ready, Mr. Siegel?

10            MR. SIEGEL:  I am.  Thank you, Your Honor.

11            THE COURT:  We'll get our witness and our jury.

12            (Witness TYLER MICELI resumes the stand.)

13            (Jury enters.)

14            THE COURT:  Be seated, please.

15            Counsel will stipulate that the jury is present and

16   properly seated.

17            MR. STEIN:  Yes, Judge.

18            MR. SELDEN:  On behalf of the government, yes.

19   Thank you, Your Honor.

20            THE COURT:  Thank you, Counsel.

21            Ladies and gentlemen, thank you for your patience

22   and your cooperation.  I think you probably gathered by now

23   that trying cases is not quite as easy as it appears on TV.

24            You've heard me on every occasion exhort you to

25   religiously follow the rules.  Well, that applies to the

526

1    lawyers and the Court as well and we struggle very hard to

2    make sure that we're following the rules because that's how we

3    ensure a fair trial to both parties.  Sometimes that takes

4    longer than we planned because we have a lot of brain power

5    around here trying to make sure that the decisions that we,

6    that I ultimately make are fair and based on our best

7    understanding of the law.  Sometimes we get them wrong.

8    That's why we have appellate courts, but it doesn't mean we're

9    not supposed try and try as hard as we asked ask you to try.

10          So please know when we're involved in any of our

11   legal huddles, that's what we're trying to do.  We're trying

12   to be as good at following the rules as we ask you to be in

13   following the rules as well.

14          So Special Agent Miceli is back on the stand.

15          We are to redirect examination by Mr. Siegel.

16          MR. SIEGEL:  Thank you very much, Your Honor.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

1   REDIRECT EXAMINATION

2   BY MR. SIEGEL:

3   Q    Special Agent Miceli, when you were being cross-examined,

4   Mr. Stein asked you a lot of questions about prior statements

5   you made about the location of the black jeans.

6   A    Yes.

7   Q    Do you remember that?

8   A    Yes.

9   Q    And while you were answering that, you said you wanted to

10  explain and Mr. Stein said you had to answer yes or no.  Do

11  you remember that?

12  A    Yes.

13  Q    Could you explain your understanding of where the black

14  jeans were found?

15  A    Yes.  My understanding is that they were in the backpack.

16  Q    And where --

17  A    I'm sorry.  Which was in the car, in the vehicle.

18  Q    Thank you.

19        Do you remember Mr. Stein asked you a number of

20  questions about a video that was played in court?

21  A    Yes.

22  Q    And he asked you to identify the people in the video?

23  A    Yes.

24  Q    I'd just like to play that video to make it 100 percent

25  clear who it is you were referring to in those

Miceli - redirect - Siegel                    528

1    identifications.

2    A    Sure.

3    Q    I'm going to play Government Exhibit 417-A.

4         MR. SIEGEL:  Mr. Villanueva, if you could please dim

5    the lights.

6         (Video played.)  (Video stopped.)

7    Q    So I'm stopping the video at timestamp 3:07:29.

8         Again, Mr. Stein had asked you to identify some of

9    these people so I'm going to blow up the images of certain

10   people and if you can describe who each person is by the

11   clothing they're wearing in the video.

12   A    Yes.  This individual wearing the hat and the gray hoodie

13   is Scott Brack.

14   Q    Now I'm blowing up the second individual.

15   A    This individual wearing the white sneakers, pants and

16   green topped jacket is Elgin Brack.

17   Q    I'm going to play it again.

18        (Video played.)  (Video stopped.)

19   Q    I'm stopping it at timestamp 3:07:37.

20        I'm blowing up two individuals.  Who are these

21   individuals?

22   A    This individual wearing the hat and dark clothing I

23   believe is Edward Vasquez and his daughter.

24        MR. SIEGEL:  Thank you, Your Honor.  No further

25   questions.

Miceli - recross - Stein                529

1          THE COURT:  Thank you, Mr. Siegel.

2          Mr. Stein, any recross?

3   RECROSS-EXAMINATION

4   BY MR. STEIN:

5   Q    So Mr. Miceli, you were just asked some questions on

6   redirect about the black pants, correct?

7   A    Correct.

8   Q    And you made a number of sworn statements in connection

9   with this case that you swore to before federal judges; the

10  complaint that I asked you questions about before and probably

11  half a dozen or so search warrant affidavits in connection

12  with electronic devices, right?

13  A    Yes.

14  Q    And did you ever, in any of those sworn statements, ever

15  state that the black pants were found in a backpack?

16  A    No.  I believe in all of them there was the same language

17  that it was in the vehicle.

18  Q    Not in the backpack?

19  A    In the vehicle, correct.

20         MR. STEIN:  Thank you.

21         THE COURT:  Thank you, Mr. Stein.  We are really

22  narrowing it down.

23         Mr. Siegel, do you have anything left?

24         MR. SIEGEL:  No, nothing else.  Thank you very much.

25         THE COURT:  Special Agent Miceli, you may be

530

1   excused.

2          THE WITNESS:  Thank you.

3          (Witness excused.)

4          THE COURT:  Mr. Siegel.

5          MR. SIEGEL:  Your Honor, the government is going to

6   call Detective Michael Nolan but we want to clean up the

7   physical exhibits that are on the witness stand.

8          THE COURT:  Okay.

9          MR. SELDEN:  May we approach the witness stand?

10         THE COURT:  You may.

11         (Pause.)

12         THE CLERK:  Please raise your right hand.

13         (The witness is duly sworn/affirmed by clerk.)

14         THE CLERK:  Please state your first and last name

15  and spell it for the record.

16         THE WITNESS:  Michael Nolan, M-I-C-H-A-E-L,

17  N-O-L-A-N.

18         THE CLERK:  Thank you.  Have a seat, please.

19         THE COURT:  You may inquire.

20         (Continued on next page.)

21

22

23

24

25

1  DIRECT EXAMINATION

2  BY MR. SIEGEL:

3  Q     Good afternoon, sir.

4  A     Good afternoon.

5  Q     What do you currently do?

6  A     I'm retired.

7  Q     What did you do before you retired?

8  A     I was a detective with the New York City Police

9  Department.

10  Q     How long were you with the New York City Police

11  Department?

12  A     Twenty-five years.

13  Q     Before you retired, did you work in any specialized part

14  of the NYPD?

15  A     Yes.

16  Q     And what was that?

17  A     I worked in the Firearms Analysis Section.

18  Q     Is that also known as FAS?

19  A     Yes.

20  Q     What is FAS?

21  A     FAS is a part of the laboratory that identifies and tests

22  firearms and ammunition.

23  Q     And what were your responsibilities at FAS?

24  A     To test firearms and ammunition for operability.

25  Q     And just in laymen's terms, when does it mean for a

1  firearm to be operable?

2  A    It means it will fire a cartridge of ammunition.

3  Q    And how many firearms have you examined?

4  A    Upwards of 370.

5  Q    So I would like to start by showing you Government

6  Exhibit 308 which is in evidence subject to connection.

7        So I'd like you to start with the firearm that is in

8  that package.

9  A    Okay.  May I?

10  Q    Yes, please.  You can take it out.

11  A    Okay.

12  Q    Do you recognize that firearm?

13  A    I do.

14  Q    What do you recognize it as?

15  A    I recognize the firearm that I got with all this other

16  evidence.  I tested this firearm.

17  Q    How do you know that you tested that firearm?

18  A    Because part of our procedure in the laboratory is every

19  time we test a firearm or ammunition, we describe or carve

20  into the metal the year, the laboratory number, the laboratory

21  item number and our initials, and I see that right here on the

22  top strap.

23  Q    And what is the laboratory number that you carved into

24  it?

25  A    2018089039.

Nolan - direct - Siegel                    533

1  Q    And you also mentioned an item number.  What's the item

2  number?

3  A    The item number is 3.

4  Q    And what do those numbers mean?

5  A    Well, when the evidence is taken into the laboratory,

6  it's basically given, as it comes in, it's given a laboratory

7  number as it comes into the laboratory.  For argument's sake

8  like the first one that comes in that year will be laboratory

9  item 1 and then so on.  This one was 89039.

10 Q    And what about the laboratory item number?

11 A    The laboratory item number is a different story.  Each

12 invoice, that's what the evidence goes on, this is like a

13 precinct level, like a list of everything that was recovered

14 from the crime scene or any kind of scene for that matter.

15 Each invoice has its own number on it and it starts with items

16 1, 2, however many you put on this invoice.

17        As far as the laboratory goes, they're connected

18 with complaint numbers.  So every time, you can have various

19 or many invoices on one complaint number.  So what it does is

20 it takes the first, let's say it has, it takes the first

21 invoice and it will start, just like the invoice does with

22 item number 1 and 2 and 3, and then the second invoice comes

23 in attached to that complaint number and then it will start 3,

24 4, 5, 6 and then so on with each additional invoice.

25 Q    And you said the firearm was lab item number 3?

CMH        OCR        RMR        CRR        FCRR

1    A    Correct.

2    Q    Is the firearm in substantially the same condition it was

3    when you examined it?

4    A    Yes.

5    Q    Apart from that red block that is running through it to

6    make it safe for the courtroom?

7    A    Yes, that wasn't there at the time.

8    Q    And did you fire that firearm to determine if it was

9    operable?

10   A    Yes, I did.

11   Q    Did it fire?

12   A    Yes, it did.

13   Q    Was the -- when you received it, was the firearm in the

14   plastic packaging that it's in now?

15   A    No, I put it there.

16   Q    How was it packaged when you received it?

17   A    It was in a cardboard box.

18   Q    Was there anything else in the cardboard box?

19   A    Yes.

20   Q    What else was in the cardboard box?

21   A    Two small plastic bags were in the box with the revolver.

22   Q    And what was in the plastic bags?

23   A    One was shell casings and then the other bag was filled

24   with ammunition.

25   Q    And how many shell casings and how many ammunition was in

1   those bags?

2   A    Can I look at the form?

3   Q    Yes.

4   A    All right.  All right.  So there was three shell casings

5   and three unfired cartridges of ammunition.

6   Q    And the plastic bags that you mentioned, were they

7   sealed?

8   A    Yes.

9   Q    In the box that that was all in, was that box sealed?

10  A    Yes, it was.

11  Q    So I'm going to come back and grab that item from you to

12  show some things on the ELMO.

13            I'm going to show you the document that's on the top

14  portion of this packaging.

15            MR. SIEGEL:  Mr. Villanueva, can we publish that for

16  the jury.

17  Q    What is this item?

18  A    This is a property invoice or voucher.

19            (Continued on next page.)

20

21

22

23

24

25

Nolan - direct - Siegel                    536

1    DIRECT EXAMINATION

2    BY MR. SIEGEL:  (Continuing)

3    Q    Are the lab item numbers that you referred to written on

4    this voucher?

5    A    Yes.

6    Q    Where are they written?

7    A    They are written on the left side.

8    Q    Can you circle on your screen those lab item numbers?

9    A    All right.  Here we go.

10        I'm sorry, not these.  The ones written in pen.

11   Q    The handwritten numbers on the left side?

12   A    Yeah.  Correct.

13   Q    So, as you run through it, the revolver, as you said, is

14   three, the next item is four, five, six, and seven?

15   A    Yes.

16   Q    And there's initials written next to those numbers.

17   Whose initials are those?

18   A    Those are my initials.

19   Q    You said that when you opened the package, when you

20   opened the cardboard box that had the gun in it, there was

21   also a sealed plastic bag containing shell casings?

22   A    Yes.

23   Q    Is that reflected on this voucher?

24   A    The sealed plastic bag?

25   Q    The shell casings.

Nolan - direct - Siegel                          537

1    A    No.

2    Q    What's reflected on this voucher?

3    A    It says fired bullet.

4    Q    When you opened up the package, were there fired bullets?

5    A    No.

6    Q    What was there instead?

7    A    Empty shell casings.

8    Q    I am now showing you a piece of cardboard that is in the

9    bottom part of this plastic packaging.  Do you recognize this

10   piece of cardboard box?

11   A    Yes.

12   Q    What this cardboard box?

13   A    It is part of the box that the evidence came in.

14   Q    What happened to the rest of the box?

15   A    It was discarded.

16   Q    Did you discard it?

17   A    Yes.

18   Q    And did you then put that piece of cardboard into this

19   plastic packaging?

20   A    Yes.

21   Q    I'm showing you the third section of the large plastic

22   package.  What is in this section?

23   A    That's the plastic envelope that the empty shell cases

24   came in.

25   Q    Could you circle the plastic envelope you are referring

Nolan - direct - Siegel                              538

1    to?

2    A     I reflected it with number four and five.

3    Q     Does that correspond to the laboratory item number?

4    A     Yes.

5                MR. SIEGEL:  And for the record, he circled a

6    plastic bag with the number four and five written on it.

7    Q     And below that there appears to be another plastic bag.

8    What plastic bag was that?

9    A     That's the plastic bag that the cart -- live cartridges

10   of ammunition came in.

11   Q     So you said that there were casings.  What happened to

12   the casings?

13   A     I retained them at the laboratory.

14   Q     How did you retain them?

15   A     I put them to the side.  I looked at them.  They were

16   clearly empty shell casings, and I carved in the year,

17   laboratory number, the laboratory item numbers and my

18   initials, like I do with all the evidence that I basically

19   look at and test.  And then I put it in an envelope, an

20   evidence envelope from the laboratory.

21   Q     I am going to show you Government Exhibit 323.

22   A     Thank you.

23   Q     Do you recognize Government Exhibit 323?

24   A     Yes.

25   Q     How do you recognize it?

Nolan - direct - Siegel                    539

1   A    I filled it out and it has my name on it because I put it

2   there and it has the laboratory number on it.

3   Q    What is Government Exhibit 323?

4   A    The empty shell casings from the evidence I received.

5   Q    When you put the shell casings in that envelope, did you

6   seal that envelope?

7   A    I did.

8   Q    Can you open it up and look at the contents?

9   A    Okay.

10  Q    Do you recognize the contents?

11  A    Yes.  Three empty shell casings.

12  Q    Do you recognize them as the shell casings that you

13  received in the same cardboard box with that firearm?

14  A    Can I use this?

15  Q    Yes.

16       MR. SIEGEL:  For the record, the witness picked up a

17  magnifying glass.

18  A    I feel like Sherlock Holmes.

19       Yeah.  I engraved all these and my initials are on

20  them with the laboratory number.

21  Q    Is that what you're looking at with the magnifying glass

22  that you have?

23  A    Yes.

24  Q    Do those three shell casings appear to be in

25  substantially the same condition as they were when you

1  packaged them?

2  A    Yes.

3        MR. SIEGEL:  Your Honor, I move to admit Government

4  Exhibit 323.

5        MR. FARRELL:  No objection, Judge.

6        THE COURT:  Received without objection.

7        (Government's Exhibit 323 received in evidence.)

8  Q    After you packaged Government Exhibit 323, what do you do

9  with that envelope?

10  A    I packaged it.  I sealed it and then I handed it in with

11  all of the rest of my evidence.  When I'm finished with the

12  case, I hand it into the evidence room in the laboratory.

13  Q    Thank you.  Going back to Government Exhibit 308, which

14  I'm showing on the ELMO, that lower plastic bag I think you

15  said contained the cartridges?

16  A    Yes.

17  Q    What happened to the cartridges?

18  A    Well, I fired two of them and I left one unfired.

19  Q    And next to that plastic bag, there are two items.  What

20  are those items?

21  A    Those are two of the cartridges that were in that bag.

22  Q    And could you just walk the jury through which of those

23  you fired and which one you didn't?

24  A    So we find that if the firearm is operable or not.  So

25  what happens is we always -- we try and fire case ammunition.

Nolan - direct - Siegel                      541

1   This would be called case ammunition because it came with the

2   case.  And then we fire one for court purposes so it would

3   show everybody in court that it worked, it fired, and that's

4   this one right here.  If you see here, you have the cartridge

5   casing and then you have the projectile, which is also known

6   as the bullet.

7            And this one here.

8   Q   Detective Nolan, let me interrupt you to reflect for the

9   record what you have done.

10           MR. SIEGEL:  So he circled on the side far from the

11  envelope a two-part item of a casing of a fired bullet.

12  A   Yes.

13  Q   You can continue.  Thank you.

14  A   This one here, I just looked at and I did not test, so I

15  did not engrave that one.

16           MR. SIEGEL:  For the record, he has drawn an arrow

17  pointing to an unfired cartridge.

18  Q   Now, there are two items here, that unfired cartridge and

19  the fired cartridge.  What happened to the third live

20  cartridge?

21  A   I fired that for what we call test fires and that's

22  retained at the laboratory as well, along with other

23  cartridges we fire from that revolver.

24  Q   I am going to show you another exhibit, but before I do,

25  want to walk through the lab numbers.  So the two items of

Nolan - direct - Siegel                    542

1  ammunition that you were just talking about that you were

2  circling on the screen, what lab numbers were assigned to each

3  of them?

4  A    I believe it was six and seven, I believe, if I had the

5  -- I could see better.  I believe this one is seven.  All

6  right.  The fired one I believe is seven.

7  Q    I will bring it up to you.

8  A    All right.  Yeah.  The fired one is seven and the unfired

9  one is six.  I can see it now.

10  Q    And were there also lab items numbers assigned to those

11  shell casings that we looked at a moment ago in Government

12  Exhibit 323?

13  A    This one here?

14  Q    Yes.

15  A    Yes, there were lab items number.

16  Q    What are the lab items assigned to those shell casings?

17  A    There were 5, 4, and I believe 4.2.  Excuse me.  Yes, 5,

18  4, and 4.2.

19  Q    You mentioned that the third live cartridge was among

20  your test fires?

21  A    Yes.

22  Q    What is a test fire?

23  A    A test fire is ammunition that we -- it's basically like

24  a known cartridge that was definitely fired from a specific

25  gun.  This way we know.  So later on the microscopic guys can

Nolan - direct - Siegel                    543

1  look at them.  Like this came with two empty shell casings

2  that were fired from a weapon.

3           Now, I don't know which weapon they were fired from

4  because I just got them in a bag.  So that's for the

5  microscopic guys later on to determine.

6           So, what my job is is I take case ammunition and FAS

7  ammunition, firearms analysis ammunition, which is regular

8  ammunition, and I fire it all from that gun, so we have like a

9  known sample from that particular revolver.

10 Q    And I think in your answer you just said there were two

11 shell casings?

12 A    Oh, I'm sorry, three.  I made a mistake.

13 Q    So I am going to hand you Government Exhibit 309.

14 A    Thanks.

15 Q    You're welcome.  Do you recognize Government Exhibit 309?

16 A    Yes.

17 Q    How do you recognize it?

18 A    This is the test fire envelope that I prepared.  It has

19 my name on it and the laboratory number.

20 Q    What is the contents of Government Exhibit 309?

21 A    These are my test fires.  These are the laboratory

22 ammunition and case ammunition that I fired from this

23 revolver.

24 Q    When you say from this revolver, are you referring to the

25 .357 Dan Wesson that was in Government Exhibit 308?

1    A    Yes.

2    Q    Do all the test fires in that envelope appear to be in

3    substantially the same condition as they were when you last

4    saw them?

5    A    Yes.

6    Q    How do you recognize those particular test fires?

7    A    Because I do -- like I said earlier, I carve the year,

8    the laboratory number and the laboratory item number on each

9    one.  I do the projectile and the shell casing.  So we keep

10   them together.

11   Q    What laboratory item numbers did you assign those test

12   fires?

13   A    I don't really assign them.

14   Q    I'm sorry?

15   A    I go from the --

16   Q    I'm sorry, that were assigned?

17   A    The next numbers down, yeah.  The FAS cartridges, the

18   fire analysis cartridges that I put through the gun were 3.7,

19   because we sample that off of the original No. 3, item No.  3.

20   So it goes 3.7, 3.8, and 3.9.

21   Q    In addition to the FAS cartridges, was there any other

22   test fires?

23   A    Yes.  That was from the case.  That was case ammunition.

24   It was one cartridge and that was 6.2.

25   Q    Is that one of the items that was in a sealed plastic bag

Nolan - direct - Siegel                    545

1   in a sealed cardboard box along with the gun?

2   A     Yes.

3   Q     What did you do with Government Exhibit 309 after you

4   collected the test fires?

5   A     Just like I did with the other exhibit, I packaged it up,

6   I sealed it, and then I handed it all in at the end my workday

7   with the -- when I was finished with the case anyway to the

8   evidence room.

9              MR. SIEGEL:  Your Honor, I move to admit Government

10  Exhibit 309.

11             THE COURT:  Any objection?

12             MR. FARRELL:  No.

13             THE COURT:  Received without objection.

14             MR. SIEGEL:  I also move to admit 308 no longer

15  subject to connection.

16             THE COURT:  Any objection?

17             MR. FARRELL:  No.

18             THE COURT:  308 is no longer subject to connection.

19  Without objection.

20             309 in as well without an objection.

21             (Government's Exhibit 308 and 309 received in

22  evidence.)

23             MR. SIEGEL:  Your Honor, I have no further questions

24  for the witness.

25             THE COURT:  Thank you, Mr. Siegel.

1          Mr. Farrell?

2          MR. FARRELL:  Just a few, Judge.

3    CROSS EXAMINATION

4    BY MR. FARRELL:

5    Q    How long have you been retired?

6    A    Since June.

7    Q    It's going good so far?

8    A    So far so good.

9    Q    We've never talked about this case, right?  My name is

10   Gary Farrell.

11   A    No.

12   Q    I am going to call you detective still.  Okay?

13   A    Okay.  But for the record, I'm retired.

14   Q    Good.  I will make it easier, Mr. Nolan.  Thank you.

15        This gun we are talking about, it was three rounds

16   that were fired; right?

17        What's the best way to talk about a bullet that's

18   been fired that was inside of the gun, the best name to give

19   it?

20   A    What kind of bullet?  Are we talking about the cartridge

21   casing?

22   Q    The cartridge casing.  You're right.  I'm sorry.  It's

23   the casing that surrounds the bullet; right?

24   A    No.  It's actually behind the bullet.  It holds the

25   bullet.

1   Q     In a revolver like this; correct?

2         This gun was a revolver; right?

3   A     Yes.

4   Q     So there were three spent shell casings in this revolver;

5   right?

6   A     Well, in the revolver or in the packaging?

7   Q     In the packaging that you were given.

8   A     Yes.

9   Q     How many bullets does this gun hold?

10  A     I believe six.

11  Q     You had it there.  You looked at it; right?

12  A     Yeah.  But I was looking at the numbers on it at the

13  time.

14  Q     In your long career, this wasn't the only .357 that

15  you've observed; right?

16  A     No.

17  Q     Do some .357's hold six and some hold five?

18  A     Some do, yes.

19  Q     And as you sit here today, you are not sure which one

20  this was?  You are not sure if it held five or six, this gun?

21  A     It held six.

22  Q     Okay.  You noted in your report that it is a

23  single/double action .357 Magnum.  What is a single/double

24  action do?

25  A     It could fire a single action or a double action.

Nolan - cross - Farrell                          548

1    Q     What is that for those people who are not gun experts?

2    A     Single action is --

3                MR. SIEGEL:  Your Honor, objection.  For the record,

4    he is not a gun expert.

5                MR. FARRELL:  Compared to me, he is, Judge.

6                THE COURT:  I think we will let the guy who has

7    worked 25 years to take a shot at it.  No pun intended.

8                Do you know what a single action is as opposed to a

9    double action?

10               THE WITNESS:  Yes, sir.

11               THE COURT:  Could you explain that?

12               THE WITNESS:  A single action revolver is like a

13   cowboy gun, you pull the hammer back and one press of the

14   trigger makes the hammer go forward and it discharges the

15   cartridge.

16               A double action is when you squeeze the trigger, the

17   hammer comes back with the pull of the trigger and then goes

18   forward when the trigger reaches the end.

19   Q     Would you agree that this gun could be fired either way?

20   A     It can be.

21   Q     Right?

22   A     I did it both ways.

23   Q     When you did your test firing?

24   A     Correct.

25   Q     And you shoot into a giant tank of water pretty much;

1   right?

2   A    Yes, sir.

3   Q    And when you picked up the gun, did you use any

4   protective latex gloves to pick it up?

5   A    At first, yes.

6   Q    Okay.  You say at first.  Did you take the gun off?  I'm

7   sorry, did you take the glove off?

8   A    Yes, because they rip and then I will discard the gloves

9   and then my hands get all messed up from the gloves.

10  Q    And you fired that gun and any gun you have ever fired

11  with your dominant hand; right?  You're right-handed.  You

12  fired the gun with your right hand?

13  A    These guns I generally use both hands all the time.

14  Q    Are you a switch hitter in baseball?

15  A    No.

16  Q    Why do you alternate hands?

17  A    Actually, I put it in my dominant hand and I hold steady

18  with my left.

19  Q    Okay.  That's what I thought.  Thank you.

20       Where does the police lab criminalistics section

21  physically in relation to your old squad, the firearms

22  analysis section?

23  A    Upstairs.

24  Q    Okay.  Now, do you work with them in terms of -- you

25  know, they have analyzed gun sometimes too; right?

Nolan - cross - Farrell                    550

A     Well, they take other -- they do other tests on them, but
yeah, I guess you can say that in a manner of speaking.

             (Continued on following page.)

1    EXAMINATION CONTINUES

2    BY MR. FARRELL:

3    Q    And you did your test on November 28th, 2018, right?

4    A    Yes.

5    Q    And as you sit here today, do you know --

6    A    No, I'm sorry.  I took these tests on the 26th.

7    Q    Are you sure?  That's the date the client was arrested

8    and the gun was recovered.  Do you think you did it that

9    quick?

10   A    Oh, I apologize.  I was looking at the date of occurrence

11   on this form, on this envelope.

12   Q    So would you now agree if you look at the bottom of your

13   report, if you have it in front you?

14   A    I don't have the report in front of me, sir.  Oh, I took

15   it --

16          MR. FARRELL:  We could go to the witness only with

17   the overhead, Mr. Villanueva.

18   Q    Here is your report marked 3500 MN-1.

19          Can you see it, Mr. Nolan?

20   A    I can.

21   Q    Do you see the bottom, do you see the date prepared?

22   A    Yes, 28th.

23   Q    Right.

24   A    Thanks.

25   Q    Okay.

Nolan - cross - Farrell                    552

1            And I'm also going to show you what's been marked as

2    3500 JT-1, just for your eyes only at this point, and ask you

3    to take a look at it.  And specifically, if you recognize the

4    name, a police department employee like you were, named

5    Jessica Tarry, an analyst in the Criminalistics Section.

6    A    Okay.

7    Q    Did you ever hear of her before?

8    A    I know who she is.

9    Q    You know who she is, right?

10   A    (No response.)

11   Q    And would you agree that she analyzed the gun the same

12   day you did, right?

13           MR. SIEGEL:  Objection, Your Honor.  He's just

14   asking him to read from an item that's not in evidence.

15           THE COURT:  Yes.  You can ask him if he knows.  And

16   if he says he doesn't know or he can't remember, then you can

17   refresh his recollection, but he can't read from the document.

18           MR. FARRELL:  Understood, Judge.

19   BY MR. FARRELL:

20   Q    As you sit here today, do you know if she did her tests

21   on the gun before you did your yours or after --

22           THE COURT:  Well, do you know as you sit here today

23   that she tested it at all?

24           THE WITNESS:  As I sit here today, I know that she

25   had the weapon before I did.

Nolan - cross - Farrell                   553

1   BY MR. FARRELL:

2   Q     She did have the weapon before you?

3   A     Yes.

4   Q     How do you know that?

5   A     Because somebody told me.  I don't remember.  I know that

6   an analyst upstairs had had it because the numbers in the --

7   in the computer --

8   Q     Right.

9   A     -- like I said earlier how we sample the numbers.  Well,

10  I would start my samples as 1, 2, 3.  And clearly, you could

11  see here my samples started -- I'm sorry, if I -- I sampled

12  it, I would have sampled the gun as 3.1, 3.2, with my test

13  fires, but I didn't do that.

14        Somebody else had done other tests and their samples

15  were up to, I guess, 6.  So I had to start my samples at 3.7

16  and then 3.8 and 3.9.  That's what I did.  So somebody else

17  had the gun before me.

18        And on top of that, it also was sealed with

19  laboratory -- it was opened and resealed.  I could tell that

20  it was opened and resealed when I received it.  So I said, oh,

21  okay.

22        And in addition to that, on all the paper work I

23  received we're always told that we have to write the

24  laboratory -- the year, the laboratory number, and -- on the

25  bottom of each page of any report that's attached, each page

SAM     OCR     RMR     CRR     RPR

1  that has words on it.  Okay?  So, God forbid something gets

2  misplaced, which I haven't seen actually.  But I was going to

3  do that, but it had already been done.  So what I did was I

4  made sure all the numbers were correct, all the lab numbers

5  that were written by that analyst, I didn't know who it was at

6  the time --

7  Q    Right.

8  A    -- and I initialed it as well.

9  Q    Did you and Mr. Siegel talk about that at all, that the

10 gun -- that you did your test after the criminalist did hers?

11 Did that ever come up?

12 A    Yeah.

13 Q    It did?

14 A    Yeah.

15 Q    He didn't ask you about it though, did he?

16 A    No, I told him.

17 Q    I got it, thanks.

18           MR. SIEGEL:  Nothing from the Government, thank you.

19           THE COURT:  Thank you.

20           Retired Detective Michael Nolan, you are excused.

21           THE WITNESS:  Thank you very much, Your Honor.

22           (Witness steps down.)

23           THE COURT:  Unless we need to deal with a witness

24 who has to testify today, we will take the evening break.

25           MR. SELDEN:  No witness that has to testify today.

Nolan - cross - Farrell                555

1      Thank you, Your Honor.  Evening break sounds great.

2      THE COURT:  Sometimes, ladies and gentlemen, we have

3  witnesses that come from out of town and rather than keep them

4  here, we will suck it up and go a little later.  So

5  fortunately, that is not the case here.  So we do come to our

6  evening break.  And as you know from the advice you have

7  already gotten from Mr. Villanueva, it is also our break for

8  the week.  So that you have an extra long gap between today

9  and when we next meet, which, as a reminder, includes the

10  beginning of Daylight Savings Time on the weekend.  So that we

11  will spring ahead and lose an hour's sleep over the weekend.

12  Make sure you stay rested.

13      But all of that, notwithstanding, the rules are just

14  as important to follow, not only on the night that we leave,

15  but on the three days that will come in between.  And those

16  rules, again, are:  Continue to keep an open mind; do not

17  discuss the case amongst yourselves or with anyone else.  To

18  the extent there are any media accounts of this case, the old

19  fashioned kind or the social media kind, you are to totally

20  disregard them, close them out of your eyes and ears.  Urge

21  you again to disregard media accounts of any legal proceeding

22  for fear that it might confuse you about what your

23  responsibilities are here.  You are not to use the overnight

24  and weekend period to conduct any research of any kind,

25  electronic or otherwise, touching on the case directly or

1   indirectly, the issues, the personalities, the names, the

2   locations that you have heard.  You are certainly not to visit

3   or go by any of the locations that have been identified in

4   these proceedings.

5          And, again, we are on radio silence.  So it is not

6   only talking face-to-face with people you meet or talking

7   face-to-face with each other, but talking by any means,

8   including texting and smoke signals and letters and any means

9   of communication you can think of is prohibited.  Not to

10  mention in any way that you are a juror, that you come to the

11  courthouse, or anything that deals with this case.

12         So with all of those admonitions, it does bring us

13  to a close of today's proceedings.  Again, we all appreciate

14  your patience, your cooperation, your attentiveness, and we

15  look forward to seeing you on Monday.  The same drill applies.

16  Come to the Central Jury Room at around 9:45 and we will get

17  started as close to that time as we can, otherwise we bid you

18  adieu and a good evening and good weekend.

19         See you next week.

20         JUROR NUMBER 1:  Thank you.

21         (Jury exits.)

22         (In open court.)

23         THE COURT:  Okay, any afternoon housekeeping?

24         MR. SELDEN:  Your Honor, the Government had

25  responded to an inquiry by Mr. Farrell with regards to

1    Detective Sergeant Keith Bryan's memo book.  He has informed

2    the Government through one of his colleagues that, in fact, he

3    did not have a memo book.  After carefully checking, it's our

4    understanding that he does not have a memo book.

5                THE COURT:  Well, that answers that.

6                MR. FARRELL:  We'll accept that representation, of

7    course, Your Honor, though it does contradict his sworn

8    testimony.  But I'm sure he was just mistaken.

9                MR. SELDEN:  Beyond that, Your Honor, no other

10   housekeeping matters from the Government.

11               THE COURT:  Let me ask, now that we are into the

12   trial somewhat, what is the Government's analysis as to when

13   they anticipate or how are we doing timewise and how long or

14   more do we anticipate for the Government's case-in-chief?

15               MR. SELDEN:  Thank you, Your Honor.

16               Your Honor, the Government does anticipate,

17   hopefully, finishing either on -- late in the day on Monday or

18   on Tuesday.

19               THE COURT:  Okay.

20               All right, so what we will do, so the defense is on

21   notice, as those of you who had trials before me are aware, we

22   have a practice, which we will adhere to, and we send out, and

23   Anthony will be finalizing it, we may even get it out tonight,

24   we send out an exposure draft of the final charge.  It is not

25   a charge conference, but it invites counsel to give us as

1  quickly as they can, hopefully before Monday, their comments,

2  their proposed modifications, additions, deletions, to the

3  final charge.  And it gives us a head start in thinking about

4  what you all might be thinking by get getting your reaction to

5  what we're thinking.

6         And then once we have reviewed any comments that

7  counsel may have, we will come up with a final proposed

8  charge, and that will be the charge and verdict sheet, the

9  proposed verdict sheet, that we will have our charge

10  conference on, whenever that comes.

11         To some extent that implicates whether there is a

12  defense case, whether there is and whether the defense case

13  triggers a rebuttal case.  All those will have to be decided,

14  but at least we thank the Government for letting us know what

15  their thinking process is as far as timing is concerned.

16         MR. STEIN:  So any comments, requests, should be

17  filed on ECF by the end --

18         THE COURT:  Yes.  You can file on ECF, but Anthony

19  is going to, if he doesn't have it, he is going to, in

20  addition we find that a lot of times it is easier for counsel,

21  we also e-mail directly to counsel a Word copy of the Word

22  document of the proposed draft.  So you don't have go crazy

23  going to Pacer.  It will be there, but counsel usually find it

24  easier to work off the document that we will e-mail to you

25  rather than fishing it off --

1          MR. STEIN:  I was talking about our responses, if we

2    have any.  That should be filed on ECF?

3          THE COURT:  Yes, but please also file them by

4    response e-mail to Mr. LoMonaco as well.

5          MR. STEIN:  Yes, I will.

6          THE COURT:  This way it cuts down that extra.  You

7    know, it focuses everybody's attention rather than getting

8    something, particularly with us where we are getting

9    everybody's filings on all cases, so it can get lost a bit.

10   This way it sort of highlights it for us and it will come

11   directly to the law clerk who is assigned to the case.

12         Do we have anything else?

13         MR. SELDEN:  Not on behalf of the Government.  Thank

14   you, Your Honor.

15         THE COURT:  So, again, obviously, we have a Friday

16   calendar.  To the extent you want to leave some stuff, you can

17   work with William to lock it up for you.  Otherwise, you take

18   it with you.

19         MR. FARRELL:  Thank you.

20         Your Honor, one quick thing before we break from the

21   defense.

22         I did bring this up off the record informally with

23   the prosecution, the Government, and I hoped we could resolve

24   it there, but I don't know that we can.

25         In light of Detective Sergeant Bryan's testimony,

1    the defense would like to, at least, interview with the

2    prospect of calling the four members of his team that he said

3    were out there, that he was able to identify.  Finbarr

4    Fleming; Detective Bill Puskas, P-U-S-K-A-S; Detective Jose

5    Chevere, C-H-E-V-E-R-E; and Detective Angelo Tessitore.

6              And the Government says they really -- their office

7    really precludes them from bringing in people to assist the

8    defense or to testify, so I need the -- as the Government

9    provided for the criminalist, we have no problem getting her,

10   I need the -- where we can fax a subpoena.  And I think I am

11   going to need the tax ID numbers, which I promise as an

12   officer of the Court not to share with anybody.

13             MR. SELDEN:  And, Your Honor, in keeping with the

14   Government previously on the evening literally of the prior

15   request providing the criminalist's contact information, we

16   will locate a contact phone number.  I don't know whether or

17   not a faxed subpoena will suffice, so we would just proffer to

18   the defense that they should reach out to the contact phone

19   number.

20             And we will, of course, provide tax ID numbers and a

21   contact phone number so that they can proceed, as they did

22   with the criminalist, in securing whatever witness they want.

23             THE COURT:  And tomorrow is a business day,

24   Mr. Farrell, so to the extent you need a subpoena so ordered

25   or anything, we are here.

Nolan - cross - Farrell                               561

1              MR. FARRELL:  Great, Judge, I appreciate it.  Thank

2    you.

3              THE COURT:  Anything else?

4              MR. FARRELL:  No, thanks, that's it.

5              THE COURT:  All right, then we will see, unless

6    there is a so-ordered subpoena tomorrow, we will see you all

7    on Monday, unless you have something on the calendar before me

8    on something else, we will see you on Monday, the same time,

9    same place.

10             MR. SELDEN:  Thank you, Your Honor.

11             MR. SIEGEL:  Thank you, Your Honor.

12             MR. LAX:  Thank you, Your Honor.

13             THE COURT:  Have a good weekend.

14             MR. SELDEN:  You too, Your Honor.

15             (Defendant exited the courtroom.)

16             (Judge Vitaliano exited the courtroom.)

17

18             (Matter adjourned to March 9, 2020 at 10:00 a.m.)

19

20

21                            ooo0ooo

22

23

24

25

562

1                        I N D E X

2    WITNESSES:

3

4       THOMAS NUZIO

5          CROSS-EXAMINATION BY MR. STEIN              381

6          REDIRECT EXAMINATION BY MR. SIEGEL          411

7       TYLER MICELI

8          DIRECT EXAMINATION BY MR. SIEGEL            413

9          VOIR DIRE EXAMINATION BY MR. STEIN          454

10         DIRECT (Continued) BY MR. SIEGEL            458

11         CROSS-EXAMINATION BY MR. STEIN              466

12         REDIRECT EXAMINATION BY MR. SIEGEL          527

13         RECROSS-EXAMINATION BY MR. STEIN            529

14      MICHAEL NOLAN

15         DIRECT EXAMINATION BY MR. SIEGEL            531

16         CROSS EXAMINATION BY MR. FARRELL            546

17

18

19                      EXHIBITS:

20
        Government's Exhibit 101             418
21      Government's Exhibit 122             418
        Government's Exhibit 123             419
22      Government's Exhibit 102             420
        Government's Exhibit 124             420
23      Government's Exhibit 103             421
        Government's Exhibit 129             425
24      Government's Exhibit 304B            430
        Government's Exhibit 306A            432
25

563

1                        I N D E X

2
                    EXHIBITS (Continued):
3

4
         Government's Exhibit 305A              435
5        Government's Exhibit 317               437
         Government's Exhibit 317A              438
6        Government's Exhibit 315               443
         Government's Exhibit 316               445
7        Government's Exhibit 311               446
         Government's Exhibit 305               448
8        Government's Exhibits 421 and S-8      448
         Government's Exhibit 306               452
9        Government's Exhibit 417-A and         458
         417-B
10       Defendant's Exhibit E                  476
         Defendant's Exhibit B                  503
11       Defense Exhibit C                      504
         Defense Exhibit D                      505
12       Government's Exhibit 323               540
         Government's Exhibit 308 and 309       545

13

14

15

16

17                *    *    *    *    *

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR