564

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - - - X

4    UNITED STATES OF AMERICA,    :    18-CR-684(ENV)

5              Plaintiff,         :
                                       United States Courthouse
6        -against-               :    Brooklyn, New York

7    ELGIN BRACK,                 :
                                       March 9, 2020
8              Defendant.         :    10:00 o'clock a.m.

9    - - - - - - - - - - - - - - X

10

11                 TRANSCRIPT OF TRIAL
         BEFORE THE HONORABLE ERIC N. VITALIANO
12        UNITED STATES DISTRICT JUDGE, and a jury.

13   APPEARANCES:

14

15   For the Government:        RICHARD P. DONOGHUE
                                United States Attorney
16                              BY: PHILIP A. SELDEN
                                    JONATHAN SIEGEL
17                                  JONATHAN LAX
                                Assistant United States Attorneys
18                              271 Cadman Plaza East
                                Brooklyn, New York
19

20   For the Defendant:         JOEL M. STEIN, ESQ.

21                              GARY FARRELL, ESQ.

22   Court Reporter:            Charleane M. Heading
                                225 Cadman Plaza East
23                              Brooklyn, New York
                                (718) 613-2643
24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

```
 1              (In open court; outside the presence of the jury.)

 2              THE CLERK:  The Honorable Eric Vitaliano presiding.

 3              The case on the calendar is USA versus Brack, case

 4    number 18-CR-684, on for a jury trial.

 5              Would the attorneys please note their appearance

 6    beginning with the government.

 7              MR. SELDEN:  Good morning, Your Honor.  On behalf of

 8    the United States, Assistant United States Attorney Phil

 9    Selden.  I'm joined at counsel table by Assistant United

10    States Attorneys Jonathan Siegel and Jonathan Lax, Paralegal

11    Specialist Elicia Bates and Detective Steven Saint-Hilaire.

12    Good morning, Judge.

13              THE COURT:  Good morning.

14              MR. SIEGEL:  Good morning.

15              MR. STEIN:  Good morning.  Joel Stein for Elgin

16    Brack who is now with us.

17              MR. FARRELL:  And Gary Farrell also for Elgin Brack.

18              THE COURT:  Good morning all.

19              THE DEFENDANT:  Good morning.

20              THE CLERK:  Counsel for both sides present including

21    the defendant.

22              THE COURT:  Mr. Bennett is not present this morning?

23              MR. STEIN:  He is.

24              THE COURT:  Glad to have you here, Mr. Bennett, and

25    Mr. Brack, of course.
```

566

1          Any housekeeping?

2          MR. SELDEN:  Just briefly on behalf of the

3    government, Your Honor, I understand on Thursday which was our

4    third day of trial, the government alerted the Court to the

5    idea that we think we ought to be done today or tomorrow.  I

6    wanted to say that we continue to hopefully be on that track

7    and might even be early as sort of the midday point tomorrow

8    of the government's case being concluded.  So I wanted to

9    reiterate that.

10          In that same vein, we wanted to let the Court know

11   there was a request by the defense for a review of physical

12   evidence.  This supplements a prior evidence review by the

13   defense of physical evidence and that that material will be

14   available for the defense here today.  However much time they

15   need, we have it physically here for them.

16          Moreover, the government provided specific requests,

17   documents relating to a Daphne Mavris.  This is the documents

18   that the defense requested and we provided Ms. Mavris's

19   documents along with two other law enforcement witnesses.  To

20   flag what these are, they're essentially a criminalist's case

21   files, another criminalist case file and then a latent print

22   examiner case file.  Those things are all available for the

23   defense.  There was a latent print recovered but it was of no

24   value.  We wanted the Court to know when we're talking about

25   in terms of that latent print.

1         In addition, the government has provided a copy of

2    tax IDs for the four requested officers that Mr. Farrell

3    requested as well as a contact phone number for that set of

4    four officers at the ATF.

5         In that same vein, the government now is asking, and

6    we want to put on the record now what we believe is for the

7    third time for any defense exhibits in actual PDF or hard copy

8    for us to have.  We requested that the defense exhibits that

9    have already been admitted or marked for identification also

10   be included in that list.  The reason why we're asking now

11   this third time is, in part, we don't want to run into an

12   issue where, whether or not it's during direct or cross,

13   there's a reference to a defense exhibit and the government

14   has to sort of scramble to figure out what we're talking

15   about.

16        As the Court is well aware, there were a number of

17   productions in this case and we just want to make sure that if

18   the defense could send us an e-mail with their exhibits by,

19   for example, this evening, that would be very helpful, just a

20   version of them in PDF.  They sent us a list yesterday but so

21   that we don't avoid sort of picking up the wrong item or

22   thinking that they're talking about page number 2 when they're

23   actually talking about page number 3, it would be just the

24   request that the government would have.

25        There also was a request of the government today for

568

1  split defense closings.

2          MR. STEIN:  Judge, let me address this.

3          MR. FARRELL:  Can we do that?  It's our request.

4  Mind if we do that?

5          MR. SELDEN:  Of course.  We'll be happy to defer to

6  the defense if they want to put that on the record.  We want

7  to flag for the Court there was a request made this morning --

8          MR. STEIN:  Can we initiate this and you can say

9  whatever you want about it since it's our request?

10         MR. SELDEN:  Of course.

11         THE COURT:  We'll have the defense first respond to

12  the request for the PDF of their exhibits.

13         MR. STEIN:  Judge, actually, I think the government

14  is being generous in saying that they asked us for this three

15  times.  It's probably more but I'll tell the Court the same

16  thing that we've told them.

17         Most, if not all of the exhibits that we have marked

18  that the government gave us, and we've identified what the

19  exhibits are, a number of them have already been admitted into

20  evidence and these exhibits come from the discovery which the

21  government has given us with one exception which we've had

22  some back and forth discussion about and we haven't decided

23  yet whether we're using that to even introduce it.  There's a

24  stipulation that's been discussed.  So I have nothing more to

25  say about it, Judge.

1          MR. SELDEN:  If we can just briefly respond.

2          MR. STEIN:  This is to me not useful but that's up

3    to Mr. Selden.

4          MR. SELDEN:  Your Honor, if we could briefly

5    respond.  As the government provided a week in advance our

6    actual exhibits to the defense, the challenge that we run

7    into, and by way of example, during Mr. Stein's

8    cross-examination of Special Agent Miceli on Thursday of last

9    week, he cited to a search warrant affidavit specifically

10   citing the affidavit number and I believe it was 18MJ1188.

11         Without having that affidavit be something that was

12   provided from the defense as Defense Exhibit A or B or C, the

13   government is left scrambling to try and identify where in our

14   20 productions plus that actual document is.

15         THE COURT:  I think --

16         MR. STEIN:  Judge, can I -- I'm sorry.

17         THE COURT:  Provide a copy of the PDF.

18         MR. STEIN:  Okay.  Judge, can I just -- Mr. Selden

19   has given you an example and I really don't want to --

20         THE COURT:  I don't want to hear any more about it,

21   Mr. Stein.

22         MR. STEIN:  With the 3500 --

23         THE COURT:  I don't want to hear any more about it,

24   Mr. Stein.

25         MR. STEIN:  Okay.

570

 1          THE COURT:  If you've offered exhibits in this

 2   trial, make a copy and send it to Mr. Selden by e-mail.

 3          MR. STEIN:  Okay.

 4          THE COURT:  Anything further on the government side?

 5          MR. SELDEN:  No.  Thank you, Your Honor.

 6          THE COURT:  Now the defense has their own request?

 7          MR. STEIN:  Yes, Judge.  We informed the government

 8   this morning, with the Court's permission, we recognize, of

 9   course, that under the rules, the defense gets one summation.

10   What we propose to the Court is since there is going to be two

11   very distinct parts to the defense summation, one is going to

12   be part, for lack of a better way to phrase it, for the

13   purposes of this is a reasonable doubt argument, and the

14   second part of the summation is going to be the defense case.

15          So we would like to be able to have each of us

16   deliver one part of the summation and we assure the Court

17   there will not be any repetition or overlap.  So the rules

18   don't specifically provide for that, I recognize it, but we

19   think that this is a reasonable request on our part especially

20   given our assurance that there's not going to be any

21   repetition or overlap.

22          THE COURT:  Mr. Selden?

23          MR. SELDEN:  Your Honor, the government would

24   respectfully oppose that request.  Learning of this this

25   morning, we haven't had an opportunity to see whether or not

571

1   any other cases cite to this proposition, but when we asked

2   Mr. Stein whether or not he had a case, unfortunately, he did

3   not.  The government's concern is that it will confuse the

4   jury.  Are we to respond in our rebuttal and -- the burden

5   obviously always rests with the government, and we embrace

6   that, but are we to respond to one particular defense closing,

7   another particular defense closing?

8            To date, we've had three days of trial testimony.

9   This is not a six month long complicated RICO case and so,

10  respectfully, we don't see why the facts and circumstances

11  here would justify two separate defense closings.

12           Thank you.

13           THE COURT:  Well, we'll take it under advisement.

14  We'll do our own investigation as to what precedent there may

15  be one way or the other on such a request.  As it has not

16  happened for me up to now doesn't mean it can't or it

17  shouldn't.  So we'll inquire.  That's not to say that counsel

18  can't provide cases of their own on either side of the issue

19  should you uncover any.  I would be happy to look at them in

20  addition to our own research.

21           Anything else on the defense side?

22           MR. STEIN:  Just on scheduling, I know the word you

23  hate the most probably, so there's a criminologist that the

24  government and us have had a number of discussions about.  I

25  guess I was somewhat pessimistic and the subpoena that the

572

1    Court so ordered is returnable for Wednesday.

2           So based on what Mr. Selden just told the Court

3    about scheduling, we had hoped that she would be called first

4    as the defense case so I will try and reach out to her and see

5    what we can do to have her come in on Tuesday afternoon if the

6    government is correct that they're going to finish sometime

7    tomorrow.

8           THE COURT:  That's fine and if there are issues

9    there because the subpoena says Wednesday, we certainly can

10   correct that problem.

11          I think it's inherent in all subpoenas that once

12   you've been subpoenaed, that there's certain flexibility that

13   attaches to the scheduling because, obviously, witnesses get

14   reached in an unpredictable order.  It is a little different

15   in this case because of the possibility of coming before the

16   subpoena actually compels attendance but as I say, we're

17   available and we'll look.  You know, as the day unfolds today,

18   Mr. Selden will give us a better view as to how the

19   government's case is going in and what the time looks like.

20          MR. SELDEN:  Of course, Your Honor.

21          THE COURT:  Anything else on the defense side?

22          MR. FARRELL:  Yes, Your Honor.  It's Gary Farrell

23   speaking.

24          Just on the issue of the four detectives that we

25   requested on Thursday, I want the Court to know that I didn't

573

1    get the information on them until 5:01 on Friday.  That's why

2    I wasn't able to come in here with subpoenas.  I know the

3    Court was amenable to signing them late Friday.

4              Furthermore, the government has provided one phone

5    number which is the contact number for these particular

6    detectives.  I've called it twice today already.  I couldn't

7    even leave a message.  Nobody picks up at this number.  So the

8    defense thinks these officers may have some germane and

9    relevant and helpful testimony or they may not, but the only

10   way we can know that is if we speak to them.

11             So I asked informally if the government would

12   produce them or make them available by phone and Mr. Selden

13   said his office's position is we don't accommodate defense in

14   terms of producing their witnesses.  Okay, that's their

15   position.  I'm dating myself when I say when I was a

16   prosecutor in the Kings County DA's office, we did it all the

17   time because we know how hard it is for the defense to get in

18   law enforcement witnesses and, conversely, how easy it is for

19   the government.  So that's the kind of quandary we're in right

20   now, Your Honor.

21             THE COURT:  These are NYPD or ATF?

22             MR. FARRELL:  These are NYPD but working with the

23   ATF task force.  So that's where I am.

24             I have the subpoenas here but I don't -- I can't put

25   the address where the marshals would serve them because I

574

1    don't know it and I can't contact the contact person because

2    they're not picking up the phone.

3              MR. SELDEN:  Your Honor, if we may briefly respond.

4    The particular detectives that Mr. Farrell requested have been

5    no secret in this particular case.  In fact, they've been

6    referenced in whether or not it's ATF, ROIs or, certainly,

7    there was a traffic stop dating back to when we had the

8    motions hearing.

9              The fact that the defense mid trial is asking for

10   the government to produce not only criminalists but also

11   detectives, we're keeping with our office policy of a contact

12   phone number.  There's been testimony in this case as to the

13   address, that being the Waters Place address where the ATF is

14   based out of.

15             THE COURT:  Is that where the phone number attaches?

16             MR. SELDEN:  It is, Your Honor.  And we had a chance

17   to speak with the section chief for that particular task force

18   and he's the one who gave those phone numbers for those

19   individuals.  So as the defense is now making the request,

20   that's the phone number that we were told to provide along

21   with the tax IDs.

22             Since they are NYPD detectives, we defer to the

23   defense in terms of their investigative strategies, serving a

24   subpoena, for example, at One Police Plaza or otherwise,

25   however they would normally do it.  I suppose the challenge is

575

1    as the government has laid out evidence, witnesses and made

2    real efforts to accommodate the defense, both before trial and

3    then during, we don't think there's any evidence of the

4    government not providing information for the defense.  It's

5    just we don't have the ability over a weekend to make folks

6    come in or be available for the defense separate and apart

7    from the office policy of a phone number and their tax IDs.

8           So if they have other witnesses that they want us to

9    try to get contact information for, by all means, we'll do

10   that.  By way of example, Ms. Mavris contacted the government

11   and said the defense subpoena has no date in terms of a

12   timestamp on it for Wednesday the 11th.  We told her to be

13   available at 9 o'clock in the morning.  The reason, in part,

14   why we did that is because she might be a defense witness.

15   We're doing that, in part, because we want to make sure that

16   they have access and availability.  In the same vein, they

17   should take the steps that they see fit to provide these

18   witnesses with trial subpoenas so ordered by the court.

19          Thank you, Your Honor.

20          THE COURT:  As I say, Mr. Farrell, the Court is

21   available to so order anything you send.

22          MR. FARRELL:  Okay, Judge.  We'll pass something up

23   soon.  Thank you very much.

24          THE COURT:  Okay.  Anything further on the defense

25   side?

576

1          MR. FARRELL:  No thank you, Judge.

2          THE COURT:  Well, a major housekeeping item, William

3  has, I think, advised both sides that at around 2 a.m. this

4  morning, he received an e-mail from Juror Number Nine who was

5  suffering from what lay people might refer to as a stomach

6  virus and is unable to attend today's trial and given the

7  current public health concerns, it would seem that it's

8  probably not a good idea for someone in such a condition to be

9  traveling any time soon and, again, in our current public

10  health environment.

11          So the Court's plan is to replace Juror Number Nine

12  with the next numbered alternate who used to be Alternate

13  Number Two but I guess is sitting as Alternate Number One now.

14          Does either side have any views?

15          MR. SELDEN:  Your Honor, the government agrees with

16  the Court's position.  Thank you.

17          MR. STEIN:  We do not.  We don't have another view,

18  I mean.  We don't have another view, Judge.  Obviously, the

19  next alternate has to be seated.

20          THE COURT:  Okay.  We get to the same place.  That's

21  all that counts.  And that's what we will do.

22          Other than that, is there anything else I need to

23  attend to before we start?

24          MR. SELDEN:  Not on behalf of the government.  Thank

25  you, Your Honor.

577

1        THE COURT:  And refresh me, we're starting with a

2   new witness?

3        MR. SELDEN:  We are, Your Honor.

4        THE COURT:  We'll let William secure our jury and

5   bring them in.

6        MR. FARRELL:  Your Honor, while we're waiting, can I

7   inquire of the government if they expect Mr. Goldstein from

8   the OCME this morning?

9        MR. SELDEN:  We would hope to get started with

10   Mr. Goldstein this morning, Your Honor.  It all depends on, I

11   think, the level of cross for this next witness, but we would

12   hope to get started at least before the lunch break with

13   Mr. Goldstein.

14        THE COURT:  Okay.

15        MR. FARRELL:  In light of that, in light of your

16   previous ruling about exhibits, I'm not going to offer these

17   but they're marked for identification.  I'm not sure if I'll

18   use them but in an abundance of caution, I'm going to turn

19   them over to the government.  They're journal articles about

20   DNA that he may or may not be familiar with, S, T and U.

21        MR. SELDEN:  Your Honor, we specifically asked for

22   defense exhibits by the close of business yesterday with the

23   fear that this might be something that would come up.  We

24   haven't had an opportunity and these weren't even listed in

25   the defense exhibits yesterday that were sent to the

578

1  government.

2       THE COURT:  You will have a chance to look at them.

3       (Jury enters.)

4       THE COURT:  Be seated, please.

5       Counsel will stipulate that the jury is present and

6  properly seated.

7       MR. SELDEN:  On behalf of the government, yes.

8  Thank you, Your Honor.

9       MR. STEIN:  Yes, Judge.

10       THE COURT:  All right.  Ladies and gentlemen, thank

11  you for your continued patience and cooperation.

12       An illness of one of your numbers forced her not to

13  be able to continue her jury service.  Juror Number Nine has

14  been replaced by originally identified Alternate Number Two

15  who became Alternate Number One and now is Juror Number Nine.

16       Again, we certainly appreciate your continued

17  service and we're ready to resume and Mr. Selden advises me he

18  has another witness for us.

19       MR. SIEGEL:  Yes, Your Honor.  The government calls

20  Detective Jonathan Fox.

21       (The witness is duly sworn/affirmed by clerk.)

22       THE CLERK:  Please state your first and last name

23  and spell it for the record.

24       THE WITNESS:  Jonathan Fox, J-O-N-A-T-H-A-N, F-O-X.

25       THE CLERK:  Thank you.  Have a seat, please.

1          THE COURT:  Mr. Siegel is handling for the

2    government.  You may inquire, Mr. Siegel.

3          MR. SIEGEL:  Thank you, Your Honor.

4    DIRECT EXAMINATION

5    BY MR. SIEGEL:

6    Q    Good morning, Mr. Fox.

7    A    Good morning.

8    Q    Where do you work?

9    A    I work at the New York City Police Department.

10   Q    And how long have you been employed by the New York City

11   Police Department?

12   A    Twenty-two years.

13   Q    And what is your current title with the NYPD?

14   A    I'm a detective at the Firearms Analysis Section.

15   Q    What is the Firearms Analysis Section?

16   A    The Firearms Analysis Section, we test firearms and

17   ammunition for operability.  We also microscopically examine

18   ballistic information such as cartridge casings, bullets and

19   bullet fragments.

20   Q    And is the Firearms Analysis Section also known as FAS?

21   A    Yes.

22   Q    How long have you been at FAS?

23   A    Sixteen years.

24   Q    What kind of training have you received in examining and

25   analyzing firearms and ballistics evidence?

Fox - direct - Siegel                    580

A     When I was first assigned to the police laboratory in

2004, I was trained by an independent forensic consultant in

identifying different types of firearm and ammunition.  Every

time a firearm and ammunition is vouchered in New York City,

the firearm and ammunition must be tested for operability.  We

test these firearms to determine if the firearms are operable

or inoperable.

That initial training program lasted six months and

during that six-month training program, I sat with senior

members of the Firearms Analysis Section, I observed them do

their case work, we took written practical examinations, we

learned about all the various types of firearms and ammunition

and how they work.  At the end of that training program, I

took a competency test.  After completing and passing that

competency test, I was able to perform firearm examinations.

I had been doing that for approximately a year to

year and half and I went to the microscopic training program.

This program lasted 18 months.  We were trained under AFTE,

A-F-T-E.  AFTE stands for the Association of Firearm Tool Mark

Examiners.  It's an association that's recognized in 42

countries and has over a thousand members worldwide.  AFTE

sets the standard of tool mark identification.

At this training program, once again, we took

written practical examinations but we learned how tools

manufacture firearms and how tools leave unique marks on the

1    firearm and when a bullet and cartridge casing come in contact

2    with the firearm, those unique marks from inside the firearm

3    would then be left on the bullet and cartridge casing after

4    it's fired out of that particular firearm.  We learn how to

5    identify unique characteristics and match them with each

6    other.  We learn how to use a comparison microscope.  The

7    comparison microscope is what I use to compare different types

8    of evidence to determine if two pieces of ballistic evidence

9    were fired from the same firearm or different firearms.

10           At the end of that training program, I took three

11   competency tests.  Upon passing and completing those

12   competency tests, I was then able to perform firearm

13   examinations.

14   Q    And you said, I think, that you've been doing this for

15   16 years with FAS?

16   A    Yes.

17   Q    In that 16 years, approximately how many different

18   firearms and ballistics evidence examinations have you

19   conducted?

20   A    Thousands.

21   Q    Have you previously testified in courts and given your

22   opinion on the subject of firearms and ballistic evidence?

23   A    Yes, I have.

24   Q    Approximately how many times?

25   A    Approximately 450 times now.

Fox - direct - Siegel                          582

1  Q    And in which courts have you testified?

2  A    I testified both criminal Supreme Courts of Manhattan,

3  Bronx, Brooklyn, Staten Island, Queens, Westchester County

4  grand jury.  I've also testified in the Eastern and Southern

5  District federal courts.

6  Q    On how many of those occasions have you been qualified as

7  an expert?

8  A    Every time.

9  Q    When was the last time you were qualified as an expert in

10  federal court?

11  A    About a week and a half ago.

12  Q    And when was the last time you testified as an expert in

13  any court?

14  A    I testified last week in Manhattan Supreme Court.

15        MR. SIEGEL:  Your Honor, pursuant to Rule 702, the

16  government offers Detective Fox as an expert in firearms and

17  ballistic evidence comparison.

18        THE COURT:  Any objections?

19        MR. STEIN:  No.

20        THE COURT:  Ladies and gentlemen, the Court

21  recognizes Detective Fox as an expert in both ballistics areas

22  that Mr. Siegel just indicated.  All that means is that as an

23  expert witness, he can do something that the ordinary witness

24  can't do.  Ordinary witnesses testify as to facts and the

25  expert witness is permitted to provide an expert opinion, key

1   word being "opinion," for the jury's consideration in the area

2   of his or her expertise.

3          Mr. Siegel.

4          MR. SIEGEL:  Thank you, Your Honor.

5   Q    Detective Fox, directing your attention to November 2018,

6   did you receive ballistics evidence from the shooting of a man

7   named Alejandro Deleon?

8   A    Yes, I did.

9   Q    And generally in that case, what sort of evidence did you

10  receive?

11  A    I received bullets, cartridge casings.  I also received

12  test fires that were fired from a .357 magnum revolver and I

13  compared those test fires to the evidence I received in this

14  case.

15  Q    And where did you receive that evidence from?

16  A    I received the evidence from the evidence control room

17  which is located at the police laboratory and they secure the

18  evidence prior to me handling it and after me handling it.

19  Q    Detective Fox, I'd like to hand you Government

20  Exhibits 300, 309 and 323.

21         MR. SIEGEL:  Your Honor, may I approach?

22         THE COURT:  You may.  Are those in evidence or

23  identification?

24         MR. SIEGEL:  Exhibit 300 is in evidence subject to

25  connection and 309 and 323 are both in evidence.

Fox - direct - Siegel                              584

1          THE COURT:  And you may approach.

2   Q    Let me start by directing your attention to Government

3   Exhibit 300 which is in evidence subject to connection.

4          Do you recognize Government Exhibit 300?

5   A    Yes, I do.

6   Q    How do you recognize it?

7   A    It's a white evidence envelope containing evidence that I

8   analyzed in this particular case.  I recognize it because I

9   created the envelope.  Also my name and initials and date of

10  examinations are on the back of this envelope.

11  Q    And what is inside of that envelope?

12  A    Inside this envelope, there's two deformed bullets, one

13  unsuitable deformed piece of lead core.  There's also security

14  envelopes as well as crime scene envelopes too.

15  Q    Can you open that envelope and examine the contents,

16  please?

17  A    (Witness complies.)  Okay.

18  Q    Do you recognize the contents?

19  A    I do.

20  Q    And how do you recognize the contents of Government

21  Exhibit 300?

22  A    It's the evidence that I examined in this particular

23  case.  I recognize it because the evidence that I have listed

24  on this envelope I have in proximal containers that contain my

25  initials, a lab item number and a lab number.

Fox - direct - Siegel                              585

1   Q     When you say "proximal containers," what's that?

2   A     It's a container that holds the evidence.  Typically, we

3   like to mark each piece of evidence, but sometimes the

4   evidence doesn't allow us to do that without destroying what's

5   on the evidence so we put the evidence in a clear plastic bag.

6   We mark that bag.  I would initial it and I would put the lab

7   number on that bag as well.

8   Q     When you first received these items, how were they

9   packaged?

10  A     When I received these items, I received them from the

11  evidence control room.  Each piece of evidence that I examined

12  in this particular case was received in the sealed crime scene

13  envelope and that crime scene envelope was sealed in an NYPD

14  security envelope.  So I received three crime scene envelopes

15  and three NYPD security envelopes.

16  Q     And what did you do with those sealed envelopes when you

17  received them?

18  A     I would unseal the envelopes.  I would then mark each

19  piece of evidence as I take it out of their particular

20  envelope.  I would inventory everything and then perform my

21  case examination notes.

22  Q     And you mentioned that you marked the items.  What did

23  you mark them with?

24  A     I marked the proximal container that I had the evidence

25  in with a Sharpie.  I also marked the crime scene envelopes

Fox - direct - Siegel                          586

1   that I took each piece of evidence out with that item number

2   and my initials, lab number also with a Sharpie.

3   Q    Were there existing markings on those bags when you

4   received them?

5   A    Yes.

6   Q    What were those existing markings?

7   A    I received lab item number 8.  Every time that evidence

8   is intake at the police laboratory, the computer system will

9   give each piece of evidence an item number.  These item

10  numbers aren't given by me but they're assigned by the

11  computer.

12         So the first piece of evidence that I examined in

13  this case was lab item number 8 and I received that in crime

14  scene envelope JSL 4.

15         The second item that I examined was lab item

16  number 9 and I received that in crime scene envelope JSL 6.

17  The last item that I examined from this particular voucher was

18  lab item number 10 and I received that in crime scene envelope

19  JSL 9.

20  Q    Can you reorganize the items you have there to put the

21  items with the bags that you received them in?

22  A    Yes.

23  Q    Actually, if you put them back inside the bags.

24  A    (Witness complies.)

25  Q    And, I'm sorry, Detective Fox, I didn't mean put them

Fox - direct - Siegel                          587

1    inside the envelopes.  I meant put the items back in the bags

2    as you received them originally.

3    A    Okay.  (Witness complies.)

4    Q    So starting with what you referred to as lab number 9 or

5    JSL 6, what is that?

6    A    It's a deformed copper jacketed bullet.

7    Q    I just want to make sure we're referring to the same --

8    yes.  I'm sorry.  Deformed jacketed bullet.  Actually, is that

9    lab number 6 that you're referring to, excuse me, JSL 6 that

10   you're referring to?

11   A    JSL 6 which I received as lab -- I'm sorry.  I

12   misunderstood you.  JSL 6 is the formed lead core and that's

13   lab item number 9.

14   Q    Okay.  Is that in the same condition today as it was when

15   you first received it?

16   A    No.

17   Q    What is the difference?

18   A    When I received this item, I received it with biological

19   type material on it so just blood.  When I received the item

20   with blood, I then cleaned the evidence prior to me examining

21   it.

22   Q    How did you clean it?

23   A    I would put the evidence in a bleach/water mixture.  I

24   would then -- after it's been resting in that mixture for

25   quite a bit of time, I would then wash it off and then perform

Fox - direct - Siegel                            588

1  my examination.

2  Q     And why did you do that?

3  A     To not get any biological material on me or my

4  microscope.

5  Q     Is that routine?

6  A     Yes, it is.

7  Q     So now let me direct your attention to lab item number 8

8  which I believe you said was JSL 4.

9  A     Yes.

10  Q     What is that?

11  A     That's a deformed copper jacketed bullet and I received

12  that in that crime scene envelope JSL 4.

13  Q     And is that in the same condition today as it was when

14  you received it?

15  A     No.

16  Q     And how is it different?

17  A     Once again, when I received this evidence, it was

18  actually one deformed piece of copper jacketed bullet.  During

19  my examination, a small piece of copper jacketing broke off in

20  that bullet during my examination which did not impede

21  anything that would require me to do an examination.  So

22  instead of having one piece, I now have two pieces.

23  Q     And are both of those pieces currently with the exhibit?

24  A     Yes.

25          MR. SIEGEL:  Your Honor, at this time, I move

Fox - direct - Siegel                                    589

1    Government Exhibit 300 which is comprised of those three items

2    of ballistic evidence previously identified as JSL 4, JSL 6

3    and JSL 9 including the packaging materials in evidence.

4              THE COURT:  Any objection?

5              MR. STEIN:  No.

6              THE COURT:  Received now in evidence, no longer

7    subject to connection, without objection.

8              (So marked ).

9    Q    And Detective Fox, if you would set those aside, I'd like

10   to direct your attention to Government Exhibit 309 which is in

11   evidence.

12             Do you recognize Government Exhibit 309?

13   A    Yes, I do.

14   Q    How do you recognize it?

15   A    I recognize it to be a manila envelope that contains test

16   fires that were taken from a .357 magnum Dan Wesson revolver.

17   I used the test fires in this envelope to prepare them to

18   compare against other evidence that I received in this

19   particular case.

20   Q    And what is a test fire?

21   A    A test fire is a known cartridge casing or bullet to be

22   fired out of a particular firearm.  Once we take test fires,

23   we would have known evidence from a particular firearm and by

24   having that type of evidence, we could compare it to unknown

25   evidence and when we compare known evidence to unknown

CMH        OCR        RMR        CRR        FCRR

Fox - direct - Siegel                    590

1   evidence, we can determine if particular bullets or cartridge

2   casings were fired from this particular firearm when comparing

3   it to test fires such as cartridge casings and bullets from

4   this firearm.

5   Q    Open up Government Exhibit 309, please.

6   A    (Witness complies.)

7   Q    Do you recognize the contents of Government Exhibit 309?

8   A    Yes.

9   Q    And how do you recognize those contents?

10  A    They're test fires that were taken from this particular

11  firearm.  They consist of three .357 magnum cartridge casings

12  and bullets and one .38 Special cartridge casing and one

13  .38 Special bullet.  I recognize them because they are marked

14  3.7 through 3.9 and 6.2.  Each piece of evidence has those

15  unique identifying item numbers etched on the cartridge casing

16  itself.

17  Q    And are those the lab item numbers that you were

18  referring to?

19  A    Yes.

20  Q    In addition to the lab item numbers, is there anything

21  etched onto these items?

22  A    The item number, initials "MN" which stands for Michael

23  Nolan and the item numbers.

24  Q    Is the laboratory number also etched onto those?

25  A    Yes.

Fox - direct - Siegel                    591

Q     All right.  So you can set those aside and let me direct
your attention to Government Exhibit 323.

          Do you recognize Government Exhibit 323?

A     Yes.

Q     How do you recognize Government Exhibit 323?

A     It's a white evidence envelope containing three cartridge
casings that I examined in this particular case.  Two of the
cartridge cases are a .38 Special, one is .357 magnum and
they're marked 4, 4.2 and 5.

          I recognize this envelope because my name and
initials and date of examination is on the back of the
envelope.

Q     Can you open it up and look at the contents, please.

A     (Witness complies.)

Q     Do you recognize the contents?

A     Yes, I do.

Q     How do you recognize the contents?

A     I recognize the contents to be two .38 Special cartridge
casings marked 4 and 4.2.  It has the lab number, 2018-89039,
and the initials "MN" as well as the item number etched onto
the cartridge casing.  And the last item is one .357 cartridge
casing that's marked item number 5 which also has "MN" and lab
number on it as well.  I compared these cartridge casings to
two test fires that I received in this particular case.

          (Continued on next page.)

1  BY MR. SIEGEL (Continuing):

2  Q    MN, is that again Michael Nolan?

3  A    Yes.

4  Q    If you would, and how did you first -- when you received

5  these, what was the condition they were in?

6  A    They were sealed in this envelope.

7  Q    I think you would put them back in the envelope and,

8  also, put test fires, 309, back in the envelope, and I will

9  come grab those from you.

10            MR. SIEGEL:  Your Honor, may I approach?

11            THE COURT:  You may.

12            (Pause in proceedings.)

13            MR. SIEGEL:  Mr. Villanueva, can you turn on the

14  Elmo?

15  Q    All that evidence you just examined, did you analyze that

16  evidence?

17  A    Yes, I did.

18  Q    Before we get into your analysis, can you explain to the

19  jury, what is the difference between a semiautomatic handgun

20  and a revolver?

21  A    The main difference between those two types of firearms

22  are how those firearms are loaded and what happens after

23  you're done firing that weapon.

24            So, a loaded semiautomatic handgun, you would take a

25  magazine, usually in the magazine vault or the grip of the

Fox - direct - Siegel                    593

1   firearm, you'd place the cartridge casings in that magazine,

2   you'd place the magazine into the magazine vault, you'd lock

3   the magazine into place.  At the top of the firearm, there's a

4   slide.  You pull that slide rearward and, as the slide is

5   going back forward, it would take a cartridge, place it into

6   the chamber of that weapon.

7            The fire of that particular type of firearm, you

8   would press the trigger, a firing pin would strike the back of

9   the cartridge, hitting the primer and leaving the indent.

10  During that process, there's an explosion, and the gunpowder

11  inside the cartridge casing is lit, turns into a gas, and

12  forces the bullet out of the firearm.

13           Everything has equal and opposite reaction.  All

14  those gases that forced that bullet out of the firearm are now

15  also pushing against that cartridge casing and causing that

16  cartridge casing to slam up against the slide and now causing

17  the slide to travel rearward again.

18           There's an extractor that's hooked into the

19  cartridge casing.  While it's in the chamber of that firearm,

20  as that slide is coming rearward, that extractor or hook pulls

21  the cartridge casing out of the firearm and ejects the

22  cartridge case after it's fired.

23           The slide will now go forward, place another

24  cartridge in the chamber of that firearm, they call that a

25  cycle of fire.  Every time you fire a semiautomatic handgun, a

Fox - direct - Siegel                    594

1   bullet will leave the front of the firearm and a cartridge

2   casing will be ejected from that firearm.

3         The revolver works in that to load a revolver, you

4   have to unlock a cylinder that's locked into the frame of that

5   weapon.  That cylinder could have five to six chambers in that

6   cylinder.  Once you unlock the cylinder, you would place the

7   live cartridges in each chamber in that cylinder, you would

8   then close the cylinder and lock it into the frame of that

9   revolver.

10        To fire that weapon, you either press a trigger or

11  you release the hammer.  So, if you press the trigger, the

12  hammer will go rearward, then forward, striking the back of

13  the cartridge, causing the bullet to exit the firearm through

14  the barrel.  They call that "double action."

15        To fire that weapon single action, you would pull

16  the hammer rearward, and now the hammer is resting rearward.

17  All you have to do is press the trigger, the hammer will go

18  forward, striking the back of the cartridge, leaving an indent

19  in the back of the primer.  When that indent or when the

20  firing pin or the hammer hits that cartridge, it creates an

21  explosion that ignites the gunpowder, which, when gunpowder is

22  lit, it turns into gas and forces also the bullet out of

23  firearm.

24        Every time you fire a revolver, that cylinder will

25  either rotate left or right, lining the new cartridge up with

Fox - direct - Siegel                          595

1   the hammer to be fired again.  The only thing that leaves a

2   revolver after being fired is the bullet.  To get the

3   cartridge casings out of the cylinder, you must manually

4   unlock that cylinder from the weapon and eject them manually.

5   And that's how the revolver would work.

6   Q    You described it a little bit, but you talked about a

7   cartridge.

8              Can you plain what a "cartridge" is?

9   A    A cartridge is what's used to be fired out of a firearm.

10             And with a cartridge, there's four components:

11  There would be the bullet; the cartridge casing itself; the

12  gunpowder or propellent which goes inside the cartridge; and

13  at the base of that cartridge is what's called a primer, and

14  that primer is used to ignite the gunpowder prior -- after

15  it's being fired.

16  Q    You already described it a little bit when you were

17  describing the difference between guns, but can you explain

18  what happens to a cartridge when it is fired out of a

19  revolver?

20  A    The cartridge stays in the revolver, in the cylinder,

21  until it's manually ejected out of that firearm.

22  Q    What is a "breech face"?

23  A    So, the breech face is the area of the firearm that the

24  base of the cartridge rests up against prior to it being fired

25  and after it being fired.

1          In the middle of that breech face, there's a hole

2    that we call an "aperture."  Behind that breech face or behind

3    that hole would be the -- that's where the hammer of the

4    revolver would come through, that hole, and would strike the

5    cartridge.

6          The area of the breech face and the firing pin

7    impression, when the firing pin strikes the back of the

8    primer, it leaves an indent.  If there's any marks on that

9    firing pin, they will then be left inside the indent of that

10   cartridge casing.  The area around that primer hole or that

11   aperture hole, that's the breech face.  That's the area that

12   the cartridge casing slams up against the firearm after it's

13   fired.  If there's any marks on that firearm from the breech

14   face, they will now be impressed on the back of that

15   cartridge.

16         These are the areas that I microscopically examined

17   to determine if two the cartridge casings are fired from the

18   same firearm.

19   Q    Let me direct your attention to Government Exhibit 323,

20   and I'm going to put them up on the Elmo.

21         MR. SIEGEL:  Can we display this for the jury?

22         (Exhibit published to the jury.)

23   Q    These are the shell casings you're referring to?

24   A    Yes.

25   Q    I have one .38 Special standing upright and two other

1    shell casings lying down.

2            Just to explain, where is it that you would look to

3    examine these?

4    A    So, on the cartridge casing where you could see the base

5    of that cartridge, that white area, that's called a "primer."

6    Where there's the indent, that's where the hammer struck the

7    back of the primer, leaving that indent.  The area around that

8    indent would be the breech face.

9            So, I would examine those two areas of that

10   cartridge casing to determine if it was fired from the same

11   firearm.

12   Q    Are the markings made by a firing pin and the breech face

13   unique to a particular firearm?

14   A    Yes, they are.

15   Q    What did you compare these shell casings too?

16   A    I compared these cartridge casings to the test fires that

17   were taken from the .357 Magnum Dan Wesson revolver.

18   Q    What was in Government Exhibit 309?

19   A    Yes.

20   Q    So, on the right side of the screen, I've laid out the

21   shell casings from 323.  And on the left side, I've laid out

22   the test fires in 309.

23           So, what in the test fires did you compare to the

24   shell casings?

25   A    I compared the other cartridge casings to the cartridge

Fox - direct - Siegel                              598

1    casings on the right.

2    Q    And did you come to any conclusions based on your

3    comparison of cartridge casings in 309 and the cartridge

4    casings in 323?

5    A    Yes.

6    Q    What conclusion did you come to?

7    A    When comparing the three cartridge casings on the right

8    to the test fires from the Dan Wesson firearm, I determined

9    that the three cartridge casings were fired from that Dan

10   Wesson firearm based on sufficient agreement of the individual

11   characteristics of the firing pin and breech face impressions.

12   Q    I'm going to now put these shell casings away, move the

13   test fires to the side.

14         Now, let me refer your attention to Government

15   Exhibit 300, which are the two bullet fragments and the

16   lead -- well, the three ballistics evidence that we discussed

17   earlier.

18         (Exhibit published to the jury.)

19   Q    Did you analyze the three items inside Government Exhibit

20   300?

21   A    Yes, I did.

22   Q    And what did you look for during your analysis of these

23   items?

24   A    During my initial examination of these items, I would be

25   looking for the sufficient agreement of the individual

Fox - direct - Siegel                    599

1    characteristics of the land and groove impression.

2          Essentially, the inside of a firearm, the barrel,

3    has lands and grooves.  The gun manufacturer will bore out the

4    middle of that barrel and create rifling.  "Rifling" is a

5    spiraling-type motion that goes through the inner portion of

6    that barrel, either rotates to the left or to the right.  That

7    the rifling causes the bullet to spiral as it's leaving the

8    barrel.  When the bullet is spiraling out of the barrel, it

9    causes the bullet to be more accurate and also causes the

10   bullet to travel faster.

11         In the process of making those lands and grooves,

12   unique characteristics from the tool that made that portion of

13   the barrel would be left on the inside of that firearm.  When

14   a bullet is fired through the lands and grooves, those unique

15   characteristics will be left on the bullet after it's fired,

16   and we would examine those characteristics and try to

17   determine if two bullets came from the same firearm based on

18   examining the areas of the land and groove.

19   Q    Are the impressions made by the lands and grooves also

20   unique to a particular firearm?

21   A    Yes.

22   Q    Let's start with what was marked as JSL-6 or lab item

23   number nine.

24         (Exhibit published to the jury.)

25   Q    Did you come to any conclusions after analyzing JSL-6?

Fox - direct - Siegel                              600

1   A    I determined that this evidence that I received was

2   unsuitable for microscopic comparison, meaning that there was

3   no class characteristics and there was no individual

4   characteristics for me to compare it against any evidence in

5   this case.  I determined it to be a lead core, which is

6   actually the inner portion of a bullet prior to it being

7   fired.

8   Q    Why would a lead core be unsuitable for testing?

9   A    So, the lead core generally are bolts made of two types

10  of metal:  The inner portion of the bullet would be a lead

11  core; and around that lead core, they would be a metal

12  jacketing.  And, generally, when bullets strike objects that

13  are harder than that, the metal jacketings could be dislodged

14  from the lead core.

15          That being said, at no point does any portion of

16  this lead core come in contact with the inner part of the

17  firearm.  So, that's why it would be unsuitable.

18  Q    Thank you.  I'm now laying out what is on the baggies as

19  JF-8 and JF-10, which were JSL-4 and JSL-9, respectively.

20          (Exhibit published to the jury.)

21  Q    On the right is JSL-8 and on the left is JSL-10.

22          Did you analyze these items?

23  A    Yes, I did.

24  Q    And what did you determine?

25  A    When I analyzed these two bullets to the test fires in

Fox - direct - Siegel                    601

1    this particular case, I determined that --

2    Q    Detective Fox, I'm sorry.

3         Before you compared them to the test fires, did you

4    compare them to each other to determine if they came from the

5    same gun?

6    A    Yes, I did.

7    Q    And what did you determine from the comparison?

8    A    My first examination with these two items, I determined

9    that when comparing the bullets to each other, I determined

10   them to be inconclusive, meaning they have the same class

11   characteristics, meaning the lands and grooves were the same

12   size; however, I didn't have enough individual characteristics

13   particulars at the time to determine if they were fired from

14   the same firearm or different firearms.

15   Q    Is there anything about JSL-8 and JSL-10 that would make

16   them particularly difficult to compare to each other?

17   A    They are different types of metal.  So, the bullet on the

18   right, which is item number eight, that's a copper-jacketed

19   bullet.  The item on the left is a lead bullet.

20        So, lead is a soft material.  When lead is traveling

21   through the inner portion of a firearm, a lot of that lead

22   will melt.  So, when I'm comparing different metals to each

23   other, it's hard to determine at that point what the

24   individual characteristics were left on that type of evidence.

25   Q    After you compared lab number eight and lab number ten to

1   each other and were not able to come to a conclusion, did you

2   compare them to anything else?

3   A     Yes.

4   Q     What did you compare them to?

5   A     I compared them to the test fire bullets that were taken

6   from the .357 Magnum Dan Wesson firearm.

7   Q     I'm going to bring the bullets back on the screen.

8             (Exhibit published to the jury.)

9   Q     These test fire bullets, are these from Government

10  Exhibit 309?

11  A     Yes.

12  Q     Did you come to any conclusions when you compared lab

13  items eight and ten to the test fires?

14  A     Yes.

15  Q     What did you conclude?

16  A     Once I was able to compare the test fires to each other

17  and determine what individual characteristics were left inside

18  that firearm, I also had a lead bullet that I could compare to

19  my other lead bullet from the crime scene.  Once I had all of

20  this evidence collectively put together, I was able to

21  determine when I compared these two bullets, eight and ten, to

22  the test fires that they were fired from the same firearm as

23  the Dan Wesson firearm based on the sufficient individual

24  characteristics of the land and groove impression.

25  Q     What did you do after you came to those conclusions?

Fox - direct - Siegel                          603

1   A    I would fill out a microscopic examination report, I

2   would place the evidence back in the envelopes, and I would

3   give the evidence back to the evidence control room after I

4   sealed the envelopes.

5   Q    Have you performed additional examinations in connection

6   with this case?

7   A    Of?

8   Q    Other than these items we've talked about, have you

9   analyzed any other items in this case?

10  A    No.

11            (Exhibit published to the jury.)

12  Q    So, I put some of these items up on the Elmo.

13            When you examined them, what kind of device did you

14  use?

15  A    I used a comparison microscope.

16  Q    What's is a "comparison microscope"?

17  A    A comparison microscope is essentially two microscopes

18  that's combined through an optical bridge.  That optical

19  bridge allows me to compare two different pieces of evidence

20  at the same exact time.

21            The marks that I'm looking for can't be seen with

22  the naked eye, but we can microscopically examine them with

23  this comparison microscope.  By doing so, I can compare two

24  different pieces of evidence at the same exact time and try to

25  determine if those pieces of evidence were fired from the same

Fox - direct - Siegel                      604

1   firearm or different firearms.

2   Q    And in connection with the comparison microscope, what's

3   a "line of demarcation"?

4   A    A line of demarcation is -- essentially, when I'm looking

5   through my microscope, I'm looking through two oculars.  I

6   would have evidence on the right side of my microscope, I'd

7   have evident on the left side of my microscope.  When I bring

8   the evidence in together, there would be a black line down the

9   middle of my oculars which helps me or shows me separating

10  each piece of evidence from each other.

11  Q    And what level of magnification do you use when you're

12  looking through the comparison microscope?

13  A    I would start at the lowest magnification, which is six

14  times, and I can go all the way up to 102 times.

15  Q    Is it fair to say that the microscopic characteristics

16  that you're looking for, that you can't see them on this Elmo?

17  A    That's correct.

18         MR. SIEGEL:  Thank you very much.  I have no further

19  questions.

20         THE WITNESS:  Thank you.

21         THE COURT:  Thank you.

22         Mr. Siegel, any cross?

23         MR. FARRELL:  Yes, Judge, just a few questions.

24

25

LAM      OCR      RPR

1   CROSS-EXAMINATION

2   BY MR. FARRELL:

3   Q    Good morning, Detective Fox.

4   A    Good morning.

5   Q    My name is Gary Farrell.  You and I have never met or

6   discussed the case, right?

7   A    We have not, no.

8   Q    You used to work with Detective Mike Nolan before he

9   refired, correct?

10  A    That's correct.

11  Q    And Detective Nolan's job was to basically determine

12  whether guns were operable or not, correct?

13          Would you say that was his primary duty and

14  responsibility?

15  A    That's correct.

16  Q    And way back when you started in the ballistics unit, you

17  used to do that also; would that be fair to say?

18  A    That's correct.

19  Q    And then you moved up, so to speak, to what you do now is

20  comparisons, as opposed to operability tests, right?

21  A    Correct.

22  Q    Would you agree with me that the science of ballistics

23  comparison has come under attack by many in the forensic

24  community in the last two years?

25  A    I would agree that there have been reports put out there

1    challenging some of the things that we do, but I wouldn't say

2    "attack."

3    Q    Okay.  You would describe it as more "challenge," right?

4    A    Correct.

5    Q    And mistakes have been highlighted by some of these

6    studies, correct?

7    A    Yes.

8    Q    Now, in your world of comparisons, you don't actually

9    need the firearm when you're trying to determine if bullets

10   were recovered from the firearm, correct?

11   A    Correct.

12        MR. FARRELL:  Judge, I'm going approach with your

13   permission and show the detective Government Exhibit 308,

14   admitted in evidence.

15        THE COURT:  You may.

16        MR. FARRELL:  Thank you.

17   Q    So, Detective, then you had never examined this gun.

18        This is probably the first time you've seen it; is

19   that fair to say?

20   A    No.  I've seen the firearm, but I didn't perform any

21   examination on this firearm.

22   Q    That was Detective Nolan's job, as you've already

23   testified.

24        He filled out a report, which, in turn, was

25   forwarded to you, correct?

Fox - cross - Farrell                          607

1   A    Correct.

2   Q    And I believe you already testified that there were three

3   shell casings found with that gun that were forwarded to you

4   also, right?

5   A    I believe so, yes.

6   Q    And Detective, you have no way of telling when those

7   bullets were fired that produced those shell casings, correct?

8        You wouldn't be able to tell -- do you understand

9   the question?

10  A    I believe -- I can't tell when a particular cartridge

11  casing was fired out of a particular firearm, no.

12  Q    That's beyond the ken of the science of ballistics,

13  correct?

14  A    Correct.

15  Q    That particular gun is a .357 Magnum revolver, correct?

16  A    Yes.

17  Q    How many of those have you seen in the course of your

18  long career in the ballistics unit?

19  A    Quite a few.

20  Q    And back when you used to have to determine if guns were

21  operable, you used to fire them, right?

22  A    Yes.

23  Q    And when you fire those guns, Detective Fox, you use your

24  dominant hand to fire, correct?

25       Like, if you're a righty, you'd use your right hand,

LAM     OCR     RPR

1   right.

2   A      Yes, I would.

3   Q      And Detective, are different guns, different types of

4   guns, easier or harder to fire?

5              Do you understand that question?

6              You know, by pulling the trigger, are some harder to

7   pull than others or are they all pretty much uniform?

8   A      I feel like most of them are uniform, but, you know,

9   depending -- it's really depending on who's shooting the

10  firearm, but I wouldn't say some are harder than others.

11  Q      Aren't there pounds of pressure?

12             Aren't there tests to determine that some you need a

13  certain -- the shooter needs to exert a certain amount of

14  pressure that can be measured; have you ever heard anything

15  like that?

16  A      Yes.  That would be a "trigger pull."

17             And generally, like, I could speak for the NYPD, we

18  have ten-pound trigger pull, which is generally one of the

19  highest.

20             That being said, any child would be able to fire

21  that particular firearm.

22  Q      Even the one in your hand, the big .357, you're saying a

23  kid could fire that?

24  A      Absolutely.

25  Q      Is the concept of "recoil" something that you're familiar

Fox - cross - Farrell                          609

1   with from your years in ballistics?

2   A    Yes.

3   Q    What is it?

4        Tell the jury, please.

5   A    Recoil is what happens after you fire a weapon.  The

6   firearm would tend to raise in the air based on how powerful

7   that weapon is.

8        All the recoil really does is affects your next

9   shot, because you would have to bring the firearm back down

10  and then re-aim.  So, the more recoil that a firearm would

11  have, the more you have to bring it and re-aim that weapon

12  again.

13  Q    Would you agree that the gun that you're currently

14  holding is considered a pretty powerful weapon?

15  A    Yes.

16  Q    With significant recoil?

17  A    Like I said, it's all possible.  I would say it's

18  definitely going to have recoil, but it also depends on what

19  kind of cartridges are in the firearm prior to being fired.

20  Q    That goes to my next question.  Would you say that --

21  were all the cartridges here uniform in the sense -- based on

22  your direct testimony, was one a .38 and two .357s?

23        I might have missed that.  If you can clear it up,

24  I'd appreciate it.

25  A    When I received those cartridge casings that I compared

1  against test fires, they were different calibers, meaning one

2  was a .38 and the other were .357 Magnum.  Basically, all that

3  means is -- a .38 Special and a .357 Magnum are essentially

4  the same type of bullets.  The bullets are the same exact

5  size.  The difference here is that a .357 Magnum cartridge is

6  longer than a .38 Special.

7          So, now that the cartridge is longer, that means

8  that cartridge would hold more propellant or gunpowder.  So,

9  that's why you're able to fire a .38 Special cartridge out of

10 a .357 Magnum, but you can't fire a .357 Magnum out of a

11 .38 Special because the cartridge is too long.

12 Q    But certain bullets can't be fired.  For example, a

13 9-millimeter bullet couldn't be fired out of the gun that you

14 have in front of you now.

15         Is that fair to say?

16 A    Yes.

17 Q    With respect to your conclusions here, just a few

18 questions.  Just so I'm using the correct terminology --

19 please correct me if I get it wrong -- from the crime scene,

20 those were marked using the "JSL."

21         That's the crime scene detective's initials,

22 correct?

23 A    Yes.

24 Q    Would it be fair to say that there were two bullets that

25 you looked at from the crime scene; one was copper-jacketed

1    and one was not.

2            Is that fair to say?

3    A    Yes.

4    Q    And I think you said -- just for the sake of my own

5    edification, describe again the significance of the copper

6    jacketing on the one bullet and not on the other bullet.

7    A    It's just a different type of metal.

8            So, the copper jacketing, once it traveled through

9    the firearm, there will be more individual characteristics

10   that would be left on that type of evidence.  The lead, once

11   it's fired out of a firearm, it's generally difficult to

12   compare a lead bullet to a copper-jacketed bullet based on how

13   the marks are left on the lead bullet.

14           So, once I received a lead test fire bullet, I was

15   then able to see what exactly was unique to that particular

16   bullet and then compare it to the bullet that I received --

17   the lead bullet that I received from the crime scene.

18   Q    Just so, again, that I understood your testimony, after

19   doing your examination and using your comparison microscope,

20   you were unable to say that those two bullets were fired from

21   the same gun; is that correct?

22   A    My original examination, when I compared the lead bullet

23   to the copper jacket, I couldn't say if they were fired from

24   the same firearm because I felt I didn't have enough

25   individual characteristics at the time.

Fox - cross - Farrell                    612

1  Q    Yet you also testified, I believe, and correct me if I'm

2  wrong, it's your opinion that those two bullets were fired

3  from the revolver that's sitting in front of you now?

4  A    That's correct.

5  Q    What changed your mind here about this?

6  A    Well, I received more evidence.

7        So, I received a lead test fire.  So, the only

8  reason why I didn't say that they were fired from the same

9  firearm in the beginning is because I limited evidence at the

10 time.  Once I had evidence that was taken from that revolver,

11 I was able to examine those test fire bullets to each other

12 and determine what was unique to that particular firearm.

13       And then once I was able to compare a lead test fire

14 bullet to the lead evidence bullet, I was able to see what

15 exactly was unique from that firearm and how it would relate

16 to a lead bullet, and, in doing so, I was then able to perform

17 a comparison and say that those bullets were fired from that

18 particular firearm.

19 Q    Are there points of comparison that you use in your

20 business, in your job?

21       Have you ever heard that term, "points of

22 comparison"?

23 A    Well, I would compare the land impression, which is the

24 lower part of the bullet, and the groove impression, which is

25 the higher part, the raised portion of that bullet.  And I

Fox - redirect - Siegel                    613

1   would compare the individual characteristics on those areas to

2   the areas of that in the test fires.

3   Q    How about the bullet that had the copper jacketing, how

4   do you compare that to the test fire lead bullet?

5         Did you do that?

6   A    I would compare all the evidence to each other, yes.

7   Q    And that didn't affect your ultimate conclusion that

8   you're sure and you're giving us your expert opinion that

9   those two bullets, though they were deformed, definitely, in

10  your view, came from the gun that's in front of you?

11  A    Absolutely.  If I say that two bullets were fired from

12  this firearm, I one hundred percent believe that they were

13  fired from this firearm.

14        When I made them inconclusive, I felt like I didn't

15  have enough evidence yet to determine that.

16        MR. FARRELL:  I see.  Thank you very much.

17        THE COURT:  Thank you, Mr. Farrell.

18        Any redirect, Mr. Siegel?

19        MR. SIEGEL:  Thank you, your Honor.

20  REDIRECT EXAMINATION

21  BY MR. SIEGEL:

22  Q    Detective Fox, you were asked a few questions about which

23  hand you fire a gun with; do you remember that?

24  A    Yes.

25  Q    That .357 revolver in front of you, is that a left-handed

Fox - redirect - Siegel                           614

1    gun or a right-handed gun?

2    A    It's neither.

3    Q    So, it could be fired with either hand?

4    A    That's correct.

5              MR. SIEGEL:  Thank you very much.

6              THE COURT:  Anything further, Mr. Farrell.

7              MR. FARRELL:  Nothing on that, Judge.  Thank you.

8              THE COURT:  Detective Fox, thank you very much.

9    You're excused.

10             THE WITNESS:  Thank you, your Honor.

11             (Witness excused.)

12             THE COURT:  Do you have another Government witness?

13             MR. SELDEN:  We do, your Honor.  The Government

14   calls criminalist Jessica Tarry.

15             Your Honor, if I may approach the witness stand and

16   retrieve piece of evidence up there.

17             THE COURT:  Housekeeping is always in order,

18   Mr. Selden.

19             MR. SELDEN:  Of course, your Honor.

20             (Witness sworn.)

21             THE COURTROOM DEPUTY:  Please state your first and

22   last name and spell it for the record.

23             THE WITNESS:  Jessica, J-E-S-S-I-C-A, Tarry,

24   T-A-R-R-Y.

25             THE COURTROOM DEPUTY:  Thank you.  Have a seat.

Tarry - direct - Selden                    615

1          THE COURT:  You may inquire.

2          MR. SELDEN:  Thank you, your Honor.

3   **JESSICA TARRY**,

4          called by the Government, having been

5          first duly sworn, was examined and testified

6          as follows:

7   DIRECT EXAMINATION

8   BY MR. SELDEN:

9   Q    Good morning.

10  A    Good morning.

11  Q    Ms. Tarry, where are you currently employed?

12  A    At the New York City Police Department police laboratory.

13  Q    Before we get to your work at the New York City Police

14  Department police laboratory, where did you go to college?

15  A    The University of New Haven in Connecticut.

16  Q    What degree did you earn at the University of New Haven

17  in Connecticut?

18  A    I earned two bachelors of science; one in forensic

19  science, and one in chemistry.

20  Q    Do you have any advanced degrees?

21  A    Those are the degrees.

22  Q    What is your current title with the New York City Police

23  Department?

24  A    Criminalist.

25  Q    How long have you worked in that role?

Tarry - direct - Selden                    616

1   A    I have worked for over eight years as a criminalist.

2   Q    Specifically, are you assigned a particular section as a

3   criminalist?

4   A    Yes.  I am assigned to the latent print development unit

5   within the police laboratory.

6   Q    Did you receive any training in the collection of latent

7   prints?

8   A    Yes.  I completed a seven-month training course, which

9   included mock casework, hands-on exercises, written and

10  practical competency examinations, as well as photography

11  training and training in the collection of trace evidence,

12  which includes possible DNA.

13  Q    Let's talk about any training that you received in the

14  collection of possible DNA.

15       What, if any, training have you received?

16  A    As part of that seven-month training course, I received

17  training in recognition of trace evidence as well as the

18  collection of that trace evidence, which includes possible

19  DNA.

20  Q    Approximately how many items have you processed for

21  samples of possible latent prints?

22  A    Over one thousand items.

23  Q    Approximately how many items have you processed for

24  samples of possible DNA?

25  A    Over one thousand items as well.

LAM      OCR      RPR

Tarry - direct - Selden                    617

1  Q    I now want to turn your attention to November 27, 2018.

2         Did there come a time you were assigned evidence

3  with an invoice number 600020923?

4  A    I received evidence that was relevant to invoice number

5  6000020923.

6  Q    And did you come to analyze any of that evidence?

7  A    Yes, I did.

8  Q    What did you receive?

9  A    I received one black metal revolver firearm, Dan Wesson

10  brand, which was Laboratory Item No. 3; I received two gold

11  metal shell casings with a headstamp imprint of Federal 38

12  that was designated Laboratory Item No. 4; I received one gold

13  metal shell casing which had a headstamp imprint of Winchester

14  .357 that was designated as Laboratory Item No. 5; I also

15  received two unfired cartridges, which were gold, copper, and

16  gray colored -- I'm sorry, pardon me, they were gold and gray

17  color, they had a headstamp imprint of Federal 38, and that

18  was designated as Laboratory Item No. 6; and the final item,

19  Laboratory Item No. 7, I received one unfired cartridge, which

20  was gold, copper, and gray colored, and that had a headstamp

21  imprint of Winchester .357.

22         MR. SELDEN:  Your Honor, for the record, I'm showing

23  defense counsel what has previously marked as Government

24  Exhibits 308, 309, and 323.

25         (Pause in proceedings.)

LAM      OCR      RPR

1          MR. SELDEN:  Your Honor, may I approach the witness?

2          THE COURT:  You may.

3          MR. SELDEN:  Thank you, your Honor.

4   Q    Criminalist Tarry, if you could look at what I'm handing

5   you, Government Exhibit 308, 309, 323, and then look up at me

6   once you're done.

7   A    May I use gloves to handle evidence?

8   Q    Of course.

9          MR. STEIN:  Judge, can we just note for the record

10  the witness put on a pair of rubber or latex gloves?

11         THE COURT:  The record will reflect.

12  Q    Criminalist Tarry, if I could just walk through each one

13  of the items you're looking at one at a time.

14         I just showed you Government Exhibit 308.

15  Specifically, you just held what was a firearm.

16         Do you recognize that firearm as it relates to

17  Government Exhibit 308, the item you just identified?

18  A    Yes, I do.

19  Q    What number was that you identified it as?

20  A    It was Laboratory Item No. 3.  On the invoice

21  specifically, it is Item No. 1.

22  Q    And if you could just walk through the remaining items,

23  going through Laboratory Nos. 4, 5, 6, and 7.  And if you

24  could hold those up for the ladies and gentlemen of the jury,

25  that would be helpful.

Tarry - direct - Selden                    619

1    A     Certainly.

2          These here are three shell casings, gold metal, two

3    of which have the headstamp imprint Federal .38 Special and

4    one of which has the headstamp imprint Winchester .357 MAG.  I

5    recognize them to be Laboratory Item No. 4, the two labeled

6    federal, and Laboratory Item 5 is the one shell casing

7    imprinted Winchester.

8    Q     Thank you.  If you could, please continue your review.

9    A     Certainly.

10   Q     Thank you very much.

11   A     In the second envelope of the items within the envelope,

12   I recognize one of the shell casings and the fired bullet that

13   were part of Laboratory Item No. 6.  Laboratory Item No. 6

14   consisted of two unfired cartridges.  This appears to be one

15   of those cartridges in a different condition:  It appears to

16   have since been fired or separated.

17         The second of those two cartridges from that item,

18   No. 6, is in this plastic packaging here.  It is still

19   unfired.

20         These are the now-fired cartridges or the shell

21   casing for the fired bullets that were previously, when I had

22   them, an unfired cartridge; and there's a second unfired

23   cartridge here in this plastic packaging.

24         And then Laboratory Item No. 7 I received also as an

25   unfired cartridge.  I recognize it here.  It is also in this

Tarry - direct - Selden                        620

1   plastic packaging.  It appears now to have been fired and the

2   shell casing component is on this side and the projectile or

3   fired bullet is here as well.

4           MR. SELDEN:  Just for the record, Criminalist Tarry,

5   is actually holding up a plastic sleeve with other items in

6   Government Exhibit 308.

7   Q   Criminalist Tarry, if you wouldn't mind putting those

8   things back away for housekeeping purposes.  If they stay in

9   the same order, that would be very helpful.

10  A   Certainly.

11  Q   Thank you.  A moment ago, you had talked about the fact

12  that you had received these items.

13          Let's briefly describe for the ladies and gentlemen

14  of the jury, where did you received these items in?

15  A   I received the items from the evidence control section of

16  the laboratory.  I received them in a white cardboard box.

17          Would you like me to...

18  Q   Is a portion of that white cardboard box in front of you

19  in Government Exhibit 308?

20  A   Yes, it is.

21  Q   Can you just show that briefly to the ladies and

22  gentlemen of the jury?

23  A   Certainly.

24          So, here is part of the box.  You can see my

25  initials on the seal here from when I repackaged it, as well

LAM      OCR      RPR

Tarry - direct - Selden                    621

1    as the laboratory number in the barcodes on the packaging.

2              MR. SELDEN:  For the record, the witness is pointing

3    to the upper left-hand side of a cardboard box, a portion of

4    which has been cut out in Government Exhibit 3508.

5    Q    So, after you received these items and you conduct your

6    analysis, what was the condition that you received them in?

7              Was it in that condition or a different condition?

8    A    As I explained earlier, slightly different condition.

9              When I received the firearm, it was zip-tied to the

10   interior packaging of the box.  Currently, it appears to have

11   a red mechanism attached to it.  When I received the item, it

12   did not have this red mechanism.

13   Q    Did you receive any associated paperwork when you

14   received these items?

15   A    I did, yes.

16   Q    Did everything match?  On the paperwork that was written

17   down for you, did everything match up?

18   A    Not exactly.

19             Laboratory Item Nos. 4 and 5 I received shell

20   casings, empty shell casings; the paperwork described them as

21   fired bullets.  The quantity listed on the paperwork as well

22   as that make, which was imprinted onto the shell casing, that

23   was correct and did correlate; however, the term that was

24   used, they were referred to as fired bullets when I received

25   shell casings.            (Continued on the following page.)

LAM      OCR      RPR

Tarry - direct - Selden                               622

1    (Continuing)

2    Q    Do you know the difference between a shell casing and a

3    fired bullet?

4    A    Yes, I do.  A -- an unfired cartridge consists of

5    different components, which include a projectile and a shell

6    casing that are attached together.  Once that cartridge is

7    fired, it leaves separate pieces.  The projectile is then

8    referred to as the fired bullet and what remains as the empty

9    shell casing is what was left of the cartridge.

10   Q    All right.

11        Just so that the record is clear, are lab numbers 4

12   and 5 actually invoice numbers 2 and 3?

13   A    That is correct.

14   Q    All right.

15        After verifying these numbers and the contents of

16   what you received what, did you do next?

17   A    I proceeded to analyze the evidence.

18        I first assessed the -- what I received in a

19   designated work space area.  Prior to opening and inventorying

20   the evidence, I did clean the whole area.  I used precautions

21   which included wearing a disposable laboratory jacket, face

22   mask, a hair net and sterile gloves.  I decontaminated the

23   workplace area, and the tools and equipment that I'd use with

24   a bleach solution followed by an alcohol solution, and I then

25   proceeded to lay down clean bench paper, new bench paper, as

Tarry - direct - Selden                              623

1    an added barrier.

2           Once I opened the items, I inventoried them as

3    described earlier.  I laid them out on the clean bench paper

4    and I assessed to look for an area which was likely to be

5    touched, but not likely to have latent prints, and I swabbed

6    those areas for possible DNA.

7    Q    So you mentioned latent prints.

8           Did you conduct both DNA swabs and latent print

9    analysis or at least examination, I should say?

10   A    Yes.  I both took collected possible trace evidence,

11   which included possible DNA, as well as I analyzed the

12   evidence in the search for the imprint development.

13   Q    And what was the order you did that in?  Was it prints

14   first or DNA first?

15   A    I first assessed the evidence to look for an area that's

16   likely to have been touched or have possible DNA, but not

17   likely to have the prints.  I swabbed most of that area, those

18   areas for possible DNA prior to beginning latent print

19   analysis in which I use a variety of lighting techniques and

20   different physical and chemical methods in order to develop

21   prints.

22          I did -- in the process of that latent print

23   analysis, I did observe one additional area which I thought

24   should be swabbed for possible blood and I did collect that

25   swab after beginning my latent print analysis.  The initial

Tarry - direct - Selden                                   624

1    swabs were taken prior to beginning latent print development

2    analysis.

3    Q    And let's just briefly talk about the latent print

4    analysis.  I know we're going in going in the opposite order

5    of how you proceeded, but did you recover any latent prints in

6    this particular analysis that you conducted?

7    A    I did not recovered any latent prints that were

8    potentially of value or suitable for caption.

9    Q    Now, let's turn to the DNA analysis you just described.

10                What did you do with regards to the DNA analysis?

11   A    Yes.  So I first -- as I mentioned, I assessed the items

12   for areas that are likely to be touched but not likely to have

13   prints, and the first swab which I collected was from the

14   textured grip area on the handle of the firearm.

15   Q    I apologize for interrupting you Criminalist Tarry, but

16   could you hold up the firearm and let the Ladies and Gentlemen

17   of the Jury know where you specifically swabbed on the

18   textured grip?

19   A    Yes, I can.

20                So here on the handle there's a textured portion on

21   this side as well as the other side.  That bumpy area is not

22   really conducive for observing prints, but it is likely to be

23   touched as the firearm is handled.  So that is the area which

24   I swabbed.

25                MR. SELDEN:  And for the record, the witness has

Tarry - direct - Selden                    625

1   identified the firearm specifically on the brown handle of the

2   areas where we swabbed on both sides.

3   Q    Do you recall the swab number associated with the swab of

4   that handle?

5   A    Yes.  I designated that swab as laboratory item number

6   3.1.

7   Q    Was that the only swab you took?

8   A    No, I took quite a few more.

9   Q    If you could walk the Ladies and Gentlemen of the Jury

10  through the other swabs you took on the firearm, please.

11  A    Certainly.

12  Q    Thank you.

13  A    The second swab which I collected was from the edges of

14  the trigger and the trigger guard.  So around this area here,

15  the trigger guard, as well as the trigger, and once again, the

16  thin edges on the other side of that trigger and trigger guard

17  as well.

18       MR. SELDEN:  And for the record, the witness has

19  pointed to both sides of the trigger guard of the firearm.

20  Q    Were there any other swabs?

21  A    That one particular was designated as laboratory item

22  number 3.2.

23       I then collected laboratory item number 3.3 which

24  was from the textured area on this hammer at the back of the

25  firearm.

VB        OCR        CRR

Tarry - direct - Selden                    626

1          And then I took one swab designated as laboratory

2     3.4 from the edges of this cylinder area in the center of the

3     firearm.  So all the way around the edges on both sides of the

4     cylinder.

5     Q    And Criminalist Tarry, if I could just briefly interrupt

6     you.

7               MR. SELDEN:  With regards to the swab from the

8     textured area, the witness has pointed to the hammer portion

9     of the firearm as well as for 3.3, as well as for 3.4 has

10    pointed to the cylinder of the firearm.

11    Q    I apologize again for interrupting you.

12              Were there any other swabs to you conducted on this

13    firearm?

14    A    Yes.  I took one additional swab from the end of the

15    barrel, which was designated as 3.5.  That's this end here

16    where...

17              MR. SELDEN:  For the record, the witness is pointing

18    to the end of the barrel.

19    Q    Thank you.

20              Any other swabs?

21    A    Yes.  Those swabs were taken prior to latent print

22    analysis.  As I mentioned earlier, I did observe one

23    additional area in the process of my latent print development

24    analysis, which was from a red/brown, an unknown red/brown

25    stain on the back of the cylinder, which is on this section

1    here.  And I swabbed that as possible blood and designated

2    that as laboratory item number 3.6.

3            MR. SELDEN:  And for the record, the witness has

4    pointed on the back of the cylinder and just before we move on

5    to any other potential swabs, do you know one way or the other

6    whether or not that was, in fact, possible blood?

7    A    I do not know.

8    Q    Do you know what section would make that determination

9    ultimately?

10   A    I forwarded the swabs with a request for DNA analysis and

11   that -- any analysis that would have been performed would not

12   have been performed by me for DNA, but it's submitted to the

13   Office of the Chief Medical Examiner.

14   Q    Is that otherwise known as OCME?

15   A    Yes, that's abbreviation.

16   Q    Thank you.

17           Criminalist Tarry, I believe we stopped with the

18   swabs of the firearm.  Did you conduct any swabs relating to

19   the head stamps of the three shell casings; collectively, I

20   believe you described as lab numbers 4 and 5?

21   A    Yes, that is correct.

22   Q    You could put that down.  Thank you.

23   A    Okay.

24           For the three shell casings, the two from laboratory

25   item number 4 and the one from laboratory item number 5 I

Tarry - direct - Selden                     628

1   collected one swab, because they were received together.  So

2   collectively I did one swab from the head stamps or the back

3   portion.  The flat area of each of those on one swab.

4           THE COURT:  Mr. Selden, I do not want to cut you

5   off.

6           Did you have more to say?

7           THE WITNESS:  And then took an additional swab of

8   the other items.  So I then took -- that was designated as

9   4.1.  I then took one swab of laboratory items number 6 and 7.

10  Also of the head stamp areas and designated that as laboratory

11  item number 6.1.

12  Q   All right.

13          MR. SELDEN:  If the Court is inquiring if this is a

14  good time for a morning break, that absolutely works.

15          THE COURT:  Okay.  Sometimes it works.  Thank you.

16          Ladies and gentlemen, we did not want you to think

17  we were not going to take the break.  Sometimes we try to

18  figure out what is a good landing point and it sounded like we

19  were getting there.  Mr. Selden has now confirmed it.

20          So we will take that midmorning break.  Again, I

21  keep repeating the rules because they are so important.

22          Do not discuss the case amongst yourselves or anyone

23  else you may run into in the back and, of course, continue to

24  keep an open mind.

25          I will see you in about 15.

Proceedings                                          629

1          THE COURTROOM DEPUTY:  All rise.

2          (Jury exits.)

3          (In open court; outside the presence of the jury.)

4          THE COURT:  Ms. Tarry, you can step down, take a

5     stretch.  Come back in 15.

6          THE WITNESS:  Should I put the firearm back in the

7     packaging?

8          MR. SELDEN:  We can take care of that.  Don't worry.

9          THE WITNESS:  Okay.

10         (Witness steps down.)    (Recess taken.)

11         (Defendant enters courtroom.)

12         (Judge ERIC N. VITALIANO enters the courtroom.)

13         THE COURTROOM DEPUTY:  All rise.

14         Court is back in session.

15         Counsel for both sides are present, including

16    defendant.

17         THE COURT:  Ready to go?

18         MR. SELDEN:  On behalf of the Government, yes, thank

19    you, Your Honor.

20         THE COURT:  Have Criminalist Tarry take the stand.

21         MR. SELDEN:  Thank you, Your Honor.

22         (Witness resumes stand.)      (Jury enters.)

23         THE COURT:  Be seated, please.

24         Counsel will stipulate that the jury is present and

25    properly seated.

Tarry - direct - Selden                    630

1    MR. SELDEN:  On behalf of the Government, yes.

2    Thank you, your Honor.

3    MR. STEIN:  Yes, Your Honor, for the defendant.

4    THE COURT:  Thank you.

5    Thank you, Counsel.  Ladies and gentlemen, welcome

6    back.  We are ready to resume.

7    You will recall Criminalist Tarry was on the stand

8    and now Mr. Selden will continue his direct examination.

9    MR. SELDEN:  Thank you very much, Your Honor.

10   DIRECT EXAMINATION (Continuing)

11   BY MR. SELDEN:

12   Q    Criminalist Tarry, a moment ago we were talking about the

13   respective lab items and I believe that we had discussed at

14   one point a lab item number specifically 3.1, the swab from

15   the textured grip of the firearm.

16   Do you remember that particular number associated

17   with that invoice number associated with that particular swab,

18   that being of the grip of the gun?

19   A    Yes.  I invoiced the swab on invoice number 6000020947.

20   Q    And Criminalist Tarry, just briefly, in terms of the swab

21   of the grip of the gun, that being the number that you just

22   made reference to, lab item number 3.1, where did that

23   particular item, along with the other swabs go, after you had

24   conducted your review?

25   A    Once I collected the swab, I allowed them to dry in the

Tarry - direct - Selden                    631

1    designated swab drying box.  I then, once dry, packaged each

2    swab individually into a manila envelope, which I labeled,

3    sealed and signed.

4              After invoicing all of those swabs on that invoice

5    number that I mentioned earlier, 6000020947, I sent the -- I

6    filled out paperwork with a request for analysis for DNA and

7    submitted those packaged swabs, as well as the invoice,

8    paperwork and the request paperwork, to the evidence control

9    section of the laboratory with that request for DNA analysis.

10   Q    And is the next step or link in that chain that someone

11   or -- those materials were sent to the Office of the Chief

12   Medical Examiner?

13   A    Apart from me returning it to the evidence control

14   section, I do not know where those swabs went past that.

15   Q    And do you know in terms of the order in which you would

16   receive particular items for review, the ballistics, the FAS

17   section, are you familiar with those sections?

18   A    Yes.  The firearms analysis section?

19   Q    Yes.  And does that happen before or after you conduct

20   your analysis?

21   A    I returned my -- the firearms analysis section would get

22   the evidence after my analysis.  I returned it to the evidence

23   control section, the firearms specifically, with a request --

24   with the original paperwork to be forwarded pending further

25   analysis.

Tarry - cross - Farrell                          632

1          MR. SELDEN:  Thank you, Criminalist Tarry.  No

2    further questions.

3          Thank you, Your Honor.

4          THE COURT:  You are welcome.

5          Mr. Selden, any cross?

6          MR. FARRELL:  Yes, Judge, thank you.

7          THE COURT:  Mr. Farrell.

8    CROSS EXAMINATION

9    BY MR. FARRELL:

10   Q    Good afternoon, Ms. Tarry.

11   A    Good afternoon.

12   Q    My name is Gary Farrell.  You and I have never met or

13   talked about this case; right?

14   A    That is correct.

15   Q    And the way your lab works is criminalists have levels,

16   you're either 1, 2 or 3.  Does it go past three?

17   A    Yes.

18   Q    How far does it go?

19   A    Level 4 would be a supervisory position.

20   Q    And you're currently a three; correct?

21   A    That is correct.

22   Q    And how long have you worked there again?

23   A    Over eight years.

24   Q    So you were given a gun to examine in this case,

25   specifically a .357 revolver; correct?

VB          OCR          CRR

Tarry - cross - Farrell                          633

1    A    That is correct.

2    Q    And the ballistics unit is in the same building as your

3    unit; correct?

4    A    It's referred to as the firearms analysis section.

5    Q    Right.

6    A    It is in the same building; correct.

7    Q    And you know they examined this gun also the same day as

8    you; right?

9    A    Past my examination and my time with the evidence, I do

10   not know what specifically occurred.

11   Q    So as you sit here today, you don't know that the gun was

12   test-fired on November 28th, 2018.  You have no knowledge of

13   that?

14   A    I personally did not review or refer to anyone else's

15   reports for -- with the exception of my own or any analysis

16   past my own analysis.

17   Q    Okay.  Did you say on direct, and please correct me if I

18   misheard, that your main duty and responsibility is looking at

19   latent fingerprints?

20   A    As part of my duties and responsibilities, it is to

21   analyze evidence for the development of latent prints, as well

22   as to collect for any possible trace evidence.

23   Q    And is that still a thing, fingerprints, with the advent

24   of DNA science?  You guys still do fingerprints?

25   A    Yes.

Tarry - cross - Farrell                            634

1   Q    If I put my fingerprint and I just see it, I see my

2   fingerprint now, is that a latent print or is this something

3   else?

4   A    Specifically, a latent print is any print -- it's a

5   chance impression.  So if I could go back to the basics and

6   explain what a print is.

7             May I?

8   Q    Sure.

9   A    Okay.

10            So on the fingers, palms and the bottom of your

11  feet, there's a pattern of raised ridges, raised skin called

12  friction ridges.  On those ridges there are pores, which exude

13  sweat.  A print is a chance impression of those ridges on to a

14  surface.  So it's possible that you may leave a print on that

15  surface as you hit it, but there are a variety of factors that

16  affect both the placement and the persistence and recovery of

17  those prints.

18  Q    And are they visible to the naked eye, latent prints,

19  typically or not?

20  A    Specifically, there's a term called patent prints which

21  are prints that are visible with ambient or visible to the

22  naked eye.  Latent prints is -- specifically refers to any

23  prints that require physical or chemical methods of

24  development in order to be seen, but the term latent print is

25  also used generally to encompass both patent prints and latent

Tarry - cross - Farrell                              635

1   prints.

2   Q    And I believe you testified that you weren't just looking

3   for fingerprints.  You were also looking for other trace

4   evidence; correct?

5   A    That is correct.

6   Q    And that would include skin cells; correct?

7   A    Skin cells are collected as possible DNA, typically.

8   Q    Right.  And blood evidence also?

9   A    That is correct.

10  Q    How many different -- how many firearms do you think

11  you've examined in your eight-year career?

12  A    I do not know the specific number.

13  Q    I'm sure you don't.  So you could give us a guess; best

14  estimate, I should say.

15  A    Probably over a hundred.

16  Q    And you did this examination because a member of the NYPD

17  specifically, Detective Nuzio asked you to do it; right?  He

18  put in an official laboratory request that you examine that

19  gun for look for certain evidence; right?

20  A    Yeah, based on the paperwork received with the evidence,

21  there was a request for a latent print development as well,

22  yes.

23  Q    And you reviewed his request carefully; correct?

24  A    That is correct.

25  Q    And would you agree that his request included the name of

VB       OCR       CRR

Tarry - cross - Farrell                     636

1   the victim in the case, Alejandro Deleon; correct?

2   A    I do not recall specifically.  I would have to be

3   refreshed in order to state that clearly.

4   Q    Do you have any of your paperwork with you today or you

5   do not?

6   A    I do not.

7   Q    Okay.  I'll try to help you out.

8           (Pause in proceedings.)

9           MR. FARRELL:  Okay.  This is under JT-3500-2 and,

10  Mr. Villanueva, if you could just have this shown to the

11  witness only, please.

12          I'm going to make an asterisk to make this a little

13  quicker and see if you now refresh your recollection as to

14  whether or not Detective Nuzio indicated that there was, in

15  fact, a victim and his name was Alejandro Deleon.

16  A    That is correct.  According to this paperwork, there's a

17  victim listed.  Victim/complainant and the name is Alejandro

18  Deleon.

19  Q    Right.  And it was also indicated to you that the victim

20  and the suspect were in physical contact; correct?

21          Do you see that right above where you just looked,

22  where I'm now asterisking again with two asterisks?

23  A    Yes.  According to the paperwork, they were in physical

24  contact.

25  Q    And that the victim was bleeding; correct?  Final

Tarry - cross - Farrell                               637

1    asterisk.

2             Do you see that?

3    A    That does indicate, yes.

4    Q    So you had that knowledge when you were doing your job

5    and doing your exam; correct?

6    A    That is correct.

7    Q    So it was in your mind that you could be finding evidence

8    not only from the perpetrator who handled the gun, but

9    possibly from the victim himself, correct, if he handled the

10   gun?

11   A    Personally, I don't look specifically for evidence to a

12   person.  I do not do the DNA analysis.  I am just observing

13   the evidence to collect what I see.  There is no determination

14   as to who that evidence specifically came from or not.

15   Q    Well, on direct you did a very detailed presentation for

16   us about the various parts of the gun that you swabbed;

17   correct?

18   A    That is correct.

19   Q    The grip, the trigger guard, the hammer, the cylinder,

20   remember those?

21   A    Yes.

22   Q    And the end of the barrel; correct?

23   A    Yes.

24   Q    And specifically you said there might have been a stain

25   that, to you, might have been blood on the back of the

Tarry - cross - Farrell                              638

1   cylinder; right?

2   A    Yes.  There was a reddish-brown looking stain on the back

3   of the cylinder that I swabbed as possible blood.

4   Q    By the way, as you are doing your swabbing, can you tell

5   whether or not you're successful?  Like, can you tell, yeah, I

6   got some skin cells on the grip or on the trigger guard?

7            Did you do that at the time that you were doing it?

8   A    There's no way to be sure.  The possible DNA that's being

9   swabbed for is often microscopic in nature.  Skin cell on an

10  individual basis is very small.  And in the training and how

11  we collect the possible DNA, there's no way to know for sure

12  without further examination or analysis what is actually

13  present when collected.

14  Q    And the process itself, I don't mean to sound like it's

15  overly simple, you're putting on a glove, you're taking a

16  Q-tip and you're rubbing it on an item, like in this case a

17  gun?

18  A    Yeah.  That's a very simplified version of it, but.

19           Essentially in the work space area, I -- while

20  utilizing proper protective equipment, which does include

21  sterile gloves, as well as a face mask, hair net and

22  disposable laboratory jacket, I apply a drop of sterile water

23  to a cotton swab, which is similar in appearance to a Q-tip,

24  as you noted, and then I brush that cotton swab with the

25  sterile water to the area of the item across the surface to

VB        OCR        CRR

Tarry - cross - Farrell                    639

1   collect any possible trace materials.

2   Q    And where do you put it?  Once you're doing your swab for

3   the first part of the gun, the way you listed it, the textured

4   area of the grip, where does it go?

5   A    We have designated swab drying boxes which are designed

6   specifically for the purpose of keeping swabs separate and in

7   an environment that is sterile while the water dries and prior

8   to packaging it in an -- individual envelopes.

9   Q    Do you typically change your gloves at all while you're

10  doing this?

11  A    Yes, I do.

12  Q    What's the purpose of doing that?

13  A    Just to prevent further transfer of anything from one

14  item to another.

15  Q    Now, the three shell casings, I believe you processed or

16  examined those as well; right?

17  A    Yes, I did.

18  Q    But those shell casings were the result of fired -- fired

19  gun; right?  They were fired; right?

20  A    They were empty shell casings, yes, that's correct.

21  Q    Would you expect to find any DNA on something that has

22  gone through that process which we all heard from Detective

23  Fox today about the way a bullet's fired with an explosion?

24           MR. SELDEN:  Objection, Your Honor.

25           THE COURT:  Sustained.

Tarry - cross - Farrell                   640

1  Q    Do you know if any evidence has ever been found from a

2  shell casing that's indicative of being fired?

3  A    It is our general procedure.  I don't know statistics

4  specifically on how likely DNA analysis is successful on fired

5  shell casings.  However, being that this was a revolver, shell

6  casings can be touched after the firing process, as well in

7  order to remove them from the cylinder.

8          So it is our procedure that we would still collect

9  possible DNA from shell casings in cases where it is a

10 revolver involved.

11 Q    And since you mentioned this was a revolver, I'm with you

12 that the cartridges that are not fired, that were not fired in

13 this case, they could be the source of skin cells or any type

14 of DNA; right?  Because they're typically loaded by hand into

15 the cylinder; correct?

16 A    Yes, skin cells would be on any numerous items.

17 Q    And as you sit here today you don't know what, if

18 anything, was found from anything that you swabbed; is that

19 right?

20 A    That's correct.  I do not receive feedback on the results

21 of any analysis performed past my own.

22 Q    Okay.  Part of the reports in your file here that you

23 prepare for the work that you've done includes a case

24 conferral sheet; correct?

25 A    That is correct.

VB        OCR        CRR

1    Q    Okay.  I'm putting it here just in case you don't have it

2    in front of you, if you need it from JT-2.

3              MR. SELDEN:  Objection, you, Your Honor.

4              THE COURT:  Sustained.

5    Q    Well, let me ask you the question then and we'll see if

6    you need it?

7              THE COURT:  Correct.

8    Q    Would you agree with me that besides the gun Detective

9    Nuzio requested analysis examination on clothing that was

10   recovered, do you agree with that?

11   A    May I refresh my recollection.

12   Q    I believe so.  I'm going to put the case conferral sheet

13   and direct your attention to the last line that I'm

14   asterisking.

15   A    Yes.

16   Q    He did request tests on clothing; right?

17   A    Yes, on that conferral.

18   Q    And he reference two voucher numbers, one for the gun

19   ending in 0923, and one for the clothing ending in 0924;

20   correct?

21   A    That is correct.

22   Q    By the way, before I forget, none of these -- the gun was

23   not processed in the field; correct?

24   A    It did not appear processed in the field.  There is an

25   indication on the paperwork received, which I would have to

Tarry - cross - Farrell                      642

1    refresh my recollection to see what was filled out

2    specifically.

3    Q    Would you agree that the New York City Police Department

4    has an Evidence Collection Unit?  You've heard of them; right?

5    A    Yes.

6    Q    And what do they do as far as you know?

7    A    As far as I know, they collect evidence and submit it to

8    the laboratory for further examination.  Specifically in my

9    interactions it has been to request for latent print

10   development and DNA collection.

11   Q    Do they do anything in the field that you do also?  Is

12   there any duplicative work done?

13   A    I cannot testify to what specifically the Evidence

14   Collection Team does in their analysis.  That's not my job.

15   Q    In your opinion, is there an advantage to have an item

16   like a gun processed in the field by Evidence Collection Unit

17   rather than you doing it for the first time two days later?

18              MR. SELDEN:  Objection, Your Honor.

19              THE COURT:  Sustained.

20   Q    Well, back to the clothing that you noted there was a

21   request for, Ms. Tarry.

22              Did you examine the coating in this case?

23   A    I did not.

24   Q    Was that your co-worker, Criminalist Morris?  Was she

25   assigned to take a look at those clothes -- at the clothing

Tarry - cross - Farrell                    643

1    that was examined -- that was requested to be examined because

2    it was recovered by Detective Nuzio?

3    A    I may clarify.  This clothing was not assigned to me.  It

4    never came into my possession.  I do not know specifically,

5    apart from this conferral, that testing was requested.  I do

6    not know any further information regarding that invoice.

7    Q    You do know Criminalist Morris; correct?

8              THE COURT:  Personally?

9    Q    Yeah, you work with her; right?

10   A    Are you referring to Criminalist Mavris.

11   Q    Yes, I'm sorry.  Thank you very much.  That was Daphne

12   Mavris?

13   A    Yes.

14   Q    That's what I was asking.  Thank you very much.

15             You know her; right?

16   A    Yes, I do.

17   Q    Because you work with her; right.

18   A    Yes.

19   Q    And do you know that she looked at the clothing in this

20   case.  As you sit here today, you know that; right?

21   A    Once again, this is not my -- this evidence was not in my

22   possession.  I do not -- I did not refer or reference other

23   people's work within this case.

24   Q    So your answer is you're saying you don't the know that

25   she examined these clothes; right?

Tarry - redirect - Selden                     644

1          MR. SELDEN:  Objection, Your Honor.

2          THE COURT:  I'm going to sustain the objection.

3          Have you ever seen any clothes in anybody's

4   possession that relates to that request that you looked at?

5          THE WITNESS:  I have not seen any clothes in regard

6   to this case.

7          MR. FARRELL:  Okay.  Thanks Judge.

8          Nothing further.

9          MR. SELDEN:  Brief redirect, Your Honor.

10          THE COURT:  You may.

11  REDIRECT EXAMINATION

12  BY MR. SELDEN:

13  Q    Good afternoon again, Criminalist Tarry.

14  A    Hello.

15  Q    So I just want to briefly walk through some of the

16  questions that Mr. Farrell just asked you about.

17          So the last line of questions that he was asking you

18  about clothing, that's actually not evidence that you at all

19  reviewed; correct?

20  A    That's correct.

21  Q    Okay.  And with regards to processing things in the

22  field, do you have information one way or the other as it

23  relates to that?

24  A    I do know that in general the laboratory has more

25  facilities available.  So often evidence is submitted to the

Tarry - redirect - Selden                          645

1   laboratory because there's better work conditions for

2   processing.

3   Q    I'll ask a better question.  I'm sorry about that.

4         You don't the know what investigative agencies

5   besides the New York City Police Department -- for example,

6   the ATF -- they had any involvement in this particular case?

7   A    I do not know.  I'm not aware.

8   Q    And in terms of, do you remember the, I believe it was

9   asterisks that Mr. Farrell went through with you about

10  physical contact, and what you were looking for?

11        Do you remember that line of questioning?

12  A    I do recall.

13  Q    You didn't have an opportunity to review any surveillance

14  videos during the course of your evidence review, did you?

15  A    No, I did not.

16  Q    You didn't actually speak with any witnesses during the

17  course of your evidence review, did you?

18  A    No, I did not.

19  Q    And that's including Mr. Deleon, did you?

20  A    That's correct.  I did not speak with Mr. Deleon.

21  Q    You recall the line of questioning by Mr. Farrell about

22  requests for DNA analysis?

23        Do you recall that line of questioning?

24  A    Yes.

25  Q    Do you remember or I should say is ultimate testing with

Tarry - redirect  - Selden                    646

1    regards to DNA analysis conducted by the criminalists at the

2    laboratory that you work at, or is it conducted by

3    criminalists at the Office of the Chief Medical Examiner?

4    A    At the Office of the Chief Medical Examiner.

5    Q    And do you have anything to do with the assessments that

6    are conducted there, one piece of evidence or another?  Do you

7    know anything about the process which they go through?

8    A    No, once I completed my invoicing of collected evidence,

9    I submit it to the evidence control section of the laboratory

10   where it is -- with a request for further analysis and that is

11   the extent to which I'm aware of its analysis.

12             MR. SELDEN:  Thank you very much, Criminalist Tarry.

13             No further questions, Your Honor.

14             THE COURT:  Mr. Farrell, anything else?

15             MR. FARRELL:  No, thanks, Judge.

16             THE COURT:  Criminalist Tarry, thank you very much.

17   You are excused.

18             THE WITNESS:  Thank you.

19             THE COURT:  Appreciate your testimony.

20             THE WITNESS:  Thank you.

21             (Witness excused.)

22             THE COURT:  Does the Government have another

23   witness?

24             MR. SELDEN:  We do, Your Honor.  The Government

25   calls Matthew Goldstein from the Office of the Chief Medical

Tarry - redirect  - Selden                647

1    Examiner.

2             Court's brief indulgence while we locate

3    Mr. Goldstein.

4             (Pause in the proceedings.)

5             (Witness enters and takes stand.)

6             THE COURTROOM DEPUTY:  Raise your right hand.

7

8             (Continued on following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **MATTHEW GOLDSTEIN**,

2              called as a witness having been

3              first duly sworn, was examined and testified

4              as follows:

5              THE COURTROOM DEPUTY:  Please state your first and

6    last name and spell it for the record.

7              THE WITNESS:  My name is Matthew Goldstein --

8    M-A-T-T-H-E-W, G-O-L-D-S-T-E-I-N.

9              THE COURTROOM DEPUTY:  All right.  Thank you.  Have

10   a seat.

11             THE WITNESS:  Thank you.

12             THE COURT:  You may inquire.

13             MR. SELDEN:  Thank you very much, Your Honor.

14   DIRECT EXAMINATION

15   BY MR. SELDEN:

16   Q    Good afternoon.

17   A    Good afternoon.

18   Q    Mr. Goldstein, where do you work?

19   A    I work at the New York City Office of Chief Medical

20   Examiner.

21   Q    Is there an acronym associated with the New York City

22   Office of Chief Medical Examiner?

23   A    The OCME.

24   Q    Is that a New York City agency?

25   A    Yes.

Goldstein - direct - Selden                  649

1   Q    Are you part of the New York City Police Department?

2   A    No.

3   Q    What does the OCME do?

4   A    We investigate suspicious deaths throughout the city of

5   New York as well as perform DNA testing on crime scene

6   evidence submitted to us by the NYPD.

7   Q    Does the OCME analyze DNA evidence submitted by the NYPD

8   alone?

9   A    No.

10  Q    Are you in a particular department of the OCME?

11  A    Yes, I work in the Department of Forensic Biology.

12  Q    How long have you worked at OCME?

13  A    About five-and-a-half years.

14  Q    What is your title there?

15  A    I am a Criminalist Level 3.

16  Q    How long have you been a Criminalist Level 3?

17  A    Almost two years.

18  Q    And what were your titles before being assigned

19  Criminalist Level 3 two years ago?

20  A    I was hired as a Criminalist Level 1 and was then

21  promoted to a Criminalist Level 2, followed by promotion to

22  Criminalist Level 3.

23  Q    What are your job responsibilities as a Criminalist

24  Level 3?

25  A    I -- excuse me.  I examine evidence for the presence of

VB        OCR        CRR

Goldstein - direct - Selden                    650

1   biological materials such as blood, semen, saliva or skin

2   cells, perform DNA testing on those pieces of evidence,

3   analyze and interpret the results of those DNA tests, form

4   conclusions, write reports and then testify in court as

5   needed.

6   Q    Please tell us about your education in the DNA tasting

7   field.

8   A    I have a Bachelor's of Science in forensic science as

9   well as a Master's of Science in forensic science, both from

10  Virginia Commonwealth University.

11  Q    Can you briefly describe any training or ongoing

12  education you received in DNA testing?

13  A    When first hired as a Criminalist Level 1 by the OCME, I

14  went through a three-month training program which included

15  lectures talking about all the scientific background all of

16  the techniques we perform in the lab.  I was then demonstrated

17  all of those techniques by an experienced member of the

18  laboratory, given the opportunity to practice those

19  techniques, both under observation as well as independently,

20  and then finally given what's known as a competency exam which

21  is essentially a final examine for training.

22          After promotion to Criminalist Level 1, I went back

23  for an additional three-month training, so for a total of six

24  months.  And then the second three months involved lectures,

25  practices and competency tests, when specifically looking at

1    the interpretation of the DNA results.

2             And finally, after the three-month Criminalist

3    Level 2 training, I went through a multi-hour oral exam, which

4    covers all the scientific background of all the techniques we

5    learned in Criminalist Level 1 and 2 training.

6    Q    Is the Office of the Chief Medical Examiner accredited to

7    perform DNA testing?

8    A    Yes.

9    Q    What does it mean to be accredited?

10   A    To be accredited means -- excuse me -- that there are two

11   different accrediting bodies.

12            In this case, the New York State Commission on

13   Forensic Science, as well as ANAD, which is a National

14   Accreditation Board.  They both have a list of guidelines and

15   standards that govern all things throughout all forensic

16   science laboratories, including such as how we handle our

17   evidence, the training required for the analysts, the

18   educational background for the analysts, and if a lab has been

19   shown to meet or exceed all the standards and all the

20   guidelines from both -- excuse me -- companies, we are deemed

21   accredited, which means that our work can be thought of as

22   accurate and reliable.

23   Q    How often is the lab accredited?

24   A    Every four years.

25   Q    In addition to the audits and examinations of the lab, do

Goldstein - direct - Selden                    652

1    you personally undergo examinations?

2    A    Yes.

3    Q    How frequently?

4    A    I'm required to do a proficiency test every six months.

5    Q    Approximately how many DNA cases does the lab handle per

6    year?

7    A    About 15,000.

8    Q    Have you personally performed DNA testing during your

9    career at the OCME?

10   A    Yes.

11   Q    How many DNA tests approximately have you performed

12   during your career at the lab?

13   A    Thousands of tests.

14   Q    What types of items have you tested?

15   A    The most common items that I test are swabs, which are

16   just one-sided Q-tips that are used to try to collect DNA from

17   a surface.  However, I've also examined sexual assault kits.

18   I've examined items of clothing.  I've examined weapons.  I've

19   examined leftover food items, cigarette butts, bottles.

20   Really, almost anything.

21   Q    Have you reviewed DNA tests performed by others during

22   your career at the lab?

23   A    Yes.

24   Q    Approximately how many?

25   A    Close to a hundred, I believe.

Goldstein - direct - Selden                653

Q    During your career, have you conducted DNA extraction,

quantitation, application and typing before?

A    Yes.


          (Continued on following page.)

Goldstein - direct - Selden                654

1    BY MR. SELDEN:   (Continuing)

2    Q    And we'll get back to those later, but have you testified

3    before in matters involving DNA?

4    A    Yes.

5    Q    Approximately how many times?

6    A    Thirty-five times.

7    Q    And where have you testified previously?

8    A    I testified in the grand jury in the Bronx, Brooklyn,

9    Queens, Staten Island and I testified at trial in Manhattan,

10   Brooklyn, the Bronx, Queens and the federal Southern District.

11   Q    Is that the Southern District of New York?

12   A    Yes.

13   Q    In all the times that you testified at trial, were you

14   designated as an expert by the court?

15   A    Yes.

16            MR. SELDEN:  Your Honor, at this time, the

17   government asks that Criminalist Goldstein be qualified as an

18   expert in forensic DNA analysis.

19            THE COURT:  Mr. Stein?

20            MR. STEIN:  No objection, Judge.

21            THE COURT:  Thank you, Mr. Stein.

22            Ladies and gentlemen, again, the point of qualifying

23   someone as an expert allows that witness, unlike the lay

24   witness, to offer an opinion.  The Court is satisfied that

25   Criminalist Goldstein can be deemed an expert in this field.

Goldstein - direct - Selden                    655

1        You may inquire on that basis, Mr. Selden.

2        MR. SELDEN:  Thank you very much, Your Honor.

3   Q    Criminalist Goldstein, let's talk about DNA generally,

4   what is DNA?

5   A    DNA is the genetic material that makes us who we are.  We

6   inherent half of our DNA from our mother and half of our DNA

7   from our father.  Over 99 percent of all DNA between people is

8   the same.  That's why we all look generally the same.  We all

9   have two arms, two legs, two eyes, a nose, a mouth, and it's

10  that small 1 percent difference that's unique to each person

11  with the exception of identical twins and that small 1 percent

12  difference is what my lab looks at.

13  Q    What is an allele?

14  A    So an allele is a different type of DNA that a person can

15  have.  So, for example, if there was a particular part of your

16  DNA that coded for eye color, I have blue eyes, I would have

17  the blue allele, but who has brown eyes has the brown allele.

18        In my lab, the alleles that we use or the different

19  types of DNA that we use are referenced as numbers.  So at any

20  given location, some person can have an 11, another person can

21  have a 9, another person can have a 15.

22  Q    What is a locus?

23  A    A locus is another word for a location along the DNA

24  chain.

25  Q    And is loci the plural of locus?

Goldstein - direct - Selden                    656

1   A    Yes.

2   Q    How many alleles at each locus?

3   A    You can have a maximum of two alleles at any given locus

4   or location.  One from mom.  One from dad.

5   Q    What is a DNA profile?

6   A    A DNA profile is a string of numbers that represents any

7   particular person's alleles at all of the 22, excuse me, the

8   24 locations that my lab looks at.  It can be thought of as

9   something like a genetic barcode or a genetic Social Security

10  number.

11  Q    Can more than one person have the same DNA profile?

12  A    With the exception of identical twins, no.

13  Q    What are some of the sources of DNA on a human body?

14  A    Most of the cells throughout your body will have DNA.

15  You can find it in skin cells, you can find it in sperm cells,

16  hair cells, blood cells.

17  Q    And what are some of the sources of skin cells?

18  A    Skin cells are the ones generally found on your

19  fingertips that fall off in the normal course of the day that

20  are left behind on items you're touching.

21  Q    On sort of a continuum, are there sources of DNA that are

22  easier to test versus ones that are harder?

23  A    Yes.  Generally speaking, blood, semen, other saliva, any

24  sort of body fluid has more DNA in it than your typical skin

25  cells so that's why those are a little bit easier to test.

Goldstein - direct - Selden                    657

1   Q    Let's talk about DNA testing at OCME generally.  How does

2   the laboratory go about testing DNA?

3   A    The DNA testing process consists of four basic steps.

4   They include extraction, quantitation, amplification and DNA

5   typing.

6   Q    We'll get to those four different tests in a moment, but

7   I want to just ask about the actual practical first step.

8             What is a swab?

9   A    A swab is a one-sided Q-Tip used to collect DNA -- excuse

10  me -- used to collect skin cells.

11  Q    Who collects the swabs that OCME receives for testing?

12  A    Most often, it's the NYPD.

13  Q    If OCME gets a physical item like a hat rather than a

14  swab, how does the lab process that item?

15  A    There are multiple options to process the item.

16  Ultimately, the goal is to find the area where we're most

17  likely to find DNA.

18            One of the most common things you can do is we can

19  swab the items ourselves.  Using a cotton swab, we can wet it

20  with a little bit of water and rub it against the surface of

21  the item.  The other options include actually physically

22  scraping the item with a razor blade.  So, for example, in the

23  example of a hat, you would scrape the razor blade around the

24  inside of the sweatband because that's where you're expected

25  to find DNA.  The other option is -- excuse me -- you can

Goldstein - direct - Selden                    658

1  actually take a physical cutting of where you think DNA would

2  be and send that to extraction.

3  Q    Does the swab get its own numbering?

4  A    Yes.

5  Q    Let's briefly talk about OCME's process for the condition

6  of swabs.  Can you walk the ladies and gentlemen of the jury

7  through the condition of swabs when they first arrive at OCME

8  and by way of example, how are they packaged?

9  A    All swabs that are accepted by the OCME have to be within

10  sealed packaging and the packaging also cannot appear wet or

11  moldy and all items of evidence must also be accompanied by

12  the proper paperwork.

13  Q    Are they unsealed?

14  A    No, they're all sealed.

15  Q    But once they arrive to you, are they unsealed then?

16  A    They're unsealed once it is ready for evidence

17  examination.

18  Q    And what do you do with regards to skin cells, do you

19  swab for skin cells with the swabs that we've just made

20  reference to?

21  A    Yes.

22  Q    And are skin cells visible to the naked eye?

23  A    No.

24  Q    I want to take a step back to certain protocols and

25  keeping track of items.  Can you describe the protocols that

1    OCME uses to keep track of the items that you received?

2    A    Once an item has entered into the Office of the Chief

3    Medical Examiner, its physical location is recorded for the

4    entire duration that it exists in our lab.  So it is received

5    by members of our evidence unit, it is placed into an area of

6    locked storage, that locked storage facility is documented in

7    our computer system and any time the evidence is removed from

8    that locked storage for examination or placed into a new

9    locked storage area, each one of those transfers is

10   electronically recorded so that we can, at any point, at any

11   time, say, okay, on Monday at 3:00 p.m., I know exactly where

12   this item was.

13   Q    Do you know what a voucher number is?

14   A    Yes.

15   Q    What is it?

16   A    A voucher number is a unique identifying number given to

17   either an item or a set of items by the NYPD.

18   Q    How -- do you know what an FB number is?

19   A    Yes.

20   Q    What is an FB number?

21   A    An FB number is the case number given to each set of

22   items that comes in and that is given to the case by the OCME.

23   Q    Do you know what an FBS number is?

24   A    Yes.  An FBS number is forensic biology subject.  It just

25   refers to the DNA evidence taken from a known person as

Goldstein - direct - Selden                    660

1   opposed to a normal FB number which is an evidentiary sample.

2   Q    A moment ago, you had talked about extraction,

3   quantitation, amplification and typing.  Can you explain those

4   basic steps to the ladies and gentlemen of the jury?

5   A    The first step of the process is DNA extraction.  The

6   point of DNA extraction is to isolate the DNA from everything

7   else in the cell, all the other cellular material.  So at the

8   end of the DNA extraction step, we want to have just a small

9   tube full of what is theoretically pure DNA.

10          The next step is known as DNA quantitation and that

11  is where we just figure out how much DNA we have.  The reason

12  we do that is the third step, amplification, has a very

13  specific range of amount of DNA we want to amplify.  If we

14  have too much DNA, we don't want to amplify that much and if

15  we don't have enough DAN, we stop testing altogether.  The

16  amplification process requires a minimum amount of DNA to move

17  forward so if we don't have that testing -- excuse me -- if we

18  don't have that amount of DNA to test, we just stop and write

19  our reports and say there's not enough there.

20  Q    So is it possible to recover DNA but there's not enough

21  presence to develop a DNA profile?

22  A    Yes.

23  Q    And if that is the case, would you be able to compare

24  that DNA to a known person's DNA to determine if it's the

25  same?

Goldstein - direct - Selden                    661

1   A    No.

2   Q    Assuming you do not find enough DNA to develop a profile

3   during the quantitation step, what would you do next -- I'm

4   sorry -- if you do find enough DNA, what would you do next?

5   A    If we do find enough DNA to move forward, if we do meet

6   that minimum threshold, we move on to what's known as DNA

7   amplification.  That's the process in which we copy very

8   specific locations along your DNA chain, hundreds of millions

9   of times.  A good analogy would be -- it's a little outdated,

10  but if you take a phone book we're copying very specific names

11  and addresses and phone numbers.  We're not copying the whole

12  book.  We're copying one name on page 500, one page on

13  page 300, et cetera.

14          And the last step is known as DNA typing.  DNA

15  typing is a process in which we run that amplified or copied

16  DNA through a machine which allows us to visualize it and it

17  creates a DNA graph for us in which we can then conduct our

18  analysis and interpretation.

19  Q    Is DNA typing the same as building a DNA profile?

20  A    Yes.

21  Q    In testing evidence, does the lab ever find mixtures of

22  DNA?

23  A    Yes.

24  Q    What does that mean?

25  A    A mixture of DNA is DNA from more than one person in a

1   single sample.

2   Q    When testing evidence from an armed robbery, for example,

3   does the lab develop known profiles?

4   A    Yes.

5   Q    Of whom?

6   A    It would indicate -- so something like an armed robbery,

7   it would develop a DNA profile from the potential victim or

8   something.  If it was a robbery from somebody's house, they

9   would develop DNA profile from the person who lives in the

10  house so that their DNA is expected to be on any particular

11  item we're searching for so we don't think that they're part

12  of the evidence.

13  Q    I want to direct your attention to 2019.  Were you

14  involved in the review of evidence related to a case OCME lab

15  number FB1807813?

16  A    Yes.

17  Q    How did you get assigned to that review?

18  A    That case was associated with other cases that I was

19  assigned to write up.

20  Q    So who is responsible for performing the DNA analysis of

21  the results of this case, you or someone else?

22  A    Someone else.

23  Q    And then following that other person's analysis, what did

24  you do?

25  A    I received the file, I went page by page starting with

1    the evidence examination notes, followed that case -- excuse

2    me -- followed the notes and all of the information in the

3    file all the way through to the end of the case.  I then came

4    up with my own conclusions and results based on what I read in

5    the file and then confirmed that those were reflected in the

6    report written by another analyst.

7    Q    Is what you're describing otherwise known as a case

8    review?

9    A    Yes.

10   Q    In general, what type of paperwork is prepared in

11   preparation in connection with DNA testing?

12   A    There are evidence examination notes.  There are notes

13   from all of the test batches.  So all of the DNA extraction

14   steps, all the quantitation steps, et cetera, each one of

15   those steps has a particular set of paperwork.  If a DNA

16   profile was developed, we would have a copy of that DNA graph

17   in the file, any sort of statistical analysis and, finally, a

18   DNA case report.

19   Q    And in addition to FB1807813, did you also conduct either

20   a review or analysis associated with OCME lab numbers

21   FB1808029, FBS1901089 and FBS1901092?

22   A    Yes, I performed the primary analysis in those three

23   files.

24   Q    And remind the ladies and gentlemen of the jury again,

25   what's the difference between an "FB" number and an "FBS"

1  number?

2  A    An "FB" number refers to evidence so items taken from a

3  crime scene, whereas an "FBS" number refers to DNA taken from

4  an individual.

5  Q    Now, let's turn to the evidence that was submitted to the

6  OCME for testing.  Overall, how many items were submitted to

7  OCME for possible testing?

8  A    I'm sorry.  In which specific case?

9  Q    In all of those cases, if you know.

10  A    I believe 7813 had one swab and I don't remember the

11  exact number, I apologize, of 8029.

12  Q    That's okay.  Were there multiple items that were

13  submitted to OCME for testing?

14  A    Yes.

15  Q    Was every item tested?

16  A    No.

17  Q    Why not?

18  A    It's OCME laboratory policy when a case comes in that a

19  maximum of three swabs from any particular case are tested up

20  front as a first round of testing.  We do that because when an

21  item, when a case comes in, an experienced supervisor will

22  review all the items that are submitted and determine the

23  three swabs that they believe have the best chance of

24  developing a DNA profile.  We don't have the resources or the

25  time to test every possible item that comes in so we

Goldstein - direct - Selden                665

1   essentially, do a case triage and try to take the three best

2   up front.

3   Q    Is follow-up testing allowed by OCME if requested?

4   A    Yes.

5   Q    And who's allowed to make a request for follow-up

6   testing?

7   A    Either the prosecution or the defense is allowed to

8   request testing.

9   Q    Have you, in fact, conducted follow-up testing for

10  defense previously?

11  A    Yes.

12  Q    The ultimate decisions, that being the supervisor who

13  makes the ultimate decision for testing, are you a part of the

14  factors or the discussion about those factors when that

15  ultimate decision is made?

16  A    No.  That's done before the evidence is examined or

17  anybody is involved writing up the case.

18  Q    Based upon your training and experience, do the police

19  swab every surface of a crime scene for DNA?

20  A    No.

21  Q    I want to turn back to that initial FB number as being

22  FB1807813.

23         During the course of your testing, were you able to

24  develop any DNA profiles from the sample associated with that

25  particular testing?

Goldstein - direct - Selden                    666

1  A    No.

2  Q    And what was the sample of?

3  A    It was a swab from the handle of the left lid of a

4  dumpster.

5  Q    After the sample was extracted, what is STR DNA typing?

6  What exactly is that?

7  A    That's -- STR DNA typing is the process by which we

8  amplify or copy the DNA and then run it through that machine

9  that allows us to visualize it and create that DNA graph.

10 Q    And, specifically, do you happen to remember the voucher

11 number for that DNA?

12 A    No.

13 Q    Is there anything that would refresh your recollection?

14 A    A copy of my case report would refresh my recollection.

15          MR. SELDEN:  Your Honor, for the witness' purposes

16 only, Mr. Villanueva, can you please put up on the screen what

17 has previously been produced to the defense as OCME-MG-3500-2

18 for the witness only, please, and I'm going to be turning to

19 page 3 of 4 for the defense just for where we're looking.

20 Q    Please take a look at this particular item and then look

21 up at me once you're done it.  Bear with me for a moment,

22 please.

23          (Pause.)

24          MR. SELDEN:  It looks like we might have some

25 technical difficulties there.  Mr. Villanueva, if we can

1  please turn to the actual ELMO, if you will, for the witness

2  only, please.  Thank you very much, Mr. Villanueva.

3  Q    Do you see the screen in front of you, Mr. Goldstein?

4  A    Yes.

5  Q    I'm just going to be pointing to what's marked as

6  3500-MG-2, page 3, we're looking specifically at the first

7  page, I apologize, the physical copy is just the first page.

8          Does that help refresh your recollection with

9  regards to the particular item that I was just making

10  reference to?

11 A    Yes.

12 Q    And what -- and how does it refresh your recollection?

13 A    The voucher number for that particular item is written on

14 the case report.

15 Q    And do you recall that voucher number at this time?

16 A    Yes.

17 Q    What do you recall that voucher number to be?

18 A    4000625254.

19 Q    And a moment ago, you had made reference to one

20 particular swab as it relates to this particular analysis.  Do

21 you recall whether or not there was one swab or multiple swabs

22 for this particular analysis?

23 A    I apologize.  There was a second swab submitted for this

24 case.

25 Q    And we'll get to that second swab in a moment, but if you

1    could just walk the ladies and gentlemen of the jury through,

2    as it relates to the DNA analysis, the ability to compare the

3    DNA analysis associated with that voucher number, that being

4    5254, can you explain the process even if you had known

5    suspects, could you compare it to the suspect lid that was

6    swabbed, that being the lid of the dumpster?

7    A    No.  Even if a known person's DNA profile was developed,

8    there was no profile developed from the evidence.  So if

9    there's no profile developed from the evidence, there's

10   nothing to compare the profile from the known person to.

11   Q    And a moment ago, you had described an additional swab.

12   Who was that additional swab of if you recall?

13   A    Sharon Sanchez.

14   Q    So could you compare Ms. Sharon Sanchez, one way or the

15   other, to the lid of the dumpster?

16   A    No.

17              (Continued on next page.)

18

19

20

21

22

23

24

25

669

1   Q    All right.  I want to turn beyond that particular

2   analysis.  Did you conduct --

3              THE COURT:  Mr. Selden, as you're moving on, maybe

4   it's a good time to take a break.

5              MR. SELDEN:  Absolutely, Your Honor.  Thank you,

6   Your Honor.

7              THE COURT:  Okay.  Ladies and gentlemen, it is time

8   for the luncheon recess and we will take that recess.  The

9   most important rules continue to apply.

10             Don't discuss the case amongst yourselves or with

11  anyone else.  Continue to keep an open mind.  Don't use the

12  luncheon period as an opportunity to conduct any research of

13  any kind, electronic or otherwise, even remotely touching on

14  this case, much less directly.

15             Again, we're always concerned about media accounts

16  and those media accounts can include things that pop up on

17  Facebook and Instagram and other of those social media

18  platforms so be especially attuned to that and if something

19  does pop up in any way that relates to this case, tune it out.

20  Do not read it or look at it.

21             The radio silence rule also continues to apply.

22  You're not to communicate with anyone, electronic, face to

23  face, by writing or anything else, about anything that goes on

24  in this trial or any of the personalities, any of the issues.

25  The fact that you're a juror, the fact that you're coming to

670

1   downtown Brooklyn and I know that today, being such a

2   delightful day, it bears some patience.  So don't let anybody

3   know you're enjoying a delightful day down in downtown

4   Brooklyn, but we will take that luncheon break.

5           Again, the cafeteria is available and there are

6   plenty of places can you go to using the good sunlight that's

7   out there to enjoy.  We'll ask you to come back to the Central

8   Jury Room between 2:15 and 2:30 and we'll get started as close

9   as we can to that time.  Again, we always appreciate your

10  patience, your cooperation, your sacrifice and your

11  attentiveness.  I look forward to seeing you after lunch.

12  Enjoy your lunch.

13          (Jury exits.)

14          THE COURT:  Criminalist Goldstein, you may step down

15  and enjoy your lunch as well.

16          THE WITNESS:  Thank you, Your Honor.

17          (Witness steps down.)

18          THE COURT:  All right.  The usual rules apply.  If

19  you want to leave your materials, you may.  William will lock

20  up the courtroom.  If you need them, take them with you and

21  we'll see you between 2:15 and 2:30.

22          MR. SELDEN:  Thank you very much, Your Honor.

23          THE COURT:  You're welcome.

24          (Luncheon recess.)

25

671

1                     AFTERNOON SESSION

2           (In open court; outside the presence of the jury.)

3           THE CLERK:  Court is back in session.

4           Counsel for both sides present including the

5    defendant.

6           THE COURT:  All right.  Are we ready to go?

7           MR. SELDEN:  On behalf of the government, yes,

8    Your Honor.

9           THE COURT:  Defense as well?

10          MR. STEIN:  Yes.

11          THE COURT:  All right.  We will have Mr. Goldstein

12   reseated and get the jury.

13          MR. SELDEN:  Absolutely.  Thank you, Your Honor.

14          (Witness MATTHEW GOLDSTEIN resumes the stand.)

15          (Jury enters.  )

16          THE COURT:  Be seated, please.  Counsel will

17   stipulate that the jury is present and properly seated.

18          MR. SELDEN:  On behalf of the government, yes, thank

19   you, Your Honor.

20          MR. STEIN:  Yes, Judge.

21          THE COURT:  Thank you, Counsel.

22          Ladies and gentlemen, welcome back.  I hope you had

23   a chance to enjoy a good lunch.  We are ready to resume for

24   the afternoon session.

25          Criminalist Goldstein has resumed the stand.  If you

1    recall, when we broke, we were on Mr. Selden's direct

2    examination and Mr. Selden may continue that examination now.

3           MR. SELDEN:  Thank you very much, Your Honor.

4    DIRECT EXAMINATION (Continued)

5    BY MR. SELDEN:

6    Q    Good afternoon again, Mr. Goldstein.

7    A    Good afternoon.

8    Q    Mr. Goldstein, before we broke, I believe we had left off

9    with regards to questions about the lid of a dumpster.

10          In addition to the lid of a dumpster, was any

11   additional testing done by the OCME regarding swabs on a grip

12   of a gun?

13   A    Yes.  In a different case number but yes.

14   Q    Let's turn to that different case, shall we?

15   Specifically, if you could briefly describe to the ladies and

16   gentlemen of the jury, was DNA found on the grip of a gun in a

17   different case?

18   A    Yes.

19   Q    And was that case related to the swab of the duster in

20   the other three cases that you described earlier on this

21   afternoon?

22   A    Yes.

23   Q    Do you recall the voucher number associated with the grip

24   of the gun as you sit here today?

25   A    No.

Goldstein - direct - Selden                  673

1   Q     Would there be anything that would help refresh your

2   recollection with regards to that voucher number?

3   A     A copy of my case report for that case.

4         MR. SELDEN:  Your Honor, at this time, the

5   government would ask, for the witness only, if Mr. Villanueva

6   is so kind to place up on the ELMO for the witness only, a

7   copy of what we will note for the defense is 3500MG-3, page 1

8   and 2 for the witness only.

9         Mr. Villanueva, if I may proceed with utilizing the

10  ELMO.  Thank you.

11  Q     Mr. Goldstein, if you could please take a look at what

12  has previously been provided to the defense as 3500MG-3 and

13  I'm now going to turn from page 1 to page 2 and just to orient

14  you, I'm going to orient down three lines.  Please take a look

15  up at me if you've had an opportunity to review.

16        Mr. Goldstein, does that help refresh your

17  recollection with regards to the voucher number that I just

18  asked about?

19  A     Yes.

20  Q     Mr. Goldstein, if you can recall, what was that voucher

21  number?

22  A     6000020947.

23  Q     Thank you, Mr. Goldstein.

24        So let's talk about that particular grip of the

25  firearm and DNA.  Was DNA found on that grip?

1    A     Yes.

2    Q     Were you able to develop one or more DNA profiles?

3    A     Yes.

4    Q     How many DNA profiles were on the grip of that gun?

5    A     The swab of the grip of the gun was, I determined it to

6    be a mixture of three people.

7    Q     How did you make that determination?

8    A     Looking at the DNA graphs from the sample and knowing

9    that any given person can have a maximum of two alleles or two

10   numbers at any given location, one from their mother and one

11   from their father, I was able to determine based on the number

12   of alleles on the DNA graph that that sample came from three

13   people.

14   Q     Are you familiar with the term "Male Donor A"?

15   A     Yes.

16   Q     What exactly is Male Donor A as it relates to those three

17   people?

18   A     Male Donor A is, in our lab, a generic term used to,

19   that's what we call a male profile that we're able to develop

20   from a piece of evidence.  Since we don't know who that male

21   profile is we call it Male Donor A.  It's the equivalent of

22   sort of a John Doe situation.

23   Q     Were you able to determine a Male Donor A as it relates

24   to those three potential individuals?

25   A     Yes.

1    Q    After you developed a DNA profile for Male Donor A, were

2    you able to determine a match for Male Donor A?

3    A    Yes.

4    Q    Did there come a time -- and I want to just, we'll get

5    back to Male Donor A in a moment -- did there come a time when

6    the OCME obtained DNA swabs from Scott Brack and Elgin Brack?

7    A    Yes.

8    Q    Was that before or after Male Donor A had been identified

9    as one of the three contributors that you just discussed?

10   A    I don't remember the exact dates that they were received

11   but the analysis of those two samples were done after the

12   analysis of the evidence.

13   Q    Are you familiar with the individual by the name of

14   Alejandro Deleon?

15   A    Yes.

16   Q    Was Alejandro Deleon Male Donor A?

17   A    No.

18          MR. SELDEN:  Your Honor, at this time, the

19   government would ask to read a stipulation into the record

20   that has been previously provided to the defense and is

21   Government's Exhibit S-3.

22          THE COURT:  You may.

23          MR. SELDEN:  Thank you, Your Honor.

24          Mr. Villanueva, if you can provide the access to the

25   ELMO and I will read this to the ladies and gentlemen of the

1  jury.  For the record, Your Honor, I am reading in

2  Government's Exhibit S-3.

3          It is hereby stipulated and agreed, by and between

4  the United States of America and the defendant Elgin Brack

5  through his attorneys that:

6          On March 8, 2019, Special Agent Tyler Miceli of the

7  Bureau of Alcohol, Tobacco, Firearms and explosives, ATF, and

8  Detective Steven Saint-Hilaire of the New York City Police

9  Department, NYPD, lawfully obtained a sample of the defendant

10 Elgin Brack's DNA by brushing a sterile cotton swab against

11 the inside of his mouth.

12         Special Agent Miceli and Detective Steven

13 Saint-Hilaire packaged the swab as evidence, vouchered it

14 under NYPD Property Clerk Invoice Number 2000852432, and

15 requested that it be tested.

16         The swab vouchered under NYPD Property Clerk Invoice

17 Number 2000852432 was sent to the Office of the Chief Medical

18 Examiner, OCME, for DNA testing without alteration.

19         On March 8, 2019, Special Agent Miceli and Detective

20 Saint-Hilaire lawfully obtained a sample of Scott Brack's DNA

21 by brushing a sterile cotton swab against the inside of his

22 mouth.  Special Agent Miceli and Detective Saint-Hilaire

23 packaged the swab as evidence, vouchered it under NYPD

24 Property Clerk Invoice Number 2000852446, and requested that

25 it be tested.

                    Goldstein - direct - Selden                677

1           The swab vouchered under NYPD Property Clerk Invoice

2    Number 2000852446 was sent to the OCME for DNA testing without

3    alteration.

4           The swabs contained in NYPD Property Clerk Invoice

5    Numbers 2000852432 and 2000852446 were tested by the OCME.

6    The testing is documented in OCME certified file numbers

7    FBS19-1089 and FBS19-1092.

8           This stipulation marked as Government's Exhibit S-3

9    is admissible in evidence.

10          Dated:  Brooklyn, New York, February 27, 2020, and

11   agreed and consented to by the parties.

12          THE COURT:  The stipulation is received in evidence.

13          MR. SELDEN:  Thank you very much, Your Honor.

14          (So marked.)

15   Q    Did you do DNA testing analysis on those particular

16   samples?

17   A    I'm sorry.  Can you say the question again?

18   Q    Sure.  Did you do DNA analysis on those samples?  And I

19   apologize for having misspoken.

20   A    Yes.

21   Q    Have you reviewed the entire case files as well as the

22   results associated with that analysis?

23   A    Yes.

24   Q    Did you reach any conclusions?

25   A    Yes.

Goldstein - direct - Selden                     678

1    Q    Before we get to those conclusions, when OCME receives a

2    suspect sample, how is it processed?

3    A    It goes through the same process that any evidentiary

4    sample would go through.  It's examined and then goes through

5    the four steps of the DNA process being extraction,

6    quantitation, amplification and type.

7    Q    Let's turn to the testing done on the DNA done for Scott

8    Brack.  Was OCME able to develop a profile for Scott Brack?

9    A    Yes.

10   Q    Was OCME able to reach any conclusions about that DNA

11   compared to the items we have discussed today?

12   A    Yes.

13   Q    Before we get to those conclusions, remind us, again, why

14   you could not reach a conclusion on the left handle of the

15   dumpster?

16   A    No DNA profiles were developed from the left handle of

17   the dumpster so since no profiles were developed, I could not

18   do any comparisons.

19   Q    Moving forward from that dumpster now to Male Donor A,

20   was that profile, that being of Scott Brack, compared to the

21   testing done regarding the grip of the firearm and Male Donor

22   A's profile?

23   A    Yes.

24   Q    What, if any, conclusions were reached?

25   A    Scott Brack is not Male Donor A and, in fact, Scott

1    Brack's DNA is completely excluded from the, all three

2    contributors of that gun swab.

3    Q    You mentioned all three contributors of that gun swab.

4    Out of those three, was there a mixture percentage of DNA?

5    A    Yes.

6    Q    Can you break down that mixture percentage for the ladies

7    and gentlemen of the jury?

8    A    Male Donor A consisted of 94 percent of the mixture found

9    on the swab of the grip, the second contributor attributed

10   4 percent and the final third contributor contributed

11   2 percent of the DNA.

12   Q    Now, let's turn to the testing on Elgin Brack's DNA swab.

13   Was OCME able to develop a DNA profile for Elgin Brack?

14   A    Yes.

15   Q    If you could briefly describe to the ladies and gentlemen

16   of the jury what, if any, conclusions you reached as it

17   relates to Elgin Brack and Male Donor A?

18   A    I was able to determine that the DNA profile of Elgin

19   Brack matches the profile of Male Donor A.

20   Q    And out of that 100 percent you just described a moment

21   ago, 94 percent, the 6 percent -- the 4 percent and the

22   2 percent, what percentage was Elgin Brack with regards to the

23   mixture that you just discussed?

24   A    He matched Male Donor A which was 94 percent of the

25   mixture.

1  Q     Are you familiar with something called a likelihood

2  ratio?

3  A     Yes.

4  Q     What is a likelihood ratio?

5  A     A likelihood ratio is a statistical comparison used to

6  compare two competing hypotheses to explain a particular

7  scenario.   The best way to explain it is to give an example.

8          So for the example of this case, I mentioned that

9  there were three contributors on the swab of that grip.  So we

10  set up two competing hypotheses.  We set up hypothesis one,

11  that being I would see what is the probability I would see

12  this exact DNA mixture, the one on the swab with the grip.  If

13  it came from Elgin Brack and two unknown people.  We would

14  calculate that probability and put it to the side.  I would

15  then calculate the probability of a second scenario.  What's

16  the probability I would see that exact mixture that we found

17  on the swab of the grip if it came from three unknown people,

18  essentially saying what's the probability I would see this

19  mixture if Elgin Brack was part of the mixture versus the

20  probability I would see this exact mixture if he was not part

21  of the mixture.  We then compared those two probabilities and

22  whichever probability is higher gets more support.

23          (Continued on next page.)

24

25

Goldstein - direct - Selden                    681

1   BY MR. SELDEN (Continuing):

2   Q     And were you able to determine if there was a

3   probability that was higher of those two probabilities?

4   A     Yes.

5   Q     And which one was that?

6   A     It would be the probability that I would see this DNA

7   mixture if it came from Elgin Brack and two unknown persons

8   rather than coming from three unknown persons.

9   Q     Were you able to determine a mathematical amount that

10  that would be more likely than the other probability?

11  A     Yes.

12  Q     What was that amount?

13  A     The DNA mixture found on the swab of the grip is

14  approximately 3.93 quadrillion times more probable if it came

15  from Elgin Brack and two unknown persons than if it came from

16  three unknown persons.

17         This supports that Elgin Brack is included as a

18  contributor to this mixture.

19  Q     Criminalist Goldstein, if you could briefly break down,

20  what does 3.93 quadrillion in layperson's terms mean?

21  A     One quadrillion is a one followed by 15 zeros.

22         We can think a million has one followed by six

23  zeros, a billion is nine zeros, a trillion is 12 zeros, then

24  we get to quadrillion which is 15 zeros.

25         To kind of put it in a little bit of perspective,

1   the distant from planet Earth to Pluto is about 3.2 billion

2   miles.  So, that's 3.2 with nine zeros.  This is a million

3   times further than it is from the Earth to Pluto.  So, you

4   could go from Earth to Pluto and back 500,000 times in 3.2

5   quadrillion miles.  That's a very large number.

6   Q    Mr. Goldstein, apart from the DNA testing work you've

7   performed and reviewed, have you had any other involvement in

8   this investigation?

9   A    No.

10       MR. SELDEN:  Thank you, your Honor.  We have no

11  further questions at this time.

12       THE COURT:  Thank you, Mr. Selden.

13       Any cross?

14       MR. FARRELL:  Yes, Judge, thank you.

15       THE COURT:  Mr. Farrell.

16  CROSS-EXAMINATION

17  BY MR. FARRELL:

18  Q    Good afternoon, Mr. Goldstein.

19  A    Good afternoon, sir.

20  Q    My name is Gary Farrell.  You and I have never met or

21  discussed this case, right?

22  A    No.

23  Q    You said on direct at the beginning of your testimony

24  when you were giving over or providing us with some of the

25  places you've testified at previously, you mentioned several

1    grand juries in several of the boroughs of New York, right?

2    A    Yes.

3    Q    You'd agree, though, grand jury is nothing like a trial.

4    There's no judge, right?

5    A    Correct.

6    Q    No defendant, right?

7    A    No.  It's much easier.

8    Q    Just you, the prosecutor, and people that are battling to

9    stay awake, right?

10   A    Basically, yes.

11   Q    And you also said you testified in that one in Manhattan,

12   the Southern District of New York, correct, in federal court?

13   A    Yes.

14   Q    This will be your first time testifying here in the

15   Eastern District of New York?

16   A    Yes.

17   Q    Welcome to Brooklyn, Mr. Goldstein.

18   A    Thank you.

19   Q    You just graduated fairly recently from University of

20   Virginia -- Virginia Commonwealth University, I'm sorry, in

21   2014, correct?

22   A    Yes.

23   Q    And here, 2020, you're already a criminalist level three,

24   correct?

25   A    Yes.

Goldstein - cross - Farrell                    684

1    Q    A meteoric rise, wouldn't you say?

2    A    It's pretty on par for where we've been in the OCME.  I'm

3    lucky enough that we have the money that spots are available

4    and I've been deemed competent enough to be promoted.

5    Q    You say you were lucky enough there was money for spots

6    available, though I did think you testified on direct that you

7    only are limited to doing certain tasks because of budget

8    constraints, right?

9    A    Yes.

10   Q    For example, in this case -- and we'll get to it a little

11   more -- there were multiple items tested.

12          I should say from the gun that you've been

13   testifying about, there were several swabs taken from several

14   parts of the gun, correct?

15   A    Yes.

16   Q    But you didn't get to look -- you did not look at all of

17   them, right?

18   A    No, we looked at only three.

19   Q    As a criminalist level three, you try to keep current in

20   the field and you read some professional journals, I would

21   think, right?

22   A    Yes.

23   Q    And I see on your impressive curriculum vitae or resume

24   you present sometimes, give presentations, right?

25   A    Yes.

LAM      OCR      RPR

Goldstein - cross - Farrell                    685

1    Q    You list five of them here.  Two of them involve

2    identification of mark of proteins in menstrual blood.

3          Is that right?

4    A    Yes, sir.

5    Q    Is that a subspecialty of yourself?

6    A    That was just -- there was an available research spot and

7    that's what I jumped into.

8    Q    Understood.

9          Would you agree that -- and I believe Mr. Selden

10   asked you about this -- that as part of your duties here, you

11   were provided with a sample from a gentleman named Alejandro

12   Deleon, correct?

13   A    Yes.

14   Q    And if you need your recollection refreshed from the

15   February 8, 2019, report, would you agree that report reflects

16   the fact that you did conclude that there was, in fact, no

17   blood on the back of the cylinder of that gun?

18   A    That's correct, yes.

19   Q    Would you agree that had you found blood, you would have

20   compared it to the victim's blood, correct?

21   A    We would have attempted to type it and, had any profile

22   been developed, we would have compared it to the Mr. Deleon,

23   yes.

24   Q    And that would have been very compelling evidence that

25   Deleon had, in fact, touched the gun of the perpetrator who

Goldstein - cross - Farrell                     686

1    shot him, right?

2    A    That's not for me to say.

3    Q    In fact, you wouldn't -- as you sit here today, you'd

4    agree that you didn't conclude because you didn't make any

5    attempt to compare Deleon's DNA profile with any of the

6    evidence recovered from the gun, correct?

7    A    No, I did compare Mr. Deleon's sample to the swab of the

8    grip.

9    Q    Okay, from the grip.

10              But how about from the barrel, the part of the gun

11   that would have been closest to him if he was running toward

12   the perpetrator?

13   A    We did not test that sample.

14   Q    So, you and your supervisor, I believe you testified you

15   got together and decided, look, we only have enough resources

16   to test a couple parts of the gun or the samples that were

17   given to us, and you decided to test the grip and the trigger

18   guard; is that right?

19   A    It wasn't my supervisor personally.  It was a criminalist

20   level four, who are supervisors in the lab.

21              Part of their job duties are to perform this case

22   triage on all cases that come into the lab.

23   Q    Got it.  But would you agree those were the two places

24   you looked at, the grip and the trigger guard?

25   A    We also did attempt to test to see if there was any blood

1    on the back of the cylinder.

2    Q    When you said three tests before, those were your three

3    in the case, right?

4    A    Yes, the grip, the trigger trigger guard, and the back of

5    the cylinder.

6    Q    So, the swab of the hammer of the gun, not examined,

7    right?

8    A    Correct.

9    Q    Swab of the edges of the cylinder of the gun, not

10   examined, correct?

11   A    Just to be sure, could you -- could I have something to

12   refresh all the swabs listed?

13   Q    You got it.

14         Here's Page 2 of the report that Mr. Selden showed

15   you on direct to refresh your recollection on another issue.

16         Would you agree now having looked at it that --

17         MR. SELDEN:  We're just going to object.  I don't

18   believe that is in evidence at this point.

19         MR. FARRELL:  I'm sorry.  Then it should just be

20   shown to the witness.

21   Q    Have you had a chance to review it, Mr. Goldstein?

22   A    Yes.

23   Q    Would you agree now that you didn't test the swab that

24   was taken from the edges of the cylinder of the gun?

25   A    We did not test that, no.

1   Q     Or the barrel of the gun?

2   A     We did not test that.

3   Q     The back of the cylinder?

4   A     We did test back of the cylinder.

5   Q     You did?

6   A     We tested it for the presence of blood.

7   Q     You're right.  But not for skin cells.

8   A     Because it was scheduled or signed in as potentially

9   blood, the lab policy is if there's no blood we don't send it

10  further for testing.

11  Q     Any opinion on what it might have been, the stain --

12  A     I didn't do the examination myself, so I've never

13  actually seen that swab in person.

14  Q     Even though you signed, it was your name on this report,

15  Matthew Goldstein, correct?

16  A     Yes.

17  Q     And did -- okay.

18        But you didn't actually look at that, you didn't

19  look for the blood yourself?

20  A     No.  I reviewed the examination notes of the analyst who

21  performed the test, but I didn't actually look at the swab

22  itself.

23  Q     And none of the ballistic evidence, I'll call it, the

24  three shell casings or the three cartridges, whatever might

25  have been found on them was never examined by you or anyone in

1    your office; is that fair to say?

2    A    That's correct, they were not tested.

3    Q    Is hair typically something that contains DNA,

4    Mr. Goldstein?

5    A    The shaft of the hair does have some DNA.  Generally

6    speaking, the most DNA is kind of the skin cells that get

7    removed with the follicle of the hair.  But sometimes there is

8    not a follicle associated with the hair.

9         MR. FARRELL:  Mr. Stein, can you point to our

10   client, Elgin Brack?

11   Q    See the gentleman with the dreadlocks?

12   A    Yes.

13   Q    He has a lot of hair, you'd agree, right?

14   A    Yes.

15   Q    And you have used -- in other cases, hair has been a

16   pivotal part of the analysis, correct, in other cases that

17   you've worked on?

18   A    I've personally only, I think, done one case that does

19   hair.  Hair is generally done by a different team within the

20   forensic --

21   Q    I understand.  But there is a team and it is an exam,

22   correct?

23   A    Yes.  Generally, if there's nothing else to test, the

24   hair would be examined.

25   Q    And Profile Donor A here, who you said matched the

1  profile of Elgin Brack, that profile wasn't tested against any

2  hair recovered in this case, as far as you know; is that fair

3  to say?

4  A    I don't know of any hair we received, so I don't think it

5  was tested against anything.

6  Q    Okay.  We'll get to that.  Thanks.

7        By the way, do you know the young lady who testified

8  right before you today, Ms. Tarry, a criminalist from the NYPD

9  criminalist office?

10 A    No.

11 Q    You never met her before?

12 A    No, sir.

13 Q    You don't know if she's the person who swabbed the gun in

14 which you're testifying about?

15 A    Her name may have been in my file, but that's the extent

16 that I know the name, if at all.

17 Q    You said you don't know anything about any hair being

18 discovered in this case, right?

19 A    Or any hair being tested.  If it was mentioned in the

20 report -- excuse me, in any paperwork, I have reviewed it but

21 it's been a while.

22 Q    So, in an attempt to refresh your recollection, I'm going

23 to show you only for your eyes what's previously been marked

24 and shown to the Government as Defendant's Exhibit N.  If you

25 could, take a look at -- I'm going to do a little squiggle

1    there --

2              MR. SELDEN:  Objection, your Honor.

3              MR. FARRELL:  He said he might not remember.

4              MR. SELDEN:  It's not his report.

5              THE COURT:  The proper procedure is to ask him a

6    question; if he can't remember, then refresh it.

7              MR. FARRELL:  Thanks, I'll do it that way.

8    Q    Mr. Goldstein, do you recall whether any clothing,

9    specifically a black hoodie --

10             MR. SELDEN:  Your Honor, may we briefly sidebar?

11             And I apologize, but I think the witness is now

12   reviewing a document I'd like to talk about it at sidebar.

13

14             (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

```
                           Sidebar                      692
```

1              (The following occurred at sidebar.)

2              MR. SELDEN:  Your Honor, as an initial matter, I

3    think the defense is showing an item to the witness that we

4    didn't know what particular item he was showing to him

5    because there was no reference to the actual defense exhibit.

6              THE COURT:  He said N.

7              MR. SELDEN:  I'm sorry.

8              The reality is this is Daphne Mavris' report, this

9    is not Mr. Goldstein's report.  So, trying to refresh a

10   witness with another criminalist's report we don't believe is

11   a proper form of refreshing.

12             MR. FARRELL:  Judge, I respectfully submit I could

13   show him anything.

14             THE COURT:  Yes.

15             MR. FARRELL:  I could show him an old baseball card.

16             THE COURT:  I don't have a problem with that.

17             MR. SELDEN:  Your Honor, where it relates, though,

18   the way he is describing the report -- I believe if he would

19   ask him if he were to show him a baseball card, Do you

20   recognize the baseball card or know anything about the

21   baseball card, if the witness says respectfully no, it ends

22   the inquiry; if there's follow-up of, Is there anything that

23   would refresh you, I think that's the appropriate line.

24             THE COURT:  I think that's where we're at, aren't

25   we?

Sidebar                                            693

1          MR. FARRELL:  Yes.

2          MR. SELDEN:  Your Honor, I don't know that that's

3    actually been posed to the witness.

4          THE COURT:  Next question, right?

5          MR. SELDEN:  Of course.  Thank you, your Honor.

6          THE COURT:  That was the whole point.

7          MR. SELDEN:  Exactly, your Honor.

8          THE COURT:  This was on the Elmo, right?  It should

9    have been off.

10

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar ends; in open court.)

2          THE COURT:  Ladies and gentlemen of the jury, in

3    the old days, things like this wouldn't happen.  We didn't

4    have any of these fancy screens, you actually had to walk

5    something up to the witness.  But now with the possibility of

6    electronics, things can get made visible that ordinarily the

7    rules say have to wait to be visible at a later point.  So,

8    we ask you to adhere to the rules, we're trying to adhere to

9    them ourselves as well.

10          Mr. Farrell?

11          MR. FARRELL:  Thank you, your Honor.

12   BY MR. FARRELL:

13   Q    Have you had a chance to look at this document,

14   Defendant's N for identification only, Mr. Goldstein?

15   A    Yes.

16   Q    Does it refresh your recollection as to whether or not

17   there was any evidence -- any clothing evidence sent to your

18   office for analysis?

19   A    I don't actually -- I've never seen this document.

20          THE COURT:  The question is whether this refreshes

21   you that you, sitting here now, remember that clothing was

22   sent to your office.

23          THE WITNESS:  No, this does not help refresh my

24   memory.

25   Q    So, as you sit here today, your answer would be to the

1  question, Mr. Goldstein, was any clothing examined by you or

2  your office in connection with this case?

3         THE COURT:  He can only speak for himself.

4         MR. FARRELL:  You're right, Judge.  Sorry.

5  Q    Did you examine any clothing?

6         Were you asked to examine any clothing that was

7  recovered in connection with this case?

8  A    No.

9  Q    And Mr. Goldstein, you would concede you're not here to

10  tell the jury how it is that Elgin Brack's DNA was part of a

11  mixture that ended up on the grip of the gun, correct?

12  A    No, I can't testify to how DNA gets on any item, I'm just

13  here to testify to the results of the testing.

14  Q    Thank you.

15         You, of course, as an experienced forensic biologist

16  and criminalist, are familiar with the concept of secondary

17  transfer, correct?

18  A    Yes, sir.

19  Q    What is it, as much in laymen's terms as you can give it

20  to us.

21  A    So, I think the best way to explain secondary transfer is

22  if I give you an example.

23         So, let's say that I were to shake hands with

24  somebody.  That would be the primary transfer.  My DNA from my

25  hand would transfer to the DNA of the hand of the person that

1    I was just shaking and his DNA would transfer to my hand.

2            Secondary transfer would be if that person that I

3    shook hands with then picked up this box of gloves or picked

4    up a pen, it's possible that some of my DNA from that

5    handshake could be transferred to that box or to that pen

6    without me ever having physically touched the box or the pen.

7            That would be the definition of secondary transfer.

8    Q    Are you familiar with any articles or treatises on this

9    concept?

10   A    Yes.

11   Q    So, you're familiar, then, with Cynthia Cale's study

12   about the secondary DNA transfer entitled Falsely Placing

13   Someone at the Scene of a Crime.

14   A    Yes, sir.

15   Q    And just as you gave a great example, that was exactly

16   her study:  It involved the shaking of hands -- this is

17   preCorona virus -- and then people touching knives and, just

18   as you said, if you and I shook hands and then I touched the

19   knife, your DNA was found on it in a large percentage of her

20   tests, correct?

21   A    Yes.

22   Q    And would you agree, being familiar with the study, that

23   sometimes, even up to 20 percent of the time, you would end up

24   being the main contributor or even the sole contributor on

25   something you never actually touched?

1              Do you recall that?

2  A    I do recall that that was one of the conclusions of the

3  paper.

4  Q    And you would agree, would you not, Mr. Goldstein, that

5  secondary DNA transfer can also happen when someone is wearing

6  gloves, correct?

7  A    Yes, it's possible.

8  Q    Do you believe that -- are you a proponent of changing

9  gloves early and often when doing your examinations?

10 A    Yes.

11 Q    And are you a proponent of making sure that your gloves

12 are sterile, or at least as sterile as possible?

13 A    Yes.

14             I usually bleach my gloves between -- I actually

15 change my gloves between items of evidence, but if I think

16 that I got something, be it potentially blood or any sort of

17 DNA on my gloves, I would spray them with bleach in order to

18 clean them off.

19 Q    And you've testified here as part of the work you did,

20 you created -- you were able to obtain or create -- I don't

21 know if "create" is the right word, but there were profiles

22 for Elgin Brack and Scott Brack in connection with this case,

23 right, DNA profiles?

24 A    Yes.

25 Q    And would you agree with me that there was a sufficient

1  similarity in their alleles, meaning that they had 20 alleles

2  in common that would be consistent with them being blood

3  relatives?

4        Do you recall that?

5  A    I didn't count the number, but blood relatives do share

6  more alleles than two random people in the population.

7  Q    Does that affect the way -- withdraw that.

8        You mentioned a term, it's within your field, we

9  wouldn't know it, Streamix or something like that?

10 A    STRMIX, S-T-R-M-I-X?

11 Q    That's the one.

12       That's to do with mixtures, right, when you're

13 trying to figure out mixtures?

14 A    Yes.  STRMIX is a software program that we use in the lab

15 that helps us kind of split apart the mixtures into individual

16 components, if possible.  And then that's also the software

17 program that calculates our statistic, our likelihood ratio.

18 Q    When there's blood relatives that are possibly in the

19 mix, is that a valid way to test, using that software, as far

20 as you know?

21 A    Yes.  It's been based on -- some of the theories behind

22 STRMIX, it takes into account that there is more -- sorry.

23       It essentially factors in relatedness already, so we

24 don't have to worry about potential blood relatives.

25 Additionally, it does actually calculate a statistic for

1  potential relative, if a potential relative was in the

2  mixture, as opposed to the person of interest.

3  Q    And it's your opinion that Scott Brack's DNA was not one

4  of the contributors.  That's you're opinion, right?

5  A    Yes.  Based on the statistics run through the STRMIX

6  program, yes.

7  Q    Do you have an opinion who the other two people were?

8  A    No, I don't have any idea who the other two people were.

9         MR. FARRELL:  Thank you, sir.  I have nothing

10  further.

11        THE COURT:  Do you want to consult with Mr. Stein

12  first?

13        MR. FARRELL:  Yes, I would, Judge.  Thanks.

14        (Pause in proceedings.)

15        MR. FARRELL:  Judge, if it's okay, I'll ask one more

16  question.

17        THE COURT:  The magic one more question.

18        MR. SELDEN:  As many as Mr. Farrell wants, really.

19  Q    I asked you about the study that Ms. Cale did.  Her first

20  name escapes me for the moment.

21        Do you remember it?

22  A    I believe it's Cynthia.

23  Q    Yes, Cynthia Cale.

24        Would you agree that she's an acknowledged expert in

25  your filed?

1    A    To be honest, I don't know her resume.  She's a published

2    author and her paper was peer-reviewed.  But as far as

3    personal accomplishments, I don't actually know them.

4           MR. FARRELL:  Sorry, Judge, I shouldn't have said

5    one question.

6           THE COURT:  I generally don't hold lawyers to that,

7    Mr. Farrell, but I do reward them when they actually do hold

8    to one question.

9    Q    Are you familiar with her article Forensic DNA Evidence

10   is not Infallible?

11   A    Yes.

12          MR. FARRELL:  Thank you.  Nothing further.

13          THE COURT:  Thank you, Mr. Farrell.

14          Mr. Selden, any redirect?

15          MR. SELDEN:  Absolutely.  Thank you, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. SELDEN:

18   Q    I'll start off where Mr. Farrell just left off:

19   Ms. Cale's study.

20          Can you explain to the ladies and gentlemen of the

21   jury some of your thoughts on Ms. Cale's study and,

22   specifically, talk to them about some of the factors involved

23   in that study?

24   A    So, as was mentioned before, the conclusions of the study

25   did show that in a high percentage of cases, there was

1    secondary transfer detectable.  However, while those

2    conclusions are scientifically valid based on the experiment

3    she set up, it is my opinion that the experiment she set up

4    actually was more conducive to secondary transfer than your

5    everyday life scenarios.

6              If I may explain.

7    Q    Let me just ask you, this wasn't pulled from everyday

8    life, the actual scenarios she came up with?

9    A    No, these were why specifically designed by her and set

10   up by her.  She instructed volunteers to do specific things

11   for specific amounts of time.

12   Q    Can you briefly explain that to the ladies and gentlemen

13   of the jury?

14   A    In order to -- I apologize.

15             So, she took a group of I believe it was 20 people,

16   paired them off, and they were going to be the primary and

17   secondary contributors to, in this case, I believe a set of

18   knives.  The knives were cleaned properly and sterilized.

19             She had all the volunteers wash their hands to make

20   sure that no foreign DNA was on it.  She then instructed the

21   volunteers to place gloves -- I don't know the precise type of

22   gloves, but some sort of gloves on their hands and to wear

23   those gloves for an hour and a half.  She didn't specify what

24   was done during that hour and a half, but gloves were worn for

25   an hour and a half.

1          Once the gloves were worn for the hour and a half,

2     she then instructed the participants to remove the gloves and

3     immediately shake hands with one another and maintain contact

4     for two whole minutes.  After the two minutes of handshaking

5     was finished, she then instructed the participants to handle

6     these clean and sterile objects for -- I believe it was two

7     minutes at a time.

8     Q     What are the some of the factors there that you think

9     would have caused your expert conclusion that this would be an

10    overrepresentation of secondary transfer DNA?

11    A     When I wear gloves, my hands sweat a lot.  Especially for

12    an extended period of time.  I don't know the specific details

13    of when during the year or what kind of movement they were

14    doing.  But the gloves, because you're wearing gloves, the

15    heat from your hands is trapped.  It will facilitate you to

16    sweat more.  And the more sweat you have on the hands, the

17    more likely you are to shed DNA and transfer that DNA to

18    another person.

19         Additionally, the two minute handshake.  I shake

20    hands for five seconds, seven seconds-ish.  In my opinion, a

21    two-minute handshake does not properly reflect everyday life

22    scenarios.

23

24         (Continued on the next page.)

25

LAM     OCR     RPR

Goldstein - redirect - Selden                703

1    (Continuing)

2    Q    Let's talk about your everyday life scenarios post-CME.

3          Do you see sort of this secondary DNA transfer

4    frequently in your work?  And how would it show up?

5    A    Well, I can never definitively say DNA being anywhere is

6    due to secondary transfer if secondary transfer was as

7    prevalent as the conclusions in Ms. Cale's paper makes it

8    seem, I would expect to see a lot more mixtures of high

9    amounts of people.  If 85 percent of the time secondary

10   transfer occurs, I would expect a lot of evidence to be

11   mixtures of three people, four people, five people.  And I've

12   examined of hundreds if not thousands of pieces of evidence

13   and that's just not the case.

14          I do see mixtures of three and four people, but I

15   also see single-source samples, as well as two-person

16   mixtures, which I don't believe reflects the percentage of

17   85 percent of a secondary transfer rate.

18   Q    Speaking of mixtures, let's turn to the mixture in this

19   case.  We'll start with the 2 percent and the 4 percent.

20          Were you able to determine at all who the 2 percent

21   and 4 percent were associated with?

22   A    No.

23   Q    And why is that?

24   A    Essentially, there was so little data because it's 4

25   percent of that mixture and 2 percent of the mixture, that

1   there was just not enough really to compare -- there wouldn't

2   be enough to really compare and get a usable number.  I did do

3   comparisons when I could, but they basically came to the

4   conclusion that we don't know there's not enough data.

5   Q    And what about that 94 percent of the mixture?

6   A    I'm sorry, what about it?

7   Q    The 94 percent.  Were you able to draw a conclusion as to

8   who that was related to?  Who Male Donor A was?

9   A    Yes, Male Donor A matched the DNA profile of Elgin Brack.

10          MR. SELDEN:  Your Honor, may we just briefly

11   approach which refers to one follow-up matter I'd like to talk

12   at side-bar about?

13          THE COURT:  Side-bar.

14          MR. SELDEN:  Thank you very much, Your Honor.

15          (Side-bar conference held on the record out of the

16   hearing of the jury.)

17

18          (Continued on following page.)

19

20

21

22

23

24

25

Side-Bar                                          705

1              (Side-bar.)

2              MR. SELDEN:  We'll be brief, Your Honor.

3              I believe during Mr. Farrell's cross-examination

4    there was many questions with regards to testing, specifically

5    what was tested and what not was tested.

6              The Government plans to elicit questions and

7    followup as to who requested testing in this particular case

8    and if there was any follow-up testing requested by either

9    side.  I believe the witness has previously testified that

10   both sides are allowed to make a testing request.  We're not

11   planning to opine or ask my further questions in that, but we

12   did want to flag it up here at side-bar before asking that

13   question.

14             MR. STEIN:  Judge, as opposed to follow-up

15   questioning by defense counsel.

16             THE COURT:  By him, I assume if he opens the door to

17   that, then it opens the door to recross.

18             MR. STEIN:  That's not my point, Judge.

19             THE COURT:  Oh.

20             MR. STEIN:  I don't know whether or not this is

21   something that Mr. Selden plans to ask on redirect, or which

22   is not something that I think came out on cross-examination,

23   but putting that aside, the implication from asking questions

24   about whether there was a defense request for followup,

25   although that may be generally permissible, it suggests that

1   we have some burden to do that.

2           MR. FARRELL:  Right.

3           MR. STEIN:  I don't think that would be a proper

4   area, putting aside even the threshold question of whether or

5   not that was subject of cross-examination, which I don't

6   believe it was, from my recollection.

7           MR. SELDEN:  Your Honor, the Government's position

8   is that Mr. Farrell asked on multiple occasions whether or not

9   a sweatshirt was tested, whether or not there was any testing

10  on the gun in particular areas.

11          THE COURT:  Only with respect to what he says he

12  handled.

13          MR. SELDEN:  Yes.

14          And so as a result with regards to that, he was the

15  DNA expert on the case.  If there were any follow-up testing

16  requests would be what we would ask of this particular witness

17  by either side.  And I think his answer would be no, but we

18  wanted to flag it for the Court.

19          THE COURT:  Yes, I think to try to accommodate

20  Mr. Stein's concern, you can ask whether or not either side

21  made a request for testing of the gun without saying which

22  side.

23          MR. STEIN:  Judge, I respectfully I object to the

24  Court's suggestion because that doesn't change the problem of

25  suggesting that in some way we had some burden to request it,

Side-Bar                                                              707

1   whether or not it was a request made by just to put in terms

2   of either side does not change the objection.

3            So I respectfully object to the Court's suggestion.

4            THE COURT:  You still object to that?

5            MR. STEIN:  Yes.  Yes.  Yes, I do.

6            MR. SELDEN:  Your Honor, out of an abundance of

7   caution, the Government will not ask that follow-up line of

8   questioning.

9            THE COURT:  What are you going to ask?

10           MR. SELDEN:  We have some other questions we can ask

11  but not that line.

12           THE COURT:  Okay.  That is fine.

13           MR. SELDEN:  Thank you.

14           (Side-bar end.)

15

16           (Continued on following page.)

17

18

19

20

21

22

23

24

25

1           (In open court.)

2    REDIRECT EXAMINATION (Continuing)

3    BY MR. SELDEN:

4    Q    Thank you, Mr. Goldstein.

5           Mr. Goldstein, you were asked a moment ago on

6    cross-examination about criminalists and specifically the

7    names of criminalists.

8           Do you when you're conducting your analysis actually

9    note the names of the particular criminalists and how you

10   would include that in your findings, if you will?

11   A    No.

12   Q    With regards to the work that you did in this particular

13   case, and I just want to turn back to the reports and the

14   other work that you did.

15          Would you have consulted with particular

16   criminalists as it relates to the OCME's determinations

17   regarding the testing that you conducted?

18   A    I'm sorry.  Can you be more specific?  I'm not really

19   sure what you're asking.

20   Q    Sure, and I'll ask a better question on that.

21          Do you typically confer with criminalists about what

22   you decide to test outside of the OCME or is it within the

23   OCME that ultimate testing decisions are made?

24   A    Sorry.  I'm just --

25   Q    You had mentioned a moment ago that you had supervisors

Goldstein - redirect - Selden                709

1  who were involved in the assessment of particular items that

2  are tested.

3          With regards to that, are there criminalists that

4  you work with, for example, from NYPD during that assessment

5  or is it a determination within OCME?

6  A    It's a determination within the OCME forensic biology

7  department.  The only exception being if an item needs to be

8  tested by multiple departments and which department goes

9  first.

10          An example would be fingerprinting and DNA testing

11  kind of who gets to test first.  But in terms of which

12  specific items we're going to test, that is the sole

13  responsibility of the OCME.

14  Q    Sure.

15          MR. SELDEN:  Thank you.  No further questions,

16  Your Honor.

17          THE COURT:  Mr. Goldstein, is the OCME located in

18  the same building with the criminalists?

19          THE WITNESS:  Which criminalists, Your Honor?  The

20  NYPD?

21          THE COURT:  NYPD.

22          THE WITNESS:  No, sir.  While we share the same

23  name, we are completely different labs and completely

24  different entities.

25          THE COURT:  In different buildings also?

1        THE WITNESS:  Yes.  The NYPD criminalists are all

2   located in Jamaica and my office is in Manhattan.

3        THE COURT:  Mr. Farrell, did you have anything?

4        MR. FARRELL:  I did, Judge.  Hopefully not much.

5   RECROSS EXAMINATION

6   BY MR. FARRELL:

7   Q    Mr. Goldstein, you are not really a big fan of Cynthia

8   Cale's studies, are you?

9   A    I don't believe her studies was an accurate

10  representation of real life, no.

11  Q    You did earlier tell me, though, that you are familiar

12  with the article:  Forensic DNA Evidence Is Not Infallible and

13  don't you agree with me that article was based not on any

14  handshake experiment, but on a guy named Lucas Anderson who

15  was arrested, charged with murder --

16       MR. SELDEN:  Objection, Your Honor.

17  Q    -- his fingernails --

18       THE COURT:  Sustained.  Sustained.

19  Q    Would you agree that not everything Ms. Cale did was

20  based upon a laboratory study with controlled -- with a

21  controlled environment and two-minute handshakes and

22  sterilized knives; right?

23  A    She did mention other scenarios where transfer does

24  happen, yes.

25  Q    Okay.  Thank you, sir.

Goldstein - recross - Farrell                711

1          MR. FARRELL:  Nothing further.

2          THE COURT:  I assume, Mr. Selden, we are concluded.

3          MR. SELDEN:  Yes, Your Honor.  Thank you,

4    Your Honor.

5          THE COURT:  Criminalist Goldstein, thank you very

6    much for your testimony.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  You are excused.

9          (Witness excused.)

10         THE COURT:  Does the Government have another witness

11   for us?

12         MR. SIEGEL:  Yes, Your Honor, at this time the

13   Government calls Seth Mastropaolo and just a moment to bring

14   him in.

15         (Witness enters and takes stand.)

16         THE COURTROOM DEPUTY:  Please raise your right hand.

17

18         (Continued on following page.)

19

20

21

22

23

24

25

Mastropaola - direct - Siegel                    712

1    **SETH MASTROPAOLO**,

2              called as a witness having been

3              first duly sworn, was examined and testified

4              as follows:

5              THE WITNESS:  I do.

6              THE COURTROOM DEPUTY:  Please state your first and

7    last name, spell it for the record.

8              THE WITNESS:  Seth Mastropaolo, -- S-E-T-H,

9    M-A-S-T-R-O-P-A-O-L-O.

10             THE COURTROOM DEPUTY:  Thank you.  Have a seat,

11   please.

12             THE COURT:  Mr. Siegel.

13             MR. SIEGEL:  Thank you, Your Honor.

14   DIRECT EXAMINATION

15   BY MR. SIEGEL:

16   Q    Sir, where do you work?

17   A    I work for the Bureau of Alcohol, Tobacco, Firearms and

18   Explosives.

19   Q    Is that also known as the ATF?

20   A    Yes, it is.

21   Q    What is your title within the ATF?

22   A    I'm a special agent.

23   Q    How long have you been a special agent for?

24   A    Approximately 20 years.

25   Q    Are you a member of any particular teams within the ATF?

VB        OCR        CRR

Mastropaola - direct - Siegel                713

1   A     Yes, I am.

2   Q     What team are you a member of?

3   A     Member of the ATF New York Group Five, otherwise known as

4   Sparta.  It's a joint robbery task force.

5   Q     As part of your role as a special agent with the ATF,

6   have you received training in forensic data extraction of

7   devices including cell phones?

8   A     Yes.

9   Q     And what is forensic data extraction?

10  A     It's a process where we use computer software and it

11  makes a mirror image of whatever information or soft --

12  electronic data is on the cell phone, laptop, GPS device.

13  Devices like that.

14  Q     What training have you received in forensic extractions?

15  A     I received training in various Cellebrite software by the

16  ATF digital forensics branch.

17  Q     And is Cellebrite software?

18  A     Cellebrite is a company that manufacturers various types

19  of software to extract data from -- electronic data from

20  computers, laptops, cell phones, devices like that.

21  Q     Approximately how many cell phones have you extracted

22  data from?

23  A     I've worked on or examined approximately 100 cell phones.

24  Q     Could you describe the training you received to use

25  Cellebrite to extract data from cell phones?

Mastropaola - direct - Siegel                   714

1   A    Yes, personnel from the ATF digital forensics branch

2   provided me with a two-day training course where they teach

3   you the various techniques to extract data or unlock cell

4   phones, and then during that course, you also do practical

5   exercises actually extracting data from cell phones.

6   Q    And have you found that Cellebrite reliably extracts data

7   from cell phones?

8   A    Yes.

9   Q    When you use Cellebrite to extract data from a cell

10  phone, does that generate a report?

11  A    I -- yes, you use the software after the extraction is

12  conducted.  I can generate various reports using that data.

13  Q    What information is in that report?

14  A    It -- basically it's a -- it IDs the device that you've

15  extracted data from.  It tells you what methods you used to

16  extract that data, and then usually from a cell phone you

17  would get text messages, possibly e-mails, different accounts

18  that are saved on the phone, photographs, videos, call logs,

19  things that was nature.

20  Q    After you generate that report or those reports from a

21  cell phone, what do you do with it?

22  A    I would provide it -- the data extraction itself and a

23  copy of the reports on a thumb drive to the case agent or

24  detective working the case.

25  Q    Do you review the report yourself?

Mastropaola - direct - Siegel                715

1    A    Typically if it's for another agent or detective, I do

2    not.  I do sometimes answer questions about it if they have

3    questions or if it's my own investigation, I will review the

4    reports.

5    Q    All right.

6              MR. SIEGEL:  Your Honor, can I approach the witness?

7              THE COURT:  You may.

8              MR. SIEGEL:  So I'm going to hand you Government

9    Exhibit 311, which is in evidence.

10   Q    Do you recognize Government Exhibit 311?

11   A    Yes, I do.

12   Q    And what do you recognize it as?

13   A    It's a cell phone, LG cell phone that I performed an

14   extraction on.

15   Q    And how do you know that you performed that extraction on

16   that cell phone?

17   A    I have signed the chain of custody either removing it

18   from the vault or to conduct the extraction.

19             MR. SIEGEL:  I'd like to show you what's been marked

20   as Government Exhibit 213, just for identification, and

21   Mr. Villanueva, it's going to be on my computer just for the

22   witness.

23   Q    Do you recognize Government Exhibit 213?

24   A    Yes, I do.

25   Q    And how do you recognize it?

Mastropaola - direct - Siegel                716

1   A    It's the beginning of the actual extraction report for

2   the cell phone.  It's the first page of it.

3   Q    And I'm just going to blow up the very first section of

4   it for you to get a better look at it.

5              Are you able to tell which cell phone this is a

6   forensic examination report for?

7   A    Yes.

8   Q    And which cell phone is this a forensic examination

9   report for?

10  A    It's item number 3, which is the cell phone here.

11  Q    And what are you looking at on the report to determine

12  that this is your report for that cell phone?

13  A    The case number is listed as well as the evidence item

14  number.

15  Q    And what is the case number?

16  A    765055-19-0011.

17  Q    And is that same number written on Government

18  Exhibit 311?

19  A    Yes, it is.

20  Q    And you mentioned evidence number three.  What does that

21  mean?

22  A    Yes.  That corresponds.  It's a unique number for the

23  item of evidence associated with that investigation.  So item

24  number three on the report refers to this item number three as

25  evidence.

VB        OCR        CRR

Mastropaola - direct - Siegel                 717

1   Q    Are you also listed in this report?

2   A    Yes.

3   Q    What are you listed as?

4   A    The examiner.

5   Q    And I'm just showing you the second page of this report.

6           Is this a full report of the -- is this report a

7   full extraction of the phone?

8   A    Yes.

9   Q    And I'm sorry.  These two pages, is this the full report

10  from the phone?

11  A    No.

12  Q    Is this just an excerpt?

13  A    Yes.

14  Q    Is this a true and accurate copy of excerpt from that

15  full report?

16  A    Yes.

17           MR. SIEGEL:  Your Honor, I move to admit Government

18  Exhibit 213.

19           THE COURT:  Any objection?

20           MR. STEIN:  No.

21           THE COURT:  Received without objection.

22           (Government's Exhibit 213 received in evidence.)

23           MR. SIEGEL:  May I publish this to the jury?

24           THE COURT:  You may.

25           (Exhibit published.)

Mastropaola - direct - Siegel                718

1   BY MR. SIEGEL:

2   Q    So I'm zooming in on the section that is marked as

3   logical on page 2.

4   A    Yes.

5   Q    What is the cell phone number for this phone that you

6   were doing the extraction for?

7   A    It's the 1336692 -- excuse me -- 902236.

8   Q    Is that what's listed next to the MSISDN?

9   A    Yes.

10  Q    You stumbled there.  That's the 1-336-690-2236?

11  A    Correct.

12  Q    Right above it there's a field for IMEI that I'm

13  highlighting.

14  A    Yes.

15  Q    Without reading the actual number, just generally, what

16  is an IMEI?

17  A    IMEI is the unique number that identifies the cell phone

18  to the carrier or provider.

19  Q    So if someone has a cell phone and they change their

20  phone number, would the IMEI change?

21  A    No.

22  Q    So I'm going to go back to the first page.

23       (Exhibit published.)

24  Q    And again on the first page I'll blow up the section that

25  says logical.

VB        OCR        CRR

Mastropaola - direct - Siegel                    719

1          And at the top there's lines say extraction start

2     date/time?

3     A    Yes.

4     Q    What is that referring to?

5     A    That refers to the date and time that the computer

6     portion of the extraction started or the examination.  So the

7     phone would have been connected to the laptop that's going to

8     run the software to conduct the extraction.

9     Q    And what time zone is that in?

10    A    New York time zone.  Eastern Standard Time.

11    Q    So here it says 12/13/2018, 1534.  Then it says minus

12    05:00.

13         What does that minus 05 mean?

14    A    That refers to UTC time which is unified time

15    coordinated, which UTC is a time that's set that -- it

16    eliminates all time zones.  So 1:00 o'clock in Paris would be

17    1:00 o'clock in New York and 1:00 o'clock in Hawaii.  Just

18    makes the global time one time.

19    Q    So does the minus 5 convert UTC to New York time?

20    A    Yes, it does.

21    Q    So 15:34, is that 3:00 o'clock?  3:34 in New York?

22    A    Yes.

23    Q    In the afternoon.

24         I'm going back to the second page again, the logical

25    section of the second page.

1                    (Exhibit published.)

2    Q    There's a phone date/time?

3    A    Yes.

4    Q    What is the phone date/time?

5    A    The phone date/time is the time that's actually set on

6    the phone, what the phone will read.  You can change that time

7    depending on where you are, and it's just saying at the time

8    of the extraction, the phone was set to 1534.

9    Q    Does that match the time from the extraction time and

10   date on the first page?

11   A    Yes, it does.

12   Q    And does that indicate that the date and time on the

13   phone is set correctly?

14   A    Yes.  They're coordinated or synchronized.

15   Q    And again, would that minus five, would that mean this

16   has been adjusted for New York time?

17   A    Yes, it does.

18              MR. SIEGEL:  So I'd like to show just the witness

19   what's been marked as Government Exhibit 215 for

20   identification.

21   Q    Just look up when you're done looking at that first page

22   and I'll page through to the second page.

23              Do you recognize Government Exhibit 215?

24   A    Yes, I do.

25   Q    And how do you recognize Government Exhibit 215?

1  A    It's a summary of user accounts that are extracted from

2  the phone.

3  Q    And what does that mean?

4  A    It's a -- the person using the phone has various accounts

5  such as eBay, Facebook.  You can save user account information

6  to the phone, that way when you access those accounts through

7  the phone, it automatically logs in and gets your information.

8  Q    Is this a full list of all the user accounts that were

9  saved on the phone?

10  A    Yes.

11  Q    Is this a true and accurate copy of a report of all of

12  the user accounts saved on the phone?

13  A    Yes, it is.

14        MR. SIEGEL:  Your Honor, I move to admit Government

15  Exhibit 215.

16        MR. STEIN:  No objection, Judge.

17        MR. SIEGEL:  Mr. Stein, I'm not sure if you said no

18  objection.  I didn't hear it.

19        MR. STEIN:  Judge, I'm sorry.  I was focused on

20  something else.

21        THE COURT:  He is offering 215.

22        MR. STEIN:  No objection.

23        THE COURT:  Received without objection.

24        (Government Exhibit 215 received in evidence.)

25        MR. SIEGEL:  Thank you, Your Honor.

Mastropaola - direct - Siegel                   722

1          I'm going to go to the very last account on page 4

2    of the exhibit.  And this is in row 23.

3          (Exhibit published.)

4    BY MR. SELDEN:

5    Q    So what service is this a user account for?

6    A    It appears to be an account for Uber.

7    Q    And in the lower right-hand corner in the second cell,

8    what I've blown up, there's a phone number listed.

9          What phone number is that?

10   A    3366902236.

11   Q    Is that the same phone number as the phone number you

12   identified as the phone number for this phone?

13   A    Yes.

14   Q    Is there an email account associated with that Uber

15   account?

16   A    Yes.

17   Q    What is that email account?

18   A    elginbrack5@gmail.com.

19   Q    Okay.  Now I'd like to show you 216.

20         MR. SIEGEL:  And again, this is for identification

21   for the witness only

22   Q    Showing you the first page, just look up when you're

23   done.

24         Do you recognize Government Exhibit 216?

25   A    Yes, I do.

Mastropaola - direct - Siegel                    723

1   Q     How do you recognize Government Exhibit 216?

2   A     It's a list of internet searches, history on -- from the

3   phone.

4   Q     Are these all internet searches ever done on this phone?

5   A     No.

6   Q     Is there a time range?  Is there a limited time range

7   that the search is for?

8   A     Yes.

9   Q     What time range would be the searches for?

10  A     For the date of 11/2/18 from 1 a.m. to 7 a.m.

11  Q     Is this a fair and accurate -- excuse me -- is this a

12  true and accurate copy of a report of the searches on this

13  phone for November 26th, 2018, from 1 a.m. to 7 a.m.?

14  A     Yes.

15         MR. SIEGEL:  Your Honor, I move to admit Government

16  Exhibit 216.

17         THE COURT:  Any objection?

18         MR. STEIN:  No.

19         THE COURT:  Received without objection.

20         (Government's Exhibit 216 received in evidence.)

21         (Exhibit published.)

22         MR. SIEGEL:  I'm starting with the exhibit and I'd

23  like to blow up the headers in the first four columns of the

24  table.

25  BY MR. SIEGEL:

Mastropaola - direct - Siegel                724

1   Q    Can you just walk us through what each of those columns

2   are?

3   A    Sure.  Column one is -- it numbers the searches.  So each

4   one will get a different number.

5            The time stamp is the date and time that the search

6   was conducted on the phone.

7            The source would be the search engine used.

8            And the last column, the value, it's the information

9   that was searched on the phone.

10  Q    So just read us through that first row as an example of

11  what that information is.

12  A    So the first search one was conducted on 11/26/2018.  It

13  was conducted on the Chrome Internet Explorer and what was

14  searched was 24-hour stores Jamaica Queens, New York.

15  Q    And what time was that search done?

16  A    4:47 a.m.

17  Q    And after that it says:  UTC time minus 5.

18  A    Correct.

19  Q    Does that mean it's been adjusted to be New York time?

20  A    Correct.

21  Q    Now below that there's a search for 4:41 a.m., so does

22  that mean this is going backwards in time?

23  A    No.  The list is filtered in reverse chronological order.

24  Q    So the first -- chronologically the first search is the

25  one at the end?

Mastropaola - direct - Siegel                725

1  A    Correct.

2         (Exhibit published.)

3  Q    So what time was the first search?

4  A    At approximately 2:34 in the morning.

5  Q    And what was that search for?

6  A    24-hour Family Dollar.

7  Q    And so between 2:34 in the morning and about, I think it

8  was 4:47 was that last one, how many searches were there?

9  A    I have to go back to the last page.

10        Twenty-seven.

11  Q    And are they all for -- well.

12        MR. SIEGEL:  Never mind, Your Honor.  Strike that.

13  Q    Now, is it fair to say that there were other searches

14  conducted on this phone outside that time window of 1 a.m. to

15  7 a.m.?

16  A    Yes.

17  Q    Are they reflected in this report?

18  A    No.

19  Q    And in addition to these searches and the user accounts

20  that we've looked at, is there also other data that was saved

21  on this phone?

22  A    Yes.

23        MR. SIEGEL:  Okay.  Thank you very much.

24        No further questions.

25        THE COURT:  Thank you very much, Mr. Siegel.

1              Any cross?

2              MR. FARRELL:  Yes, Judge, thank you.

3              THE COURT:  Mr. Farrell.

4    CROSS EXAMINATION

5    BY MR. FARRELL:

6    Q    Good afternoon, Special Agent Mastrapaolo.

7    A    Yes.

8    Q    I'm Gary Farrell.

9              We've never met or discussed the case; right?

10   A    No.

11   Q    The phone of Elgin Brack, that's what we're talking

12   about, the extraction; right --

13   A    Right.

14   Q    -- for this phone.

15             You didn't have any trouble getting into it, did

16   you?

17   A    No.

18   Q    No secret password or anything like some iPhones have?

19   A    No.

20   Q    How far back in years or months did this extraction go in

21   terms of pulling out data?

22   A    That, I don't know.  It's whatever was on the phone.

23   Q    So if he had the phone for four years, it's everything

24   that was on that; right?

25   A    Not necessarily.  He could have deleted or somebody could

1  have deleted information on the phone.

2  Q    And the data, the type of data that is extracted would

3  include any text message he ever sent or received; is that

4  true?

5  A    Not necessarily.  If it's been deleted or overwritten, it

6  wouldn't be there.

7  Q    Right.  But those are the things that would keep it from

8  being there.  If it wasn't deleted, it would be there; right?

9  A    Yes.

10  Q    How about e-mails?  Assume they weren't deleted.  Would

11  they show up in this extraction?

12  A    Only if it was on the phone.  If they use various email

13  applications, it wouldn't show up.

14  Q    How about social media like Facebook or Instagram if

15  photos were posted?

16  A    Yes.

17  Q    That would show up, right, in this extraction?

18  A    Yes.

19  Q    And I don't know that you know the answer, but this was a

20  lot -- if you had to put it in pages like your extraction

21  report that Mr. Selden asked you about, that's only four

22  pages.

23         Would you agree with me that if you put it on pages,

24  all the stuff that came out of his phone would be like 2500

25  pages; is that fair to say?

1  A    It depends how much information's on the phone.  It would

2  be different for every extraction.

3  Q    But since you did this extraction, don't you have an idea

4  what it was?

5  A    No.

6  Q    Why not?

7  A    I don't analyze the data.  I merely do the extraction.

8  Q    So the case agent, Special Agent Miceli would have had

9  that; right?

10  A    Either the case agent or the detectives.  They would have

11  access to it.

12  Q    You were also asked to do the same type of extraction to

13  Scott Brack's phone; correct?

14  A    I don't know whose phone -- who the phones belong to.

15  Q    Well, it wasn't just this phone that you were asked to

16  work on in connection with this case; right?

17  A    Correct.

18  Q    You know, we all have -- most of us, I guess -- have

19  contacts in our phone; right?  Certain names and numbers?

20  A    Sure.

21  Q    Is that something that's extractible and was it

22  extractible in this case?

23  A    I believe so, yes.

24  Q    I'm sure you wouldn't remember but I'll ask you.  If I

25  was to direct you to a certain phone number in Scott Brack's

1  contacts, would you have any idea of who it was without seeing

2  it?

3  A    No.

4  Q    Okay.

5          MR. FARRELL:  Your Honor, with the Court's

6  permission, I'm referencing Brack discovery 00509.  If

7  Mr. Bennett, who has it on his laptop, could approach the

8  witness and show him that contact for purposes of refreshing,

9  that's our request.

10          THE COURT:  Show it to the Government first.

11          MR. FARRELL:  Yes, of course.

12          (Pause in the proceedings.)

13          MR. FARRELL:  Mr. Bennett, show him 509 and 512, and

14  that's all my inquiries about that.

15          (Pause in the proceedings.)

16  BY MR. FARRELL:

17  Q    Okay.  Special Agent, now that you've seen the contact

18  info, would you agree that Scott Brack had a name Boogie

19  associated with this phone number (201) 887-4960?

20          MR. SIEGEL:  Objection.

21          THE COURT:  Sustained.

22          You can ask him about his knowledge and whether that

23  refreshes him about his knowledge.

24          MR. FARRELL:  I see.  I don't know that it will, but

25  I'll try.

1    Q    Did you look at -- does that refresh your recollection

2    about your knowledge of this guy Scott Brack's contacts?

3    A    No.

4    Q    Because you never really looked at it; right?

5    A    Never looked at the -- never analyzed that data.

6

7              (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. FARRELL:  (Continuing)

2   Q    Okay.  We'll try it another way through another witness.

3   I just have a few more.  You can step back, Mr. Bennett.

4   Thanks for your help.

5            Now, this extraction report that's in evidence

6   showing various things like Uber, et cetera, right, that stuff

7   you're familiar with, right?

8   A    Yes.

9   Q    By the way, one of those reports, one of the things

10  that's on that extraction report that's in evidence as

11  Government's 215, would you agree with me that number 9 is a

12  city, is a Wells Fargo, a reference that he had a Wells Fargo

13  app on his phone or something?  Do you understand that?

14  A    I didn't look at that.

15  Q    Okay.  Well, I'm showing you the first page of what's in

16  evidence or an exact copy of what's in evidence.  Want to look

17  at number 9?

18            MR. FARRELL:  This is in evidence.  Everyone can see

19  this one.

20  A    I don't see number 9.

21  Q    You don't see number 9?

22            MR. STEIN:  It stopped at 7.  You have to push the

23  page up.

24  A    There it is.

25  Q    Have you got it now?

1    A    Yes.

2    Q    You agree it's Wells Fargo?

3    A    Yes.

4    Q    And number 13, can you see?

5    A    No.

6    Q    How's that?

7    A    Yes.

8    Q    And that's a City of New York, that's NYC.gov for

9    employees to check certain things, correct?

10   A    I don't know what -- it is a New York City website but I

11   don't know what it's for.

12   Q    Now, you've talked to the jury about these searches that

13   came in one discrete time period.  Out of everything on the

14   phone, it's on November 26, 2018, for about a period of five

15   hours, there's reference to multiple searches, correct?

16   A    Yes.

17   Q    All similarly titled 24 hour stores.  Some are specified

18   boy areas in Queens like Jamaica, correct?

19   A    Correct.

20   Q    In any of the other -- whatever else is in that phone,

21   did you ever see any other searches like that for 24 hour

22   stores other than that discrete time period from the early

23   morning hours of November 26th?

24   A    That's the only time period I looked at.  I didn't look

25   for anything else.

1   Q    By the way, there's no way of you sitting here can tell

2   the jury who was making those searches on that phone at that

3   time on the early morning of November 26th, correct?

4   A    Correct.

5   Q    Thank you.

6        MR. FARRELL:  I have nothing further -- wait.

7   Q    If I asked you about certain Facebook photos that were in

8   Elgin Brack's report, you wouldn't necessarily have seen them,

9   right?

10       You weren't asked to review things that he put on

11  Facebook, correct?

12  A    I've seen account photos.

13  Q    Account --

14  A    User account photo.

15  Q    You have seen some?

16  A    Yes.

17       THE COURT:  Is that one photo or multiple photos?

18       THE WITNESS:  I believe it was two photos.

19       MR. FARRELL:  Judge, maybe I'll get lucky and these

20  will be those two.

21       THE COURT:  I don't know if you caught it,

22  Mr. Farrell.  He mentioned user account photo.  It doesn't

23  mean anything to me.  I don't know if it means anything to

24  you.

25       MR. FARRELL:  Might not be.

Mastrapaolo - cross - Farrell                734

1          All right.  Well, I'd ask this witness only, please,

2    Mr. Villanueva, for this one.

3    Q    This is marked Government Exhibit 104B-2 just for the

4    purposes of labeling it something at this point.

5          Does this look like a picture you've seen before

6    from the extraction, Special Agent?

7    A    Yes.

8    Q    And is it a fair and accurate representation of what,

9    what you saw?

10   A    Yes.

11         MR. FARRELL:  I'd offer this.

12         MR. SIEGEL:  No objection.

13         THE COURT:  Anything, Mr. Farrell, a number?

14         MR. FARRELL:  Right now, it's GX 104B-2.  We may

15   make it a defense exhibit later, but just so it comes in now.

16         THE COURT:  It comes in.  You may substitute it as a

17   letter later.

18         (Government Exhibit 104B-2 so marked.)

19   Q    So this is a young man -- you don't know Elgin Brack,

20   right?

21   A    No.

22   Q    Okay.  So we'll say it's a young man holding a stack of

23   20s, right?

24   A    Correct.

25   Q    When was the picture posted, do you know?  Is there any

1   way you would know that?

2   A    No.

3   Q    Okay.  I'm going to show you another picture or two and

4   then I think I'm done.

5            This is Defense V, as in "Victor."

6            MR. FARRELL:  Now, witness only, please,

7   Mr. Villanueva.

8   Q    Does that one look familiar, Special Agent?

9   A    No.

10  Q    You never saw that one before?

11  A    No.

12           MR. FARRELL:  I have nothing further then.  Thank

13  you very much.

14           THE COURT:  Any redirect, Mr. Siegel?

15           MR. SIEGEL:  No, nothing from the government.  Thank

16  you.

17           THE COURT:  Special Agent Mastropaolo, you are

18  excused.  Thank you very much.

19           THE WITNESS:  Thank you.

20           (Witness excused.)

21           (Continued on next page.)

22

23

24

25

1          THE COURT:  Ladies and gentlemen, that brings us to

2    the mid afternoon break.  It's a little late but it's daylight

3    savings time so we have extra light.  We are going to take

4    that mid afternoon break.

5          Again, remember because it's important to remember,

6    do not discuss the case amongst yourselves or with anyone

7    else.  Continue to keep an open mind.

8          We'll be back in about 15.

9          (Jury exits.)

10         THE COURT:  Okay.  See you in about 15.

11         (Court is in recess.)

12         (In open court; outside the presence of the jury.)

13         THE CLERK:  Court is back in session.

14         Counsel for both sides are present including

15    defendant.

16         THE COURT:  All right.  Ready to go?

17         MR. SELDEN:  Your Honor, on behalf of the

18    government, we are ready to proceed.  We have a brief

19    housekeeping matter that we wanted to raise for the Court.

20         We anticipate being able to call our next witness

21    who is an out of town witness and so, if possible, we would

22    appreciate if Court would run a little later than we have been

23    to hopefully get him on and off the stand.

24         THE COURT:  We will endeavor to do that.

25         MR. SELDEN:  Besides that, nothing further from the

1    government.  Thank you, Your Honor.

2         THE COURT:  Put your broom away and vacuum cleaner

3    and we're ready to go, please.

4         (Jury enters.)

5         THE COURT:  Be seated, please.

6         Counsel will stipulate that the jury is present and

7    properly seated.

8         MR. SELDEN:  On behalf of the government, yes.

9    Thank you, Your Honor.

10        MR. STEIN:  Yes, Judge.

11        THE COURT:  Thank you, Counsel.

12        Ladies and gentlemen, welcome back.  We're in the

13   home stretch of the afternoon session.  The government advises

14   they have another witness for us and I will ask the government

15   to call this witness now.

16        MR. SELDEN:  Yes.

17        MR. SIEGEL:  Yes, Your Honor.  Before we call the

18   witness, we have two brief stipulations and then we'll call

19   the witness.

20        THE COURT:  Sounds like a plan.

21        MR. SIEGEL:  I'm reading Government Exhibit S-6.  It

22   reads:

23        It is hereby stipulated and agreed by and between

24   the United States of America and defendant Elgin Brack through

25   his attorneys that if an official from Sprint, with knowledge

738

1  of Sprint's recordkeeping practices were called to testify,

2  this official would testify that:

3          One, Government Exhibit 211A consists of a true and

4  accurate copy of an explanation of terms used by Sprint in its

5  records.

6          Government Exhibit 211B consists of true and

7  accurate copies of Sprint records for the locations of various

8  Sprint cell phone towers during the period November 1, 2018,

9  to November 28, 2018.

10          Government Exhibit 211C consists of true and

11  accurate copies of Sprint records for the cellular telephone

12  number (646)765-8741, including records of incoming and

13  outgoing calls made to and received by that number, and of

14  cell phone towers utilized by that number, during the

15  period -- and there's a typo -- during the period during the

16  period November 1, 2018 to November 28, 2018.

17          Government Exhibits 211B and 211C were made at or

18  near the time of the occurrences reflected above and in the

19  records by, or from information transmitted by, a person with

20  knowledge of the matters described therein or were generated

21  by an electronic process of Sprint's recordkeeping system.

22  Making and maintaining such records was a regular part of

23  Sprint's business.

24          Government Exhibits 211A, 211B and 211C, as well as

25  this stipulation marked as Government Exhibit S-6, are

739

1    admissible in evidence.

2            Dated:  Brooklyn, New York, February 27, 2020,

3    signed by the parties.

4            THE COURT:  The stipulation and those exhibits are

5    received without objection.

6            (So marked.)

7            MR. SIEGEL:  I'm going to read another stipulation

8    which is Government Exhibit S-2.

9            It is hereby stipulated and agreed by and between

10   the United States of America and the defendant Elgin Brack,

11   through his attorneys, that if an official from T-Mobile with

12   knowledge of T-Mobile's recordkeeping practices were called to

13   testify, this official would testify that:

14           One, Government Exhibit 212A consists of a true and

15   accurate copy of an explanation of terms used by T-Mobile in

16   its records.

17           Two, Government Exhibit 212B consists of true and

18   accurate copies of T-Mobile records for the cellular telephone

19   (336)690-2236, including records of subscriber information for

20   that number during the period November 1, 2018 to November 28,

21   2018.

22           Government Exhibit 212C consists of true and

23   accurate copies of T-Mobile records for the cellular telephone

24   (336) 690-2236, including records of incoming and outgoing

25   calls made to and received by that number, and of cell phone

740

1  towers utilized by that number, for that number during the

2  period November 1, 2018 to November 28, 2018.

3  Government Exhibits 212B and 212C were made at or

4  near the time of the occurrences reflected above and in the

5  records by, or from information transmitted by, a person with

6  knowledge of the matters described therein or were generated

7  by an electronic process of T-Mobile's recordkeeping system.

8  Making and maintaining such records was a regular part of

9  T-Mobile's business.

10  Government Exhibits 212A, 212B and 212C, as well as

11  this stipulation, marked as Government Exhibit S-2, are

12  admissible in evidence.  Dated Brooklyn New York, February 27,

13  2020, and signed by the parties.

14  THE COURT:  And they are received without objection.

15  (So marked.)

16  MR. SIEGEL:  Your Honor, at this time, the

17  government calls David Magnuson.

18  THE CLERK:  Please raise your right hand.

19  (The witness is duly sworn/affirmed by clerk.)

20  THE CLERK:  Please state your full name.

21  THE WITNESS:  My name is David Magnuson,

22  M-A-G-N-U-S-O-N.

23  THE CLERK:  Thank you.  Have a seat.

24  THE COURT:  You may inquire.

25

1    DIRECT EXAMINATION

2    BY MR. SIEGEL:

3    Q     Good afternoon.

4    A     Good afternoon.

5    Q     Sir, where do you work?

6    A     I'm self-employed.

7    Q     What is it that you do?

8    A     I provide historical geolocation analysis for the legal

9    community.

10   Q     And what does that mean?

11   A     Well, the electronic devises that we all use nowadays

12   contain location information, GPS and things of that nature,

13   as well as the cell phones that we use have an abundance of

14   location information relating to cell towers.

15   Q     You said that you serve the legal community.  What kind

16   of clients do you work for?

17   A     Primarily state and federal prosecutors as well as

18   private law firms.

19   Q     Before you worked providing these services, what is it

20   that you did?

21   A     I was an FBI Special Agent for 25 years.

22   Q     And as an FBI Special Agent, were you a member of any

23   specialized teams within the FBI?

24   A     Yes, sir.

25   Q     What specialized team were you a member of?

Magnuson - direct - Siegel                742

1    A     The name was called Cellular Analysis Survey Team or

2    CAST.

3    Q     What did you do as a member of CAST?

4    A     We provided state and federal law enforcement

5    intelligence agencies with cell site analysis and historical

6    analysis and phone tracking.

7    Q     And did you receive specialized training to be a CAST

8    agent?

9    A     Yes, sir.

10   Q     What training did you receive?

11   A     I received in excess of 500 hours of training from the

12   FBI, from other government agencies, from private

13   telecommunications companies as well as the mobile phone

14   companies, their engineers and their legal compliance

15   personnel as well.

16   Q     As part of your duties as a CAST agent, did you review

17   cell phone records and cell phone cell site location data?

18   A     Yes, sir.

19   Q     And what did you do before you joined the FBI?

20   A     Prior for the FBI, I worked for the Department of Defense

21   procuring technical data for weapons systems training devices

22   for the Navy, Marine Corps and the U.S. Army.

23   Q     And what about before that?

24   A     Prior to that, I was a missile systems engineer for

25   Martin Marietta Aerospace in Orlando, Florida.

Magnuson - direct - Siegel                    743

1    Q    And before that?

2    A    I worked for a company in Long Branch, New Jersey called

3    Electronic Associates where we designed and developed nuclear

4    power plant control systems.

5    Q    And before that?

6    A    Prior to that, I was an electronic technician in the U.S.

7    Air Force.

8    Q    What was your highest rank in the Air Force?

9    A    E-4, sergeant.

10   Q    Were you honorably discharged?

11   A    I was.

12   Q    During your time as a member of that specialized CAST

13   team, did you apply your knowledge and training to

14   investigations handled by the FBI?

15   A    Yes.

16   Q    And is it fair to say in all those cases, you were

17   examining and analyzing cell phone evidence?

18   A    Correct, yes.

19   Q    Have you testified in court before?

20   A    Yes.

21   Q    Approximately how many times have you testified?

22   A    Between actual trials, hearings and sworn depositions,

23   I've testified over a hundred times.

24   Q    And does that include both state and federal court?

25   A    It does.

Magnuson - direct - Siegel                744

1   Q    In any of those 100 plus cases where you testified, were

2   you qualified by a court as an expert in the field of cell

3   site data analysis and geolocation data analysis for cell

4   phones?

5   A    Yes.

6   Q    Have you been qualified as an expert in those fields in

7   the Eastern District of New York?

8   A    I have, yes.

9   Q    About how many times have you testified as an expert in

10  the Eastern District of New York in the past year?

11  A    It's approximately three times in the past year here.

12  Q    And have you also been qualified as an expert in those

13  fields in other courts?

14  A    Yes, sir.

15  Q    Has a challenge to your qualifications as an expert in

16  cell site data analysis ever been successful?

17  A    No, sir.

18            MR. SIEGEL:  Your Honor, at this time, the

19  government offers Mr. Magnuson as an expert in the field of

20  cell site data analysis and geolocation data analysis for cell

21  phones.

22            THE COURT:  Any objection?

23            MR. STEIN:  No.

24            THE COURT:  Again, the tendered expert is

25  acknowledged as an expert which now permits him to offer

1    expert opinion in his field of expertise.

2           Mr. Siegel.

3    Q    So Mr. Magnuson, start us out at a basic level.  How is a

4    cell phone call made?

5    A    Well, when you press "send" on the cell phone, the cell

6    phone is constantly scanning its environment for the

7    strongest, cleanest signal, and it will go to the strongest

8    cleanest signal and connect to the network.  Your phone has

9    two radios in it so we can talk and listen at the same time.

10   It's essentially a walkie-talkie.

11   Q    And what is the role of cell towers in the transmission

12   of cellular telephones?

13   A    Cell towers or cell sites contain the power supplies and

14   radios and the infrastructure, the antennas and such that our

15   phones connect to.

16   Q    So in order to connect to the network, does the phone

17   first have to connect to a cell tower?

18   A    Correct, yes.

19   Q    Will a cell phone always connect to the closest cell

20   tower?

21   A    No.

22   Q    What are some of the factors that will affect which tower

23   a phone connects to?

24   A    Well, a rather large land mass would be one.  An antenna

25   or a cell site which may have a weak signal or a dirtier

Magnuson - direct - Siegel                    746

1   signal would be one other.  A weak battery on your phone might

2   prevent you from connecting to something other than the

3   closest signal or the furthest antenna.

4   Q    But as a general matter, will a phone connect to a nearby

5   cell tower?

6   A    Yes.

7   Q    What information is stored by cell phone companies when

8   someone makes a cell phone call?

9   A    All the cell phone companies maintain all of the activity

10  associated with our cell phones, the date and time of a call,

11  the duration, the direction, and they also capture and store

12  the cell site information which the phone connected to to

13  obtain resources from the network.

14  Q    And what kind of information is that cell site

15  information?

16  A    That's essentially a code which can be then looked up in

17  the cell tower database for the particular company and then

18  you're able to map out and show the exact location of that

19  cell tower as well as the orientation of the antennas on that

20  cell tower.

21  Q    In terms of the records that are kept by the phone

22  companies, does it keep the cell tower every time a call is

23  made?

24  A    Can you repeat?

25  Q    Sure.  In terms of the information that's kept by the

1   cell phone companies, does the cell phone company keep a

2   record of the cell tower for every time a phone call is made?

3   A    Yes, sir.

4   Q    What about when someone's using the internet on their

5   phone or doing a search on their phone, would the cell company

6   keep a record of which cell tower was used for that data

7   search?

8   A    Only AT&T keeps data session information with related

9   cell site information.

10  Q    What about Sprint and T-Mobile?

11  A    They do not capture it or provide location or cell site

12  information associated with any data activity.

13  Q    So just phone calls?

14  A    Phone calls and SMS and, text.

15  Q    Were you asked by the government to review certain

16  records in this case to determine the approximate location of

17  certain cellular telephones on November 25th and 26th of 2018?

18  A    I was.

19           MR. SIEGEL:  All right.  I'd like to show the

20  witness, and this is going to be in evidence so we can show

21  everybody, Government Exhibit 211C.

22  Q    Do you recognize Government Exhibit 211C.

23  A    I do.

24  Q    Have you previously reviewed this record?

25  A    Yes, sir.

Magnuson - direct - Siegel                  748

1  Q    And what cellular provider created this record?

2  A    This is a Sprint database for phone number (646)765-8741.

3  Q    And that phone number you just listed, (646)765-8741, in

4  the analysis that you did, did you use any phone, did you use

5  any name for that phone number?

6  A    Yes.  Rather than repeating the ten digit phone number, I

7  just called this, I referred to this phone's activity as the

8  New York phone.

9         MR. SIEGEL:  Your Honor, at this time, I'd like to

10  read one more stipulation.

11         THE COURT:  Sure.

12         MR. SIEGEL:  If we can go back to the ELMO,

13  Mr. Villanueva.

14         It is hereby stipulated and agreed by and between

15  the United States of America and the defendant Elgin Brack,

16  through his attorneys, that:

17         One, Government Exhibit 310 is Scott Brack's

18  cellular telephone, assigned phone number (646)765-8741.

19         Government Exhibit 310 was recovered by a

20  Special Agent of the U.S. Bureau of Alcohol, Tobacco, Firearms

21  and Explosives, ATF, from a gray 2002 Toyota Solara with a New

22  York State license plate HYC8724 on the evening of

23  November 26, 2018.

24         Government Exhibit 310 is in substantially the same

25  condition as it was when it was recovered by the ATF.

Magnuson - direct - Siegel                749

1          This stipulation, marked as Government Exhibit S-10,

2    is admittable in evidence.

3          Dated:  Brooklyn, New York, February 27, 2020, and

4    signed by the parties.

5          THE COURT:  Received in evidence without objection.

6          (So marked.)

7    Q    And Mr. Magnuson, that phone number that we just read in

8    that stipulation, is that what you referred to in your reports

9    as the New York number?

10   A    It is, yes.

11   Q    So if I refer to that as the Scott Brack number

12   occasionally, will you understand what I'm referring to?

13   A    Yes, sir.

14   Q    By the way, why did you call it the New York number?

15   A    Well, this particular phone number has a New York area

16   code, 646.

17         MR. SIEGEL:  I'd like to show the witness another

18   exhibit which is also in evidence which is Government

19   Exhibit 212C.

20   Q    Do you recognize 212C?

21   A    Yes, sir, I do.

22   Q    And what cell phone provider created 212C?

23   A    This is a T-Mobile product.

24   Q    And have you previously reviewed these records?

25   A    I have.

Magnuson - direct - Siegel                    750

1   Q     What phone number are these records for?

2   A     The phone number here is (336)690-2236.

3   Q     In your analysis, did you have a name for that phone

4   number?

5   A     Yes.  For this phone, I referred to it as the North

6   Carolina phone.

7   Q     And why did you call it the North Carolina phone?

8   A     Well, the area code is originated in North Carolina.

9   Q     So in this exhibit, 212C, and the one we looked at a

10  moment ago, 211C, are there call detail records?

11  A     Yes.

12  Q     What are call detail records?

13  A     It's a term in the industry used to refer to the

14  information in the database connected with our phone.  The

15  network computer captures all the information.  This is a

16  T-Mobile call detail record or a CDR.  The Sprint one was

17  their version and they did different formats but they contain

18  mostly the same information.

19  Q     And does that information include the time the call was

20  made?

21  A     Yes, sir.

22  Q     And the number that was called?

23  A     Correct.

24  Q     I'm going to ask you about row K, column K.

25  A     Yes, sir.

1   Q    On the table is listed IMEI.

2   A    That's an acronym for international mobile equipment

3   identifier.

4   Q    And what is that?

5   A    That would be the unique serial number assigned to a

6   handset, a mobile phone handset.

7   Q    So this number, for example, in Row 15, in column K,

8   there's a long string of digits.  Does that refer to a

9   particular device that's being used for this phone number?

10  A    It refers to the North Carolina phone, yes.

11  Q    A device being used with the North Carolina phone number?

12  A    Yes, sir.

13  Q    Is the number for the IMEI unique to a particular phone?

14  A    Yes.

15  Q    And is -- what does the term "check digit" mean in

16  reference to an IMEI?

17  A    In this particular case, I understand that the last digit

18  in the IMEI number is called a check sum and it's used as part

19  of the algorithm designed by the engineers when they're doing

20  their analysis or troubleshooting or research.  It's a

21  technique, software technique, to confirm an identity of the

22  phone.

23        (Continued on next page.)

24

25

Magnuson - direct - Siegel                752

1   BY MR. SIEGEL (Continuing):

2   Q    Is the check digit always -- can a check digit be any

3   number?

4   A    It can be zero or one.

5   Q    So, if an IMEI is shown with all the numbers the same but

6   instead of a zero at the end there's a one at the end, would

7   that be the same IMEI?

8   A    The first 15 digits would confirm that, yes, sir.

9   Q    I just want to ask, scrolling down here, if you look at

10  what's highlighted now as Row 257, if you look down at the Row

11  262, does the IMEI change?

12  A    Yes.

13  Q    Does that mean that whoever was using the North Carolina

14  phone number, they changed devices that they were using?

15  A    It would the appear so, yes.

16       MR. STEIN:  Judge, I object to the form of the

17  question.  It's leading.

18       THE COURT:  It is leading.

19  Q    What does that mean?

20  A    Could you repeat?

21  Q    What does it mean that the IMEI changed?

22  A    It means the hardware changed, the device changed.

23  Q    By "hardware," what do you mean?

24  A    The actual physical phone.

25  Q    In addition to cell site information, does Government

LAM       OCR       RPR

Magnuson - direct - Siegel                753

1    Exhibit 212-C and 211-C -- it's a detail record.

2              Does it include cell cite information?

3    A    Yes, sir.

4    Q    What is "cell cite information?

5    A    It's a term used to describe the information pertaining

6    to cell towers for a particular network.

7    Q    Does it also include information about the location of

8    the cell towers?

9              MR. STEIN:  Judge, objection leading.

10             THE COURT:  I'll allow it to get to the question.

11   Q    Sorry, you can answer the question.

12   A    Can you repeat?

13   Q    Does it also include information about the location of

14   the tower?

15   A    Yes.

16   Q    I'm going to now show you Government Exhibit 212-B, which

17   is in evidence.

18             MR. SIEGEL:  I'm having a brief technical

19   difficulty.  I'm just going to pull it up another way.

20             (Pause in proceedings.)

21             MR. SIEGEL:  Apologies for that.

22   Q    I'm showing you 212-B; specifically, Page 4.

23             (Exhibit published to the jury.)

24   Q    Do you recognize 212-B?

25   A    Yes, sir.

Magnuson - direct - Siegel                          754

1   Q     Is this an exhibit -- is this an item that you reviewed?

2   A     Yes.

3   Q     And what is this fourth page of Government Exhibit 212-B?

4   A     This is subscriber and account information from T-Mobile

5   on a specific account.

6   Q     And which specific account is this the subscriber

7   information for?

8   A     This is for the North Carolina phone.

9   Q     According to the T-Mobile records, who was the listed

10  subscriber for the North Carolina phone?

11  A     A Mr. Elgin Brack.

12  Q     And, so, if I refer to the "North Carolina phone"

13  occasionally as the "Elgin Brack phone," will you understand

14  what I'm referring to?

15  A     Yes, sir.

16  Q     What did the Government ask you to do with regard to

17  these records?

18  A     I was requested to examine the records of two phones over

19  a two-day period and determine which cell towers the phones

20  connected to on certain times.

21  Q     And did the Government provide you with a number of

22  addresses for you to also look at the location of the phones

23  in relation to those addresses?

24  A     Yes, sir.

25  Q     Did you prepare a map of those addresses?

1    A    I did.

2         MR. SIEGEL:  I'd like to just show the witness

3    Government Exhibit 217-A, which has been provided to the

4    defense.

5    Q    Do you recognize 217-A?

6    A    I do.

7    Q    How do you recognize 217-A?

8    A    It's a map that I prepared with addresses which were

9    provided to me.

10   Q    Is this a fair and accurate depiction of where those

11   addresses are?

12   A    It is.

13        MR. SIEGEL:  Your Honor, I move to admit Government

14   Exhibit 217-A.

15        THE COURT:  Any objection?

16        MR. STEIN:  No.

17        THE COURT:  Received without objection.

18        (Government Exhibit 217-A so marked.)

19        (Exhibit published to the jury.)

20   Q    Mr. Magnuson, the addresses shown on this map, do you

21   know what they are beyond that they are addresses?

22   A    No.

23   Q    In addition to these four addresses shown on the map, did

24   the Government also ask you to look at the address of 2008

25   Hughes Avenue on some of the maps?

1    A    Yes.

2    Q    Did you use the call detail and cell site records in

3    Government Exhibits 211-C and 212-C to create additional maps

4    depicting the locations of cell towers that were interacting

5    with the two phones we have been talking about?

6    A    Yes.

7    Q    Was that for November 25 and 26, 2018?

8    A    Correct.

9    Q    And how did you do that?

10   A    I take the cell tower database and I import it into a

11   commercial off-the-shelf mapping software, and then I use the

12   search or the look-up function in the mapping software, and

13   then I search for the tower that's listed in CDR and then map

14   out the cell tower details.

15   Q    And did you combine those maps into a report?

16   A    I did.

17   Q    So, I'm going to show you what's been marked as

18   Government Exhibit 217.

19         Do you recognize Government Exhibit 217?

20   A    Yes, sir.

21   Q    Is this a compilation of the maps you've described?

22   A    Yes.

23   Q    Based on your knowledge, training, and experience in the

24   field of cell cite data analysis and geolocation data analysis

25   for cell phones, do you have an opinion as to whether those

1    maps fairly and accurately represent the locations of the cell

2    towers that interacted with the two phones we've been talking

3    about at specified times on November 25 and 26, 2018?

4    A    I do.

5    Q    What is your opinion?

6    A    I find them to be very accurate.

7         MR. SIEGEL:  Your Honor, I move to admit Government

8    Exhibit 217.

9         THE COURT:  Any objection?

10        MR. STEIN:  No objection, Judge.

11        THE COURT:  Received without objection.

12        (Government Exhibit 217 so marked.)

13        (Exhibit published to the jury.)

14   Q    Let's go through this.  Let's start with the first page.

15        What is this first page?

16   A    This is a cover page to my analysis report, indicating

17   the phone numbers involved in the analysis, date and time, my

18   name, who prepared it.

19   Q    And are the phone numbers the Elgin Brack and Scott Brack

20   phone numbers we were just talking about?

21   A    Yes, sir.

22   Q    Looking now at Page 2, what is Page 2 of this document?

23   A    This is a brief summary background of what was requested

24   of me, laying out the date and time which was requested of me

25   to analyze and laying out the methodology which I used to map

1   out and create the mapping solution slides.

2   Q     Now looking at Page 3, what is Page 3?

3   A     These are written conclusions pertaining to the maps that

4   I produced.

5   Q     So, we'll come back to those at the end.

6         What is Page 4?

7   A     This a legend of sorts.  We're going to be looking at

8   some maps further on in the report, and this gives some

9   insight to anyone who is reviewing the report that when you

10  see this open-winged icon with the little belly on it, it's

11  just suggesting which direction off the tower the phone had to

12  be to create the record it created.

13  Q     So, in terms of what's shown by that -- what you referred

14  to as the signet with the belly and I'll refer to it as the

15  signet with the blue semicircle on the inside, what is that

16  representing?

17  A     It's just representing -- to give whoever is viewing it a

18  visual understanding that the phone is in that direction.

19  Like the one below the arrows, the phone is in that direction

20  in that sector.

21  Q     Where would a cell tower be on that icon?

22  A     Right where the two lines meet.

23  Q     Is the phone necessarily within that blue circle?

24  A     No.

25  Q     What is Slide 5?

1   A     This is an overview, a zoom-out view of Long Island and

2   New York City area showing the concentration of cell sites,

3   cell towers, throughout the area.

4   Q     Are there more cell towers in more densely-populated

5   areas?

6   A     Yes.

7   Q     Why is that?

8   A     There's more users.  You need more antennas to service

9   more users.

10  Q     What is Slide 6?

11  A     It's a typical view of a cell tower mast, showing the

12  antennas at the top of the mast and that the antennas are

13  facing in three different directions.

14            Each cell tower has a service -- is required to

15  service a footprint of 360 degrees.  But since the antennas on

16  the cell tower are directional, they carve it up into three

17  sectors of 120 degrees, and that's what that shows.

18  Q     I'm going to jump ahead to Page 8.

19            What is Page 8 showing?

20  A     This is a top-down view, if you will, of a cell tower, a

21  typical three-sided cell tower.

22            The black dot in the center of the blue circle is

23  the cell tower.  Here, we can see that the sectors are carved

24  up into three sections and just to show that each cell tower

25  is not oriented the same exact way.  They can be -- the

Magnuson - direct - Siegel                    760

1  antennas can be adjusted and pointing in different directions.

2  Q    In this example, each of the three sections, do those

3  each represent an antenna?

4  A    Yes.

5  Q    I'm now looking at Slide 9.

6         What is Slide 9?

7  A    This is an example of the T-Mobile call detail record.

8  Q    And you highlighted or called out certain fields that are

9  shown.

10        Starting with date of call, what is "date of call"?

11  A    That's the exact date captured by the network computer of

12  that particular event.

13  Q    What about "time call"?

14  A    Here again, it's the exact time, date and time, of the

15  call.

16  Q    Does T-Mobile records keep -- does T-Mobile keep their

17  records in any particular time zone?

18  A    T-Mobile provides their records in Universal Coordinated

19  Time.

20  Q    Is that also known as "UTC"?

21  A    UTC or Greenwich Mean Time.

22        And from there, you have to derive your time zone.

23  For instance, Eastern Standard Time is five hours -- minus

24  five hours from UTC.

25  Q    So, for example, if the records say 6 o'clock, to get to

Magnuson - direct - Siegel                761

1   New York you'd have to subtract five to make that one o'clock

2   in New York?

3   A    Yes, you would have to perform that conversion to get the

4   accurate time.

5   Q    Next thing you called out is call direction.

6          What is "call direction"?

7   A    We have either incoming or outgoing, so that's labeled in

8   that column.

9   Q    And further to the right, you have antenna or azimuth.

10         What does that mean?

11  A    That's the particular direction.  If you're looking at a

12  compass, you have zero as north, 180 is south, east is 90,

13  west is 270.  You'll see a number here between zero and 360

14  and that will let you know the center of that sector, where

15  it's pointing.  So, that's how I know how to orientate the

16  icons for the cell site.

17  Q    To go back to Slide 8, on the left there is the sector at

18  the top where it says zero.

19         Would that have a azimuth of zero?

20  A    Yes.

21  Q    And the example on the right, the second says one, it

22  says 30, so that antenna has an azimuth of 30.

23  A    30 degrees, yes, sir.

24  Q    The last call out on Slide 9, it says the latitude and

25  longitude of cell tower.

Magnuson - direct - Siegel                     762

1           What does that mean?

2   A    That's the specific latitude and longitude location of

3   that particular cell tower.

4   Q    What is Slide 10?

5   A    This is similar to the previous slide, but this is

6   Sprint's call detail record.

7   Q    And does "call direction" mean the same thing; incoming,

8   outgoing?

9   A    Yes, sir.

10  Q    And the date and time of call, are there any differences?

11  A    No.

12  Q    Does Sprint use UTC?

13  A    No.

14  Q    So, if there's a call record for someone in New York, do

15  you have to do any conversion to figure out what time that

16  call is in when looking at it?

17  A    No.

18  Q    What about "cell tower data" on the right, what does that

19  mean?

20  A    That's a five-digit Sprint engineering code which refers

21  to the specific cell tower and the specific antenna on that

22  cell tower which the phone connected to in order to obtain

23  resources from the network.

24  Q    Just to go back to the T-Mobile sample, it says "sample."

25           Does this have anything to do with this particular

1  case?

2  A    No.

3  Q    And the sample to Sprint, do those records have anything

4  to do with this case?

5  A    No.

6  Q    So, what is Slide 11?

7  A    I took the raw data from the call detail records for both

8  phones; in this case, it's the North Carolina T-Mobile phone.

9  And I reformatted it and listed all the calls for November 25

10  and November 26, 2018, in chronological sequence for

11  reference.

12  Q    And there are two highlighted numbers and I just want to

13  walk through that.  It says 11/25/2018.

14        Is that the date of this call?

15  A    Yes.

16  Q    There's a time after that of 12:21:03.

17        Has that been adjusted for UTC?

18  A    It has been, yes.

19  Q    So, that would be the time in New York at the time of

20  that call?

21  A    Correct.

22  Q    After that, there's the number two under the column

23  "duration."

24        What does that mean?

25  A    That's the duration of that particular call activity in

LAM    OCR    RPR

Magnuson - direct - Siegel                    764

1    seconds.

2    Q    That's a two-second call?

3    A    Yes.

4    Q    And it's a "voice" call.

5         What does that mean?

6    A    That means it's an actual telephone voice call, not a

7    text message or a data session.

8    Q    Where it says "outgoing"?

9    A    That's the direction.  So, the North Carolina phone made

10   an outgoing call.

11   Q    In this case, who was the North Carolina phone calling?

12   A    Calling a New York phone.

13   Q    The Elgin Brack phone is calling the Scott Brack phone.

14   A    Correct.

15   Q    And on the far right, there's "Cell ENOB."

16        What does that mean?

17   A    That's T-Mobile's internal engineering code identifying

18   the precise tower and antenna which the phone connected to.

19   Q    And the latitude and longitude, what is that?

20   A    That's the location of the cell tower.

21   Q    Going down to Slide 12, is this just a continuation of

22   more phone records for that North Carolina Elgin Brack phone?

23   A    Yes.

24   Q    Slide 13, same thing?

25   A    Continuation, yes, sir.

Magnuson - direct - Siegel                765

1   Q    What about Slide 14?

2   A    This begins the chronological listing of all the calls

3   for the New York phone on 11/25 and 11/26/2018.

4   Q    Is the data that's shown in this the same as what was

5   shown for the North Carolina phone?

6   A    It's similar, yes.

7   Q    Going ahead for the next few slides, are those just

8   continuation of call activity for the New York phone or the

9   Scott Brack phone?

10  A    Yes, sir.

11  Q    So, on Page 21, there's a map.

12       What does this map indicate?

13  A    Here, we're looking at -- date and time is November 25,

14  2018, at 12:21 p.m.  We have, according to the records, North

15  Carolina phone calls the New York phone.  And below that,

16  using the icons system, I'm showing the cell tower and the

17  sector in which each phone connected to at the time of the

18  call.

19  Q    So, based on the mapping that you did and your expertise,

20  do you have a conclusion about whether at 12:21 p.m. on

21  November 25 these phones were near each other?

22  A    Yes.

23  Q    Were they near each other?

24  A    Yes.

25  Q    Were they also near 2008 Hughes Avenue in the Bronx?

Magnuson - direct - Siegel                    766

1    A    It appears so, yes.

2    Q    Going on to Slide 22, will you walk us through Slide 22?

3    A    This is a similar mapping solution on November 26, 2018.

4    At approximately 1:34 a.m., the North Carolina phone called

5    the New York phone.  Here again, I mapped out the sector and

6    the cell tower and the sector which each phone utilized during

7    that activity.

8    Q    Again, do you have any conclusion about whether these two

9    phones were near each other at 1:34 a.m. on November 26?

10   A    Yes, in very close proximity.

11   Q    Approximately where were they, where were the phones?

12   A    In the Heights section of Hoboken, New Jersey.

13   Q    Moving on to the next slide, can you explain that next

14   slide?

15   A    Yes.  The date is, again, November 26, 2018.  The time is

16   3:54 a.m., and we have a call on the New York phone calling

17   the North Carolina line.  And here again, I mapped out the

18   sectors which each phone used and connected to at the time.

19   Q    So, at 3:54 a.m., is that the a call from the Scott Brack

20   phone to the Elgin Brack phone?

21   A    Correct.

22   Q    And, again, do you have a conclusion about whether those

23   phones were near each other at this time?

24   A    I would say that they were again in close proximity.

25   Q    For this call, is that consistent with the North Carolina

LAM      OCR      RPR

Magnuson - direct - Siegel                    767

1   phone being present at that 50-92 Northern Boulevard address

2   at the time that it received a call from Scott Brack?

3   A    It's possible, yes.

4   Q    In addition to being possible, in your opinion, if it

5   were there, would that be consistent with hitting on this cell

6   tower?

7   A    I would say no.

8   Q    Would you be able to conclude whether it was nearby?

9   A    This is a -- you can see the scale at the top right, so

10  there is a very small area.  So, these phones are very close

11  proximity.

12  Q    Slide 24?

13  A    Here's the New York phone on November 26, 2018.  From

14  5 a.m. through 5:57 a.m., we see the New York phone is

15  connecting to towers in Jamaica, Queens.

16  Q    Slide 25?

17  A    Here, it's November 26, 2018, calls at 6:15 a.m. and

18  6:28 a.m., and we see the -- it's in the area of the Bronx.

19  Q    You say "it's."

20          What is "it"?

21  A    Could you repeat?

22  Q    You said "it's" in the area of the Bronx.

23          What is in the area?

24  A    The New York phone is in the Bronx connecting to cell

25  sites in the Bronx at that time.

Magnuson - direct - Siegel                    768

1    Q    What is Slide 26?

2    A    Again, North Carolina phone, November 26, 2018.  The time

3    is 10:48 a.m.  North Carolina phone calls the New York phone,

4    and here we represent the sectors which each phone connected

5    to at the time of the event.

6    Q    And do you have a conclusion about whether these phones

7    were nearby each other at that time?

8    A    I would say that they were in very close proximity, yes.

9    Q    In what area were those phones?

10   A    It appears to be back in the Heights neighborhood in New

11   Jersey.

12   Q    Is that 10:48 a.m. on November 26?

13   A    Correct.

14   Q    What is shown in Slide 27?

15   A    This is November 26, 2018, in the evening, approximately

16   8:40 p.m.  The North Carolina phone calls the New York phone.

17   Q    And, again, do you have a conclusion about whether those

18   phones were nearby each other at that time?

19   A    I would say that they are in close proximity.

20   Q    Do you also have an opinion about whether they are nearby

21   that 2008 Hughes Avenue address?

22   A    Yes, I do.  They are very close to that address.

23   Q    Slide 28?

24   A    It's November 26, 2018.  The time range is approximately

25   8:39 p.m. through 9:21 p.m.  And we're seeing that the New

LAM       OCR       RPR

Magnuson - direct - Siegel                    769

1    York phone is, again, connecting to, utilizing, cell sites in

2    the Bronx, New York.

3    Q    So, at this point, I just want to go back up to your

4    conclusions at the beginning so you can summarize what it is

5    that you saw on these maps.

6    A    Yes, sir.

7    Q    Could you summarize your conclusion for us?

8    A    Yes.  This is a written explanation of the mapping slides

9    that we just saw.

10            So, to go through it, at 12:21 p.m. on November 25,

11   2018, both phones connected to several cell sites in the

12   vicinity of 2008 Hughes Avenue in the Bronx, New York.

13            Number two, at approximately 1:34 a.m. on

14   November 25, 2018, both phones connected to cell sites in the

15   Heights neighborhood in Hoboken, New Jersey.

16            At approximately 3:54 a.m., both phones connected to

17   cell sites in the vicinity of 50-92 Northern Boulevard, Long

18   Island City, Queens.

19            From approximately 5 a.m. through 5:57 a.m., the New

20   York phone was in the area of 115-10 Merrick Boulevard,

21   Jamaica, Queens.

22            Further, at 6:15 a.m. and 6:28 a.m., the New York

23   phone connected to cell sites in the vicinity of 2008 Hughes

24   Avenue, Bronx, New York.

25            At 10:48 a.m., both phones again connected to cell

1    cites in the Heights neighborhood of Hoboken, New Jersey.

2             Later in the evening of November 25, 2018, between

3    approximately 8:30 p.m. through approximately 9:30 p.m., both

4    phones connected to several cell sites in the vicinity of 2008

5    Hughes Avenue, Bronx, New York.

6             MR. SIEGEL:  Your Honor, just one moment.

7             THE COURT:  Surely.

8             (Pause in proceedings.)

9             MR. SIEGEL:  Your Honor, no further questions for

10   this witness.

11            THE COURT:  Thank you, Mr. Siegel.

12            Any cross?

13            MR. FARRELL:  Yes, Judge.  Thanks.

14            THE COURT:  Mr. Farrell.

15   CROSS-EXAMINATION

16   BY MR. FARRELL:

17   Q    Good afternoon, Mr. Magnuson.

18   A    Good afternoon, counselor.

19   Q    We never met or discussed the case, right?

20   A    That's true, correct.

21   Q    It's pretty late in the day.  I'm going to try to keep

22   this quick.

23            Would you say this is about your third anniversary

24   of the Sierra Cellular Analysis Group?

25   A    Yes, sir, I would.

1  Q    And that was after a long and illustrious 25-year career

2  with the FBI, right?

3  A    Yes, sir.

4  Q    I think I heard this correct on direct, you served in the

5  Air Force, correct?

6  A    Yes.

7  Q    You worked for the Army and the Navy, right?

8       Did I get that right?

9  A    I worked for the Department of the Navy, but I worked on

10 Army, Marine and Navy programs.

11 Q    So, if any of the services play each other in football,

12 who do you root for?

13 A    The Trifecta:  I root for them all.

14      THE COURT:  Coast Guard.

15 Q    You said you testified at over a hundred trials; is that

16 right?

17 A    Well over 80 criminal trials and sworn depositions and

18 hearings, yes.

19 Q    Would you agree, though, that many of those trials wasn't

20 in your capacity as an expert in cellular phone stuff, it was

21 during the time when you were working international organized

22 crime cases, right?

23 A    No, sir.

24 Q    You testified as an expert in that number of trials,

25 that's your testimony?

1   A    I've been doing this approximately 13 years, yes, sir.

2   Q    Did you testify -- I'm looking at your CV.  For five

3   years, you were in the international organized crime, you were

4   a member of that squad, right?

5   A    Yes, sir.

6   Q    You testify at all during that time?

7   A    I believe I did, but I didn't incorporate that into my

8   CV, no.

9   Q    Then five years after that you were in the high-intensity

10  drug trafficking FBI task force, right?

11  A    Yes, sir.

12  Q    Is that like Colombian cartels?

13  A    Correct.

14  Q    El Chapo?

15  A    Not quite El Chapo, but...

16  Q    Did you testify for any of that stuff?

17  A    I believe I was in court once or twice with HIDT, yes.

18  Q    Throughout all of these times you testified, it's almost

19  always been for the Government or state court prosecution,

20  right?

21  A    Correct.

22  Q    And the few times you testified for law firms, it's been

23  in civil cases; would that be fair to say?

24  A    Yes, sir.

25  Q    You wouldn't testify for a defendant charged in a

1   criminal case, right?

2   A    Could you repeat?

3   Q    You would not testify for a criminal defendant, correct?

4   A    I would say correct, yes.

5   Q    Even if the price was right?

6   A    Never say never.

7   Q    Speaking of price, is it fair to say that the work you've

8   done in this case, you've received up 'til now or your bill

9   will be in the vicinity of $33,000; is that correct, sir?

10  A    I don't know the exact amount.

11  Q    Well, you can give us a ballpark.

12       I have a feeling it's not 5,000, right?

13  A    Correct.

14  Q    So, it's pretty close to 33,000, the number I just said,

15  right?

16  A    I'll take your word for it.  I really don't know the

17  billing situation.

18  Q    Do you have a staff that does that billing situation or

19  do you do --

20  A    Yes.

21  Q    -- it yourself?  You do.

22       Let me just ask you briefly about your mapping

23  technique.

24       Would you say you use a pie chart mapping technique?

25       Have you ever heard of that term before?

1   A    I've heard the term "pie," yes, a slice of the pie and

2   the open wings, yes.

3   Q    So, you use that, right?

4   A    Yes.

5   Q    It's not the only way to do it, right?

6   A    No, there's different techniques that can be employed,

7   yes.

8   Q    Would you agree that with the way you do it, you don't

9   really get a true frequency because the frequencies aren't

10  linear; isn't that right?

11  A    Could you rephrase?

12  Q    Yes.

13       Describe what the term "pattern of the frequency"

14  means?

15  A    What are you referring to?

16  Q    I'm referring to a phone calling a tower.  So, you can

17  take it from there.

18  A    Pattern of the frequency?

19  Q    How about the term "linear frequency," is that something

20  you ever heard of before?

21  A    No, not in reference to cell phones.

22  Q    You believe you're using the most accurate way to do it,

23  right?

24  A    I believe so.

25  Q    The way you do it with the pie charts?

1  A    Yes, sir.

2  Q    I'm not going to ask you about the charts so much as I'm

3  going to ask you about some of the call details.  And I'm

4  going to start with what we'll call the North Carolina phone

5  on November 25.  I hope you can see that.

6         MR. FARRELL:  It's in evidence, so I think we can

7  play it, Mr. Villanueva.

8

9         (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2    Q    Okay.  This starts at 11:25:18; right?

3    A    I don't have a picture.  Okay.

4    Q    We've got it.  Hopefully we'll fix that.  Got it?

5    A    Yes.

6    Q    So you see just as you described, the calls are detailed

7    by the date and this page is all November 25th.  The time,

8    obviously, varies.  The duration of the call is in seconds;

9    right?

10   A    Correct.

11            (Exhibit published.)

12   Q    And sometimes the word voice appears and as you

13   previously testified, that indicates to call between two

14   phones, right.

15   A    A phone call, yes.

16   Q    A phone call.

17            And for example, at November 25th, 5:29 p.m., that's

18   a text sent outgoing text from the North Carolina phone;

19   right?

20   A    Correct.

21   Q    Then the next ten or twelve entries here, the word other

22   is used.

23            I thought there could only be a call or a text.

24   Apparently, that's not right.

25            What's other in terms of a phone record?

1    A    Well, in regard to the cell site information, it's only

2    provided from voice information on T-Mobile.  So other,

3    T-Mobile does not provide a description of what the term other

4    means in that category.  So it can only be -- I can only

5    describe it as network activity.

6    Q    But can you do any better than that?  What could it

7    possibly mean if it's not a text?

8    A    It could possibly be a data session.

9    Q    Which is what?  A data session?

10   A    Internet.

11   Q    Okay.  On November 25th of 2018, I'm switching to another

12   page now, the very next page.

13            (Exhibit published.)

14   Q    Would you agree with me that at 5:58 p.m. there's a call

15   from the North Carolina phone to the New York phone; right?

16   A    Could you move the slide a little bit.

17   Q    Sure.  Is that better?

18   A    Yes, sir.

19   Q    Do you see the 5:58:59 call?

20   A    I do, yes.

21   Q    And then there's a call right after it, 5:59:36, same

22   call or same destination.  It's the North Carolina phone

23   calling the New York phone; right?

24   A    Yes.

25   Q    And then just after that at 6:00 o'clock and 19 seconds,

Magnuson - cross - Farrell                778

1  same call.  North Carolina phone to New York phone; right?

2  A    Correct.

3  Q    And those are very short calls, two seconds, two seconds,

4  six seconds; correct?

5  A    Correct.

6  Q    By the way, Mr. Magnuson, your life experience, when two

7  people are in the same car, they generally don't call each

8  other; correct?

9  A    I would agree, yes.

10 Q    Would you agree with me that on that same evening,

11 11/25/18, starting at 7:16 p.m. going down to the rest of the

12 page through 9:06:53, those are all other -- how did you

13 describe it before?  If it's not delineated as a text, it's

14 indicative of?

15 A    It could be a data session opening.

16 Q    Okay.  Do you agree that it could be a text also or not?

17 A    No.  And T-Mobile doesn't provide any details on it.

18 Q    Well, I mean, it's all to the same phone number, right,

19 646-541-0915?  Do you agree with that?

20 A    Correct.

21 Q    And that takes us through 9:06:53; correct?

22 A    Correct.

23 Q    And would you agree with me then the next call, after

24 that last activity at 9:06:53 for the North Carolina phone,

25 there is then, essentially, radio silence until 1:34 and 6

VB       OCR      CRR

1    seconds in the morning on November 26th; is that fair to say?

2           It's the next page.

3    A    Could you could you repeat please.

4    Q    Sure.

5           We just saw on the last page of these detail records

6    that the last date of activity on November 25th was denoted at

7    9:06 p.m.  That's it.  9:06 p.m., nothing further until 1:34

8    in the morning; is that fair to say?

9    A    Yes.

10   Q    And this is a call you charted; correct?  The 1:34 a.m.

11   call?

12   A    Yes.

13   Q    And where did your conclusions point that the

14   North Carolina phone was at that point?

15   A    I don't recall.  I'd have to refer.

16   Q    Do you have your reports in front of you or do you

17   need time to do it?

18   A    No, I don't have them in front of me, no.

19   Q    They're in evidence, so we've got them.

20          By the way, Mr. Magnuson, you're not here to tell

21   the jury who was actually using a particular phone at a

22   particular time when a call was made; correct?

23   A    Correct.

24   Q    And the next call there was a call at 1:46 also outgoing

25   from the North Carolina phone to the New York phone; correct?

Magnuson - cross - Farrell                    780

1    1:46 a.m.?  The second one from the top?

2    A    From the bottom.

3    Q    Well, I'm doing it as the top here.

4    A    Okay.

5    Q    Right?

6    A    Yes.

7    Q    Okay.  And then the next call after that was almost two

8    hours later, an hour-and-a-half later, New York call

9    calling -- New York phone calling North Carolina phone at

10   3:54 a.m.; correct?

11   A    I can't see the times, Counselor.

12        MR. STEIN:  You have to slide it over.

13        MR. FARRELL:  How's that?

14        MR. STEIN:  That's it.

15   Q    Can you see it now?

16   A    Yes, thank.

17   Q    And you'd agree then, the time's right?  Goes from 1:46

18   to 3:54 a.m.; right?

19   A    Yes.

20   Q    And then there's no other activity on the call for over

21   six-and-a-half hours.  The next reported call being 10:38 a.m.

22   and 59 seconds; right?

23   A    The activity occurs at 10:38:59.

24   Q    Right.  And again we have those same activity logs or

25   denotations as other.  There's five of them over an

1    approximately 3- or 4-minute time span; right?  All going to

2    that same number, 646-541-0915; correct?

3    A    Correct.

4    Q    And then we jump down to 10:48 a.m. and 48 seconds.

5    There is a 33-second call from the North Carolina phone to the

6    New York phone; correct?

7    A    Correct.

8    Q    And then at 11:42, almost an hour later, another call

9    from the New York phone.  This time from the New York phone to

10   the North Carolina phone; correct?

11   A    Yes.

12   Q    So again, to reiterate an earlier question, you'd agree

13   then that it's unlikely that the two people calling each other

14   are sitting next to each other in a car at that point; right?

15              MR. SIEGEL:  Objection.

16              THE COURT:  If you asked him the question and he

17   answered it --

18              MR. FARRELL:  Right.

19              THE COURT:  -- then it's asked and answered.

20              MR. FARRELL:  I'll leave it alone.  Thanks.

21   Q    But this page then ends -- there's another call at

22   3:04 p.m. from the North Carolina phone to the New York phone,

23   correct, for 7 seconds?

24   A    Yes, sir.

25   Q    And then as you testified on direct and you charted out

1  that call at 8:40 p.m., the North Carolina phone called the

2  New York phone; correct?  And you charted that out and it was

3  in the Hughes Avenue vicinity; correct?

4  A    Yes, sir.

5  Q    Now I'd like to ask you some questions about the New York

6  phone.

7         I'm going to direct your attention to page 2 of

8  the -- going to go to the bottom of page 2.  This is the

9  dated -- is for the New York phone -- November 25th, 2018, at

10 7:02 and 37 seconds p.m. there's a 336-second call from the

11 New York phone to this number:  (201) 887-4960; correct?

12 A    Yes.

13 Q    And the last -- then there's four additional calls

14 reflected on this page, all back and forth between that same

15 number, the New York phone and the what I'll call the 201

16 number; is that right?

17 A    Yes.

18 Q    And you know that 201's a New Jersey exchange; correct?

19 A    Correct.

20 Q    Now I'm going to show you page 3 --

21         (Exhibit published.)

22 Q    -- of this New York call records.

23         The third call down at 12:29, there's a 98-second

24 call from the New York phone to the 201 phone, that same 201

25 phone we've been talking about; right?

Magnuson - cross - Farrell                783

1    A    Yes, sir.

2    Q    Were you ever asked to chart that call, do you recall?

3    A    I don't.  I don't believe I was.

4    Q    And that was for 98 seconds, I think we said; right?

5    A    Yes, sir.

6    Q    And then down a few calls further at 12:51 a.m. and

7    59 seconds, there's a 429-second call again to that same

8    number; is that right?

9    A    Yes.

10   Q    And then down a little further at 1:20 a.m., another call

11   from the New York phone to that Jersey phone.  This time 562

12   seconds; right?

13   A    Yes.

14   Q    Going down to 1:37 a.m. again, there's three calls.  One

15   at 1:37, one at 1:43, one at 1:48, all from the New York phone

16   to the New Jersey phone; correct?

17   A    Correct.

18   Q    And the length of the call is 249 seconds, 175 seconds,

19   41 seconds; correct?

20   A    Yes.

21   Q    Were you asked to chart any of those calls by the

22   Government?

23   A    No, sir.

24   Q    Do they ever tell you who the subscriber was for that

25   particular phone?

1    A    For the 201?

2    Q    Right.

3    A    No, sir.

4    Q    Would you agree that that 201 phone number was called

5    more than Elgin Brack's phone, the phone connected to Elgin

6    Brack, registered to him was called, on November 26th of 2018?

7    A    I hadn't done a frequency analysis.

8    Q    The Government ever ask you to do that in this case;

9    right?

10   A    No, sir.

11   Q    You've been asked to do it in other cases; right?

12   A    Yes.

13              MR. FARRELL:  Okay.  Thanks, nothing further.

14              THE WITNESS:  Thank you.

15              THE COURT:  Okay.  Thank you, Mr. Farrell.

16              Any redirect?

17              MR. SIEGEL:  Nothing from the Government, thank you,

18   Your Honor.

19              THE COURT:  Mr. Magnuson, you're excused.  Thank you

20   very much.  Safe travels.

21              THE WITNESS:  Thank you, Your Honor.

22              (Witness excused.)

23              THE COURT:  Ladies and gentlemen, that brings us to

24   the close of today's session and, of course, that brings me to

25   my important instructions reminders.  Again, do not discuss

Proceedings                                                    785

1   the case amongst yourselves or with anyone else.  Continue to

2   keep an open mind.

3          Do not use the recess period overnight to conduct

4   any research of any kind, electronic or otherwise, to visit

5   any of the locations you heard mentioned during the course of

6   the trial.  To the extent that there are any media accounts,

7   again the broadened definition of media, that include social

8   media platforms, you are to tune it out completely.  You are

9   not to listen to it, watch it, pay any attention to it

10  whatsoever.  Again, I urge you all to try to tune out any

11  media accounts of any legal proceeding for fear that you may,

12  in the course of viewing or listening, may hear things there

13  that might confuse you about what your responsibilities are

14  here.

15         We also are on a no-communication rule, radio

16  silence.  Again, that is all forms of communication, including

17  the face-to-face contact between yourselves and others, but

18  all forms of communication, whether it be telephone or

19  writing, you name it, you are not to mention anything about

20  the case, any of the personalities, any of the issues, the

21  fact that you are a juror, the fact that you come to the

22  courthouse at all.

23         Again, we all appreciate your patience and

24  cooperation and your sacrifice.  We understand that it is a

25  sacrifice and we all appreciate that sacrifice.

Proceedings                                786

1          We bid you to have a pleasant evening.  If the

2    weather people are correct, not going to be as nice a day

3    tomorrow as it was today, but you we hope to see you on time

4    as usual, central jury room at around 9:45.  We will get

5    started as close to that time as we can, and in the interim,

6    we wish you a pleasant evening and we will see you tomorrow.

7          THE JURY:  Thank you.

8          THE COURTROOM DEPUTY:  All rise.

9          (Jury exits.)

10          (In open court; outside the presence of the jury.)

11          THE COURT:  Okay.  It is time for my usual check-in

12    to see where the Government thinks it is in terms of the

13    master plan here.

14          MR. SELDEN:  Thank you, Your Honor.

15          Your Honor, the Government anticipates reviewing our

16    evidence this evening to see if there is anything else minus

17    some stipulations specifically outstanding that we have, but

18    we would expect to rest very early in the morning, if not

19    shortly after the Court's call in of the jury and the

20    stipulation.

21          THE COURT:  Okay.

22          Mr. Stein or Mr. Farrell, you are ready to go

23    tomorrow?

24          MR. FARRELL:  Yes, Judge.  I believe that over the

25    lunch break Mr. Stein was able to advance Criminalist Marvis's

Proceedings                                          787

1   testimony until tomorrow.  We would expect to lead off with

2   her.

3              Mr. Bennet was able to serve the main detective that

4   we were -- to serve his office, the main detective that we

5   want to come in.  We hope he appears.

6              And then Mr. Brack will be ready to testify.  We

7   will some, since it's really late in the day, I don't

8   anticipate any lengthy applications, but there may be one or

9   two before he testifies.

10             THE COURT:  So it is anticipated that Mr. Brack will

11  testify?

12             MR. FARRELL:  Yes, Judge.  It's more than

13  anticipated.  He certainly will.

14             THE COURT:  Then that being the case, let me

15  allocute him now.

16             Mr. Brack, your lawyer has advised me that it is

17  your plan to testify; is that correct?

18             THE DEFENDANT:  Yes.  Yes, sir.

19             THE COURT:  And have you discussed with Counsel

20  whether or not you should testify?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  And you understand of course that you

23  have the absolute Constitutional right to testify if you

24  choose to do so?

25             THE DEFENDANT:  Yes, sir.

Proceedings                    788

1          THE COURT:  And you realize you have the absolute

2    Constitutional right not to testify, to remain silent, and if

3    you were to exercise that right, the Court would instruct the

4    jury that they could not hold your silence against you.

5          Do you understand that?

6          THE DEFENDANT:  Yes, sir.  It will give everybody a

7    fair chance.

8          THE COURT:  And based on those -- all of those

9    understandings and it's under the advice of Counsel, I

10   understand that you voluntarily and freely have chosen that

11   you will take the stand.

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Okay.  Very good.

14         So that could be tomorrow, I suppose.  We will see

15   how things go.

16         We wish everyone a pleasant evening.

17         MR. STEIN:  Judge, I have one thing.

18         THE COURT:  And again, everything will be locked up

19   if you need to keep anything here, and we will see you same

20   time, same place tomorrow.

21         MR. STEIN:  Judge, hopefully it's not presumptuous

22   of me to ask, if not for a ruling, whether you could share

23   your thoughts with us as to whether or not you will allow us

24   to have the two separate and not overlapping summations.

25         THE COURT:  We are still looking at it.  We did not

VB      OCR      CRR

Proceedings                                              789

1   hear anything, as far as I know, Anthony, from Counsel yet.

2   So we are still doing our own thinking but we will try to let

3   you know.  Anthony will, as soon as he and I have had a chance

4   to fully discuss it, we will let both sides know what our

5   thinking is by email.  This way, you will have it hot off the

6   presses as they used to say in the old days.

7            MR. STEIN:  Perhaps this evening, since summations

8   may be Wednesday.

9            THE COURT:  Yes, we still have to have a formal

10  charge conference.  We do have the comments which we

11  appreciate, the comments that Counsel have shared with us on

12  the exposure draft.  But that notwithstanding, we still need a

13  formal charge conference.

14           Probably would make sense whether or not we are

15  complete with testimony tomorrow, probably to do that at the

16  close of business tomorrow, notwithstanding where we might

17  otherwise be and go from there.  And what we will do is we

18  will, if there will -- there will be some corrections, nothing

19  particularly significant, from what I gather, to what the

20  exposure draft was but we will -- Anthony will send you

21  another copy of that.

22           And what we do, we will highlight in yellow things

23  that are different between the exposure draft that you saw and

24  the draft that will be the formal proposal for the charge

25  conference.  So it will hopefully jump out at you; okay?

Proceedings                                                    790

1          Any other housekeeping before we go?

2          MR. SELDEN:  Just briefly.

3          I believe Mr. Farrell made reference to the main

4   detective, but we wanted to confirm who that person was that

5   would be on the defense exhibit.

6          MR. FARRELL:  Finbarr Fleming.

7          MR. SELDEN:  Okay.

8          And then there was a reference to two potential

9   applications tomorrow before the defendant testified.  If

10  there is any preview of those things now, consistent with the

11  Government's request for exhibits, we don't want to slow the

12  process down.  If there was an application, we could either

13  address it now or at least have some knowledge about what

14  might be coming tomorrow before Mr. Brack testifies.  We just

15  inquire before the Court if the Defense wants to put those

16  things on the record now.

17         THE COURT:  You mean the subject area?

18         MR. FARRELL:  Well, Judge, I think one thing is I

19  think I'd like you to revisit the application to play limited

20  portion of Mr. Brack's video.  It's not -- we don't want any

21  audio -- when he's in the ATF office.  It's one thing to say

22  have the agent say, oh, yeah, he signed something left-handed.

23  That's testimony.

24         I think he's entitled or should be entitled to show

25  demonstrative evidence; the same way the Government has

VB        OCR        CRR

Proceedings                                                    791

1    brought in 40 videos, photographs. You can see the agent
2    gives him his pen in his right hand, in Mr. Brack's right
3    hand. He's handcuffed left-handed. Mr. Brack then takes his
4    right hand, puts the pen in his left hand, and he signs
5    handcuffed essentially.

6          I think that shows a real effort and you know that's
7    part of our defense here is that he's not the robber. He's
8    not the shooter. He's a lefty. The shooter is obviously --
9    the robber is obviously a righty. I'm not saying it's the
10   be-all and end-all of defenses, so I suspect -- and I'm going
11   to argue or Mr. Stein will -- it's a -- it's something that
12   goes to his defense here. And I think it's important that the
13   jury not just rely on a throwaway line by Agent Miceli, oh,
14   yeah, he signed lefty. I think they should see it.

15         And there's a two-fold reason that the video's
16   relevant. It shows in clear detail that he was patted down
17   inside the room and money was recovered from his pocket and
18   put on a table in a wad of bills. And I think that's relevant
19   testimony in light of Sergeant Bryan's testimony that he was
20   thoroughly patted down at the scene, and I think this
21   contradicts that, and the jury should be able to see it and
22   make their own evaluation of credibility of Bryan and for what
23   that's worth. I think it has more probative value. I don't
24   see any prejudicial effect here. Everyone knows he was
25   arrested. Everyone knows he was handcuffed.

Proceedings                                    792

1          So that's the main application I was thinking of,

2     Judge.

3          THE COURT:  There were two or one?

4          MR. FARRELL:  Yes, that was one.

5          The other is we request the Government to stipulate

6     what they know to be a fact; that the 201 phone number was

7     Edwin Vasquez's phone number.  If not, we need to recall Agent

8     Miceli, which just to recall him for that thing, which they

9     know is true, doesn't seem the right way to do it.

10         THE COURT:  A stipulation would seem to make the

11    most sense, Mr. Selden.  I urge you to do that rather than

12    waste the jury's time by recalling Special Agent Miceli.

13         MR. SELDEN:  And always, Your Honor, appreciating

14    that the Court very much wants stipulations.  If we could just

15    have some time to think about that proposed stipulation.

16         But I want to get back to the issue of the

17    revisiting of the application.  There's a real reason why the

18    Court denied that application.  In part, it really will

19    mislead the jury into questioning whether or not Elgin Brack

20    made a post-arrest statement, the context of that post-arrest

21    statement.

22         Mr. Farrell is correct, there's undisputed testimony

23    that there was an arrest effected here, but where he, we

24    believe, misses the point is that the Defense and the idea

25    that defendant Elgin Brack was being interviewed or made

Proceedings                                               793

1  statements, did not have to come out, was purposely not

2  elicited throughout the pendency of his trial, and would

3  confuse the jury.

4           More importantly, Agent Miceli testified that he was

5  left-handed.  This is simply an attempt to bolster that

6  evidence and if the agent had forgotten, needed to be

7  refreshed, maybe the Defense could have done that.  But in

8  this particular matter there is no legal basis.  The 40 videos

9  that they're referencing or any videos in this case, there is

10  a lawful basis to bring those things in.

11          They have not cited to a rule or to a law that would

12  permit this and based upon the Court's prior ruling, we

13  believe that it would not be appropriate.

14          Thank you, Your Honor.

15          THE COURT:  Okay.

16          MR. FARRELL:  Very brief response, Judge.

17          It's demonstrative evidence.  A video -- they could

18  have just had the guy testify, oh, I got robbed.  The guy

19  pointed a gun at me, but we wouldn't -- no good lawyer would

20  say that's wrong.  Of course they're allowed to put in the

21  video to show it.  It's the best evidence.

22          This -- just like this is the best evidence of how

23  he signed.  We're not talking about interrogations or

24  interviews.  I'm not going to ask him about that.  It's just

25  the physical action of how he signs that paper and that the

1   cop patted him down.

2          You can reserve, Your Honor, if you'd like.  I

3   didn't make the best application I could have, but I put them

4   on notice, as they asked, and that's where we are.

5          MR. SELDEN:  Nothing further from the Government.

6   Thank you, Your Honor.

7          THE COURT:  Thank you all.

8          Have a pleasant evening.  See you tomorrow.

9          ALL:  Thank you.

10         MR. SELDEN:  Your Honor, one last, actually,

11  housekeeping matter.

12         THE COURT:  Yes.

13         MR. SELDEN:  If the Defense is, in fact, proposing

14  some clip for the Government, we would ask for it this

15  evening, consistent with the Court's prior ruling that all

16  defense evidence, including items that were, for example,

17  either shown for identification purposes, or admitted, be

18  provided to the Government this evening.  And we would ask for

19  them at a reasonable hour.  I don't think 9 o'clock this

20  evening is too late, given that we're now on the verge of the

21  defendant testifying.  Rather than just, for example, saying

22  we have a clip, here's the time.  Actually show us the clip.

23  Show us what they're talking about.

24         We understand this is something the Defense

25  obviously is trying to revisit and, as such, we would ask that

Proceedings                                    795

1  those materials be made available to the Government.

2          THE COURT:  If it is an exhibit, it is an exhibit.

3  It should be exchanged.

4          MR. FARRELL:  Understood.

5          MR. SELDEN:  Thank you, Your Honor.

6          THE COURT:  Anything else?

7          MR. SELDEN:  Nothing further from the Government.

8          Thank you, Your Honor.

9          THE COURT:  We will see you tomorrow.

10          ALL:  Thank you, Your Honor.

11          MR. STEIN:  Judge, I don't know if this is okay for

12  the Marshals.  We're going to be reviewing some physical

13  evidence that the Government has produced for us.  Is it okay

14  if Mr. Brack stays here while we look at that?

15          THE COURT:  That is up to the Marshals.  They have

16  to let him look at it somewhere, so let the Marshals pick

17  where it is.

18

19          (Matter adjourned to Tuesday, March 10th at

20  10:00 a.m.)

21

22                          ooo0ooo

23

24

25

VB      OCR      CRR

796

1                         I N D E X

2    WITNESSES:

3

4        JONATHAN FOX

5            DIRECT EXAMINATION BY MR. SIEGEL          579

6            CROSS-EXAMINATION BY MR. FARRELL          605

7            REDIRECT EXAMINATION BY MR. SIEGEL        613

8        JESSICA TARRY

9            DIRECT EXAMINATION BY MR. SELDEN          615

10           CROSS EXAMINATION BY MR. FARRELL          632

11           REDIRECT EXAMINATION BY MR. SELDEN        644

12       MATTHEW GOLDSTEIN

13           DIRECT EXAMINATION BY MR. SELDEN          648

14           CROSS-EXAMINATION BY MR. FARRELL          682

15           REDIRECT EXAMINATION BY MR. SELDEN        700

16           RECROSS EXAMINATION BY MR. FARRELL        710

17       SETH MASTROPAOLO

18           DIRECT EXAMINATION BY MR. SIEGEL          712

19           CROSS EXAMINATION BY MR. FARRELL          726

20       DAVID MAGNUSON

21           DIRECT EXAMINATION BY MR. SIEGEL          741

22           CROSS-EXAMINATION BY MR. FARRELL          770

23

24

25

797

1                    I N D E X (Continued)

2

3                          Exhibits:

4

5           Government Exhibit 300              589
            Government Exhibit S-3              677
6           Government Exhibit 213              717
            Government Exhibit 215              721
7           Government Exhibit 216              723
            Government Exhibit 104B-2           734
8           Government Exhibit S-6              737
            Government Exhibit 211A             738
9           government Exhibit 211B             738
            government Exhibit 211C             738
10          Government Exhibit 212A             739
            Government Exhibit 212B             739
11          government Exhibit 212C             739
            Government Exhibit S-2              740
12          Government Exhibit S-10             749
            Government Exhibit 217-A            755
13          Government Exhibit 217              757

14

15

16

17

18              *      *      *      *      *

19

20

21

22

23

24

25

          CMH        OCR        RMR        CRR        FCRR