798

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2

 3   - - - - - - - - - - - - - - - X

 4   UNITED STATES OF AMERICA,    :   18-CR-684(ENV)

 5            Plaintiff,          :
                                      United States Courthouse
 6        -against-               :   Brooklyn, New York

 7   ELGIN BRACK,                 :
                                      March 10, 2020
 8            Defendant.          :   10:00 o'clock a.m.

 9   - - - - - - - - - - - - - - - X

10
                         TRANSCRIPT OF TRIAL
11            BEFORE THE HONORABLE ERIC N. VITALIANO
              UNITED STATES DISTRICT JUDGE, and a jury.
12

13   APPEARANCES:

14
     For the Government:          RICHARD P. DONOGHUE
15                                United States Attorney
                                  BY: PHILIP A. SELDEN
16                                    JONATHAN SIEGEL
                                      JONATHAN LAX
17                                Assistant United States Attorneys
                                  271 Cadman Plaza East
18                                Brooklyn, New York

19
     For the Defendant:           JOEL M. STEIN, ESQ.
20
                                  GARY FARRELL, ESQ.
21

22   Court Reporter:              Charleane M. Heading
                                  225 Cadman Plaza East
23                                Brooklyn, New York
                                  (718) 613-2643
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

CMH        OCR        RMR        CRR        FCRR

1          (In open court; outside the presence of the jury.)

2          THE CLERK:  Honorable Eric N. Vitaliano presiding.

3          Case on the calendar is USA versus Brack, case

4    number 18-CR-684 on for jury trial.

5          Will the attorneys please note their appearance

6    beginning with government counsel.

7          MR. SELDEN:  Good morning, Your Honor.  On behalf of

8    the United States, Assistant United States Attorney Phil

9    Selden.  I'm joined at counsel table by Assistant United

10   States Attorneys Jonathan Siegel, Jonathan Lax, Paralegal

11   Specialist Elicia Bates and Detective Steven Saint-Hilaire.

12   Good morning.

13         THE COURT:  Good morning.

14         MR. STEIN:  Good morning, Your Honor.  Joel Stein

15   for Elgin Brack.

16         MR. FARRELL:  And Gary Farrell also for Elgin Brack.

17         THE COURT:  Good morning to you as well.

18         Good morning, Mr. Brack.

19         THE CLERK:  Counsel for both sides are present

20   including the defendant.

21         THE COURT:  Okay.  We have housekeeping matters to

22   attend to in no particular order.

23         Mr. Selden, does the government have anything?

24         MR. SELDEN:  Just to alert the Court that

25   Detective Finbarr Fleming who was requested by the defense is

1  present.  We understand he's outside the courtroom.  He

2  informed government counsel that he actually wasn't served

3  with the subpoena, but we made sure he's here this morning.

4  He's here as we also made sure that Ms. Daphne Mavris, another

5  defense witness, was here.

6          Besides that, no additional matters for the

7  government.

8          THE COURT:  We appreciate the government's

9  assistance in keeping us on schedule.

10          All right.  On defense side, we have open items.

11  Anything further on the open items?  I'll try to remember them

12  all.

13          MR. FARRELL:  Yes, Your Honor.  The defense seeks to

14  elicit, to introduce very small portions of the video at the

15  ATF headquarters showing Mr. Brack being patted down by agents

16  and property being placed on the desk which we think looks

17  like money, it's a wad of money, and then move to another

18  snippet that shows Mr. Brack signing with his left hand even

19  though his left hand is handcuffed.

20          THE COURT:  Does the government want to be heard

21  further?

22          MR. SELDEN:  Briefly, Your Honor.  Your Honor, with

23  regards to that video, we stand not only on our prior

24  positions that it will confuse the jury, also, upon review,

25  there are five law enforcement agents in a room with Mr. Brack

1   and we think it would raise a question as to whether or not he

2   did or did not make statements and also whether or not Scott

3   Brack or anyone else made statements.

4         We're happy to stipulate if the defense has a

5   proposed stipulation about the withdrawal of particular items

6   from him but at this point, we haven't found a reason why

7   those two videos that they've proposed to elicit would be

8   admissible and in the case of the actual signature, there's

9   already testimony that he signed with his left hand.  So we

10  don't think that it would be necessary given the trial

11  testimony to date.

12        MR. FARRELL:  Judge, if I can have the last word

13  since it's my application.

14        THE COURT:  I'm always generous with replies.

15        MR. FARRELL:  You are, Judge.

16        THE COURT:  Overly generous, I'm told.

17        MR. FARRELL:  You totally are and we appreciate it.

18        At the risk of sounding somewhat redundant, it's

19  demonstrative evidence that furthers the point of the left

20  hand signature.  It wasn't like he grabbed a pen and signed.

21  He made a real effort.  He was handcuffed and instead of

22  scribbling something with his right hand, he used his dominant

23  hand and I think that's worth the jury seeing.

24        With regard to the property being removed from him,

25  I think that demonstrative evidence serves to contradict the

1    testimony of Sergeant Bryan that he was thoroughly padded down

2    at the scene of apprehension.  That's the argument, Judge.  I

3    do think it's relevant and I think the government,

4    respectfully, is just speculating about what the jury might

5    infer due to the presence of agents and interrogations about

6    Mr. Elgin Brack or Scott.  There's nothing -- that's just

7    really wild speculation.  We're not going to argue that in our

8    summation.  It's just -- I don't think any prejudicial,

9    possible prejudice to the government outweighs the probative

10   value of this video.

11                  MR. SELDEN:  Your Honor, if I may briefly respond --

12                  THE COURT:  I'm going to have to let Mr. Farrell

13   respond.

14                  MR. SELDEN:  Of course, Your Honor.

15                  With regards to the protective pat down versus a

16   search, I don't think there was any testimony from

17   Sergeant Bryan that someone was searched but that there

18   potentially was testimony about a protective pat down.  I

19   don't know if that was even testified to one way or the other

20   and if the defense can point to the transcript describing the

21   thorough search, we'd be happy to sort of reconsider our

22   position, but if that's the point, to try to impeach

23   Sergeant Bryan, we don't believe there's evidence in this

24   record that would support that.

25                  THE COURT:  Are you tempted, Mr. Farrell?

803

1        MR. FARRELL:  I'm, of course, tempted, Your Honor.

2        There is also the issue that Mr. Brack, as you

3   probably recall, Judge, at the hearing testified that not

4   only, among other things, he had marijuana in his possession

5   that was not found at the scene which one could arguably think

6   would have been found had there been a pat down.  Forget for

7   the moment, I concede Mr. Selden is right.  I don't think the

8   Sergeant said it was a thorough search at the scene but

9   definitely a pat down, and when you see the objects coming out

10  of his pocket, you would think that even a modest pat down

11  would have recovered them and they would have been taken at

12  the scene as opposed at ATF headquarters.

13       THE COURT:  Okay.  The application is denied.

14       To the extent that there is some limited probative

15  value to this, this wonderful discussion on the record

16  establishes convincingly why it shouldn't be admitted.  What

17  police procedures are, whether they were followed, what's the

18  difference between a pat down, a search, a protective pat

19  down, we're not getting into any of that.

20       Whether or not there was money in his pocket is not

21  relevant to the charges here other than to the defense theory

22  that there was no motive to commit this robbery because he had

23  money.  All of that has already been established on the record

24  and the fact that the money was returned to Mr. Brack at the

25  ATF so they had to have it to return it.  When they got it is

804

1    at best, confusing and certainly not probative of anything.

2         To the extent that the video would be, would be

3    impeachment material with respect to the sergeant who was

4    running the lead on the operation, the observations that the

5    take down on Hughes Avenue, it's extrinsic.  So the Court

6    denies the application.

7         MR. FARRELL:  Your Honor, of course, we respect your

8    ruling.  I just want to, so there's no sidebar necessary, I

9    hope I'd be able to elicit that when he signed left-handed,

10   that his hand, that he signed handcuffed.  I think that's a

11   fair comment, is that okay?

12        THE COURT:  Yes.  I have no problem with that.

13        MR. FARRELL:  Okay.

14        THE COURT:  He was obviously arrested.

15        MR. FARRELL:  Right.

16        THE COURT:  There is convincing evidence in the

17   record that he was arrested so the fact that he might be, and

18   I think there's, my recollection, sometimes I go right from

19   the suppression hearing into the trial, that he was

20   handcuffed, that the people taken out of the car were

21   handcuffed besides the little girl.

22        So the fact that he is handcuffed is certainly not

23   new to the record and the fact that he was still handcuffed at

24   the time he signed, you can elicit that.  I don't have a

25   problem with that.

1        Do you have more, Mr. Farrell and Mr. Stein?

2        You made the application for the hybrid closing.

3   Correct?

4        MR. STEIN:  Correct, Judge.

5        THE COURT:  Anyone want to be heard further?

6        MR. STEIN:  Just, again, of course, I never repeat

7   myself but just for emphasis, we are not going to overlap or

8   be repetitive at all.  It will be two separate and distinct

9   arguments.

10       THE COURT:  Poor Anthony is bleary eyed, but we

11  looked high and low including scholarly comment and there are

12  certainly no decisions and no scholarly comment about it one

13  way or the other so the Court concludes that it's probably

14  within my discretion to decide that.

15       Given the dearth of comment, it strongly suggests to

16  the Court that, given its unusual nature, that to the extent

17  it should ever be permitted, that it should be extremely rare

18  and exceptional.  There is nothing extremely rare or

19  exceptional about this case to suggest that a hybrid summation

20  should be permitted so that application is denied.

21       Are there any other pending housekeeping matters?

22       MR. FARRELL:  Yes, Judge, just a couple.

23       Prior to Mr. Brack's testimony, the defense will

24  seek, without objection, I know, to introduce certified

25  business records from the New York City Parks Department and

1   through stipulation, certain bank records of Elgin Brack.

2         What the defense would like to do, Judge, rather

3   than stand at the ELMO and go page after page after page, we

4   made copies for all counsel and the jury of those exhibits,

5   kind of going old school here, Judge.  Would that be okay, if

6   during Mr. Brack's testimony, that we gave the paper copies to

7   the jury?

8         THE COURT:  If they're in evidence by stipulation or

9   otherwise, I have no problem with that.

10        MR. FARRELL:  Okay.  Thank you.

11        THE COURT:  I don't know if you have it in a binder.

12        MR. FARRELL:  It's stapled, Judge.  They're not all

13  that voluminous.

14        THE COURT:  So you're providing one copy for each

15  juror?

16        MR. FARRELL:  Correct.

17        MR. SELDEN:  Are those copies available for the

18  government now?

19        MR. FARRELL:  Yes.

20        THE COURT:  And, again, these are documents that are

21  going in by stipulation?

22        MR. FARRELL:  Yes, Judge.  Right before I ask

23  Mr. Brack any question, we'll put those in.

24        THE COURT:  That's fine.

25        MR. FARRELL:  And Mr. Bennett will distribute them

1    to the jurors.

2          THE COURT: You may have detected during the course

3    of the trial I have no problem with old school. It must be

4    the color of my hair.

5          Any other housekeeping?

6          MR. SIEGEL: Your Honor, I'm sorry, I'm just looking

7    at the exhibit that was handed to us. There are pages

8    missing. I don't know if it's just this copy or it's in the

9    original.

10         MR. STEIN: Judge, I can speak to that. As the

11    Court may recall, when these were sent to me by a third party,

12    there were some pages missing. I sent -- pursuant to the

13    Court's order some time in the middle or end of February, I

14    sent them everything. So they've had it for a couple of weeks

15    and pursuant to the Court's order last evening, I sent them

16    the pages of the actual exhibit which is two periods of

17    Mr. Brack's bank statement, not some other period of time that

18    the government wasn't going to agree to.

19         So there are pages missing. That's what was sent to

20    me and that's what they've had for a while.

21         THE COURT: Sent to you by the bank?

22         MR. STEIN: No, a third party.

23         THE COURT: A third party.

24         MR. SIEGEL: Your Honor, I'm looking at Mr. Stein's

25    e-mail on my phone right now and there are pages in the e-mail

808

1    that he sent that aren't in this exhibit.  So when we came to

2    an agreement in principle on this, it was that the entire

3    statements as he sent them to us for those two periods would

4    come in.

5              It's in the e-mail you sent.

6              MR. FARRELL:  Judge, if that's the case, we'll use

7    the ELMO for the bank records.  Hopefully the government is

8    satisfied that the business records are all there.

9              MR. SELDEN:  Your Honor, if I may add one additional

10   point.  The actual Office of Payroll cover page in the

11   business record cert. certainly has nothing to do with the

12   particulars since we're all stipulating to this.  The actual

13   cover page seems to suggest incorrectly that Elgin Brack is

14   currently employed by and on active payroll with the New York

15   City Department of Parks and Recreation.  We have reason to

16   believe that he actually was no longer employed as of at least

17   January 23, 2019, which is one way to read this cover page.

18             So we would simply ask that these cover pages as

19   well as the business record certification that includes

20   narratives not be included.  They're not germane to his

21   employment.  They're a description that appears not to be

22   accurate with the actual records contained therein.

23             THE COURT:  Mr. Farrell or Mr. Stein?

24             MR. FARRELL:  Judge, first of all, there's no

25   stipulation.  We're moving them in pursuant to the federal

 1  rules of evidence as certified business records so we need the

 2  certification.

 3          There's nothing either inherently flawed or wrong

 4  about the certification.  I don't think anyone is going to

 5  suggest -- I'm not going to ask Mr. Brack are you gainfully

 6  employed as you sit here today because that's certainly not

 7  the case.  It's all about his record up until the time of the

 8  incident.  That's it.  That's why we're offering them.  That's

 9  all we're going to look at, is to show the money he was making

10  as a City employee.

11          MR. SELDEN:  Your Honor --

12          MR. STEIN:  Excuse me.

13          Can I just add Defendant's B which is already in

14  evidence and Defendant's C which is already in evidence

15  through the testimony of Special Agent Miceli are paycheck

16  stubs which, it's hard to tell some of them because one is

17  overlaid on top of another, which look like September,

18  October, August, July and that's part of Defendant's B which

19  is in evidence, and Defendant's C which is also in evidence

20  through Special Agent Miceli is a separated paycheck stub for

21  the period from October 7th to October 20th.

22          THE COURT:  2018?

23          MR. STEIN:  Yes.

24          MR. SELDEN:  Your Honor, the government's not

25  opposing the complete records as Mr. Siegel has just made

810

1    reference to so we would first ask for the complete records,

2    not what we've just been handed, and as a result, we would ask

3    that these not be handed to the jury but our concern is with

4    this cover page.

5           The cover page starts, and I want to read this into

6    the record:  January 23, 2019.  Sent via certified mail.  It

7    continues on to describe:  Copies of the following records are

8    hereby submitted in response to your request.  PMS print

9    screens showing Elgin Brack's record of City employment.

10   These records indicate Elgin Brack is currently employed by

11   and on active payroll with the New York City Department of

12   Parks and Recreation.

13          The business cert. is about the actual records, not

14   about the cover page, and the government is confused as to why

15   the defense would so vehemently want to admit this cover page

16   without real focus on the actual records.  We're not in

17   disagreement that there were pay stubs recovered from Elgin

18   Brack.  Mr. Stein is correct about that.

19          THE COURT:  The certification and the actual records

20   themselves can come in.  The rest not.

21          MR. SIEGEL:  And, Your Honor, this is just one final

22   issue on the bank statements.  On the bank statement, there

23   are some handwritten notes by I understand whoever it is who

24   sent the documents to Mr. Stein.  It just, for example, it has

25   an arrow to the defendant's address and says, "Correct

811

1  address" on it.

2         THE COURT:  They should be redacted.

3         MR. SIEGEL:  They should just be whited out.

4         THE COURT:  If you are going to show them.

5         MR. FARRELL:  Right.  I'm only going to show them on

6  the ELMO.

7         THE COURT:  Right, but you have to make sure the

8  handwriting, you can either white it out or cover it up in

9  some fashion.

10         MR. STEIN:  The handwriting was on there when they

11  were sent to me, Judge.  I produced as it was.

12         THE COURT:  We understand that but that's not part

13  of the record that's admissible.  That's hearsay.

14         MR. STEIN:  Speaking of old school, I don't even

15  know if White-Out exists any longer.

16         THE COURT:  I think it does, Joel.  I don't know

17  what you'd use it for.

18         MR. SELDEN:  Your Honor, we would just ask, because

19  there have been so many defense exhibits that have come in

20  either last night or this morning, that the defense just show

21  us what they're going to propose before Mr. Brack actually

22  testifies.  We would hate to have to jump up.

23         THE COURT:  Yes.  That's just for expedition

24  purposes.  That makes sense.

25         MR. SELDEN:  The last thing that I was going to say

812

1    with regards to stipulations is that the defense had asked for

2    a stipulation regarding the New Jersey number, that being the

3    201 number.

4            Consistent with the Court's preference, the

5    government is willing to stipulate that that number was

6    associated with Mr. Edward Vasquez, not the name "Boogie"

7    because we don't have any independent knowledge of the name

8    "Boogie" being associated, but that that number was Edward

9    Vasquez.

10           THE COURT:  Mr. Farrell and Mr. Stein?

11           MR. STEIN:  Judge, in the text messages which I

12   think are Scott Brack's, it says "Boogie" next to the 201

13   number that Mr. Selden is referring to.

14           THE COURT:  Well, you have the -- you can make the

15   argument.  He's giving you that that number belongs to

16   Mr. Vasquez.

17           MR. STEIN:  Correct, but on the records that are

18   relevant to this, it doesn't say "Edward Vasquez."  It says

19   "Boogie."

20           MR. SELDEN:  But those records are not in.  That's

21   the thing.  The records for Scott Brack's phone records are

22   not in evidence and so at this point, those records are not

23   in.  Moreover, it's just not relevant.

24           THE COURT:  Scott Brack's records have not been

25   offered.

813

1      MR. FARRELL:  That's okay, Your Honor.  We
2  understand.  We'll abide by the Court's ruling.  The important
3  thing is that it's Edwin Vasquez's number, right, and that's
4  what we're going to argue.
5      THE COURT:  Right, and they're going to stipulate
6  that it is.
7      MR. SELDEN:  Yes.
8      THE COURT:  Anything further?
9      MR. FARRELL:  Yes, Judge.  Sorry.  This is taking a
10  little longer than we thought.
11      The government was gracious enough to show us some
12  evidence yesterday in Mr. Brack's presence and there's some
13  others.  If we can have a brief moment to look at two last
14  bags of evidence that he hasn't seen yet that I've marked as
15  Defendant's X for identification and Defendant Y for
16  identification.  These are items that were recovered in the
17  car that on Mr. Brack's direct, he will acknowledge as being
18  in his backpack.  He just needs a minute or two to do that.
19      Just so the Court knows, our first witness, and the
20  government knows, our first witness is going to be the
21  criminalist, Daphne Mavris, the next witness will be Detective
22  Finbarr Fleming and then last will be Elgin Brack.
23      THE COURT:  Okay.  And where are we, Mr. Selden,
24  where are we on the government's case?
25      MR. SELDEN:  Your Honor, we have not rested yet.  We

814

1   anticipate reading a stipulation into the record and then

2   resting.  So I think we'll be ready to start right off with

3   the defense case after we read this stipulation in.

4            The government always defers to the Court, this

5   having been my first trial before Your Honor, with regards to

6   motions for judgment of acquittal, but wanted to just flag

7   that the government's case looks to conclude shortly.

8            THE COURT:  Well, I have and if counsel agree to do

9   it, we can take the motion to close the government's case just

10  prior to the close of the government's case and have it deemed

11  to have been made at the close of the government's case.  So

12  we can do that rather than breaking, sending the jury back and

13  then bringing them back a very short time later.  So I'm

14  guided by counsel, particularly defense counsel.

15           MR. STEIN:  Judge, pursuant to Rule 29(a) of the

16  Federal Rules of Criminal Procedure, we move the Court to

17  enter a judgment of acquittal on his behalf.

18           THE COURT:  Does the government wish to be heard?

19           MR. SELDEN:  Your Honor, viewing the evidence in the

20  light most favorable to the government, the government

21  believes that there is substantial evidence in this case and

22  evidence that would satisfy beyond a reasonable doubt each one

23  of the nine charged counts regarding defendant Elgin Brack.

24  We stand on the current record before the Court.

25           Thank you, Your Honor.

815

```
1          THE COURT:  And the Court will reserve decision and
2    the argument is deemed made at the actual close of the
3    government's case.
4          MR. FARRELL:  Judge, I don't want to take advantage
5    of your liberal reply policy, but if I can just add that the
6    element of identification the defense submits was not met.
7          Although there were four civilian witnesses, all had
8    a short range view of the perpetrator, not one of those four
9    identified Mr. Brack.  He was only identified by detectives
10   who saw him 18 hours after the fact.  And while there is
11   circumstantial evidence, Judge, I certainly concede that,
12   defense respectfully argues that it does not rise to the level
13   of proof beyond a reasonable doubt.
14         THE COURT:  Your argument is deemed to have been
15   made prior to the government's response to it.
16         MR. FARRELL:  Thank you very much.
17         THE COURT:  All right.  So if I got what you're
18   saying correctly, Mr. Farrell, you need a couple more minutes
19   with Mr. Brack, is that it?
20         MR. STEIN:  I think so, Judge.
21         THE COURT:  All right.  So then we will take a
22   five-minute break here and allow you all to go back and have
23   your conversation and then we'll come back out.  Okay?  So
24   just alert William as to when you've had your chance.
25   Particularly now that we've gotten the Rule 29 out of the way,
```

816

1   it gives you a little extra time.

2        MR. SELDEN:  Your Honor, if we could just make one

3   request that the evidence actually stay out here with the case

4   agent.  He's not going to interact and we'll be seated far

5   enough away so that counsel --

6        THE COURT:  So they can do it in open court?

7        MR. SELDEN:  Exactly, Your Honor.

8        THE COURT:  I think Marshals permitting.

9        THE MARSHAL:  That's fine with the Marshals,

10  Your Honor.

11       MR. FARRELL:  Judge, we've concluded our physical

12  inspection of the evidence.  Mr. Brack's had a chance to look

13  at it and I think we're ready to go.

14       THE COURT:  So you're ready to go.  That's even

15  better.

16       MR. FARRELL:  Yes.

17       THE COURT:  All right.  Then let's bring the jury

18  out.

19       (Jury enters.)

20       THE COURT:  Be seated, please.

21       Counsel will stipulate that the jury is present and

22  properly seated.

23       MR. SELDEN:  On behalf of the government, yes.

24  Thank you, Your Honor.

25       THE COURT:  Defense?

817

1          MR. STEIN:  Yes, Judge.

2          THE COURT:  Thank you, Counsel.

3          Ladies and gentlemen, welcome back.  Today is not as

4    nice as it was yesterday, but you're certainly nonetheless

5    welcome just as hardily as you were yesterday.  We certainly

6    all appreciate your continued sacrifice, patience and

7    cooperation in this important work as you are major players in

8    our criminal justice system and your attentiveness and your

9    punctuality and your attendance are critically important to

10   the administration of our justice system.

11         Of course, that would be true under all

12   circumstances, but we all know that, currently, we're all

13   being confronted particularly in the media with concerns about

14   the coronavirus and the like and I want to assure all the

15   jurors that the court, and I mean not just me, but the court

16   itself is acutely aware of those concerns and we, along with

17   the General Services Administration, are taking extra steps to

18   ensure that all of our facilities here at the courthouse are

19   scrubbed down and that we minimize in every possible way any

20   chance occurrence that someone infected with the virus would

21   come in contact with any of us.

22         So we, again, thank you.  You are soldiers in the

23   war of justice and we appreciate your acceptance of your

24   responsibilities.

25         Now, as you recall, we're still on the government's

818

1    case and I ask the government where are we to go next?

2              MR. SELDEN:  Thank you very much, Your Honor.

3              With the Court's permission, I'd like to read a

4    stipulation into the record.

5              Mr. Villanueva, if you would not mind please letting

6    me use the ELMO as I read Government Exhibit S-5.

7              For the record, Your Honor, I'm now reading

8    Government's Exhibit S-5.

9              It is hereby stipulated and agreed by and between

10   the United States of America and the defendant Elgin Brack,

11   through his attorneys, that:

12             The attempted robbery and robberies of the following

13   stores on November 26, 2018 resulted in the loss of United

14   States currency in the following amounts:

15             $0.00 was taken from the Duane Reade located at

16   60-02 Roosevelt Avenue in Queens, New York;

17             Approximately $300 was taken from the 7-Eleven

18   located at 50-92 Northern Boulevard in Queens, New York;

19             Approximately $802.17 was taken from the Rite Aid

20   located at 33-01 30th Avenue, Queens, New York;

21             And approximately $200 was taken from the Rite Aid

22   located at 115-10 Merrick Boulevard in Queens, New York.

23             This stipulation marked as Government Exhibit S-5,

24   is admissible in evidence.  Dated:  Brooklyn, New York,

25   February 29, 2020.  Agreed and consented to by the parties.

1          Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Selden.  That stipulation

3   is received in evidence without objection.

4          (Government Exhibit S-5 so marked.)

5          THE COURT:  Mr. Selden?

6          MR. SELDEN:  Thank you, Your Honor.  On behalf of

7   the government, the government now concludes its case in

8   chief.  We rest.  Thank you.

9          THE COURT:  Thank you, Mr. Selden.

10          Now, ladies and gentlemen, the government has rested

11   and you remember back when Mr. LoMonaco was reading the

12   opening instructions to you, the fact that the government has

13   rested doesn't mean that the case is over by any means.  It's

14   one of the major building blocks but it's only one of the

15   building blocks so that there's more of the case to come.

16          I told you that, and Mr. LoMonaco read to you, that

17   the defense has no obligation whatsoever.  The burden of proof

18   in this case rests on the government throughout.  Every

19   element of the crime has to be proven by the government.

20   Defense has no burden whatsoever, doesn't have a burden to

21   produce any evidence to offer any witnesses, but I'm advised

22   by the defense that there is some proof that the defense

23   wishes to put in and I'll call on either Mr. Stein or

24   Mr. Farrell to call their first witness or whatever else comes

25   first.

820

1          MR. STEIN:  Judge, the defense calls Daphne Mavris.

2  I'm going to step out in the hall to get her.

3          THE COURT:  Yes, please.

4          (Pause.)

5          THE CLERK:  Please raise your right hand.

6          (The witness is duly sworn/affirmed by clerk.)

7          THE CLERK:  Please state your first and last name

8  and spell it for the record.

9          THE WITNESS:  My first name is Daphne Mavris,

10  D-A-P-H-N-E, last name is Mavris, M-A-V-R-I-S.

11          THE CLERK:  Thank you.  Have a seat, please.

12          THE WITNESS:  Okay.

13          THE COURT:  Mr. Stein, you may inquire.

14          MR. STEIN:  Yes.

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MR. STEIN:

3    Q    Good morning, Ms. Mavris.

4    A    Good morning.

5    Q    Can you tell us your background?

6    A    Yes.  I have a Bachelor's of Science degree in forensic

7    science from John Jay College of Criminal Justice.

8    Q    And when did you get that degree?

9    A    In 2010.

10   Q    And are you employed?

11   A    Yes, I am.

12   Q    By whom are you employed?

13   A    I am employed by the New York City Police Department

14   police laboratory.

15   Q    And what specifically is your job there?

16   A    My title is a Criminalist Level 3 and I am assigned to

17   the criminalistics section of the laboratory.

18   Q    Ms. Mavris, did there come a time as part of your duties

19   as a criminalist that you came into possession of some items

20   of property?

21   A    Yes.

22   Q    And specifically, do you recall coming into possession or

23   custody of some clothing?

24   A    Yes.

25   Q    Okay.  And do you recall what the clothing was?

Mavris - direct - Stein                                822

1    A    I would have to have a case number to be sure.

2    Q    Okay.

3              MR. STEIN:  May I approach the witness?

4              THE COURT:  You may.

5              MR. STEIN:  With what's been marked for

6    identification as Defendant's N-3.

7    A    Yes, this looks familiar.

8    Q    Okay.  And is there a case number that you can reference?

9    A    The laboratory number is not written on this sheet, but I

10   do recall the laboratory number.

11   Q    Okay.  And what was the number?

12   A    It was 2018-089039.

13   Q    So looking at that document, does this help you remember

14   whether or not you came into custody of some items of

15   clothing?

16   A    Yes.

17   Q    And what were the items of clothing?

18   A    The first item was listed as pants, black pants.  The

19   second item is listed as a sweatshirt.

20   Q    Thank you.

21             MR. STEIN:  May I approach the witness again with

22   Government's Exhibit 307?

23             THE COURT:  You may.

24             MR. STEIN:  I believe these are in evidence.

25   Q    Would you take a look at these?

Mavris - direct - Stein                    823

1    A    Sure.  Yes.

2    Q    Do you recognize those?

3    A    Yes.

4    Q    And what are these?

5    A    That appears to be the evidence that is listed on the

6    invoice that I was reviewing before.

7    Q    The black pants?

8    A    It appears that way, yes.

9    Q    And in addition to the pants, you testified you received

10   another item of clothing?

11   A    Correct.

12   Q    What was the other item of clothing?

13   A    I described it as a hoodie.

14   Q    Do you recall it had a particular brand?

15   A    I recall that the brand was listed as Pelle Pelle.

16   Q    When you received the pants, what did you do with them at

17   first?

18   A    After opening the evidence and ensuring that that item

19   corresponded to what was written on the invoice, I then

20   proceeded with a visual examination in which I look at the

21   pants and I proceed with a collection of the trace material

22   that is on the pants.

23   Q    Okay.  And in addition, did you go into the pockets of

24   the pants?

25   A    Yes, I did.

Mavris - direct - Stein                      824

```
1   Q    And what, if anything, did you find in the pockets of the
2   pants?
3   A    In the front left pocket of the pants, I found a receipt.
4            MR. STEIN:  Can I approach again, Judge?
5            THE COURT:  You may.
6   Q    I'd like to show you, for example, what's been marked as
7   Defendant's Exhibit I.
8   A    Yes.
9   Q    And what is that?
10  A    This is the McDonald's receipt paper that I had found in
11  the front left pocket of the pants.
12           MR. STEIN:  Judge, I move Defendant's I into
13  evidence.
14           THE COURT:  Any objection?
15           MR. SELDEN:  No objection, Your Honor.
16           THE COURT:  Received without objection.
17           (Defendant's Exhibit I so marked.)
18  Q    Now, could you, if I can just direct the witness'
19  attention, this is a receipt from where?
20  A    This is from McDonald's.
21  Q    Right.  And does it have a particular location?
22  A    There is an address listed in the center of the receipt.
23  Q    And what's the address?
24  A    It reads, 772 Broad Street, Newark, New Jersey, 07, I
25  believe that is a 1023.
```

Mavris - direct - Stein                              825

1   Q    Okay.  And is there a date for the receipt?

2   A    Yes, there is.

3   Q    And what's the date?

4   A    The date appears to say 11/26/2018.

5   Q    And is there a time?

6   A    There is a time listed.

7   Q    And what's the time?

8   A    It is slightly crumpled on this receipt so it's a bit

9   unclear.  The first two digits I can make out on the sheet are

10  08.

11  Q    And can you make out the other number?

12  A    The last digit is 9.  It might be a 08:29.

13  Q    A.m. or p.m.?

14  A    A.m.

15  Q    And the person who purchased the items, what did that

16  person purchase?

17  A    This reads, "Egg cheese biscuit," and the second item I

18  see says, "L sweet iced tea."

19  Q    And was this paid for with cash or with a credit or debit

20  card?

21  A    The bottom of the receipt states, "Cash tendered."

22  Q    And is there some writing in the lower right-hand corner?

23  A    Of the sheet of paper, yes.

24  Q    And is that your handwriting?

25  A    That is my handwriting.

Mavris - direct - Stein                           826

1    Q     Okay.  And you noted on it the date?

2    A     I'm sorry?

3    Q     You noted on it your initials and a number?

4    A     Yes.  The bottom right corner has, I handwrote the

5    laboratory number as well as my initials.

6              MR. STEIN:  Judge, can I publish this to the jury on

7    the ELMO?

8              THE COURT:  Sure.

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2          MR. STEIN:  Okay, thank you.

3    Q    Now, from whom did you receive these items?

4    A    I received these items from the evidence control section

5    of my laboratory.

6    Q    And is there a particular member of the police department

7    that you received this from?

8    A    Yes, but I do not recall who that individual is at this

9    time.

10         MR. STEIN:  I will approach again with what's been

11   marked for identification as Defendant's N-3.

12   Q    Does that help you remember from whom you received this?

13   A    No.  The invoice does not list who I receive the evidence

14   from.  It would be listed on the chain of custody.

15   Q    Now, did you perform various tests on these items of

16   clothing?

17   A    I performed a visual examination.

18   Q    And what were the results of your visual examination?

19   A    I would need to look at the laboratory report for the

20   results.

21         MR. STEIN:  Approaching the witness again with

22   what's been marked for identification as Defendant's N.

23   A    For laboratory item number 1, those are the pants.  I

24   observed possible hairs, possible fibers, possible glitter,

25   stains of unknown origin, some debris, as well as material

Mavris - direct - Stein                    828

1    wearing.

2            For laboratory item number 2, that is a hoodie or

3    the sweatshirt.  I observed possible hairs, possible fibers,

4    possible glitter, possible plant material, stains of unknown

5    origin, debris and some discoloration.

6            MR. STEIN:  Judge, at this time I would offer

7    Defendant's N into evidence.

8            MR. SELDEN:  No objection.

9            THE COURT:  Received in evidence without objection.

10           (Defendant's Exhibit N received in evidence.)

11           MR. STEIN:  It is a two-page document.

12           THE COURT:  Does it have a title, Mr. Stein?

13           MR. STEIN:  Laboratory report.  Laboratory report

14   number 2018-089039.  It's two pages.

15           THE COURT:  Received in evidence.

16           MR. STEIN:  And I'm going to turn to the second page

17   as well.  It's a two-page document.

18           (Exhibit published.)

19   BY MR. STEIN:

20   Q    Now, you said you observed some stains of unknown origin;

21   correct?

22   A    Correct.

23   Q    And as part of your visual examination in looking for

24   stains, would you have been looking for blood stains?

25   A    If I observed possible blood, I would document that, yes.

Mavris - direct - Stein                               829

1   Q    And on either one of these two items, did you observe
2   what appeared to be blood stains?
3   A    No, I did not.
4   Q    Do you know what luminol is?
5   A    Yes, I do.
6   Q    What is luminol?
7   A    Luminol is a chemical reagent that is used to help
8   visualize if there's possible blood.
9   Q    Okay.  And as a result of your visual examination of
10  these two items, did you apply luminol to either one of these
11  items of clothing?
12  A    No, that is not protocol.
13  Q    Okay.  Because you didn't observe what appeared to be
14  blood?
15  A    Correct.
16            MR. STEIN:  Excuse me, Judge.
17            THE COURT:  Sure.
18            (Pause in the proceedings.)
19            MR. STEIN:  Judge, showing the witness what's now in
20  evidence as Defendant's N.
21  Q    Could you tell us from whom you received the two items of
22  clothing that you testified about?
23  A    The report does not list who I received the clothing
24  from.
25  Q    So if I could just direct your attention --

VB        OCR        CRR

1   A     Sure.

2   Q     This does not do that?

3   A     No, that is the invoicing officer, but it does not mean

4   that I directly received the evidence from that invoicing

5   officer.

6   Q     So who was the invoicing officer?

7   A     The invoicing officer is listed as a Detective Thomas

8   Nuzio.

9   Q     Thank you.

10          Who requested the examination of these items of

11  clothing?

12  A     I do not know.

13          MR. STEIN:  May I approach the witness with what has

14  been marked for identification as Defendant's N-2.

15          THE COURT:  You may.

16  Q     What is that?

17  A     This is a form called the Request for Laboratory

18  Examination.

19  Q     And who was that submitted by?

20  A     The investigating officer is listed as a Detective

21  William Bravo.

22  Q     And what were the tests?  Do you remember what the tests

23  were that were requested?

24  A     This particular Request for Laboratory Examination is for

25  the receipt paper.  This is a form -- I'm sorry.  This is a

1    form I had filled out for the receipt that I had found in the

2    front left pants pocket.

3    Q     Thank you.

4          MR. STEIN:  May I have a moment to confer with

5    Mr. Farrell?

6          THE COURT:  Yes, please.

7          (Pause in the proceedings.)

8    Q     Did you bring your file with you?

9    A     I do not have it on-hand, no.

10   Q     Is it in the hallway?

11   A     It is in my bag.

12   Q     Okay.

13         MR. STEIN:  Is it possible that we could retrieve

14   that, Judge?  I think there's a representative here from the

15   witness's office.  Perhaps he could do that.

16         THE COURT:  Yes, if he can or she can.

17         MR. STEIN:  He.

18         THE COURT:  Either one.

19         (Pause in the proceedings.)

20         MR. STEIN:  Approaching the witness again.

21         THE WITNESS:  Thank you.

22   BY MR. STEIN:

23   Q     So does that help you remember?

24   A     Remember which?

25   Q     Which is the detective who requested the analysis or the

Mavris - direct - Stein                          832

1    examination of the two items of clothing?

2    A    Let's see.  The Request for Laboratory Examination was

3    prepared by Detective Thomas Nuzio.

4    Q    Now, what did you do with the McDonald's receipt after

5    you had retrieved it from the pants pocket and made some

6    markings on -- your markings in the lower right-hand corner of

7    the receipt?  What did you do with that?

8    A    So when I had found the receipt paper in front of the

9    front pants pocket, I first notified a supervisor that I had

10   found it.  From that point, the supervisor looked at the

11   receipt and deemed it a discrepancy.

12        From that point, the supervisor had made a call,

13   attempted to call the investigating officer to do a conferral

14   to state that this receipt had been found.

15        As for my actions after I removed the receipt form

16   the pants pocket, I placed it into a piece of heat-sealed

17   plastic.  I then made a photocopy of both sides of the receipt

18   so I can include that photocopy in my case file.

19        Afterwards, I invoiced that receipt.  So I placed it

20   on a separate invoice.  I packaged it separately from the

21   original evidence, and I had submitted it for possible

22   additional testing.

23   Q    And what was the additional testing that you requested?

24   A    Latent print examination.

25   Q    What did you do with the trace evidence that you found on

Mavris - direct - Stein                    833

1   these items of clothing?

2   A    The trace material was either tape-lifted or hand-picked

3   from the clothing.  So that means taking a piece of clear tape

4   and pressing it on the clothing to collect those small trace

5   materials that are adhered to the clothing.

6            Those tapes are then secured and packaged separately

7   after I conduct a microscopic examination of them.

8   Q    And where were they sent?

9   A    Those were sent to the property clerk for storage.

10  Q    And do you know where they were sent to after that?

11  A    I do not know.

12  Q    So do you know, have any knowledge as to whether they

13  were sent to the Office of the Chief Medical Examiner of the

14  City of New York?

15  A    No, I do not know.

16  Q    Do you know who Tiffany Garcia is?

17  A    Yes.

18  Q    And who was Tiffany Garcia?

19  A    She is an analyst that works in the latent print

20  development unit of the laboratory.

21  Q    Okay.  And do you know whether or not Ms. Garcia had an

22  opportunity to examine Defendant's I, the McDonald's receipt,

23  for any fingerprints?

24  A    I did not know what happened to the receipt after I sent

25  it for examination.

Mavris - direct - Stein                    834

1    Q    So if I showed you something, that wouldn't help you

2    remember?

3    A    It might.

4         MR. STEIN:  I'm showing you what's been marked for

5    identification as Defendant's M.

6    A    According to this lab report, she had received the

7    receipt paper for analysis.

8         MR. STEIN:  Could we approach, Judge?

9         THE COURT:  Side-bar.

10        (Side-bar conference held on the record out of the

11   hearing of the jury.)

12

13        (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1              (Side-bar.)

2              MR. STEIN:  So we entered into a stipulation but

3     Mr. Selden just reminded me that it's a Government stipulation

4     but I'd like to be able to read it into evidence because this,

5     it relates to this witness's testimony.

6              THE COURT:  Is it already in?  It is not in the

7     record or you want to read it?

8              MR. STEIN:  I want to offer it into evidence and I

9     want to read it.

10             MR. SELDEN:  Your Honor, we would respectfully

11    oppose that at this time.  We were planning to actually read

12    this in once cross examination was completed of this

13    particular witness.  It is a Government stipulation and we

14    think it would confuse the jury given the evidence that's come

15    in so far, that we plan to address not only on cross, but that

16    we plan to utilize the stipulation once the Defense has been

17    done with this witness, not before.

18             THE COURT:  Then you can do it on redirect if you

19    are not happy after they cross.

20             MR. STEIN:  I'm always happy, Judge.

21             THE COURT:  Okay.

22             (Side-bar end.)

23

24             (Continued on following page.)

25

Mavris - direct - Stein                                      836

1              (In open court.)

2    BY MR. STEIN:

3    Q    The trace evidence that you retrieved, you obtained from

4    the clothing, typically in your experience, what office would

5    that be sent to?

6    A    The tape lifts that I collect are typically forwarded to

7    the property clerk for storage.

8    Q    And after that, what office would examine the trace

9    elements that you recover from those items of clothing?

10             THE COURT:  If any.

11   A    Oh, hypothetically?

12   Q    In your experience.

13   A    If additional testing is required from the trace

14   materials on the tape-lifts, the laboratory can take back the

15   tape-lifts and collect the appropriate materials from them for

16   additional testing, depending on what's being asked.

17   Q    Additional testing by whom?

18   A    For example, if there needs to be fiber testing, my

19   laboratory would conduct the fiber testing.  If DNA

20   suitability is asked for, for hairs, my laboratory would

21   collect the hairs from the tape-lifts and then forward it to

22   the Office of the Chief Medical Examiner for testing, for

23   example.

24             MR. STEIN:  I have no further questions, Judge.

25             THE COURT:  Thank you, Mr. Stein.

Mavris - cross - Selden                    837

1           Any cross?

2           MR. SELDEN:  Briefly, Your Honor.  Thank you,

3    Your Honor.

4           THE COURT:  Mr. Selden.

5           MR. SELDEN:  Thank you very much, Your Honor.

6    CROSS EXAMINATION

7    BY MR. SELDEN:

8    Q    Good morning, Ms. Mavris.

9    A    Good morning.

10   Q    Ms. Mavris, Mr. Stein asked you to take a look at a

11   photocopy of an item.

12          Do you remember that photocopy of an item?

13   A    Yes.

14   Q    And you testified a moment ago that it was difficult for

15   you to read; correct?

16   A    Correct.  One of the numbers appeared to be crumbled in

17   the paper.

18          MR. SELDEN:  For the record, I'm showing Defense

19   Counsel what has previously been provided and shown to the

20   Defense as Government's Exhibit 222-A.

21          (Pause in the proceedings.)

22          MR. SELDEN:  Your Honor, may I approach the witness?

23          THE COURT:  You may.

24          MR. SELDEN:  Thank you, Your Honor.

25   Q    Ms. Mavris, I'm handing you what been marked and shown to

Mavris - cross - Selden                     838

1   Defense as Government's Exhibit 222-A.  Would you please take

2   a look at that and look up at me?

3   A    The contents?

4   Q    Do you recognize what I've just handed you?

5   A    Yes, I do.

6   Q    How do you recognize it.

7   A    I recognize this to be the container that contains the

8   receipt paper that I had packaged it into.  I recognize it by

9   my initials that are on the outside of this container, as well

10  as my initials that are on the tape seals that were originally

11  on this envelope.

12  Q    Could you please open up the envelope and review the

13  contents inside.

14  A    Sure.  Do you need me to wear gloves?

15       MR. SELDEN:  Not unless you have a preference for

16  it.  If you do not, you do not have to.

17       THE WITNESS:  Okay.

18       There's no gloves.  Okay.  That's fine.

19       Yes.

20  Q    Ms. Mavris, what do you see inside the contents of

21  Government's Exhibit 222-A?

22  A    Inside this envelope is the McDonald's receipt paper from

23  the front left pocket of the pants that I had examined.

24  Q    In fact, that's the receipt that Defense Counsel just had

25  you read into the record, but it actually has the full number

1  available in terms of the date and time; correct?

2  A    Yes.

3  Q    All right.  So let's read the actual full number into the

4  record, please.

5  A    The phone number you said?

6  Q    I'm sorry.  The full record of the date and the time.

7  A    The date is 11/26/2018, and the time is listed as

8  08:29 a.m.

9         MR. SELDEN:  Your Honor, the Government moves to

10  admit Government's Exhibit 222-A into evidence.

11         THE COURT:  Any objection?

12         MR. STEIN:  No.

13         MR. SELDEN:  Permission to publish to the jury.

14         THE COURT:  We sort of did that backwards,

15  Mr. Selden.

16         MR. SELDEN:  I think I did, Your Honor.  Thank you,

17  Your Honor.

18         THE COURT:  Sometimes it works.  You may publish.

19         (Defendant's Exhibit 222-A received in evidence.)

20         (Exhibit published.)

21         MR. SELDEN:  Mr. Villanueva, if I could please

22  utilize the ELMO.  Thank you.

23  BY MR. SELDEN:

24  Q    Now, Ms. Mavris, I understand that this Government's

25  Exhibit 222-A appears to be in what state to you in terms of

Mavris - cross - Selden                    840

1  the coloration?  That's not how you looked at it when you

2  analyzed it; correct?

3  A    The receipt appears darker than I had first observed it.

4  Q    And you don't know what, if any, testing was conducted by

5  the latent prints section following the work that you did as

6  it relates to this particular receipt; correct?

7  A    I do not know what testing was conducted.

8  Q    You don't know if they conducted dye testing with regards

9  to the change in the coloration on this receipt; correct?

10  A    I do not know.

11  Q    And you don't the know whether or not they were able to

12  determine if there was, in fact, a latent print of value;

13  correct?

14  A    Correct.

15  Q    And before we get into the substance of what's in this

16  particular item, what is a latent print of value?

17  A    A latent print of value is one print that has enough

18  details and features to move forward with a comparison.

19  Q    So in fact, if there was a latent print of no value, you

20  couldn't compare it to anyone; isn't that correct?

21  A    I'm not a latent print examiner.

22  Q    Do you know one way or other?

23  A    If it has no value then, to my knowledge, you could not

24  move forward with comparison.

25  Q    All right.

Mavris - cross - Selden                    841

1        MR. SELDEN:  And let's zoom on in just so that the

2   record is clear where you were reading.

3   Q    Were you reading from the line 11/26/2018 there?

4   A    Yes; correct.

5   Q    And when you said 829, was that what you were talking

6   about there?

7   A    Yes.

8        MR. SELDEN:  Pointing, for the record, with my pen.

9   Q    Now, Ms. Mavris, I apologize, Criminalist Mavris, a

10  moment ago you were talking about the things that you do and

11  the things that you don't do as a criminalist with regards to

12  the review of evidence.

13       Do you recall the line of direct where you were

14  asked about the Office of the Chief Medical Examiner?

15  A    Yes.

16  Q    Do you work at the Office of the Chief Medical Examiner?

17  A    I do not.

18  Q    Do you have any idea the decisions that are made at the

19  Office of the Chief Medical Examiner with regards to trace DNA

20  evidence?

21  A    No, I do not.

22  Q    Do you have any idea with regards to the specific

23  evidence that was collected in this particular case regarding

24  trace DNA evidence?

25  A    I'm sorry.  Can you repeat that.

Mavris - cross - Selden                         842

1    Q    Do you know what decisions, if any, were made by the

2    Office of the Chief Medical Examiner with regards to trace DNA

3    evidence in this particular case?

4    A    No, I do not.

5    Q    And we are assuming that there is, in fact, if any, trace

6    DNA evidence in this case that could be analyzed; correct?

7              MR. STEIN:  Judge, objection.

8              THE COURT:  Yes, I will sustain the objection as to

9    form.

10             MR. SELDEN:  So I will reformulate the question,

11   Your Honor.

12   Q    But Ms. Mavris, you don't know what, if any, conclusions

13   the Office of the Chief Medical Examiner made with regards to

14   any DNA evidence --

15             MR. STEIN:  Objection.  She can't testify as what

16   she doesn't know.

17             THE COURT:  I think that is the point of the

18   question, that she does not know any of those.

19             MR. SELDEN:  That is correct, Your Honor.

20             THE COURT:  So and that is true; correct?

21             THE WITNESS:  Correct.  Yes, correct.

22   BY MR. SELDEN:

23   Q    Ms. Mavris, with regards to the particular process by

24   which you yourself collected this receipt, I want to go back

25   to the receipt.

Mavris - cross - Selden                    843

1          A moment ago you were asked on direct about a

2     Ms. Tiffany Garcia; correct?

3     A    Correct.

4     Q    Do you know who, if any, individuals Ms. Garcia then

5     would have passed this receipt along to, if at all?

6     A    No, I do not.

7     Q    So you don't know one way or the other whether or not

8     there was a latent print of value developed; correct?

9     A    No.

10              MR. SELDEN:  Court's brief indulgence, Your Honor.

11              (Pause in the proceedings.)

12              MR. SELDEN:  Your Honor, at this time the Government

13     would wish to read into evidence a proposed stipulation that

14     has been agreed to by the parties.

15              THE COURT:  Please.

16              MR. SELDEN:  Thank you.

17              (Exhibit published.)

18              MR. SELDEN:  It is hereby stipulated and agreed by

19     and between the United States of America and the defendant,

20     Elgin Brack, through his attorneys that the receipt recovered

21     by New York City Police Department, NYPD Criminalist Daphne

22     Mavris, from the pocket of black jeans, Government Exhibit 307

23     was forwarded for latent print development under NYPD Property

24     Clerk invoice number 600021105 receipt.

25              Thereafter, one latent print of potential value,

VB        OCR        CRR

Mavris - cross - Selden                    844

1   potential latent print, was developed on the receipt by a

2   qualified NYPD criminalist, captured and forwarded to the NYPD

3   latent prints section for further examination.

4           Thereafter, an NYPD detective assigned to the latent

5   print section who is qualified in the examination and

6   comparison of latent prints concluded that the potential

7   latent print lacked sufficient individual characteristics and,

8   therefore, was unsuitable for comparison.  As such, the

9   potential latent print was not suitable for comparison to any

10  other latent print, regardless of whether such other print was

11  from a known or unknown source.

12          This stipulation is marked as Government

13  Exhibit S-12.  Admissible in evidence, indicated Brooklyn,

14  New York, March 10th, 2020.  Signed by the parties.

15          THE COURT:  Received in evidence without objection.

16          (Government's Exhibit S-12 received in evidence.)

17          MR. SELDEN:  With the Court's brief indulgence,

18  Your Honor.

19          THE COURT:  Please.

20          (Pause in the proceedings.)

21          MR. SELDEN:  Your Honor, the Government has no

22  further questions at this time.  Thank you.

23          THE COURT:  Thank you, Mr. Selden.

24          Mr. Stein, any redirect?

25          MR. STEIN:  No.

Mavris - cross - Selden                845

1          THE COURT:  Criminalist Mavris, thank you very much.

2          THE WITNESS:  Thank you very much.

3          THE COURT:  You are excused.

4          (Witness excused.)

5          THE COURT:  Does the Defense have another witness?

6          MR. FARRELL:  Yes, Your Honor.

7          At this time the Defense calls Detective Finbarr

8     Fleming, who I'm going to go out into the hall and signal that

9     he is up.

10         (Witness enters and takes stand.)

11         THE COURTROOM DEPUTY:  Please raise your right hand.

12

13         (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1  **FINBARR FLEMING**,

2              called as a witness having been

3              first duly sworn, was examined and testified

4              as follows:

5              THE WITNESS:  Yes.

6              THE COURTROOM DEPUTY:  Please state your first and

7  last name, and spell it for the record.

8              THE WITNESS:  Finbarr Fleming -- F-I-N-B-A-R-R,

9  Fleming, F-L-E-M-I-N-G.

10             THE COURTROOM DEPUTY:  All right.  Thank you.  Have

11 a seat, please.

12             THE COURT:  Mr. Farrell, you may inquire.

13             MR. FARRELL:  Thank you, Your Honor.

14 DIRECT EXAMINATION

15 BY MR. FARRELL:

16 Q    Detective Fleming, how long have you worked for the NYPD?

17 A    26 years.

18 Q    What's your current assignment?

19 A    I'm a detective in the joint robbery task force.

20 Q    How long have you held that assignment?

21 A    Since 2014.

22 Q    Okay.  I want to go back to November 28th of 2018.

23          Were you working that evening?

24 A    Yes, I was.

25 Q    Okay.  Were you part of a team of task force co-workers,

Fleming - direct - Farrell                          847

1  together with other NYPD detectives, that were at Hughes

2  Avenue in the Bronx?

3  A    Yes.

4  Q    And what was the purpose of you being there at that time,

5  as far as you can recall?

6  A    We were sitting on a car, a vehicle that was parked on

7  Hughes Avenue.

8  Q    And do you remember the make of the car or the color of

9  it?

10  A    I don't recall the make of the car.

11  Q    About how many members of the team, your team, were

12  there, as far as you can remember?

13  A    Six approximately.

14  Q    Okay.  Were you on foot or you were in a car?

15  A    In a vehicle.

16  Q    Was anyone else in the vehicle with you --

17  A    Yes.

18  Q    -- do you recall?

19       Who was that?

20  A    Detective Chevre.

21  Q    Are you familiar with Sergeant Bryan, B-R-Y-A-N?

22  A    Yes, I am.

23  Q    Was he at that scene that evening?

24  A    Yes.

25  Q    Was he the highest ranking officer at the scene that

Fleming - direct - Farrell                   848

1   evening?

2   A    No.

3   Q    Who was?

4   A    Lieutenant Smith.

5   Q    Has Lieutenant Smith since retired from the force?

6   A    Yes, he has.

7   Q    Where was the car you and Detective Chevre were seated in

8   relation to the target car?

9   A    We were a block off of Tremont Avenue, off of -- on a

10  side street off of Hughes Avenue.  Out of the building line.

11  Q    Okay.  Could you actually see the target car from where

12  you were sitting?

13  A    No.

14  Q    If you can recall, do you know which members of the team

15  were closest to that target car?

16  A    Sergeant Bryan.

17  Q    Do you know if he was alone -- he was in a car,

18  obviously; right?

19  A    Yes.

20  Q    Do you know if he was alone or if someone was in there

21  with him?

22  A    I don't recall if he was alone or not.

23  Q    Did there come a time around 8:45 that evening that you

24  did see the target car come into your line of view?

25  A    Yes.

1   Q    And what, if anything, did you do?

2   A    At that point we -- the car drove southbound on Hughes

3   Avenue.  Lieutenant Smith blocked off Hughes Avenue from

4   Tremont.  At that point we pulled up behind the car.  There

5   was -- I don't know what position we were in, but we pulled up

6   behind the car.

7   Q    As you sit here today, do you recall if Sergeant Bryan

8   was in front of you in relation to the target car?

9   A    I don't recall that.

10  Q    Did you do anything -- well, let me ask you this.

11       Did you see anybody bolt or run from the target car?

12  A    Nope.

13  Q    What did you do with respect to the target car?

14  A    We approached the car.

15  Q    When you say we, that is you and Detective Chevre?

16  A    Yes.

17  Q    Did you have your guns out?

18  A    Yes.

19  Q    What side, if any, did you approach?

20  A    Passenger side.

21  Q    And what, if anything, did you do when you approached the

22  passenger side of the target car?

23  A    We approached the passenger side of the car.  We

24  opened -- I opened the passenger door, pulled the male

25  occupant out, handed him off to the person behind me.  Noticed

Fleming - direct - Farrell                    850

1  there was another person in the back seat, reached in, and

2  grabbed that individual and pulled him out.

3  Q    So just to recap.  It was the front passenger seat that

4  you first went to; correct?

5  A    Yes.

6  Q    And did you verbalize any command to the person sitting

7  in the front row or did you just open the door?

8  A    Police don't move.

9  Q    And then you opened the door; correct?

10 A    Yes.

11 Q    Did you place your hands on that person?

12 A    Yes.

13 Q    And when you pulled him out, was he patted down in any

14 way by you?

15 A    Not by me.

16 Q    Who did you hand him to?

17 A    Detective Puskas and Detective Tessitore.

18 Q    And did you see what, if anything, they did with them?

19 A    No.

20 Q    And then you moved to the back seat?

21 A    Yes.

22 Q    Okay.  Was it dark at this point, just outside the

23 general --

24 A    Yes.

25 Q    -- since it's 8:45 at night?

Fleming - direct - Farrell                    851

1   A   Yes, it was.

2   Q   Could you see the occupant in the back seat?

3   A   I just saw a figure.

4   Q   Okay.  And what did you do with respect to that figure?

5   A   I grabbed him out.  I pulled him out as quick as I could

6   for my safety.

7   Q   And do you see the gentleman with the long, black

8   dreadlocks sitting at the Defense table?

9   A   Yes, I do.

10  Q   Was that the gentleman that you pulled out at that time.

11  A   Yes, it was.

12  Q   Did he in any way resist or fight with you, Detective?

13  A   No.

14  Q   Now, when you pulled him out -- by the way, do you recall

15  what he was wearing?

16  A   No.

17  Q   How about the gentleman in the front seat?  Any -- front

18  passenger seat, any idea what he was wearing?

19  A   Dark clothing.

20  Q   Could you tell from where you were from the passenger

21  side of the car who, if anyone, was dealing with the driver?

22  A   No.

23  Q   Okay.  You're not sure?

24  A   I don't recall.  It was a chaotic scene.

25  Q   Understood.

1          So what happened when -- how -- you put your hands

2   on Mr. Elgin Brack and pulled him out of the back seat of the

3   car; right?

4   A    Yes.

5   Q    And did you pat him down at that point?

6   A    No.

7   Q    What did you do with him?

8   A    I handed him off to the detectives behind me.

9   Q    Okay.  As you sit here today, you're not sure which ones;

10  right?

11  A    Detective Puskas and Detective Tessitore.

12  Q    Okay.  It was definitely them?

13  A    It was definitely them.

14  Q    Did you see what they did with Mr. Elgin Brack?

15  A    No.

16  Q    So would it be fair to say it was only a few seconds that

17  you were actually very close to Mr. Elgin Brack?

18  A    That's correct.

19  Q    In your long, 26-year career, you've had occasion to

20  smell marijuana before, right, Detective?

21  A    Yes.

22  Q    Did you smell any on Elgin Brack that evening, do you

23  recall?

24  A    Not that I can recall, no.

25  Q    Okay.  Do you recall, as you sit here today, what

Fleming - direct - Farrell                      853

1   happened with Elgin Brack in terms of being placed in the

2   police vehicle?

3   A    No.

4   Q    Okay.  How about the front seat passenger that you first

5   pulled out Scott Brack?  Did you see him placed in any police

6   vehicle?

7   A    No, I didn't.

8   Q    Did you see the driver placed any police vehicle?

9   A    No.

10  Q    Where is the next place you went after the scene at

11  Hughes Avenue?

12  A    I transported the vehicle back to our office at 1250

13  Waters Place.

14  Q    Is that the target vehicle?

15  A    Yes.

16  Q    How did you do that?  You just drove it back?

17  A    Just drove it back.

18  Q    You got the keys somehow?

19  A    Somehow, yeah.

20  Q    When you looked -- you obviously sat in the driver's seat

21  started the car and drove; right?

22  A    Yes.

23  Q    How long a drive was it from the Hughes Avenue point of

24  the stop to your base at ATF headquarters at Water Street in

25  the Bronx?

Fleming - direct - Farrell                854

1    A    Approximately 15 minutes.

2    Q    Did you have any fellow detective team members with you

3    in the car?

4    A    No.

5    Q    When you entered the car, could you describe the front

6    seat?  What, if anything, do you recall about it?

7    A    I don't recall what was in the front seat of the car.

8    Q    Did you have an occasion to look into the back seat?

9    A    Yes.

10   Q    Did anything stick out in your mind of anything you saw?

11   A    A knapsack and the child seat.

12   Q    That's it?

13   A    And clothing.

14   Q    Okay.  Would it be fair to say the car that was -- there

15   was a lot of stuff going on back there?

16   A    Yes.

17   Q    Now, you drove the car to ATF headquarters; correct?

18   A    Yes.

19   Q    When you parked the car -- I assume you parked the car;

20   right?

21   A    Yes.

22   Q    What did you do then?

23   A    I went upstairs to the office.

24   Q    Did you have any further dealing with the target car that

25   evening?

Fleming - direct - Farrell                     855

1   A      No.

2   Q      Were you involved in any way with anything to do with the

3   processing of Elgin Brack?

4   A      No.

5   Q      Prior to going to Hughes Avenue that evening, Detective,

6   were you involved in the investigation into a series of

7   robberies that had happened earlier in the morning in Queens,

8   New York --

9   A      No.  No.

10  Q      Okay.  Thank you.

11         MR. FARRELL:  Thanks for coming in today.  Thank you

12  very much.

13         THE WITNESS:  Thank you.

14         THE COURT:  Thank you, Mr. Farrell.

15         Any cross?

16         MR. SELDEN:  No cross.  Thank you, Your Honor.

17         THE COURT:  Detective Fleming, thank you very much.

18  You are excused.

19         THE WITNESS:  Thank you, sir.

20         (Witness exits courtroom.)

21         MR. FARRELL:  Your Honor, can the parties have a

22  quick side-bar before the next witness?

23         THE COURT:  Yes.  (Side-bar conference.)

24

25         (Continued on following page.)

Proceedings                                          856

1          (Side-bar.)

2          MR. FARRELL:  Your Honor, is it okay if we take a

3    break now?

4          THE COURT:  Yes.  We have to reconfigure; right?

5          MR. FARRELL:  Yes, thanks very much.

6          THE COURT:  So we will take the break.

7          MR. SELDEN:  Your Honor, just the one request we

8    would have during the break is if the Defense could actually

9    provide us those reconfigured exhibits, if they have them.

10          MR. FARRELL:  Okay.

11          MR. SELDEN:  By the end of the break, since it

12    sounds like Mr. Brack might be testifying shortly after that.

13          THE COURT:  That is what is next.

14          MR. FARRELL:  When we reconfigure.

15          MR. SELDEN:  I think there was some question as to a

16    missing page.

17          MR. FARRELL:  We are not going to give the jury

18    that.  We are going to use the original and the ELMO and the

19    Government -- we can take off the front page.

20          MR. SELDEN:  Absolutely.

21          MR. FARRELL:  Great.

22          MR. SELDEN:  Thank you, Your Honor.

23          THE COURT:  Okay.

24          (Side-bar end.)

25

Proceedings                                                        857

1           (In open court.)

2           THE COURT:  All right.  Ladies and gentlemen, after

3    conferring with counsel at the side-bar, we are going to take

4    the midmorning -- we are taking the midmorning break now.  We

5    did it little later yesterday, but we are going to take the

6    midmorning break now.  Figure about 15 minutes or so.  The

7    rules remain the same.  Just because we are on the Defense

8    case, none of those rules change.

9           Again, continue to keep an open mind.  Do not

10   discuss the case amongst yourselves or with anyone else you

11   may run into in the back and we will see you in about

12   15 minutes or so.

13          THE COURTROOM DEPUTY:  All rise.

14          (Jury exits.)

15          (In open court; outside the presence of the jury.)

16          THE COURT:  So now I can get a better picture.

17          Do we have any time estimates on the length of

18   testimony at all?

19          MR. FARRELL:  I don't think the direct will be more

20   than a half-hour, 40 minutes.

21          THE COURT:  I am assuming, and I should not, that

22   Mr. Brack will be the last of the Defense witnesses?

23          MR. FARRELL:  Yes, Judge.  We're going to rest.

24          THE COURT:  Okay.  Because I am trying to -- we have

25   lunch coming up at some point.

Proceedings                                 858

1          And the Government cross, any idea as to how long?

2          MR. SELDEN:  Your Honor, given that the Defense has

3    articulated a half an hour to 45 minutes, we're hoping to be

4    shorter than that.  I would anticipate nowhere more than

5    probably a half an hour.  But we'll see how things come out.

6          THE COURT:  Okay.

7          So I think to sketch it out, what we will probably

8    do, unless I am radically shocked, what we will probably do is

9    do direct and then break for lunch.  And that will give us at

10   least some time.

11         MR. FARRELL:  Judge, any chance we could convince

12   you to take an early lunch then?  I'd rather not have the

13   Government, skilled lawyers that they are, give them an

14   hour-and-a-half more to think about his direct and then

15   cross-examination.  I'd rather, if we could at least start,

16   work through, that's my application.  Either an early lunch or

17   a -- or we work through.

18         THE COURT:  To me, it does not matter.  That is what

19   I am trying to get a feel.

20         Let me put it this way.  If everybody thinks we

21   could be wrapped up by before 2 p.m., then I do not mind

22   working through, because then we could have the whole

23   afternoon.

24         MR. FARRELL:  From the Defense standpoint, I think

25   it's eminently possible.  We are not going to have any videos,

Proceedings                                             859

1   even pictures that are in evidence already, some of the

2   records.

3            THE COURT:  Government, what do you think?  It is

4   not -- I am not going to hold anybody to anything.

5            MR. SELDEN:  Of course.  And we will certainly try.

6   But in light of some of the promises that were made in the

7   Defense opening, I don't know where this direct will lead us

8   in terms of other items, but we will certainly try.

9            THE COURT:  Okay.

10           And we can see how things unfold as we go.  It is

11  possible that the Government will even be short.  It is

12  possible that the Defense may actually be longer.  But we will

13  play it by ear.

14           But those are the two, basically, the obvious to be

15  restated is either we are going to take a break or we are

16  going to work through.  So both remain on the table and we

17  will see how the cards play.

18           MR. FARRELL:  Mr. Brack wants to address you briefly

19  before he testifies.

20           THE COURT:  Now?

21           MR. FARRELL:  Yes.  That's all right.

22           THE COURT:  Sure, Mr. Brack.

23           Again, the rules remain the same with this being

24  taken down and whatever you say can be used against you.

25           THE DEFENDANT:  All right.

Proceedings                                    860

1            I, quote, unquote, I would like this to be quoted,

2    I've made several complaints about my lawyer before this trial

3    to you.  Now I have Mr. Garvin as a witness.  Me and Joe just

4    had a meeting this weekend.  I told him can he email the

5    prosecutors to get certain witnesses.  He didn't do that.  He

6    didn't do that at all.  I feel like I'm fighting two brothers

7    and a cousin.  He's not doing nothing I asked him to do.

8            And Mr. Gary is brought on second.  So it's not much

9    he can do.

10

11            (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    VB        OCR        CRR

Proceedings                                861

1    (continuing)

2         THE DEFENDANT:  This has been an ongoing problem,

3    something needs to be done.  And as, like, a veteran, a person

4    that's been in four, five, six trials, I'm pretty sure you can

5    cross-examine way better than that.  You didn't show the jury

6    nothing and we had a meeting.  I wrote this on a pad.  I have

7    told him.  I don't know what else to do.  I feel like I'm

8    fighting two brothers and a cousin, like, come on.

9         THE COURT:  Anything else, Mr. Brack?

10        THE DEFENDANT:  Something else has to be done.  I

11   have made many complaints before the trial.  Nothing new, Gary

12   can tell you.  I keep writing it.  I keep telling him and he

13   keep telling nothing to do.

14        Do you have anything to say about that?

15        THE COURT:  Me?

16        THE DEFENDANT:  No, him.

17        THE COURT:  Your complaints are on the record.  The

18   only thing I can tell you, Mr. Brack, that ultimately, lawyers

19   have to be in charge of what makes sense under the rules.  So

20   they know what their clients want and they have to make

21   judgments as to whether or not that what the client wants is

22   doable.

23        And I don't want to know anything about what the

24   exchange is.

25        MR. STEIN:  Judge, I'm not going to.

Proceedings                                862

1          THE COURT:  Certainly it's not none of my business,

2    and it's certainly none of the Government's business.

3          MR. STEIN:  Judge, yesterday we submitted four

4    subpoenas to the Court which were so ordered.

5          THE COURT:  Yes.  I know.  I signed them.  I did

6    sign them.

7          Anything further before we take our brick?

8          MR. SELDEN:  No.

9          THE COURT:  We will take a break.  See you in about

10   15.

11         (Recess taken.)

12         THE COURTROOM DEPUTY:  All rise.

13         Court is back in session.  Counsel for both sides

14   are present, including defendant.

15         THE COURT:  Mechanically, are we ready to go?

16         MR. FARRELL:  Yes, Judge.

17         MR. SELDEN:  On behalf of the Government, Your

18   Honor, we had identified a bag for Mr. Brack to review with

19   counsel.  During the course of that review, Mr. Farrell had

20   requested that the Government remove several legal documents,

21   including a letter that Mr. Brack wrote to another court with

22   regards to a request for executing his speedy trial rights.

23   The Government agrees with the position to remove those items

24   as they are not germane to the case here today.

25         That being said, we would ask that there also be

Proceedings                                       863

1   removal of -- there appear to be several resumes in the actual

2   bag itself.  We would ask that those resumes that are

3   associated with Mr. Brack be removed and not put forth as

4   evidence before the jury.

5           MR. FARRELL:  I don't know.  It is part of who he

6   is.  I don't see that as so prejudicial.  This is this guy's

7   -- this young man's resume.  It's part of who he is.  I could

8   elicit it all on direct.  What's the difference?  I mean, I'd

9   rather not.  In fact, I don't intend to.

10          THE COURT:  If you think it is important for the

11  jury to know who he is, then ask him.

12          MR. FARRELL:  You guys could keep find it.  I didn't

13  see it myself.

14          MR. SELDEN:  Your Honor, after having consulted with

15  Mr. Farrell, I think he is not planning to dump out the

16  contents of the bag before the jury.  We can remove that

17  resume, as well as what we just identified was an additional

18  legal paper for Mr. Elgin Brack related to a criminal case

19  before it would go back to the jury.

20          THE COURT:  That's fine.

21          MR. FARRELL:  Judge, can Mr. Brack just -- are you

22  sure?  You're all right.  He a little bout of nervousness.  I

23  though he had to use the men's room, but he assures me he is

24  okay.

25          THE COURT:  Okay.  Are we otherwise ready?

Proceedings                                      864

1          MR. FARRELL:  Yes.

2          THE COURT:  The Government?

3          MR. SELDEN:  On behalf of the Government, yes.

4          THE COURT:  Then we shall proceed.

5          Counsel, we will plan a sidebar at around 1:00 so we

6  can make some judgments as to what the best course is in light

7  of how things have unfolded until that point, unless we need

8  -- but obviously if we need some sidebar prior to that, it

9  will happen.  Just in case we are on a role, let's take a look

10 at where we are at 1:00.

11         (Jury enters the courtroom.)

12         THE COURT:  Please be seated.  Counsel will

13 stipulate that the jury is present and properly seated.

14         MR. SELDEN:  On behalf of the Government, yes.

15 Thank you, Your Honor.

16         MR. STEIN:  Yes.

17         THE COURT:  Thank you, counsel.

18         Ladies and gentlemen, welcome back.  We are ready to

19 proceed.

20         I hope you have had a chance to refresh.  I will ask

21 the defense if they have another witness to call.

22         MR. FARRELL:  Yes.  At this time, the defense calls

23 Mr. Elgin Brack.

24         THE COURT:  Mr. Brack.

25         THE COURTROOM DEPUTY:  Please stand up.  Raise your

Brack - direct - Farrell                    865

1   right hand.

2              (Witness sworn.)

3              THE COURTROOM DEPUTY:  Please state your first and

4   last name and spell it.

5              THE WITNESS:  Elgin Brack, E-L-G-I-N, B-R-A-C-K.

6              THE COURTROOM DEPUTY:  Thank you.  Have a seat,

7   please.

8              THE WITNESS:  All right.

9              THE COURT:  Mr. Farrell, you may proceed.

10             MR. FARRELL:  Thank you.

11  **ELGIN BRACK**,

12       called by the defense, having been duly  sworn, was

13       examined and testified as follows:

14  DIRECT EXAMINATION

15  BY MR. FARRELL:

16  Q    Good afternoon, Mr. Brack.  How are you feeling?

17  A    I'm good.

18  Q    Okay.  How old are you, sir?

19  A    24.

20  Q    Are you married?

21  A    No.

22  Q    Do you have any children?

23  A    No.

24  Q    In the Spring of 2018, did you have a job here in New

25  York City?

Brack - direct - Farrell                              866

1   A    Yes.

2   Q    What did you use to do?

3   A    Parks Department.

4   Q    And do you recall some of the parks you used to work at?

5   A    No.

6   Q    Were there parks around the city that you worked at?

7   A    Yeah.  Yeah.

8   Q    What did you use to do?  Tell the jury, what was your

9   job.

10  A    It depends on like overtime or just a regular day.

11  Q    Did you have a uniform?

12  A    Yeah.

13  Q    Did you like your work?

14  A    Yeah.

15  Q    You mentioned overtime, Mr. Brack.  How many hours was

16  your regular week?  Did it vary or was it the same?

17  A    It was the same, but I don't know like how many hours

18  exactly.  I know I was at work every day.

19  Q    Some days you worked -- some weeks you'd actually work

20  seven days?

21  A    No.  Most of the time I worked seven days.

22  Q    What was the deal with overtime in your job, so to speak?

23  A    As long as you got something to do, overtime is there.

24  Q    How did overtime pay?

25  A    Time-and-a-half, and sometimes like on holidays, you get

1    like an extra day of pay.

2            MR. FARRELL:  At this time, Your Honor, I am asking

3    what's previously been marked as Defendant's Exhibit G be

4    moved into evidence as certified records from the City of New

5    York Financial Information Services Agency, Office of Payroll

6    Administration.  I'd ask Mr. Bennett to pass out these copies

7    to the jury and give Mr. Bennett a -- Mr. Brack a copy as

8    well.  I'm sorry.

9            THE COURT:  Any objection?

10           MR. SELDEN:  We would ask for a copy as well from

11   Mr. Bennett, but no objection.

12           THE COURT:  Received without objection.

13           (Defendant's Exhibit G received in evidence.)

14           MR. FARRELL:  All of the jurors have a copy.  Thank

15   you.

16   Q    Mr. Brack, I want to direct your attention to the page --

17   go to the bottom right.

18   A    I don't have a copy.

19           MR. FARRELL:  Mr. Bennett.

20           THE WITNESS:  I think he has to reload.

21           Thanks.

22   Q    Mr. Brack, I'd like you to go to the bottom of the page

23   that's marked at the bottom right corner, 000839.

24   A    All right.

25   Q    Okay.  Do you see the pay date, November 16, 2018?  And

Brack - direct - Farrell                            868

1   it notes your amount year-to-date, YTD, that means

2   year-to-date.  Do you see up to that point you already have

3   made $25,160.53; correct?

4   A    Yes.

5   Q    And all of these records, you have reviewed them before?

6   A    Yeah.

7   Q    It breaks down your pay in terms of regular pay and

8   overtime pay; correct?

9   A    Somewhat.

10  Q    Right.  And I just want to move along to show a few more

11  days.  How about 0842, 842 being the last three, that shows

12  another pay period that pay date was October 5, 2018?

13  A    You said 842?

14  Q    Ending 842.

15  A    All right.  I'm there.

16  Q    Do you see what was your -- it says hours this pay

17  period.  How many?

18  A    80.

19  Q    So for that particular week, that pay period, would it be

20  fair to say you didn't work overtime that week; is that

21  correct?

22  A    No.  I actually did, but it's like once you get a certain

23  amount of like hours overtime, they can't, like, put it all on

24  one check, so they got to, like, disperse it in different

25  checks.

Brack - direct - Farrell                    869

1   Q    Let's go to the next page then.  That makes sense when

2   you look at the next page, 843.  Do you see there under

3   recurring regular gross hours period is 80; correct?

4   A    Yeah.

5   Q    A little bit down from it, it says paid overtime at

6   premium rate, 21 hours; correct?

7   A    Yeah.

8   Q    And it tells you how much that's worth, it was worth

9   $425.26; correct?

10  A    Yeah.

11  Q    And year-to-date, the next column, at that point you

12  already had logged 280 hours of overtime; correct?

13  A    Yeah.

14  Q    Would you agree these records reflect just how much money

15  you made on any given pay period, which was every two weeks;

16  right?

17  A    Yeah.

18  Q    I think that's it for the records now.  Thank you.

19        How often did you get paid?  I don't think I asked

20  you that.  Was it every two weeks?

21  A    Yeah.  Every two weeks.

22  Q    How did the City pay you?  Was it check or direct

23  deposit?

24  A    Oh, I got a check.

25  Q    What would you typically do with your checks, Mr. Brack?

Brack - direct - Farrell                    870

1  A    It depends.  Like if I need it then, I take it to the

2  check cashing place or I'll wait and take it to the bank,

3  because normally when I get off, the bank is closed, but if I

4  need it ASAP, I'm gonna take it to the check cashing place.

5  Q    By ASAP, you mean as soon as possible?

6  A    No.  As soon as I get off.

7  Q    Okay.  What do you think the most money you ever made is

8  during a two-week pay period?

9  A    Think about 3500.

10  Q    You mentioned a bank.  What bank did you have during the

11  time that you were working here in 2018?

12  A    Wells Fargo.

13  Q    Okay.

14          MR. FARRELL:  At this point, I'd like to take a

15  moment, Your Honor, and read a stipulation that is marked

16  Defendant's S-1.

17          It is hereby stipulated and agreed, by and between

18  the United States of America and defendant Elgin Brack,

19  through his attorneys, that, number one, the following defense

20  exhibit is a true and accurate copy of Elgin Brack's bank

21  statements at Wells Fargo ending, account ending 9156 (the

22  bank statements) for the period from October 11, 2018 to

23  November 9, 2018 and November 10, 2018 to December 11, 2018.

24  The bank statements, as well as the stipulation marked as

25  Defense Exhibit S-1 are admissible in evidence.  With that,

```
                    Brack - direct - Farrell                871
```

1    Your Honor, I will move in Elgin Brack's bank records.

2               THE COURT:  I didn't catch the exhibit number.

3               MR. FARRELL:  That is Defendant's F, F as in

4    Farrell.

5               THE COURT:  Okay.  You got a commercial in here.

6    Right.

7    Q    How long did you have that account, do you think?

8               THE COURT:  They are received in evidence without

9    objection.

10              (Defendant's Exhibit F received in evidence.)

11   A    I don't recall, like, how long I had a certain account,

12   but I know, like, before I started, I made an account, but

13   something went wrong and I had to make a new one, so I don't

14   remember.

15   Q    Okay.  But during this time period that we are talking

16   about, October and November, you had a bank account at Wells

17   Fargo; correct?

18   A    Yeah.  Yeah.

19   Q    I'm just going to pick a random page here.  I am going to

20   pick page 407, and it is tough to see for the jurors.  I don't

21   know if we can get it.  The print is small.

22              Do you have a copy of copy in front of you, Mr.

23   Brack, or not?

24   A    No.

25   Q    Mr. Bennett is going to get you one in a minute.

Brack - direct - Farrell                                  872

1              For example, going down to October 26th --

2    A     I can't see the date.

3    Q     I'll wait for Mr. Bennett to get it to you.  Page 4 of 7

4    on the top, Mr. Brack.

5    A     All right.

6    Q     Okay.  I will go to 10/25.

7              Do you see where I am pointing with my pen?  It

8    says, "None Wells Fargo ATM withdrawal authorized on 10/25 at

9    9101 Jamaica Avenue, Queens?

10   A     Yeah.

11   Q     That's you taking out $100; right?

12   A     Yeah.

13   Q     And your balance at that point was what?

14   A     $7,205.49.

15   Q     I am going to go to the next page, 5 of 7.  Just look at

16   random entry on November 5th.

17   A     Hold on.  Excuse me.  For the jury, can you show the

18   dates?

19   Q     Yes.  Thanks, Elgin.  I'm going to show it here as

20   November 5th; right.  It says ATM check deposit and the date

21   is November 5th on the left side, but in the body, it talks

22   about ATM check deposit on November 3rd at a place in High

23   Point, North Carolina.

24   A     Yeah.

25   Q     And the check was for $2,081.50.  Do you remember that?

Brack - direct - Farrell                               873

1    A    Yeah.

2    Q    Do you think that was a work check?

3    A    Definitely was.

4    Q    And what were you doing down in High Point, North

5    Carolina?

6    A    Just visiting.

7    Q    Later on the same page, if you go down to the third to

8    the last entry is November 8, 2018, and it looks like a small

9    purchase was made at Wendy's in Greensboro, North Carolina;

10   correct?

11   A    Yes.

12   Q    Did you visit there also?

13   A    Yeah.  It's right next to each other.

14   Q    Do you have family in North Carolina, Mr. Brack?

15   A    Yeah.

16   Q    It says -- I'd like you to turn to the next page.  It

17   says page 2 of 5, but the dates are going progressively

18   November 13, 2018.  I am going to show you, right.  You can

19   see November 13th.  It shows a series of rides that you took

20   with Lyft; is that correct?

21   A    Yeah.

22   Q    And November 13th, it also looks like you were back in

23   High Point, North Carolina, when you looked at one of the top

24   entries, you made cash deposits; right?

25   A    Uh-hum.

Brack - direct - Farrell                    874

1   Q     Right?

2   A     Yeah.

3   Q     Multiple cash deposits; correct?

4   A     Yeah.

5   Q     And let's see, on November 16th your balance was, if you

6   look -- I'm doing it again.  I'm sorry.  The last bank entry

7   on November 16th, Mr. Brack, tell the jury what your balance

8   was at that point.

9   A     The 16th?

10  Q     Yes.  November 16th.

11  A     I don't know.  I can't tell you.

12  Q     Okay.  We can --

13  A     Oh, it says $4,735.38.

14  Q     Okay.  Now, going to the last page, this is three of

15  five.  For our purposes, it is the last page of this exhibit,

16  and it talks about activity in later November; correct?

17  A     Yeah.

18  Q     Do you see November 23rd, the second entry from the

19  bottom, even though it is dated November 23, it reflects a

20  withdrawal that you made from North Main Street, High Point,

21  North Carolina; correct?

22  A     Yeah.

23  Q     Was this around the time of Thanksgiving, as you recall?

24  A     Yeah.

25  Q     You went home, you went to North Carolina, I should say,

Brack - direct - Farrell                                        875

1   for the Thanksgiving holiday?

2   A    Yeah.

3   Q    It says on November 22, which I believe was Thanksgiving,

4   a purchase at Superior Foods in High Point, North Carolina;

5   correct?

6   A    Yes.

7   Q    And look at the bottom entry, November 26, 2018, can you

8   read your balance to the jury, Mr. Brack?

9   A    I can't.

10  Q    Do you see it there?

11  A    $4,347.35.

12  Q    Thank you.  That's good for the bank records.

13           MR. STEIN:  Mr. Farrell.  Mr. Farrell.

14  Q    Mr. Brack, I am going to show you Defendant's Exhibit D

15  in evidence.  It's kind of light.  If Mr. Bennett could help

16  me here.

17           Since it's in evidence, I can read it.  It shows on

18  Halloween of 2018, October 31st, at 3:35, you've got a balance

19  printout showing $6,410.39; correct?

20  A    Yes.

21  Q    I'm going to show you Defendant's Exhibit B in evidence.

22  It shows various things, including pay stubs; right?

23  A    Yeah.  Yes.

24  Q    That was from your job at the Parks Department; right?

25  A    Yes.

Brack - direct - Farrell                    876

1   Q    And there's also Wells Fargo cards here too that would

2   allow you to withdraw money; is that right?

3   A    Yes.

4   Q    And your Social Security card and MetroCard?

5   A    Yes.

6   Q    You had these items on you when you were arrested on

7   November 26, 2018?

8   A    Yes.

9   Q    Thank you.

10        The name Scott Brack has been mentioned throughout

11   the trial, Mr. Elgin Brack.  Who is Scott Brack to you?

12   A    My cousin.

13   Q    How much older was he than you?

14   A    Hum.

15   Q    About?

16   A    About 20, 30 years.  Like 20.

17   Q    I'm sorry?

18   A    Yeah, like around 20.

19   Q    During this time period, when I say this time period, I

20   mean November of 2018, who did Scott live with, if you recall?

21   A    One of -- one of his friends.

22   Q    Okay.  A male friend or a female friend?

23   A    Male friend.

24   Q    Okay.  Did Scott have children that you knew about?

25   A    Yeah.

Brack - direct - Farrell                    877

1   Q    Who is the mother of his children?

2   A    Ebony.

3   Q    And Mr. Brack, do you remember when the gentleman, a

4   retired FBI agent testified yesterday and a bunch of phone

5   records were put on the screen so the jury could see them,

6   your phone records?

7   A    I think so.

8   Q    On November 25th there were multiple text messages to one

9   number (646) 541-0915.  Do you remember seeing those

10  yesterday?

11  A    Before I make a statement, can I see that?

12  Q    Can you see the --

13  A    Yeah.

14  Q    Yes.  Sure.

15       I believe this is from D-M-2, the call activity from

16  the North Carolina phone.

17       MR. SELDEN:  Mr. Farrell, if we could briefly

18  approach as to what you are showing on the screen.

19       MR. FARRELL:  It is in evidence.

20       MR. SELDEN:  I don't know that it is.  So if we can

21  briefly approach just to see.

22       No objection, Your Honor.  Thank you very much.

23       THE COURT:  You may proceed, Mr. Farrell.

24  BY MR. FARRELL:

25  Q    Okay.  Mr. Brack, do you see the -- there's multiple

Brack - direct - Farrell                    878

1   others.  It says from the North Carolina phone.  That's your

2   phone; right?

3   A    Yeah.

4   Q    To a number, (646) 541-0915?

5   A    Yeah.

6   Q    Who were you texting?  Whose phone was that?

7   A    I was texting Ebony.

8   Q    Thank you.  We will get back to the phone in a little

9   bit.

10       What was your relationship like with Scott and Ebony

11  back in November of 2018?

12  A    Like even though me and Scott cousins, he be locked up

13  for like 20 years, so me and him don't really like know each

14  other.  So, since he been out, you know, we've been posing

15  like get up, like, chilling with each other, feeling each

16  other out.  But I work a lot and I feel like, you know,

17  that's, like, what I would rather do than, like, chill with

18  people.  So when I had the time to chill with him, that's when

19  I took it.

20  Q    Did his children live with him?

21  A    No.

22  Q    So he and Ebony did not live together even though they

23  had children?

24  A    Nah, nah.

25  Q    Where did Ebony live, around where?

1   A      She live like -- she live down the block.

2   Q      What block?

3   A      Hughes, on Hughes Avenue.

4   Q      In the Bronx?

5   A      Yeah, in the Bronx.

6   Q      Where did Scott live, if you know?

7   A      He lived all the way up the street going toward like

8   Tremont, but on Hughes Ave, too.

9   Q      Now, you already testified that you were in North

10  Carolina for Thanksgiving; correct?

11  A      Yeah.

12  Q      Did there come a time that you came back to New York?

13  A      Yeah.

14  Q      Okay.  Why did you come back to New York?

15  A      It's because -- really, he was supposed to go down there

16  and have, like, a big Thanksgiving, but, you know, like,

17  family issues, so I didn't want to pick and choose going to

18  family dispute, so I tried to spend Thanksgiving with both.

19  Q      So you came back up to New York?

20  A      Yes.

21  Q      And on November 25, 2018, were you in the Bronx?

22  A      Yes.

23  Q      By the way, the name Edward Vasquez has been mentioned

24  numerous times during the trial.  Did you know that guy?  Did

25  you know him by another name?  You have seen his picture and

Brack - direct - Farrell                          880

1  his Government name.

2  A    I know him by a different name.

3  Q    What was that?

4  A    Boogie.

5  Q    And was he older than you, your age, or younger than you?

6  A    He was older than me, but -- yeah, he was older than me.

7  Q    Did you ever call this guy, Mr. Brack?

8  A    No, we wasn't that close.

9  Q    Did you have his phone number in your phone?

10  A    No.

11        MR. FARRELL:  I'm sorry Mr. Selden, I should have

12  told you this before, if we can queue up Government videotapes

13  417-A and B, please.

14        MR. SELDEN:  Of course.  Brief indulgence.

15        MR. FARRELL:  It is my fault.

16        MR. SELDEN:  Absolutely not.  It is going to take us

17  a second.  If you want to proceed on.

18        MR. FARRELL:  Good idea.  Thank you.

19        MR. SELDEN:  Of course.

20  Q    While Mr. Selden is helping me out here, Mr. Brack, do

21  you remember in the afternoon just generally the afternoon of

22  November 25th, what were you doing?  You already said you were

23  in the Bronx.  Who were you with?

24  A    It depends on what time.

25  Q    Okay.  Like if I were to say 3:00 or -- I will say 3

Brack - direct - Farrell                    881

1   o'clock.  Would you be able to tell me what you were doing

2   exactly at 3 o'clock?

3   A    I think, like, I had just got, like, back to Hughes

4   Avenue like around that time.

5   Q    And if you saw a videotape of yourself in the Bronx,

6   would that help your memory as to really where you were going

7   and what you were up to?

8   A    Yeah.  Yeah.  I think so.

9   Q    Mr. Selden is going to help us out with that.

10           MR. SELDEN:  Mr. Villanueva, I think we have it

11   plugged in and brief indulgence while I hit play.

12           MR. FARRELL:  Sure.  Of course.  Thank you.

13           (Video playing.)

14           MR. FARRELL:  Could you stop it for a second, Mr.

15   Selden?

16           MR. STEIN:  Sure.

17           (Video stopped.)

18   Q    Mr. Brack, do you see the guy in the gray sweatshirt?

19   A    Yeah.

20   Q    Who's that?

21   A    That's my cousin.

22   Q    Scott?

23   A    Yeah.

24   Q    Do you see the guy to his right?

25   A    Yeah.

Brack - direct - Farrell                              882

1    Q    Who's that?

2    A    You talking about right here?

3    Q    Scott's right.  Well, there are two guys at the front.

4    One guy is really in the front and then there is another guy

5    behind him to the right.  Who is that?

6    A    Me.

7    Q    Okay.

8              MR. FARRELL:  Can we continue rolling, Mr. Selden?

9              MR. SELDEN:  Of course.

10             (Video playing.)

11             MR. FARRELL:  We could stop.

12             (Video stopped.)

13   Q    Who is that guy, Mr. Brack?

14   A    That's Boogie.

15   Q    Who's the little girl with him, do you know?

16   A    That's his daughter.

17   Q    Did you ever catch her name?

18   A    Nah.  I didn't try to associate with her like that.

19   Q    Okay.  Now, Mr. Brack, I want to ask you about the

20   clothes you were wearing that day.  You saw them; right?

21   A    You can go back to it, yeah.

22   Q    Do you want to see it again?

23   A    Yeah.

24   Q    All right.  Thank you.

25             While Mr. Selden is cuing it up, Mr. Brack, can you

Brack - direct - Farrell                    883

1  tell the jury where you were headed at that time, on Hughes

2  Avenue?  Where you were walking to?

3  A    We was going to the car.

4  Q    To the car.  When you say the car, whose car was it?

5  A    Boogie's car, I guess.

6  Q    Where were you going from there once you got in the car?

7  Take a look, Mr. Brack.

8         MR. FARRELL:  Stop it, please, Mr. Selden.

9  Q    I'm sorry.  I'm asking two questions at once.  So let me

10 finish that first question.  Where were you going to go once

11 you got into the car?

12 A    We was going shopping.

13 Q    Shopping for what?

14 A    Clothes.

15 Q    You are wearing clothes, though, at that time?

16 A    Yeah.

17 Q    Where did you get the clothes from?

18 A    I got the clothes -- I got the pants out of the car and I

19 got the hoodie, I got that from, like, in the house, in the

20 house, like -- basically, the house is his friend's house, but

21 he got off Section 8, so he doesn't live there, but he still

22 has clothes there, and I was just to grab that jacket so I can

23 wear that to get the clothes and that was that.

24 Q    How about the pants?  Why did you grab those particular

25 pants?

Brack - direct - Farrell                    884

1   A     It's because the other pants I had was messed up.

2   Q     How did they get messed up?

3   A     The night before, me, Scott and Boogie, we was playing

4   with the kids, smoking and drinking and, yeah, we woke up that

5   night and, yeah...couldn't walk around like that.

6   Q     So those clothes in that video, had you ever worn them

7   before that afternoon?

8   A     Which ones?

9   Q     The Pelle Pelle, it was a Pelle Pelle jacket; right?

10  A     Yes.

11  Q     That you were wearing in that video?

12  A     Yeah.

13  Q     And black pants with zippers?

14  A     Yeah.

15  Q     Had you ever worn them before, before we saw you in that

16  video?

17  A     No.

18  Q     Did you ever wear them after that?

19  A     No.

20  Q     I am going to -- what's admitted in evidence as D-M-2,

21  call logs of 3500 -- I'm sorry, call logs from the North

22  Carolina phone.  At 5:58 in the evening, I'm looking up there,

23  Mr. Brack, on November 25, 5:58, that is your number calling

24  Scott's number; is that right?

25  A     Yeah.

Brack - direct - Farrell                                        885

1    Q    Then a minute later, you call him again, and then a

2    minute after that, you call him again; correct?

3    A    Yeah.

4    Q    So you weren't with him then; right?

5    A    No.

6    Q    Because you were calling him?

7    A    Yeah.

8    Q    As the records show, these were quick calls, two seconds,

9    two seconds, six seconds; right?

10   A    Yeah.

11   Q    So, as you are sitting here today, did you ever actually

12   speak to him?

13   A    Yeah.  But the -- the calls is basically, like, just

14   where you at.  We was basically on the same street, but we in

15   like different houses.  That was pretty much it.

16   Q    Okay.  And then, there's a whole series, about 15, from

17   7:16 in the evening all the way up to 9:06 and 53 seconds.

18   It's just you and one other number that you already identified

19   as Ebony's number; right?

20   A    Yeah.

21   Q    Was that a Facebook messenger?  Do you remember how you

22   were contacting her?

23   A    That's a text, I think.  If I remember right, it's a

24   text.

25   Q    Okay.  What were -- not telling us what the texts were

1   specifically, just the general nature, what were they about?

2   A    All the texts, I can't tell you.  If you got something

3   like maybe refreshing my memory.  But I know, like, some of

4   the texts.

5            MR. FARRELL:  Okay.  I am going to show only for the

6   witness' eyes, Mr. Villanueva, what's been previously marked

7   as Brack 001366.

8   Q    Look at those to yourself, Mr. Brack, once Mr. Villanueva

9   puts it up.  Let me know when it's up there.

10  A    I see it.

11  Q    Take your time.  Look at them.

12           These are printouts of your texts, right?

13           MR. SELDEN:  Objection, Your Honor.

14           MR. FARRELL:  Not what they're saying, Judge, just

15  what it is that he is looking at.

16           THE COURT:  He can identify what it is that he is

17  looking at.

18  A    Yes.

19  Q    Okay.  Have you had a chance to read them?

20  A    No, but, like, I remember now.

21  Q    Okay.  What were you texting about?

22  A    About a bus ride, like.  A bus ride back to North

23  Carolina.

24  Q    When were you planning to go back to North Carolina?

25  A    It was supposed to be the night of the 25th but they

Brack - direct - Farrell                    887

1    convinced me to staying to the next day, which was that

2    Monday, I think.

3    Q    Who convinced you?

4    A    The kids, Ebony and Scott.

5    Q    Now, as we've shown, and Mr. Magnuson showed yesterday,

6    your phone activity ends on the 25th at 9:06 and 53 seconds?

7    A    Yeah.

8    Q    You realize that, and it doesn't pick up again until the

9    next morning, which we'll get to in a minute.

10            Where were you and what were you doing when you're

11   texting with Ebony?

12   A    I was with Boogie and them.

13   Q    And afterwards, after that last text, where did you go?

14   What did you do?

15   A    We was basically -- if I got it right, around that time,

16   it was close for Boogie to be going back to the shelter around

17   like 10:00 or 11:00, and they was going to make a trip to

18   Jersey.  I didn't want to do that, so I stayed in the Bronx.

19   Q    Were you in Boogie's car at some point that evening?

20   A    Yeah.  Like right before I left them.  That's why I left

21   them, because they was going back to Jersey, and I didn't want

22   to go, so I stayed in the Bronx.

23   Q    When you got out of Boogie's car, did you have your phone

24   with you?

25   A    No.

Brack - direct - Farrell                    888

1   Q    And what, if anything, did you do to try to find out

2   where it was?

3   A    I ain't find out my phone was missing until like sometime

4   later and then I had to go from where I was at, I had to go

5   all the way back to Ebony's house, knock on the door, ask her

6   to call my cousin to see if the phone was in the car.   I

7   didn't know if I left it in, like, a store or something, but I

8   wanted her to check with him.

9   Q    Was she able to call for you?

10  A    Yeah.

11  Q    Now, I want to direct your attention to the next day, the

12  calls that are made from your phone.   There is a call made

13  from your phone --

14          THE COURT:  Mr. Farrell, we are --

15          MR. FARRELL:  This is D-M --

16          THE COURT:  This is our planned break.

17          MR. FARRELL:  All right.  Judge, conference.  You

18  are right, Judge, sorry.

19          (Sidebar held outside the hearing of the jury.)

20          (Continued on the next page.)

21

22

23

24

25

```
                        Sidebar                      889
```

1              (The following occurred at sidebar.)

2         THE COURT:  Yes.

3         MR. FARRELL:  I might have underestimated my time,

4    I'm sorry, Judge.

5         THE COURT:  I don't want you to rush.  I want to

6    know if you have considerably more, then it would make sense

7    to take lunch.

8         MR. FARRELL:  It would, it's more than I thought.

9         THE COURT:  Most lawyers do.  We will break for

10   lunch and come back.

11        MR. SELDEN:  Your Honor, when we return, and I

12   didn't want to raise this in front of the jury, Mr. Farrell

13   has been asking a number of leading questions of Mr. Brack.

14        THE COURT:  It is hard for a defense not to ask a

15   leading question.

16        MR. FARRELL:  Thanks, Judge.

17        MR. SELDEN:  Absolutely, Your Honor.  The challenge

18   here is that, if not all, his questions, the lion's share,

19   have been leading.  So questions like isn't it true your phone

20   called this phone.  The witness can testify to what he did or

21   what he didn't do.

22        THE COURT:  Yes.

23        MR. SELDEN:  But I think at this point we are going

24   to start objecting and we would ask for Mr. Farrell to modify

25   his questions to open-ended, direct questions.  Nothing

```
                          Sidebar                          890
```

1    further from the Government.

2            THE COURT:  That is what he is going to spend lunch

3    preparing.

4            MR. FARRELL:  Fair enough.

5            THE COURT:  Otherwise, I will start sustaining.

6            MR. FARRELL:  I get it, Judge, thank you.

7            THE COURT:  Thank you.

8            (Sidebar concluded.)

9            (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                        891

1          (In open court.)

2          THE COURT:  Ladies and gentlemen, after conferring

3    with counsel, we have concluded that it is most prudent to

4    take our lunch break now and so we shall.  The rules continue

5    to apply.  Do not discuss the case amongst yourselves or with

6    anyone else.  Continue to keep an open mind.

7          Do not use the lunch break as an opportunity to

8    conduct any investigations, research, electronic or otherwise,

9    directly or remotely, touching on this case.

10         Again, we are always cautious of the media rule, to

11   the extent there is any media comment, because even thoiugh

12   you are not necessarily near a television or a radio, as we

13   know, these social platforms can pop up someplace else.  To

14   the extent there is any account in any form of media related

15   to this case, please disregard it, tune it out, avert your

16   eyes.  Again, we remain on radio silence.  So that the

17   non-communication rule doesn't only mean face-to-face

18   communications, but it means communications of any kind:

19   Electronic, in writing, telephone, anything, no mention

20   whatsoever about anything that relates directly to this case,

21   any of the personalities, the issues, and no mention of the

22   fact that you are a juror coming to the courthouse in

23   Brooklyn.

24         We will take our break.  I don't know what the

25   weather is like outside.  The cafeteria is open.  You are

Proceedings                                           892

1    certainly free to go out even if it's dripping.

2           We ask you to come back to the central jury room at

3    around 2:15 and we will get started as close to that time as

4    we can.

5           Again, enjoy your lunch and we will see you at 2:15.

6           (Jury exits the courtroom.)

7           THE COURT:  Okay.

8           MR. STEIN:  We will see everybody at 2:15, 2:30, and

9    we will start as soon as we can after that.

10          MR. STEIN:  Excuse me, Judge.

11          THE COURT:  Enjoy your lunch.  Mr. Stein?

12          MR. STEIN:  Yes.  Depending on when Mr. Brack's

13   testimony is finished, do you anticipate having a charge

14   conference this afternoon?

15          THE COURT:  Yes.  We are going to definitely have

16   the charge conference this afternoon.  We will take a break,

17   give people time to assemble their thoughts and give Anthony

18   time to get you a hard copy of the proposed charge.  You will

19   have had it already electronically and we will go from there.

20          MR. SELDEN:  Your Honor, just a brief housekeeping

21   matter.

22          THE COURT:  Yes.

23          MR. SELDEN:  I understand exhibits were provided to

24   the jury.  If we can confirm with Mr. Villanueva none of the

25   jurors took those exhibits back to the jury room.  I just

```
                        Proceedings                      893
```

1   wanted to confirm that all of those exhibits remain in the

2   courtroom.

3          THE COURT:  William, can you count them up.

4          THE COURTROOM DEPUTY:  They left them here.

5          MR. SELDEN:  Thank you very much, Your Honor.  No

6   other housekeeping matters for the Government. Thank you, Your

7   Honor.

8          THE COURT:  All right.  Enjoy your lunch.  We will

9   see you on the other side.

10          MR. SELDEN:  Thank you, Your Honor.

11          (Lunch recess.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

894

1                    AFTERNOON SESSION

2          (In open court; outside the presence of the jury.)

3          THE CLERK:  Court is back in session.

4          Counsel for both sides are present including

5     defendant.

6          THE COURT:  Are we ready to go?

7          MR. SELDEN:  On behalf of the government, yes,

8     Your Honor.  Thank you, Your Honor.

9          MR. STEIN:  Judge, I have one matter to bring up

10    before the testimony resumes.

11         THE COURT:  You have one matter?

12         MR. STEIN:  To bring up.

13         THE COURT:  Mr. Brack can have a seat anyway.

14         MR. STEIN:  Yes, it has to do with his testimony.

15         (Witness ELGIN BRACK resumes the stand.)

16         MR. STEIN:  So I understand the Court has ruled on

17    this and I respect the Court's ruling, of course, I have

18    accept it although I disagree with it, but I just want to

19    bring this to your attention.

20         So Mr. Farrell argued a number of times about our

21    request to play a snippet or so of the video when Mr. Brack

22    was arrested and in ATF custody.  Then Mr. Farrell argued a

23    number of times that this was clearly demonstrative evidence.

24         So, if I can just turn this around, if the

25    government thought there was an issue as to whether or not

895

1   persons were right-handed or left-handed, even if you want to

2   put it in the context of a shooting, they wanted to be able to

3   prove that the defendant was right-handed or left-handed and

4   they had a video of that, I find it hard to believe this that

5   evidence would not be admissible.

6           I don't understand, frankly, when the government

7   argues that that's confusing.  What is it that's confusing

8   about it?  This is an intelligent jury.  They're not going to

9   hear anything about his being interviewed or being questioned

10  or anything like that.  It's simply to demonstrate, as we have

11  argued in a number of different other parts of the case, that

12  he was left-handed.  I don't understand, frankly, the basis of

13  the Court's ruling.  It's confusing.  I don't know what

14  prejudicial means.  That means it hurts them?  I really don't

15  understand, frankly.

16          THE COURT:  Mr. Selden, do you want to be heard

17  before I respond to Mr. Stein.

18          MR. SELDEN:  Your Honor, we believe the record is

19  clear with regard to the Court's prior ruling.

20          THE COURT:  Yes.

21          This is the ruling, Mr. Stein.  Most demonstrative

22  evidence or other evidence, all that kind of evidence, we're

23  not saying it's something about the quality of evidence that

24  makes it inadmissible.  It's all, in the context of the case,

25  the fact that there is already evidence uncontradicted in this

896

1    case that Mr. Brack is left-handed.  I'm not belaboring the

2    record further that could lead to questions about where he

3    was, why he was there, what was going on.

4         MR. STEIN:  He was arrested.

5         THE COURT:  What was going on in that room is not

6    relevant to this trial.  It's not like this is demonstrative

7    evidence of something that is relevant to the case.  At best,

8    it shows him using his left hand as his dominant hand which is

9    conceded, period.

10        MR. STEIN:  Judge, I understand.

11        THE COURT:  So it's cumulative and it's out under

12   403.

13        MR. STEIN:  Judge.  I understand there was, I'll

14   call it my characterization, brief testimony by Agent Miceli

15   that he was left-handed so that was, I don't know if it was

16   last week.

17        THE COURT:  Whatever it is, it's uncontradicted.

18   It's in the record, conceded that he's left-handed.  Conceded,

19   period.  Cumulative.

20        MR. STEIN:  Okay.

21        THE COURT:  Any other housekeeping?

22        MR. STEIN:  No.

23        MR. SELDEN:  Not on behalf of the government.  Thank

24   you, Your Honor.

25        THE COURT:  Mr. Farrell, are you otherwise ready?

1          MR. FARRELL:  Yes, Judge.

2          THE COURT:  Mr. Villanueva says we have a jury so

3     bring them in.

4          (Jury enters.)

5          THE COURT:  Be seated, please.

6          Counsel will stipulate that the jury is present and

7     properly seated.

8          MR. SELDEN:  On behalf of the government, yes.

9     Thank you, Your Honor.

10          MR. STEIN:  Yes, Judge.

11          THE COURT:  Thank you Mr. Stein as well.

12          Ladies and gentlemen, welcome back.  I hope you had

13     a chance to enjoy a good lunch and we're ready to pick up the

14     afternoon session.

15          When we broke for lunch, remember we were on the

16     defense case, Mr. Brack was on the stand and Mr. Farrell was

17     on his direct examination.  We'll ask Mr. Farrell to continue

18     that direct examination now.

19          MR. FARRELL:  Thank you, Your Honor.

20          (Continued on next page.)

21

22

23

24

25

Brack - direct - Farrell                          898

1   DIRECT EXAMINATION (Continued)

2   BY MR. FARRELL:

3   Q    Mr. Brack, over the break, I realized I forgot to ask you

4   a few questions about the time you spent on Hughes Avenue the

5   day before the incident so that being November 25, 2018.

6   Okay?

7   A    All right.

8   Q    I asked you if you were going or where were you going and

9   you said you were going shopping.  I didn't follow up though.

10          Did you actually go shopping or buy any clothing?

11  A    Yeah.

12  Q    What did you by?

13  A    Two seats and some shirts.  That's it.

14          MR. FARRELL:  Mr. Selden, whenever you're ready to

15  set up, that would be great.

16          Mr. Villanueva, this is for Mr. Brack only.

17  Q    I'm going to show you when has been previously marked for

18  identification at this point only as Defendant's A.  Do you

19  see that?

20  A    Yes.

21  Q    Is that one of the sweatsuits that you bought?

22  A    I bought the pants that day, yeah.

23  Q    The jacket also or not?

24  A    No, the jacket don't go with it.

25  Q    Okay.  You bought those pants though that you're wearing,

Brack - direct - Farrell                    899

1   right?

2   A     Yeah.  Yeah.

3   Q     And this is how you looked when you were arrested on the

4   evening of the 26th?

5   A     Yeah.

6           MR. FARRELL:  Okay.  We offer Defendant's A for

7   identification.

8           THE COURT:  Any objection?

9           MR. SELDEN:  No objection.

10          THE COURT:  Received without objection.

11          (So marked.)

12          MR. FARRELL:  If we can show everybody now.

13  Q     Just what you said before, the pant that you're wearing

14  in this picture you bought the day before in the Bronx,

15  correct?

16          THE COURT:  "Pants," he said.

17          MR. FARRELL:  Pants.  You're right.

18  Q     It was pants, right?

19  A     Sweats.  I bought two.

20          THE COURT:  You bought them both?

21          THE WITNESS:  No, I bought two.  This is only one.

22  The other one is not on here.

23          THE COURT:  But you bought both the sweats and the

24  hood here?

25          THE WITNESS:  No.  That's not a hoodie.

Brack - direct - Farrell                    900

1            THE COURT:  Is there anything in this picture that

2    you didn't buy the day before, November 25th?

3            THE WITNESS:  The jacket.

4            THE COURT:  The jacket?

5            THE WITNESS:  Yeah.

6    Q    How about the sneakers?

7    A    Oh, I been owning the sneakers.

8    Q    You had them for a while, right?

9    A    Yeah.

10           MR. FARRELL:  Now with Mr. Selden's assistance, I'm

11   going to ask that we, again, for the last time see

12   Government's Exhibit 417 from, a shot of Hughes Avenue in the

13   Bronx.

14           (Video played.)

15           MR. FARRELL:  Okay.  We can stop it.

16           (Video stopped.)

17           MR. FARRELL:  Thank you, Mr. Selden.

18   Q    Okay.  I asked you about the clothing you were wearing

19   before and now I'm going to ask, with Mr. Bennett's

20   assistance, that you be shown what's in evidence as Government

21   Exhibit 306 and 307.

22           MR. FARRELL:  Okay.  What are you showing him first,

23   Mr. Bennett?

24           MR. BENNETT:  306 -- 307, actually.  I apologize.

25   Q    Looking at 307, Mr. Brack, what is it?

1   A    The first one is 307, right?

2   Q    I believe so, yes.

3   A    These are jeans.

4   Q    You mentioned earlier that you were wearing black pants

5   when you were on Hughes Avenue on November 25th.  Are those

6   the pants you were wearing?

7   A    Yeah.  In the video, right?

8   Q    Yes.

9   A    Yeah.

10        MR. FARRELL:  Okay.  And the other exhibit,

11  Mr. Bennett, show him that, please.

12  Q    Do you recognize that, Mr. Brack?

13  A    Yeah.

14  Q    What is it?

15  A    This is the, this is the Pelle Pelle jacket.

16  Q    Was that what you were wearing in the video?

17  A    Yeah.

18  Q    What I didn't ask you, what I meant to ask you is what

19  did you do with each of those items, the pants and the hooded

20  shirt, hooded sweatshirt, after you went shopping.  What did

21  you do with those clothes?

22  A    I left both of them in the car.

23  Q    Whose car was that?

24  A    Boogie's.

25  Q    And I believe you did testify that you never wore either

1   the jacket or the pants again, correct?

2   A    No.

3   Q    Was there something you didn't like about the jacket or

4   the sweater, the sweatshirt?

5   A    Young people don't wear these.  This is, like, Pelle

6   Pelle is out of style.  That's, like, 2008, 2006.

7   Q    How about the pants with the zippers, is that your style,

8   Mr. Brack, wearing pants with zippers?

9   A    I mean, like, the cuts in them, they still, like,

10  young-ish but, like, I don't really like the bling bling, like

11  the flashy.  You hear me?  That's why I never buy Jury.

12          THE COURT:  Mr. Farrell, remember you're on direct.

13          MR. FARRELL:  Yes, Judge.  I'm going to try to

14  control myself.

15          You can take the exhibits away thank you.

16          THE COURT:  So the record is clear, that last

17  exhibit is 306.

18  Q    When we broke before lunch, Mr. Brack, I was asking you

19  about the time that -- I showed you a series of texts that you

20  acknowledged they were from Ebony, correct -- to Ebony, right?

21  A    Yeah, I think so.

22  Q    Now I'm asking you, again, who were you with at the time

23  you were making, had completed making those, those texts?

24          THE COURT:  If anyone.

25  Q    Who, if anyone?

Brack - direct - Farrell                              903

1        MR. FARRELL:  Thank you, Judge.

2   A    It was me, my cousin, Boogie, and there was another dude.

3   I think his name was, like, Rich.  He was the dude who house

4   it was where my cousin usually stay.  It was, like, that was

5   his house.

6   Q    Had you met that guy before?

7   A    Not really.  Like, we haven't met, like, been introduced,

8   but while I was on Hughes, like, I see him walking into the

9   store or something like that.

10  Q    And what, if anything, were you guys doing at that time?

11  What was going on?

12  A    Just chilling.  Smoking.  Just chilling.

13  Q    And did there come a time they went somewhere and you

14  didn't?

15        MR. SELDEN:  Objection, Your Honor.

16        THE COURT:  Sustained.

17  Q    What happened next, Mr. Brack?

18  A    Like, the last time I was, like, I was with him?  The

19  last time I seen him?

20  Q    Yes, sir.

21  A    That was, like, around when they was going back to

22  Jersey.  It was, like, around, like, 9:20, something like

23  that.  He was going to Jersey.

24  Q    And where were you?

25  A    I stayed in the Bronx.

Brack - direct - Farrell                904

1   Q    And did you have occasion to see Ebony again that

2   evening?

3   A    I went over there like around 10 something.  It's because

4   I was chilling with somebody and then it got boring and I went

5   to pull out my phone and I realized the phone had fell out my

6   sweats.  So I went to Ebony so she could call him to ask is my

7   phone in the car because I -- I wanted to make sure, like, I

8   ain't leave my phone in the store or nothing like that, so

9   before I raise hell in the store, I want to make sure it's not

10  in the car.

11  Q    Okay.  I want to now direct your attention to call

12  details that are in evidence already under a people's exhibit

13  from Mr. Magnuson.

14          I want to direct your attention --

15          MR. FARRELL:  When you're ready, Mr. Villanueva,

16  everyone can see this.

17  Q    Do you have it, Mr. Brack?

18  A    I can't see the thing -- oh, yeah, I got it.

19  Q    Directing your attention to 11/26, 1:34 and 6 seconds

20  a.m., do you recognize your phone, correct?

21  A    Yeah.

22          MR. SELDEN:  Objection, Your Honor.

23          MR. FARRELL:  I need to direct him, Judge, to the

24  call.

25          THE COURT:  Just direct him.

1          MR. FARRELL:  And then ask the question.

2    Q    You see that your phone called Scott's phone at that

3    time, correct?

4    A    Yeah.

5    Q    Did you make that call, Mr. Brack?

6    A    No.

7    Q    And the call directly below it is the same, is at 1:46

8    and 31 seconds a.m.  Again, it's your phone calling your

9    cousin Scott's phone.  Do you see it?

10   A    It doesn't have the seconds.

11   Q    It doesn't but it has the phone making a call, correct?

12   A    Oh, right, yeah.

13   Q    So the question is the same.  Did you make the call?

14   A    No.

15   Q    And lastly on this issue, the next call down, but this

16   one is at 3:54 and 19 seconds a.m., it has an incoming call

17   from your cousin Scott's phone to your phone.  Did you ever

18   receive such a call, Mr. Brack?

19   A    No.

20   Q    Now, I want to direct your attention to the next morning,

21   Mr. Brack.  Did there come a time that you saw your cousin

22   Scott?

23   A    Yeah.

24   Q    Tell the jury how that came about.

25   A    He had to, he had to meet with Ebony and the kids before

1  she took them somewhere so he can give her, like, a house key

2  or something like that.  So I was supposed to meet up with him

3  so I can get my phone back.

4  Q    And about what time was this?

5  A    6:30, 7 in the morning, somewhere around there.

6  Q    And where did you actually meet him?

7  A    I met him right off, right off of Hughes, like the way

8  you see us walking, like.

9  Q    In that video this we just saw?

10  A    Yeah, somewhere down that block there.

11  Q    Was he in a location or a house or was he in a car?

12  A    No, he was in a car.

13  Q    What car was that?

14  A    Toyota Solara.

15  Q    Is that the car from last, from the night before?

16  A    Yeah.  That's the only car I seen him and anybody I have.

17  Q    And what, if anything, happened then, Mr. Brack, after

18  you see your cousin in the car?

19  A    I seen him, we start talking and then I hop in the car

20  with him.

21  Q    At that point in time, Mr. Brack, did you have any money

22  with you?

23  A    Yeah.

24  Q    How much did you have?

25  A    I had over, like, 6,000.

1  Q    Do you recall not exactly, but to the best extent, the

2  extent of your memory, what the denominations were?  Like how

3  much -- do you know what I mean by that?  What type of bills

4  did you have?

5  A    I had mostly 100s but I had a couple 20s and 5s because,

6  you know, like, once you buy something and you get change

7  back, yeah, but I didn't have -- that was it.  Like, 20s and

8  5s and stuff like that.

9  Q    Why did you have that amount of money on you that

10 morning, Mr. Brack?

11 A    I had that money when I came to meet them.  It's, like,

12 the holidays, I barely, like, get to see them, so I initially,

13 like, planned doing something for the kids because I knew I

14 wasn't coming back for Christmas.

15 Q    And I believe you answered this initially but where had

16 you been planning to go that evening on the 26th of November?

17 Where were you --

18 A    That evening?

19 Q    Yeah, that night.  Where were you planning to go?

20 A    Oh, back to Carolina.

21 Q    And when you got into Scott's -- withdraw that.

22        What, if anything, happened after you entered the

23 car that Scott was driving, the car that you identified as

24 Boogie's?

25 A    He told me that --

Brack - direct - Farrell                    908

1           MR. SELDEN:  Objection, Your Honor.

2           THE COURT:  Sustained.

3    Q    What happened?  Where did you go guys go, if anywhere?

4    A    He said --

5           MR. SELDEN:  Objection, Your Honor.

6           THE COURT:  You can't tell us what he said.

7           THE WITNESS:  Oh.

8    A    He, he had to pick up Boogie.

9    Q    And where was Boogie?

10   A    He was at the shelter.

11   Q    Where is that?

12   A    In New Jersey.

13   Q    Okay.  So how did you guys -- did you go there?

14   A    Yeah.

15   Q    Who drove?

16   A    My cousin.

17   Q    And where did you sit?

18   A    In the passenger.

19   Q    Okay.  And during that trip, did anything happen?

20   A    Nothing significant.  Like what?

21   Q    Did you ever get your phone back?

22          MR. SELDEN:  Objection, Your Honor.

23   A    Yeah.

24          THE COURT:  I'm going to allow it.

25   Q    How did you get it back?

Brack - direct - Farrell                    909

1    A    Like 10 or 15 minutes I was, like, Yo, where my phone at?

2    He was, like, Oh, here you go, and he just gave it to me.

3    Q    And where's the first place you stopped, Mr. Brack?  Did

4    the car stop as you're riding?

5    A    You mean like pacifically (sic)?

6    Q    Yes.

7    A    We stopped at the tolls, tolls, gas.

8    Q    I don't mean tolls.  I mean was there a location that you

9    stopped and got out of the car or that Scott got out of the

10   car?

11   A    The first stop we actually made but nobody got out was we

12   pulled up to the shelter and that was that.

13   Q    Did Boogie get out?

14   A    No.  Boogie, he said he was cleaning his room or

15   something, come back.  So --

16   Q    Where did you guys go then?

17   A    I told him I had to go to Wells Fargo.

18   Q    You're in the State of New Jersey now, right?

19   A    Yeah.  Yeah.

20   Q    Do you know the city or town?

21   A    I think, I think we was, like, in Newark, but I don't, I

22   don't remember.

23   Q    Did you get dropped at a certain point?  Did you find a

24   Wells Fargo?

25   A    Yeah, he drove me while we was waiting on Boogie.  Like,

1   the shelter is, like, at a downtown so, you know, most

2   downtown places, they got, like, banks and Wells Fargo is a

3   big bank so we ended up going to a bank and that's where I was

4   dropped off at.

5   Q    What was your reason for going to the Wells Fargo?

6   A    It's because when I make certain purchases, like, if I

7   usually swipe my card in Brooklyn and I happened to swipe my

8   card in North Carolina or the Bronx, they will block my card

9   until I can confirm that was me.  So I had a block on my card.

10  The only thing I can do is get money from the ATM.  So I went

11  to get that block taken off my card.

12  Q    Were you able to accomplish that?  Did you do that?

13  A    No.  They told me to go back to the 14th Street branch.

14  Q    14th Street where?

15  A    In New York.

16  Q    I want to direct your attention to more calls in

17  evidence, Mr. Brack.  Specifically, at 10:38 to 10:41, there's

18  a series of five communications between your phone and what

19  you already identified as Ebony's phone.  Do you see those?

20  A    Yeah.

21  Q    Do you recall as you sit here today what they were about?

22  A    I don't remember what they was about, no.

23  Q    Well, you see right after that, the next actual call is

24  at 10:48 and 48 seconds, and it's your phone calling Scott's

25  phone for 33 seconds.

1   A     Yeah.

2   Q     So you're calling him.  You weren't with him in the car,

3   right?

4   A     Nah.  Nah.  I wasn't with him.

5   Q     Do you recall why you were calling him?

6   A     Yeah.  I was telling him I was ready to be picked back

7   up.

8   Q     And the next call after that is approximately an hour

9   later at 11:42 and 27 seconds.  This time it's Scott's phone

10  calling your phone for 44 seconds.

11          Do you recall the nature of that, what that call was

12  about?

13          MR. SELDEN:  Objection, Your Honor.

14  A     He was looking for me.

15          MR. SELDEN:  We'll withdraw the objection.

16          THE COURT:  Objection is withdrawn.

17          MR. FARRELL:  At this time, I'd like the witness to

18  be shown, and the jury can see it too, it's in evidence, as

19  Defendant's I in evidence.

20          Mr. Selden, if you would, the corresponding

21  government exhibit with the actual real original receipt is

22  what?

23          MR. SELDEN:  We'll be happy to get it for you.

24          MR. FARRELL:  Thank you very much.

25          MR. SELDEN:  Of course.

Brack - direct - Farrell                    912

1          For the record, I'm providing Mr. Farrell

2    Government's Exhibit 222-A.

3          MR. FARRELL:  Thank you very much.

4          MR. SELDEN:  Of course.

5          MR. FARRELL:  We're going to show this to the

6    witness, 22-A, and he's already able to look at the screen.

7          THE COURT:  222-A, Mr. Farrell.

8          MR. FARRELL:  Thank you, Judge.

9    Q    That McDonald's receipt is in evidence at the trial,

10   Mr. Brack.  It's showing a purchase on 11/26 of 2018 at

11   8:29 a.m. at a McDonald's at 772 Broad Street in Newark, New

12   Jersey of an egg and cheese biscuit and a sweet ice tea.

13         Did you make that purchase at that time, Mr. Brack?

14   A    No.

15   Q    Were you ever in that McDonald's as far as you know on

16   that day or any day in that specific McDonald's in Newark, New

17   Jersey?

18   A    No.

19   Q    Is that the type of order you would get, egg, cheese,

20   biscuit?

21   A    No.

22   Q    What's your breakfast order, Mr. Brack?

23   A    I get at least a McGriddle or something but not that, not

24   a biscuit.

25   Q    Okay.  That's good for that exhibit.  Thank you.

Brack - direct - Farrell                    913

1           By the way, your bank records that are in evidence

2    show you do make purchases from McDonald's sometimes, right,

3    Mr. Brack?

4    A    Yeah.

5    Q    Do you usually pay in cash or by card?

6    A    No, I use my card.

7    Q    After the call that I just asked you about at 11:42 a.m.

8    from Scott Brack's phone to your phone, could you tell the

9    jury where you, what you were doing at about that time?

10   A    I was still, I was still in the area of the Wells Fargo,

11   Fargo bank, but when he called me, he was looking for me and I

12   was, like, a couple stores down at a pizza shop so that was

13   that.

14   Q    Did you have some pizza that day?

15   A    Yeah.

16   Q    Pay cash?

17   A    Yeah, cash.

18   Q    And tell the jury as best you can recall what did you do

19   in the afternoon, say, after 12 o'clock noon up to the next

20   call you made to Scott at 3:04 and 47 seconds p.m.   In

21   approximately that three hour period, can you tell the jury

22   what you were doing?

23           MR. STEIN:  Mr. Farrell, it's not in focus.

24           MR. FARRELL:  Oh, okay.

25   Q    Okay.  Have you got the question, Mr. Brack?

1    A    Yeah.

2    Q    Where were you as best you can recall?  What were you

3    doing?

4    A    From 11:42 to 3:04, I did a lot.  I left New Jersey, got

5    all the way back to New York and had to get right back on that

6    same, I guess it's, like, a shuttle or bus and go back to New

7    Jersey.

8    Q    What was the reason for all that traveling?

9    A    It's because we couldn't -- like, he wanted to be on time

10   with Boogie's car because he say he ain't want to hear him

11   crying or whatever.  So he got mad when he couldn't find me

12   and I couldn't tell him besides the pizza shop, like, I don't

13   know what else to tell him so he ended up leaving.  So I ended

14   up talking to a couple of people, trying to get back to

15   New York, and they told me to get on this bus, it's going to

16   take me to a shuttle and that's going to get me back to

17   New York.

18   Q    And is that what you did?

19   A    That's what I did and when I finally got to New York, I

20   end up getting a call, like, Yo, where you at?  And I told

21   him.  They was, like, Yo, get on the shuttle and come right

22   back, and they met me at the pick up spot.

23   Q    I want to direct your attention to a call now several

24   hours after the 3 o'clock, 3:04 call, to 6:04 p.m. and that's

25   a call for 9 seconds from Scott's phone to your phone.  Do you

Brack - direct - Farrell                          915

1   remember that call?

2   A    Yeah.

3   Q    Where were you at that time when you received that call?

4   A    I think I was just getting back in Jersey.

5   Q    Okay.  And where was Scott if he wasn't with you?

6   A    He was with Boogie.  He was waiting to pick me up.

7   Q    And where did you go after you got picked up, Mr. Brack?

8   A    After we got picked up, we drove around Jersey with

9   Boogie and then I told him that I had to make the bus so he

10  was trying to drive me back to New York.

11  Q    I showed you defendant's A in evidence, Mr. Brack, and

12  you acknowledged that's what you were wearing on the night of

13  your arrest, correct?

14  A    Yeah.

15  Q    There's no hat or hood in this jacket.  Did you have a

16  hat or a hood or what's called a do-rag?

17  A    Nah.

18  Q    Were you wearing anything gray that evening?

19  A    No.

20  Q    Where were you hanging out in the Bronx once you returned

21  to the Bronx, Mr. Brack?

22  A    At that dude, like, Rich's apartment, whatever you want

23  to call it.

24  Q    And what were you guys doing there?

25  A    We were smoking.

1   Q    Smoking marijuana?

2   A    Yeah.

3   Q    Who was smoking?

4   A    All of us.

5   Q    Now, did there come a time that you left Rich's

6   apartment?

7   A    Yeah.

8   Q    Where were you going?

9   A    I guess everybody went they separate routes but my, my

10  route was to go to the store because we ran out of wraps.

11  Q    And from the store, where did you go?

12  A    I think I went to Ebony's house.

13  Q    Did you have any property at Ebony's house?

14  A    No.

15  Q    A backpack?

16  A    No.

17  Q    Did there come a time that evening that you did get your

18  backpack?

19  A    Yeah, that was when we first got back.

20  Q    Okay.  And where was it?

21  A    It was in Rich's apartment.

22       MR. FARRELL:  I'd like the witness to be shown

23  Exhibit 304 in evidence.

24       (Continued on next page.)

25

E. Brack - direct - Farrell                         917

1    (Continuing)

2    Q    What is it?  Do you recognize that, Mr. Brack?

3    A    It's the bookbag.

4    Q    Okay.  Was it your bookbag?

5    A    Yeah.

6    Q    How long had you had that bookbag as of November 26th,

7    2018?

8    A    Probably like, two years.

9    Q    And Mr. Brack, did you have that -- at what point did you

10   pick that bag up when you got back to the Bronx?

11   A    ASAP.  Like, that was the -- since we knew we was leaving

12   for the bus and we knew, like, we had time, we was smoking and

13   chilling, we was just like, go ahead and get everything ready,

14   so when it's time to go, we could just pull out.

15   Q    Did you pack that bag with anything?

16   A    My clothes.

17   Q    Okay.

18        MR. FARRELL:  I'm going to show you what's in

19   evidence as Government Exhibit 305.

20        That's not it, John.  That's the jeans.

21   Q    Take a look, Mr. Brack, if you will, at what's in that

22   bag.

23        MR. FARRELL:  Thank you, Mr. Bennet.  You can leave

24   that backpack right there.

25   Q    What do you have in your hands, Mr. Brack?

E. Brack - direct - Farrell                    918

1    A    Some jeans.

2    Q    Okay.  Are they yours?

3    A    Yeah.

4    Q    Okay.  Did you pack them had your backpack?

5    A    Yeah.

6    Q    Okay.  What's next in that bag he just gave you?

7    A    Another pair of jeans.

8    Q    Yours also?

9    A    Yeah.

10   Q    Did you pack them in the bag?

11   A    Yeah.

12   Q    What else is in Government 305?

13   A    A shirt.

14   Q    Is that your shirt?

15   A    Yeah.

16   Q    Did you pack it in the bag?

17   A    Yeah.

18   Q    Anything else in that exhibit?

19   A    My slides.

20   Q    What do you call them?

21   A    My slides.

22   Q    Okay.  Some people call them flip-flops; right?

23   A    Yeah, yeah.

24   Q    Okay.  Did you pack them in the bag also?

25   A    Yeah.

E. Brack - direct - Farrell                    919

1          MR. FARRELL:  Mr. Bennet, could you show what's

2   marked for ID only at this point, W and X.

3   Q    W is -- take a look at that, Mr. Brack, see if you

4   recognize what's in that.

5   A    Say what?

6   Q    I'd ask you to look inside the bag.  Look at the contents

7   and tell me if you recognize it.

8   A    Yeah, it's a shirt.

9   Q    That was yours?

10  A    Yeah.  I bought it from the corner store in the Bronx.

11  Q    Did you pack it in that backpack?

12  A    Yeah.

13  Q    Okay.  Keep going, please.

14  A    My boxers.

15  Q    Okay.  Did you pack them?

16  A    Yeah.

17  Q    Okay.  Keep going.

18          What's that?

19  A    Another pair of Polo boxers.

20  Q    Pack them?

21  A    Yeah.

22  Q    What you got there?

23  A    Another pair of boxers.

24  Q    Okay.  Did you pack them?

25  A    Yeah.

1    Q    Keep going, please.

2    A    Polo socks.

3    Q    Okay.  Did you pack them?

4    A    Yeah.

5              And this is the other sock.

6    Q    Okay.

7    A    A Levi shirt.

8    Q    Did you pack that?

9    A    Yeah.

10             And boxers.

11   Q    Okay.  Did you pack those?

12   A    Yeah.

13   Q    Is that it for that bag?

14   A    There's some type of rag in here.

15   Q    Okay.  Is that yours?

16   A    I don't recall it but it might have been in the bag.

17   Q    Okay.

18             Mr. Brack, does all those clothes with the exception

19   of the thing you're not sure about, the headwrap, were they --

20   is that -- is that how they looked the last time you saw them

21   pretty much when you packed them last year, November 26th?

22   A    I didn't see the headwrap.

23   Q    I said forget the headwrap; just the other item that you

24   talked about.

25             Is that -- they're your clothes and that's how they

E. Brack - direct - Farrell                921

1   looked?

2   A    Yeah.

3         MR. FARRELL:  I'd offer Defendant's W in evidence,

4   Your Honor.

5         MR. SELDEN:  No objection, Your Honor.

6         THE COURT:  Received without objection.

7         (Defendant's Exhibit W received in evidence.)

8         MR. FARRELL:  Okay.  Mr. Bennet, you can trade W and

9   now show the witness X, please.

10        THE COURT:  Is this for identification only?

11        MR. FARRELL:  Yes.  For ID, Judge, thank you.

12  BY MR. FARRELL:

13  Q    Okay.  Mr. Brack, we realize there's a lot of different

14  stuff in there.

15  A    Yeah.

16  Q    So don't dump it out, please.

17  A    All right.

18  Q    But take a look at it and tell me if you recognize any

19  items and say what they are.

20  A    Like, pay stubs.

21  Q    Your pay stubs?

22  A    Yeah.

23        Backwoods.

24  Q    What is Backwoods?

25  A    It's cigars.

E. Brack - direct - Farrell                      922

1  Q    Okay.  Did you use them to smoke cigars?

2  A    Yeah.

3  Q    Real cigars or marijuana cigars?

4  A    Marijuana cigars; wraps.

5  Q    Okay.  Keep going.

6  A    More wraps.  Backwoods.  Russian Creme.

7  Q    Is this stuff all packed in the same backpack?

8  A    Yeah.  The wraps was definitely in there.

9  Q    Okay.  Anything in that bag now that's Defendant's X that

10 you know that you packed that, please take out.

11 A    This wallet.  This wallet case.

12 Q    Okay.

13 A    This is locking gel.  It's Jamaican Mango Lime.

14 Q    Is that a hair product or something else?

15 A    Yeah, it's a hair product.

16 Q    Keep going.

17 A    Headphones.  A Ray Bans glasses.

18 Q    They were packed too?

19 A    Yeah.

20          All right.  So question, you said the stuff that I

21 packed?

22 Q    Yes, that you packed in your backpack.

23 A    All right.

24 Q    Is that it?

25 A    Yeah.  But pretty much it's some other stuff that was

VB        OCR        CRR

E. Brack - direct - Farrell                         923

1   already in there.

2   Q    Okay.  Like what?

3   A    Deodorant.  Condoms.  Condoms.

4   Q    Okay.  Are those -- are you holding them now?  Did you

5   pack them in your backpack?

6   A    Yeah, like they was already in my bag when I packed it

7   that night.

8   Q    I see.  I should have phrased the question:  Anything

9   that was in your backpack on the night of November 28th,

10  that's what I'd like you to identify.

11  A    All right.

12         THE COURT:  26th?

13         MR. FARRELL:  26th, Judge.  Thank you very much.

14  A    Charger; iPhone case; just a whole lot of other pay

15  stubs, Metro Cards.

16  Q    Okay.  From what you can tell, Mr. Brack, is all the

17  stuff this in Defendant's X for identification, was that stuff

18  that was in your backpack on the night of November 26th, 2018?

19  A    Actually, there's a couple things in this bag that wasn't

20  in my bag.

21  Q    Do you know what they were?  Can you identify those?

22  A    I don't know what this is.  It's like a...

23  Q    Okay.  You can put that on the side.  Anything that

24  wasn't in your backpack, put on the side.

25  A    All right.  Like these gloves.  I don't know what this

E. Brack - direct - Farrell                    924

1    is.

2    Q    Okay.

3    A    Leather glove.  It's two other gloves, and I don't know

4    what this is.  It's like a razor...

5    Q    It wasn't yours, as far as you know?

6    A    Yeah.  Yeah, it wasn't in my bag.

7    Q    Okay.

8    A    Okay.  And like, that's pretty much.

9         MR. FARRELL:  So I would offer everything that

10   Mr. Brack's identified as being in his backpack on

11   November 26th as Defendant's X in evidence.

12        MR. SELDEN:  No objection.

13        THE COURT:  Received without objection.

14        (Defendant's Exhibit X received in evidence.)

15   BY MR. FARRELL:

16   Q    Mr. Brack, I'm showing you the black pants.  We've

17   already talked about Exhibit 307 in evidence.

18   A    All right.

19   Q    Did you pack those --

20        MR. FARRELL:  You have it, Mr. Bennet?

21   A    Yeah, I'm just about to clear this off because it's

22   getting too crowded up here.

23   Q    All right.  Thank you.

24        MR. FARRELL:  Okay, Mr. Bennett, you can trade 307

25   for Defendant's X.

E. Brack - direct - Farrell                    925

1   Q    You see 307, the black pants?

2   A    Yes.

3   Q    Did you pack those in your bag, your backpack, that

4   evening, Mr. Brack?

5   A    No.

6          MR. FARRELL:  I'm showing you up on the screen up

7   here what's been admitted as Government 308 in evidence.

8   Q    Okay.  You got it, Mr. Brack?

9   A    Yeah, I can see it.

10  Q    Okay.  What is it?

11  A    It's the gun.

12  Q    Did you pack that in your backpack?

13  A    No.

14  Q    Is this your gun?

15  A    No.

16  Q    Did you see this gun at any time on November 26th, 2018?

17  A    No, I didn't see it on the 26th.

18  Q    Did you see it on the 25th?

19  A    No.  I seen it prior, but not, not them days.

20  Q    Where did you see it prior to the day you were arrested?

21  A    I seen it in a car.

22  Q    Whose car?

23  A    Boogie's.

24  Q    About how many days before -- do you know exactly when

25  you saw it in there?

E. Brack - direct - Farrell                926

1    A    It was like -- it was like, the -- the first time I met

2    him.  We was -- it wasn't him but it was me and some other

3    dude that be with them, like, in the Bronx.  We were smoking

4    and I ended up dropping a bud.  And we was moving the seat and

5    like, under the seat, how you like, pulled the seat, the gun

6    ended up falling from somewhere under the seat and I end up

7    seeing it.

8    Q    Did you touch it when you saw it?

9    A    No.

10   Q    Mr. Brack, I want to get back to the night in question

11   when you were ultimately arrested on November 26th, 2018.

12           You testified now about packing that backpack with a

13   variety of items.

14           Where did you go after it was packed?

15   A    After it was packed, we went back in the house and we was

16   just smoking.

17   Q    Did there come a time you left the house?

18   A    Boogie left to go get him and his kid something to eat.

19   Q    And you stayed?

20   A    Yeah, we stayed.

21   Q    You and?

22   A    Me and Rich.

23   Q    Was Scott with you at that point?

24   A    No, he went off somewhere but he didn't go with them.

25   Q    I want to direct your attention to what I think will be

1    the last time to those calls from November 26th.  The last

2    call on the sheet shows time of 8:40 and 5 seconds, call for 7

3    seconds from your phone to Scott's phone.

4              Do you remember making that call?

5    A    Yeah.

6    Q    What was the purpose of that call?

7    A    It was like an hour after, like, a particular smoke

8    session we had and Scott left again.  He was supposed to be

9    coming right back but I left, went to the store, came back and

10   he still wasn't there.

11             So Boogie told me to call him to see where he was at

12   because we were about to go to the bus.

13   Q    And you made that call and talked to him?

14   A    Yeah, I made the call.  He said he was coming.

15   Q    And did he come?

16   A    Yeah, he came.  Sometime later probably like, 10,

17   15 minutes later.

18   Q    And what, if anything, did you do when Scott returned?

19   A    Nothing.  We waited for him to get in the car so we can

20   leave.

21   Q    Describe -- when you say the car, what are you talking

22   about?

23   A    Toyota Solara.  I don't understand.

24   Q    Yeah, I'm asking you.

25   A    Oh.

E. Brack - direct - Farrell                928

1    Q    What car did you ultimately get into that night?

2    A    Yeah, the Toyota.

3    Q    Okay.  Describe to me the order of who got in the car and

4    who sat where.

5    A    All right.  So after the smoke-out, me and Scott, we went

6    to -- like, I was leaving for the bus.  So he told me yo,

7    let's go so Eb can see you before you leave.  And we went to

8    go say bye to Ebony.

9              Now, he got, like, another little chick, somewhere

10   so he went to go holler at her before he left.  That's when I

11   went to the store.

12             So when I went to the store, I left the store, I

13   went straight back to the car.  That was -- that was like

14   pretty much you it.

15   Q    Okay.  And when you went to the car, did you have your

16   backpack with you?

17   A    No, my backpack was already in the car.

18   Q    How did it get there?

19   A    Because I put it there when I first got there.

20   Q    First got where?

21   A    In the Bronx.

22             Boogie and the kid was already in the car.  They was

23   waiting for us to come back.

24   Q    And you went where in the car?

25   A    Went where?  What do you mean?

1  Q    Well, you got in the car you said.  What position did you

2  take in the car?

3  A    Oh, I got in the back.

4  Q    Okay.  Where was Boogie in the car?

5  A    Boogie was in the driver's seat.

6  Q    Okay.  And who was in the passenger seat at that point,

7  anyone?

8  A    Nobody.

9  Q    Did there come a time somebody got in the passenger seat?

10 A    Yeah.

11 Q    Who?

12 A    Scott, my cousin.

13 Q    So you're sitting in the car next to the little girl;

14 right?

15 A    Yeah, yeah.

16 Q    Could you describe the back seat generally?  How did it

17 look?

18 A    It was -- it was -- it was -- it was cluttered a little

19 bit, but it was just pretty much bags.

20 Q    Okay.

21       I'd like to show you only at this point what's

22 previously been marked as Defendant's H for identification.

23       Have you had a chance to see it, Mr. Brack?

24 A    Yeah.

25 Q    Recognize it?

1   A    Yeah.

2   Q    What is it?

3   A    It's the other bookbag.

4   Q    When you say the other bookbag, what does that mean?

5   A    It's cause when I first put my stuff in the car, that --

6   it was that bag with a couple other bags in there.  And I just

7   remember that because besides my bookbag, that's the only

8   other bookbag that was in the car.

9   Q    Did you know whose it was?

10  A    No.

11  Q    Okay.  That's good.

12       MR. FARRELL:  I'm going to offer --

13  Q    Does this picture capture how that bag looked to you when

14  you saw it on the evening of the 26th, not the position of

15  where it was?

16  A    I mean, I didn't see it from that view, but it's the same

17  color, same thing.

18       MR. FARRELL:  Okay.  Offer Defendant's H,

19  Your Honor.

20       MR. SELDEN:  No objection, Your Honor.

21       THE COURT:  Received without objection.

22       (Defendant's Exhibit H received in evidence.)

23       MR. FARRELL:  Now we can publish it, please.

24       (Exhibit published.)

25       MR. FARRELL:  Thank you.

E. Brack - direct - Farrell                    931

1          Now, for Mr. Brack's eyes only, Defendant's Q

2    previously marked for identification.

3    Q    What do you see there, Mr. Brack?

4    A    I see Jimmy Jazz bag in the seat next to my bookbag.

5    Q    And was that the first time you ever saw that Jimmy Jazz

6    bag, when you got in the car that evening?

7    A    No.

8    Q    You saw it earlier?

9    A    Yeah.

10   Q    When you put your bag in the car, was it there?

11   A    No.

12   Q    So how did you see it then?

13   A    It's because when I was getting into the back seat, it

14   was on the floor.  So, like, I stepped on the bag and then I

15   had to, like, take a feel, like, yo, what is that in the bag?

16   Make sure I didn't break nothing or mess something up.  But it

17   was on the floor and my bag was sitting there, I think beside

18   like another bag.

19   Q    So when you were in the car, Jimmy Jazz bag wasn't in

20   this position, was it?

21   A    No.  In this picture it's on the seat.

22   Q    Other than the position of the bag, does the picture

23   fairly and accurately represent how the Jimmy Jazz bag looked

24   in terms of how it was packed, you know?

25          Do you understand the question?

E. Brack - direct - Farrell                    932

1   A    I don't.

2   Q    Okay.  Well, you said the bag -- you recognize the bag;

3   right?

4   A    Yeah.

5   Q    That's how the bag itself looked; right?

6   A    Yeah.

7   Q    Okay.

8            MR. FARRELL:  Offer Defendant's Q.

9            THE COURT:  No objection, Your Honor.

10           MR. SELDEN:  No objection, Your Honor.

11           THE COURT:  Received without objection.

12           (Defendant's Exhibit Q received in evidence.)

13           MR. FARRELL:  Defendant's Exhibit J only for

14   Mr. Brack.

15  Q    You see the items in there?

16  A    I see a car seat and the two bookbags.

17  Q    Okay.  Your bag and the blue bag?

18  A    Yeah.

19  Q    Is that about where they were when you got in the car or

20  not?

21  A    Yeah.

22           MR. FARRELL:  Offer Defendant's J in evidence.

23           MR. SELDEN:  No objection, Your Honor.

24           THE COURT:  All right.

25  BY MR. FARRELL:

VB        OCR        CRR

E. Brack - direct - Farrell                933

1  Q    By the way, is the Jimmy Jazz bag visible in the picture,

2  Mr. Brack?

3  A    I mean, I can't see the whole picture.

4         THE COURT:  There was no objection, so it is

5  received without objection.

6         (Defendant's Exhibit J received in evidence.)

7         MR. FARRELL:  Oh, we can publish this, thanks,

8  Mr. Villanueva.

9         (Exhibit published.)

10 A    Can you like fix the picture?

11 Q    It's tough?

12 A    Oh, yeah, yeah, yeah.  I can see.

13 Q    Do you see the Jimmy Jazz bag in there?

14 A    Yeah.

15 Q    Now it's on the floor; right?

16 A    Yeah, that's how it was when I got in it.

17 Q    All right.

18         MR. FARRELL:  Last picture, I believe.  Defendant's

19 I for Mr. Brack only -- Defendant's Exhibit L, I'm sorry.

20         Defendant's Exhibit L for identification marked.

21 Q    Do you recognize some of the stuff in that picture?

22 A    Yeah.

23 Q    What is it?

24 A    That's the black shirt that I bought from the corner

25 store.  That's the jeans and that's a key.

VB      OCR      CRR

E. Brack - direct - Farrell                934

1   Q     Was that your key?

2   A     Nah, it was a hotel key.  I just left with it.

3   Q     Okay.  Does that stuff look -- does the picture show how

4   the items looked back in November 26th, 2018?

5   A     Yeah.

6   Q     This is not viewed within the car, though.  This is shown

7   on top of the car; right?

8   A     Yeah.

9          MR. FARRELL:  Okay.  Offer Defendant's L.

10         MR. SELDEN:  No objection, Your Honor.

11         THE COURT:  Received without objection.  You may

12  publish.

13         MR. FARRELL:  Publish, Your Honor?

14         (Defendant's Exhibit L received in evidence.)

15         (Exhibit published.)

16  BY MR. FARRELL:

17  Q     Okay.  When Scott got in the car, what happened,

18  Mr. Brack?

19  A     It was -- it was like a Jeep.  It was like a Jeep

20  Cherokee or something, like, pulled beside us.  Like, pulled

21  beside us, like pulled beside us.  And whoever was the driver,

22  they knew Scott.

23         So we took, like, a couple minutes with the driver

24  of that car talking to Scott and I was, like -- pretty much it

25  until we waited for them to leave.

E. Brack - direct - Farrell                935

1    Q    Then what happened?

2    A    Then we pulled out.

3    Q    Okay.  Then what happened?

4    A    We started driving toward, I think it was like Tremont,

5    but Boogie had to put in, in the GPS where the bus location

6    was at.  It was like, in Chinatown somewhere, and he didn't

7    remember it.

8            So we kind of like pulled over to, like, put the GPS

9    in and that's when the cops came.

10   Q    Okay.  What happened when you say the cops came.  Take us

11   through what happened.

12   A    It was like, regular detective cars, like, not marked but

13   you know, like, the detective cars with the lights.

14   Q    Right.

15   A    Like, they was riding around, like, the area.  They was

16   hitting they lights, but they never pulled up on the car.  So

17   once we finally, like, pulled over to put in the GPS, a car

18   pulled up behind us, but nobody jumped out.  So we didn't

19   really, like, pay it no mind.

20           But a car from the front stopped, people hopped out

21   and surrounded the car.

22   Q    What happened at that point, Mr. Brack?

23   A    Everybody just was just stuck.

24   Q    Did there come a time anyone got out of the car you were

25   in?

E. Brack - direct - Farrell                936

1   A    Yeah.  The police, they came, surrounded the car, I guess

2   made sure everybody was where they was supposed to be.  Then

3   opened the car door, the front and the passenger.

4   Q    Okay.  Both front doors were open, driver and passenger?

5   A    Yeah, yeah.

6   Q    And what happened to Mr. Vasquez or Boogie, and Scott?

7   A    They took the driver out first.  Then they took Scott

8   out, the passenger.

9   Q    And how about you and the little girl?  What happened to

10  you guys?

11  A    Me and the little girl, they just had us in the back seat

12  for like, 10, 15 minutes.

13  Q    And what was -- could you see what was going on with

14  Boogie and Scott?

15  A    Yeah.

16  Q    What was going on?

17  A    Like, more police came and the officers that grabbed them

18  was talking to the new officers that came, and they was

19  just -- it's, like, another car pulled up and they was, like,

20  flashing they lights at, like, Boogie and Scott, but that was,

21  like, pretty much it.

22  Q    Did you see if Boogie or Scott were handcuffed?

23  A    Yeah, yeah, yeah.  They was handcuffed.

24  Q    Did you see they were searched or patted down?

25  A    I didn't see nobody patted down, but.

E. Brack - direct - Farrell                937

1  Q    How about you, Mr. Brack, tell the jury how it was that

2  you came out of the car.

3  A    The officer closest, like, it's an officer that stood

4  with me, like, he stayed on the passenger side.  And he said

5  what do we do with the rest of them?

6          And they was, like, who else is in the car?  And he

7  said there's two girls.

8          And I looked and I was, like, what?

9          And then, he was, like, some dude that he was

10 talking to, yelled back across the street and was, like, take

11 them out.

12         He took me out the car and held my wrists.  Like, he

13 held my -- he held my wrists and another officer came and held

14 my wrists and walked me to the front where Scott and Boogie

15 was but, like, all right.  Boogie is across the street and

16 Scott is on this side of the street.  Like, my side, like the

17 right side.

18 Q    Okay.

19 A    And they took me on the right side.  And that was that.

20 Q    Where did you go from there?

21 A    I went to, like, they made me stand in the front of a car

22 and they just made me wait.

23 Q    Did they pat you down?

24 A    No.

25 Q    Did they handcuff you?

1    A    No, no.

2    Q    Did there come a time you went somewhere?

3    A    Yeah.  Like, that's when they handcuffed me.

4    Q    Okay.  Were you put in a vehicle?

5    A    Yeah.  Like, a -- a -- like a Tahoe or a Yukon, something

6    like that.

7    Q    Were Scott and/or Boogie in that vehicle?

8    A    No.  I was in the car by myself.

9    Q    And where did you end up?

10   A    We ended up at the ATF building.

11   Q    Okay.  Before we leave the car and get to the ATF, I'm

12   going to show you again 306 that you previously identified as

13   a jacket that you wore on November 25th, the day before.

14          Mr. Brack, when you were in the back seat, did you

15   see that jacket at all?

16   A    When?

17   Q    The night of -- at the time when you got in the car on

18   Hughes Avenue just prior to you being stopped.

19   A    Yeah.  It was -- it was the -- I didn't see the whole

20   jacket because it was other clothes, like, surrounding it a

21   little bit.  But yeah, the jacket was definitely there.

22   Q    Okay.  How about the black zippered pants?

23   A    Nah, I didn't see the pants but I remember the last time

24   I took them off.  I took them off and left them in the car.

25   Q    That was the day before; right?

E. Brack - direct - Farrell                939

1    A    Yeah.

2    Q    How about your phone?  Did you have your phone with you?

3    A    Yeah, yeah.  I had my phone in my pocket.

4    Q    From there you went back to the precinct, right, to where

5    the officers were at?

6    A    Yeah.

7    Q    Did there come a point that you met Special Agent

8    Tyler -- Special Agent Miceli?

9    A    Yeah.

10   Q    Was he at the scene of the car stop that you recall?

11   A    I don't -- I don't think so.  I don't think so.

12   Q    Did he ever ask you to sign something, Mr. Brack?

13   A    It was, like, your rights, Miranda rights, or something

14   like that.

15   Q    Did you sign it?

16   A    Yeah.

17   Q    What hand did you use?

18   A    My left hand.

19   Q    Are you left or right-handed, Mr. Brack?

20   A    I'm definitely left-handed.

21   Q    Mr. Brack, at the time of your arrest, did you have a

22   Facebook account?

23   A    Oh, yeah, yeah.

24   Q    And did you used to post things about marijuana

25   sometimes?

E. Brack - direct - Farrell                    940

1    A    Yeah.

2    Q    Okay.

3         MR. FARRELL:  I'm going to show you what -- I've

4    just remarked gentlemen from the Government, it's the same

5    picture.  I'm going to make it Defendant's AA, if that's okay.

6         Let me show it to you.

7         (Pause in the proceedings.)

8         MR. FARRELL:  So it's Defendant's AA in evidence.

9    It came into evidence yesterday.  You can show everyone,

10   Mr. Villanueva.

11   Q    Do you have it, Mr. Brack?

12   A    Yeah, I see it.

13   Q    Okay.  That's you holding a bunch of 20s; right?

14   A    Yeah.

15   Q    When did you post this, approximately?

16   A    I'd say, like -- say like, probably like a week before.

17   Q    A week before you were arrested?

18   A    Yeah.

19        Do you have, like, a color one so I can probably see

20   like the background?  See where I'm at?

21   Q    I should have one, but I'm not sure if I do.  I

22   apologize.

23        But that is -- did you post other pictures of money

24   on your Facebook account?

25   A    Yeah, a couple of them.

E. Brack - direct - Farrell                    941

1   Q     Okay.

2         MR. FARRELL:  Now, this is for Mr. Brack's eyes

3   only, please.  Defendant's V as in Victor, ID only.

4   Q     Do you recognize that picture, Mr. Brack?

5   A     Oh, yeah.

6   Q     That from your Facebook account?

7   A     Yeah.

8   Q     And when did you post it?

9   A     I -- I think about, like, around the same time as the

10  other one, if I'm not mistaken.

11  Q     What was the purpose of posting money or a picture of you

12  holding money?

13  A     I don't know.  I was just young.

14  Q     Did you ever post a picture of you holding a gun?

15  A     No.

16        MR. FARRELL:  I'd offer Defendant's V as in Victor

17  in evidence.

18        MR. SELDEN:  No objection, Your Honor.

19        THE COURT:  Received without objection, V.

20        (Defendant's Exhibit V received in evidence.)

21        MR. FARRELL:  We can now show it, Mr. Villanueva.

22        (Exhibit published.)

23  BY MR. FARRELL:

24  Q     A whole bunch of 20s on the floor, right, Mr. Brack?

25  A     No.  It's on like, a table.

E. Brack - direct - Farrell                    942

1    Q    Oh, on a table.  You're right.

2    A    Yeah.

3    Q    Thank you.

4         Did you have your phone in the car when the car was

5    stopped?

6    A    Yeah.

7    Q    Where was it when the officer asked you to get out of the

8    car?  Did you have it on your person?

9    A    At least I thought I had it on my person.

10

11        (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION (Continuing)

2   BY MR. FARRELL:

3   Q    Do you know if you did or you didn't?

4   A    No.  I mean, I know I didn't, but at the time I thought

5   it was on my person.

6   Q    How long had you had that phone, by the way?

7   A    I can't say.  I can't say.

8   Q    About?  Two days?  Six weeks?  Six months?

9   A    I definitely -- I definitely got that phone like that

10  month.  That month.

11  Q    Mr. Brack, how many wallets did you have with you on the

12  night of November 26th, when the car you were riding in was

13  stopped?

14  A    I had two wallets.

15  Q    What colors were they?

16  A    Brown and black.

17  Q    Have we seen photos of them in evidence in this case?

18  A    I don't think so.

19  Q    We didn't see the black wallet?

20  A    Yeah, yeah.

21  Q    What did you keep in the black wallet?

22  A    Nothing really, just like pay stubs, Social Security

23  card, MetroCards, stuff like that.

24  Q    Where did you keep the $6,000 that you testified about?

25  A    Oh, I just keep that in my pocket and I keep like the

Brack - direct - Farrell                          944

1    black wallet just in case like I get stopped by the police and

2    they ask where I got that money, I could show proof.

3    Q    What about the brown wallet, what did you keep in that?

4    A    The brown wallet, the brown wallet, I really didn't use

5    that wallet, but that's probably where I'll stash like money,

6    like, hide it for myself.

7    Q    Speaking of the money, did there come a time that the

8    police took it from you?

9    A    Yes.

10   Q    Where did that happen?

11   A    At ATF.

12   Q    How did they take it from you?  Do you remember?

13   A    They first brought me in there, like the ATF building, I

14   was not handcuffed.  I was just like around in the room free.

15   I kept asking to go to the bathroom because I was like faked

16   tired of being in the room, and then the last time I went to

17   the bathroom, they cuffed me, and then they said now we got to

18   pat you down and that's when they got the wallet and stuff.

19   Q    Speak of being handcuffed, Mr. Brack, you testified

20   briefly that you signed something at Agent Miceli's request

21   with your left hand.  Was your left hand handcuffed when you

22   signed it?

23   A    I think so.

24   Q    Mr. Brack, on November 26th of 2018, you had over $6,000

25   in your possession; correct?

Proceedings                                945

1    A     Yeah.

2    Q     And as we've seen from your bank statement, you had over

3    4,000 in the bank; right?

4    A     As in currently right now?

5    Q     No.  Back then.  November 26th.

6    A     Yeah.

7    Q     Yes.  Did you need money on November 26, 2018?

8    A     No.

9    Q     We've  all seen four videos at this trial, one from Duane

10   Reade, one from 7-Elven, and two from Rite Aid,  where a guy

11   pulled a gun with his right hand and in one instance shooting

12   a man,  and three others robbing people.  Was that man you,

13   Mr. Brack?

14   A     No.

15             MR. FARRELL:  Thank you.  I have nothing further.

16             Excuse me.

17             THE COURT:  Do you want to confer, Mr. Farrell?

18             MR. FARRELL:  Could we have a minute, please, Judge?

19   I see I'm getting the high sign.

20             THE COURT:  It's okay..

21             MR. FARRELL:  Yes, we are concluded with our direct,

22   Judge.  Thank you.

23             THE COURT:  Thank you very much, Mr. Farrell and Mr.

24   Stein.

25             Ladies and gentlemen, that brings us to the

Proceedings                                              946

1   mid-afternoon break.  We will take the mid-afternoon break for

2   10, 15 minutes, to give you a chance to relax.  Again,

3   remember the rules.  Do not discuss the case amongst

4   yourselves or with anyone else and continue to keep an open

5   mind and we will see you in about 15 minutes or so.

6              (Jury exits the courtroom.)

7              THE COURT:  Mr. Farrell, I'm glad I did not delay

8   lunch for everybody.

9              MR. FARRELL:  You are right, Judge.

10             THE COURT:  We will see you in about 15 minutes.

11             MR. SELDEN:  Your Honor, two brief housekeeping

12  matters.  If the defense could actually bring the exhibits off

13  by the table.  We are not planning to utilize the lion's share

14  of those exhibits.  Also, if any of those exhibits were marked

15  for identification in terms of documents, if we can see those

16  exhibits that were either marked for ID --

17             THE COURT:  As opposed to received in evidence?

18             MR. SELDEN:  Exactly, as well as the ones received

19  in evidence, that would be great.

20             THE COURT:  Okay.

21             MR. SELDEN:  Yes.

22             THE COURT:  Did you mark all your ID?

23             MR. FARRELL:  I think so.

24             MR. SELDEN:  If we can see them all, that would be

25  very helpful.  Thank you, Your Honor.

Proceedings                                    947

1           THE COURT:  Yes.

2           (Recess taken.)

3           (In open court - jury not present.)

4           THE COURTROOM DEPUTY:  All rise.  Court is back in

5   session.

6           THE COURT:  Is all the housekeeping handled?

7           MR. SIEGEL:  Your Honor, Mr. Selden is going to be

8   walking in in just a minute.

9           THE COURTROOM DEPUTY:  Counsel for both sides are

10  present and the defendant is present.

11          THE COURT:  Is there anything to take care of?

12          MR. SELDEN:  Nothing for the Government.

13          MR. STEIN:  None.

14          MR. FARRELL:  None on the defense.

15          THE COURT:  Mr. Selden, you are going to handle

16  cross?

17          MR. SELDEN:  Yes.

18          THE COURT:  You have the floor, Mr. Selden.

19          MR. SELDEN:  Yes, Your Honor.

20          (Jury enters the courtroom.)

21          THE COURT:  Be seated, please.  Counsel will

22  stipulate that the jury is present and properly seated.

23          MR. SELDEN:  On behalf of the Government, yes.

24  Thank you, Your Honor.

25          MR. STEIN:  Yes, Judge.

Brack - cross - Selden                     948

1          THE COURT:  Thank you, counsel.

2          Ladies and gentlemen, welcome back.  We are ready

3    right now for the homestretch of this afternoon's session.

4          If you will recall, Mr. Farrell just finished his

5    direct examination of Mr. Brack and Mr. Selden tells me he has

6    cross.

7          Mr. Selden, you may inquire.

8          MR. SELDEN:  Thank you, Your Honor.

9    CROSS EXAMINATION

10   BY MR. SELDEN:

11   Q    Mr. Brack, you were asked a series of questions by Mr.

12   Farrell about working for the City of New York; correct?

13   A    Yes.

14   Q    You were asked a series of questions about working for

15   the New York City Parks Department, isn't that also correct?

16   A    Yes.

17   Q    Is your microphone not working, Mr. Brack?

18   A    Nah.

19          THE COURT:  Neither is yours, Mr. Selden.

20          MR. SELDEN: Is it now, Your Honor?

21          THE COURTROOM DEPUTY:  It's okay.  Is that working

22   better?

23          THE COURT:  It's working.

24          MR. SELDEN:  Thank you, Your Honor.

25   Q    Mr. Brack, the acoustics in this room are not great, so,

1   please, if you could move up closer to the microphone,  that

2   would be very helpful?

3   A    If I move up any closer, it's going to be in my mouth.

4   Q    It's working now, Mr. Brack.  Thank you so much.

5   A    All right.

6   Q    Mr. Brack, you were asked a series of questions about

7   working at the Parks Department and money that you made there;

8   correct?

9   A    Yes.

10  Q    You enjoyed making that money; correct?

11  A    Yes.

12  Q    And Mr. Brack, you enjoyed showing off that money;

13  correct?

14  A    Somewhat.

15  Q    Somewhat?

16  A    Yeah.

17  Q    What do you mean by somewhat?

18  A    I mean, I ain't -- I just did it.  I didn't get a real

19  kick out of it, but I just did it.

20          MR. SELDEN:  Mr. Villanueva, if we could show on the

21  ELMO, please, Defense Exhibit AA.

22  Q    Mr. Brack, that's not you showing off money?

23  A    Yes.

24  Q    Okay.  So when I asked the question you enjoyed that

25  money and enjoyed showing it off, you said somewhat?

1    A    Exactly.  I showed it off, but it don't mean I enjoyed

2    it, like I got a nut out of it.

3    Q    What did you just say?

4    A    I mean, I'm just being honest.

5    Q    But what did you just say?

6    A    I showed the money, but it wasn't like joy doing it.  I

7    just did it.

8    Q    That's not what you just said.  Please repeat what you

9    just said, Mr. Brack.

10   A    I enjoyed showing the money --

11              MR. FARRELL:  Objection.

12              THE COURT:  If you want the record read back, the

13   reporter will read it back.

14              MR. SELDEN:  Yes, please.  Madam Court Reporter, if

15   you could please read the record back.

16              (Record read.)

17              MR. SELDEN:  Thank you, Madam Court Reporter.

18   Q    Mr. Brack, on November 26, 2013, you were no longer

19   employed by the New York City Parks Department?

20   A    You said what?

21   Q    I said on November 26, 2018, you were no longer employed

22   by the New York City Parks Department, were you?

23   A    I technically was.

24   Q    Technically?

25   A    Yes.

Brack - cross - Selden                    951

1   Q     In fact, your last day for the New York City Parks
2   Department, your last time card signed was November 2, 2018;
3   correct?
4   A     Somewhat.
5   Q     What do you mean by somewhat?
6   A     It's because they told me that once I got -- once I did
7   the test for the New York State ID and I brought the paper
8   back saying I did the test that I could continue until I get
9   the ID, so I was technically still employed there.
10  Q     But you weren't going to continue to collect paychecks
11  after November of 2018; correct?
12  A     No.  You're wrong.  I'm still collecting paychecks but
13  technically my pay goes up.
14  Q     So, after November 2, 2018, it's your testimony that you
15  were still employed by the New York City Parks Department?
16  A     Yes.
17  Q     Between November 2, 2018 and November 26, 2018, how many
18  hours did you work on behalf of the Parks Department?
19  A     I don't remember.
20  Q     Was it more than one?
21  A     Yeah.
22  Q     Was it more than 10?
23  A     It was -- I did at least a regular 40.
24  Q     That first week, from November 2nd on, you did 40 hours?
25  A     Yeah.  I'm still collecting my overtime money too.

MDL      RPR      CRR      CSR

Brack - cross - Selden                                     952

1   Q    I didn't ask that question, Mr. Brack.  I asked how many

2   hours you worked following November 2, 2018.

3   A    I don't recall.

4   Q    A moment ago you described 40 hours.  Mr. Brack, nothing

5   about working at the Parks Department had to do with a Duane

6   Reade in Queens, did it?

7   A    No.

8   Q    And nothing about working at the Parks Department had to

9   do with the 7-Eleven in Queens, did it?

10  A    No.

11  Q    Nothing about working at the Parks Department had

12  anything to do with the Rite Aid store, did it?

13  A    No.

14  Q    Mr. Brack, you said a moment ago that you were walking

15  around with pay stubs because you wanted to explain the money

16  you had on your person to the police; isn't that correct?

17  A    No.  I said if I ever got stopped, I can have proof.

18  Q    Mr. Brack, you were planning to leave the night that you

19  were arrested; correct?

20  A    Yes.

21  Q    In fact, you had all the money that you had in the world

22  on your person that night when you got arrested; correct?

23  A    Wrong.

24  Q    Mr. Brack, with regards to the money that you had on your

25  person, you had change on your person; correct?

Brack - cross - Selden                953

1  A    No.  I had change in my bag.

2  Q    And that change in your bag, that was your change;

3  correct?

4  A    Yeah.

5  Q    Mr. Brack, a moment ago you were asked questions about

6  Hughes Avenue and I suppose I'm a little confused.  Walk us

7  through the timeline here.  You borrowed clothes from a

8  particular person that you described wearing on Hughes Avenue;

9  correct?

10 A    Say what?

11 Q    Mr. Brack, remember when you were shown a series of

12 photographs from Hughes Avenue?

13 A    Yeah.

14 Q    You said the night before you were borrowing clothes;

15 correct?

16 A    Actually, it was a video, but I did borrow clothes in

17 that video, yes.

18 Q    Because you were partying the night before, according to

19 you; correct?

20 A    Something like that, yeah.

21 Q    Was it something like that or was that, in fact, what

22 happened?

23 A    We was playing with the kids, then we ended the night

24 smoking and drinking, doing whatever.  It wasn't technically

25 partying like at a club.  I'm just being pacific [sic].

1    Q    Mr. Brack, you said that you ruined your pants from the

2    night before.  Is that what your testimony is here today?

3    A    That outfit, yes.

4    Q    What was that outfit?

5    A    It was them jeans and it wasn't the yellow shirt.  I

6    don't remember the shirt, but it was the blue jeans.

7    Q    Mr. Brack, I am going to show you --

8              MR. SELDEN:  Your Honor, may I approach the witness?

9              THE COURT:  You may.

10             MR. SELDEN:  Thank you, Your Honor.

11   Q    I am going to show you what's been previously admitted as

12   Government Exhibit 303.  You're saying that you ruined these

13   blue jeans?

14   A    No.

15   Q    You're saying that you ruined these blue jeans?

16   A    Yes.

17   Q    Mr. Brack, how did you ruin these blue jeans?

18             THE COURT:  Does that have an exhibit number?

19             MR. SELDEN:  Yes, Your Honor, these are a pair of

20   jeans from Government Exhibit 305.

21             THE COURT:  So they are both in 305?

22             MR. SELDEN:  Yes, Your Honor.

23             THE COURT:  Can you distinguish one from the other?

24             MR. SELDEN:  Your Honor, I would be happy to

25   distinguish them.  One is a Decibel pair of jeans and another

1    one is a Heritage and America pairs of jeans.  The Decibel

2    pair of jeans is the one that I'm holding up for Mr. Brack

3    that a moment ago he testified that he ruined.

4    Q    Mr. Brack, can you show the ladies and gentlemen of the

5    jury, just describe where did you ruin these jeans?

6    A    Where the pocket is at in the center.

7    Q    So this was where?  I'm sorry.  I guess I must be missing

8    it.  Where on the pockets in the center?

9    A    They're not like that now because they was cleaned, but

10   at the time, while they was being cleaned, I had to borrow

11   clothes.

12   Q    So you had your pants cleaned between November 25th and

13   November 26th, is that your testimony here today?

14   A    No.

15   Q    When else would you have had your pants cleaned, you

16   said?

17   A    When --

18   Q    Please, if I could finish.

19          When else would you have had your pants cleaned?

20   You said you were partying and then you wore a different pair

21   of clothes and then you had the day you just described on

22   direct.  When would you have had your pants clean?

23   A    So could I explain?

24   Q    Mr. Brack, when did you have your pants cleaned, at what

25   time?

1   A    I don't remember what exact precise time, but I know on

2   the night when I first messed up the jeans, I took the jeans

3   off then.

4   Q    But, Mr. Brack, you remembered by every phone call during

5   the direct examination where you were over those 24 hours;

6   correct?

7   A    Yeah.  I didn't make that many phone calls.

8   Q    Mr. Brack, I didn't ask if you made a lot of phone calls.

9   I asked if you remembered every detail of that day during that

10  24 hours, when were those jeans cleaned?

11  A    Them jeans was cleaned during the night after I first got

12  them messed up.  I took them off.  I went in the car, got the

13  black jeans, gave them to the person who's supposed to wash

14  them.  Would you like to know the person?

15  Q    Mr. Brack, you said a moment ago that you had $6,000 on

16  your person; correct?

17  A    Yes.

18  Q    And you still had to borrow clothes, as you described,

19  from somebody from a Section 8 house?

20  A    No.

21  Q    Mr. Brack, why are you borrowing clothes if you have

22  another pair of jeans in the backpack you just talked about?

23  A    It's because I was seen by everybody wearing the jeans

24  before.  Why would I wear the same jeans again?

25  Q    So let me get this straight, you are wearing the first

Brack - cross - Selden                    957

1   pair of jeans, those jeans that you say someone else cleaned

2   over those 24 hours.  You've got these other pair of jeans,

3   but you can't wear these because everyone else saw you wearing

4   these?

5   A    No.  That's why I wasn't wearing them.

6   Q    And that was everyone else you were partying with that

7   evening?

8   A    No.  I walk outside.  I move around, just like I don't

9   wear the same suit every day.

10  Q    Mr. Brack, a moment ago you talked about the details of

11  that particular day by phone call.  Do you remember that, when

12  Mr. Farrell asked you about particular times and particular

13  locations?

14  A    Yes.

15  Q    Mr. Brack, you gave very detailed testimony, but I'd ask

16  you, two days before, can you walk us through that particular

17  day by phone call, that is, every one of the calls that you

18  had and where you were?

19  A    Can you refresh my memory and then I can probably tell

20  you?

21  Q    Mr. Brack, I'm not going to ask you to refresh memory.

22  I'm going to ask you whether or not you're able to talk about

23  every phone call you made two days before.

24  A    I'm asking you can I see something to refresh my memory.

25  Q    Because at that --

Brack - cross - Selden                    958

1      THE COURT:  No.  You have to answer the question

2  that he asks you, Mr. Brack.

3  A    I doubt it.

4  Q    Because you need to see those records to talk about what

5  you said happened on that particular day; correct?

6  A    No.  I just see the calls and the times and then I

7  remember where I was at them times.  It refreshing my memory,

8  sir.

9  Q    Mr. Brack, you were 23 years old on November 26, 2018;

10 correct?

11 A    No.

12 Q    How old were you?

13 A    22.

14 Q    How old are you now?

15 A    24.

16 Q    You were in your early 20s?

17 A    I was 22.  Being precise with you, sir.

18 Q    Mr. Brack, is that in your early 20s?

19 A    Yes, it is.

20 Q    Mr. Brack, I'm showing on the screen --

21      MR. SELDEN:  Mr. Villanueva, if you don't mind.

22 Q    -- what's been previously admitted as Government Exhibit

23 417-A.  Mr. Brack, this is you in Government Exhibit 417-A;

24 correct?

25 A    Yes.

Brack - cross - Selden                              959

1    Q    This is you wearing white sneakers; correct?

2    A    Yes, I didn't borrow them.

3    Q    Mr. Brack, I didn't ask you if you borrowed the white

4    sneakers.

5    A    All right.

6    Q    Mr. Brack, this is you wearing pants with zippers on

7    them; correct?

8    A    Yes.

9    Q    And those zippers are distinctive; correct?

10   A    Yes.

11   Q    And you said you had $6,000 that particular day; correct?

12   A    Yes.

13   Q    But you didn't want to wear bling-bling pants; correct?

14   A    Yes.

15   Q    But you still wore them; correct?

16   A    Yes.

17   Q    Mr. Brack,  I'm going to show you what's been previously

18   admitted as Government Exhibit 306.  You're also, in that

19   photograph, wearing Government Exhibit 306; correct?

20   A    Yes.

21   Q    Mr. Brack, can you describe the colors on this particular

22   item?

23   A    I would say green, like navy blue, and I don't know.

24   That's like cement gray.  Cement gray.

25   Q    And you said you don't wear Pelle Pelle; right?

1    A    Yeah, yeah, I don't.

2    Q    But that day you were wearing Pelle Pelle?

3    A    Exactly.

4    Q    So it's not that you don't wear it, it's just that it's

5    not your favorite thing to wear; correct?

6              MR. FARRELL:  Objection.  Argumentative.

7              THE COURT:  I will sustain it.

8              MR. SELDEN:  Your Honor, I will rephrase the

9    question.

10   Q    Mr. Brack, on that particular day, 12 hours before the

11   incidents that we have talked about here, you were wearing

12   these clothes; correct?

13   A    Yes, sir.

14   Q    Mr. Brack, you also were wearing your backpack in that

15   photograph; correct?

16   A    Yes, sir.

17   Q    And you keep that backpack on you all the time; correct?

18   A    No.

19   Q    You let that backpack go other places without you there?

20   A    Yes.

21   Q    Why would you do that, Mr. Brack?

22   A    It's nothing in it but clothes.

23   Q    But you testified on direct that there were a number of

24   papers; correct?

25   A    Yes.

Brack - cross - Selden                          961

1   Q    A number of papers that relate to you; correct?

2   A    Yes.

3   Q    Pay stubs; correct?

4   A    Yes.

5   Q    Things that you thought were important enough to keep

6   otherwise you would have thrown them out; correct?

7   A    No.

8   Q    So how did they end up just in your bag then?

9   A    They was in my bag because I kept them there, but not

10  less important enough for me to throw them away.  Got to file

11  taxes.

12  Q    I'm sorry.  What did you just say?

13  A    I said I kept them for taxes purposes like.

14  Q    So, in November of 2018, you were preparing for your

15  taxes that were going to happen in April?  Is that your

16  testimony here today?

17  A    You don't start filing your taxes in April.  I think you

18  start like around January, February.

19  Q    Mr. Brack, I'm showing you what is marked and admitted as

20  Government Exhibit 417-B.  That's the backpack we were just

21  talking about; correct?

22  A    Yes, sir.

23  Q    Mr. Brack, that's the backpack you said you packed on the

24  night when you were stopped by the police; correct?

25  A    Yes, sir.

Brack - cross - Selden                    962

1  Q    And you described that interaction with the police that

2  evening; correct?

3  A    Yes, sir.

4  Q    And during that interaction, it's your testimony here

5  today before these ladies and gentlemen that the police called

6  you a girl?

7  A    Yeah.  They thought it was two girls in the back.

8  Q    That wasn't my question.  They called you a girl, is that

9  your testimony?

10  A    However you want to phrase it.

11  Q    Were those their words?

12  A    Yes, sir.

13  Q    And it's your testimony here today that they left you in

14  the car for 15 minutes?

15  A    10 to 15 minutes, yes.

16  Q    And you know that they were investigating a felony

17  traffic stop; correct?

18         MR. FARRELL:  Objection.

19         How could he know that?

20         THE COURT:  He is going to ask him.  The answer is

21  he does or he doesn't.

22  A    I didn't know at the time, but now I know.

23  Q    Mr. Brack, they came up to the car with their guns drawn;

24  correct?

25  A    Yes, sir.

Brack - cross - Selden                          963

1   Q    They pulled you out quickly; correct?

2   A    No.

3   Q    So it's your testimony that they left you in there after

4   coming up to the car with their guns drawn for 10 to

5   15 minutes?

6   A    There was an officer standing by my side, but, yeah.

7   Q    And no one found a gun on the street out there; correct?

8   A    I don't know.

9   Q    You don't know if they were still looking for a gun, do

10  you?

11  A    No.

12  Q    Mr. Brack, this is you in Government Exhibit 101;

13  correct?

14  A    Yes, sir.

15  Q    And this is your cousin Scott Brack in Government Exhibit

16  102; correct?

17  A    Yes.

18  Q    This is Mr. Vasquez, or Boogie, as you described him, in

19  Government Exhibit 103; correct?

20  A    Yes.

21  Q    You and Mr. Vasquez don't look anything alike; correct?

22  A    No.

23  Q    Mr. Brack, I want to turn to this next slide.  Look at

24  Government Exhibit 101.  That's you; correct?

25  A    No.

Brack - cross - Selden                    964

1   Q    Government Exhibit 101 is not you, on the right-hand

2   side?

3         THE COURT:  On the right.

4   A    Oh, yeah.

5   Q    Mr. Brack, at the time of this picture being taken, you

6   had a mustache; right?

7   A    Yeah.

8   Q    I'm sorry.  I didn't hear you.

9   A    Yeah.

10  Q    You were in your early 20s; correct?

11  A    Yes.

12  Q    Mr. Brack, you had a lot of hair; correct?

13  A    Yes.

14  Q    Mr. Brack, you got your cell phone back, according to

15  your testimony, from your uncle earlier on in the day on the

16  day you were stopped by the police; correct?

17  A    No.

18  Q    When did you get your cell phone back, Mr. Brack?

19  A    You said my uncle.  He's my cousin.

20  Q    I'm sorry.  Your cousin.  You got your cell phone back

21  from your cousin earlier on in the day; correct?

22  A    Yes.

23  Q    That was something that you got at about 10 o'clock in

24  the morning, correct?  You had your cell phone?

25  A    No.

Brack - cross - Selden                                965

1    Q    You didn't have your cell phone?

2    A    I did, but I got it back earlier than that.

3    Q    Okay.  But you had your phone at that time; correct?

4    A    Yeah.

5    Q    Mr. Brack, you said that that was actually in New York;

6    correct?

7    A    What?

8    Q    When you got your cell phone back.

9    A    Yeah.

10   Q    And that was before you went to New Jersey and then back

11   to New York and then back to New Jersey that day?

12   A    Yeah.

13   Q    That's your testimony here today?

14   A    Yeah.

15   Q    Mr. Brack, you were, at approximately 10 o'clock that

16   morning, looking for cab companies in North Carolina; correct?

17   A    Yeah.

18   Q    In fact, you were looking for cab companies including

19   12n'GO; correct?

20   A    I don't think that was one of them, but....

21   Q    Well, you know what 12n'GO is; correct?

22   A    No.

23   Q    You know that 12n'GO is a North Carolina-based company?

24   A    No.

25   Q    You know that it's based in the Greensboro area; correct?

Brack - cross - Selden                    966

1   A    No.

2   Q    Mr. Brack, with regards to your particular cab companies

3   that you were looking for, which ones were you looking for?

4   A    I think I just put in  cab.

5   Q    In fact, you were looking for taxicab in Greensboro,

6   North Carolina; correct?

7   A    I don't remember.  I just remember a cab, I think.

8   Q    We will get back to cabs in a moment.

9        Mr. Brack, Family Dollar is based out of North

10  Carolina; correct?

11  A    I don't know.

12  Q    It's a convenience store based out of North Carolina,

13  isn't that also correct?

14  A    I don't know.

15  Q    Mr. Brack, a moment ago I was asking you about cabs.

16       MR. SELDEN:  For the witness only, Mr. Villanueva,

17  if we can.

18  Q    Mr. Brack, do you recall looking for a taxicab

19  Greensboro, North Carolina in a Google search on November 26th

20  at 10 o'clock in the morning?

21       MR. FARRELL:  I'm sorry.  Is that in evidence?

22       MR. SELDEN:  It's for identification-purposes only.

23       MR. FARRELL:  Does the jury have it?

24       THE COURT:  No, no.

25       MR. FARRELL:  I'm sorry.  Thank you.  But he

Brack - cross - Selden                    967

1    shouldn't be reading from something.

2            Judge, objection.  He shouldn't be reading from

3    something  that's not in evidence.

4            THE COURT:  As you did, it's for purposes of

5    directing his attention.

6            MR. FARRELL:  He can do it by pointing, I think.

7            THE COURT:  I guess you could.

8            MR. SELDEN:  Absolutely, Your Honor.

9    Q    Mr. Brack, I'm now pointing to the particular date and

10   time and I am pointing to the web history.  Did you conduct --

11   A    I don't see no date and time.

12   Q    Mr. Brack, do you see that date and time?

13   A    Yeah.

14   Q    Do you see what that says?

15   A    Yeah, Google search.

16   Q    Do you see what that says?

17   A    Yes.

18   Q    Mr. Brack, you were searching for taxicabs at 10 clock in

19   the morning on November 26, 2018; correct?

20   A    No.

21   Q    You were not?

22   A    No.

23   Q    Was someone else searching for cabs?

24   A    No.

25   Q    Mr. Brack --

Brack - cross - Selden                          968

1   A    I could explain if you like.

2   Q    Mr. Brack, I'm going to ask you whether or not you had

3   your phone at that time.  You did; correct?

4   A    I did.

5   Q    Because you had gotten your phonebook at that point?

6   A    Yeah.

7   Q    And, Mr. Brack, you, after getting back your phone, had

8   been in touch with your cousin Scott Brack; correct?

9   A    In person, yeah.

10  Q    But you guys actually called each other as well; correct?

11  A    Probably after that.

12  Q    In fact, you guys called each other at approximately 6:04

13  p.m. that night; correct?

14  A    And that was 10:00 a.m., right, the Google search?

15  Q    The Google search was 10:00.

16  A    All right.

17  Q    And then at 6:04 p.m. there was a phone call from Scott

18  Brack to you; correct?

19  A    I don't remember.  I have to see.

20  Q    Mr. Brack --

21       MR. SELDEN:  I am showing for Mr. Brack for

22  identification only GX-211-C-1.  These are call records that

23  are already in evidence.

24  Q    Mr. Brack, do you see that?

25  A    No.

1            MR. SELDEN:  Mr. Villanueva, if we can just put for

2    Mr. Brack, please.

3    A    No.  I could see it, but you just got to put it down.

4    Q    Okay.  Thank you, Mr. Brack.

5    A    It's not level right.

6    Q    Mr. Brack, do you see that Government Exhibit number?

7    A    Yeah.

8    Q    Okay.  Mr. Brack, we are going to start on out.  Mr.

9    Brack, we are going to read across the line, okay?

10   A    Yeah.

11   Q    I understand there are a lot of numbers, but these are

12   the numbers that your counsel showed you, okay?

13   A    All right.

14   Q    All right.  So we're going to walk through these numbers

15   real quick.

16            (Continued on following page.)

17

18

19

20

21

22

23

24

25

1   BY MR. SELDEN:   (Continuing)

2   Q    Do you recognize this 646 number?

3   A    Yeah.

4   Q    And what number is that?

5   A    That's my cousin's number.

6   Q    All right.  Do you recognize this 336 number?

7   A    Yeah.

8   Q    All right.  And do you recognize this, what that says?

9   A    Yes.  It says, "Outgoing."

10  Q    All right.  And this is at 18:03:58, correct?

11  A    Yes, military time.

12  Q    And that's 6:03 p.m., correct?

13  A    Yeah.

14  Q    So your cousin called you at 6:03 p.m. on the 26th of

15  November, correct?

16  A    Yeah.

17  Q    And he called you at 6:03 because he had seen something,

18  correct?

19       MR. FARRELL:  Objection.  Calls for a conclusion.

20  How can he know that?

21       THE COURT:  Sustained.

22  A    I don't remember.

23  Q    Well, you remember what you did right after your cousin

24  called you, correct?

25  A    No, I don't.

1  Q    Do you remember the last web history that you had on your

2  phone, Mr. Brack?

3  A    No, I don't.

4  Q    In fact, you looked on your web history on your phone

5  under, "Title:  Need to win a case in 2018," correct?

6  A    Need to in a case?

7  Q    Need to win a case in 2018.

8  A    Nah, I wouldn't see that.

9  Q    Mr. Brack, I'm showing you Government's Exhibit 225-A for

10 identification purposes only.

11       Mr. Brack, do you see what's at the top left?

12 A    Yeah.

13 Q    Do you see what the title is?

14 A    Yeah.  I, I don't know nothing about that.

15 Q    Does that not refresh your recollection, Mr. Brack?

16 A    That must have happened when my phone was gone but I

17 don't, I don't remember that at all.

18 Q    You said that must have happened when your phone was

19 gone, but a moment ago, you just testified that you already

20 had your phone.  Isn't that true, Mr. Brack?

21 A    Can you go back to the paper?

22 Q    Sure, Mr. Brack.

23       Before we show you this paper, you did have your

24 phone at that point, correct?

25 A    I'm trying to see the time, what internet that is, but I

Brack - cross - Selden                    972

1  don't remember looking at that at all.

2  Q    Mr. Brack, at 6 o'clock, you said that you had received a

3  phone call from your uncle, correct?

4  A    That's what you just showed me.

5  Q    You testified that you actually had received that phone

6  call, correct?

7  A    I don't remember.  You just showed me so I agreed.  It

8  says outgoing call to my phone.

9  Q    Mr. Brack, I'm showing you Government's Exhibit 225-A

10 once again for identification purposes only.

11 A    All right.  Can you move it to the side?

12 Q    Absolutely, Mr. Brack.

13 A    No, no, the URL.

14      Yeah, I definitely didn't look that up.

15 Q    And Mr. Brack, you can see that last visited date,

16 correct?

17 A    Yeah, it says 6:04.

18 Q    Mr. Brack, I'm just going to show you what is the second

19 page of that.

20      Mr. Brack, do you see what that says right there?

21 A    Yeah, it says the same thing.

22 Q    Mr. Brack, do you see what that says right there?

23 A    "Google Ad Services."

24 Q    Do you see what that says right there in terms of time?

25 A    Yeah.  6:04.

Brack - redirect - Farrell                  973

1   Q     But you said you had your phone but you don't remember

2   that web history, is that correct?

3   A     I had my phone by then but I don't know if I had my phone

4   at that time.  Honestly, I didn't make that, I didn't do that

5   at all.

6   Q     Okay.

7          MR. SELDEN:  With the Court's brief indulgence,

8   Your Honor.

9          THE COURT:  Okay.

10         (Pause.)

11         MR. SELDEN:  Your Honor, we have no further

12  questions at this time.  Thank you.

13         MR. FARRELL:  A couple on redirect, please.

14         Can I see the exhibit with the extraction that you

15  just showed him for identification, Mr. Selden?  Did you leave

16  that there?

17         MR. SELDEN:  Of course.

18         THE COURT:  Mr. Farrell, redirect.

19  REDIRECT EXAMINATION

20  BY MR. FARRELL:

21  Q     Okay, Mr. Brack, I'm showing you the document Mr. Selden

22  was just asking you about.  Do you see it?

23  A     No, not really.  Yeah, I see it.

24  Q     And what he's talking about was a Google Ad Service?

25         MR. SELDEN:  Objection, Your Honor.

CMH       OCR       RMR       CRR       FCRR

Brack - redirect - Farrell                    974

1   Q     Isn't that right?

2         THE COURT:  It's not in evidence.

3         MR. SELDEN:  It's not in evidence, Your Honor.

4   Counsel is actually testifying to what he's talking about.

5   It's a leading question.

6         THE COURT:  Yes.  It's not in evidence.  If you want

7   to offer it, you can offer it.

8   Q     Well, take a good look at this part here that I'm showing

9   you with my finger.  I'm not reading.  Take a good look and

10  read it closely to yourself.

11        (Pause.)

12  A     Okay.

13  Q     And after looking at that, do you recall whether or not

14  you, while doing, looking at Google, that you saw an ad come

15  up and you clicked on it?

16  A     I'm guessing that's the only case in this.  I don't know.

17  I don't see no other, I didn't put that search in so I must

18  have clicked the ad.

19        MR. FARRELL:  If I can get some help showing 317,

20  please.

21        MR. SIEGEL:  The picture is 317-A.

22  Q     Can you see that, Mr. Brack?

23  A     Yeah.

24  Q     See part of the black wallet?

25  A     That's the brown wallet.

975

1   Q     Right, the brown wallet.  Okay.  Do you see the cards

2   sticking out with the scales of justice?

3   A     Yeah.

4   Q     That's a card of an attorney you had, right?

5   A     Yeah.

6   Q     Because you had a misdemeanor case in Brooklyn, right?

7   A     Yeah.

8   Q     And you were trying to win it, right?

9   A     Yeah.

10  Q     Thank you, sir.

11            MR. FARRELL:  Nothing further.

12            THE COURT:  Any recross, Mr. Selden?

13            THE WITNESS:  Farrell, you dropped some papers.

14            MR. FARRELL:  Thank you.

15            MR. SELDEN:  No recross.  Thank you, Your Honor.

16            THE COURT:  None?  Okay.  Then the witness is

17  excused.

18            (Witness excused.)

19            (Continued on next page.)

20

21

22

23

24

25

1          THE COURT:  Mr. Farrell, Mr. Stein, do we have

2    anything further?

3          MR. FARRELL:  Yes, we have one other piece of

4    evidence for us if you're ready.

5          THE COURT:  I'm ready if you're ready.

6          MR. FARRELL:  I'm ready.  Judge, I'm doing this oral

7    stipulation between the government and the defense.

8          THE COURT:  I'm going to mark you, Mr. Farrell.

9          MR. FARRELL:  The government and the defense

10   stipulate that on November 26th of 2018, Edwin Vasquez was

11   using the phone number (201)887-4960.

12         Both parties agree.  So stipulated.  Government?

13         MR. SELDEN:  Absolutely.  I think it was "Edward"

14   but absolutely, we agree, Mr. Farrell.  Absolutely.

15         MR. FARRELL:  Thank you.

16         With that, Your Honor, ladies and gentlemen of the

17   jury, defense rests.

18         THE COURT:  All right.  Received in evidence without

19   objection.

20         Ladies and gentlemen, it goes without saying that

21   merely because of the fact that the stipulation is oral, you

22   treat it the same way as all of the ones that were read to you

23   and the document itself was received in evidence.  The

24   difference is when exhibits go back to the jury room, I'm not

25   sending Mr. Farrell back to reread it to you, okay, as much as

977

1   he might want to go, but no.

2           Anyway, we have completed another building block.

3           There is no rebuttal case, correct, Mr. Selden?

4           MR. SELDEN:  With the Court's brief indulgence, I'd

5   like to confer with my co-counsel.

6           (Pause.)

7           MR. SELDEN:  No rebuttal case.  Thank you

8   Your Honor.

9           THE COURT:  Thank you, Mr. Selden.

10          So what that means, ladies and gentlemen, is that

11  yes, we've completed another building block but this is most

12  important.  It doesn't mean the case is over.  The fact is

13  that you have heard all of the evidence, both the testimony

14  and the exhibits that you are going to hear in this case.

15  Everything else you hear is either going to be argument of

16  counsel or going to be the law from the Court, but the case is

17  not over, so that means you must continue to keep an open

18  mind.

19          We have also come to the end of the day so the

20  important recess instructions that I give you continue with

21  the equal vigor as all the other times I have given them to

22  you and that is do not discuss the case amongst yourselves or

23  with anyone else and continue to keep an open mind.

24          Do not use the evening recess period as an

25  opportunity to do any research, electronic or otherwise,

1    directly or remotely touching on the case, the issues, the

2    personalities.  You certainly should not use the recess time

3    to visit any of the locations and indeed if you live near any

4    of them, the locations that you may have heard during the

5    course of the trial, I am going to ask you to direct yourself

6    in a different way around those locations.

7         To the extent that there are media accounts of this

8    case including social media, you are to totally avert yourself

9    from them, not listen to them or watch them.  Again, I urge

10   jurors, while you are sitting as a juror, try to avert

11   yourself from news or media accounts about any case for fear

12   that you might hear something there that will confuse you

13   about your role here.

14        The no communication rule is a radio silence rule so

15   it's not only don't talk to fellow jurors and others face to

16   face, but in addition to that, don't communicate in any

17   fashion, whether it's telephone or through some sort of social

18   media platform or handwriting or any other way, about the

19   case, about the personalities, the issues, the fact that

20   you're a juror, the fact that you're coming here to the United

21   States Courthouse in Brooklyn.

22        I don't know if it's raining.  According to the

23   weather people, it's supposed to be drizzling at some point.

24   I hope you get home safe and sound and dry.  We return

25   tomorrow.  The next of the building blocks, again, will be the

979

1    closing arguments of the lawyers telling you what they think

2    the evidence has shown or the absence of evidence has shown to

3    you and also the instructions from the Court on the law that

4    you apply to the facts and, finally, the beginning of

5    deliberations when the case is given to the jury for its

6    consideration.

7            So we bid you a pleasant evening.  You go with our

8    thanks for your sacrifice, your patience and your

9    attentiveness.

10           We ask you to return to the Central Jury Room

11   tomorrow morning at or around 9:45 and we'll begin as close to

12   10:00 as we can and we wish you a pleasant evening in the

13   interim but we'll see you tomorrow.

14           (Jury exits.)

15           THE COURT:  Okay.  So we will take a 10 minute

16   break, get all our materials, come back and see you and we

17   will conduct a formal charge conference at that time.

18           We assume that the arguments made at the close of

19   the government's case in chief are repeated at the close of

20   the case?

21           MR. STEIN:  Yes.  Pursuant to Rule 29(b) of the

22   Federal Rules of Criminal Procedure.

23           THE COURT:  And I assume the government reiterates

24   it's opposition to that motion?

25           MR. SELDEN:  Yes, respectfully, Your Honor.

980

1          THE COURT:  And the Court reserves decision on

2    subsection (b) as well as subsection (a).

3          So we will have the formal charge conference and

4    then we'll go from there.  I will alert counsel in their

5    planning for summation and charge, I have a time limitation

6    tomorrow so we will not work past 5:00.  So keep that in mind.

7    It should be an incentive to be as concise as you can in your

8    summations and the jury is always told by me, if you've been

9    before me before, that there is no rush to justice.  No one is

10   encouraged to speed ahead and to the extent that the jury has

11   not concluded its work by the close of regular business

12   tomorrow, we'll just come back on Thursday and if not

13   Thursday, Friday, so we can have it resolved.

14         See you in 10 minutes.

15         THE DEFENDANT:  Excuse me.

16         MR. FARRELL:  Can Mr. Brack have a quick minute,

17   Judge?

18         THE COURT:  Mr. Brack?

19         THE DEFENDANT:  Just quick.  I've made my complaint

20   about Stein earlier and now I'm going to add another decision

21   and before there becomes a disturbance in the courtroom, I

22   want Mr. Farrell, the one I trust more, to do the closing

23   argument.  And I guess Stein thinks, like, this is, like --

24         THE COURT:  That's not for any of us other than at

25   that table.

Charge Conference                    981

1        THE DEFENDANT:  But I'm letting you know if there's

2    a disturbance, that's why.

3        THE COURT:  You can tell me whatever you want.  It's

4    on the record.  I don't get involved in that.

5        THE DEFENDANT:  All right.

6        THE COURT:  That's not for me to get involved in.

7        THE DEFENDANT:  All right.

8        THE COURT:  So your comments are on the record.

9        THE DEFENDANT:  Thank you.

10       THE COURT:  You're welcome.

11       (Court is in recess.)

12       (In open court; outside the presence of the jury.)

13       THE CLERK:  Court is back in session.

14       Counsel for both sides are present including the

15   defendant.

16       THE COURT:  Be seated, everybody.

17       Okay.  We're ready for the charge conference and for

18   veterans of this part, the way we do that is, first, we mark

19   the charge as proposed as Court Exhibit 1 and the verdict

20   sheet as Court Exhibit 1A, and then we begin with the charge

21   from front to back.

22       We go over it first for people who have specific

23   comments or a modification or deletion of something that's in

24   the charge beginning at the lowest page that either side has a

25   problem working to the back.  After that process is over, if

1   somebody has an addition, meaning something that's not in the

2   charge at all but they think should be, then we take them up

3   on the second go around.

4        So we'll begin at the beginning and whoever has got

5   the lowest number can sound that first, government or defense.

6        What about you?

7        MR. STEIN:  I think they had none.

8        MR. SELDEN:  Your Honor, on behalf of the

9   government, we actually didn't have any proposed changes to

10  the jury charge.

11       THE COURT:  Okay.  I will start then and just focus

12  on what defense might have.

13       MR. STEIN:  Judge, back on February 24th when you

14  had asked us to file a requested charge, we filed a request to

15  charge identification, ECF Number 155.

16       THE COURT:  Well, is it in here?

17       MR. STEIN:  No.

18       THE COURT:  All right.  What are you complaining

19  about that's in here?  Let's do it my way first, Joel.

20       MR. STEIN:  Oh, complaining about what's in here?

21       THE COURT:  Yes.  What's the lowest page you have a

22  complaint?  The government says they don't have any problem

23  with the proposal so the question is if you have an issue.

24       MR. STEIN:  I do.

25       THE COURT:  Okay.

Charge Conference                                   983

1            MR. STEIN:  Well, one of them --

2            THE COURT:  What's the lowest page that you have an

3    issue on?

4            MR. STEIN:  Okay.  It was page 59 of the previous

5    one.  I don't know if that's this one.  It's the instruction

6    on motive.

7            THE COURT:  Anthony, did it change at all?

8            MR. STEIN:  It did not.

9            THE CLERK:  No, it's still on 59.

10           MR. STEIN:  It did not.  I didn't realize that,

11   Judge.

12           Is it okay if I remain seated?

13           THE COURT:  Yes.  What's up?  What's your problem?

14           MR. STEIN:  Okay.  So I have a number of questions

15   with the way this is written.

16           THE COURT:  Okay.

17           MR. STEIN:  Just taking it with the way it's

18   written, going to the end of it, starting at the end where it

19   says, starting in the middle of the sentence, "but the

20   presence or absence of motive is a circumstance that you may

21   consider as bearing on the intent of a defendant."

22           Now, whoever committed these robberies, whoever shot

23   Mr. Deleon, no one would rationally claim that these were not

24   intentional crimes so I'm not sure what the Court means when

25   it writes, when it's proposed to instruct the jury that motive

1   is to be considered on the question of intent.  I don't agree

2   with that at all, Judge, and I put that in my letter which I

3   filed on March 8th.  It's ECF Number 167.

4          So we have Mr. Farrell's opening statement and, of

5   course, during the course of the trial, we've submitted a lot

6   of evidence, in my view, including Mr. Brack's testimony as

7   well as to why he had no motive to commit the crime.

8          THE COURT:  Right.

9          MR. STEIN:  Because he had money in the bank,

10  literally, he had money on him, he had a job.  So these, this

11  evidence including his testimony is meant directly towards

12  whether or not he had a motive to commit the crimes, not that

13  he had a motive to intend to commit the crimes.  The intent is

14  irrelevant to this because these are real obviously

15  intentional crimes.

16         So I had proposed some language in my request.  As I

17  said, it's ECF 167 filed on March 8th.  I can read it into the

18  record because I think our language that we're proposing makes

19  the question of motive central to the defense here.  It

20  negates not intent, it negates whether or not he committed the

21  crime.  And it's for the jury to consider that in deciding

22  whether or not the government has proved Mr. Brack guilty

23  beyond a reasonable doubt.

24         Our summation in so many words is going to say

25  Mr. Brack apparently, I'm doing this off the cuff now,

Charge Conference                                    985

1    Mr. Brack did not commit these crimes because he had no motive

2    to do so, he had no motive to do so because he had a lot of

3    money, it's displayed in the pictures from Facebook, he has

4    the job, he's got the money on his person.

5              THE COURT:  I understand the substance of it.

6              Let me ask Anthony first is this from Sand?

7              THE CLERK:  Yes.  Sand number 618.

8              MR. STEIN:  With all due respect to Judge Sand, I

9    have been before him, he's very knowledgeable, this is not

10   appropriate for this case.  I mean, I don't think it's

11   appropriate at all.

12             I ask the Court to consider the language that I

13   submitted or that we submitted in our filing on March 8th

14   which goes directly to the point of the motive evidence which,

15   as I've said, is a significant part of the defense

16   presentation in this case.  I mean it's a rhetorical question

17   but why would someone commit these robberies for $1,100 when

18   he's got thousands and thousands of dollars?

19             THE COURT:  So the record is clear, we added this

20   instruction from Sand precisely to accommodate the defense

21   argument.

22             MR. STEIN:  Well, it does not do that, Judge, at

23   all.

24             THE COURT:  That was what the Court intended.

25             MR. STEIN:  Judge, I'm asking --

1          THE COURT:  Mr. Selden, do you have any comments on

2   Mr. Stein's argument?

3          MR. SELDEN:  Your Honor, Mr. Stein's argument and

4   his request for a motive instruction specifically, the defense

5   motive instruction, essentially adds another element that the

6   government would have to prove.

7          MR. STEIN:  It's not -- sorry.

8          THE COURT:  I don't think -- I think what he's

9   trying to say is that, forget about whatever the crime is, he

10  didn't have a motive, whatever you have to prove to establish

11  the elements of the crime, he didn't have any motive to commit

12  that crime regardless of what the elements are.  That's the

13  sum and substance of what you're trying to say.

14         MR. STEIN:  The very first line of my proposed

15  charge is:  Although proof of motive is not a necessary

16  element of the crimes -- I wrote "crime" but it should be

17  "crimes" -- with which the defendant is charged.  It's laid

18  out right in the very first part of the request to charge,

19  what I'm -- besides the fact that what I think the Court is

20  proposing to charge is, I don't mean to be disrespectful, is

21  inappropriate for this case.

22             If you charge the jury on what you're proposing to

23  do, they're going to jump on that in their summation and

24  they're going to say, Oh, it's only relevant to intent and you

25  are going to hear Judge Vitaliano's instructions on the law

Charge Conference                                987

1    which you're bound to follow.  It doesn't fit this case.

2          MR. SELDEN:  Your Honor, if I may, because I didn't

3    have an opportunity to actually flush it out, it squarely fits

4    this case, the Sand instruction does.

5          By Mr. Stein's logic, anyone with money should get

6    his proposed instruction with regard to motive, and we believe

7    that Sand adequately addresses both the defense's position as

8    well as the government's position.  The Sand instruction has

9    been utilized in this court as well as in other courts

10   throughout this Circuit and the proposed instruction as the

11   Court has outlined it we believe is appropriate, it's an

12   appropriate balance between what Mr. Stein is proposing and

13   what the government is proposing.

14         MR. STEIN:  Judge, I mean, I -- it's not

15   appropriate.  They're going to be arguing in their summation

16   that you should only listen to Judge Vitaliano, it's relevant

17   to intent.

18         THE COURT:  I'll take another look at it.

19         MR. STEIN:  Okay.  I'm just asking --

20         THE COURT:  But reference again the docket entry,

21   Mr. Stein?

22         MR. STEIN:  Number 167.

23         THE COURT:  We'll take another look at it because as

24   you read it, it's not too far off this one so I'll take a look

25   at it.

1          MR. SELDEN:  If the Court will take a look at that

2     case, I believe it's from 1995, the facts and circumstances of

3     that case are fundamentally different from the fact and

4     circumstances of this particular case and with regards to

5     Mr. Stein's proposal, we would ask how he believes those facts

6     line up with this particular case from that case.

7          MR. STEIN:  Judge, I don't know what case Mr. Selden

8     is referring to from 1995.

9          MR. SELDEN:  This is the case Mr. Stein cited to for

10    his proposed jury instruction.

11         MR. STEIN:  It was not --

12         MR. SELDEN:  Was there a case cited?

13         MR. STEIN:  In my identification request.

14         MR. SELDEN:  I apologize, Your Honor.  With regards

15    to this proposal, Mr. Stein I don't think actually cites to a

16    case.

17         MR. STEIN:  I did not.  I formulated language which

18    I thought was appropriate for the case.

19         THE COURT:  He's citing "Stein On Instructions."

20         MR. SELDEN:  Absolutely.  And while Mr. Stein is

21    certainly a learned counsel and has been effective during the

22    pendency of this trial --

23         THE COURT:  That's for sure.

24         MR. SELDEN:  -- we certainly believe that Sand is

25    appropriate.

1           THE COURT:  We'll take a look at it.  As I say in my

2   listening, they're not too far apart.

3           MR. STEIN:  Judge, can I add something else here?

4           THE COURT:  On this one.

5           MR. STEIN:  What Mr. Selden wants is something

6   that's for argument in their summation.

7           They can say, well, he wanted more money, just like

8   people who are wealthy commit stock fraud and they get more

9   money.  Why would someone commit fraud when he's already a

10  millionaire?  Well, because he's greedy or whatever they want

11  to argue.

12          This is a question of what the law is that the jury

13  is bound to follow.  So they can argue what they want, we can

14  argue what we want.

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Charge Conference                               990

1   (Continuing)

2           THE COURT:  Yes, my job is to make sure that this

3   charge is fair to both sides, and to be clear.  My

4   understanding, what I think I understand what you are

5   saying is, notwithstanding what the elements of the crime

6   might be technically -- forget about the *mens rea*.  He did not

7   do the *actus*.

8           MR. STEIN:  Correct.

9           THE COURT:  He did not do it.

10          MR. STEIN:  Correct.  But if you say *actus*, I think

11  you'll scare the jury.

12          THE COURT:  But I think that is what you are saying.

13  So a charge as directed at *mens rea* is not something that

14  accurately captures your complaint.

15          MR. STEIN:  Correct.

16          THE COURT:  Okay.

17          MR. STEIN:  Don't say *mens rea* either, Judge.

18          MR. SELDEN:  So Your Honor, if we're reading

19  Mr. Stein's interpretation correctly, we would be comfortable

20  if the last phrase starting with:  But the presence or absence

21  of motive is a circumstance that you may consider as bearing

22  on the intent of a defendant.

23          If that was removed, he would be satisfied with this

24  proposed Sand instruction.

25          MR. STEIN:  Actually, that's not what I wrote.

Charge Conference                                   991

1          THE COURT:  He is not saying that.

2          He thinks you would be happy with that.

3          MR. STEIN:  Say it again.  I doubt it but I'll

4    listen.

5          MR. SELDEN:  Simply removing the last phrase that

6    Mr. Stein had highlighted he had a problem with when we

7    started our discussion, removing:  But the presence or absence

8    of motive is a circumstance that you may consider as bearing

9    on the intent of a defendant.

10         THE COURT:  It is bearing on the intent.

11         MR. STEIN:  Yes, that's my problem.  I mean, that's

12   one of my problems.

13         THE COURT:  You could say bearing.  Period.  Put the

14   period before bearing.

15         MR. SELDEN:  Or may consider, I guess.

16         THE COURT:  Yes, you may consider the presence or

17   absence of a motive.  Period.  Not -- his concern is that the

18   charge limits the jury's consideration of the presence or

19   absence of motive only to the *mens rea*, is what it sounds

20   like, as opposed to the *actus reus*.

21         MR. STEIN:  He didn't do it.

22         THE COURT:  Which is the *actus reus*.

23         If he never did the act, it does not matter what his

24   intent was.

25         MR. SELDEN:  So Your Honor, with regards to that,

1  the Government would propose removing the last words in the

2  sentence starting with:  As bearing on the intent of a

3  defendant.  And stop with:  Motive is a circumstance that you

4  may consider.  Period.

5            THE COURT:  Yes.

6            MR. STEIN:  Well, Judge --

7            THE COURT:  I will look at your language and I am

8  going to try to harmonize between <u>Sand</u> and -- but I think I

9  know what you want, Mr. Stein.

10            MR. STEIN:  My language is to put the question of

11  motive in the context of the jury's obligation to consider

12  whether or not the Government has proved our client guilty

13  beyond a reasonable doubt.  So that's why I wrote...

14            THE COURT:  I do not think these two charges are

15  that far off, is what I am telling you, in my listening.

16            MR. STEIN:  Okay.

17            THE COURT:  When I listen to the <u>Sand</u> charge and I

18  listen to what you want, I do not think they were that far off

19  and I think we can harmonize it.

20            MR. STEIN:  Okay.

21            THE COURT:  If you do not like how I harmonize it,

22  you still have the ability to make an exception.

23            I think you would rather win.

24            MR. STEIN:  Well, I would rather you adopt our

25  language.

Charge Conference                              993

1          THE COURT:  When you get to the next Stein on
2     Charges, you can cite me as supporting.  I have it.
3          Anthony, do you need anything else on that?
4          THE LAW CLERK:  No.
5          THE COURT:  Okay.
6          Anything on page 59?
7          MR. STEIN:  Well, there's no page to look at because
8     it is not here.
9          THE COURT:  No, no, no.  If you are telling me you
10    are okay with the rest of the stuff that is there, we can then
11    turn to stuff that is not there.
12         MR. STEIN:  Correct, yes, Judge.
13         THE COURT:  Okay.  Then we are okay; so that the
14    record is clear, that neither side has any further specific
15    objections.
16         MR. FARRELL:  I'm sorry, Judge.  I had a couple.  We
17    didn't get to coordinate completely.
18         THE COURT:  Okay.
19         MR. FARRELL:  Again, Judge, you and your law
20    secretary drafted this before all the evidence was in, so you
21    put some you put in:  If applicable.
22         THE COURT:  Correct.
23         MR. FARRELL:  And we want to make sure --
24         THE COURT:  Yes, please.  I understand.  Yes,
25    please.

Charge Conference                                    994

1             MR. FARRELL:  Okay.

2             I believe that stipulations is certainly applicable.

3    Expert witnesses is applicable.

4             THE COURT:  Gary, can you just give the page at the

5    bottom.

6             MR. FARRELL:  Yes.

7             Page 18:  Stipulations are certainly applicable.

8    Multiple stips have been entered.

9             Page 30:  Expert witnesses, I believe, is

10   applicable.  I'm sure the Government does, too, since they

11   called them.

12            Page 35:  Testimony of defendant is clearly now

13   applicable.

14            THE COURT:  Correct.

15            MR. FARRELL:  But page 36 would not be.

16            THE COURT:  Correct.

17            MR. FARRELL:  Since interviewed witnesses, I

18   believe, is applicable.  Prior inconsistent statements, I

19   believe, is applicable.

20            Defendant's -- I'm sorry.  I'm not giving the page

21   numbers, Judge.

22            Prior inconsistent is 45.

23            Defendant's evidence at trial is applicable.  We did

24   put on a case, page 49.

25            Specific investigative techniques:  I'm sure the

Charge Conference                     995

1   Government would say that is applicable.  I can't, in good

2   faith, argue it's not.

3          I would say -- that's page 50.

4          On page 54:  Uncharged acts considered for a limited

5   purpose, I don't think is applicable.

6          THE COURT:  I do not think we had any 404.

7          MR. FARRELL:  Right.  So we are in agreement.

8          On page --

9          THE COURT:  That is out.

10         MR. FARRELL:  -- page 57, I believe:  Consciousness

11  of guilt is not applicable in this case and ask that it not be

12  charged.

13         THE COURT:  Yes, I agree.

14         MR. SELDEN:  Your Honor, if we could just -- and I

15  apologize to Mr. Farrell -- but I think there was testimony

16  going back to page 54 with regards to uncharged acts

17  considered for a limited purpose.

18         I think there was real discussion by Mr. Brack of

19  his use of marijuana throughout the pendency of his

20  interactions.

21         THE COURT:  No, no, no.

22         MR. FARRELL:  Okay.

23         Moving along then, Judge.  Use of recording and

24  transcripts.  I mean, it certainly wasn't a tape case.  I

25  don't know that we referred to any transcripts.

1          THE COURT:  I cannot remember.

2          MR. FARRELL:  We don't think it's applicable, Judge.

3    It's not the hugest deal in the world, but I think we can

4    leave it out.

5          MR. SELDEN:  Your Honor, I think we can leave it

6    out.  We don't recall any transcripts.

7          THE COURT:  Yes, I do not recall any.  We can take

8    it out.

9          MR. FARRELL:  I believe that concludes the portions

10   of the charge that were subject to seeing how all the evidence

11   plays out.

12         THE COURT:  Yes.

13         MR. FARRELL:  Okay.  Thank you.

14         MR. SELDEN:  Your Honor, just to be clear, from the

15   Government's perspective, I think the use of charts, maps and

16   summaries on page 66, we believe, is applicable.

17         MR. FARRELL:  Oh, yes.  I missed that one.  You're

18   right, Mr. Selden.  Clearly it is applicable.

19         THE COURT:  Okay.

20         Is there anything else is in the charge as proposed?

21         MR. STEIN:  Judge, we made a request about the

22   language on the presumption of innocence, but I saw that in

23   the revised version you adopted the request.

24         THE COURT:  We did.

25         MR. STEIN:  Unless and until.

1          THE COURT:  Correct.

2          MR. STEIN:  Unless sounds like it's inevitable

3    without the until.

4          THE COURT:  I have actually charged that before.

5    This is not the first time.

6          MR. STEIN:  Yes, I was there.

7          THE COURT:  I think it may have been you.

8          MR. STEIN:  You are correct.

9          THE COURT:  Nothing else?

10          And we can go to Mr. Stein who has this burning

11    identification.

12          MR. SELDEN:  Nothing else on behalf of the

13    Government.  Thank you, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MR. STEIN:  So I put -- we put in this somewhat

16    lengthy request for identification, which is now irrelevant,

17    because that was before -- we filed it before the Government

18    informed us that they weren't going to elicit any in-court

19    identifications after a lot of back and forth, as I'm sure you

20    recall.

21          THE COURT:  Yes.

22          MR. STEIN:  So what we're requesting, very simply

23    is, that the Government has to prove beyond a reasonable doubt

24    that Mr. Brack is the perpetrator.

25          THE COURT:  Okay.  I think we have said that about

1   twenty times.

2          MR. STEIN:  It may be self-evident, but there is not

3   a specific instruction that says that.

4          MR. SELDEN:  Isn't that every one of the

5   instructions throughout here?  I suppose we're confused as to

6   how that is not talked throughout.

7          MR. STEIN:  The Government has to prove the

8   identification of the perpetrator beyond a reasonable doubt.

9          THE COURT:  No, they do not.  They have to prove

10  that Mr. Brack was the perpetrator beyond a reasonable doubt.

11         MR. STEIN:  Fine, Judge.

12         THE COURT:  That is in there.  That is what the

13  whole charge is about.

14         I think that nothing further is needed on that.  To

15  the extent that you disagree, you have an exception.

16         MR. STEIN:  Judge, going back to the request on

17  motive.  Is it possible before we start tomorrow --

18         THE COURT:  We will see.  We will just see.

19  Absolutely.

20         MR. STEIN:  We'll submit the language.

21         THE COURT:  Absolutely.

22         In fact, I am sure Anthony will e-mail it to you

23  tonight.

24         MR. STEIN:  Okay.

25         THE COURT:  You will have it in advance.  That is

1   the good thing about the e-mailed stuff, except when you do it

2   to us and it is 2:00 o'clock in the morning, we do not like

3   it.

4           Okay.  Now the verdict sheet.  1-A.

5           Anything on the verdict sheet?

6           MR. STEIN:  Not from us, Judge.

7           MR. SELDEN:  Your Honor, the Government had proposed

8   a verdict sheet that had an articulation of guilt before or

9   not guilt before moving on to the substantive elements.  We

10  just wanted to note that for the record.  We understand that

11  it was not adopted by the Court.

12          THE COURT:  We did not adopt it.  I think it is

13  unclear and the fact of the matter is that if the jury were to

14  find, for example, Mr. Brack not guilty on Count 2, he is

15  entitled to a directed verdict on Count 3.

16          MR. SELDEN:  Thank you, Your Honor.

17          THE COURT:  Nothing else?  Okay.

18          Then we will massage this into the final version.

19  With respect to that motive charge, we will give you a preview

20  by e-mail so you will have it in preparation.

21          Anthony, you have e-mails for all the lawyers?

22          THE LAW CLERK:  Yes.

23          THE COURT:  This way in case you are working

24  separately, you will both have it.

25          And we will see you tomorrow.

```
                      Proceedings                        1000
```

1          MR. STEIN:  So you have docket entry 167, Judge.

2          THE COURT:  Anthony should have it.

3          THE LAW CLERK:  Yes.

4          THE COURT:  Okay.  Then everybody prepare well.  Get

5     a good night's sleep and we will see you tomorrow, and good

6     luck to both sides, of course.  It has been a well-tried case

7     by everyone.

8          The Court appreciates the caliber of the advocacy.

9          ALL:  Thank you, Your Honor.

10

11         (Matter adjourned to Wednesday, March 11th at

12    10:00 a.m.)

13

14                           oooOooo

15

16

17

18

19

20

21

22

23

24

25

1001

1                      I N D E X

2

3   WITNESSES:

4        DAPHNE MAVRIS

5            DIRECT EXAMINATION BY MR. STEIN          821

6            CROSS EXAMINATION BY MR. SELDEN          837

7        FINBARR FLEMING

8            DIRECT EXAMINATION BY MR. FARRELL        846

9        ELGIN BRACK

10           DIRECT EXAMINATION BY MR. FARRELL:       865

11           CROSS EXAMINATION BY MR. SELDEN          948

12           REDIRECT EXAMINATION BY MR. FARRELL      973

13

14                     EXHIBITS:

15

16           Government Exhibit S-5           819
             Defendant's Exhibit I           824
17           Defendant's Exhibit N           828
             Defendant's Exhibit 222-A       839
18           Government's Exhibit S-12       844
             Defendant's Exhibit G           867
19           Defendant's Exhibit F           871
             Defendant's A                   899
20           Defendant's Exhibit W           921
             Defendant's Exhibit X           924
21           Defendant's Exhibit H           930
             Defendant's Exhibit Q           932
22           Defendant's Exhibit J           933
             Defendant's Exhibit L           934
23           Defendant's Exhibit V           941

24

25                 *     *     *     *

CMH       OCR       RMR       CRR       FCRR