1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2    - - - - - - - - - - - - - - X
      UNITED STATES OF AMERICA,    :   18-CR-00684(ENV)
 3                                 :
                                   :
 4                                 :   United States Courthouse
          -against-               :   Brooklyn, New York
 5                                 :
                                   :
 6                                 :   February 18, 2020
                                   :   10:00 a.m.
 7    ELGIN BRACK,                  :
                                   :
 8          Defendant.            :
      - - - - - - - - - - - - - - X
 9
           TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
10          BEFORE THE HONORABLE ERIC N. VITALIANO
                UNITED STATES DISTRICT JUDGE
11
                   A P P E A R A N C E S:
12
      For the Government:      RICHARD P. DONOGHUE, ESQ.
13                             United States Attorney
                               Eastern District of New York
14                             271 Cadman Plaza East
                               Brooklyn, New York 11201
15
                               BY:  PHILIP SELDEN, ESQ.
16                                  JONATHAN SIEGEL, ESQ.
                                    JONATHAN LAX, ESQ.
17                                  Assistant United States Attorneys
18
      For the Defendant:       LAW OFFICES OF JOEL M. STEIN, ESQ.
19                             30 Wall Street
                               8th Floor
20                             New York, New York 10005
21                             BY:  JOEL STEIN, ESQ.
22
                               LAW OFFICES OF GARY A. FARRELL
23                             305 Broadway
                               Suite 1400
24                             New York, NY 10007
25                             BY:  GARY A. FARRELL, ESQ.
```

*Proceedings*                                                    2

1              A P P E A R A N C E S: (Continued.)

2   Court Reporter:          DENISE PARISI, RPR, CRR
                             Official Court Reporter
3                            United States Courthouse
                             225 Cadman Plaza East
4                            Brooklyn, New York 11201
                             Telephone: (718) 613-2605
5                            E-mail: DeniseParisi72@gmail.com

6   Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.
7

8                    *    *    *    *    *

9           (In open court.)

10          THE COURTROOM DEPUTY:  All rise.  Court is now open.

11  The Honorable Eric N. Vitaliano presiding.  Case on the

12  calendar is USA versus Elgin Brack, case number 18-CR-684 on

13  for a status conference and pretrial conference.

14          Would the attorneys please note their appearance

15  beginning with Government.

16          MR. SELDEN:  Good morning, Your Honor.

17          On behalf of the United States Assistant United

18  States Attorney Phil Selden.  Your Honor, I'm joined at the

19  lectern by Assistant United States Attorney Jonathan Siegel

20  and Assistant United States Attorney Jonathan Lax.

21          MR. SIEGEL:  Good morning, Your Honor.

22          MR. LAX:  Good morning, Your Honor.

23          THE COURT:  Good morning.  Too many Jonathan's.

24          MR. STEIN:  Good morning, Your Honor.

25          Joel Stein for Elgin Brack.

*Proceedings*                                                    3

1          THE COURT:  Good morning, Mr. Stein.

2          MR. FARRELL:  Good morning, Your Honor.

3          Gary Farrell, likewise, for Elgin Brack.

4          THE COURT:  Good morning, Mr. Farrell.

5          THE COURTROOM DEPUTY:  All parties are present,

6    including defendant.

7          THE COURT:  Good morning, Mr. Brack.

8          THE DEFENDANT:  Good morning.

9          THE COURT:  All right.  I guess you would like to

10   eliminate so much I guess we've got more, so, Mr. Selden, why

11   don't you try to catch us up to where we think we are at.

12         MR. SELDEN:  Thank you, Your Honor.  Just with

13   regard to a few brief housekeeping matters, Your Honor, the

14   Government anticipates providing 3500 Giglio materials on

15   Monday, the 24th a week in advance of trial previously

16   consistent with the agreed-upon deadlines.  The Government

17   would make a request of Mr. Brack to similarly provide, if

18   there is going to be, materials that he plans to rely on

19   during the pendency of the case by that Monday as well; and

20   just as a housekeeping matter, we plan to, and have spoken

21   with Mr. Stein, exchange those materials via messenger, so we

22   don't anticipate any issues with that.

23         THE COURT:  Wonderful.

24         MR. SELDEN:  Your Honor, consistent with the 3500

25   and Giglio materials, we also would ask, and the Government

*Proceedings*                                                              4

1   plans to provide a witness list on the 24th, a week in advance

2   of trial, we would ask for a similar witness list from

3   Mr. Brack of proposed witnesses.

4          Consistent with that, we also would ask --

5   Mr. Brack, during the course of his motions in limine, made

6   reference to a Wells Fargo financial document, and I believe

7   there's going to be some discussion today of his financial

8   motive and/or evidence that the defendant wish to put before

9   the jury.  Unfortunately, to date, we haven't been able to

10  resolve obtaining those documents in an un-redacted format,

11  and so we would ask now on the record whether or not the

12  defense would be willing to provide that Wells Fargo document

13  as well as the backup documents, the documents from the months

14  preceding that one particular month to the Government in an

15  un-redacted format.

16         MR. STEIN:  Judge, we did discuss this earlier, as

17  well as the previous submissions, so this is what I proposed,

18  I don't know whether this is going to be agreeable or not, so

19  I was sent through a third party bank statements from

20  Mr. Brack's account at Wells Fargo, so the relevance of it is

21  limited.  This isn't an exploration of his finances.  It's

22  limited to a finite point, which is that on the day he was

23  arrested, 11/26/2018 -- I don't remember the exact amount --

24  he had 2,000 and something dollars in his account.

25         MR. FARRELL:  More than that.  4,347.

1          MR. STEIN:  That's not the --

2          MR. FARRELL:  Yes, it is.

3          MR. STEIN:  Okay.

4          THE COURT:  I remember the 4,000 number.

5          MR. FARRELL:  Yes, correct, Judge.  Your memory is

6    correct.

7          MR. STEIN:  Mr. Farrell is correct.

8          The point of it is we limited it to what was in his

9    bank account on that day, the day of his arrest, relevant

10   towards motive.  I don't know why they would need to see all

11   of the bank statements from all of the periods of time that

12   they were provided to me.  I don't see why that's something

13   they're entitled to have.  This is all related to a receipt

14   that was found -- that was seized from Mr. Brack when he was

15   arrested.  It's a deposit slip, or what's printed out from an

16   ATM machine, it looks like to me, which had about $6,000 in

17   the account at that time, and that was on October 31st.  So

18   this all started because I wanted to be able to introduce the

19   receipt which was seized from him at that time.  They can

20   argue that it doesn't show that much because it's October 31st

21   and not November 26th, so I have since then supplemented it by

22   giving them a redacted bank statement for November 26th

23   showing the $4,000 and change.  I've told the Government that

24   we would be prepared to send them from that particular page in

25   the bank statement un-redacted -- that page which would show

*Proceedings*                                                              6

1  the time period from sometime in November up until

2  November 26th, so I'm not sure what purpose it would serve for

3  them to have his bank statements from all these other months

4  that were provided to me by a third party.  I didn't get that

5  from the bank, but I have no reason to dispute them.  The

6  account number -- the account number on the bank statements,

7  the last four digits of it, corresponds to the account number

8  for the ATM receipt that I was talking about before which

9  showed the balance on October 31st, but the relevant period --

10  the relevant date is November 26th, which, as I said, shows

11  the balance of 4,000 and change, so I don't see why they need

12  to see all these other documents.  I don't know whether

13  they're questioning the authenticity of what I provided to

14  them even though it's redacted or what.  It has the last four

15  digits of the bank account at the top of the page.

16             THE COURT:  Mr. Selden.

17             MR. SELDEN:  Thank you, Your Honor.

18             Your Honor, putting aside the authenticity and the

19  business certification, if Mr. Brack plans to introduce motive

20  or lack thereof through his financial status at the time of

21  the alleged crimes, we think that having the backup

22  documents -- not years and years of materials, but simply in

23  the months prior -- would be helpful for context for the jury,

24  and without having access to documents that it sounds as if,

25  pursuant to a reciprocal request under Rule 16, that Mr. Stein

1   has in his possession, custody, and control.  If the

2   Government was in possession of similar documents, we would

3   have an obligation to turn them over to Mr. Stein, and it

4   sounds like he's saying that he does have those documents, so

5   we would simply ask to review those documents.  If motive is,

6   in fact, going to be placed before the jury, we would like to

7   be able to understand the context of that motive beyond just

8   one financial number at the end of a redacted document.

9            MR. STEIN:  Judge, actually, that's not an accurate

10  recitation of the reciprocal discovery obligation for the

11  defendant.  It's much narrower than it is for the Government.

12  The Government has to produce whatever they have that's

13  outlined in the rule.  For the defendant, it's narrower, and I

14  believe somewhere in my papers I cited this when we went back

15  and forth about this.  It's limited to what we plan on

16  introducing in our case in chief, so this is what we plan on

17  introducing as part of our case in chief, not all these other

18  bank statements for irrelevant periods of time.

19           THE COURT:  I think, contextually, there seems to be

20  an issue, I think in fairness, Mr. Stein, of whether this is

21  just despite or whether over the couple months prior it's a

22  fairly consistent source of income.  So we may keep saying,

23  well, putting aside authenticity and certification, except

24  that we really can't, and if that foundation has to be laid

25  for the introduction of the document, the documents, not what

*Proceedings*                                                                8

1   somebody has provided over the transom, or however you got it.

2            MR. STEIN:  They were e-mailed to me, Judge.

3            THE COURT:  E-mailed.

4            Particularly, you know, in this electronic age, you

5   can't believe your own eyes.

6            MR. STEIN:  All I can do is repeat, Judge, it has a

7   correct bank account number.

8            THE COURT:  Yeah, okay.  And with a statement from

9   the bank, it's not authentic.  It's a piece of paper that has

10  a bank account number on it that was emailed.

11           MR. STEIN:  Okay, Judge.

12           THE COURT:  So if you plan to do that, then couple

13  of months prior would be relevant for context.  The object is

14  that he didn't need it then, he's not going to need it next

15  week or the month after because he's had it for a long time.

16  To the extent that one buys the argument that people with

17  money don't commit robberies --

18           MR. STEIN:  That's the argument.  Thank you.

19           THE COURT:  -- that's an interesting --

20           MR. STEIN:  They can say whatever they want about

21  it, but that's --

22           THE COURT:  -- it's an interesting argument.  It

23  certainly isn't resident with me, but it might be resident

24  with 12 folks over there, I don't know.

25           MR. STEIN:  Yes.

*Proceedings*                                                              9

1          THE COURT:  Keep going on somebody's list.

2          MR. SELDEN:  Thank you, Your Honor.

3          Your Honor, we --

4          THE COURT:  I don't whose list, but as long as we

5    keep going.

6          MR. SELDEN:  Of course, Your Honor.

7          THE COURT:  We will get to the end one way or

8    another.

9          MR. STEIN:  We have a long list.

10         MR. SELDEN:  We anticipate as much from Mr. Stein.

11         This morning the Government received from

12   Mr. Farrell a reference to a potential cell site expert on

13   behalf of the defense.  We are now approximately two weeks

14   before trial and the Government had previously provided our

15   expert notice in May of 2019 with a request for any expert

16   information by the defense on this topic by May 30th of 2019.

17   We would simply ask, it sounds as if the defense does not plan

18   to call that expert, but if, in fact, they are planning to

19   call an expert, we would ask that they provide us with expert

20   notice as soon as possible.

21         THE COURT:  I assume that they did do that.

22         MR. FARRELL:  That's a fair request, Judge, of

23   course, but we retained the expert solely to help us with

24   cross-examination, and we are not going to call him.

25         THE COURT:  Mr. Selden is just protecting himself in

1  the case all of a sudden sometime around midnight on Saturday,

2  it strikes you that maybe you should.

3      MR. FARRELL:  Right.  That's true and fair, Judge.

4  I understand.

5      THE COURT:  Okay.  So that's covered.

6      MR. SELDEN:  Continuing on the Government's requests

7  of the defense.

8      On January 31st at ECF 129, the Government had

9  provided preliminary jury instructions to the defense.  We

10  would simply inquire through the Court when -- if the

11  defendant plans to submit his proposed jury instructions, if

12  it's possible to do that in advance of trial so that we are

13  not in the throws of litigation.

14      THE COURT:  Our rules actually require it, as I

15  recollect them.

16      MR. SELDEN:  I believe that's correct, Your Honor,

17  but we wanted to see on the record when the defense plans to

18  provide their proposed instructions.

19      THE COURT:  In the real world, it is, for the most

20  part -- I don't know how Mr. Stein plans to proceed, and

21  Mr. Farrell -- is that there may be a couple that they may

22  propose, but for the most part, everybody relies on the

23  Government's overall presentation.

24      MR. SELDEN:  Of course.

25      THE COURT:  And then we see the charges that they

*Proceedings*                                                          11

1   don't like.

2          I assume, Mr. Stein, at some point prior to trial we

3   will see your version of things that made up the things you

4   don't like that the Government has proposed, or things that

5   the Government hasn't proposed at all that you want.

6          MR. STEIN:  That will be done, Judge.  You will

7   forgive me, I didn't know -- I thought you were going to set a

8   schedule for it.

9          THE COURT:  No.  I think it's sort of set out in the

10  rules, but, you know, the sooner the better because

11  Mr. LoMonaco would appreciate that as well.

12         MR. STEIN:  I'm sure he will.  I know he's been

13  bored recently.

14         MR. SELDEN:  Your Honor, continuing on the

15  Government's discussions of some housekeeping matters,

16  pursuant to Rule 12.1, the Government in ECF 139 had made a

17  request for alibi notice.  We understand that Mr. Stein does

18  not need to respond back to that request until February 23rd,

19  but we did just want to put on the record that request.

20         In addition, Your Honor, the Government wanted to

21  address Mr. Stein and Mr. Elgin Brack regarding the eighteenth

22  and nineteenth discovery productions that I believe were

23  addressed at last week's -- or, I apologize, at the last

24  status conference.  It's come to our attention that these

25  productions were reproduced to Elgin Brack after his refusal

*Proceedings*                                                            12

1    to accept them in a hardcopy -- that, meaning through an

2    actual portable hard drive version, and that they were

3    reproduced to Mr. Brack, unfortunately, through a flash drive,

4    and the MDC has indicated that they will not accept a flash

5    drive and so we have endeavored and will be sending out a

6    reproduction of the reproduction again today.

7              For the record, and so things are clear, Mr. Stein

8    has indicated that Mr. Farrell and Mr. Stein are both in

9    possession of all 20 discovery productions, so just so that

10   the record is clear, defense counsel for Elgin Brack have all

11   the defendant's discovery productions to this date.

12             THE DEFENDANT:  Can I speak on that?

13             THE COURT:  Sure.

14             THE DEFENDANT:  Just like I told my lawyer, I would

15   like CDs.  As far as my lawyer having 18, 19, this is my first

16   time hearing about 20, but they are busy, they have other

17   clients, so they can't, like, come every day to show me piece

18   by piece, so I would just like CDs of 18, 19 and 20, please,

19   and I didn't refuse nothing, but too much going on to argue.

20             THE COURT:  You will get discovery in the format

21   that the Government provides it.

22             MR. SELDEN:  Your Honor --

23             THE COURT:  If we can accommodate any request, we

24   will accommodate them, otherwise you will make due, Mr. Brack.

25             MR. SELDEN:  As always, we appreciate Mr. Brack's

*Proceedings*                                                                  13

1  involvement in the matter, but unfortunately CDs with the

2  subject matter would not be feasible for the MDC, which is why

3  the portable hard drives that have been previously produced to

4  him will be the format they accept.

5          Your Honor, moving on to sort of housekeeping

6  matters, we do want to note for the record and would ask the

7  Court, and are not suggesting that the Court be involved, but

8  that a plea offer in this case was, in fact, extended to

9  Mr. Brack on May 29, 2019.  It expired on June 13, 2019.  We

10  just wanted to confirm on the record that that plea offer,

11  without getting into the substance of it, had been, in fact,

12  articulated to Mr. Brack by counsel.

13          MR. STEIN:  Yes, Judge, I presented to him the

14  proposed written plea agreement back in late May.  I don't

15  remember the exact date.

16          THE COURT:  And the fact that we are here is an

17  indication that it was declined.

18          MR. STEIN:  Correct.

19          THE DEFENDANT:  Yeah.

20          MR. SELDEN:  Your Honor, before turning over the

21  Government's discussions to Mr. Siegel on the Government's

22  additional matters, we did want to address one additional

23  request, and that was for accommodations for the first victim

24  that the Government anticipates calling in the Government's

25  case in chief.  We want to make sure -- and Mr. Stein, we

*Proceedings*                                                          14

1   know, is a zealous advocate, but we think with regards to this

2   one matter, we might have been missing each other with regards

3   to what the Government is proposing.  Specifically, the

4   Government is not suggesting that we plan to lead the first

5   victim to, for example, an in-court identification by pointing

6   to the defendant or by intimating that the victim should do

7   so, but instead -- by way of example, the victim struggles at

8   times and has to utilize a notepad.  One example would be if

9   the victim is asked his relative age, if the victim is asked

10  his relative age, if the victim writes on the notepad a

11  number, the ability for Government counsel to be able to

12  utilize a leading question -- for example, is it correct that

13  your age is approximately 50, the number you are writing on

14  the note pad, versus the in-court identification, which the

15  Government does not plan to utilize.  The ability to use the

16  notepad and to be closer to the victim who, for the record,

17  suffers from brain damage, we believe is, pursuant to the

18  Court's discretion, something that's appropriate in this case.

19            THE COURT:  Mr. Stein?

20            MR. STEIN:  Judge, I don't think we have any quarrel

21  about that.  The nub, of course, is the courtroom

22  identification, which it's not limited to just that particular

23  witness --

24            THE COURT:  Yeah.

25            MR. STEIN:  -- but every witness they plan on

*Proceedings*                                                    15

1    calling from --

2              THE COURT:  We will get to that general -- yes, but

3    this is just limited to accommodating physical accommodations

4    for that particular --

5              MR. STEIN:  There's no problem.  I don't want to be

6    in a situation where when it comes to if you are going to

7    allow a courtroom verification where someone from the

8    Government is going to say --

9              THE COURT:  Isn't that the guy?

10             MR. STEIN:  -- do you see the guy in the courtroom

11   sitting over there that shot you?

12             THE COURT:  Exactly.  I think Mr. Selden is acutely

13   aware of that as well.

14             MR. SELDEN:  Yes, Your Honor.

15             Your Honor, I'm now going to turn over some of

16   today's discussions to Mr. Siegel.

17             Thank you, Your Honor.

18             THE COURT:  Thank you, Mr. Selden.

19             Mr. Siegel.

20             MR. SIEGEL:  Just to continue on a housekeeping

21   matter before we get into the actual meat of the motions in

22   limine, in order to try and make the trial more efficient and

23   less long for the jury, I think we've agreed in principle on a

24   number of stipulations.  That includes --

25             THE COURT:  I hope you are as effective as you were

1    in your last trial in streamlining it.

2              MR. SIEGEL:  That's always what I'm aiming for, Your

3    Honor.

4              So we have agreed on stipulations for some of the

5    LPR data; for DNA swabs that were taken from the defendant and

6    from the firearm that was recovered; some of the surveillance

7    video from inside and outside the stores; a test fire that was

8    done from the seized firearm.  I also understand that we've

9    agreed on one of the issues in the motion in limine, the

10   surveillance video from the gun store.  Right before this

11   conference, I spoke with Mr. Stein, and I think we are agreed

12   on a stipulation that that video would be admissible as video

13   of Elgin Brack from a certain date in a certain place in a

14   store with no reference to the fact that that is a gun store

15   or that he was buying a gun.  My understanding of why

16   Mr. Stein is doing that is obviously to keep out the evidence

17   of the fact that he was buying a gun, which the Government is

18   willing to agree to in order to smooth the way of that

19   surveillance video into evidence.

20             MR. STEIN:  Judge, can I just interject something?

21             I'm not sure what the reference is to about a

22   stipulation concerning the DNA on the gun.  I'm not sure --

23             THE COURT:  On the swab, I think he said.

24             MR. SIEGEL:  Just the swab.  That Item Number 3 on

25   Voucher 6,011 is a swab that was taken of the firearm at Item

*Proceedings*                                                      17

1    Number 1 on Voucher 7012.

2         THE COURT:  Again, I compliment both Mr. Stein and

3    Mr. Siegel on a sound accommodation of that surveillance video

4    from North Carolina.

5         MR. SIEGEL:  So at that point, unless there's

6    additional housekeeping issues, we can get into the meat of

7    the motion in limine.

8         THE COURT:  And that's on Mr. Stein's dime, I

9    assume.

10        MR. STEIN:  Yes, Judge.

11        Well, the most important thing from my perspective

12   is the in-court identifications.  So this goes back to early

13   October when we filed a motion to exclude the in-court

14   identification, and I probably don't need to remind you, but

15   at this point, 15 months have passed since November 26th.

16        THE COURT:  My recollection was that at that point,

17   the Government did not have a then current intent to offer

18   in-court identification.

19        MR. STEIN:  Well, actually, they never said that

20   until they filed a notice last week, which I objected to.

21        THE COURT:  I understand that, but the impression I

22   had gotten -- my point, Mr. Stein, was the impression I had

23   gotten last fall was that they did not have an intent at that

24   time to offer in-court identification.

25        MR. STEIN:  Judge, actually, I'm sorry to be

*Proceedings*                                                              18

1   argumentative about it -- actually, I'm not sorry, but I think

2   they didn't say what their intent was.  They --

3           THE COURT:  I said that's my impression.

4           MR. STEIN:  -- didn't respond, Judge.

5           THE COURT:  My impression of what I heard in open

6   court was that they didn't -- that was their intent at the

7   time.

8           MR. STEIN:  Be that as it may, Judge --

9           THE COURT:  I agree.  Be that as it may.  If I can

10  speed it up a bit, there's nothing before me at the moment

11  that I recall reviewing that indicate -- what's obvious?

12  What's obvious is that the Government wouldn't be proposing to

13  do that unless they were confident that the witnesses are

14  going to pick Mr. Brack out, but I see nothing in the papers

15  so far to tell me on what that confidence is based on, which

16  is the inquiry you make as to whether or not there's a valid

17  basis to make an in-court identification.

18          MR. SIEGEL:  So, Your Honor, maybe it would make

19  sense if we laid out that basis and then --

20          THE COURT:  -- and then let Mr. Stein respond to it.

21          MR. SIEGEL:  -- and then Mr. Stein could respond to

22  it.

23          The basis -- as we put into our notice, the people

24  who we anticipate would be able to identify Mr. Brack are the

25  four cashiers that he robbed at gunpoint, one from each of the

1  stores.  Those people stood about two feet away, about as

2  close as I am standing to the court reporter right now; they

3  spoke to him before he robbed them when he tried to -- or when

4  he pretended to check out at the cash register; they then saw

5  him when he pulled a gun and demanded money from the cash

6  register; and as was seen in the surveillance video that we

7  talked about at the suppression hearing, he's wearing a hood,

8  but the majority of his face is exposed.  They couldn't see

9  his hair, but they could see his face, they could see his

10 eyes, they could see nose, they could see his chin, they could

11 see his mouth with a drawstring in it, so based on that

12 interaction, we understand that those witnesses would be able

13 to identify him in court.

14        THE COURT:  You suppose or you know?  If you know,

15 how do you know unless you have shown them a picture?

16        MR. SIEGEL:  We have not shown them a picture.

17        THE COURT:  Any picture.

18        MR. SIEGEL:  We have not shown them -- we have shown

19 them the surveillance video from their own store, which they

20 have, in most cases, had already reviewed.  We have --

21        THE COURT:  So you don't know for sure that they are

22 going to identify the defendant.

23        MR. SIEGEL:  We do not know for sure.  What we know

24 is that they have said we think that we would be able to

25 identify the person who robbed us.  The reason we don't want

1    to show them a picture and say, Hey, can you recognize this

2    guy, is that could be extremely suggestive, but they have said

3    that they believe that they can identify the person who robbed

4    them, and, in several cases, they have said that since the day

5    of the robbery in police reports, and that will be in the

6    3500, so what we anticipate is that we may ask them on the

7    witness stand, Do you think you would recognize the person if

8    you saw him today, and, if so, do you see him.

9              MR. STEIN:  There's that word "may."

10             Judge, there's a little bit of a Kabuki dance going

11   on here because way back in September following Second Circuit

12   law, which I would be glad to read from which doesn't leave

13   this, in my view, in your discretion, but it's a matter of

14   law, which is the *Archibald* case -- the *Archibald* case, which

15   is cited on page 33 of the original papers in this case, which

16   is ECF Docket 85, and I quoted at length in a footnote, which

17   is footnote 22 on page 33 of the language from the Second

18   Circuit denying a petition for rehearing, so if I could -- if

19   you would indulge me so I can read this so you can see that

20   this is not something that's just in your discretion, and I

21   think what's going on here is that basically this is --

22   forgive the language -- this is a crap shoot.  Fifteen months

23   later, there's been no identification procedure.  Back on

24   September 24th, we made a request for a lineup.  They never

25   answered the request for the lineup even though in their

*Proceedings*                                                                21

1   answer to the motions, they said they will respond to the

2   request for the lineup in their answer to the motions, which

3   they didn't do, so I didn't create this situation.  This is

4   their case.  They have to decide how they are going to best

5   proceed to try and prove these charges, so instead of

6   arranging some kind of identification procedure, going back to

7   September of 2019 when I asked for a lineup and they never

8   answered, so they now want to have a situation where under the

9   most suggestive circumstances, they are going to ask witnesses

10  who haven't seen the perpetrator in 15 months.  We can debate

11  the details of whether or not his face was disguised in some

12  way.  We can agree that, at least to some extent, it was

13  disguised because, Mr. Siegel is correct, there are some

14  portions of the face that are hidden to some extent.

15          So if you would indulge me, Judge.  So this is

16  footnote 22 on page 33 of ECF Docket 85.  This is the language

17  from the Second Circuit denying the petition for rehearing,

18  and you will see in the language, Judge, this isn't

19  discretion.  The order denying the petition for rehearing

20  stated, quote:  "We wish to make it clear in respect to that

21  portion of our opinion relating to in-court procedures for

22  identification that special procedures are necessary only

23  where, one, identification is a contested issue" -- without a

24  doubt.

25          "Number two, the defendant has moved in a timely

*Proceedings*                                                    22

1    manner prior to trial for a lineup."  September 24th, 2019, I

2    have the email.  I don't think they would deny that.

3              "Three, despite that defense request, the witness

4    has not had an opportunity to view a fair out-of-court lineup

5    prior to his trial testimony for a ruling on the fairness of

6    the out-of-court lineup has been reserved.  Subject to this

7    modification of the opinion, the petition for rehearing is

8    denied."

9              So there's no -- nothing within your discretion to

10   decide this; and this is, under the most suggestive possible

11   circumstances, they're going to ask a witness from 15 months

12   ago to look at -- everybody knows who the defendant is in the

13   courtroom, there's no secret about that -- to make an

14   identification, and this is not proper.  This is the language

15   of the *Archibald* case, which also relied on a previous

16   precedent, which I cited in my papers, which is *United States*

17   *against Brown*, it's on page 33 to 34, that preceded *Archibald*.

18             So they should not be able to create this situation,

19   do nothing about preserving some kind of reliable

20   identification procedure, come in here 15 minutes later and

21   you see the guy who robbed you.  To me, this is not

22   permissible.

23             THE COURT:  Mr. Siegel?

24             MR. SIEGEL:  So, Your Honor, I don't have

25   Mr. Stein's brief from last fall in front of me, but I think

1    the *Matthews* case that was also cited in the papers and that

2    we discussed at length at the last oral argument on the last

3    round of motions, the *Matthews* case is clear that it is in the

4    Court's discretion, and even under the language that Mr. Stein

5    just quoted, it requires a timely request for a lineup.

6              September 2019 was ten months after these robberies

7    occurred.  Ten months is already time for memories to

8    potentially fade; and as the Government was clear at the last

9    oral argument, we didn't want to be in a position of creating

10   potentially additional evidence or potentially evidence one

11   way or another.  What the *Matthews* case makes clear is that

12   the Court has the discretion because an in-court

13   identification -- it's a risky proposition for the Government,

14   and the fact that it is -- the fact that there is a defendant

15   sitting at counsel table is something that the defendant can

16   argue at closing, and *Matthews* lists that as a potential

17   remedy for the issues that Mr. Stein is listing, but it's

18   quite possible that someone on the stand will say, I can't

19   recognize him, or I don't see him, or that they identify the

20   wrong person.  If the Government asks the witness to identify

21   the person who robbed them, those are risks the Government is

22   taking.  If the witness does identify Mr. Brack, Mr. Stein can

23   make all the arguments to the jury that he has just made here

24   for why the jury should not take -- should not give that

25   weight, but at this point, 15 months later, even at the point

*Proceedings*                                                    24

1   when he requested a lineup, ten months later, a lineup isn't

2   appropriate at that point.  This isn't a situation where he

3   requested a lineup the day he was arrested or a week after he

4   was arrested or a month after he was arrested, and in these

5   circumstances, the witness should be able to testify to

6   whether they can recognize someone, if they recognize someone,

7   and then whatever weight that has is up to the jury.

8             MR. STEIN:  Judge, they are not going to put this on

9   me by saying I didn't ask for a lineup until September 24,

10  2019.  This is their investigation, it's their prosecution,

11  the robberies take place in the early morning hours on

12  November 26th, the arrests are later that evening about 12

13  hours later, and they don't have a witness who can identify

14  someone from the scenes, so they are not going to put this on

15  me by saying that we didn't ask for this sooner.  They have to

16  decide how they are going to proceed, and it seems to me

17  pretty obvious that this is something that they should have

18  thought of way before September 24, 2019, otherwise, how do

19  you preserve the integrity of an in-courtroom identification?

20            MR. SIEGEL:  Respectfully, that's -- even the

21  language that Mr. Stein read, that's not what it says.  The

22  language that Mr. Stein read requires a timely request by

23  defense counsel, so the Government conducted its investigation

24  as it chose to do.  We think --

25            THE COURT:  Are you aware of any cases that defines

1   "timely," Mr. Siegel?

2          MR. SIEGEL:  I am not, but I think, as *Matthews*

3   says, it's the Court's discretion as to what would be

4   appropriate and what is necessary to make sure that any

5   identification is fair.

6          MR. STEIN:  Judge, when they filed this notice,

7   which I filed yet another set of papers to address, I asked

8   two remedies, and this is ECF 143, so --

9          THE COURT:  This is this last filing, Mr. Stein?

10          MR. STEIN:  Actually, I filed something yesterday in

11   response to the request for special accommodations for the

12   witness.

13          THE COURT:  Yes, I signed that.

14          MR. STEIN:  Excuse me?

15          THE COURT:  I thought you meant the attire.

16          MR. STEIN:  No.  I'm just saying, I did file

17   something else, but it's not relevant to this, so their

18   notice, their so-called identification notice, is -- speaks in

19   terms of "may" -- they may do this.  Okay?  You may do this --

20   and I don't think that kind of notice is notice of anything.

21   At this point, they should have some certainty if they had --

22   they can take this the way they want to -- if they had done

23   their job by protecting the integrity of a potential

24   in-courtroom identification by arranging a proper procedure so

25   that we don't have this particular discussion, so I made two

*Proceedings* 26

1  requests:  Number one is I asked that their identification

2  notice that they filed -- ECF 140 is their identification

3  notice, which is very perfunctory, it just says they may ask

4  for a courtroom identification.

5          THE COURT:  For the record, Mr. Stein, what date is

6  that?

7          MR. STEIN:  Mine or theirs?

8          THE COURT:  The 140, what you just referenced.

9          MR. SIEGEL:  It's February 11th.

10         THE COURT:  February 11th of 2020?

11         MR. STEIN:  Right, ECF 140.

12         So I made two requests, one is to strike their

13  notice because it's insufficient and any eyewitness from the

14  scene should be precluded from being asked to make an in-court

15  identification -- I know I never repeat myself -- 15 months

16  later.

17         Alternatively, Judge, as to each witness from

18  eyewitness from the store that they expect to call and be

19  asked to make an identification as to each one of them out of

20  the presence of the jury, out of the presence of the

21  defendant, that each one should be -- testify to that person's

22  independent source of being able to make an identification.

23  Obviously, the defendant shouldn't be there because if he's

24  sitting there, that would taint the whole process; and, of

25  course, this shouldn't be in front of the jury either, so you,

*Proceedings*                                                                   27

1   as the gatekeeper, can make a threshold determination as to

2   whether or not this is permissible, which, as I've said, it

3   isn't, so depending on what each of the four or so witnesses

4   testifies to about what their ability was to observe

5   descriptions, distance, whatever the totality of the

6   circumstances are, so that you can make a proper determination

7   as to whether or not they can ask for in-court identification.

8          MR. SIEGEL:  Your Honor, Mr. Stein is suggesting

9   that in every case where a witness is going to make an

10  in-court identification, that a lineup or a similar procedure

11  is required.  That's not the law.  The Second Circuit has held

12  it's not the law.  The Court may, in its discretion, require

13  it, and given that there was no request for a lineup for ten

14  months after -- until ten months after the crime, in this

15  case, it's not appropriate.  That February 11th date where we

16  made the notice, that was pursuant to a Court's order, to your

17  order that we make that notice on February 11th, and the

18  reason it was "may" instead of "will" is because we don't know

19  what the witness is going to say at trial.  At trial, the

20  witness may say --

21         THE COURT:  You are saying that you are definitely

22  going to ask.

23         MR. SIEGEL:  Yes.

24         THE COURT:  I think that's what Mr. Stein was

25  eluding to.

*Proceedings* 28

1       MR. SIEGEL:  We are going to ask -- we anticipate

2   asking --

3       THE COURT:  That you somehow know what the answer is

4   going to be.

5       MR. SIEGEL:  We anticipate asking if they would

6   recognize the person if they saw them today.

7       MR. STEIN:  Judge, I just wanted to add one thing to

8   this.

9       The description, of course, again, not rehashing

10  about the details of the person's face, but you could see

11  Mr. Brack's very long dreadlocks, so these people are going to

12  be asked to look at someone whose hair was obscured by a hood

13  that was tightly drawn around the outlines of the face, so --

14  I'm sorry, there's one thing I want to add.

15      Judge, I'm sorry, I want to correct something that I

16  sent a message to the Government about.

17      Although it's not acceptable that a lawyer makes a

18  misstatement in a court filing, but I wrote in my page 1 of

19  ECF 143, I wrote that it was two months since the Court's

20  order on January 16th to provide identification notice.

21  Obviously, that was in error because it was about three weeks

22  or so, but to me, although I shouldn't make that kind of

23  mistake, it's irrelevant because they should have done this,

24  as I have been arguing, long ago and not just in response to

25  the Court's order on January 16th.

*Proceedings*                                                      29

1        MR. SIEGEL:  We made the notice when we made it

2   because that's when the Court ordered us to make it.

3        THE COURT:  Mr. Stein's point is you could have made

4   it earlier.  Are you saying that there's nothing that required

5   you to make it earlier, or are you saying that you hadn't made

6   up your mind until you --

7        MR. SIEGEL:  I'm saying there isn't anything that

8   required us to make that earlier, we hadn't made up our mind,

9   and I've been corrected by my colleagues, we frankly still

10  haven't made up our mind.  It's something that we are giving

11  active thought to, it's something that we are going over the

12  witnesses in prep, but --

13       THE COURT:  I think that was Mr. Stein's point

14  before, that he doesn't really know yet.  You haven't

15  really --

16       MR. SIEGEL:  But we don't really know yet, and I

17  don't know that we will know until that day.  I mean, for

18  purposes of Mr. Stein's motion, I think we can assume that we

19  are going to do it and we can resolve the issue on that, but

20  standing here right now, I don't -- I don't know what question

21  we are going to ask each one of these witnesses.  I think it

22  is a question we may ask.

23       THE COURT:  And I suppose to help fill in more of

24  the spaces, based on what you just said, I assume it's also

25  theoretically possible that you may ask some but not all of

*Proceedings* 30

1    these witnesses that question.

2             MR. SIEGEL:  That's right.

3             MR. STEIN:  Judge, with all due respect, I don't

4    know want any witness to be asked the question, whether it's

5    some or a few.  It's none.

6             THE COURT:  I hear you, but you also wanted to know

7    what their plan was, and I thought you were concerned about

8    not being informed, even at this point, as to whether or not

9    that was the plan.

10            MR. STEIN:  Correct.  That's why I moved to strike

11   the notice as insufficient.

12            Judge, can I just reference also -- again, in ECF

13   Number 143, footnote 1 on page 1, I cited the rule of criminal

14   procedure, which is Rule 12(b)4(A), which leaves it to the

15   Government's discretion, because it used the word "may" --

16   this is way back at the beginning of the case -- that they may

17   serve notice of its intent to use specified evidence at trial,

18   quote:  "At the arraignment or as soon afterwards as

19   practical."

20            Now we can go back and forth again about the Court's

21   order on January 16th about a request for the lineup back in

22   September, but the rules of criminal procedure required them

23   to give some kind of notice at the arraignment or as soon

24   afterwards as practical.  I mean, was I supposed to ask for a

25   lineup at arraignment?

*Proceedings*                                                               31

1        Judge, it's not a very lawyerly word, but I'm

2   listening to the Government argue about this, but this

3   shouldn't be something that's such an important issue because

4   it's no secret that identification is an important part of

5   this trial.  This shouldn't be a crap shoot.  They haven't

6   decided if they are going to ask.  If they do ask, they don't

7   know what the witness is going to say.  This is -- I mean --

8        MR. SIEGEL:  Your Honor, we've narrowed it down of

9   all the potential witnesses to four people we may call.  Those

10  four people are all similarly situated with the exact same

11  basis to identify him, so in terms of narrowing it down so

12  that we can have the discussion about whether this is

13  appropriate, as we submit it is, other than actually sitting

14  here right now and putting the witness on the stand and having

15  them give their testimony, which I'm not aware of any case

16  where that's been done, all we can say is that this is what we

17  intend; these are the four people we may ask it of, nobody

18  else; and the basis for it is what's shown on the surveillance

19  video that Mr. Stein has had for months, which is they stood

20  about two feet away from Elgin Brack, looked him in the eye

21  and spoke to him.

22        MR. STEIN:  Judge -- it would just be repetitive,

23  Judge.  I mean, I just think this is not an acceptable way to

24  proceed based on the law that I just quoted from and that is

25  in my papers.

*Proceedings*                                                        32

1        THE COURT:  We are going to analyze your case in

2   connection with *Matthews,* which is advanced by the Government

3   and see where we're at.  If there's no further argument on

4   that, we'll reserve on it and try to sift through it all.

5        Other points?

6        MR. SIEGEL:  Just to tick through some of the issues

7   in the motions in limine, there was back and forth about

8   Mr. Brack's prior criminal acts and prior arrests and criminal

9   history.  I don't know if we've reached agreement on that, but

10  the Government doesn't intend to cross him on that unless he

11  puts his character into evidence or otherwise gives testimony

12  that would be misleading without that context.  So we don't

13  intend to use it just to attack his general credibility as

14  felonies are sometimes used, but if he makes comments of "I've

15  never been in trouble with the law"; "I've never done anything

16  like this," or if there's any argument that that's not the

17  kind of person that he is who commits these violent crimes,

18  then I think evidence that he has been arrested and has

19  admitted to violent crimes in the past should be admitted.

20       MR. STEIN:  I don't think that's going to be an

21  issue.

22       Judge, can we just go back to something -- I know

23  Mr. Siegel is going through the in limine, but I wanted to go

24  back to something that has to do with one of the eyewitnesses.

25  This is the gentleman who was severely shot.

*Proceedings* 33

1    THE COURT:  Yes.

2    MR. STEIN:  Back in my original filing, ECF 85, I

3  asked that the victim, the injured witness, that his testimony

4  and the medical records be excluded because putting aside from

5  whether or not he can make an in-court identification, whether

6  or not his testimony is necessary, as opposed to the sympathy

7  that is undoubtedly going to be generated, because from my

8  understanding and looking at the medical records, he was very

9  badly injured, and I assume he's going to be permanently brain

10  damaged, so the whole point of his testimony, as I understand

11  it, putting aside the eyewitness aspect of it, it is -- they

12  want to be able to call him to prove discharge of a firearm,

13  which is one of the elements of Count Three of the indictment.

14    So I had pointed out five or six different ways that

15  they can prove discharge in this case, including a video, a

16  store video surveillance, in which the actual shooting takes

17  place.  So the perpetrator is standing next to this gentleman,

18  and you could see the gun being fired, they have ballistics

19  evidence to show that a gun was fired, they have New York City

20  Police Department officers who responded to the scene of the

21  injured person.  There's a number of different ways.

22    So, again, putting aside whether or not there's

23  going to be a courtroom identification from this witness,

24  can -- when this came up, Judge, in your order from

25  January 16th -- I have to find the tab -- so this is on

*Proceedings*                                                    34

1    page 28 of the Court's order, which is ECF Number 122, you

2    would reserve decision on this, I had moved to preclude

3    photographic and medical evidence of a witnesses -- of a

4    victim's injuries suffered during one of the incidents as well

5    as the testimony of the victim in the event that he cannot

6    identify.

7              Well, that gets back to the problem of whether or

8    not he can make an identification.  The point is, I don't know

9    whether he's going to make an identification, they don't know

10   whether or not he can make an identification, but this is

11   someone who was grievously injured, and it's unnecessary to be

12   able to prove the element in Count Three of discharge of a

13   firearm with all the other evidence they have to show that a

14   firearm is discharged, including a video of the actual

15   shooting.

16             MR. SIEGEL:  Your Honor, this is an eyewitness who

17   is going to say, I was working at the Duane Reade, this man

18   approached me, he demanded money, and then we struggled and I

19   was shot.  That's testimony that comes in in courts all the

20   time every day in this courthouse and around the country, and

21   it's not unduly prejudicial for a witness to say I was shot.

22             THE COURT:  I think Mr. Stein was referring to more

23   than that, wasn't he?

24             MR. STEIN:  I am, Judge.  It's the 403 analysis.

25             THE COURT:  And then what happened?  You know, what

1    was the nature of the injury itself?

2           MR. STEIN:  Judge, I understand he's in a facility,

3    I don't know whether he's ever going to be discharged from the

4    facility and he's in very bad shape, so is this really

5    necessary to prove discharge of a firearm when they have a

6    number of different ways --

7           THE COURT:  Yeah, the sequela of what happened after

8    he was shot is certainly not necessary.

9           MR. SIEGEL:  So let me be clear.  We are not going

10   to ask him:  Do you live in a facility?  What are your plans

11   for the rest of your life?  How has this affected you?  We are

12   not going to be asking those questions.  We are not going to

13   be showing bloody photographs of him lying on the floor.  I

14   think we've actually made a very serious effort to not bring

15   in the things that are gory or inflammatory.

16          THE COURT:  Inflammatory, yeah.

17          MR. SIEGEL:  But it is not inflammatory for a

18   eyewitness to say, I was robbed, which goes to the robbery

19   conspiracy and the robbery charge, and I was shot.

20          THE COURT:  Yes.

21          MR. STEIN:  My point is, Judge, again, whether this

22   is necessary to prove discharge when they have all these other

23   ways and avoid the sympathy.  I hear what they're saying about

24   there's going to be no bloody pictures, there were pictures of

25   the wounds that are awful.  I'm talking about --

*Proceedings* 36

1    THE COURT:  He's going to be here, Mr. Stein.  The

2  principle issue goes back to the one that we spent the most

3  time on is whether or not he can make the identification.

4    MR. SIEGEL:  And I should also be clear that he

5  doesn't have, like, a piece of his -- he's not visibly missing

6  any piece of his head.  He's going to walk in on his own two

7  feet and testify.  He needs accommodations, as we've said.

8  That's -- that is the unfortunate consequence of Mr. --

9    THE COURT:  That's true of a lot of witnesses who

10  haven't been shot, so that's not unusual either.

11    MR. SIEGEL:  Given that there are cases where, in

12  fact, the gory photographs are admissible, the fact that we

13  are not admitting that but we just want the witness himself, I

14  think this is well within the bounds of what is ordinarily

15  admitted.

16    MR. STEIN:  Judge, I'm just referring to the Court's

17  order dealing with this particular issue.

18    THE COURT:  Right.  And it will be resolved,

19  Mr. Stein.

20    MR. STEIN:  Okay.  Well, in any event, it's on

21  page 28 and 29 of the Court's order, so we are back to the in

22  limine.

23    THE COURT:  Mr. Siegel.

24    MR. SIEGEL:  On the reverse side of talking about

25  Mr. Brack's -- any argument of Mr. Brack's good character --

*Proceedings*                                                    37

1        THE COURT:  I think Mr. Stein has indicated that

2   that is not an issue.

3        MR. SIEGEL:  That's right.  The reverse of that is

4   efforts to talk about Scott Brack's alleged bad character and

5   Scott Brack's criminal history and Scott Brack's guilty plea.

6   I think the Government laid it all out in its papers, but --

7        THE COURT:  I'm not sure I understand what Mr. Stein

8   is actually asking for there.

9        MR. STEIN:  Several things, Judge.  One is that you

10  take judicial notice of his guilty plea.  The record of his

11  guilty plea was sealed -- I'm not sure why, I can guess -- but

12  in any event, you can certainly take judicial notice of the

13  fact that he pleaded guilty to -- I don't even know what he

14  pleaded guilty to, I can just guess.

15       THE COURT:  I don't know why you would want that

16  because it would -- it would be reading the count that he pled

17  guilty to.

18       MR. STEIN:  Because part of our argument, Judge,

19  besides the identification is that two other people committed

20  the robbery, and it's no secret he --

21       THE COURT:  He pled guilty to conspiring with Elgin

22  Brack.

23       MR. STEIN:  Correct, Judge, but we are not asking,

24  obviously, that when -- if you take judicial notice of his

25  guilty plea that you would take -- you would include that.

*Proceedings*                                                    38

1   You would say on such and such a date, Scott Brack pleaded

2   guilty to -- whatever the count is he pleaded guilty to.

3           THE COURT:  And in fairness, the count would be

4   read.  And in that count, he pleads guilty.  Not just he pled

5   guilty, he pled guilty to conspiring with Elgin Brack and

6   others.  That's what you want the jury to hear?

7           MR. STEIN:  Of course, not, Judge.  Like I said,

8   what I wanted you to do -- what I'm asking you to do is to

9   take judicial notice that he pleaded guilty on whatever the

10  date is to whatever the charge is.

11          THE COURT:  To what?

12          MR. STEIN:  I don't know what the charge is.  It was

13  sealed.

14          THE COURT:  He pled guilty to conspiring to commit

15  Hobbs Act robbery.

16          MR. STEIN:  And he pleaded guilty to conspiracy to

17  commit Hobbs Act, period.

18          THE COURT:  I'm not shortening it at all.  That's

19  what he pled guilty to, not half of what he pled guilty to.

20          MR. STEIN:  Well, courts redact things all the time,

21  as we've been discussing here.

22          THE COURT:  The point of it all, I don't quite see

23  the relevance of it in any event.

24          MR. SIEGEL:  I think -- that's the Government's

25  view.  Even aside from making potentially misleading

*Proceedings*                                                     39

1   redactions to what he pleaded guilty to, it's not relevant.

2   The law is clear, the jury instructions are clear.  Only one

3   person is on trial here --

4              THE COURT:  -- on trial is what's relevant.

5              MR. STEIN:  Well, that's literally a correct

6   statement, but we are going to be arguing that two other

7   people committed the crime, one of whom was Scott Brack.

8              MR. SIEGEL:  They can argue that.  We will also be

9   arguing that Scott Brack committed this crime.  I don't think

10  that's going to be in dispute.

11             THE COURT:  They don't disagree with half of your

12  proof, Mr. Stein.

13             MR. SIEGEL:  Just like you couldn't put into

14  evidence, "Well, my co-conspirator hasn't pleaded guilty,

15  therefore, we're all not guilty," the fact that someone has

16  pleaded guilty is irrelevant to Mr. Brack's -- to Mr. Elgin

17  Brack's guilt.

18             And it is also, by the way, inadmissible hearsay.

19  All of it is.  So it's irrelevant, it risks infusing the jury,

20  it's hearsay, and the only thing that Mr. Stein is proposing

21  to be admitted is, frankly, misleading.  To argue that he

22  pleaded guilty to conspiracy; therefore, you can infer that he

23  conspired with someone other than Elgin Brack when, in fact,

24  what he pleaded guilty to is conspiring with Elgin Brack is

25  misleading to the jury.

*Proceedings*                                                40

1           MR. STEIN:  Judge, a long time ago I raised this

2      issue.  Their indictment says the two of them, the Bracks,

3      pleaded guilty with others unnamed.  So that's their

4      indictment, that's the language they put that in there, so

5      that gives us an opportunity to argue exactly what I'm arguing

6      which is that Scott Brack and another individual --

7           THE COURT:  Yeah, but you are dropping out the

8      "and," though, Mr. Stein.

9           MR. STEIN:  Excuse me?

10          THE COURT:  You are dropping out the "and."  "And

11     others."

12          MR. STEIN:  Right, and others.  Actually, I don't

13     know if that's the --

14          THE COURT:  That's where the misleading comes in.

15          MR. STEIN:  Well --

16          THE COURT:  One of the others is clearly identified

17     and it's the defendant.  You can't use that as evidence that

18     he pled guilty with others without acknowledging that he pled

19     guilty of -- one of the others, maybe there are others,

20     because that's what it was charged, but one of the ones that

21     is identified as one of the others of the entire conspiracy,

22     one of the co-conspirators -- two of the co-conspirators are

23     identified in the count; one is Scott Brack and the other is

24     Elgin Brack, and that's what he pled guilty to.

25          MR. SIEGEL:  Your Honor, I would also add and I

1   think it's pretty clear that part of the defendant's argument

2   is going to be that there was a third man involved in all of

3   this.  None of that -- even if there was a third man, that

4   doesn't mean that there wasn't the second man of Elgin Brack.

5   So this is sort of bleeding into the discussion about person A

6   and attempts to mislead the jury about person A, but Scott

7   Brack is not on trial, person A is not on trial.  They can

8   make their defense that Elgin Brack wasn't guilty, but the

9   fact that other people are also guilty is relevant to his

10  guilt.

11           MR. STEIN:  Judge, I completely disagree with that.

12  Are they really saying that we cannot argue that Scott Brack

13  and a third individual -- we don't have to dance around about

14  this -- who was a driver of the car, who was in there when

15  everybody was arrested, there's information that's relevant to

16  his circumstances.  So, I mean, are they seriously saying that

17  we can't argue that the third person in the car, along with

18  Scott Brack, were the perpetrators of the robbery?  I don't

19  think so.

20           MR. SIEGEL:  Maybe I was unclear.  If they want to

21  argue that Scott Brack was involved in this robbery, that's

22  fine.  If they want to argue that Scott Brack was, in fact,

23  the person in the store who pulled the trigger, I suppose

24  that's fine.  If they want to argue that a third person was

25  also involved, that's fine.  What's misleading to the jury is

*Proceedings*                                                          42

1   to bring in evidence that there were three people involved and

2   only one person is on trial here and therefore for some reason

3   they should acquit.

4            MR. STEIN:  No, I'm saying two people, Judge, not

5   three people.

6            THE COURT:  Yes, but that, Mr. Siegel, is what that

7   charge is all about at the end.  The jury is not to speculate

8   about why some of the names that you may hear aren't on trial

9   before them.

10           MR. SIEGEL:  Well, and that's an instruction that we

11  requested --

12           THE COURT:  That's a request that's always given and

13  it will be given.  I mean, if they want to talk about the fact

14  that Scott Brack is not here, if they want to talk about a

15  third party, I don't know what the good faith basis for that

16  or how they intend to offer proof about that --

17           MR. SIEGEL:  Well, the point I'm making --

18           THE COURT:  -- I don't know what's going to be in

19  the records that will permit you to argue.

20           MR. STEIN:  Judge, part of our in limine submission

21  are recordings from the Bureau of Prisons which arguably

22  implicate another person, so person A who hasn't been

23  identified by name in the record, but his nickname is Boogie.

24  So in some text messages and in some telephone calls that we

25  provided as exhibits, Boogie is talking with Scott Brack two

*Proceedings* 43

1  days before the robbery about what arguably is a plan to

2  commit a robbery.  So...

3          THE COURT:  How are they admissible?

4          MR. STEIN:  How are the text messages admissible?

5          THE COURT:  Yes.

6          MR. STEIN:  We cited a residual exception to the

7  hearsay rule, it's Rule 807 of the Federal Rules of Evidence.

8  My argument is in there because there's independent evidence

9  to show that that's -- that the discussions were reliable.

10  There's the text messages; there's the recordings from the

11  jail, although it's not -- obviously it's not admissible

12  evidence; there was a Pretrial Services report about Scott

13  Brack -- I'm not sure why they produced it in discovery -- but

14  there are independent bases to believe that the discussions

15  are of evidentiary value.

16          MR. SIEGEL:  I think Mr. Stein may be mixing a

17  couple different streams of issues or perhaps I'm confused.

18  There aren't any jail calls with person A as far as I'm aware

19  of.

20          MR. STEIN:  There are not.  There's text messages

21  between Boogie, who is person A, and Scott Brack.

22          MR. SIEGEL:  So let's separate those out.  The jail

23  calls are jail calls by the defendant, Elgin Brack, with

24  someone who is a relative of his, I believe an aunt or a

25  cousin, and calls between Scott Brack and that person.  Those

*Proceedings* 44

1  are just clear hearsay and to the extent they are -- they are

2  just clear hearsay and they don't fall under the residual

3  exception, especially Elgin Brack's own statements.  Both of

4  those were statements made by, then, the defendants, while

5  they were in jail and when they knew they were being recorded.

6  So arguments -- argument of that isn't in any way reliable,

7  that a defendant can create evidence that they can admit at

8  trial without testifying by just making a recorded jail call.

9  There are no cases cited by Mr. Stein where that has been

10  allowed and that doesn't fall into the logic of the hearsay

11  exception and it violates the rule that generally if a

12  defendant wants to get their statements in, they have to

13  testify.  So that's for those calls.

14           For the text messages with who is identified in the

15  text message chain as Boogie, what those text messages are, to

16  be clear, is Scott Brack asking to borrow a person's car

17  because something is going to happen and they say Friday or --

18  Friday or Saturday is when this thing was going to happen.  In

19  fact, these robberies, the robberies that we are talking about

20  happened on a Sunday night into Monday morning.  So, again,

21  these text messages, I don't know what the relevance is to

22  this robbery, but they are just going to mislead and confuse

23  the jury.

24           MR. STEIN:  Judge, the relevance is that he --

25  person A, Boogie, is planning a robbery with Scott Brack.

1   That's the relevance.

2            MR. SIEGEL:  There is nothing --

3            THE DEFENDANT:  Can I speak?

4            THE COURT:  Not now you can't.

5            MR. STEIN:  As I said, Judge, we are going to be

6   arguing; there's no secret about this that I'm disclosing

7   today, we have been arguing for some months in our papers that

8   we are going to be arguing that two other people committed the

9   robbery, Scott Brack and a third person.  I don't mean a third

10  robber, I mean a third person other than Elgin Brack.

11           MR. SIEGEL:  To be clear, these text messages don't

12  suggest -- don't say anything about a robbery.  It's

13  conversations about did you get the car for either -- there's

14  discussion about getting a car for today, which was three days

15  before the robbery, or for Friday and Saturday, which was two

16  days and one day before the robbery.  There's no discussion

17  about doing anything on the dates of this charged robbery and

18  there's no discussion about robberies, period.  There's

19  discusses about getting a car.

20           MR. STEIN:  Well, everything doesn't have to be in

21  black and white, Judge.  The fact that it wasn't on the exact

22  date or they didn't use the word robbery or stickup doesn't

23  mean that there isn't a basis to argue that this is what the

24  discussion was that was taking place between two other people.

25  I mean, we see tapes of recordings in drug cases all the time,

*Proceedings*                                                        46

1   and unless a prosecutor is really lucky, people don't say

2   cocaine or heroin, they use all kinds of different codes.  So

3   this isn't really any different.

4            MR. SIEGEL:  In those cases where there are wires

5   that Mr. Stein was referring to, those statements are

6   admissible as either statements of the defendant or statements

7   of co-conspirators of the defendant.  That doesn't apply where

8   the defendant is trying to admit statements by other people,

9   so that doesn't get around that even if these statements are

10  relevant, even if they are not going to just mislead the jury,

11  they're still hearsay.

12           MR. STEIN:  Judge, can I read from one particular

13  text message, which is from November 24th, two days before the

14  robbery, in which Boogie -- the driver of the car, person A --

15  is saying to Scott Brack:  "We said Friday or Saturday, my G."

16  Which I think G is just a street term of art.  "It's going

17  down this weekend, my G."

18           So it doesn't give a specific date, but it's pretty

19  clear that in the context that what is -- what they are

20  referring to from which we can make our argument.  It's one

21  thing to say that this is completely irrelevant, it doesn't

22  prove anything; they can argue what they want to that this

23  proves and we will argue what we want to what we think it

24  proves.

25           THE COURT:  And your argument for the hearsay

*Proceedings*                                                        47

1   objection again is?

2          MR. STEIN:  Well, this was -- I disagree with

3   Mr. Siegel's statement that we didn't cite any cases in our

4   papers supporting the application of the residual exception to

5   the hearsay rule.  I cited cases, Judge.  There are cases that

6   support this, including, I think, some reference to phone

7   conversations.  So you have the papers, Judge.

8          THE COURT:  I will look at them.

9          Do you want to be heard on that aspect of the

10  argument, Mr. Siegel?

11         MR. SIEGEL:  No, Your Honor.  I don't think this

12  falls into the residual exception for the reasons I already

13  gave, and I don't think it's relevant, and I think it's just

14  an attempt to mislead the jury or confuse the jury.

15         THE COURT:  I'm trying to remember if you -- there

16  was one aspect that the Government hadn't submitted papers on;

17  was this --

18         MR. SIEGEL:  This is an issue that came up in Elgin

19  Brack's reply was the first time we saw these text messages.

20         THE COURT:  Right.  So you have or have not

21  submitted anything in writing?

22         MR. SIEGEL:  We have not submitted anything in

23  writing.

24         THE COURT:  So you haven't cited a case one way or

25  the other on this matter?

*Proceedings* 48

1      MR. SIEGEL:  On this issue, that's right.  But for

2  the issue of text messages between --

3      THE COURT:  Whether they fall within the residual

4  exception to the hearsay rule.

5      MR. SIEGEL:  We have not cited cases on that, again,

6  because it just came up in the reply, but the heart of the

7  residual exception is that this be something that is otherwise

8  reliable and --

9      THE COURT:  Well, do you want to cite -- by the end

10  of the day, if you want to submit a letter on that subject,

11  since it came up -- in effect, it's sur-reply to the reply,

12  you may.

13      MR. SIEGEL:  We will do that, Your Honor.

14      Similar to this, there's questions -- there's the

15  defendant's efforts to admit evidence of Scott Brack's

16  criminal history as they laid out in their brief to prove his

17  propensity to commit violence.  Under Rule 404, that's not

18  allowed under the rules of evidence and we don't think that

19  should be allowed here.

20      THE COURT:  Do you want to be heard on that,

21  Mr. Stein?

22      MR. STEIN:  No, Judge.  I mean, it's not just --

23  it's not just violence that he committed.  He was also

24  convicted of a number of robberies as well as violent acts.

25      THE COURT:  Including this one.  He's being

*Proceedings* 49

1  convicted of this offense.

2     MR. STEIN:  Judge, the other part is -- I don't know

3  if Mr. Siegel is going to proceed further with Scott Brack,

4  but the other part of this was, unlike our client who was

5  employed and had literally money in the bank, Scott Brack was

6  unemployed and was in debt, so we wanted to be able to

7  introduce that to show that he had a motive to commit robbery,

8  unlike our client.

9     THE COURT:  Well, it backs up into the issue of

10  Mr. Brack's plea.  Mr. Brack has admitted committing --

11     MR. STEIN:  I understand that, Judge, but we wanted

12  to be in a position where we could make a --

13     THE COURT:  If that comes in, then this is

14  cumulative and serves no purpose.  If the idea is to offer

15  proof that he had a reason to commit a crime, when he's

16  admitted that he did commit the crime, we are not wasting any

17  time on that proof.

18     MR. STEIN:  Just briefly, Judge, we wanted to be

19  able to contrast that with Elgin Brack who doesn't have that

20  situation --

21     THE COURT:  That's not relevant.

22     MR. STEIN:  Okay.

23     MR. SIEGEL:  And Your Honor may have just ruled on

24  this, but also not relevant is any argument that Elgin Brack

25  was a hard-working guy who has held down a job for many

*Proceedings*                                        50

1   months.  To the extent they want to argue motive based upon

2   the money he had in his bank account -- I think Your Honor has

3   addressed that -- they would have to provide us with the

4   actual bank statements, as well as bank statements going a few

5   months back, to the extent that they want to prove he had a

6   job and this is how much he was paid, that's fine, but any

7   arguments about he was employed, he was a hard worker, he's a

8   good guy, unlike Scott Brack.

9           THE COURT:  Well, if he's taking -- in the usual

10  fashion, to the extent he takes the stand, if he's going to

11  take the stand, he will be permitted to ask him about those

12  kinds of things:  Where did you live?  Are you married?  Do

13  you have a job?

14          MR. STEIN:  Judge, we are not going to ask questions

15  which are going to suggest in some way that he's, quote, a

16  good guy, unquote.  We are going to show that he was

17  employed -- there's a certified record, I don't think they are

18  disputing it, the admissibility or the relevance of it, as to

19  motive -- lack of motive.

20          THE COURT:  This is in connection with live

21  testimony, Mr. Stein, or what?

22          MR. FARRELL:  Background.

23          MR. STEIN:  Well, it doesn't have to be in

24  connection with live testimony because it's a certified record

25  of his employment with the New York City Parks Department.

*Proceedings*                                               51

1   They also -- we are going to be including them as exhibits,

2   but when they arrested Mr. Brack, there were a whole bunch of

3   receipts -- pay receipts -- paycheck stubs from his job, so

4   those are going to -- they took them from him when he was

5   arrested, those are going to be exhibits.  Again, it all has

6   to do with motive, Judge.

7              THE COURT:  What else is on the list?

8              MR. SIEGEL:  In the motions, there was discussion of

9   person A and identifying whether he was going to testify in

10  providing his last known address; we will either include him

11  or not include him on our witness list which we are going to

12  be providing on Monday of next week.  We have provided his

13  last known address to Mr. Stein and Mr. Farrell as set forth

14  in the motion.

15             One thing I do want to raise, in the event --

16             MR. STEIN:  I'm sorry.  I don't know if you are

17  going off on another subject.

18             MR. SIEGEL:  I'm not.

19             MR. STEIN:  On that note, Judge, I don't know what

20  was going on, maybe something just fell through the cracks,

21  but on February 13th, we got a message from the Government

22  saying that that night they would provide us with person A's

23  address, so that was sometime last week.  We got person A's

24  address at 10:50 p.m. last night.

25             MR. SIEGEL:  I have no excuse for that other than I

*Proceedings*                                                          52

1   have been juggling a lot of balls with trial.  I did tell

2   Mr. Stein we would provide it on, I think he said the 14th; I

3   did not provide it until the 17th.  It has been now provided

4   two weeks in advance of trial.

5              MR. STEIN:  We are all working hard, but they are

6   going to be arguing -- there's no secret, we are not dancing

7   around here -- they are going to be arguing that this was an

8   equally available witness so therefore we can't make an

9   argument they didn't call him so they are hiding something or

10  he's guilty or whatever, so this discussion is in the context

11  of they're making a requested charge which they have done for

12  equally available witnesses, and we are going to disagree as

13  to whether or not that's, in fact, true.

14             MR. SIEGEL:  Your Honor, just to clarify on the

15  issue of equally available, the defendant attached exhibits to

16  his last motion with text messages by Boogie who he says is

17  person A.  Those text messages include Boogie's phone number,

18  so they have had that since March or April, which they could

19  have easily used to reach out.  We also provided records for

20  where he was staying at the YMCA, which was his last, last

21  known address.  They have had this, I think, since -- at least

22  since last year.  So despite the fact that there was this

23  three-day delay in getting them his current last known

24  address, I don't think there is any argument that he is

25  equally -- he's equally available or equally unavailable and

1  that they have had his phone number, assuming that this Boogie

2  person is, in fact, person A; they had the records for the

3  YMCA, which is where he was staying; and now, as of yesterday,

4  they have all the information we have.

5          MR. STEIN:  Judge, I believe that the YMCA address

6  that Mr. Siegel is referring to is a homeless shelter where

7  this person was staying temporarily.  I don't know this for a

8  fact, but it's my belief he's long gone from there.

9          One thing leads to another.  I don't know whether or

10  not they intend on introducing as an exhibit -- they haven't

11  sent us their exhibits yet, but one of the things they

12  produced in discovery, production number 18, was certified

13  records which are incomplete, certified records from the YMCA

14  to show that on certain days in late November of 2018, person

15  A was living there and, in effect, they were trying to

16  establish -- I think, if they are going to offer this -- an

17  alibi to show that person A was signed-in for the night at the

18  YMCA.  I don't know whether they planned on offering this.  If

19  they do, rest assured I will be objecting on *Crawford* grounds

20  that this is a violation of the defendant's constitutional

21  right; they have some clerk in a YMCA shelter certifying some

22  records that were cut off at the top that he was there at the

23  time, but we will deal with that as it comes up.

24          MR. SIEGEL:  Well, actually, Your Honor, this is the

25  first time I have heard about this issue, so it might be good

*Proceedings* 54

1    to raise this earlier than at trial if this is an issue

2    Mr. Stein wants to raise.  I don't know in what way he's

3    saying they're incomplete, I haven't seen any briefing on the

4    *Crawford* issue.  I think records created by the YMCA in the

5    regular course of their business are not testimonial anyway,

6    so to the extent Mr. Stein is anticipating an issue, I think

7    we should address that before trial instead of having a

8    prolonged sidebar or briefing while the jury is sitting and

9    waiting.

10            MR. STEIN:  Judge, they are incomplete because, on

11   July 9th, 2019, I sent a message to the Government saying that

12   part of the top of one of the pages, an important page, was

13   cut off so you can't see the information.  And the response

14   from the prosecutor was, that the pages that were produced to

15   you in discovery are the only version in the Government's

16   possession.  If we receive additional copies from the YMCA, we

17   will produce those copies.  So that's my reason for saying

18   they're incomplete; part of the top of the page which has

19   dates and symbols and stuff, to be able to interpret these

20   records in some way, is cut off.  So that's what I mean by

21   incomplete.  And if this record from the YMCA is going to be

22   part of their exhibit, I don't need to busy the Court with yet

23   more litigation, so if it's on their exhibit list, we are

24   going to be filing an objection on *Crawford* grounds.  It's a

25   violation of the defendant's constitutional right to

*Proceedings*                                                          55

 1  confrontation because -- bring in the clerk, or whoever has

 2  personal knowledge of whether or not person A was there that

 3  night or not.

 4          MR. SIEGEL:  Like I said, Your Honor, I think the

 5  law is pretty clear that business records from a non-law

 6  enforcement agency are not -- do not raise *Crawford* issues,

 7  but Mr. Stein can -- he can submit a letter on this before

 8  trial and we can address it before trial and Your Honor can

 9  resolve it.

10          On person A, I want to flag the issue, in the event

11  that the Government does not call person A, and in any event

12  that the defendant intends to call person A, as they've eluded

13  to, I think it would be appropriate for the Court to briefly

14  examine him outside the presence of the jury to determine if

15  he's just going to plead the Fifth.  If person A is just going

16  to plead the Fifth Amendment, there is a great deal of case

17  law that I can cite that it's appropriate for the Court to

18  determine that beforehand, and if he's just going to plead the

19  Fifth to not have him do that in front of the jury.

20          MR. STEIN:  I don't know if that's correct or not,

21  but we'll see, I guess, when we get to that point.  That will

22  be interesting, though, if he does, if nothing else.

23          MR. SIEGEL:  Just to make sure, there is -- just to

24  start, there's the ABA Standards for Criminal Justice,

25  Section 4-7.7, which says that defense counsel should not call

*Proceedings*                                          56

1    a witness in the presence of the jury when counsel knows the

2    witness will claim a valid privilege not to testify.  If

3    defense counsel is unsure whether a particular witness will

4    claim a privilege not to testify, counsel should alert the

5    Court and the prosecutor in advance, and outside the presence

6    of the jury, so that exactly that kind of inquiry can be made.

7          There's a 1999 Eastern District case by then

8    District Court Judge Reena Raggi, which is *Hernandez vs.*

9    *Senkowski*, S-E-N-K-O-W-S-K-I, and that's 1999 WL 1495443.

10          MR. STEIN:  Hernandez versus what?

11          MR. SIEGEL:  Senkowski, S-E-N-K-O-W-S-K-I.

12          And at page star 14, Judge Raggi rejected as

13    meritless any claim that Hernandez, who is the defendant

14    there, was entitled to have the witness invoke the Fifth

15    Amendment before the jury.

16          There is similarly a 2005 Second Circuit case,

17    *Greiner v. Wells*, G-R-E-I-N-E-R v. Wells, W-E-L-L-S, which is

18    417 F.3d 305, 2005, which rejected a claim that a court should

19    have allowed a defendant to call a witness in front of the

20    jury to invoke the Fifth Amendment and noted that the Court,

21    by excluding that evidence -- or, excuse me -- this was an

22    ineffective assistance of counsel claim, so the attorney, by

23    refusing to call the witness in order for him to invoke the

24    Fifth, acted consistently with the norms of practice reflected

25    in the ABA standards and with well established New York law in

1   refusing to call him to the stand.

2          So, according to those cases and others, to the

3   extent person A intends to plead the Fifth, the Court should

4   determine that outside the presence of the jury, and if that's

5   what he's going to do, he should just not be called at all.

6          MR. STEIN:  Maybe the Government can cut down on

7   some of the guesswork and tell us whether or not -- if they've

8   spoken to this person, whether he intends on invoking his

9   Fifth Amendment privilege.

10         MR. SIEGEL:  The first step is the Government --

11         THE COURT:  Maybe by after Monday, the 24th, we will

12   find out.

13         MR. SIEGEL:  I think that's right.

14         THE COURT:  Stay tuned.

15         MR. STEIN:  Always.

16         MR. SELDEN:  I think that's everything the

17   Government wants to be heard on.

18         THE COURT:  Mr. Stein, do you have more?

19         MR. STEIN:  No.

20         THE COURT:  All right.  Let's check with

21   Mr. LoMonaco and see if he has any inquiry.

22         MR. STEIN:  Judge, Mr. Brack wanted to address the

23   Court when it's convenient.

24         THE COURT:  Mr. LoMonaco says you've covered too

25   much.

*Proceedings*                                                    58

1            Mr. Brack wants to address the Court?

2            THE DEFENDANT:  All right, so just let me know if

3    you can't hear something I say.  I want you to get word for

4    word what I say.

5            All right, so I don't know what's going on here, but

6    I feel like my due process and my speedy trial, my fair -- my

7    right to a fair and speedy trial is being violated.  The lady

8    that's reporting this, you look at the transcripts or whatever

9    she puts out afterwards, you will see that the prosecutor just

10   lied more than three times today.  And I haven't been getting

11   my discovery, so I haven't, like -- like, that's not fair.  I

12   can't look at discovery on time.  You get in court lying to

13   the judge about motions, like, come on.  Like, this is not

14   fair, and we all know this is not fair and I know I'm not the

15   only one paying attention, so I think something needs to be

16   done.

17           Like, that's just what I want to make word for word.

18   I hope you could please put that down.  Thank you.

19           THE COURT:  Your words are on the record.

20           THE DEFENDANT:  Thank you.

21           THE COURT:  Anything further?

22           MR. SELDEN:  Not on behalf of the Government, thank

23   you, Your Honor.

24           MR. STEIN:  Judge, just on logistics?  So, assuming

25   we finish on March 2nd, jury selection, are we going to come

*Proceedings*                                                      59

1    forthwith to the courtroom or will we await instructions?

2            THE COURT:  As I say, I generally am guided by

3    counsel.  Of late, counsel -- most counsel, both in civil and

4    criminal cases, seem to want to start on a fresh day, even if

5    the jury selection is fairly quick.  Obviously, if the jury

6    selection drags into the post lunchtime, then we definitely

7    will start on the next day, so I'm guided by what counsels'

8    wishes may be.

9            Do you have a preference, Mr. Stein?

10           MR. STEIN:  I probably would like to start the next

11   day because jury selection can be pretty intense.

12           THE COURT:  Yes, and I agree.  As I said, most

13   counsel have opted for the fresh day start.  I'm not opposed

14   to that.

15           Mr. Selden, do you have a view?

16           MR. SELDEN:  Your Honor, thank you, just two brief

17   points for the record.  The Government would like to get the

18   trial commenced actually on the first day of jury selection,

19   consistent with what Mr. Elgin Brack has said on the record,

20   he would like to utilize his speedy trial rights, and any

21   additional delay we would prefer consistent with what he has

22   voiced and consistent with what, hopefully, would be a quick

23   jury selection in the morning to get started with witnesses

24   that day, in addition to openings, that would be the

25   Government's position.

*Proceedings*                                                    60

1          MR. STEIN:  Judge, it's hard to believe that his

2     speedy trial rights are going to be affected in any way by --

3          THE COURT:  I don't think they are either, and if

4     based on Mr. Selden's articulation of the Government's

5     position, Mr. Stein, do you still adhere to your original

6     request?

7          MR. STEIN:  To the next day?

8          THE COURT:  Yeah.

9          MR. STEIN:  Yes.

10         THE COURT:  Well then, that's what it will be.

11         MR. SELDEN:  And fully not questioning the Court's

12    decision and we respect that, I will note that Mr. Brack was

13    just raising his hand.  We want to just put that on the

14    record, understanding the Court has made a ruling.

15         THE COURT:  Mr. Brack, you were raising your hand?

16         THE DEFENDANT:  I just wanted to make it known that

17    the due process of fair speedy trial, that's what I was

18    calling fair.  You coming to court lying in front of the Judge

19    and everybody, that's not fair --

20         THE COURT:  I don't want to hear any more about

21    that, mister.

22         THE DEFENDANT:  I'm just being honest.

23         THE COURT:  Well, you've already made your

24    statement.  I don't want to hear it repeated.

25         THE DEFENDANT:  Yes, Your Honor.

*Proceedings*                                                     61

1        MR. SELDEN:  Your Honor, just with regards to the

2   logistics, we understand the Court and parties should be

3   presents at 9:30, Mondays through Thursdays.

4        Is the Court planning to sit on Fridays for this

5   particular trial?

6        THE COURT:  Generally, we do not sit on Fridays.

7   The most notable exception to that rule is that if we have a

8   deliberating jury, then we bring a deliberating jury back in

9   on Friday and, as with all scheduling rules, they are all

10  subject to change.

11       MR. SELDEN:  Of course.

12       THE COURT:  So it can be, given the way the flow of

13  the trial is -- I mean, let me be blunt, have I trashed my

14  ordinary Friday calendar to allow the trial to continue -- a

15  trial to continue?  I have.  If I think the circumstances of

16  the case warrant that, that's what we will do.  So yes, we go

17  into this assuming you are not here for trial on Friday, but

18  I'm not giving you an ironclad "no," there's no way, no how

19  that you won't be here.

20       MR. SELDEN:  Thank you, Your Honor.

21       THE COURT:  That's as fair as I can be.

22       MR. SELDEN:  And I think I've misspoken and my

23  colleague, Mr. Siegel, has corrected me in terms of my

24  understanding.  The court starts at 9:30 or ten o'clock?

25       THE COURT:  It's 9:45.  What we tell the jury is

*Proceedings* 62

1    9:45 and we try to get started at 10:00, or as close

2    thereafter as we can.  Those that have been here before know

3    that we try to take a midmorning break and a midafternoon

4    break, and we try to break around 1:00 and we try to break

5    around 5:00, but all of those are clearly not set in stone.

6    Court reporters can speak painfully to that, that sometimes we

7    run -- if the folks are on a roll, we continue to roll, and

8    there really is no hard and fast rule about when we end.  If

9    we can finish a witness, sometimes we'll be here for more than

10   an hour.  If we have out-of-town witnesses, we certainly try

11   to accommodate those witnesses so that they don't have to

12   spend a night overnight and come back the next day, and things

13   of that nature.  So we are very flexible about all the other

14   deadlines during the day, so we are definitely not rigid about

15   timing, but if things are going according to the blueprint,

16   the blueprint would be midmorning, midafternoon break, one

17   o'clock lunch, five o'clock adjourned.

18              MR. SELDEN:  Thank you very much, Your Honor.

19              THE COURT:  William wants to make sure that we don't

20   have any snafu.  The trial will be targeted for 9:45.  Judge

21   Orenstein will be selecting the jury at 9:30 in this

22   courtroom, so that on that first day, it is 9:30 and it will

23   be in this courtroom.

24              MR. SELDEN:  Thank you, Your Honor.

25              MR. STEIN:  Judge, since we've agreed in principle

*Proceedings*                                                               63

1   to a number of stipulations, does the Government have a rough

2   estimate as to how long they project the trial will last from

3   their point of view?

4           THE COURT:  Well, that's always a good question.

5           MR. SELDEN:  Of course, Your Honor.  Assuming that

6   the stipulations are all agreed to, the Government would

7   anticipate concluding the Government's case in chief by our

8   second week of trial, hopefully early in the second week of

9   trial.

10          THE COURT:  Second?

11          MR. SELDEN:  Yes.

12          THE COURT:  That would be the week beginning

13  March 9th?

14          MR. SELDEN:  I believe so, Your Honor.

15          THE COURT:  And we will go from there.

16          Anything else we need to address?

17          MR. SELDEN:  Nothing further on behalf of the

18  Government.

19          Thank you, Your Honor.

20          THE COURT:  So as of right now, unless we have the

21  need for it, if something pops up or if we need further

22  clarification about something, then the next appearance will

23  be before Judge Orenstein on March 2nd, correct?

24          MR. SELDEN:  Yes, Your Honor.

25          MR. STEIN:  Yes.

*Proceedings*                                                                 64

1          THE COURT:  The time has been excluded to the

2    beginning of trial.  We will get all the matters on which

3    we've reserved, we will get that out as quickly as we can,

4    sometime this week and everybody will have a -- some further

5    understanding of where we're going and how we plan to get

6    there.

7          MR. SELDEN:  Thank you, Your Honor.

8          THE COURT:  Okay.  Good luck to all.  See you on

9    March 3rd.

10         MR. SELDEN:  Thank you, Your Honor.

11         MR. SIEGEL:  Thank you.

12         (Matter concluded.)

13

14                    *    *    *    *    *

15

16   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

17

18      /s/ Denise Parisi              March 5, 2019
     _____       _____
19      DENISE PARISI                        DATE

20

21

22

23

24

25