```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- x
UNITED STATES OF AMERICA,                :
                                         :
         -against-                       :
                                         :                    MEMORANDUM & ORDER
ELGIN BRACK,                             :
                                         :                    18-CR-684 (ENV)
                             Defendant.  :
                                         :
----------------------------------------------------------- x
```

VITALIANO, D.J.

On March 12, 2020, a jury returned a verdict convicting defendant Elgin Brack of one count of Hobbs Act robbery conspiracy; one count of attempted Hobbs Act robbery; one count of possessing, brandishing and discharging a firearm during a crime of violence; three counts of Hobbs Act robbery; and three counts of possessing and brandishing a firearm during a crime of violence. Trial Tr., Dkts. 173–180, at 1174:9–1177:13. Presently before the Court is Brack's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. Def.'s Mot., Dkt. 187. For the reasons that follow, Brack's motion is denied.

The Facts

The charges in this case arose out of a series of three robberies and one attempted robbery perpetrated at four convenience stores in Queens between approximately 3:30 a.m. and 5:45 a.m. on November 26, 2018. Crim. Compl., Dkt. 1, at 4–7. Brack was alleged to be the gunman who attempted to rob the first victim, whom he shot in the head and hand, and successfully robbed the next three. Id. His cousin, Scott Brack, was alleged to be the getaway driver who drove the pair to and from the locations of the robberies. Id. at 10. Before the trial, Scott Brack pleaded

guilty.[1]

      Elgin Brack chose a different path; he demanded trial.  The evidence of his guilt at trial was bountiful.  First, the government introduced surveillance video of each incident.  Each video showed the perpetrator entering a convenience store, brandishing a firearm and appearing to demand money from the clerk.  *See* Trial Tr. at 146:3–148:15, 155:7–158:1, 192:23–199:1, 250:25–254:25.  The perpetrator himself appeared to be a young, African-American male sporting a green-and-black hooded sweatshirt, black pants with zippers on the pant legs and a pair of white sneakers.  *See, e.g.*, Trial Tr. at 159:11–13.  Although the hooded sweatshirt partially obscured the perpetrator's hair and face, the jury could see for itself from the videos whether he resembled Brack in any meaningful way.  The victims themselves also testified at trial.  None of them made an in-court identification of Brack as the robber.  But, all of the victims indicated that the robber appeared to be in his late teens or twenties, which is consistent with Brack's age of 22 at the time of the robberies.  Trial Tr. at 147:25–148:4, 154:22–155:1, 199:5–7, 254:8–15.

      The prosecution continued to build its case solidly, brick by brick, by introducing a bundle of evidence to connect Brack to the firearm used to perpetrate the robberies.  The government began by calling NYPD Detective Thomas Nunzio, who testified that he recovered a .357 Magnum revolver and live ammunition from Brack's backpack.  Trial Tr. at 333:12–21, 336:8–12, 338:11–14, 357:5–358:25.  Next, the government called NYPD Detective Jonathan Fox, an expert in firearms and ballistic evidence comparison, who, based on a comparison between the bullet fragments recovered from the scene of the attempted robbery and test rounds

---

[1] The facts are taken from the evidence introduced at trial and are presented here, as they must be, in the light most favorable to the verdict of the jury convicting Brack of all charges proffered against him.  *See United States v. Aquart*, 912 F.3d 1, 10 (2d Cir. 2018).

fired afterwards, found that the firearm discovered in Brack's backpack was the same firearm that had been used in the attempted robbery. Trial Tr. at 582:15–22, 602:12–24. To connect his testimony, the government called NYPD criminalist Jessica Tarry, who testified that she gathered DNA from the grip of the firearm, Trial Tr. at 624:11–24, laying the foundation for Office of Chief Medical Examiner ("OCME") criminalist Matthew Goldstein, who testified that 94% of the DNA gathered from the grip matched Brack's DNA profile. Trial Tr. at 654:16–25, 673:24–674:25, 679:6–25.

  Next came a bucket of evidence offered by the government to connect Brack's cellphone to the robberies. The prosecution called ATF Special Agent Tyler Miceli, who testified that he found Brack's cellphone in the car in which Brack was arrested, and that the recovered cellphone was subsequently mined for data. Trial Tr. at 433:1–9, 510:9–21. The government then called ATF Special Agent Seth Mastropaolo, who reviewed for the jury a report generated from the cellphone to show the searches made on the phone on November 26 from 1 a.m. to 7 a.m. Trial Tr. at 723:11–14. He highlighted that searches were made for 24-hour convenience stores around the times of the robberies; for example, a search was made at 2:34 a.m. for "24-hour Family Store" and another search was made at 4:47 a.m. for "24-hour stores Jamaica Queens, New York." Trial Tr. at 724:12–16, 725:3–6.

  Then, to tighten the snare, the government called David Magnuson, an expert in the field of cell site data analysis and geolocation data analysis for cell phones. Trial Tr. 744:18–745:1. Magnuson walked the jury through an analysis of cell tower data to show that Brack's cellphone was in close vicinity to Scott Brack's cellphone throughout the early hours of November 26. Trial Tr. at 769:3–25. Further, and of particular note, Magnuson showed that at 3:54 a.m. Brack's phone was near 50-92 Northern Boulevard, the location of the second robbery, minutes

before it happened.  Trial Tr. at 766:15–767:11.

In a separate and compellingly incriminating proffer, the government offered evidence connecting Brack to the clothing worn by the shooter as seen on the surveillance video that had been received in evidence.  Special Agent Miceli testified that he recovered from the car in which Brack was arrested the green-and-black hooded sweatshirt.  Trial Tr. at 432:22–433:9.  Similarly, Detective Nunzio testified that he found a crime scene video-matching pair of black pants with zippers in Brack's backpack.  Trial Tr. at 351:10–25.  Lastly, closing another evidentiary loop, the government introduced a surveillance video from the afternoon before the robberies showing Brack walking down Hughes Avenue in the Bronx wearing these same articles of clothing.  Trial Tr. at 452:8–460:18.

In the teeth of this highly inculpating government case, the defense put on a limited case of its own.  Brack first called NYPD criminalist Daphne Mavris, who had examined the green-and-black hooded sweatshirt and black pants for DNA evidence.  Trial Tr. at 827:23–828:5.  She testified that in the course of her testing, she separately recovered a previously undiscovered McDonald's receipt from the pants showing a breakfast purchase in Newark, New Jersey at 8:29 a.m. on November 26.  Trial Tr. at 824:10–825:14.  Brack would later deny any knowledge of the receipt or the restaurant.  Trial Tr. at 912:9–25.

Moving to the last act of the play, in an effort to discredit the proof offered to connect Brack to the firearm and clothing recovered from the vehicle in which he was arrested, the defense called NYPD Detective Finbarr Fleming, who testified to Brack's arrest in the Bronx, including his removal from the vehicle used in the crimes.  Trial Tr. at 846:1–855:9.

Then came the most damning evidence of all: Brack's own testimony.  The jury apparently saw it for what it was—incredible.  He tried to tailor his testimony to refute the

4

convincing evidence produced by the prosecution.  Brack sought to explain why he was seen on video wearing the perpetrator's clothing while in the Bronx on November 25, the day before the overnight robbery spree would be carried out.  Brack explained that the clothes were not his, but rather clothes he had borrowed from one of Scott Brack's friends.  Trial Tr. at 883:8–884:25.  He also explained that, as seen in the video, he was actually on his way to shop for new clothes, and after shopping, he did not wear the green-and-black hooded sweatshirt or the black pants again.  *Id.*

Next, Brack told the jury that around 10 or 11 p.m. on November 25, Scott Brack and Person A,[2] with whom he had spent most of the day, decided to go back to New Jersey where Person A resided.  Trial Tr. at 887:13–22.  Brack said he stayed in the Bronx, but soon realized that he had lost his phone.  Trial Tr. at 887:23–25, 888:3–9.  Conveniently, as the yarn spun, that meant he did not have his phone at the time of the robbery spree.  Trial Tr. at 905:2–19.  Miraculously, as Brack's testimony disclosed, the "lost phone" was his again when Scott Brack returned to Hughes Avenue around 7 a.m. on the morning of November 26.  Trial Tr. at 906:2–8.

If it had not done so already, Brack's tussle with believability would then hit its zenith.  He testified to crisscrossing the Hudson River several times that day.  First, Brack joined his cousin Scott in the car and accompanied him back to New Jersey to pick up Person A.  Trial Tr. at 908:8–20.  Once in New Jersey, Brack was dropped off at a Wells Fargo to sort out an issue with his bank card.  Trial Tr. at 910:3–15.  Then, for reasons left unexplained in his testimony,

---

[2] As outlined in the Court's earlier ruling, Person A was not the owner of the car used to perpetrate the robberies, but he had borrowed it with permission from his brother and generally had been the only person to drive it for the past few months.  Suppression Mem. & Order, Dkt. 125, at 6.  Person A was not alleged to be present at the robberies and had apparently given Scott Brack permission to use the car, but was himself driving it the next day when Brack was arrested.  *Id.*

5

between about 11:00 a.m. and 3:00 p.m., Brack took a bus from New Jersey back to New York, and then took a bus from New York back to New Jersey. Trial Tr. at 914:4–22. Upon returning to New Jersey, Brack was picked up by Scott Brack again, and they returned to the Bronx together along with Person A. Trial Tr. at 914:23–915:10. After remaining at the Bronx apartment for a few hours, the same group left to bring Brack to a bus heading to North Carolina, at which point they were intercepted by the police. Trial Tr. at 917:9–14, 935:4–9.

To be sure, Brack's testimony was also sprinkled with flat out denials. Brack denied ownership of the revolver used in the shooting found in his backpack and denied that he had put it there. Trial Tr. at 925:11–25. As noted above, Brack also denied ownership of the green-and-black hooded sweatshirt and the black pants. Trial Tr. at 924:16–925:5. Adding to his collection of denials, Brack testified that the McDonald's receipt found in the black pants was not his and that he in fact did not make a purchase from McDonald's on the morning of November 26. Trial Tr. at 912:9–25.

Aside from his rapid-fire denials, Brack also sought to neutralize any motive to commit the crimes. Specifically, he testified that he had been employed with the New York City Parks Department in the year before the robbery, had made over $25,000 year-to-date, and had over $4,000 in his bank account as of November 26. Trial Tr. at 865:24–868:3, 875:7–11. Brack introduced bank receipts and paycheck stubs to corroborate this testimony. *Id.* Brack also testified that he had $6,000 of his own money in cash on him on November 26, explaining that he had intended to purchase a gift for Scott Brack's kids for the holidays. Trial Tr. at 906:25–907:14.

Finally, Brack told the jury that he is left-handed. Trial Tr. at 939:19–20. Supporting this testimony, he claimed that, upon his arrest, he signed a document outlining his rights with

6

his left hand, which was corroborated by Special Agent Miceli and went uncontradicted in the record. Trial Tr. at 509:16–21, 939:12–18. Brack's left-handedness was significant, as the video evidence showed the perpetrator handling the firearm with his right hand, while two detectives testified they ordinarily fire guns with their dominant hand. Trial Tr. 549:10–19, 607:23–608:2; *see also* Trial Tr. at 1047:19–1049:8. With those finishing touches, the case went to the jury.

## Legal Standard

Rule 33 gives a trial court the discretion to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Leavening it, case law makes clear that the discretion accorded by the rule is to be exercised "sparingly." *United States v. Fama*, 979 F. Supp. 2d 338, 341 (E.D.N.Y. 2013) (internal quotations omitted). "The test is whether 'it would be a manifest injustice to let the guilty verdict stand.'" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (citation omitted). For a court to grant a Rule 33 motion, "[t]here must be a real concern that an innocent person may have been convicted." *Id.*

While in assessing the requirements of the ends of justice, the trial court "is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses,'" it may not usurp the jury's role. *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) (quoting *Sanchez*, 969 F.2d at 1413). Only "where exceptional circumstances can be demonstrated" may the trial court "intrude upon the jury function of credibility assessment." *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000) (internal quotations omitted). Thus, although a decision to grant a new trial is reviewed for abuse of discretion, *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001), the trial court's freedom to reverse the credibility assessments of the jury is limited.

Discussion

I.      Motion to Suppress

Prior to trial, Brack moved to suppress evidence recovered from the vehicle in which he was arrested. The items seized included what police would discover was Brack's backpack. Def.'s Omnibus Mot., Dkt 85. On December 18, 2019, the Court held a suppression hearing. After considering the hearing evidence and the parties' briefing, the Court denied Brack's motion, holding that seizure of the car was proper under the plain view doctrine, and that Brack's arrest was supported by probable cause. *See* Suppression Mem. & Order, Dkt. 125, at 9–12. Further, although Brack did not give police consent to search his backpack, the Court found that Person A had consented to a search of the car and everything in it, and this consent gave officers apparent authority to search the backpack because they had no reason to know it was Brack's. *Id.* at 13–15. In the alternative, the Court also found that the evidence in the backpack would have been inevitably discovered by a valid inventory search. *Id.* at 15–17.

Brack now looses a broadside at the ruling denying his suppression motion. Def.'s Mem., Dkt. 187-1, at 3–18. Specifically, Brack claims that the evidence revealed at trial contradicts the Court's findings that (1) officers had apparent authority to search his backpack, (2) the evidence recovered from the backpack would inevitably have been discovered by an inventory search and (3) his arrest was supported by probable cause. *Id.* Each of Brack's contentions remain meritless.

As to the first point, Brack fires off no fewer than six reasons why the Court's finding of apparent authority was an error. First, Brack contends that this finding was contradicted by the trial testimony of Detective Sergeant Keith Bryan, who was present during Brack's arrest and testified that he observed Brack carrying a backpack before he entered the car. *Id.* at 4; *see also*

8

Trial Tr. at 309:10–310:2.  With knowledge of Brack's possession of the backpack prior to his arrest being of no strategic value to Brack if confined to Detective Sergeant Bryan, Brack argues, simply, that Detective Sergeant Bryan's knowledge should be imputed to at least the other members of the arrest team because those team members were in communication using point-to-point radio.  Def.'s Mem. at 4; *see also* Trial Tr. at 305:7–11.

     A review of the trial transcript reveals, however, that there is absolutely no testimony by Detective Sergeant Bryan that he communicated this fact (or any specific observation for that matter) to the rest of the arrest team.  *See* Trial Tr. at 305:1–310:25.  Moreover, even assuming for argument's sake that he did communicate this information over radio to the arrest team, Brack ignores that another team of officers separate from the arrest team of which Detective Sergeant Bryan was a member searched the vehicle.  Indeed, Brack points to no testimony suggesting that Detective Sergeant Bryan's observation was shared with those officers.  *See* Trial Tr. at 302:15–25, 330:1–16, 433:13–24, 847:20–848:4.  In short, there is no basis in the record to impute Detective Sergeant Bryan's knowledge about Brack's backpack to the officers who obtained consent to search the vehicle and its contents from Person A and, consequently, had apparent authority to search the bag.  *Cf. United States v. Roberts*, No. 18-CR-0096 (BMC), 2018 WL 4521206, at *2 (E.D.N.Y. Sept. 21, 2018) ("[T]he collective knowledge doctrine does not apply where 'there is no evidence that an officer has communicated his suspicions with the officer conducting the search, even when the officers are working closely together at a scene.'" (quoting *United States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016))).[3]

---

[3] In support of this theory, Brack also divines that Detective Nunzio, who traveled from Queens to join the ATF search team in the Bronx, was deliberately recruited to insulate the search team from Detective Sergeant Bryan's knowledge.  Def.'s Mem. at 4–5.  While Detective Nunzio's trip is unexplained, there is no record evidence from which to infer the nefarious purpose Brack suggests.

Switching gears, the defense next contends that the testimony of Special Agent Miceli debunks the Court's finding that the search team had apparent authority because he testified that he recognized one backpack as Brack's, but not a second backpack that was also found in the car. Def.'s Mem. at 5. While Brack is correct that Special Agent Miceli concluded that the backpack searched was Brack's, there is no evidence that he reached this conclusion *before* the search. Indeed, given that Brack's wallet with photo identification was found inside the backpack when it was searched, it is no mystery why this conclusion was ultimately drawn. Trial Tr. at 436:16–437:19.

Third, Brack clutches to two surveillance videos, one showing Brack wearing the backpack on Hughes Avenue on November 25, and another showing him wearing the same backpack at a store in North Carolina on November 21. Def.'s Mem. at 5. Brack presses that this shows the officers conducting the search knew the backpack was his when they searched it without his consent or warrant. The argument founders, though, on the facts Brack omits. First and foremost, the Hughes Avenue video was not recovered by officers until the day *after* the search and could not be the basis of any pre-search knowledge. As for the other, nothing in the record suggests that the North Carolina video was recovered before the search. Trial Tr. at 452:8–18.

The remaining three of Brack's six arguments on this point also fail scrutiny. In one of his three arguments, Brack objects that Person A did not confer apparent authority because he told officers that Brack "always walks around with a bag," Def.'s Mem. at 4. But, the Court had already found that this statement alone did not suggest that one of the backpacks in the car was actually Brack's. Suppression Mem. & Order at 14–15. His argument on this matter does not point to any other fact that the Court overlooked which might modify Person A's nebulous

10

statement about Brack's bag-toting practices.

In the next argument, taking a different tack, Brack claims that it was unreasonable for officers to rely on Person A's consent because the officers coerced it by detaining him and making references to his daughter and arrest record. Def.'s Mem. at 5–6. Yet, on the totality of the record, these facts do not show that Person A's consent was "a mere acquiescence in a show of authority" rather than a "free and unconstrained choice." *See United States v. Wilson*, 11 F.3d 346, 351 (2d. Cir.1993) (noting that an individual's consent to a search is a question of fact to be determined by the totality of all the circumstances). Pointedly, the defense fails to cite a single case suggesting that the circumstances here invalidated Person A's consent.

Last in this string, Brack claims that the Court did not explicitly find that Person A gave his consent *before* the search, but the documents relied on by the Court indicate that consent was given at 11:20 p.m., well before the search was conducted at 12:00 a.m. *See* Suppression Mem. & Order at 7, 14; Gov't Suppression Mot. Opp'n, Dkt. 103, Exs. D, F.

The balance of Brack's arguments on this aspect of his new trial motion, which is directed at the Court's adverse determination of his pretrial motion to suppress evidence, is, for all intents and purposes, a grand scale motion to reconsider the denial of suppression. For example, Brack takes aim at the Court's finding, in the alternative, that the suppression motion should be denied because the evidence that Brack sought to suppress would have been discovered in the course of a lawful inventory search of Person A's vehicle that the ATF task force later conducted. Def.'s Mem. at 8–9. In reaching its conclusion, the Court relied on the suppression hearing testimony of Lieutenant Smith and the government's proffer of the written inventory search protocol that controlled the search conducted by law enforcement. *See* Suppression Mem. & Order at 16. Citing *United States v. Gorski*, 852 F.2d 692 (2d Cir. 1988),

11

the defense argues that the government's showing at the suppression hearing was insufficient to establish the bona fides of a valid inventory search and that the deficiency was not cured by the government through additional trial testimony. Def.'s Mem. at 8–9. As much as Brack roots the other way, the government's showing needs no bolstering. As noted in the suppression ruling, Lieutenant Smith's testimony at the suppression hearing that his unit does inventory searches "as a matter of its regular practice" was "precisely what was missing in *Gorski*." Suppression Mem. & Order at 16 (internal citations omitted).

  Relatedly, the defense attacks the finding that evidence seized from the vehicle would have been inevitably discovered during a valid inventory search because of apparent deviations committed by the search team. Def.'s Mem. at 8–9. In particular, Brack cites to a several-week delay in creating the report of investigation and the search team's failure to catalogue the green-and-black hooded sweatshirt, which was taken from the car in an initial search, and the McDonald's receipt found in the black pants, which was recovered much later by a criminalist processing the clothing. *Id.* At any rate, where, as here, there is substantial evidence that a valid inventory search was conducted, the validity of that search does not dissolve merely because an item of evidence recovered in a search was not catalogued in the manner required by the protocol governing inventory searches upon which the finding of inevitable discovery rests. *See United States v. Lopez*, 547 F.3d 364, 371–72 (2d Cir. 2008) (holding that "failure to itemize every object" did not invalidate an inventory search).

  The last of Brack's three arguments challenging the denial of his suppression motion repeats the ill logic of his claim that if probable cause was lacking for his arrest, the search that led to the discovery of evidence used at trial would be invalidated. With his foundational focus on the probable cause to arrest, Brack highlights that neither Detective Sergeant Bryan nor

Detective Fleming, both of whom testified at trial to the circumstances of Brack's arrest, mentioned Lieutenant Smith's claim that he immediately recognized Brack from surveillance video, even though Lieutenant Smith claimed at the suppression hearing that he relayed this to Detective Fleming. Def.'s Mem. at 9–14. But, the defense's crazy quilt of transcript snippets does not weave a credible story. The Court found Lieutenant Smith's statement testimony at the suppression hearing to be credible, Suppression Mem. & Order at 11–12, and Brack fails to point to a single line of testimony from any witness either at the suppression hearing or at trial contradicting Lieutenant Smith's statement that he recognized Brack from his marathon review of surveillance videos of the robberies. *See* Def.'s Mem. at 9–14. Finally, as for the illogic of the argument, whether the members of the ATF task force had probable cause to arrest Brack has no bearing on the validity of the search challenged by the motion to suppress. As was explained in the ruling denying the motion to suppress, "the evidence recovered from the car is not a fruit of his arrest." Suppression Mem. & Order at 12. Furthermore, to the extent that any of the alternative theories validating the search hinged upon the existence of probable cause to arrest Brack, Lieutenant Smith's most credible testimony at the pretrial suppression hearing provided ample evidence of that. *Id.* Nothing in his lament about the denial of his suppression motion warrants revisiting the suppression ruling, much less a new trial.[4]

II.     Denial of His Right to Present His Defense

Brack sought to establish a reasonable doubt by showing the jury that he is left-handed.

---

[4] Perhaps in search of a more forgiving standard, Brack moves alternatively for the Court to re-open his suppression hearing. "The decision whether to re-open a suppression hearing lies soundly within the discretion of the district court." *See United States v. Perez*, No. 01-CR-848 (SWK), 2002 WL 1835601, at *1 (S.D.N.Y. Aug. 8, 2002). Since this is old wine in new bottles, for the same reasons recited above, Brack's motion to re-open the suppression hearing is also denied.

13

The evidence, Brack claimed, would prove he could not be the gun-toting robber because video surveillance showed the perpetrator handling the firearm with his right hand. Trial Tr. at 1047:19–1049:8. Incontrovertibly, neutralizing his contentions on this motion, Brack was given more than a fair and adequate opportunity to present that defense. To be specific, Brack elicited testimony from Special Agent Miceli stating that Brack signed a waiver of his rights with his left hand. Trial Tr. at 509:16–21. Brack himself also testified that he was left-handed. Trial Tr. at 939:12–20. This testimony went uncontradicted at any point during trial.

What he objects to now is the Court's refusal to allow him to introduce cumulative evidence. Brack's principal focus fixes on the Court's refusal to admit a video of him signing a waiver of his rights with his left hand. Trial Tr. at 372:16–374:25, 790:18–794:4, 894:16–895:15. Using its broad discretion over such matters, *see United States v. Gilan*, 967 F.2d 776, 780 (2d Cir. 1992), the Court balanced the probative value of Brack's proffer against its potential for prejudice, jury confusion or causing undue delay, as prescribed by Federal Rule of Evidence 403,[5] and declined to admit it. Trial Tr. at 374:17, 895:21–896:19. Under this rubric, the Court found that any probative value from the video was substantially outweighed by the danger of confusing the jury and needlessly presenting cumulative evidence. Trial Tr. at 895:21–896:19. Indeed, the added probative value of the proffered evidence was essentially nil since Brack's left-handedness had been conceded on the record. Trial Tr. at 896:11–19.

Brack now argues that this decision was an error and warrants a new trial because it violated his right to present the defense of his choosing. Def.'s Mem. at 18–21. This argument

---

[5] Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

falls far short of the showing required to prevail on a Rule 33 motion. First and foremost, Brack did present the defense of his choosing. He was precluded only from introducing evidence that was not only cumulative, but had the potential to confuse the jury, since it related to *Miranda* warnings, statements Brack may have provided law enforcement and why none had been admitted, merely to bolster proof on a conceded point. Brack's argument that demonstrative evidence may be more compelling than testimony does not change this analysis, as a criminal defendant's right to present evidence is not "unlimited," but is subject to "reasonable restrictions" as provided in the Federal Rules of Evidence. *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)).

  Furthermore, even if the evidence should have been admitted, the error would not warrant a new trial. The evidence introduced against Brack was overwhelming. The jury saw video surveillance of the perpetrator, whose face was partially uncovered and resembled Brack's. *See, e.g.*, Trial Tr. at 159:11–13. Also received in evidence was proof showing that Brack's DNA was on the grip of the firearm used in the robberies, that the firearm and the perpetrator's clothing were found in his backpack, that his phone was in the vicinity of one of the robberies just minutes before it occurred, and that Brack was wearing the perpetrator's clothes on video surveillance. *See* Trial Tr. at 351:10–25; 357:5–358:25; 432:22–433:9; 452:8–460:18; 766:15–767:11. Beyond that, Brack's testimony, in which he claimed that he was en route to shop for new clothes when caught on surveillance in the perpetrator's clothing, that he had coincidently lost his phone just prior to the robberies, and that he had traveled between New York and New Jersey two times in one day for no discernable reason, was, to be charitable, unpersuasive. *See* Trial Tr. at 883:8–884:25; 905:2–19; 914:4–22. Bluntly, there is no "real concern that an

15

innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

## Conclusion

For the foregoing reasons, Brack's Rule 33 motion for a new trial is denied in all respects.

So Ordered.

Dated: Brooklyn, New York
         November 22, 2020

                                              /s/ENV
                                    ERIC N. VITALIANO
                                    United States District Judge